```
 1              UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4

 5  ----------------------------------------
                                          :
 6  DAVID FERGUSON, et al.,               :
                                          :
 7           Plaintiffs,                  :
                                          :
 8       vs.                              :      CASE NO.
                                          :    C-1-02-039
 9  RYDER AUTOMOTIVE, et al.,             :
                                          :
10           Defendants.                  :
                                          :
11  ----------------------------------------

12

13       DEPOSITION OF:     FREDERICK L. WOLF

14       TAKEN:             By the Plaintiffs
                            Pursuant to Agreement
15
         DATE:              February 20, 2003
16
         TIME:              Commencing at 9:10 a.m.
17
         PLACE:             Kohnen & Patton
18                          441 Vine street
                            Suite 1400
19                          Cincinnati, Ohio  45202

20       BEFORE:            Debra J. Henderson, RPR
                            Notary Public - State of Ohio
21

22

23

24
```

```
 1    APPEARANCES:

 2
             On behalf of the plaintiffs:
 3
                     Thomas R. Koustmer, Esq.
 4                       of
                     Law Office of Thomas R. Koustmer
 5                   7 West Seventh Street
                     Suite 1800
 6                   Cincinnati, Ohio  45202

 7
             On behalf of the defendant Allied Systems, Inc.:
 8
                     Robert A. Winter, Jr., Esq.
 9                       of
                     Hemmer Spoor Pangbum DeFrank, PLLC
10                   Suite 200
                     250 Grandview Drive
11                   Ft. Mitchell, Kentucky  41017

12
             On behalf of the defendant Ryder Systems & Commercial
13             Carrier:

14                   David E. Larson, Esq.
                         of
15                   Larson & Larson, P.C.
                     11300 Tomahawk Creek Parkway
16                   Suite 310
                     Leawood, Kansas  66211

17

18           On behalf of the defendant Hanes Supply:

19                   Craig R. Paulus, Esq.
                         of
20                   Taft, Stettinius & Hollister, LLP
                     425 Walnut Street
21                   Suite 1800
                     Cincinnati, Ohio  45202-3957

22
             Also present:
23
                     Peter J. Terzian

24
```

```
1                          I N D E X

2    FREDERICK L. WOLF                                    PAGE

3       Cross-Examination by Mr. Koustmer                   4
        Cross-Examination by Mr. Larson                    33
4       Cross-Examination by Mr. Paulus                    35
        Further Cross-Examination by Mr. Koustmer         43
5       Further Cross-Examination by Mr. Larson           48
        Further Cross-Examination by Mr. Koustmer         50
6       Further Cross-Examination by Mr. Paulus           51
        Examination by Mr. Winter                         51
7       Further Cross-Examination by Mr. Larson           52
        Further Cross-Examination by Mr. Paulus           52
8       Further Cross-Examination by Mr. Koustmer         53
        Further Examination by Mr. Winter                 54
9
     EXHIBITS                              MARKED   REFERENCED
10
        Wolf Exhibit A                       38         38
11      Plaintiffs' Exhibit  G               -          20
        Plaintiffs' Exhibit  H               -          21
12      Plaintiffs' Exhibit  M               8           8
        Plaintiffs' Exhibit  N              15          15
13      Plaintiffs' Exhibit  Q               -          30
        Plaintiffs' Exhibit  U               -          28
14      Plaintiffs' Exhibit  V               -          25
        Plaintiffs' Exhibit  Y               -          27
15
                              - - -
16

17

18

19

20

21

22

23

24
```

```
1                       FREDERICK L. WOLF
2    of lawful age, a witness herein, being first duly sworn as
3    hereinafter certified, was examined and deposed as follows:
4                       CROSS-EXAMINATION
5    BY MR. KOUSTMER:
6         Q.    Sir, would you please state your full name,
7    spelling your last name?
8         A.    Frederick L. Wolf, W-o-l-f.
9         Q.    What is your address, sir?
10        A.    169 South Orchard Street, Brookville.
11        Q.    Brookville, Indiana?
12        A.    Ohio.
13        Q.    Oh.  What is the zip code?
14        A.    45309.
15        Q.    And your date of birth?
16        A.    ████ .
17        Q.    And your social security number?
18        A.    ██████
19        Q.    Where are you currently employed?
20        A.    Allied Automotive Group or Allied Systems.  I'm
21    not sure.
22        Q.    How long have you been employed there?
23        A.    21 years.
24        Q.    What did you do before that?
```

```
 1          A.    I was a truck mechanic, also.

 2          Q.    Where at?

 3          A.    I'm trying to remember.  American Truck

 4    Service.

 5          Q.    Where is that at?

 6          A.    The P.O. Box was in Centerville, Ohio.  That's

 7    all I can remember.

 8          Q.    What did you do there?

 9          A.    Truck mechanic.

10          Q.    How long did you work there?

11          A.    Approximately two years.

12          Q.    How about before then?

13          A.    Genes, Incorporation, G-e-n-e-s.

14          Q.    What did you do there?

15          A.    Truck mechanic.

16          Q.    How long did you work there?

17          A.    Approximately a year or two.

18          Q.    How about prior to Genes, Inc.?

19          A.    United States Navy.

20          Q.    Were you honorably discharged?

21          A.    Yes.

22          Q.    How long did you serve?

23          A.    4 1/2 years.

24          Q.    Did you go right in after high school?
```

```
1          A.    About six months later.

2          Q.    Do you have a high school degree?

3          A.    Yes.

4          Q.    Any other education beyond high school?

5          A.    Just various trade schools, job-related stuff.

6          Q.    Your career at Allied, what did you start out

7     as?

8          A.    Excuse me?

9          Q.    What did you start doing when you started

10    working for Allied?

11         A.    Just general maintenance, repair, and overhaul

12    of their tractor-trailer equipment.

13         Q.    You said that was 20 years ago?

14         A.    21.  February of '82 is when I started.

15         Q.    And what do you do for them now?

16         A.    Same thing.  Maintenance and repair of their

17    tractor-trailers.

18         Q.    What facility do you work in?

19         A.    Miamisburg.  It's a shop five miles south of

20    the actual terminal.

21         Q.    What terminal?

22         A.    The Moraine terminal.

23         Q.    And were you working back in September of 2000?

24         A.    Yes.  To my knowledge, I was.
```

```
1        Q.    Okay.  What terminal were you working at?

2        A.    Marian, Ohio.

3        Q.    Do you know a Dave Ferguson?

4        A.    Yes.

5        Q.    How do you know him?

6        A.    Well, he's a driver.

7        Q.    Now, you know he fell off his truck in

8   September -- I believe it was 7th of 2000?

9        A.    I didn't know that until recently.

10       Q.    Okay.  Do you know anything about the cable

11  that broke on the truck when he fell?

12       A.    No.

13       Q.    Did you repair it?

14       A.    Not to my knowledge.

15       Q.    Did you see it?

16       A.    No.

17       Q.    Okay.  Do you know what happened to it?

18       A.    No.

19       Q.    Have you heard anything about what happened to

20  it?

21       A.    The actual cable?

22       Q.    The actual cable.

23       A.    No.

24       Q.    Okay.  I will ask you some more questions about
```

```
1    it in a minute.

2          A.    Sure.

3          Q.    Let me show you -- I just got these from Allied

4    Automotive Group, produced today, pursuant to some answers

5    to Plaintiffs' Request for Production, Supplemental

6    Answers.

7                MR. KOUSTMER:  Let's mark this M.

8                (Plaintiffs' Exhibit M was marked for

9                identification.)

10         Q.    Can you identify that?

11         A.    It looks like the minutes of a safety meeting

12   which I was in attendance.

13         Q.    What is the date of the safety meeting?

14         A.    September 30th, 2000.

15         Q.    Okay.  And so you were in attendance there?

16         A.    Yes.

17         Q.    Is that normal for you to be in attendance at

18   these safety meetings?

19         A.    Yes.  I was like on the committee there, and we

20   tried to have monthly safety meetings.

21         Q.    How long were you on that committee?

22         A.    I'm not sure.

23         Q.    Are you on the committee now?

24         A.    No.
```

1        Q.    But back in 2000, September of 2000, you were
2   on the committee?
3        A.    Yes.
4        Q.    Mike Planaro was also on the committee?
5        A.    Palladino.
6        Q.    Palladino.  I'm sorry.  So the people in
7   attendance here are marked --
8        A.    Yes.
9        Q.    -- correct?  Okay.  Number 7 says, "A
10  discussion was brought up on the placement of safety cables
11  for trucks.  The shop is actively replacing all safety
12  cables as they become available."
13              First of all, were all the safety cables being
14  replaced on all of the trucks?
15       A.    I'm not sure.  There was no policy that I know
16  of.  I mean, we were replacing them as they came in.
17       Q.    What do you mean, "as they came in"?
18       A.    The cables, you know, we wouldn't get 100 of
19  them at a time.  They would come in six, eight, ten at a
20  time, whatever.
21       Q.    Well, where were they coming from?
22       A.    I have no idea.
23       Q.    So they would come into the shop, the
24  replacement cables, and how would you decide what trucks you

```
1    were going to replace them on?

2         A.    To my knowledge, just the ones that were

3    actually in the shop that we were working on, we would

4    replace the cables while we had the truck in the shop.

5         Q.    So, say you had X truck in your shop, and you

6    were working on whatever, the engine or whatever you work

7    on, and that day four safety cables came in, you would

8    replace all four on this truck?

9         A.    Well, if we had some in stock, we would replace

10   the cables if the truck was in the shop.

11        Q.    Let's imagine they were in stock.  If four came

12   in that day, that truck is sitting there, you're working on

13   something, you replace all four cables?

14        A.    Yes, before we release the truck, as per

15   instruction of my boss.

16        Q.    Who was that?

17        A.    Gordon Beal.

18        Q.    You saved me a question.  And how long had

19   this been going on?

20        A.    I don't know.

21        Q.    Had it been going on more than a month?

22        A.    I don't recall.

23        Q.    Well, were you -- you don't know if you were

24   doing these in 1999?
```

```
1          A.    I don't know.
2          Q.    Who were the mechanics that would be working on
3   the safety cables?
4          A.    Every one that was employed at the Marian
5   facility at the time.  There was 10 to 12 mechanics, I
6   believe.  To my recollection.
7          Q.    Okay.  And who were they?
8          A.    Bob Puddles.
9          Q.    Is he still there?
10         A.    Yes.  He's in Moraine -- or Miamisburg, I mean.
11         Q.    Okay.
12         A.    Mike Amera (phonetic).  Homer Ryman.
13         Q.    Is Mike still there?
14         A.    Yes.  Homer Ryman.
15         Q.    Ryman?
16         A.    Yeah.  R-y-m-a-n.
17         Q.    Is Homer still there?
18         A.    Yes.
19         Q.    At Miamisburg, right?
20         A.    Yes.  Frank Boetcher.
21         Q.    Boetcher?
22         A.    B-o-e-t-c-h-e-r, I believe.
23         Q.    Is Frank still there?
24         A.    Yes.
```

```
 1        Q.    Okay.

 2        A.    Roger Mart.

 3        Q.    M-a-r-t?

 4        A.    Right.

 5        Q.    Is Roger still there?

 6        A.    Yes.   Jerry Calulet.

 7        Q.    Is Jerry still there?

 8        A.    Yes.   I don't know if there was any more.

 9        Q.    How about a Tom Heller?

10        A.    I don't know him.  He was a terminal manager, I

11 believe, in Moraine.

12        Q.    Give me one minute, okay?

13        A.    Sure.

14        Q.    What were they being replaced with?

15        A.    What, the cables?

16        Q.    Yes.

17        A.    With a replacement cable.

18        Q.    Do you know what that was made out of?

19        A.    No, I have no idea.

20        Q.    Do you know if it was stainless steel?

21        A.    I don't know.

22        Q.    Do you know why they were being replaced?

23        A.    Not really.

24        Q.    Do you have a guess why they were being
```

```
1   replaced?

2           MR. WINTER:  I object to guessing.  Go ahead

3       and answer.  I move to strike, too.  Go ahead and

4       answer.

5       A.    Just, actually, because our boss told us to

6   replace them.  I wasn't privy to any information why we were

7   replacing them.  He said we have to put these cables on the

8   trucks.

9       Q.    Was there any memorandum that went around from

10  Decatur, Georgia that said they all had to be replaced, to

11  your knowledge?

12      A.    Not to my knowledge.  I didn't see them in any

13  memorandum from Delavan or any others saying to replace the

14  cable.  Not to my knowledge.

15      Q.    Had you ever seen one that had broken?

16      A.    Maybe once or twice.

17      Q.    Do you remember when that was?

18      A.    No.

19      Q.    So if a truck only had three replaced and one

20  not replaced, would that be because of the fact that they

21  weren't in the shop enough to replace it?

22      A.    Possibly.

23      Q.    If a truck came in and you were replacing a

24  cable and you had enough cables, would you replace all four
```

1    of the cables?

2         A.    Yes.

3         Q.    So the only reason it would be that one of the

4    cables was not replaced was because there weren't enough

5    cables in the shop at the time the others were replaced?

6               MR. LARSON:  Objection.  Calls for speculation.

7         A.    I guess so.

8         Q.    Did you ever inspect the truck that Mr.

9    Ferguson was injured on?

10        A.    No.  I don't even know what truck number it is.

11        Q.    As a member of the safety committee, was the

12   subject ever brought up before about replacement of the

13   safety cable at any of the other meetings -- minutes of the

14   meetings that you were at?

15        A.    Not to my knowledge, but it would be in the

16   minutes if they were.

17        Q.    And that would be the minutes of where?

18        A.    The safety committee meeting for Marian, Ohio.

19        Q.    And you said you don't remember when you were

20   on this committee?

21        A.    I don't remember the exact dates, no.

22        Q.    You were on the committee back in June of '00,

23   weren't you -- 2000?

24        A.    I don't know.

```
1          Q.     Okay.

2                 MR. KOUSTMER:  Let's mark this as N.

3                 (Plaintiffs' Exhibit N was marked for

4                 identification.)

5          Q.     Does that show June of 2000 and you being

6    present at a meeting?

7          A.     Yes.

8                 MR. WINTER:  Exhibit N, right?

9                 MR. KOUSTMER:  Yes.

10         A.     Yes, it does.

11         Q.     Okay.  Do you know how long you had been on the

12   committee prior to that?

13         A.     I can't recall.  A year.  I'm not sure.

14         Q.     Was Marian ever going to be used as a test site

15   for replacement of the cables?

16         A.     Not to my knowledge.

17         Q.     That would be shown in the committee meetings?

18         A.     I would think, yes.

19         Q.     Do you remember about it being chosen as a

20   test site?

21         A.     No.

22         Q.     Do you remember anything about that being put

23   on hold?

24         A.     What being put on hold?
```

```
1        Q.    A test site.

2        A.    No.

3        Q.    And that's for Marian, right?

4        A.    I worked in Marian, yes.

5        Q.    You don't know anything about Moraine?

6        A.    No, I do not.

7        Q.    Did you know whether or not they were ordered

8   to retrofit all of the trucks at one time with the safety

9   cables?

10       A.    No, just the ones that came equipped with them

11  are the only ones we were replacing, to my knowledge.

12       Q.    What does "retrofit" mean to you?

13       A.    I would say it would mean to equip a truck that

14  was not equipped at the factory.

15       Q.    During this period of time -- I might have

16  asked you this, but let me ask it again.  The cables, when

17  they would come in, do you know where they were coming from?

18       A.    No.

19       Q.    Do you know how many would come at a time or

20  would it be different?

21       A.    No.  Our supervisor took care of all of the

22  parts ordering and the parts receiving.

23       Q.    But you actually replaced cables, correct?

24       A.    Yes.
```

```
 1        Q.    As part of your job?

 2        A.    Yes.

 3        Q.    Okay.  When a truck was in there, how would you

 4   determine whether there was cables or not to replace?

 5        A.    If they had the older style on them, we were

 6   told to replace them.

 7        Q.    What would you do?  You were told to replace

 8   them, but how would you know if there was cable on site to

 9   replace them?

10        A.    We would just look on the shelf.

11        Q.    They were kept somewhere then?

12        A.    Right.  Parts shelves.

13        Q.    Were they being replaced all at the same time

14   or were there different kinds that were being used?

15        A.    I don't recall.

16        Q.    You said the "old kind."  Can you describe to

17   me the old kind?

18        A.    Well, the old kind had a straight bolt and

19   cable coming out the end.  The newer style that I remember

20   had an eyelet with a bolt connected to the eyelet.  They

21   were two different styles.

22        Q.    And so you were replacing with the bolt style

23   or what?

24        A.    With the eyelet style.
```

1      Q.     With the eyelet style?

2      A.     To my recollection, the ones we replaced, we

3  installed the eyelet style cable.

4      Q.     Let's take a look at this here.  We have a

5  cable.  Do you know how long this went on?

6      A.     No.

7      Q.     Is it still going on?

8      A.     We replaced some a couple of weeks ago, but it

9  was on a piece of equipment we got from other terminals that

10 were originally equipped with them and they had taken them

11 off.

12     Q.     So there were no cables on those whatsoever?

13     A.     No.

14     Q.     How long had it been that you were replacing

15 cables -- up to what point in time?

16     A.     I don't recall.  Up until --

17     Q.     Last year or 2001, were you still?

18     A.     Well, last year, see, trucks were being

19 redomiciled from Marian down to Moraine as the traffic

20 increased down here and they were winding operations up down

21 there.

22            I worked -- in 2001, December was my last month

23 up there.  And by then we only had, you know, ten pieces of

24 equipment up there.

1         Q.    Okay.

2         A.    And I believe, to my knowledge, all cables had

3   been replaced.

4         Q.    Do you know when all of the cables had been

5   replaced?

6         A.    No.  Over a period of time, you know?

7         Q.    Right.  That's what I'm trying to get at.  What

8   period of time?

9         A.    I don't know.

10         Q.    Were any still being replaced in 2001?

11         A.    I don't recall.

12         Q.    Let me show you a sample cable.  We have never

13   marked this as an exhibit.  It's the actual -- not the

14   actual cable that was broken but an actual cable.

15         A.    Uh-huh.

16         Q.    Are those the kind that were being replaced?

17         A.    Yes.

18         Q.    Okay.  And you say those -- they were being

19   replaced with the bolt?

20         A.    Eyelet.

21         Q.    Eyelet.  Do you know why they went to an eyelet

22   design?

23         A.    No.

24         Q.    Let me show you what I've marked before as

```
1    Plaintiffs' Exhibit G.
2                 MR. LARSON:  Are these the earlier exhibits,
3         Tom?
4                 MR. KOUSTMER:  Some are, some aren't.
5                 MR. LARSON:  I think I have these.
6                 MR. KOUSTMER:  Yeah, you do.
7                 MR. LARSON:  Okay, thanks.
8         Q.    Exhibit G, is that the type that was being --
9    you were replacing them?
10        A.    Yes, that is the newer style we were using as
11   replacements.
12        Q.    Okay.  Was that to keep them tighter?
13                MR. LARSON:  Object to the form.
14        A.    No.  They couldn't be too tight because the
15   doors to the cargo unit couldn't be opened.  You have to
16   have a little bit of slack in them.
17        Q.    Did they call them clotheslines?
18        A.    Sure.
19        Q.    Do you know why?
20        A.    I don't know.
21        Q.    You never heard a driver tell you why they were
22   called clotheslines?
23        A.    Not why.
24        Q.    What did you hear drivers say about it?
```

1          A.     Referring to them as clotheslines, it's what --

2   it gives the appearance of a clothesline.  I never saw any

3   actual clothes hanging on them, though.

4          Q.     Did drivers ever complain about them to you?

5          A.     Not to my knowledge.

6          Q.     So you don't remember if they did or didn't?

7          A.     No.  Drivers complain about a lot of things.

8   Unless they specifically write it up, you know --

9          Q.     Okay.  I will show you what has been marked as

10  Plaintiffs' Exhibit H.  One of them is the design you talked

11  about, but down below it is another design.

12         A.     Right.

13         Q.     Were you using that -- were any of those being

14  used to replace them?

15         A.     Early on, it's possible, yes.

16         Q.     Okay.  That is a different design than this

17  actual one?

18         A.     This is more like the original design.

19         Q.     But it's not the original design, correct?

20         A.     I don't know.

21                MR. LARSON:  Object to the form.

22         Q.     That is this other one we have here?

23         A.     They look the same to me.

24         Q.     You're saying these two look the same to you,

```
 1    the actual cables we have?

 2           A.    Yes.  They appear to.

 3           Q.    Did you actually involve yourself with any

 4    inspection of cables to see if ones were bad or not?

 5           A.    Periodically, during the preventive maintenance

 6    on the truck, we would look at them just to make sure they

 7    were there, basically.  We didn't stress test them or

 8    anything like that.  We would just visually inspect them.

 9           Q.    Is that before they started to be replaced?

10           A.    It's on a preventive maintenance worksheet,

11    different items you're supposed to inspect or look at.

12           Q.    Well, maybe I'm a little confused, because I

13    thought you said during this period of time when they came

14    in the shop you just replaced them with the eyelet no matter

15    what condition?

16           A.    I don't know the date, but, yes, we were told

17    to replace them all.  But prior to that, we inspect them

18    just visually, which we still do, you know?

19           Q.    What did you look for when you inspected them

20    visually?

21           A.    Just the wire being frayed or something like

22    that, you know, like if it wasn't intact, basically.

23           Q.    Did you actually bend them to look --

24           A.    No.
```

```
 1        Q.      -- past the coating that is on them?
 2        A.      No.
 3        Q.      There is a vinyl coating on them, correct?
 4        A.      Right.
 5        Q.      At the point where they -- you can use this
 6   one -- go up against the nut -- or what do you call this
 7   metal piece here?
 8        A.      Crimp fitting.
 9        Q.      It's been called a lot of different things in
10   these depositions.  Okay.  So you called it a crimp fitting.
11   Did you actually bend the lock between the vinyl coating and
12   the crimp fitting to see if there was any corrosion there?
13        A.      No.
14        Q.      That wasn't part of the --
15        A.      Not -- no.
16        Q.      No one told you to do that?
17        A.      No.
18        Q.      You just looked at it?
19        A.      Right.  We just visually looked at it.
20        Q.      Were you involved in replacing cables where
21   you would run out and there wouldn't be enough to replace
22   all four on a truck, so you would only replace one or two or
23   three?
24        A.      Yes.
```

1        Q.    How many times did you do that?

2        A.    I can't recall.

3        Q.    If that was done and the truck was put back in

4   service, would you put any warning on the truck?

5        A.    No.

6        Q.    So there's nothing to tell someone that all the

7   cables have not been replaced?

8        A.    No.

9        Q.    You just put the truck back in service?

10       A.    Yes.

11       Q.    And then the plan, I guess, was the next time

12  the truck came in for some other service you would get to

13  that cable?

14       A.    Yes.

15       Q.    What I'm asking directly is, there wasn't

16  something where you made a note that said truck A-87, next

17  time we get cables in, call it into the shop, we have one

18  more cable to go on it?

19       A.    No.  There was no campaign, per se, to my

20  knowledge.

21       Q.    So it would just be if that truck happened to

22  go in the shop for something else and you happened to have

23  some cables there, you finish the cable job?

24       A.    Yes.

1          Q.     And, likewise, during this time, there's no

2     campaign to go out and check all cables on all of the

3     trucks?

4          A.     I don't know that we physically went out to

5     check, physically, the cable.  Like I say, we replaced them

6     as the truck was in the shop for other repairs.

7          Q.     But there wasn't a period of time where you

8     all had to go out there and look at all of the cables to

9     determine which ones were better or worse than others?

10         A.     Not to my knowledge.

11         Q.     Exhibit V here.  That's another picture of

12    what you were replacing, right?

13         A.     Correct.

14         Q.     Now, has that changed at all?

15         A.     Yeah.  I believe the new ones are more like the

16    original style.

17         Q.     So we went from the original style, which is

18    this one that's broke here, right?

19         A.     Yeah.

20         Q.     Okay.

21         A.     The original crimp fitting straight bolt.

22         Q.     With the vinyl all of the way up to -- what did

23    you call this?

24         A.     I call it a crimp fitting.

1        Q.    Okay.  Crimp fitting, okay.  Other witnesses

2    referred to it as other things, so my mind is blurred on it.

3        A.    Well, it has been smashed on there, crimped.

4        Q.    Crimp fitting, that's good.  And so now they're

5    being -- they're being replaced with something like -- well,

6    what's in Exhibit V?

7        A.    What I call the eyebolt design.

8        Q.    The eyebolt design, okay.  Now they are being

9    fitted with what?

10        A.    The straight bolt kind.  Just like that.

11        Q.    Okay.  Like this other one we have here?

12        A.    Well, those are both the same, I believe.

13        Q.    Okay.  Something similar to that, though?

14        A.    Yes.

15        Q.    Do you know why they went from one design, to

16    one design, to another design?

17        A.    No.

18        Q.    You just did what they told you?

19        A.    Right.

20        Q.    Are you in the process of replacing the eyebolt

21    design, or are you just leaving those on and the new ones

22    you put on you're using this different design?

23        A.    We aren't actively replacing the eyebolt one.

24    If the cable is bad, we replace it with what we have in

1    stock.  And I believe the ones we have in stock are like the

2    original design.

3          Q.    And do you know when those were ordered?

4          A.    No.

5          Q.    And do you know what those are made out of?

6    Are they made out of stainless steel?

7          A.    I don't know.

8          Q.    Let's show you what is marked as Plaintiffs'

9    Exhibit Y.  That is an order form that came to me through

10   somebody's subpoena.  It's an 11/15/00 invoice date, and it

11   shows "1/4 inch-5/16 inch nylon coated stainless steel with

12   stainless steel threaded stud at each end.  Three inch of

13   thread, finished length ten feet."  Would that be what they

14   are now replacing them with?

15         A.    I don't know.  I assume, yes.  It sounds like

16   it would be.

17                MR. WINTER:  Object to the assumption.

18         Q.    Showing you a picture, which is Exhibit Number

19   U, these are the eyebolt style, correct?

20         A.    Yes.

21         Q.    Okay.  Are you instructed to have the bottom

22   taut and the top loose like that?

23         A.    No.

24         Q.    How do you know how much to tighten them?

1       A.      Well, it's just they can't be taut because the

2   doors won't open, so you leave a little slack in them.

3       Q.      It looks like, from that picture, that the

4   bottom is taut and the top is slack.  Was there a reason for

5   that?  Is that because of the door?

6       A.      It appears to me that the posts that they go

7   onto are bent slightly, which would make the top more slack

8   than the bottom.

9       Q.      Do those posts bend?

10      A.      I've seen them bend, yes.

11      Q.      Is that a problem?

12      A.      Not to my knowledge.  The driver could hit

13  something, low overhead, or something like that.

14      Q.      Are a lot of posts bent on the trucks that you

15  work on?

16      A.      Not that I recall.

17      Q.      Do you know a Thomas Fay?

18      A.      Yes.  He's a driver, also.

19      Q.      Do you know about his accident on August 8th of

20  2000?

21      A.      I heard that he fell off a truck.  That's all I

22  know.

23      Q.      Did you hear why he fell off the truck?

24      A.      No.

```
 1          Q.    You didn't hear that his safety cable broke?

 2          A.    No.

 3          Q.    Did you have anything to do with replacing his

 4    safety cable on the truck that he was on?

 5          A.    Not to my knowledge.

 6          Q.    Do you know what happened to the safety cable

 7    that broke in his case?

 8          A.    No.

 9          Q.    What about a Ray Thornton?

10          A.    Yes, he's a driver also.

11          Q.    Did you hear anything about his fall?

12          A.    No.

13          Q.    Do you know when that was?

14          A.    I didn't know he fell.

15          Q.    Now, you said you have or haven't seen these

16    cables that are broken?

17          A.    I've seen a couple.

18          Q.    A couple.  Do they break at what you call the

19    cringe, again?

20          A.    Crimp.

21          Q.    Crimp.  At the point where the crimp is?

22          A.    I believe that the one or two or three that I

23    saw, yes, they were broken in the same spot, approximately.

24          Q.    Same spot as the one we have there?
```

30

```
1        A.    Approximately the same spot, yes.
2              MR. WINTER:  It's a deposition exhibit to Mr.
3        Ferguson and Mike Palladino.  I think it's Exhibit Q.
4              MR. LARSON:  It would be the loose end of this,
5        right?
6        Q.    Do you know if they were being replaced at
7   other places other than the place you were at?
8        A.    No, I don't know.
9        Q.    Were you -- another facility merged with
10  yours, right?
11       A.    We were all one facility before we branched off
12  into two separate facilities for approximately four years,
13  then merged back into one again.
14       Q.    When did you merge back?
15       A.    It happened over a period of time, but the
16  final -- they closed the Marian facility in December of
17  2001.  And I was re-employed in Moraine in March of 2002.
18       Q.    And did the Moraine trucks have replacement
19  cables on them when you got there?
20       A.    I'm not sure.  I don't know.
21       Q.    To your knowledge, is the coating different on
22  the new one compared to the old one?
23       A.    I don't know.
24       Q.    You haven't noticed that?
```

1      A.    No.

2      Q.    As you were replacing the cables, what would

3  you do with the old cables?

4      A.    Throw them away.  Dumpster.

5      Q.    Okay.  So Gordon Beal told you to replace them,

6  correct?

7      A.    Right.

8      Q.    Did Bill Weaver have anything to do with that?

9      A.    I don't know.  He was in the Moraine facility

10  at the time.  I didn't work for him.

11      Q.    Okay.  Was there ever any official timetable

12  set up by the company, you know, we have six months, we need

13  to get these replaced, or anything like that?

14      A.    I don't know.

15      Q.    As far as you knew, it was just when a truck

16  came in for something, if there is some new safety cables up

17  in the parts department, you grab them and put on as many as

18  you had?

19      A.    Right.  If it had any old style on there,

20  replace them.  I wasn't aware of any timetable.

21      Q.    And you don't know how long that took?

22      A.    No.

23      Q.    It could have taken a year, it could have taken

24  two years, you have no idea?

1          A.     I have no idea.

2          Q.     And you don't know where the new replacement

3    cables were coming from?

4          A.     No.

5          Q.     Do you know where the new design is coming

6    from?

7          A.     No.

8          Q.     Now, if you didn't have enough for the four,

9    any particular order you used to replace them?  Did you

10   replace top ones, bottom ones, or anything like that?

11         A.     To my recollection, we were instructed to

12   replace the top ones if we only had two.

13         Q.     Who would have given you that instruction?

14         A.     Gordon Beal.

15         Q.     Anyone else give you any instructions about the

16   cable other than Mr. Beal?

17         A.     No.

18         Q.     Do you know a Tom Kelly?

19         A.     Never met him.  I believe he was a terminal

20   manager at Moraine.

21         Q.     Were you ever told that you could get extra

22   from Marian's cables?

23         A.     Extra?

24         Q.     Cables.

```
1        A.    I worked in Marian.

2        Q.    Okay.  Did you ever ship any to the other

3   plant?

4        A.    I don't know.

5        Q.    Moraine?

6        A.    I don't know.

7        Q.    Do you know a Rick Shivley?

8        A.    Yes.

9        Q.    Have you ever worked with him?

10       A.    Yes.

11       Q.    Where at?

12       A.    Moraine.

13       Q.    And what period of time did you work with him?

14       A.    I worked with him for 16 years, until the two

15  sites split, and I'm working with him again now.  He's the

16  yard mechanic, so I don't see him regularly, but I see him a

17  couple of times a week.

18            MR. KOUSTMER:  I believe that's all I have,

19       sir.  Some of these other gentleman might have a few

20       for you.

21            MR. LARSON:  I just have a couple.

22            THE WITNESS:  Sure.

23                   CROSS-EXAMINATION

24  BY MR. LARSON:
```

1      Q.    Was there a procedure, Mr. Wolf, that a driver

2   can write up a condition on his truck?

3      A.    Yes.

4      Q.    And then submit it to the shop?

5      A.    Yes.  A vehicle condition report.  VCR, we call

6   it.

7      Q.    And would it be fair to say that the two ways

8   that trucks come in for service would be on a rotational

9   preventive maintenance program --

10     A.    Right.

11     Q.    -- or by a driver writing up a ticket?

12     A.    That's correct.

13     Q.    And of the two, which do you do more of?

14     A.    Probably the driver write-ups.

15     Q.    Would it be fair to say that the driver

16   write-ups can cover the gamut of anything on that vehicle

17   that needs to be addressed?

18     A.    Yes.

19     Q.    Or at least something that the shop can

20   address?

21     A.    Right.

22     Q.    And would -- if a driver wanted to or felt the

23   need to write up his truck because it had the old style

24   cables, the original style cables, would that be something

```
1    he could do?

2         A.    Sure.

3         Q.    And would the procedure be that if he wanted

4    that cable changed out or cables of the old style, they

5    would be submitted to the shop and he would be assigned a

6    spare truck in the meantime?

7         A.    Or he could sign off and wait for his truck to

8    be repaired.

9         Q.    By "sign off," he would either go off duty,

10   basically, until his truck was finished and back to him to

11   drive?

12        A.    Right.

13        Q.    But if he chose to keep driving, were spare

14   trucks usually available?

15        A.    Most of the time.

16             MR. LARSON:  Thank you.  That's all I have.

17                       CROSS-EXAMINATION

18   BY MR. PAULUS:

19        Q.    My name is Craig Paulus.  I represent Hanes

20   Supply, who makes cables like this.  And I have just a

21   couple of questions for you.

22             You said you worked for Allied for 21 years; is

23   that right?

24        A.    Yes.
```

1      Q.    Does that mean at some point you worked for

2  CCI?

3      A.    I'm sorry, yes.  CCI, Complete Auto Transit, it

4  used to be called.  We all merged.

5      Q.    I asked because it's so confusing.

6      A.    Yes, it is.

7      Q.    So at some point, you did work for CCI?

8      A.    Yes.  We went from Complete Auto Transit to

9  Commercial Carriers, Incorporated, CCI.  Then we were Ryder

10  Automotive Carrier Division, then Ryder sold to Allied.

11     Q.    Are you aware that at some point CCI was

12  manufacturing the trucks as well as operating the car

13  hauling business?

14     A.    I don't know that.

15     Q.    Where are the VCR -- the vehicle condition

16  reports kept?

17     A.    The ones that the drivers write up?

18     Q.    Uh-huh.  For each individual truck.

19     A.    There's a book that they fill out the

20  information that we need.  We kept the white copy off of

21  that, and normally a repair order is typed up and we

22  document everything we do by time and parts charge out on

23  the typed up repair order, and that goes in a file for that

24  particular truck number.

```
1          Q.    Okay.  So does the VCR go back in the truck

2    cab?

3          A.    Yes, sir.  The VCR stays in the cab.  The

4    yellow copy goes in a book, the pink copy is dispatch, so

5    they know the truck is released from the shop.

6          Q.    Earlier Mr. Koustmer was showing you some

7    exemplars, which is a fancy word for examples.  Do you know

8    if these are painted?

9          A.    Right.

10         Q.    When they come -- you have seen replacement

11   cables, right?

12         A.    Yes.

13         Q.    Are they painted?

14         A.    No.

15         Q.    Who paints these, do you know?

16         A.    It's probably done during refurb.

17         Q.    Who does the refurb?

18         A.    I don't know.

19         Q.    Tell me about the refurb process, what you know

20   about it.

21         A.    Take an old rusty truck, repaint it, put knew

22   hydraulic hoses on it, repair structural -- you know,

23   replace structural crossmembers, that kind of stuff.

24         Q.    Okay.  Is that something that's done locally in
```

```
1    Ohio or is that done in West Stockholm, New York?

2         A.    I'm not sure where it's done.

3         Q.    I will show you -- do you have any involvement

4    with maintenance logs for trucks?

5         A.    What do you mean?

6         Q.    Well, let me show you a document, and I will

7    ask the court reporter to mark it Wolf A.

8               (Wolf Exhibit A was marked for identification).

9         Q.    If you could take a look, do you recognize that

10   document --

11        A.    No.

12        Q.    -- or those type of records?

13        A.    It appears to be a computer printout of unit

14   number 61304 and parts and -- that were, you know, different

15   dates the truck was repaired.

16        Q.    Does this reflect what you do in the shop to

17   repair the trucks periodically and then it's entered in the

18   database?  Is that what this is?

19        A.    Yes.  It appears to be.

20        Q.    Who enters this information into the database?

21        A.    My supervisor.

22        Q.    Who would be that?

23        A.    Either Bill Weaver or Lloyd -- I forget his

24   last name.  Anyway, it's supervision's job.  They normally
```

```
 1   document all of this stuff, close out the work order and
 2   that type of stuff.
 3        Q.    Okay.  As I look through this, and I'll point
 4   out to you, if you want me to, but there are a couple of
 5   entries here, periodically, that say winterize --
 6   "winterization," actually.
 7             For example, on February 8th, 2000, which is on
 8   the tenth page, it says, "winterization."
 9             MR. WINTER:  Which page?  Is it the lower right
10       hand?
11             MR. PAULUS:  It's page 10, about halfway down.
12        A.    I don't have any page numbers here so -- you
13   can't read them.  Page 10?
14        Q.    Yes.
15        A.    Okay.  2/8.
16        Q.    2/8/00.
17        A.    Winterization.
18        Q.    What goes into the winterization process?  Is
19   that something that you would -- one of your duties to
20   perform that?
21        A.    Yeah.  Just to check the level of antifreeze,
22   pressures, that kind of stuff.  Make sure there is
23   antifreeze in it.  That kind of stuff.  That's what it
24   involves.  Fluid levels, that type of stuff.
```

1    Q.    Does it involve lubricating these exposed

2    joints on the cables between what you're calling the crimp

3    joint and the vinyl?

4    A.    To my knowledge, no, we never lubricated.

5    Q.    You never put on any water displacer at all?

6    A.    No.

7    Q.    Nothing to protect it?

8    A.    No.

9    Q.    Do you ever wash the trucks?  Are you aware of

10   whether anybody washes them?

11   A.    They take them to the truck wash if they are on

12   the road.  It's the driver's discretion.

13   Q.    The driver's discretion.

14   A.    Yeah.  If they have a hydraulic leak and it

15   sprays inside, they wouldn't want to slip, so they stop at

16   the truck wash and wash it off.

17   Q.    Is there any records of that?

18   A.    I don't know.

19   Q.    While you worked in the maintenance department

20   at Allied or CCI or these related entities, did you ever

21   take parts off of one truck to put onto another?

22   A.    Yes.

23   Q.    Did you ever do that with safety cables, to the

24   best of your recollection?

1       A.    No.  Just recently, maybe.  Just like last

2   week.  It was the only time I can ever remember doing it.

3       Q.    What were the circumstances of that?

4       A.    We got a truck transferred in from another

5   terminal that didn't have them equipped.  They need the unit

6   to, you know, haul freight, so we took cables off of another

7   truck that was shopped in order to put that one on the road.

8       Q.    Are you aware of any agreement between Allied

9   and Ryder, CCI, Commercial Carriers, Inc. relating to

10  liability arising out of these cables or the manufacturer of

11  the trucks?

12      A.    No.

13      Q.    You told us earlier that the cables were -- the

14  cables -- the cable or any of the old cables that were

15  replaced were taken off the truck?

16      A.    Right.

17      Q.    You put the new eyebolt design on?

18      A.    That's correct.

19      Q.    And you threw the other ones away?

20      A.    Yes.

21      Q.    Who told you to throw them away?

22      A.    I guess it was -- we just assumed they weren't

23  any good.  We weren't taking them off for any reason, why

24  keep them.

1          Q.    Was there any policy to keep them?

2          A.    No.

3          Q.    Any handbook that might address that sort of

4     thing?

5          A.    I don't know.

6          Q.    Based on your experience working with these

7     cables periodically, as part of your job duties, did you

8     ever -- were they always uniform in this gap between the

9     metal threaded stud crimp joint and the vinyl?  Is this

10    space in here, exposed metal, consistent for each unit?

11         A.    I would say so, yes.

12              MR. KOUSTMER:  Objection.  Go ahead.  I think

13         that misstates his statement, but go ahead.  Oh, that

14         is not the one we questioned, that is the new design.

15              MR. PAULUS:  I'm right now looking at this one.

16              MR. KOUSTMER:  Just so it's clear.

17              MR. PAULUS:  To make the record clear, I'm

18         showing the witness, I guess, the unbroken exemplar.

19              MR. KOUSTMER:  For the record, not the same as

20         the broken exemplar.

21         Q.    Do these appear to be the same?

22         A.    Yes.

23              MR. KOUSTMER:  He says they are the same.

24         A.    I said they appear to be the same.

```
 1                    MR. KOUSTMER:  Right.

 2          Q.    And they actually are.

 3                    MR. KOUSTMER:  Right.

 4          A.    I notice that now, but one is smaller than the

 5  other.

 6                    MR. KOUSTMER:  And there is also a gap on the

 7            one that is not broken and there is no gap between

 8            the one that is broken.

 9                    MR. PAULUS:  I think I'm done for the moment.

10                    MR. KOUSTMER:  I've got a couple of questions

11            as follow-up, okay?

12                    THE WITNESS:  Sure.

13                      FURTHER CROSS-EXAMINATION

14  BY MR. KOUSTMER:

15          Q.    You said -- you just told them they were being

16  taken off for a reason.  What was the reason?

17          A.    I didn't know the reason.  I said that when we

18  took them off, we didn't keep them for any particular

19  reason.

20          Q.    Have you ever heard of an Allied Holding, Inc.?

21  Did you ever work for that company?

22          A.    Allied Holding.  They were the parent company,

23  I believe, of the company Allied Automotive Group or Allied

24  Systems.
```

```
 1          Q.    He was asking you about some things on the log
 2   here.
 3          A.    Maintenance records.
 4          Q.    Maintenance records.  Was there any routine
 5   maintenance done on the safety cables?
 6          A.    Routine maintenance?
 7          Q.    Yes.
 8          A.    Not to my knowledge.
 9          Q.    Okay.  So he asked you if you had sprayed any
10   lubricant in there, anything like that.  But there is really
11   no maintenance to these?
12          A.    Right.
13          Q.    They are just put on and left on?
14          A.    Exactly.
15          Q.    So you didn't wash them, you didn't put
16   anything on them, you didn't do anything like that?
17          A.    No.
18          Q.    Were you ever instructed to take the cables and
19   twist here where the vinyl meets this part, the cringe?
20          A.    Crimp.  C-r-i-m-p.
21          Q.    Crimp.  C-r-i-m-p.  Okay, I got it.  Have you
22   ever been instructed to take that and twist it to see if the
23   metal had corroded at all on the inside?
24          A.    No.
```

1          Q.     And you can't see the metal past this --

2          A.     Coating.

3          Q.     -- vinyl here, coating, right?

4          A.     Right.

5          Q.     And you're saying that the new ones that are

6     being replaced, your company is painting them?

7          A.     No.

8          Q.     Are they coming painted?

9          A.     The new ones are coming clear.

10          Q.     And when they come clear, you can see through

11     to see the metal, correct?

12          A.     Yes.

13          Q.     And with them coming that way, are you now --

14     when they get to you clear, do you paint them?

15          A.     No.

16          Q.     So the ones you're putting on now, whether it's

17     the eyebolt style or the other newer style, they are clear?

18          A.     Yes.

19          Q.     And they are being put on clear?

20          A.     Yes.

21          Q.     Do you know when that started?

22          A.     No.

23          Q.     Now, if I was a driver and I put in a VCR for a

24     replacement cable, safety cable, and I went into your shop

1    and you only had two, you would replace two and give me the

2    truck back?

3        A.    Yes.

4        Q.    You wouldn't keep the truck waiting for some

5    shipment from where -- we don't know where it's coming from,

6    until you could replace the other two cables, would you?

7        A.    No.  We will release the truck.

8        Q.    Back to the driver?

9        A.    Unless the driver refused to drive it.

10       Q.    But it would not be kept in the shop?

11       A.    No.

12       Q.    And what period of time would it be when you

13   were replacing these that you wouldn't have cables?  I mean,

14   how long would it take to get cables?

15       A.    I don't recall.

16       Q.    Well, you said a couple -- I know at least more

17   than once you only replaced two or three on them, and then

18   you put the truck back into the rotation or wherever it

19   goes?

20       A.    Uh-huh.

21       Q.    Now, how long would you then have to wait for

22   some more cables to get in?

23       A.    I -- I'm not sure.

24       Q.    You don't know?

```
 1          A.    No, I don't know.  We had 100 trucks, which
 2    would mean we would need 400 cables to replace all of them,
 3    and we would, like I say, get them in -- I don't know the
 4    quantity, but I would say, you know, 20 or 40 at a time
 5    maybe.
 6          Q.    You don't know how they were coming in?
 7          A.    No, I don't know where they came from or who
 8    manufactured them or how frequently they did arrive.
 9          Q.    Did they come in as few as six?
10          A.    I don't know.
11          Q.    Would replacing cables be marked on what he has
12    marked as Wolf A?
13          A.    It might be, yes.
14          Q.    Might or might not?
15          A.    It might.  It should, actually, if it was done.
16    If the part was charged out properly, then it should be on
17    here.
18          Q.    What -- how would it read?
19          A.    I really don't know.
20          Q.    Is there such a thing as a driver vehicle
21    inspection report?
22          A.    Yes.  It's a VCR.  That's what they fill out
23    when they have a problem with their unit.
24               MR. KOUSTMER:  Thank you, sir.
```

```
 1                    MR. LARSON:  Just a few more, Mr. Wolf.
 2                    THE WITNESS:  Sure.
 3                        FURTHER CROSS-EXAMINATION
 4    BY MR. LARSON:
 5         Q.    If the shop, for whatever reason, didn't have
 6    enough cables in stock to fully change out a particular
 7    rig --
 8         A.    Uh-huh.
 9         Q.    -- I understand that you would do as many as
10    you have available and release the rig from the shop?
11         A.    Yes.
12         Q.    The driver has the option to accept that truck
13    or he could refuse to work on that truck until all of the
14    cables are replaced, true?
15                    MR. KOUSTMER:  Objection.
16         A.    I believe so.
17         Q.    Particularly if the driver considered it to be
18    a safety item?
19                    MR. KOUSTMER:  Objection.
20         Q.    Is that true?
21         A.    I believe so, yes.
22         Q.    If you were setting about to change out the old
23    cables on a particular rig and you only had three cables,
24    was there a method that you would use to decide which cable
```

1   of the four would not be replaced?

2        A.    No particular method.  It would just be a

3   visual inspection, which one looked the worst, basically.  I

4   mean, at that time, I said before, we never got --

5   physically twisted, but at that time we would just pull on

6   them a little bit, make sure it was intact, and the best

7   one, that looked best to the eye, was the one that remained

8   on there.

9        Q.    But would you be able to tell from the ground

10  looking up at the cables whether they were the original

11  style versus the eyelet style?

12       A.    Yes, you can.  There's a distinct difference in

13  the end.

14       Q.    You don't have to get up on the truck and

15  examine them closely?

16       A.    No.

17       Q.    Of the original cables that you replaced, do

18  you recall, or not, having some sort of a gap between the

19  coating and the end of the crimping?  Do you recall being

20  able to visualize some of the cable?

21       A.    Yes, on most of them.

22       Q.    On most of them you could visualize the cable

23  with some gap between the end of the vinyl covering and the

24  crimp?

```
 1          A.    Yes.

 2                     FURTHER CROSS-EXAMINATION

 3    BY MR. KOUSTMER:

 4          Q.    You say "most of them," not all of them?

 5          A.    I haven't seen all of them, but the ones I have

 6    seen, the majority I think have a small space between the

 7    covering and the crimping.

 8          Q.    The majority of them?

 9          A.    Yes.

10          Q.    Okay.  That you've seen?

11          A.    That I've seen.

12          Q.    And that space is similar to the space that

13    we're looking at here in the exemplar?

14                MR. PAULUS:  The broken exemplar.

15          Q.    Or is it similar to when you're talking about

16    that or is it similar to the nonbroken exemplar?

17          A.    Similar to the nonbroken one.

18          Q.    Okay.  So you're not calling this gap on the --

19    you're not calling this a gap on the nonbroken exemplar?

20          A.    That is a small gap, but it's not --

21          Q.    That's not what you're referring to when you're

22    referring to the "majority of them"?

23          A.    No.  The majority, about a half-inch gap.

24          Q.    Okay.  And that is on the nonbroken exemplar?
```

```
1        A.    Correct.

2        Q.    Okay.

3              MR. KOUSTMER:  Nothing further.  Thank you.

4              MR. PAULUS:  I have one more.

5                    FURTHER CROSS-EXAMINATION

6   BY MR. PAULUS:

7        Q.    Are you aware that -- are you aware whether or

8   not CCI and your employer are presently affiliated with one

9   other?

10       A.    No, I'm not aware.  I don't know.

11             MR. PAULUS:  That's it.

12                        EXAMINATION

13  BY MR. WINTER:

14       Q.    You said there were six mechanics at Marian?

15       A.    There were more than six.  I can't recall how

16  many.

17       Q.    When they do maintenance activity on the

18  trucks, do you have technical manuals to the system?

19       A.    Yes.

20       Q.    You don't have a technical manual for the

21  maintenance of the clothesline cable, do you?

22       A.    No.

23       Q.    Were you ever given any instructions from any

24  person outside of your employer as to how to maintain those
```

```
1    cables?

2         A.    No.

3         Q.    You discarded the old cables as they were taken

4    off?

5         A.    Yes.

6         Q.    Why?

7         A.    Nobody told us different.

8         Q.    What benefit do you see in retaining old cables

9    lying around the shop?

10        A.    I don't see a benefit.  That's why we threw

11   them away.

12             MR. WINTER:  That's it.  Nothing further.

13             MR. LARSON:  One more question.

14                  FURTHER CROSS-EXAMINATION

15   BY MR. LARSON:

16        Q.    If you didn't throw the old one away, would

17   there be a concern that the old cable could inadvertently be

18   put back on a truck?

19        A.    Possibly.

20             MR. LARSON:  Thank you.

21                  FURTHER CROSS-EXAMINATION

22   BY MR. PAULUS:

23        Q.    Would there be any danger of putting a broken

24   cable back on a truck?
```

1        A.    Any danger?  Yes, I would say so.

2        Q.    I mean, if it came off and it were in two

3    pieces, would you put that back on the truck?

4        A.    No.

5                    FURTHER CROSS-EXAMINATION

6    BY MR. KOUSTMER:

7        Q.    Did you keep any of the broken ones?

8        A.    No.

9        Q.    You threw those away, too?

10       A.    Right.

11       Q.    If they were involved in someone being injured

12   in an accident, would you have kept them?

13       A.    If I was told to.

14       Q.    That wasn't a decision you would make?

15       A.    No.

16       Q.    Who would have made that decision?

17       A.    The maintenance superintendent or the safety

18   director, I believe.

19       Q.    So you would do what they told you to do?

20       A.    Yes.

21       Q.    You wouldn't make that decision independently?

22       A.    No.

23       Q.    Would you go to them and ask them?

24       A.    Well, normally I would not be aware that the

```
 1   driver had fell off of that type of equipment.

 2        Q.    But if you had a broken cable and you had heard

 3   that a driver had fallen off, would you then go to someone?

 4        A.    Yes.  I would ask my supervisor, should I keep

 5   this.

 6        Q.    Okay.

 7                        FURTHER EXAMINATION

 8   BY MR. WINTER:

 9        Q.    How many times did that occur?

10        A.    None, to my knowledge.

11             MR. LARSON:  I'm finished.

12             MR. WINTER:  Rick, you have the right to read

13        your deposition, and I will ask that if somebody is

14        going to be ordering this that you read it to make

15        sure that the lovely court reporter got it down

16        right, okay?

17             THE WITNESS:  Okay.

18

19                        _____
                          FREDERICK L. WOLF

20

21                        - - -
                   DEPOSITION CONCLUDED AT 10:22 A.M.
22                        - - -

23

24
```

```
 1                    C E R T I F I C A T E

 2    STATE OF OHIO        :
                           : SS
 3    COUNTY OF CLERMONT   :

 4             I, Debra J. Henderson, RPR, the undersigned, a

 5    duly qualified and commissioned notary public within and for

 6    the State of Ohio, do hereby certify that before the giving

 7    of his aforesaid deposition, FREDERICK L. WOLF was by me

 8    first duly sworn to depose the truth, the whole truth and

 9    nothing but the truth; that the foregoing is the deposition

10    given at said time and place by FREDERICK L. WOLF; that said

11    deposition was taken in all respects pursuant to

12    stipulations of counsel; that I am neither a relative of nor

13    employee of any of the parties or their counsel, and have no

14    interest whatever in the result of the action; that I am

15    not, nor is the court reporting firm with which I am

16    affiliated, under a contract as defined in Civil Rule 28

17    (D).

18             IN WITNESS WHEREOF, I hereunto set my hand and

19    official seal of office at Cincinnati, Ohio, this _____ day

20    of _____, 2003.

21

22                                _____
      My commission expires:      Debra J. Henderson, RPR
23    May 8, 2005.                 Notary Public - State of Ohio

24
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620  Cincinnati, Ohio  45202**

