hanes.dep.v1                                                    9/16/2003

1

1    WILLIAM C. HANES

2

3

4                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
5                       WESTERN DIVISION

6    ----------------------------------------

7    DAVID FERGUSON, et al.,

8                        Plaintiffs,

9         -vs-                    File No. C-1-02-039

10   RYDER AUTOMOTIVE CARRIER SERVICES, INC.,
     et al.,
11
                        Defendants.
12   ----------------------------------------

13

14

15                  Examination Before Trial of

16   WILLIAM C. HANES, taken pursuant to Notice under

17   the Federal Rules of Civil Procedure and Agreement,

18   taken at the Roycroft Inn, 31 South Grove Street,

19   East Aurora, New York, taken on February 12, 2003,

20   commencing at 9:07 A.M., before MARTIN S. WRIGHT,

21   CSR, Notary Public.

22

23

                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                    2

1                    INDEX TO WITNESSES

2

3    Witness                    Examination By

4

5                         MR. KOUSTMER  MR. LARSON

6

7  WILLIAM C. HANES               4        73

8                               105       110

9

10                        MR. PAULUS

11                            113

12

13

14

15

16

17

18

19

20

21

22

23

                    DENALL, VITRANO AND ASSOCIATES, INC.
                         (716) 856-0085

hanes.dep.v1                                                    9/16/2003

3

```
 1    APPEARANCES:

 2    THOMAS R. KOUSTMER, ESQ.,
      7 West 7th Street, Suite 1800,
 3    Cincinnati, OH 45202,
      Appearing for the Plaintiffs.
 4
      LARSON & LARSON,
 5    BY:  DAVID E. LARSON, ESQ.,
      1300 Tomahawk Creek Parkway, Suite 310,
 6    Leawood, KS 66211,
      Appearing for the Defendants Commercial
 7    Carriers, Inc. and Ryder Systems, Inc..

 8    TAFT, STETTINIUS & HOLLISTER,
      BY:  CRAIG R. PAULUS, ESQ.,
 9    425 Walnut Street, Suite 1800,
      Cincinnati, OH 45202,
10    Appearing for the Defendant Hanes Supply.

11

12          (Whereupon, the following stipulations were

13    entered into by all parties.)

14          It is hereby stipulated by and between

15    counsel for the respective parties that the oath of

16    the Referee is waived, that filing of the

17    transcript are waived, and that all objections,

18    except as to the form of the questions, are

19    reserved until the time of trial.

20

21    W I L L I A M   C.   H A N E S ,  51 Briggswood

22    Drive, Elma, New York, after being duly called and

23    sworn, testified as follows:
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                        9/16/2003

4

```
 1   EXAMINATION BY MR. KOUSTMER:

 2

 3   Q.  Mr. Hanes, my name's Tom Koustmer.  I represent Mr.

 4       and Mrs. Ferguson, and your deposition's here today

 5       by notice and agreement.  I'm going to be asking

 6       you some questions.  If at any time you don't

 7       understand one of my questions, just tell me and

 8       I'm re-answer it, or, re-ask it --

 9   A.  Okay.

10   Q.  -- or we'll get the Court Reporter to read it

11       back.  It's my understanding that you are the

12       President of Hanes Supply, Inc., is that correct?

13   A.  That's correct.

14   Q.  Okay.  Do you own Hanes Supply, Inc.?

15   A.  Yes, I'm a hundred percent owner.

16   Q.  Okay.  And how long have you owned that?

17   A.  I've owned the entire corporation, probably

18       1985ish.

19   Q.  Okay.  So, during the period of time in which we're

20       here on, 1994/1995, you were the owner of Hanes

21       Supply, Inc.?

22   A.  That is correct.

23   Q.  And you were also the President?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                        9/16/2003

5

```
 1  A.  That is correct.

 2  Q.  Okay.  And what is your educational background?

 3  A.  Graduate of Canisius High School and graduate of

 4      the University of Buffalo with a degree in civil

 5      engineering.

 6  Q.  Okay.  Did you go on to any other schooling after

 7      your degree in civil engineering?

 8  A.  I took half of an MBA program but didn't complete

 9      it.  Time constraints were too difficult.

10  Q.  Was that also at the University of Buffalo?

11  A.  That's correct.

12  Q.  What year did you get your civil engineering

13      degree?

14  A.  1980.

15  Q.  And, so, where did you work between 1980 and 1985?

16  A.  Hanes Supply.

17  Q.  Did you buy Hanes Supply from someone?

18  A.  Yes, a family corporation, company from my father,

19      Theodore Hanes.

20  Q.  Now, you provided some safety cables to Commercial

21      Carriers, Inc., is that correct, in 1994/1995 time

22      frame?

23  A.  Correct.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                          9/16/2003

6

1   Q.   Okay.  Can you tell me how that came about?

2   A.   Commercial Carriers -- I'd like to make the record

3        straight of why we're talking about that.

4        Commercial Carriers, Delavan, Ryder, Murray Recon,

5        that's all considered one company, because they've

6        gone through a number of different gyrations, and

7        we've changed our computer system to state that.

8        So it used to be Ryder.  It used to be Delavan.

9        It's -- you know, they've gone through a number of

10       different ownership changes and I just wanted to

11       make that clear at this point in time.

12  Q.   Okay.

13  A.   My recollection from 1994 was that from our history

14       they had bought some.  We'll have to look at the

15       history of the -- how the cables evolved.

16  Q.   Okay.  I assume you're referring to some of these

17       documents that were given to me by your Counsel --

18  A.   That's correct.

19  Q.   -- yesterday, and then there was a couple he gave

20       me today, which I don't really understand.  But why

21       don't we -- if we want, we'll just skip ahead.  I

22       had them marked right there and we'll take a look

23       at them.  Okay?

7

```
 1  A.  Super.
 2  Q.  I got them marked Plaintiffs' BB, Plaintiffs' CC,
 3      Plaintiffs' DD, Plaintiffs' EE, and then we're
 4      going to skip, because we may have marked
 5      Plaintiffs' FF in Mr. Terzian's file, Plaintiffs'
 6      GG and Plaintiff HH, which are two documents
 7      provided to me today from your Counsel.  This -- is
 8      this what you're referring to that you want the
 9      look at?
10  A.  Correct.
11  Q.  And you've looked at these prior to your testimony
12      here today?
13  A.  That's correct.
14  Q.  Okay.  Anything else you'd looked at prior to your
15      testimony?
16  A.  We reviewed the entire sales history of -- of
17      Ryder.  Ryder, Commercial.
18  Q.  Okay.  And are there documents that detail that
19      sales history?
20  A.  It's computer.
21  Q.  Okay.  If I ask your Counsel in an interrogatory
22      request for production, you'll provide a sales
23      history of Ryder, Commercial, or all the companies
```

hanes.dep.v1                                                        9/16/2003

8

```
 1      you named, then he could request that from you and
 2      that would be generated by computer?
 3  A.  From 1992, correct.
 4  Q.  Okay.  Did you bring that with you today?
 5  A.  No, sir.
 6  Q.  Okay.  But you reviewed it prior to your
 7      deposition?
 8  A.  That's correct.
 9  Q.  Okay.  Anything else you reviewed?
10  A.  That was -- no.
11  Q.  Okay.  So, let's -- I'll give you these.
12  A.  Mm hmm.
13  Q.  And you were going to tell me -- I think I asked
14      you what you remember of how it came about that
15      Commercial Carriers, Inc. ordered safety cables
16      from your company.
17  A.  Okay.  In 1993, looks like some 3/8ths was --
18      cables were ordered that were yellow coated and it
19      was a little different design with turn buckles,
20      similar lengths, 152 inches, 90 inches, 95, 98.5
21      inches, so it looked like there were, you know,
22      five total -- excuse me, eight total cables that
23      were purchased.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

9

1   Q.   Okay.  And you're referring just on the front of
2        it?
3   A.   This -- yeah, this is your Plaintiff DD.
4   Q.   Okay.  And, so, you're saying in 1993 was ordered
5        what?
6   A.   Some 3/8ths cables that are copied to 7/16ths in
7        the yellow coated.
8   Q.   And how long were those?
9   A.   Lengthwise, they were 152 inches, 90 inches, and
10       98.5 inches.
11  Q.   One of each or --
12  A.   Four.  Four of the first one.
13  Q.   Okay.
14  A.   And two and two.
15  Q.   And two and two.  Prior to that order, had you ever
16       met with anyone at Commercial Carriers, Inc. or any
17       of these companies you named and discussed with
18       them this order?
19  A.   This -- I don't -- I don't -- I don't recall
20       discussing this order or I don't know how the sales
21       history of this evolved.
22  Q.   Okay.  What's the next one?  Or what do you --
23  A.   The next one that we can find from the sales


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                          9/16/2003

```
 1      history is -- looks like June of '94.  It was
 2      3/16ths cable.  There were two pieces at 44 and a
 3      half inches, then coated quarter inch, two pieces
 4      at 3/16ths by 64 and a half inch.
 5   Q. I'm sorry.  Three pieces of what?
 6   A. First item, number one, was two pieces of a 3/16ths
 7      by 44 and a half.  Item number two was two pieces
 8      of 3/16ths by 64 and a half.  Item number three was
 9      3/16ths by 68 and a half, two pieces, and item
10      number four was four pieces of 3/16ths by 81 and a
11      half.  That was back on, again, 1994.
12   Q. June of '94, all those were ordered?
13   A. It wasn't June.  It was July.  Seventh month.  It
14      was the 7th.
15   Q. Okay.  All of those were ordered on July 7, 1994, I
16      guess?
17   A. Yes.  We shipped on the 7/8/94, invoiced on
18      7/11/94.
19   Q. Okay.  Can you tell me from DD what the price of
20      these cables were?
21   A. The --
22   Q. I forgot to ask you?
23   A. They're about $97 each.
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

hanes.dep.v1                                                    9/16/2003

11

1   Q.   And how about the ones that were ordered in July

2        7th of '94?

3   A.   They were $48, 50, 50, 52.

4   Q.   And that's Exhibit BB?

5   A.   BB.  I'm going to October of '94.  There were four

6        pieces of a one-eighth cable, PVC coated yellow by

7        133 inches.  Those had threaded studs on each end.

8   Q.   And what's the price of those?

9   A.   Those are $28 each.

10  Q.   Okay.

11  A.   And that was -- I remember taking that order

12       verbally from Mike Bevilacqua.

13  Q.   Okay.  Do you remember -- and do you remember those

14       other orders?

15  A.   No.

16  Q.   Okay.  You don't remember the other order BB or

17       DD.  Would you have been the one that's taken the

18       orders at this time?

19  A.   It's possible.  I'd have to look in the history.

20       But I don't remember those two.

21  Q.   Or there's other people who take that --

22  A.   There's other people on inside sales taking orders,

23       yeah.


                 DENALL, VITRANO AND ASSOCIATES, INC.
                         (716) 856-0085

hanes.dep.v1                                                    9/16/2003

12

1   Q.  How many people were in your Sales Department?

2   A.  Inside sales at that time, there were probably

3       three or four people.

4   Q.  Okay.  How many engineers were working there?

5   A.  Engineers at Hanes Supply?

6   Q.  Yeah.

7   A.  We don't -- the only engineer that has a formal

8       engineering training background is myself.

9   Q.  Okay.  Let me just go to one of these that I can go

10      through it and kind of --

11  A.  Sure.

12  Q.  -- understand it in case something comes up.  When

13      you're looking at -- you got a separate document on

14      it, Number 64780, and I'm referring to Plaintiffs'

15      BB, and the description, you get the description of

16      what it is?

17  A.  Mm hmm.

18  Q.  Correct?

19  A.  Correct.

20  Q.  This on BB is one and three sixteen and then the

21      length is 44 and a half, right?

22  A.  It's 3/16ths.

23  Q.  Oh, I'm sorry.  One and -- okay.  3/16ths.  Good.


                DENALL, VITRANO AND ASSOCIATES, INC.
                       (716) 856-0085

hanes.dep.v1                                                     9/16/2003

13

```
 1      44 and a half?  What's 7 times 19 mean?
 2   A.  That's 17 strands with 19 wires in each strand.
 3   Q.  Okay.  SSAC?
 4   A.  That refers to stainless steel aircraft cable.
 5   Q.  Okay.  Then you've got nylon coated?
 6   A.  Mm hmm.
 7   Q.  To one fourth width, correct?
 8   A.  To one quarter inch width.
 9   Q.  Okay.  Now, that's the front page.  What's the
10       second page?  What's that?  The same?  Another
11       order that day?
12   A.  That's all part of that same work -- what we call
13       the work order.
14   Q.  Okay.  When it says same there, that would mean
15       SSAC?
16   A.  The same description as the first item.
17   Q.  Going to Plaintiff's CC, that's 1/8th inch, and
18       that's got GAC.  That's the aircraft cable?
19   A.  Galvanized aircraft cable.
20   Q.  Yeah.
21   A.  Aircraft cable.
22   Q.  Does aircraft cable come not galvanized?
23   A.  Typically not.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

14

```
 1   Q.   Okay.  So, when you order it, it's galvanized?

 2   A.   That's correct.

 3   Q.   Can you order cable that's not galvanized?

 4   A.   We can order cable that's not galvanized.  It's

 5        called bright wire rope.

 6   Q.   Okay.  PVC, is that vinyl coated?

 7   A.   Yeah.

 8   Q.   Is that what it means?

 9   A.   Right.  Correct.

10   Q.   Yellow means the coating, the color you make the

11        coating?

12   A.   That's the color of the coating, correct.

13   Q.   Okay.  So, it comes in all different colors?

14   A.   It's -- it's available in different colors,

15        correct.

16   Q.   And it also comes in clear?

17   A.   Clear is available.

18   Q.   Okay.  And clear, you can see through to the metal?

19   A.   Well, depending on the -- what the surface

20        conditions are.  If -- if it's been marred up or if

21        there's a lot of wear or brushing on the PVC, it

22        can get scuffed up.

23   Q.   Right.  But if it's not scuffed up, can you see
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

15

 1      through to the --

 2   A.  Correct.

 3   Q.  If it's yellow coating, you can't see through?

 4   A.  It's -- it's more difficult, yeah, very difficult,

 5       depending on the shade of yellow.

 6   Q.  Okay.  Do you remember what kind of shade this

 7       yellow was or was ordered?

 8   A.  It was fairly opaque.

 9   Q.  Could you see through it?

10   A.  I tend to think not.

11   Q.  Okay.  Now, you said the last one we discussed --

12       and I forget the number.  Let me find the last one

13       we discussed.  Is that what we --

14   MR. PAULUS:  That's one we haven't discussed.

15   THE WITNESS:  Yeah.

16   MR. PAULUS:  I think it's this one.

17   MR. KOUSTMER:  Was it July?

18   THE WITNESS:  I -- the 3/8ths.

19   MR. KOUSTMER:  October.

20   MR. PAULUS:  Plaintiff's CC.

21   BY MR. KOUSTMER:

22   Q.  Plaintiff's CC, you say you remember.  You didn't

23       remember the first two that we discussed, BB and


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

hanes.dep.v1                                                    9/16/2003

16

1        DD, but you remembered Plaintiff's CC.  What did
2        you remember about that?
3   A.  Basically, I remember the inside sales function,
4        that Mike Bevilacqua called up, he wanted these
5        things, these units in quickly, and they were
6        shipped -- the components that we purchased were
7        shipped in in a UPS Next Day Air fashion, so it was
8        a -- a very quick order.  And then we, you know,
9        got the material in and they were delivered the
10       next day.
11  Q.  Okay.  Did he tell you why they needed them?
12  A.  They were reviewing -- I believe I was out there,
13       in August, September time frame, to Delavan, and
14       they were reviewing different types of wire rope
15       assemblies for their top of their trucks.
16  Q.  Okay.  And is the prices marked on this one, too,
17       correct, $28 each would be on CC?  Correct?
18  A.  Correct.
19  Q.  Okay.  And DD'S price was 97.25 each?
20  A.  Mm hmm.  Correct.  Yep.
21  MR. PAULUS:  You have the answer audibly.  It's not
22       videotaped so they --
23  THE WITNESS:  He can't hear me.


                    DENALL, VITRANO AND ASSOCIATES, INC.
                          (716) 856-0085

hanes.dep.v1                                                    9/16/2003

17

```
 1   MR. PAULUS:  You have to say yes or no in an audible
 2       answer.
 3   BY MR. KOUSTMER:
 4   Q.  Okay.  Now, on Plaintiff's Exhibit BB, the price
 5       was between 48.34 and 52.94, correct --
 6   A.  Correct.
 7   Q.  -- for each one?  Okay?  Anything else I need to
 8       know in reading these, how to read through one of
 9       these?
10   A.  No.
11   Q.  Okay.  Go ahead.  You got some other ones.  What's
12       that, Exhibit EE --
13   A.  The last one.
14   Q.  -- that your Counsel provided to me?
15   A.  Correct.
16   Q.  Okay.
17   A.  This was ordered on the -- the day following --
18       following the DD.  No, excuse me, not DD.  CC.  And
19       Mike had called up and, again, requested a UPS Next
20       Day Air shipment, and they decided to go to quarter
21       inch wire rope coated to 5/16ths with threaded
22       studs on each end.
23   Q.  And what was the price of that?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                9/16/2003

18

```
 1  A.  Those were 19.55 each.

 2  Q.  And, so, these are ordered when?

 3  A.  Probably shipped on the 4th.  It was ordered --

 4      shipped on the 5th, so it was ordered on the 4th.

 5  Q.  4th of what month?

 6  A.  October of '94.

 7  Q.  Okay.  And how many were shipped?

 8  A.  Four pieces.

 9  Q.  And you say you remember a conversation concerning

10      that shipment or not?

11  A.  Yes.  I -- I remember Mike calling up ordering

12      those.

13  Q.  Okay.  What did he --

14  A.  And --

15  Q.  Go ahead.  What did he say?

16  A.  We want to evaluate quarter inch coated to 5/16ths.

17  Q.  Did he say what he was evaluating it for?

18  A.  The -- the application was most likely the -- for

19      the safety cables on the top of their cabs.

20  Q.  Okay.  Now, today your Counsel's given me a couple

21      other documents, Plaintiff's Exhibit GG and HH.

22      Can you tell me what those are or mean?

23  A.  Refer to the same work orders that we've talked
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

19

```
 1      about.
 2  Q.  Which one does GG refer to?
 3  A.  I can tell you by work order number, the order
 4      document number would be the same.
 5  Q.  Okay.
 6  A.  Okay?  That 073238 and 073238, they both match up,
 7      but this is another screen that's available on our
 8      computer that tells who the inside sales person was
 9      and who ordered it from our customer.
10  Q.  Okay.  And which -- so, that number matches up with
11      Plaintiffs' CC, Plaintiff GG matches Plaintiff CC
12      by the top document number, correct?
13  A.  Correct.
14  Q.  And the document number being 073238.  And, so,
15      this new document, Plaintiff GG, it says ordered by
16      Mike B.  Inside sales person would be WCH.  That
17      would be William C. Hanes?
18  A.  That's correct.
19  Q.  Okay.  And, bill, that means the person's being
20      billed from W C Hanes, or what's this?
21  A.  Yeah, just that bill, W C Hanes, that was just for
22      further information.  The salesman -- I was not the
23      -- the chief salesman at that account, but I
```

hanes.dep.v1                                                          9/16/2003

                                                                    20

```
 1       helped out.  It's a gentleman, Gary Ranick,
 2       R-a-n-i-c-k.
 3   Q.  Gary Ranick was the chief sales person for the
 4       Ryder, Allied, Delavan, CCI account?
 5   A.  Yeah, he was -- he was an outside sales guy for
 6       them.
 7   Q.  Okay.  Is he still employed by your company?
 8   A.  Correct.
 9   Q.  Okay.  Now, Plaintiff HH matches up with Plaintiff
10       EE, and that being document 073584, and that's the
11       shipment on 10 -- shipped 10/5, and that's for a
12       quarter inch assembly coated.  What's assembly
13       coated mean?  Is that the clear coating?
14   A.  Quarter inch by 128 TS to TS, threaded stud to
15       threaded stud, wire rope assembly, coated, so it
16       means a -- it's a wire rope assembly.
17   Q.  What's that being coated with, the PVC?
18   A.  Yeah, coated to 5/16ths with PVC.
19   Q.  Okay.  When it says coated, does that mean it's
20       going to come out in the clear coating or you
21       pick -- who picks the color?
22   A.  The customer picks the color.
23   Q.  Okay.  But you ordered this coated.  It doesn't say
```

hanes.dep.v1                                                    9/16/2003

21

```
 1     a color.  Or does it?  That's what I'm getting at.
 2  A.  Yes, it does, coated yellow.
 3  Q.  In reviewing your records, did you ever sell CCI or
 4      the companies that you mentioned any cable that
 5      wasn't yellow, of this dimension on EE?
 6  A.  On the quarter inch coated to 5/16ths?
 7  Q.  Yes.
 8  A.  Review of our records no.
 9  Q.  So, it was all yellow?
10  A.  Correct.
11  Q.  Okay.
12  A.  In what time frame up to?
13  Q.  '94 to '95?
14  A.  Right.
15  Q.  And HH, which matches EE, shows again it was
16      ordered by Mike B and your WCH, inside sales
17      person, you billed him, correct?
18  A.  I entered the order.
19  Q.  Okay.  Now, you said that you had been out there,
20      what was it, August and September of '94, August or
21      September?
22  A.  Vaguely remember.
23  Q.  Okay.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                              9/16/2003

22

```
 1   A.   Do not remember the specific details.

 2   Q.   But you remember being out there?

 3   A.   Somewhere in that time frame.

 4   Q.   Okay.  What -- what do you remember about going out

 5        there?

 6   A.   They -- Mike had called up and they were reviewing

 7        options for wire rope assemblies.

 8   Q.   And these are for the -- the cables on the truck?

 9        Did they tell you that?

10   A.   Yes.

11   Q.   Okay.  What else did they tell you?  What else did

12        Mike tell you that you remember?

13   A.   He wanted different options on what was available

14        as far as wire rope and fittings.

15   Q.   Okay.  So had you been out there before to that

16        facility or was that your first time?

17   A.   I might have been there at other times.  But it

18        wasn't any type of set routine on a monthly or, you

19        know, quarterly basis.

20   Q.   Okay.  So when you went out there, what did you --

21        who'd you meet with?

22   A.   Mike was the primary contact.  I don't know if

23        there were some other gentlemen involved or not.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

23

```
 1        There perhaps could have been.
 2   Q.   Okay.  So Mike was definitely there and maybe some
 3        others?
 4   A.   Yeah, possibly.
 5   Q.   Okay.  Do you know if a Peter Terzian was there?
 6   A.   Can't remember.
 7   Q.   And did you take anything out with you to show them
 8        or --
 9   A.   I don't recall.  Might have been literature.  I --
10        I -- I don't recall.
11   Q.   Okay.  But you knew going out that the reason he
12        wanted you to come out was to review different
13        options for a wire cable on the truck?
14   A.   Wire, wire rope assemblies.
15   Q.   Okay.
16   A.   When I got there, then he started, you know,
17        mentioning about the truck.
18   Q.   Okay.  What -- what did he tell you that they
19        wanted?
20   A.   They were evaluating different wire rope assemblies
21        for the -- for the truck.
22   Q.   Okay.  Did he show you a picture of a truck with
23        wire rope on it or did he show you a drawing or
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

24

```
 1     what did he show you or -- or did he just describe
 2     it to you verbally?
 3  A. I don't honestly recall.
 4  Q. Okay.  What did you tell him?
 5  A. Basically, I told him what was available as far as
 6     threaded studs and -- and, again, commercial
 7     standard products.
 8  Q. Okay.  What products did you tell him were
 9     available?
10  A. Well, anything that was -- that was in our catalog,
11     would have been -- would have been available.
12     It -- you know, it really is the customer's
13     discretion to pick what they -- they need to --
14     feel they need to use.
15  Q. Okay.  Well, did you give him descriptions of the
16     different diameters that could be used or the
17     different type of material that could be used?
18  A. No.  No.  I -- he might have had cut sheets which
19     listed different cables and diameters with
20     different tensile -- tensile strengths.  But,
21     again, it was their call to pick what they wanted
22     to utilize.
23  Q. Okay.  Did you make any recommendation to him?
```


                    DENALL, VITRANO AND ASSOCIATES, INC.
                            (716) 856-0085

hanes.dep.v1                                                    9/16/2003

25

```
 1  A.  No.

 2  Q.  Did you -- did he show you any drawings at the

 3      time?

 4  A.  Boy, I don't recall.

 5  Q.  Okay.  When you said you offered him threaded --

 6      or, you talked about threaded studs versus --

 7  A.  Mm hmm.

 8  Q.  What?

 9  A.  Threaded stud was an option.  It was an end

10      fitting.

11  Q.  Okay.  Did you explain what was good about threaded

12      studs?

13  A.  Threaded stud is a threaded stud.  It's swaged on

14      the wire rope.

15  Q.  Okay.  What was the other option instead of a

16      threaded stud?

17  A.  For whatever reason, that was the path they chose

18      to go down.

19  Q.  Okay.

20  A.  Threaded studs.

21  Q.  Are there -- was there another option given to

22      them?

23  A.  I don't recall.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

26

```
 1   Q.  It might have been, but you don't remember or --
 2   A.  I don't remember.
 3   Q.  Okay.  You don't know one way or the other?
 4   A.  No.
 5   Q.  How about the coating?  My understanding, you could
 6       have nylon coating or vinyl coating, correct?
 7   A.  Those are two options.
 8   Q.  Who chose the coating?
 9   A.  I told them what was available.  It was -- it was
10       their call.
11   Q.  Did you make a recommendation as to the coating?
12   A.  I don't recall.
13   Q.  So, you don't -- you don't know if you did one way
14       or the other?
15   A.  No.
16   Q.  So you might have, but you don't recall it?
17   A.  I don't recall making a recommendation.  I don't
18       recall it.
19   Q.  Okay.  What's the difference between vinyl and
20       nylon?
21   A.  Vinyl is a plastic and nylon is a nylon material.
22   Q.  Okay.  Which is more expensive?
23   A.  Nylon's slightly more expensive.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                          9/16/2003

```
 1  Q.  Okay.  Which would better protect the metal on the
 2      inside?
 3  A.  The surface isn't damaged, either one should do a
 4      fine job.
 5  Q.  What if the surface gets damaged?
 6  A.  The surface is damaged, either product, you know,
 7      it -- I'd have to review specifications on, you
 8      know, the specific properties between nylon and
 9      PVC.
10  Q.  Okay.  So you don't know?
11  A.  I don't have that off the top of my head.
12  Q.  Okay.  Do you know which is easier to damage?
13  A.  I would say that probably PVC might be a little bit
14      softer than nylon.
15  Q.  So, how long did this meeting, if you remember,
16      last in September?
17  A.  Maybe a half hour.
18  Q.  At this meeting, was the choice made of what
19      material was going to be used?
20  A.  No.  They were evaluating internally.
21  Q.  Okay.  So, you left there, correct, without an
22      order of any kind?
23  A.  I don't believe, no, I didn't get an order.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.vl                                                    9/16/2003

28

```
 1  Q.  Okay.  And when's the next time that you meet with
 2      Mike B or hear anything from Commercial Carriers,
 3      Inc. or any of their affiliated companies?
 4  A.  To the best of my recollection was the October time
 5      frame that we talked about.
 6  Q.  Okay.  And that would be the -- that would be this
 7      order, Plaintiff EE, where they ordered four of
 8      them?
 9  A.  No, obviously, it's the --
10  Q.  You tell me which one.
11  A.  This particular one here, which is order number
12      073538.
13  Q.  That's Plaintiffs' CC?
14  A.  CC.
15  Q.  Okay.  And that one's for the -- an eighth of an
16      inch, right?
17  A.  Correct.
18  Q.  Now, an eighth of an inch, do you know what the --
19      oh, strike that.  I'm going to show you something
20      else.  All right.  Plaintiff Exhibit U, which
21      everyone's got, can you identify what that is?
22  A.  It's a catalog cut from our catalog.
23  Q.  Did you give that to them, to Commercial Carriers
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

29

```
 1      in '94 or '95, or you don't remember or what?
 2  A.  They might have had our general catalog.  This --
 3      this was something that was readily available.  It
 4      gave the specifications on cable.  That's me.
 5      Excuse me for a second.
 6  MR. PAULUS:  Can we go off the record?
 7           (Off the Record Discussion)
 8  BY MR. KOUSTMER:
 9  Q.  Okay.  Are we ready from the break?
10  A.  Sure.  Yeah.
11  Q.  Looking at -- Plaintiff's U's from your catalog?
12  A.  Our current catalog.
13  Q.  Okay.  Did you have something similar to that in
14      '94, '95?
15  A.  We had catalogs from that time frame.
16  Q.  Do you have any of those catalogs left?
17  A.  There's -- yes, there's some available.
18  Q.  Okay.  I'll probably request one from your Counsel
19      on discovery.
20  A.  Not a problem.
21  Q.  Its got starred here, vinyl coated galvanized
22      aircraft cable.  That was what was used to make the
23      cables after October of '94, correct?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

30

```
 1  A.  Vinyl coated galvanized aircraft cable, correct.

 2  Q.  Okay.  And they were a quarter of an inch in

 3      diameter, correct?

 4  A.  Correct.

 5  Q.  And that is 7,000 pound, what, breakage?  Is that

 6      what it says?

 7  A.  Minimum breaking strength, 7,000 pounds.

 8  Q.  Okay.

 9  A.  Mm hmm.

10  Q.  The other ones that were ordered the couple days

11      beforehand, what were they?  They were the eighth

12      of an inch?

13  A.  Correct.

14  Q.  Okay.  And those had a 2,000 pound breakage?

15  A.  Correct.

16  Q.  Did Mike B or anybody at Commercial Carriers ask

17      your advice on the minimum OSHA standards for

18      cables, safety cables?

19  A.  No.

20  Q.  Okay.  Did you provide them that information?

21  A.  No.

22  Q.  Did you know it at the time that you sold it to

23      them?
```

hanes.dep.v1                                          9/16/2003

1   A.   I was not familiar with the exact specification.

2   Q.   So, after your -- so, I'm clear, after your meeting

3        with them in October, August or September --

4   A.   Mm hmm.

5   Q.   -- of '94, they ordered two different types of

6        cables from you?  The first was for the eighth of

7        an inch, correct --

8   A.   Yes.

9   Q.   -- diameter, and the next was for a quarter inch

10       diameter --

11  A.   Correct.

12  Q.   -- correct?  Were they both of the -- everything

13       else the same, just the difference in diameter?

14  A.   Studs were different.

15  Q.   Okay.  What were the difference in the studs?

16  A.   Smaller cable would have a smaller threaded stud.

17  Q.   Okay.  Did you ever discuss with Michael B how

18       they're going to attach them to the -- to the

19       trailers or the trucks?

20  A.   He -- he probably -- probably went down the -- the

21       -- the stud viewpoint to insert them through a

22       post.

23  Q.   Okay.  Did he tell you that or is that just

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                              9/16/2003

                                                              32

```
 1      something you surmised by what they were ordering?
 2  A.  That's -- it was -- I can't recall.  I -- that must
 3      have been their design criteria.
 4  Q.  Okay.  When you went out there for the half an hour
 5      meeting, did you walk outside and look at a truck
 6      or trailer?
 7  A.  It's possible.
 8  Q.  You don't remember?
 9  A.  I don't exactly remember, no.
10  Q.  Did you give them the stainless steel option?
11  A.  They requested galvanized.  Stainless was available
12      also.
13  Q.  When you went out there, did you discuss stainless
14      versus galvanized?
15  A.  No.
16  Q.  Did they ask you about it?
17  A.  I don't recall.
18  Q.  Okay.  What's the difference between stainless and
19      galvanized?
20  A.  Stainless has a lower tensile strength but it's
21      more corrosion resistant.
22  Q.  When you galvanize something, does that make it
23      more brittle?
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                          (716) 856-0085

hanes.dep.v1                                                    9/16/2003

33

```
 1   MR. LARSON:  Object to the form.

 2   THE WITNESS:  Too vague.

 3   BY MR. KOUSTMER:

 4   Q.  Okay.  Let me show you what's marked as -- well,

 5       marked as Exhibit -- Plaintiff's Exhibit S.  Are

 6       these the order forms for -- well, you identify

 7       what Plaintiff's S is.

 8   MR. PAULUS:  Look all the way through it.

 9   THE WITNESS:  Excuse me?

10   MR. PAULUS:  I just wanted to look at that one.

11       Thanks.

12   THE WITNESS:  Mm hmm.

13   MR. PAULUS:  Okay.

14   THE WITNESS:  Those are purchase orders from Commercial

15       and our corresponding work orders and invoices.

16   BY MR. KOUSTMER:

17   Q.  Okay.  And that has to do with the cables during

18       this period of time, 1994, 1995, is that correct?

19   A.  Correct.

20   Q.  So what was eventually ordered was the quarter inch

21       yellow cable, correct?

22   A.  Correct.

23   Q.  Okay.  Do you remember seeing any of these as they
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                        9/16/2003

1        left your place to go over there?

2    A.   On occasion.

3    Q.   Okay.  We have the cable, not the original cable,

4         but a cable given to us by my client from

5         someone -- I forget the guy's name.  Everybody

6         wants to depose him, but I forget his name.  Okay?

7         The -- what I'm getting at is it's -- did the

8         coating go up to the -- to the metal part?

9    A.   As close as possible.

10   Q.   Okay.  Can -- can it be made where there's like a

11        quarter inch or something that the coating doesn't

12        go all the way?

13   A.   That could occur.

14   Q.   Okay.  But there, it -- in this case, they were

15        ordered to go up to the metal?

16   A.   Our fabrication procedure is to have the plastic as

17        close to the switch fitting as possible.

18   Q.   Okay.  So, at your place, you ordered the wire and

19        then you installed the vinyl coating?

20   A.   No.

21   Q.   Okay.  What do you do?

22   A.   We ordered the wire rope, you know, PVC coated.

23        That's one option.


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

hanes.dep.v1                                                    9/16/2003

1   Q.   Okay.

2   A.   Or you can order the wire rope and have it PVC

3        coated afterwards.

4   Q.   And -- and in this case, what did you do?

5   A.   Probably ordered the rope already PVC coated.

6   Q.   Okay.

7   A.   Possibly.  Or might have had it coated, also.

8        Either way.

9   Q.   Okay.  And then, what do you do before you then

10       sell it to CCI or any of their companies?

11  A.   We assemble the wire rope assembly.

12  Q.   Assembly, okay.  So you attach the metal parts, the

13       swivel?

14  A.   Not the swivel.  The threaded stud.

15  Q.   Okay.  You attach the threaded stud, and it's your

16       policy to attach it up to the -- as close as

17       possible to the vinyl, correct?

18  A.   Correct.

19  Q.   So, when you cut the rope as it's coming into your

20       assembly plant, you cut and have to take off some

21       of the vinyl to attach the metal stud, right?

22  A.   That's correct.

23  Q.   Okay.  And then you get the length that Hanes


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

36

```
 1      Supply asked for and then ship them out, correct?
 2   A. Not that Hanes Supply asked for.
 3   Q. I'm sorry.  CCI asked for.
 4   A. Correct.
 5   Q. Okay.  I'll show you Exhibit T, which is a mill
 6      test certificate, a bunch of them that were
 7      produced in discovery by your Counsel, and I don't
 8      think you got it, but you might have it in
 9      discovery.
10   MR. LARSON:  I do have a note about mill certificates
11       here.
12   MR. KOUSTMER:  Yeah.
13   BY MR. KOUSTMER:
14   Q. Can you explain what those are?
15   A. These are mill test certificates from one of our
16      manufacturers that we deal with.
17   Q. Okay.  And they are -- they test -- what type of
18      tests are they?
19   A. It's a certificate on the specifications of the
20      wire rope.
21   Q. And what are they testing, that the specifications
22      are correct or what?
23   A. They're testing that the -- that the wire rope
```

hanes.dep.v1                                                    9/16/2003

```
 1      meets the specification.
 2  Q.  Okay.  What specification's that?
 3  A.  Typically mill specs.
 4  Q.  Are any of those sheets that were produced -- I
 5      think I got them all -- related to this order in
 6      '94, '95 for CCI or any of the Ryder, Allied
 7      companies?
 8  A.  We could have utilized some from this mill for this
 9      quarter inch -- this particular mill for the
10      quarter inch wire rope assemblies.
11  Q.  Now, there's other than quarter inch enclosed in
12      that exhibit, are there not?
13  A.  That's correct.
14  Q.  So it's just something that was produced that it
15      could have been, but we're not sure if it was or
16      not?
17  A.  We don't know the exact -- not having the sample,
18      don't know the exact manufacturer.
19  Q.  Okay.  We can't go back and determine that, the
20      mill test certificates for that?
21  A.  No.
22  Q.  Okay.
23  A.  Sample's gone.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                      38

```
 1   Q.   Right.  And I did notice here there was a -- very
 2        back, almost all of them are type of core, steel
 3        core, and then it says coating galvanized, and then
 4        the last two, there's no coating.  Does that mean
 5        that it wasn't galvanized?  These weren't
 6        galvanized?
 7   A.   These were a grade of stainless, a Type 304
 8        stainless.
 9   Q.   Okay.  The next one is also a stainless?
10   A.   That's correct.
11   Q.   Okay.  Stainless is not galvanized, right?
12   A.   No.
13   Q.   Now, did you ever go back out to Commercial
14        Carriers, Inc. after the order came in in October
15        and all the orders started coming in in what's been
16        marked as Plaintiffs' Exhibit S and discuss with
17        them the choice that was made?
18   A.   Not to my recollection.
19   MR. LARSON:  Can you repeat the question?
20   BY MR. KOUSTMER:
21   Q.   Did you ever go back out to CCI , Commercial -- did
22        you ever go back out to Commercial Carriers, Inc.
23        and discuss with them the choice that was made
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                            (716) 856-0085

```
 1      after October when the order came in?

 2  A.  No.

 3  Q.  Did you ever have any further discussions with Mike

 4      B or anyone at Commercial Carriers, Inc. about the

 5      safety cables after the one meeting?

 6  A.  I don't recall any.

 7  Q.  Okay.  In your interrogatories that you answered,

 8      you state that in approximately 1999 Commercial

 9      Carriers --

10  A.  Oh, well, yeah.  Yeah.  Yeah.

11  Q.  Okay.  Up to '99, you didn't have any other meeting

12      with them, is that what you're saying?

13  A.  Yeah, I thought you were talking about the '95 --

14       '94/'95 time frame.

15  Q.  I was.  That's fine.

16  A.  Yeah.

17  Q.  Okay.  The next time had you a talk with them was

18      in 1999?

19  A.  Was somewhere in that time frame, '99, they made --

20      they decided to change the design of the cables.

21  Q.  Okay.  And what did they change it to?

22  A.  They went to a fully threaded eye bolt half inch by

23      four and a half, with a -- a thimble, and then
```

hanes.dep.v1                                                          9/16/2003

                                                                          40

```
 1      quarter inch cable PVC coated.  And I believe the
 2      coating was changed to -- I'd have to review the
 3      records to see when the coating was changed to a
 4      clear by them.
 5 MR. LARSON:  Can we specify who "they" is?
 6 THE WITNESS:  I don't know if Mike was involved at the
 7       time.  They have a new guy in Purchasing, Ken
 8       Hamm.  He might have been involved.  Might have
 9       been an engineer.  I can't remember the people.
10 BY MR. KOUSTMER:
11 Q.  Let me show you what's been marked as Plaintiffs'
12      Exhibit I.  As you look at the one with the cars in
13      it, several pictures of cars, was the design change
14      as it looks on the upper -- is that what you're
15      talking about, the upper part of the post?
16 A.  Correct.
17 Q.  Okay.  So, that's the eye bolt, thimble, quarter
18      inch PVC, coated clear, correct?
19 A.  I don't know what exact time frame the clear
20      started.
21 Q.  Okay.  But that was the design it was changed to,
22      correct?
23 A.  Correct.
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

41

```
 1   Q.   Okay.  Have there been any other design changes
 2        that were made that you know of that were ordered
 3        from Hanes Supply?
 4   A.   That were ordered from Commercial Carriers?
 5   Q.   Yeah.  By Commercial Carriers, Allied, Ryder or
 6        anyone in that group.
 7   A.   Any other design changes?  Such as?
 8   Q.   Different specifications.  Different diameter.
 9        Different material.  Different coating.
10   A.   The only difference is the color of the coating
11        that I -- that I can recall.
12   Q.   Okay.  Let me show you what's marked as -- oh, we
13        can go right off of I.  On I, on the bottom one?
14   A.   Mm hmm.
15   Q.   There seems to be a gap between where the coating
16        starts and where the -- what do you call that, stud
17        or --
18   A.   Threaded stud.
19   Q.   Threaded stud?
20   A.   Yep.
21   Q.   Okay.  Was that requested at any time?
22   A.   I don't believe so.
23   Q.   Okay.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                          9/16/2003

42

```
 1  A.  But one thing to consider during the manufacturing
 2      process is that you got metal flow, and it's not an
 3      exact science as far as how the metal will flow.
 4  Q.  Okay.  But you try and get the coating up to -- to
 5      the metal stud?
 6  A.  Yes.  We try to get as close as possible.
 7  Q.  Okay.  Have Commercial Carriers or Allied or Ryder
 8      ever ordered any stainless steel nylon coated cable
 9      from you?
10  A.  No, sir.
11  Q.  Okay.
12  A.  Looking at this exhibit with the way that is swaged
13      on, I don't believe that's a Hanes Supply product.
14  Q.  Okay.
15  A.  I really don't, because of the -- the flashing on
16      the swage, and that the diameter is the same here
17      as it is here, and I don't think -- that's possibly
18      not our product.  We would never put something out
19      there, I don't believe, that -- that has that type
20      of excessive flashing.
21  Q.  It might not be your product?
22  A.  Might not be from -- our product.
23  MR. LARSON:  Which photograph are you referring to?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                            9/16/2003

43

1   MR. KOUSTMER:  I.

2   MR. PAULUS:  The photograph that shows a single stud is

3       what he's pointing at.

4   BY MR. KOUSTMER:

5   Q.  I gave it to you, basically, to ask you about the

6       -- that this was a different design started

7       sometime in 1999?

8   A.  Mm hmm.

9   Q.  I don't know if your people made that design or

10      not.  But I'm just asking if that's a visual of

11      the design you described.  And also this gap.

12  A.  Mm hmm.

13  Q.  Okay.  I might have asked you this, but let me ask

14      you again.  Did they ever order stainless steel

15      nylon coated from you?

16  A.  Not to -- not to the best of my recollection.

17  Q.  Okay.  We got Plaintiffs' Exhibit V here which

18      shows -- from another company, Allied's ordered

19      some, and what they're ordering there is quarter

20      inch nylon coated stainless steel threaded stud.

21      Correct?

22  A.  That's correct.  By ten feet.

23  Q.  Okay.  Was that one of the options that you gave

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

```
 1      them when you met with them?
 2  A.  It was their choice.  They were -- it's their
 3      choice to utilize the material they felt was
 4      appropriate.
 5  Q.  Okay.  Just so I'm -- just so I'm clear, because
 6      there's some confusion on this point.  But your
 7      testimony is that Commercial Carriers, Inc. in 1994
 8      when they began ordering these safety cables from
 9      you --
10  A.  Mm hmm.
11  Q.  -- they chose the material, not you, correct?
12  A.  That's correct.
13  Q.  Okay.  They chose the specifications for the
14      material, not you?
15  A.  That's correct.
16  Q.  They chose the coating for the material, not you?
17  A.  Correct.
18  Q.  Okay.  And when I refer to you, I refer to you or
19      anyone --
20  A.  At Hanes Supply.
21  Q.  -- or anyone in your company, Hanes Supply?
22  A.  Correct.
23  Q.  And when I refer to they, I'm referring to
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                              9/16/2003

                                                              45

```
 1      Commercial Carriers, Inc., Allied and their
 2      companies.  Okay?  So, it was all their decision of
 3      what material, specifications for that material and
 4      coating to put on that material, is that correct?
 5  MR. LARSON:  Let me simply object to the form of the
 6      question, that you're lumping Allied in to CCI in
 7      1994 -- 1994, because there was no relationship at
 8      that time.
 9  MR. PAULUS:  I also wanted to clarify that he may not
10      be the -- he's not here in this deposition today
11      as the 30(b)5 witness for Hanes Supply, though he
12      may later be designated on certain subjects, if we
13      choose to have that deposition.
14  BY MR. KOUSTMER:
15  Q.  This order came through you, correct?
16  A.  I took the order from Mike Bevilacqua.
17  Q.  Okay.
18  MR. PAULUS:  Which order are you referring to?
19  MR. KOUSTMER:  I'm referring to the -- both the sample
20      they ordered -- on what was that? -- 10/5, and
21      then subsequent, when they started ordering them
22      in quantity.
23  THE WITNESS:  Mm hmm.
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                            (716) 856-0085

hanes.dep.v1                                                          9/16/2003

46

1  BY MR. KOUSTMER:

2  Q.  That was through you, correct?

3  A.  Correct.

4  Q.  Anyone else dealing with them as far as this order

5      goes, other than yourself?

6  A.  They could have, you know, put other orders in with

7      other outside -- inside sales guys.

8  Q.  Did anyone go out with you to this meeting?

9  A.  No.

10 Q.  Okay.  To your knowledge, did anyone at your

11     company give them advice or recommendation on what

12     type of material to use, what coating to use, what

13     diameter to make the safety cable, whether it be

14     PVC, nylon, galvanized steel, stainless steel?  Did

15     anyone in your company make a recommendation to

16     them?

17 A.  No.

18 Q.  Okay.  So, you're saying that Commercial Carriers,

19     Inc. was the one that picked this design and also

20     is the one that picked the specifications for the

21     material to be used in the design?

22 A.  That's correct.

23 Q.  Okay.  Your company, Hanes Supply, Inc., had

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

```
 1        nothing to do with that other than to take the

 2        order, is that correct?

 3  A.    We told them what was commercially available in

 4        threaded studs, and they designed what they felt

 5        was appropriate.

 6  Q.    Did you give them any advice as to how long the

 7        material, different material would last?

 8  A.    No.

 9  Q.    Okay.  Did they tell you when you went out there or

10        at any other time, Mike B or anybody from

11        Commercial Carriers, Inc., did they tell you we

12        want these safety cables to last the life of our

13        trailer, which is approximately ten years?

14  A.    No.

15  Q.    Okay.  Did you know how long these safety cables

16        were supposed to last?

17  A.    No.

18  Q.    Did you give them any instructions on replacement

19        of them?

20  A.    The instructions would be the standard warnings on

21        our work order invoices.

22  Q.    Okay.  So, just so we're clear, the only

23        instruction you gave them would be this standard
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                9/16/2003

48

 1       warning we're looking at on Exhibit S at the
 2       bottom, which says -- do you want to read it or
 3       I'll read it?
 4   A.  You can read it.
 5   Q.  Wire rope products, slings, and lifting equipment
 6       will break if abused, misused or overused, period.
 7       Regular inspection before and after use is
 8       necessary, period.  Consult industry
 9       recommendations and standards before using.  Any
10       and all returns of any article may be made only
11       upon the consent of the seller.  Upon any return
12       consented to seller, seller reserves the right to
13       charge buyer a reasonable restock charge.
14   MR. PAULUS:  Can I see this a second?  It looks like
15       there's a word cut off here.  Because on the copy
16       on the left margin of the page is cut off.  It says
17       regular inspection on the end of one line, the next
18       line starts with tenance.
19   MR. KOUSTMER:  You provided them to me.
20   MR. PAULUS:  Sorry about that.  We'll --
21   MR. KOUSTMER:  They're not mine.
22   MR. PAULUS:  We'll find these.  Actually, I think these
23        were key punched.  These are the ones you got from

                DENALL, VITRANO AND ASSOCIATES, INC.
                         (716) 856-0085

```
 1      CCI.

 2  MR. KOUSTMER:  Oh.

 3  MR. PAULUS:  But --

 4  MR. KOUSTMER:  Somebody provided them to me.

 5  MR. PAULUS:  Right.

 6  MR. KOUSTMER:  I don't -- Mr. Ferguson doesn't have

 7      those.  He didn't design them, build this.

 8  MR. PAULUS:  Okay.  What's your question?

 9  BY MR. KOUSTMER:

10  Q.  Okay.  That's the only warning that you gave?

11  A.  That's our standard warning.

12  Q.  Okay.  Did you give any other instructions about

13      longevity of the cables?

14  A.  No.

15  Q.  All right.  Did you give them any type of written

16      material with -- when you sold them the cables as

17      to maintenance or longevity or anything else?

18  A.  No.

19  Q.  Okay.  Did you give them -- it refers in here to

20      industry recommendations and standards.  Did you

21      give them any industry recommendations or

22      standards?

23  A.  No.  That is put in there to -- because we deal
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                    50

```
 1      with a lot of different industries, people have to
 2      take it upon themselves to see what is applicable
 3      to their industry.
 4   Q. Okay.  When -- strike that.  So when you sold them
 5      the cables, you didn't give them anything in
 6      writing, other than the invoice and the bill,
 7      correct?
 8   A. Correct.
 9   Q. Okay.  I'll show you Exhibit A which has previously
10      been marked.  You knew when you sold them that they
11      were going to be used to hang like this, as a
12      safety cable between two posts on the top of a
13      trailer and a truck?
14   A. The design concept was the post with cables.
15   Q. You knew that was going to happen, correct?
16   A. More or less.
17   Q. Yeah.  Did you tell them anything about how tight
18      they should be?
19   A. No.
20   Q. Okay.  Does it make a difference if they're loose
21      or tight as far as wear and tear on them?
22   A. Straight line would -- would -- my opinion, would
23      probably be better.  But, it's -- it's really --
```


                    DENALL, VITRANO AND ASSOCIATES, INC.
                            (716) 856-0085

```
 1      again, it's the discretion of the Commercial
 2      Carrier how they want to design the thing.
 3  Q.  Okay.  Did you tell them anything or give them any
 4      warning or anything in writing that you have to
 5      keep the -- you have to tighten these things down
 6      every so often?
 7  A.  No.
 8  Q.  I think -- okay.  I think Plaintiffs' Exhibit G,
 9       that shows the design in 1999, correct?
10  A.  '99 to 2000 time frame.
11  Q.  Okay.  When they -- when they asked for a change in
12      the design, did they tell you why?
13  MR. LARSON:  Object to the form as to "they."  They is
14       ambiguous.
15  BY MR. KOUSTMER:
16  Q.  Who contacted you about the design change in '99,
17      2000, around there?
18  A.  I'd have to review the records, but my guesstimate
19      is probably Purchasing, Ken Hamm.
20  Q.  Okay.  Purchasing at the same place as CCI was, but
21      it might not be CCI?  I think that's what
22      co-counsel's getting at, is a different entity?
23  MR. LARSON:  Probably the same location?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

52

1    THE WITNESS:  Yeah.  Yeah.  They're out in West Seneca
2        now.
3    BY MR. KOUSTMER:
4    Q.  They moved?
5    A.  Yeah.
6    Q.  Okay.  So, the purchasing history, had you sold
7        them any after '95?
8    A.  Yeah, it was an ongoing sale.  They'd order; we'd
9        ship.
10   Q.  Okay.  So that they were being sold through '96 and
11       '97?
12   A.  I believe so, yes.
13   Q.  Okay.  Then in '99, you're contacted by someone and
14       you believe that was someone in Purchasing?
15   A.  It -- I'd have to review it.
16   Q.  Okay.
17   A.  Yeah, I remember going there, but I don't remember
18       all the individuals.  Just wasn't there because I
19       do recall an engineer at that that wanted a fully
20       threaded eye bolt, which we did come up with for
21       them.
22   Q.  Okay.  And that was in 1999 or 2000?
23   A.  I'm not sure.


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                        9/16/2003

53

```
 1  Q.  Okay.  When this person you talked to wanted a
 2      fully threaded eye bolt, did they give you the
 3      reason why?
 4  A.  For more adjustment in the system.
 5  Q.  Did they tell you that they were -- cables were
 6      breaking?
 7  A.  No.
 8  Q.  When's the first time you learned that the cables
 9      had been breaking?
10  A.  I think we learned when we were party to this suit.
11  Q.  Okay.  Before then, no one had informed you that
12      cables were breaking or there was a problem with
13      them breaking?
14  A.  No.
15  Q.  Once you started making the eye bolt safety cable,
16      did you stop making the other kind that you were
17      making in '94, '95?
18  A.  I'd have to review my sales history.  We only
19      looked up to -- to the '94 -- '94 time frame.  I'll
20      have to go further and see what the time period
21      is.  I'll have to get back to you on that.
22  Q.  Okay.  Would your records show who it was you
23      talked to in '99 or 2000 around that time frame
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

54

```
 1     about changing to -- to the eye bolt system?
 2  A. It probably would show who ordered them with us.
 3  Q. Okay.  So that's similar to Mike Bevilacqua in
 4     '94?
 5  A. Correct.
 6  Q. Okay.  And the reason given was -- that they wanted
 7     this design is to keep them tighter or tighten them
 8     up or what?
 9  A. The reason they -- they weren't extremely explicit
10     on a reason.  They wanted -- they were very
11     explicit about wanting a lot of adjustment.
12  Q. Okay.
13  A. Additional adjustment.
14  Q. But they didn't tell you why?
15  A. No.
16  Q. Okay.  I'll show you Plaintiffs' Exhibit P.  Have
17     you ever seen this drawing before?
18  A. I don't recall it.
19  Q. Okay.  Was any type of drawing given to you at the
20     time that you went out and talked to them?
21  A. I don't recall it.
22  Q. Okay.  I'll show you Plaintiffs' Exhibit Q.  Have
23     you ever seen that before?
```

hanes.dep.v1                                                    9/16/2003

                                                                    55

    1   A.   Those are the drawings provided by Commercial that
    2        we've assembled to.
    3   Q.   Okay.  And, so, you would have gotten these
    4        drawings when in the process?
    5   A.   With the purchase order.
    6   Q.   Okay.  So, the -- the purchase order that came
    7        in -- which purchase order would that be?  Would
    8        that be in exhibits -- Exhibit S?  This is Exhibit
    9        S.
   10   A.   From the time frame of their doing the drawing to
   11        the time frame of the order, that the -- you know,
   12        I'm not sure what the time frame of when they
   13        give -- gave us the drawing into when we started
   14        production of these.  I don't know if -- you know,
   15        the period, you know, but this was an ongoing
   16        drawing that they would, say, send to us after, you
   17        know, after the initial run, so --
   18   Q.   Okay.  So, there's an initial run, and then you're
   19        saying they send you a drawing?
   20   A.   Yeah.  We have drawings on file for these of the
   21        different lengths, and it was unusual that they
   22        wanted from the nut to the nut sort of.
   23   Q.   Why is that unusual?


                      DENALL, VITRANO AND ASSOCIATES, INC.
                              (716) 856-0085

56

```
 1   A.  I mean, it's just, usually, the industry standards,

 2       you measure with overall length, you know, so

 3       that -- but that's no big deal.  Just how they

 4       measured it.

 5   Q.  It doesn't have any particular significance?

 6   A.  No.

 7   Q.  Oh.  And you're saying that there's other drawings

 8       that you might have of what was ordered by CCI,

 9       Commercial Carriers, Inc., in your files?

10   A.  I would think they'd change the drawing with the

11       length.  I'd have to review that.

12   Q.  Okay.  Might be more than one drawing?

13   MR. PAULUS:  We did produce you a drawing of

14        substantially similar to this, but not identical.

15   MR. KOUSTMER:  Okay.

16   MR. PAULUS:  We can look for more.  Okay?  I said we'll

17        look.

18   BY MR. KOUSTMER:

19   Q.  Let me show you Plaintiffs' Exhibit R while we're

20       going into that.  This looks like -- what is this?

21   A.  That's our work order.

22   Q.  Okay.  You know whose writing's on there?

23   A.  As far as the signature down here, that looks like
```

hanes.dep.v1                                                    9/16/2003

57

```
 1      the receipt for the gentleman at Commercial, and
 2      looks like we back ordered some nuts.
 3  Q.  Okay.  Now, I was also given a couple other
 4      exhibits by your attorney, Exhibit Z.  I don't know
 5      if you got Z. That must be in this document
 6      production.  Can you tell me what that is?
 7  A.  This is one of our purchase orders for the -- for
 8      the threaded studs.
 9  Q.  From?
10  MR. PAULUS:  I'm not sure this is supposed to be
11      attached.
12  THE WITNESS:  Yeah, these were for the studs, and it
13      looks like on the initial product we provided, we
14      probably provided the -- you know, we had the
15      cable coated.  We might have either bought the
16      cable complete or sent it out to get coated.  I'll
17      have to -- again, I'll have to review that more
18      closer.  Based on the price, I don't know.
19  BY MR. KOUSTMER:
20  Q.  Okay.  Well, let's -- this is a -- oh, you're
21      buying the product yourself from Assembly Specialty
22      Products?
23  A.  That's correct.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

58

 1  Q.  Okay.  So, is this generated in your computer

 2      system, this document?

 3  A.  Correct.

 4  Q.  Okay.  And that shows the -- the first page shows

 5      the studs?

 6  A.  Right.

 7  Q.  Okay.  What's the second page show?

 8  A.  It just gives more detail.

 9  Q.  Same deal with the studs?

10  A.  Yes.

11  Q.  Okay.  And the third page, I think maybe that's a

12      different order.  What's the third page?  That's

13      from a different company?

14  A.  That's from a different company called Loos,

15      L-o-o-s.

16  Q.  What are you ordering from them?

17  A.  It's either the complete cable or the cable getting

18      coated.  I'm not a hundred percent sure.  It's one

19      or the other.

20  Q.  Okay.  So, you're not sure whether it's the

21      complete cable or just the coating of the cable?

22  A.  Correct.

23  Q.  And these are all received in December of '94,

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

59

```
 1      correct?

 2   A.  Correct, from the upper right-hand corner.

 3   Q.  And then, oh, Plaintiffs' Exhibit AA, I think, is

 4       just the second page of the third page of this.

 5   A.  Just more detail.

 6   Q.  Got the same number on it.  And, again, that's just

 7       ordering of the lot of the quarter.  How much is in

 8       a lot?

 9   A.  A lot, which is the term we used in the computer to

10       enter that particular item.

11   Q.  Okay.  Oh.  Okay.  How much are you ordering here?

12   A.  Looks like from down here it was 20,000 feet.

13   Q.  Okay.

14   A.  And received 19,715.

15   MR. PAULUS:  I think these two go together.  This is

16       from Z.  I think the document numbers are the

17       same.

18   MR. LARSON:  Okay.

19   MR. PAULUS:  Yeah.

20   BY MR. KOUSTMER:

21   Q.  When the design was changed around 1999, 2000, did

22       you have any input on how it -- the new design

23       should be, on specification, diameter coating?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                        9/16/2003

60

```
 1  A.  They -- essentially my only input was to find the
 2      fully threaded eye bolt, because what they found
 3      in the catalogs again is standard commercial item
 4      was not fully threaded, and I could find those for
 5      them and get them fully threaded, which would help
 6      them, you know, install the cables.
 7  Q.  Okay.  You -- it was requested to get a fully
 8      threaded eye bolt?
 9  A.  Correct.
10  Q.  Did anyone ever ask you from Commercial Carriers,
11      Inc. in '94, '95 to perform some tests, any type
12      of testing on the cables you were selling them?
13  A.  No.
14  Q.  Did you offer to perform any type of testing?
15  A.  No.
16  Q.  Did anybody at Commercial Carriers, Inc. ask you
17      for any OSHA requirements or any other
18      requirements that has to deal with strength before
19      they ordered these safety cables?
20  A.  No.
21  Q.  Did anyone at Commercial Carriers, Inc. in, '94,
22      '95 ask you to give an opinion based on your
23      engineering background as to what would be the
```

hanes.dep.v1                                              9/16/2003

61

```
 1      suitable material specification and/or coating to
 2      do to make these safety cables?
 3  A.  No.
 4  Q.  Did you render any opinion with your engineering
 5      background about what material specifications
 6      coatings should be used?
 7  A.  No.
 8  Q.  And to your knowledge, who besides Mike B -- I
 9      won't try --
10  A.  Bevilacqua.
11  Q.  Bevilacqua?
12  MR. LARSON:  Bevilacqua.
13  THE WITNESS:  We've had three different versions.
14  BY MR. KOUSTMER:
15  Q.  Who besides Mike were you communicating with at
16      Commercial Carriers, Inc. at the time?
17  A.  There was another gentleman, Ron Vacanti, that was
18      in Purchasing.
19  Q.  Ron?
20  A.  Vacanti.
21  Q.  Want to spell that for the Court Reporter, if you
22      know?
23  A.  Yeah.  I think it is on some of the paperwork in
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                    62

 1      there.

 2   MR. LARSON:  V-a-c-a-n-t-i is what's written here.

 3   THE WITNESS:  I think that's correct.

 4   BY MR. KOUSTMER:

 5   Q.  You probably -- well, have you seen him since?  Do

 6       you know if he's still in this area?

 7   A.  I -- I haven't seen him since.  He left Commercial

 8       Carriers, you know.  I haven't had contact with him

 9        or anything like that.

10   Q.  Anyone else you might have talked with over at

11        Commercial Carriers, Inc. as it relates to this

12        ordering of the safety cables?

13   A.  There -- there could have been engineers in the

14        past.  I just don't recall any of their names.

15   Q.  Do you know how many engineers were working there?

16   A.  I don't know how many men they had in Engineering.

17        Men or women.

18   Q.  More than one, though?

19   A.  I -- I would assume so, a company that large.

20   Q.  Okay.  Was Mike B introduced as an engineer?

21   A.  I'm not sure if he was in Engineering or if he was

22       in Purchasing.  It -- you know, it was sort of --

23       he might have been wearing both hats.


               DENALL, VITRANO AND ASSOCIATES, INC.
                     (716) 856-0085

hanes.dep.v1                                                    9/16/2003

1   MR. KOUSTMER:  If you guys want to take a break, I want

2        to just look through these exhibits, make sure I

3        got everything.  I might be done.

4              (Off the Record Discussion)

5   BY MR. KOUSTMER:

6   Q.  Sir, I just have couple other questions.

7   A.  Okay.

8   Q.  When the order came in, started to come in, to your

9        knowledge, did you or did you not have a drawing of

10       the cables?

11  A.  No.  From the time frame that I saw, I can't -- I

12       don't know.

13  Q.  You don't know?

14  A.  I -- you know.

15  Q.  What is it -- and we covered some of this.  But

16       what is it exactly you would do from the time the

17       cables came to you?  What -- what is the assembly

18       process?

19  A.  As far as how we assembled the wire rope

20       assemblies, right?

21  Q.  Yeah.  I'm assuming you ordered the wire rope from

22       someone?

23  A.  Right.


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                    9/16/2003

64

1   Q.  And then you do something to it to get it to
2       Commercial Carriers, Inc..  What is it?  What is
3       that process that you used?  What did you do?
4   A.  The process is we'll go by their specs to say I
5       want quarter inch coated to 5/16ths with threaded
6       studs on each end.  Might be a length of a hundred
7       twenty-five inches, could be a hundred and thirty
8       inches, whatever they'd want in the quantity they'd
9       want.  The inside sales guy take the order, and
10      write it up as a work order.  Then a copy of that
11      work order would go to the Production Department,
12      where they would cut the wire that's coated, strip
13      off the appropriate amount of plastic.
14  Q.  Okay.  They -- so, they cut the wire to the length
15      specified, correct?
16  A.  Right.  Taking --
17  Q.  First they choose the -- the diameter of the wire
18      or --
19  A.  Right.
20  Q.  That's already ordered or --
21  A.  Right.  It's in inventory.
22  Q.  Okay.  So, you have some in inventory, so you cut
23      the wire, you strip off the coating, right?


                DENALL, VITRANO AND ASSOCIATES, INC.
                       (716) 856-0085

hanes.dep.v1                                                    9/16/2003

65

```
 1  A.  Correct.
 2  Q.  And then, in this case, you did what?
 3  A.  After you strip it off on each end, then you'd
 4      slide the threaded stud over the -- the wire and go
 5      through a swaging process, and then open channel
 6      die.
 7  Q.  What process is it?  Can you explain?
 8  A.  I -- a hydraulic swaging.  It's -- we have four
 9      presses, but the one that -- the production one is
10      a five hundred ton press.  It's a hydraulic press
11      with a ram.  Basically, you -- you use separate --
12      separate dies for different size wire ropes.
13      Okay?  So, the die for this particular one, it's a
14      9/16ths thread, so we ordered the studs so that
15      they swaged down to be smooth, so after finish, it
16      will be down to 9/16ths.  So you put it in 98/16ths
17      open channel die.  It's like a split die, looks
18      just like this.
19  MR. LARSON:
20  MR. LARSON:
21  MR. PAULUS:  Did you want to take some pictures of
22      these?
23  THE WITNESS:  Yeah, we can e-mail it.  You just swage
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

66

```
 1      down.  This is -- this is -- this is actually
 2      fixed up here.  And the ram takes it up, swages it
 3      on, and it becomes like a continuous piece of
 4      steel there.
 5  BY MR. KOUSTMER:
 6  Q.  And you're swaging on what, the --
 7  A.  The threaded stud onto the cabling.
 8  Q.  Okay.
 9  A.  After -- after -- after they're manufactured, they
10      get coiled, inspected, put in shipment container,
11      some type of box, and transported in our trucks
12      over to Commercial.
13  Q.  Mm hmm.  Okay.  What's the inspection process?
14  A.  Inspection process is that we have a two -- the
15      gentleman who does fabrication, there's four
16      people in that department.  It's also visually
17      inspected by another individual than the guy who
18      swaged it, so that's --
19  Q.  Okay.  What are they inspecting?  What are they
20      looking for?
21  A.  Looking to make sure it was swaged.
22  Q.  That wouldn't have anything to do with it breaking
23      at this point, would it?  Looking at Exhibit F and
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

67

```
 1     E -- E and F?

 2  MR. PAULUS:  Object to the form.

 3  BY MR. KOUSTMER:

 4  Q.  Would this swaging have anything to do with the

 5      breakage at these -- this point?

 6  A.  If a wire rope is going to fail, it typically fails

 7      beyond the swage fitting.

 8  Q.  Okay.

 9  A.  Whether it's new, used, whatever.

10  Q.  Is that what that did here?

11  A.  Looks like it failed on the other side of the -- of

12      the swaging, correct.

13  Q.  Okay.  So, your swaging process, it's really not an

14      issue as to why this -- how this failed?

15  A.  No.

16  Q.  Okay.  The only thing at issue is the wire itself?

17  A.  I don't think the wire itself.  The wire is fine.

18      Got to be inspected.

19  Q.  Huh?

20  A.  It's got to be inspected.  Service life.

21  Q.  But it's my understanding that you didn't tell the

22      people at Commercial Carriers, Inc. anything about

23      inspecting the cables, other than your one warning
```

hanes.dep.v1                                                    9/16/2003

68

```
 1      on your invoice, correct?
 2  A.  We have the warning on there, and the end user has
 3      to take it upon themselves if he sees corrosion or
 4      some type of deformation in the product to remove
 5      it from service.
 6  Q.  Okay.  And you didn't give them an opinion as to
 7      how long the product would last?
 8  A.  No.
 9  Q.  Okay.
10  A.  Too many variables.
11  Q.  If you'd been asked for an opinion, would you have
12      given one?
13  A.  It could have been months, it could have been
14      years, but, it depends on conditions.  You're up
15      north, corrosion, salt, how well are the vehicles
16      maintained, are they washing them down.  It's like
17      a car.
18  MR. PAULUS:  Could you repeat the question?  Read back
19      the question, please.
20          (Whereupon, the above-requested question was
21      then read by the reporter.)
22  THE WITNESS:  And my response?
23  MR. PAULUS:  Don't bother reading the response.  But I
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

69

```
 1       just wanted to make sure you were answering the
 2       question.
 3  THE WITNESS:  Okay.
 4  MR. PAULUS:  Is that it?  You were -- the question you
 5       were asking or --
 6  BY MR. KOUSTMER:
 7  Q.  Well, I'm -- would you have given an opinion, I
 8      think was the question, if they had asked you?
 9  A.  Would I give an opinion?
10  Q.  Would have you -- would you?
11  A.  You have given an opinion?
12  Q.  If they had asked you, if they had told you we need
13      something for ten years, would you have given them
14      an opinion as to what material they should use or
15      what specifications?
16  A.  On ten year, it -- again, it's the variables of
17      what type of environment that you're working in.
18  Q.  Okay.
19  A.  It really comes down to that.
20  Q.  You knew they were going to be used on trucks,
21      correct?
22  A.  Correct.
23  Q.  And you knew those trucks carried cars all over the
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                              9/16/2003

70

```
 1        -- the United States, is that correct?
 2   A.   Yeah.  I assume.
 3   Q.   So, would -- if you had been asked, would you have
 4        recommended this material to use for those safety
 5        cables?
 6   A.   If I -- if I'd been asked what?
 7   Q.   If you had been asked that they needed a material
 8        to use for safety cable that they wanted to last
 9        approximately the -- the length or use of the
10        truck, which they say is, give or take, ten years,
11        depending on the conditions, would you have
12        recommended this material?
13   A.   I would -- would -- you know, based on that, a ten
14        year life span would be pushing the window for
15        galvanized.
16   Q.   You -- you would say -- what do you mean, "pushing
17        the window for galvanized"?
18   A.   That's -- that's a long time for any type of
19        galvanized product to be subject to salt,
20        corrosion.
21   Q.   And why's that?
22   A.   It's the chemical process that happens, the
23        galvanizing breaking down.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                9/16/2003

71

1   Q.  So, would stainless steel have been a better

2       choice?

3   MR. LARSON:  Object to the form.

4   THE WITNESS:  He objects.  What do I say?  Do I answer

5       the question?

6   MR. PAULUS:  Go ahead.  Go ahead and answer.

7   THE WITNESS:  Could you repeat the question?

8   BY MR. KOUSTMER:

9   Q.  Would stainless steel have been a better choice?

10  A.  Stainless steel would have been more corrosion

11      resistant.

12  Q.  And what is it about the galvanizing that makes it

13      more susceptible, I think you said, to breaking

14      down or --

15  A.  It's the oxidation process.

16  Q.  And if you'd used steel that wasn't galvanized,

17      would you have the same problem or --

18  A.  You would have accelerated the oxidation process.

19  Q.  Okay.  Are you surprised that after five to six

20      years on these trucks these cables started

21      breaking?

22  A.  I'm surprised if they were maintained properly and

23      inspected, they would have been removed.


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

9/16/2003

72

```
 1  Q.  Okay.  So, you're saying that if they had been
 2      maintained and inspected, they should have been
 3      removed, correct?
 4  A.  Correct.
 5  MR. PAULUS:  Object.
 6  THE WITNESS:  You object?
 7  MR. PAULUS:  Object, but go ahead and answer.
 8  MR. KOUSTMER:  That that -- that's the solution to the
 9       problem, not washing them down or anything?
10  MR. PAULUS:  I object to the form.  I think it's vague.
11  THE WITNESS:  That is --
12  BY MR. KOUSTMER:
13  Q.  Okay.  Well, if I understand what you're saying,
14      that -- that, really, the material that was used on
15      these cables really wasn't suitable for a ten year
16      time span?
17  A.  Depending on conditions.  Ten years is a long time
18      in, you know, a difficult environment.
19  Q.  So, whether it's suitable or not, was there
20      something more suitable to use for a ten year time
21      span depending on conditions, which we know that
22      these safety cables are going to be on a trailer
23      hauling cars all over the United States, north,
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

1      south, east, west?

2   A.  Mm hmm.

3   MR. PAULUS:  Object to the form.

4   THE WITNESS:  So, if he objects, what do I do?

5   MR. PAULUS:  You go ahead and answer.

6   THE WITNESS:  Okay.  Can you repeat the question then?

7        Do you mind?  I want him to repeat it.

8   MR. KOUSTMER:  Yes, you better have him repeat it.

9              (Whereupon, the above-requested question was

10       then read by the reporter.)

11  THE WITNESS:  Stainless would have a longer service

12       life, so it -- it was and is an option.

13  MR. KOUSTMER:  Okay.  Thank you, sir.  That's all I

14       have.

15

16  EXAMINATION BY MR. LARSON:

17  Q.  Mr. Hanes, my name's Dave Larson.

18  A.  Okay, Dave.  How are you?

19  Q.  I have a few questions for you.  Good.  How are

20       you?

21  A.  Not too bad.

22  Q.  When the -- I take it you have a -- a facility here

23       in the Buffalo area where you do the things you've

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

74

```
 1      talked about, the swaging and that sort of thing?
 2  A.  Correct.
 3  Q.  Is that a -- a -- like a factory environment?
 4  A.  Yes.  Yeah.
 5  Q.  And as I -- if I understand correctly, you have in
 6      inventory at any given time different, with respect
 7      to wire rope, different sizes and dimensions of --
 8      of wire rope and different strengths of wire rope?
 9  A.  Correct.
10  Q.  All right.  And depending upon a particular order
11      you receive, it may be necessary for you to order
12      additional, for example, wire rope from your
13      suppliers to fill a particular order?
14  A.  That's correct.
15  Q.  Now, will you go off your inventory first and then
16      start seeing how much you need, stage out your
17      orders that way?
18  A.  We try to -- to work the trends as best as we can
19      for inventory control.
20  Q.  So, you got somebody keeping an eye on how much
21      you've got in inventory gauged against your --
22  A.  Your historical trends.
23  Q.  -- your current orders?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

```
 1   A.   Historical trends, orders, computer keeps track --

 2   Q.   All right.

 3   A.   -- with manual verification, cycle counts.

 4   Q.   Is there a particular individual as of 1994, '95

 5        that was in charge of monitoring the inventory

 6        process?

 7   A.   For which product line?

 8   Q.   Let's say wire rope.

 9   A.   For wire rope, at that time, it would be a Don

10        West.

11   Q.   And would Mr. West be also the person if he thought

12        it was time to replenish your supply of a

13        particular variation of wire rope, that he would

14        inform someone in your Purchasing Department to

15        secure that?

16   A.   Correct.

17   Q.   All right.  In the '94 or '95 time frame, who were

18        the wire rope suppliers for one quarter inch wire

19        rope to Hanes Supply company?

20   A.   In that time frame?

21   Q.   Yes.

22   A.   We had Kumho, K-u-m-h-o.

23   Q.   And that's a company we have the mill certs on?
```

hanes.dep.v1                                                    9/16/2003

76

```
 1   A.  Certs on, right.  Now, there was a company -- I'll
 2       have to review when they start having financial
 3       problems -- a company called Manho, M-a-n-h-o,
 4       another Korean manufacturer.  And those were the
 5       two major players in that time frame.  We became
 6       involved with Kiswir, which is another Korean
 7       manufacturer when Manho had some problems.  Kiswir,
 8       K-i-s-w-i-r, when Manho had some time frame -- had
 9       some financial problems.  So those were the major
10       players for us.
11   Q.  And would your records, either hard copy or
12       computer, at your company that the search was
13       requested reveal, for example, in 1994 from whom
14       you would have purchased one quarter inch wire rope
15       and the quantity as to each of your suppliers?
16   A.  We could review the -- the purchase orders to see
17       which vendors we utilized in that time frame.
18   Q.  All right, sir.  Now, how -- well, strike that.  I
19       think I understood you to say that you can order
20       from, say, Kumho a quarter inch wire rope and ask
21       them to put the particular coating on that your
22       customer might request?
23   A.  Correct.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

77

```
 1   Q.   And is it also correct that you have the capability
 2        at your facility to also install?
 3   A.   No.  That's an extrusion process, it's called, and
 4        you extrude the -- the -- you know, appropriate
 5        synthetic material that the customer wants on the
 6        wire rope.
 7   Q.   And you don't do that?
 8   A.   No, we don't do that.  No.
 9   Q.   So for all of the coated wire rope that you've
10        sold, including what we've been talking about
11        here --
12   A.   Mm hmm.
13   Q.   -- that's always done by the supplier of the wire
14        rope?
15   A.   Supplier of the wire rope or a third party,
16        possibly Loos.  We might have sent wire rope for
17        them to be PVC coated, as we've talked about
18        before.
19   Q.   So you might take uncoated wire rope that you have
20        in inventory and send it out to somebody here in
21        the United States to do the coating?
22   A.   Correct.
23   Q.   All right.  And the company that you might use for
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                          9/16/2003

1      that or had used in the past was who?

2  A.  Loos, L-o-o-s.

3  Q.  Thank you.  Are you able to determine by looking at

4      the sample that we have here as to whether that

5      coating would have come from Korea or from Loos?

6  A.  Difficult to say.  I -- I -- I can't -- I can't

7      answer which, you know, how that was extruded, by

8      which -- which vendor.

9  Q.  Do you know if there's a -- a way for a

10     metallurgist to be able to differentiate between

11     what the Koreans might have used versus Loos?

12 MR. PAULUS:  In terms of the --

13 THE WITNESS:  It wouldn't be a metallurgist because

14      you're talking about plastic.

15 BY MR. LARSON:

16 Q.  Okay.

17 A.  Some type of synthetic material.

18 Q.  Okay.  So somebody who would be knowledgeable about

19     analyzing this particular material.

20 A.  Geez, I've never had that question.

21 Q.  Okay.  Regardless, it's not a process that you do.

22     If we assume that the coating for the CCI orders

23     was done by the Korean suppliers --


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

hanes.dep.v1                                                9/16/2003

79

```
 1  A.  Okay.

 2  Q.  -- how big of a lot is -- does it -- does it come

 3      on a big spool?

 4  A.  Typically 5,000 foot reels.

 5  Q.  Now, do you recall if you had any other customers

 6      back in 1994 to 1995 who were also requesting one

 7      quarter inch wire rope with the specifications set

 8      forth in the documents we've looked at, the 7 by 19

 9      wire rope that wanted a yellow coating, vinyl

10      coating?

11  A.  There might have been other small orders, but the

12      -- the bulk of the inventory utilization was for

13      Commercial.

14  Q.  Would your records indicate back in, again, this

15      time frame, a -- a purchase order to one of the

16      Korean suppliers of your wire rope for this

17      particular type and strength of wire rope with a

18      yellow vinyl coating?

19  A.  Would -- would our purchase orders specify that?

20  Q.  Yes, sir.

21  A.  Yeah.  I'm --

22  Q.  Okay.  And if you're special ordering that

23      particular type of wire rope to comply with a
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

80

1      specific purchase order from a customer, would you

2      typically make that order from your supplier to one

3      supplier?

4  A.  Could be.  Could be.  You know, other -- I mean,

5      any of those three could do the job.

6  Q.  But when you're -- when you're -- I see.  All

7      right.  But if your records indicated that there

8      was only one Korean company that was providing you

9      the yellow coated wire rope that met the

10     specifications of Commercial Carriers, Inc. and

11     none others were providing that, wouldn't it be

12     reasonable to assume that that company that was

13     giving it to you was the one that provided the wire

14     rope to -- to respond to the CCI purchase orders?

15  A.  It's -- I mean, that is an option, but it's -- you

16     know, like I say, you can't be a hundred percent

17     sure which particular company we utilized based on

18     we -- there's no history on this cable that's in

19     question.  Correct?

20  Q.  I'm sorry?

21  A.  There's no history on when it was installed or

22     anything, is there?

23  Q.  Well, we know that it was in 1995.


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                          9/16/2003

81

```
 1  A.  Oh, it was installed in '95, okay.  Okay.  And it
 2      was never replaced then?  It was original equipment
 3      that --
 4  Q.  Well, if we operate under that assumption.
 5  A.  Okay, '95.  Well that narrows the window for me.  I
 6      didn't know when it was installed.
 7  MR. PAULUS:  But that's an assumption, because we don't
 8      have the item.  I -- are we in agreement we don't
 9      have the item that broke?
10  MR. LARSON:  I don't have the item, but I'm just trying
11      to identify ways in which to --
12  MR. KOUSTMER:  The absent party had -- company had the
13      item.
14  MR. PAULUS:  Last we heard.
15  MR. KOUSTMER:  And discarded it.
16  BY MR. LARSON:
17  Q.  My point is if there's -- if there's only one
18      company that you were obtaining the yellow
19      coated --
20  A.  Mm hmm.
21  Q.  -- wire rope that met the specifications set forth
22      by Commercial Carriers, Inc., then they would have
23      been the -- the company who provided the wire rope
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

82

```
 1      for the entire batch of cables that were produced,
 2       true?
 3  A.  That's -- that's possible.
 4  Q.  Okay.  With respect to the 1999, 2000 time frame
 5       that you were asked about -- Mr. Bevilacqua works
 6       for a different company now, doesn't he?
 7  A.  He's still with Commercial Carriers, right?
 8  Q.  Actually, he's not, but, I'm just -- you would have
 9       purchase orders from his current employer --
10  A.  Oh.
11  Q.  -- as to the 1999, 2000 cables that were purchased?
12  A.  You -- I'm sure that we -- we probably do have
13       something.
14  Q.  Let me ask you this.  Mike Bevilacqua is -- is the
15       company that he's with currently that you're
16       talking about that was doing the 1999, 2000 --
17  A.  Okay.
18  Q.  -- design change with the eyelet --
19  A.  Okay.
20  Q.  -- is that -- is that who you're referring to?
21  A.  Well, it's the guys out in West Seneca.
22  Q.  I understand.  But it is Mike Bevilacqua's company?
23  A.  He's still there, right?  Yeah, yeah.  So, yeah,
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

83

```
 1      he's out there in -- yeah.

 2   Q.  Okay.  Let's go off the record.

 3                  (Off the Record Discussion)?

 4   BY MR. LARSON:

 5   Q.  Let's go back on the record.

 6   A.  Okay.

 7   Q.  Just so it's clear, whatever company Mr. Bevilacqua

 8       is employed by today --

 9   A.  Okay.

10   Q.  -- whoever that might be --

11   A.  Yeah.

12   Q.  -- that is the company that you were talking about

13       with respect to the 1999 and 2000 --

14   A.  Change.

15   Q.  -- purchase orders and the change -- the change in

16       that particular wire rope configuration?

17   A.  That's correct.

18   MR. KOUSTMER:  I'm going to object.  I think the

19       purchase orders would show what company it was.  I

20       don't really know if currently he's -- where --

21       I don't know when Bevilacqua, whatever, moved, was

22       it '99, 2000 or when, but --

23   MR. LARSON:  Well, CCI shut down its operations in '97.
```

hanes.dep.v1                                                    9/16/2003

84

1   MR. KOUSTMER:  But they were taken over by --

2   MR. LARSON:  They didn't continue manufacturing car

3        haulers, Tom.  That's the point.

4   THE WITNESS:  They sold the property off for big bucks

5        right over by the Target Store.

6   MR. KOUSTMER:  Let's see what the orders say.

7   MR. PAULUS:  Mm hmm.

8   THE WITNESS:  Yeah.

9   BY MR. LARSON:

10  Q.  Now, in 1994, when you went over to Commercial

11      Carriers, what was their location at that time, do

12      you remember?

13  A.  They were on Walden Avenue.

14  Q.  And did you go over there in response to a request

15      by Mike Bevilacqua or someone else to -- to come

16      over?

17  A.  Just want him to wait downstairs?  Excuse me.

18  MR. PAULUS:  I told him to wait downstairs.

19  THE WITNESS:  It's Dave Learn.  Somewhere in that time

20        frame.

21  BY MR. LARSON:

22  Q.  I guess my question is was your visit to CCI in

23      1994 in the fall in response to a request you


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                          9/16/2003

85

1        received from someone at CCI?

2   A.   Yes.  I would think so.

3   Q.   Okay.  And I understand that that was almost ten

4        years ago.

5   A.   Yeah.

6   Q.   We're trying to understand as best as what

7        happened, but would it be fair to say that the

8        purpose for them requesting you to visit was to

9        discuss with you the -- the various options for the

10       material that they would utilize for these cables

11       to go on, above the tractor?

12  MR. PAULUS:  Object to the form.

13  THE WITNESS:  The primary thing I could remember about

14       the call was the threaded stud.  That's what they

15       wanted to -- to tie these things in.

16  BY MR. LARSON:

17  Q.   And would it be fair to say that as of the time you

18       left that meeting, you were aware of the purpose

19       that they had intended for the cables and the

20       threaded stud assembly?

21  A.   Well, they were talking about these upright posts

22       with the cables, yeah.

23  Q.   And did -- would it be fair to say that you also

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

```
 1     had an understanding then that the -- that the
 2     purpose of the -- of the cables was to perhaps
 3     guard against a fall or a slip by a workman up at
 4     that level?
 5  A. The -- they were railing cables.  I assumed they
 6     might have a man up there at that point in time.
 7     It was a design change, I guess.  They'd never
 8     provided anything in the past.
 9  Q. Okay.  But -- but I want -- I'm just interested in
10     your understanding of the reason that cables were
11     being considered was with respect to fall
12     protection?
13  A. They -- I was -- it -- it was more of a -- it was a
14     safety cable, but they never -- you know, it was --
15     I didn't know they were talking about a perimeter
16     or, you know, actual fall where a guy was going to
17     be hooking off with a lanyard or something along
18     that line.  That never came into play.
19  Q. Okay.  If you had been specifically advised that
20     you -- a particular strength of cable was needed to
21     withstand the -- whatever type of forces that a
22     human body might impose --
23  A. Mm hmm.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                  9/16/2003

87

 1  Q.  -- wouldn't you agree that a 7,000 pound tensile

 2      strength would be adequate for that purpose?

 3  A.  Yes.

 4  Q.  And probably many times more than adequate?

 5  A.  Well, it -- it exceeds what -- there's been a lot

 6      of changes in the fall protection laws, and it

 7      exceeds what OSHA's talking about now.  That's come

 8      more into forefront in the late 90s.  7,000

 9      pounds.  The application, I don't have a problem

10      with it.

11  Q.  Okay.  So, the -- the choice of the -- the

12      selection of the tensile -- is it tensile strength

13      that we're talking about?

14  A.  Tensile, minimum breaking strength.

15  Q.  The selection of a wire rope, that that's physical

16      properties include tensile strength of 7,000

17      pounds, based on the representation that it's to

18      withstand a human body, you believe that's an

19      adequate specification for that purpose?

20  A.  Well, I mean, you could have some four hundred

21      pound guy that's going from a running start 50 feet

22      away from the back end of the carrier, but, I mean,

23      you know, that's a hypothetical but --


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                      9/16/2003

88

1  Q.  Sure.

2  A.  -- but, I mean, yeah.  I mean, 7,000 seems

3      reasonable.

4  Q.  Let me ask you this.  The Exhibit Q which you were

5      shown with the drawing?

6  A.  Mm hmm.

7  Q.  If it specifies in part one quarter to 5/16th times

8      7 times 19 GAC yellow coated cable, with TS 14916-3

9      swage studs?

10 A.  Mm hmm.

11 MR. KOUSTMER:  That's what you provided to them?

12 THE WITNESS:  Yes, threaded studs, right.

13 MR. PAULUS:  Can you hold up for a second?  We'll pull

14     this out and show it to him?

15 MR. LARSON:  Sure.

16 MR. PAULUS:  It's in here, isn't it?

17 MR. KOUSTMER:  Should be.  I think they're all in

18     there.

19 MR. PAULUS:  There we go.

20 THE WITNESS:  Okay.

21 BY MR. LARSON:

22 Q.  Now, the -- the specification as to the dimensions

23     of the cable, that would have been based upon


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

89

```
1        information that you would have provided to
2        Commercial Carriers, true?
3   A.   They had our catalogs, they knew the -- the specs
4        on the rope, I assume, and that's what they chose.
5   Q.   And when you were meeting with them, did -- did you
6        discuss with them as an option the -- the one
7        quarter inch wire rope as one of the options that
8        they could consider?
9   A.   It -- it's possible.  I don't know how we got to or
10       how one quarter inch became the final judgment.
11       You know, again, we would be going on what they
12       wanted.
13  Q.   Well, you -- you indicated earlier that you were
14       invited over there to explain to them the options
15       that they had --
16  A.   Mm hmm.
17  Q.   -- for this product for this particular need,
18       correct?
19  A.   Mm hmm.
20  Q.   You have to say yes.
21  A.   Yes.  Yeah.
22  Q.   And I guess my question is, first off, was -- was
23       wire rope one of many considerations for the
```


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                    90

 1      particular material or was that in your mind the
 2      best?
 3   A. That wasn't in my mind.  That was in the customer's
 4      mind.  That's what they wanted to go with.
 5   Q. Okay.
 6   A. They didn't -- said to me that, hey, we want to put
 7      chain up there, whatever.
 8   Q. So that when you came over there, did they tell you
 9      we want to discuss with you wire rope?
10   A. They -- the main thing I remember is this doggone
11      stud that they were tied into, they wanted some way
12      to -- with this threaded stud.  That was the -- the
13      whole focus of the meeting.
14   Q. Okay.  And the threaded studs was something you
15      could -- you had done in the past and were capable
16      of doing, true?
17   A. Yeah.  I don't think Delavan -- I don't believe
18      they ever utilized them, but we'd done it for other
19      customers.  It's very common in the industry for
20      railings to use threaded studs.
21   Q. Okay.  That's the point I was trying to make, that
22      there was nothing -- nothing out of the ordinary
23      with, what, using threaded studs for the particular


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                    9/16/2003

1      application in question?

2  A.  No.

3  Q.  All right.  Well, I guess I'm curious then, if --

4      if they already had wire rope in mind and the

5      threaded studs in mind, what -- what was the

6      purpose for them asking you to come and see it?

7  A.  Probably to see if they could get the -- the

8      threaded stud with the type of thread going through

9      the adjustment.

10 Q.  You told them you could do that?

11 A.  Yeah.  We could get those machined with the longer

12     thread length.

13 Q.  Now, if there was anything about either their plans

14     as -- as discussed with you when you visited them

15     or their -- their ultimate selection of the wire

16     rope and the manner in which it was to be

17     configured for them, if there's anything about that

18      -- that that you felt was inadequate or

19     inappropriate for the use that you knew they

20     intended, would you have advised them of that?

21 MR. KOUSTMER:  Objection.  Go ahead.

22 MR. KOUSTMER:  I'm just objecting as to the form.

23 THE WITNESS:  Repeat the question, I guess.


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                      9/16/2003

1  MR. LARSON:  Would you read back?

2          (Whereupon, the above-requested question was

3      then read by the reporter.)

4  THE WITNESS:  They picked out what they wanted.  We

5      assembled it.  There's a service life to this

6      product.  And it's got to be inspected.

7  BY MR. LARSON:

8  Q.  Okay.  Well, I understand that.  That's not my

9      question.

10  A.  Okay.  Okay.

11  Q.  My question is if -- well, and we can expand it.

12      If -- if a customer comes to you and makes a

13      request for something that you sell --

14  A.  Mm hmm.

15  Q.  -- you know the intended use that they have in

16      mind.

17  A.  Not all the time.  But sometimes.

18  Q.  I assume, as you do, as did in Commercial Carrier's

19      case, you knew what they had in mind for this

20      cable, right?  You told us that?

21  A.  Yeah, they were going to put these cables across

22      these uprights, posts, right.

23  Q.  If they came to you and ordered something that was,


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                          9/16/2003

93

```
 1      in your judgment, totally inappropriate or
 2      inadequate for that --
 3   A. Yeah.
 4   Q. -- for that use, would you tell them that?
 5   A. Yeah, I would have, if it was totally inappropriate
 6      or inadequate.  This is adequate.
 7   Q. Okay.  That's my question.
 8   A. Okay.
 9   Q. I mean, these are customers of yours, they're
10      people?
11   A. Heck, yeah.  Yeah.  Heck yeah.  Yeah.
12   Q. You want to help them make the right decision?
13   A. Yeah.  We try our best, you know, to help, but you
14      know, the -- the -- you know, we've -- can't stress
15      enough that we deal with a large differential type
16      of customer base, that, you know, we -- we can
17      present the information.  We'll help them as much
18      as possible.  But they've got to make intelligent
19      decisions for the industry, you know, and -- and,
20      you know, you know, like I say, this -- this --
21      this, if properly maintained, can do the job.
22   Q. Okay.  So, then I'm not trying to argue with you.
23   A. Right, right.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

```
 1  Q.  But what I'm trying to establish is that -- and you
 2      already indicated -- the customer makes the final
 3      call on what they want?
 4  A.  Yeah.
 5  Q.  And you said that.  But, in this case, it was also
 6      a process in arriving at that final judgment of
 7      consulting with you as to what their various
 8      options were --
 9  A.  Mm hmm.
10  Q.  -- for their intended purpose; fair statement?
11  A.  We provided different information on what was out
12      there.
13  Q.  Okay.  And that's part of the fact gathering
14      process or enabling them to make an intelligent,
15      informed decision.  As you said, part of that
16      process was eliciting information from you as to
17      what various options you could provide from your
18      company, correct?
19  A.  I mean, you could brainstorm on a gazillion
20      different ways of doing this thing, you could go to
21      synthetic rope, you could go to -- you know, again,
22      chain, et cetera, et cetera.
23  Q.  Understood.  But, you, as I understand it, provided
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

```
 1      them at least enough information from which they
 2      were able to draft a very specific purchase order
 3      for a very specific strength of wire rope --
 4   A. Mm hmm.
 5   Q. -- and a very specific coating for that wire
 6      rope --
 7   A. Mm hmm.
 8   Q. -- and a very specific manner in which it was to be
 9      swaged and fitted, correct?
10   A. Yeah.  I mean, that -- it is what it is.
11   Q. All right.  Did you have any discussions with the
12      people at Commercial Carriers on the issue of
13      tension to be applied to the cables?
14   A. I don't recall it.
15   Q. Now, I think you indicated earlier and I think you
16      qualified it to just say that it would be a
17      preference on your part to have it taut -- that was
18      not your words -- but, was with no slack, is that
19      what you said?
20   A. That's what you typically see on railing -- cable
21      railing systems.
22   Q. Insofar as the longevity of the cable, as with taut
23      or in the manner as depicted in these photographs
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

```
 1       you've been shown, do you have any opinion as to
 2       how, if at all, longevity would be affected?
 3   A.  I mean, if -- if it's flexing when it's taut, you
 4       know, I don't know what type of movement and
 5       cycling is going on versus it being loose and --
 6       and moving that way, you'd have to -- probably have
 7       to do an engineering study.
 8   Q.  Okay.  So, would you agree that as a cable that's
 9       sitting as depicted in Exhibit G is not in tension?
10   A.  The cable?
11   Q.  Yes.
12   A.  If there is tension in that, there's minimal load
13       on it.
14   Q.  And with -- with respect to your testimony about
15       corrosion, do temperature variations come into play
16       there?
17   A.  Definitely.  Heat, cold cycles, I would think.
18   Q.  Okay.  I would want to make sure we don't try to
19       elicit opinions from you that you're not qualified
20       to offer.
21   A.  Yeah, yeah.  I'm -- I'm no chemist by any stretch
22       of the imagination.
23   Q.  Feel free to tell us.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                          9/16/2003

97

1  A.  Yeah.

2  Q.  I don't have sufficient background to know that,

3      but if you have developed this expertise in the

4      course of your employment, then that's what I'm

5      interested in knowing.

6  A.  Yeah, I -- I'm not a chemist.

7  Q.  Okay.

8  A.  So --

9  Q.  And with respect to the -- your comments and

10     opinions about service life of a -- of a cable such

11     as this, would it -- would you also, on that

12     particular issue, defer to -- to the engineers or

13     the metallurgists who study those things on a

14     regular basis?

15 MR. KOUSTMER:  Objection.  Come on.

16 THE WITNESS:  The -- a metallurgist, you know, would

17     have far more knowledge than I would based on salt

18     spray tests or whatever they do to determine, you

19     know, what the, you know, life span of this would

20     be.  I can -- I can -- like I say, I can only --

21     you know, what happens in the market out there

22     is -- and there're so many different conditions

23     that can -- you know, get a tough winter, you get


                 DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                    9/16/2003

98

1       a lot of salt on the road.  It's a problem.

2   BY MR. LARSON:

3   Q.  Yeah.  But in order to completely cause the

4       breakage of a cable --

5   A.  This one?

6   Q.  -- such as the -- the exemplar we have before

7       us?  --

8   A.  Mm hmm.

9   Q.  -- you also have to have a failure in the -- and

10      help me with this.  There's -- there's seven

11      different strands?

12  A.  Seven strands.

13  Q.  Seven different strands of 19 strands each,

14      correct?

15  A.  Right.

16  Q.  Okay.

17  MR. PAULUS:  Well, in the orders, right, that we're

18       talking about.

19  MR. LARSON:  In the orders.

20  MR. PAULUS:  We're talking about the exemplar.

21  MR. LARSON:  In the orders.

22  MR. PAULUS:  Okay.

23  BY MR. LARSON:


                DENALL, VITRANO AND ASSOCIATES, INC.
                       (716) 856-0085

hanes.dep.v1                                                    9/16/2003

```
 1  Q.  If the -- if you could trace the failure of the
 2      cables in question to one particular lot of wire
 3      rope and you have no other failures from any of the
 4      other cables that you've produced for Commercial
 5      Carriers, what, if any, conclusions would you draw
 6      from that?
 7  MR. KOUSTMER:  Objection.
 8  THE WITNESS:  Can you repeat the question, I guess?
 9           (Whereupon, the above-requested question was
10      read by the Reporter.)
11  THE WITNESS:  Substantial corrosion on the lost sample,
12       lost cable in question.
13  BY MR. LARSON:
14  Q.  Okay.  It -- it wouldn't matter to you at all if --
15      if there -- if only a select group of cables
16      failed from one particular lot of wire rope?
17  A.  That -- well, if you're saying if there's a
18      manufacturing problem with the cable, that would
19      be -- you know, become apparent quickly, and, you
20      know, we have -- we have confidence in the vendors
21       that we utilize.
22  Q.  And if that's the case, then -- then why haven't
23      all of the cables that you've produced that were
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

1        subjected to the same, if not worse, conditions

2        that the cable in question was subjected to have

3        not failed and now coming up on ten years?

4    MR. KOUSTMER:  Objection.

5    MR. PAULUS:  Objection to form.

6    THE WITNESS:  Okay.  Can you repeat that again?  I'm

7        just -- okay.  Let me see what he's trying to

8        say.  Okay?

9            (Whereupon, the above-requested question was

10       read by the Reporter.)

11   THE WITNESS:  I don't know.

12   BY MR. LARSON:

13   Q.  Okay.  What -- are you aware of any abuse, misuse

14       or overuse of the cables that you sold to

15       Commercial Carriers?

16   A.  I have no knowledge of what's occurring in the

17       market to them.

18   Q.  What -- what would -- what's -- what would you

19       consider to be abuse, misuse or overuse of a wire

20       rope cable?

21   A.  Abuse, looking at the end fitting, maybe it's been

22       bent or somebody has leaned into it or damaged it

23       with a -- you know, maybe the thing got into a

hanes.dep.v1                                        9/16/2003

101

```
 1      slight accident and they, you know, scuffed up the
 2      cable, broken wires.  Abuse is -- you know, again,
 3      I come back to the corrosion issue, anything that
 4      would damage the product from its original state.
 5  Q.  Are the -- is the coating, either vinyl or --
 6      what's the other option?
 7  A.  Another option is -- is nylon.
 8  Q.  Nylon.  Is -- are those coatings intended to
 9      prevent corrosion?  Or, if not prevent it, at least
10      lessen it?
11  A.  It -- you -- it can lessen it.  It cannot totally
12      stop the corrosion process.
13  Q.  Is there any other -- any other purpose for having
14      the coating that you know of, other than to deter
15      corrosion?
16  A.  Well, it's -- it's a -- it's something to hold onto
17      that is going to be much more ergonomic or
18      friendlier on a guy's hands.
19  Q.  For corrosion to occur, does the -- do the elements
20      need to somehow get past the coating?
21  A.  No, the -- the -- it's not a total airtight seal
22      with -- with coating.  I mean, so, the oxidation
23      process can happen.
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                          9/16/2003

102

1  Q.   Now, how -- how -- how would one go about

2       inspecting the -- this cable we have here for

3       corrosion?

4  A.   Start off with the end fittings, see the -- the

5       amount there, and in any type of assembly, the key

6       point is always the connection point.  And you have

7       to evaluate that.  On this one, you can see that

8       the -- it's damaged, there, and that there's

9       substantial corrosion on the outer wires which

10      probably leads to a lot of inner corrosion.  This

11      is, obviously, corroded all the way through.

12      Another thing that can be done is you can -- you

13      know, you can take it and you can sort of, if you

14      hear crackling when you move the wire rope, like

15      that, then you know you've got a problem.  But

16      that's -- you know, it's one of the issues with --

17      you know, is how -- how to come up with that.  But,

18      again, you know, the -- the key point is right --

19      you know, right at the opposite end of the -- of

20      where it's -- of where the swage is.

21 Q.   All right.  Is -- is that location one that is more

22      subject to corrosion than in other locations along

23      the cable as a result of -- because of the swaging

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

103

1       process?

2   A.  Because of the swaging process, it can't be -- you

3       know, it's not totally sealed, you know, and that

4       even -- even, you know, just -- just can't be done.

5   Q.  All right.  And does the cable itself extend --

6   A.  Extends.

7   Q.  -- up to where the bolt is?

8   A.  No.

9   Q.  Doesn't go into the threaded area?  Probably about

10      a little bit before the threads start, maybe an

11      eighth of an inch or quarter of an inch --

12  A.  Correct.

13  Q.  -- back from the thread?

14  A.  Correct.

15  Q.  All right.  But the -- and what's this device piece

16      called right here?

17  A.  That's the threaded stud.

18  Q.  The threaded stud.  All of the cable underneath

19      there is uncoated, correct?

20  A.  That's correct.

21  Q.  All right.  The -- as I understand it, you don't

22      provide to your customers any specific guidelines

23      as to how they would go about inspecting the

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

1      cables, correct?

2  A.  Prevent -- specific guidelines?

3  Q.  For inspection, you don't give them what we just

4      talked about, the -- the protocol or procedure for

5      what to look out for when they're inspecting cables

6      or how to go about doing it?  That's not -- that

7      does not come from you, correct?

8  A.  Typically, the wire rope manufacturers provide that

9      information.

10  Q.  And they provide that to whom?

11  A.  Well, any -- any one in the industry that would --

12      that would need to -- to utilize it.

13  Q.  Okay.  So it's -- if Commercial Carriers wanted

14      that information, then they'd have to go to one of

15      the manufacturers to get it?

16  A.  They requested information from us, you know, we

17      could, you know, try -- try to help them with

18      that.

19          (Discussion off the record.)

20  BY MR. LARSON:

21  Q.  Go back on.  Exhibit Q --

22  A.  Okay.

23  Q.  -- is the drawing?


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                9/16/2003

105

1  A.  Okay.

2  Q.  What does TS 146 -- strike that.  What does

3      TS 14916-3 swage signify?

4  A.  That might have been a part number that we utilized

5      at the -- at the -- at that time or something, a

6      part number that Delavan assigned to it or

7      Commercial.  I'm not a hundred percent sure.  We

8      had that assembly -- see what part number they

9      used.  So that that's the assembly right there.

10     Yeah.  They used a part number, C-1869.  Yeah,

11     three inches of thread length.  I'm not sure.

12 Q.  You can't tell what -- at least right now, whether

13     that corresponds with one of Hanes Supply part

14     numbers?

15 A.  Could have been another manufacturer of threaded

16     studs in the industry.  I -- I don't know.  I can't

17     -- I can't remember.

18 MR. LARSON:  I think that's all the questions I have.

19     Thank you, sir.

20 MR. KOUSTMER:  I just have a couple followups.

21 THE WITNESS:  Okay.

22

23 RE-EXAMINATION BY MR. KOUSTMER:


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                    9/16/2003

106

```
 1
 2   Q.  When you were explaining to Counsel there how you
 3       would check this sample we have --
 4   A.  Mm hmm snow.
 5   Q.  -- for a better word, for corrosion, did you ever
 6       tell anyone at Commercial Carriers, Inc. how to
 7       check for corrosion on one of these safety cables?
 8   A.  Did I explicitly give them a set of written
 9       directions?
10   Q.  Well, that would be one.
11   A.  Or verbally?
12   Q.  Did you ever do it in writing first?
13   A.  No.
14   Q.  Did you ever do it verbally?
15   A.  No.
16   Q.  Okay.  You said the -- and if I'm wrong, just tell
17       me I'm wrong, but I think I heard you say that the
18       area that is most susceptible to corrosion would
19       be --
20   A.  Mm hmm.
21   Q.  -- would be -- let see if I have the exhibit.
22   MR. PAULUS:  Is that it?
23   BY MR. KOUSTMER:
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

 1  Q.  Okay.

 2  A.  Mm hmm.

 3  Q.  Would be this area on I that I'm circling, which is

 4      right where -- and I forget again what you called

 5      this when you were talking to Mr. Larson.

 6  A.  Threaded stud.

 7  Q.  The threaded stud.  Okay.  Where -- where the

 8      threaded stud ends and the vinyl coating begins,

 9      correct?

10  A.  Mm hmm.  Yes.

11  Q.  Okay.

12  A.  Yeah.

13  Q.  And one of the ways I think you said that you check

14      for corrosion is to look at that area?

15  A.  Right.

16  Q.  Okay.

17  A.  Visually.

18  Q.  Visually.  Exactly.  So, if in this case we have an

19      Exhibit I -- which we don't think is one of

20      yours  --

21  A.   Mm hmm.

22  Q.  -- they started the coating farther back from the

23      threaded stud?


                DENALL, VITRANO AND ASSOCIATES, INC.
                        (716) 856-0085

hanes.dep.v1                                                  9/16/2003

1  A.  Mm hmm.

2  Q.  Makes it easier to look for corrosion, doesn't it?

3  A.  It's easier to look for corrosion but less

4      protection.

5  Q.  Okay.

6  A.  It is a tradeoff.

7  Q.  Okay.  But, in your case, when you were building

8      these for Commercial Carriers, Inc., you were

9      having the vinyl coating go all the way up to the

10     threaded stud, right?  Close as possible, such as

11     this sample we got?

12 A.  This sample right here, that -- you know, we're as

13     close as realistically possible, yet, it's still

14     visually inspectable.  So we could -- you know, you

15     could see the, obviously, galvanizing going.

16 Q.  Oh, okay.  By twisting it around?

17 A.  Yeah.  Yeah.

18 Q.  Okay.  You say that you can see in there?

19 A.  Yeah.

20 Q.  Okay.  And could you have done that -- this sample

21     we have it's, obviously, been frayed in some

22     manner -- if there -- it hadn't been frayed?

23 A.  Excuse me?  Can you see if it's frayed?


            DENALL, VITRANO AND ASSOCIATES, INC.
                   (716) 856-0085

hanes.dep.v1                                                    9/16/2003

109

```
 1   Q.   No, I see it's frayed.  But I'm saying that -- that
 2        you're saying that you can see by twisting this
 3        around --
 4   A.   Mm hmm.
 5   Q.   -- the steel between the threaded stud and the
 6        plastic coating?
 7   A.   Yes.  Yes.
 8   Q.   But, that was never verbally or -- or in written
 9        form provided to Commercial Carriers, Inc.?
10   A.   No.
11   Q.   Okay.  Now, just so I'm clear on something, you
12        talked about service life.  When you met with Mike
13        or anybody else at Commercial Carriers, Inc., did
14        they ever tell you how long they wanted the service
15        life of this product to be?
16   A.   No.
17   Q.   Okay.  Did you know -- well, strike that.  Did you
18        ask how long the service life was going to be?
19   A.   No.
20   Q.   Okay.  So, when this was chosen, the quarter inch
21        galvanized aircraft cable, in your mind, you didn't
22        know how long they were going to have that up
23        there?
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                9/16/2003

110

 1  A.  There was never an explicit time stated.

 2  Q.  Okay.  And did you tell them anything about what

 3      was proper maintenance of these cables?

 4  A.  Did -- did we go over maintenance on the cables?

 5      They purchased them, you know.  No, we did not

 6      discuss, you know, maintenance on the cables.

 7  Q.  Okay.  So you didn't verbally discuss it and you

 8      didn't provide them anything in writing?

 9  A.  We -- we do have things in writing as far as, you

10      know, our catalogs and our various handbooks and

11      things along that line.  Now, again, I'll have to

12      review the time frame that was in there about what

13      was -- what was in those particular books.  I'll

14      have to go back.  But it's -- you know, people have

15      to, you know, have enough common sense to inspect

16      what the hell they're using.

17  MR. KOUSTMER:  That's all I have, sir, thanks.

18  MR. LARSON:  One last question.

19  THE WITNESS:  Sure.

20

21  RE-EXAMINATION BY MR. LARSON:

22

23  Q.  Did you ever tell anybody from Commercial Carriers


                    DENALL, VITRANO AND ASSOCIATES, INC.
                           (716) 856-0085

1        in '94 or '95, that -- that the cables that they

2        were buying could corrode completely through

3        depending upon various factors as early as four

4        years out?

5   A.   No.  They never asked the question.

6   Q.   And you -- whether asked or not -- didn't give

7        them any information as to how long they might

8        expect these cables to last out in the -- in the

9        environment?

10  A.   No, that was never discussed by either party.

11  Q.   All right.  Exhibit U, which is from your more

12       current --

13  A.   Catalog.

14  Q.   -- catalog, it talks about, at least, some

15       differences between nylon and vinyl --

16  A.   Mm hmm.

17  Q.   -- in the middle section there?

18  A.   Okay.

19  Q.   Where did that information come from?

20  A.   That was -- that information was provided by --

21       thanks.  This is information provided by a

22       manufacturer, from a company called Carolina Steel

23       Wire who is since out of business.  They used to be


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                         9/16/2003

```
 1      one of our vendors.
 2  Q.  When they were in business, were they a -- a
 3      manufacturer of wire rope?
 4  A.  That's correct.
 5  Q.  There's an indication toward the bottom of that
 6      paragraph, the second paragraph?
 7  A.  Mm hmm.
 8  Q.  It says generally compared with nylon, they,
 9      referring to the vinyl coatings --
10  A.  Mm hmm.
11  Q.  -- are more flexible, have better resistance to
12      sunlight, and are less expensive?
13  A.  Yeah.
14  Q.  Is that?
15  A.  Yeah, that's -- that's a very accurate statement
16      that PVC -- they put UV inhibitors into the plastic
17      and, you know, these things are out in sunlight,
18      and it's -- it's -- you know, it's -- it's -- it's
19      a good choice in that regard.  And it is more
20      flexible.  Nylon is stiffer.  It's a harder
21      material.
22  Q.  So, if you have a cable that is intended to -- and
23      is going to be out in the sunlight all the time
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                            9/16/2003

1     while the sun's shining --

2  A.  Uh-huh.

3  Q.  -- that factor might -- according to this --

4  A.  Yeah, according to this information.

5  Q.  -- might draw one to consider the vinyl over nylon?

6  A.  Yeah.  It's a reasonable assumption, yeah.  Yeah.

7  MR. LARSON:  That's all I have.  Thank you.

8  THE WITNESS:  Yeah.

9  MR. KOUSTMER:  Nothing.

10

11  EXAMINATION BY MR. PAULUS:

12

13  Q.  I have -- I have one question.

14  A.  You're supposed to be the good guy.

15  Q.  Yeah.  Mr. Larson --

16  MR. LARSON:  Just wait.

17  BY MR. PAULUS:

18  Q.  -- asked you a question I think was very similar to

19       this one.  But, have you been told at any time or

20       been made aware at any time by any of your car

21       hauling customers whether the coating -- the

22       purpose of the coating on these hand cables is to

23       protect the vehicles that are cargo from scrapes


DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

114

```
 1      against unprotected metal?
 2  A.  It's -- it's a consideration for the car holders.
 3      I can't remember if they told me that, but it's --
 4      it's a common sense scenario.
 5  MR. KOUSTMER:  Object to the question.  Anything else?
 6  MR. PAULUS:  No.
 7  MR. LARSON:  Thanks, Mr. Hanes.  Nice to meet you.
 8  THE WITNESS:  Yep.  You, too.
 9                     *    *    *    *    *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

DENALL, VITRANO AND ASSOCIATES, INC.
(716) 856-0085

hanes.dep.v1                                                    9/16/2003

                                                                  115

```
 1          I hereby certify that I have read the

 2     foregoing 114 pages and that they are a true and

 3     accurate transcript of the testimony given by me in

 4     the above-entitled action on February 12, 2003.

 5

 6

 7

 8                          WILLIAM C. HANES

 9

10

11

12

13     Sworn to before me this

14          day of          , 2003.

15

16

         Notary Public.
17

18

19

20

21

22

23
```

                    DENALL, VITRANO AND ASSOCIATES, INC.
                          (716) 856-0085

hanes.dep.v1                                                    9/16/2003

116

1    STATE OF NEW YORK)

2              SS:
     COUNTY OF ERIE)

3

4

5         I, MARTIN S. WRIGHT, Certified Shorthand

6    Reporter, a Notary Public in and for the State of

7    New York, County of Erie, DO HEREBY CERTIFY that

8    the deposition of WILLIAM C. HANES was taken down

9    by me in a verbatim manner by means of Machine

10   Shorthand, on February 12, 2003.  That the

11   deposition was then reduced in writing under my

12   direction.  That the deposition was taken to be

13   used in the above-entitled action. That the said

14   deponent, before examination, was duly sworn by me

15   to testify to the truth, the whole truth and

16   nothing but the truth, relative to said action.

17        I further CERTIFY that the above-described

18   transcript constitutes a true and accurate and

19   complete transcript of the testimony.

20

21
       MARTIN S. WRIGHT, CSR,
22     Notary Public.

23


            DENALL, VITRANO AND ASSOCIATES, INC.
                    (716) 856-0085