UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID FERGUSON, et al.

Plaintiff,

C-1-02-039

-v-

RYDER AUTOMOTIVE, et al.,                    Judge Weber

Defendants.

PLAINTIFF'S UNDISPUTED FACTS AND CONCLUSIONS OF LAW AS TO
DEFENDANT COMMERCIAL CARRIERS, INC., MOTION FOR SUMMARY JUDGMENT

1.    Hanes Supply did not design the hand cable.  Hanes Supply merely manufactured

the cable in accordance with the specifications provided to it by Defendant Commercial Carriers,

Inc.

Defendant Hanes Supply, Inc., Answers and Objections to Plaintiff's First Set of

Interrogatories No. 4 filed herein.

2.    Q.    Please state what type of material was used in the cable that was
broken that is the subject of this lawsuit.

A.    Galvanized steel.

Q.    Please state what material is currently being used in the
replacement cables on the trucks.

A.    Stainless steel.

Answers and Objections of Defendants Allied Systems and Defendant Allied Automotive

Group, Inc., to Plaintiff's most recent set of Interrogatories and Request For Production of

Documents No. 3 and No. 4 filed herein.

3.    That only 500 trucks were in the fleet in January and February, 1999 that would

need replacement cables.

Robert Farrell, V.P., Allied deposition.

5.    A.    "I'd have to see the issues that you're proposing and then take a look at it that way.

It was my understanding based on the testimony that this particular wire rope, the exemplar, if you will, the failed exemplar was consistent with what was being supplied by Hanes.  There has been no evidence to suggest otherwise.

According to Allied individuals that testified and saw it, it was -- the failure was consistent with what we were experiencing, or what they were experiencing.  I'm not sure what you want to look at."

Alexander depo P.22.

6.    Hanes Supply and Commercial Carriers, Inc., released this product on the market

without sufficient testing.

Alexander depo Pp. 40 and 41.

7.    Q.    What's going on with these cables in the field that enables the corrosive process to get started?

A.    It's the flexibility of the cable.  It's extremely flexible away from the fitting, okay, right in the area where you leave the fitting, okay.  And that is where the flexing, through use of people grabbing onto it, using it as a hand support, leaning on it.

You also have the over-the-road vibrations, allowing it to flap back and forth similar to a flag in the wind, if you will.

Alexander depo. Pp. 48 and 49.

8.    A stainless steel cable will not corrode as the instant cable did.

Alexander depo. Pp. 54 and 55.

9.    This design would not be fit for a 10 year/million mile life.

Alexander depo P. 57.

10.     That the yellow coating over the cable obstructed an inspection for rust.

Alexander depo Pp. 68, 69 and 70.

11.     One opinion of Gabriel G. Alexander at P. 74 and P. 75:

A.     For example, one of the things they could have done is use the eyebolt design, okay. So in that design, you don't have, you know, that high concentration of stresses right there. Do you follow me?

Q.     Um-hum.

A.     You have the ability swivel between the fixed post and the swaged fitting, if you will.

Q.     So would it be your opinion that the selection of the more rigid swaged fitting was an inappropriate choice for the intended us of this cable?

A.     With a steel cable. With a stainless steel cable, that would not be subjected to corrosion and loss of strength due to corrosion. I think that that would have been adequate.

Q.     Okay. But if you're using the galvanized material, then you would need to have at a minimum some sort of a swivel connection?

A.     That's correct.

Q.     So whoever made the decision on the use of a swaged fitting versus a swivel fitting in association with the galvanized aircraft cable was guilty of a poor design?

A.     Yes, that's a poor design.

Alexander depo P. 95.

12.     The instruction given to the drivers concerning the cables in April of 1999 were

inadequate.

Alexander depo Pp. 109, 110.

13.     Q.     Was there any maintenance activities that could have been done on the clothes lines to prolong their life before the water intrusion and rust began,

3

sir?

    A.     Yeah, you can clean them, clean the ends and oil them.

    Q.     And did that come from anything from the manufacturer of the truck or the component part manufacturer?

        I'll withdraw the question.

        Did you see any evidence that those instructions were provided to the Allied defendants by any manufacturer or component manufacturer?

    A.     No, I did not.

Alexander depo P. 115

14.     The design of the cable was defective from the beginning.

Alexander depo P. 119.

15.    Q.     That's what I was asking you, that if an untrained driver who is not able to recognize the deterioration of a cable sees a cable, is it your opinion that it's reasonable for him to expect it to be satisfactory in going to hold it?

    A.     I think yes.  That's why he would grab for it.

Alexander depo Pp. 132, 133.

16.     The findings of Gabriel G. Alexander are that:

Within a reasonable degree of engineering certainty, and subject to change if additional

information becomes available, it is my professional opinion that:

    1.     The Ferguson vehicle was defective.

    2.     Ferguson's actions were proper and were not a cause of this incident.

    3.     The Safety Cable failed during normal reasonable operation and caused his crash.

    4.     The incident vehicle was defective in that the Safety Cable failed during normal reasonable operation.

4

5.      The Safety Cable was defective in that it was not corrosion resistant and failed in an area of reduced cross section in the presence geometric stress concentrations.

6.      The incident vehicle was defectively manufactured without a proper Safety Cable, known available technology that should have been utilized in its design.

7.      The incident Vehicle was dangerous and defective in a manner that caused Ferguson's fall.

8.      Furthermore, in the absence of a proper design, which would prevent falls, warnings and instructions should have been provided with regard to required inspection and maintenance procedures.

9.      Hanes' design and manufacture of the incident Safety Cable was improper and caused Ferguson's fall.  Further, CCI and Allied's actions were improper in that they failed to correct the defective condition that Hanes created.  Further, Allied had prior knowledge of the defective condition, and was responsible for the vehicle's maintenance, and failed to act on the knowledge and correct the defective condition that Hanes created.

10.     By not properly maintaining the incident vehicle Allied, reasonably and with substantial certainty, created an unsafe work condition that would and in fact did lead to Ferguson's injuries.

11.     CCI's responsibility for the configuration of the incident vehicle was as great as that of Hanes as they completed the vehicle and was responsible for it's configuration.

Alexander report previously filed with 26A Disclosures

16.     Commercial Carriers, Inc., changed to Allied sometimes in 1997.

Palladino depo P. 13.

17.     Mr. Palladino says the problem with the cables was that the cables were breaking where the cable meets the steel crimps as in Ferguson's case.

Palladino depo Pp. 24, 27, 71.

18.     Mike Palladino stated in his initial report immediately after the accident that the

5

cause of the accident was fatigued cable on the head rack.

Palladino depo P. 8.

19.     Broken cables broke at the crimp edge also known as swag where the exemplar also broke.

Wolf depo P. 29.

20.     The exemplar is similar to broken cables that injured Ferguson.

Palladino depo P. 40.

21.     Allied employees were never instructed how to care for the cables.

Wolf depo Pp. 44-46.

22.     The exemplar is similar to other broken cables and break at wedge.

Shively depo Pp. 8, 9.

23.     Eventually the design of the cables went to using stainless steel to eliminate corrosion.

Shively depo P. 17.

24.     Never given instruction for care, maintenance or how to inspect cables.

Shively depo P. 18.

25.     Cables that injured David Ferguson broke at the end cable, crimp, the same as exemplar used by expert, Gabriel Alexander.

Weaver depo Pp. 6, 7.

26.     Proper procedures at Allied is to hold a part on a truck that is involved in an accident.

Weaver depo Pp. 8, 9, 40.

27.    Mike Palladino, Safety Supervisor, told Bill Weaver he, Mike Palladino, had the cable that injured Plaintiff after the accident.

Weaver depo Pp. 9, 10.

28.    No instructions of any kind were given for care, maintenance, and inspection of cables.

Weaver depo P. 27.

29.    No one told Allied employees to inspect cables for corrosion or how to inspect for corrosion.

Weaver depo P. 30.

30.    The new cables have clear plastic coating to see the metal through.  On the old cables as in the Ferguson case, the plastic was painted yellow and you could not see the metal or corrosion.

Weaver depo Pp. 31, 32.

31.    Mr. Ferguson could not examine the cables on this truck because of plastic over the cables painted yellow by Commercial Carriers, Inc.

Ferguson depo Pp. 33-35.

32.    The safety cables were put on the trucks to stop people from falling off at the most dangerous part of the truck to hold on to management told Ferguson.

Ferguson depo Pp. 51, 52.

33.    Ferguson, prior to his injury, was never told not to use cables because they were failing.

Ferguson depo P. 53.

7

34.     Ferguson assumed the cables were good because if they were not replacement

cables, they had been checked by maintenance.  He stated:

> A.     Well, not necessarily due to the fact that you're getting out of this
> vehicle, you're being told by your employer that the cables are safe, they're
> replacing them, that they're good cables, don't worry about them, if they're on the
> truck they're good, they've been checked, they're good.  You trust -- I basically
> say you would trust your employer that they would be telling you the truth that
> the cables would be good. . . .
>
> . . .
>
> A.     I looked at the cable, sir, I looked -- when I looked at the truck,
> when I did my walk around I seen it had four cables on it.  I had seen that some of
> the cables had been replaced.  I presumed that whoever replaced those first cables
> would have inspected the whole -- the other -- the rest of the one.  And if it had
> one of the old type on that I would presume that they would have checked to see
> if it was okay seeing how that's their job.
>
> Q.     Okay.  So you assumed that if there was what would be considered
> original equipment, cable on there, that somebody had inspected it and made the
> decision that it should stay there?
>
> A.     Sir, there's -- they replaced -- Mr. Weaver and Allied has told us,
> there's two types of these two cables right here (indicating).  They're telling us
> one has a newer type of steel in it that is better than the old ones we've got.  I
> wouldn't know if this would be the new one or the old one.
>
> Q.     Okay.
>
> A.     They're telling us that this same exact cable has got a newer steel
> in it, it's made different, and it doesn't rust through like these do and they don't
> break.

Ferguson depo Pp. 55-58.

35.     Not sure new cables depended on painted.

Ferguson depo P. 59.

36.     Ferguson described the accident as follows:

> A.     I hooked the T hook into the elongated slot, took up the slack with

8

my left hand in the chain.  They have a special hook that you can take up the slack in the chain.

Q.    Grab hook?

A.    Grab hook.  I took the slack in the chain up with the grab hook, put my right hand down on the trailer ramp, which is the slide part of the trailer, it slides in and out.  It's like a pan actually.  I put my right hand down on that.  I went to get up and I put my left -- I had to stick my foot back a little ways because I was down basically hunched into the wheel.  I started -- my foot went back, my foot slipped back a little bit and I just out of instinct grabbed the cable, and I lifted up and when I did the cable snapped.  When the cable let loose I grabbed the top cable, trying to stop from going, but I couldn't.  I was already over the edge of the trailer and that's when I come on down.

Q.    Did you get hold of the top cable at all?

A.    Yes, I did.

Q.    With what hand?

A.    Right hand.

Q.    When you grabbed the lower cable you grabbed it with your left hand?

A.    Yes, sir.

Q.    And did I understand you to say you grabbed it because you were losing your balance?

A.    Not exactly losing my balance.  My foot -- it's kind of hard to explain it for someone who has never loaded a tractor-trailer with car carriers, but I'll try to explain it to you.

There's a gap between the two ramps.  My foot rolled over the front roller, or my tip of my toe went over the roller.  I just instinctively went -- I mean, I wasn't -- I just out of instinct grabbed ahold of the -- placed my hand on to the lower safety cable right -- I'd say just a little ways in front of the upright that holds the cable on.

Q.    Were you doing that to help yourself stand up?  I mean, was that the purpose for it?

9

A.     Do you mean to pull myself up?

Q.     Yes.

A.     No.  I just -- I just put my -- when my foot went down, when my foot slipped down a little ways, I mean, I wasn't going to fall of the truck at that time.  My foot slipped a little bit off of the front where the two decks connect because I was down on my knees, I reached up just instinctively.  When I did, I just put my weight on the cable and the cable let go.  But I was getting up.


Ferguson depo Pp. 63, 64.

37.    Mr. Ferguson explains the accident as follows:

Q.     Why don't you  try it again.

A.     Okay, sir.  As I said in my previous statement to the question you asked previously, I looked up, by the time -- yes, I looked up -- they told us they were fixing cables.  I looked up, I saw new cables on one side of the truck, I presumed the cables were good because I knew they had been up there.

        If they didn't look at the whole thing and they left one on there that was bad then God help them.  I mean, to me it seemed like if a person fixed three, wouldn't you fix the fourth one?  If you go up there, you know you got three bad ones and it's in the shop, you would presume that they would have looked at the other and said, Well, this one's okay for the time being or they just didn't have the cable to fix it or whatever.  I don't know what their problem was.

Q.     When you're up there securing that vehicle, just prior to your injury, that lower cable was only a couple feet from you, wasn't it?

A.     It would be inches, sir, not feet.  I would say it would probably be inches from my face.  I would say probably less than a foot from my face at times.

Q.     I really don't mean to be repetitious, but I just want to understand.  Was your grabbing of that lower cable on the occasion of your fall simply a reflex to the fact that you were losing your footing?

A.     I would -- that's exactly what I was trying to explain to you.  I grabbed the cable, just out of reflex -- when I -- I didn't lose my footing.  I stepped back, there was a gap in between the two trailers, my toe went in, and I was still getting up and the tip of my toe came off of the deck.  I just went down that few inches and, out of reflex, I grabbed the cable, put weight on it, and that's

when it snapped.

Ferguson depo Pp. 99-101.

38.    Mr. Ferguson stated:

Q.    And the fourth you reasonably anticipated that had been tested and tested satisfactorily?

A.    Actually, I just presumed that it was replaced with the rest of them or it would have been good.

Q.    No reason to believe --

A.    -- that it was defective, no, sir.

Q.    Who would have done the testing or replacing in the ordinary course of Allied's business?

A.    I would imagine the shop would have.

Q.    And that's Bill Weaver's folks?

A.    Yes, sir.

Ferguson depo P. 129.

39.    Mr. Ferguson's testimony was that where the cables had been painted, the paint obscures the metal cable underneath and impairs your ability to see if there has been any deterioration of the metal.

Ferguson depo P. 157.

40.    Pete Terzain, General Manager of Manufacturing, Commercial Carriers, Inc., until sold to Allied in 1997.

Terzain depo P. 6.

41.    Between January 1, 1994 and 1997, 861 trailers were manufactured by

11

Commercial Carriers, Inc., all with cables designed that injured Plaintiff.

Terzain depo Pp. 13, 37.

42.    Terzain says starting putting on truck in the spring of 1994.

Terzain depo P. 24.

43.    All 861 cables were bought from Hanes Corp.

Terzain depo P. 39.

44.    Commercial Carriers, Inc., requested vinyl coating be colored yellow.

Terzain depo P. 37.

45.    Hanes Supply decided the material specifications and design of the cable in

question.

Terzain depo Pp. 47, 65, 66.

46.    Commercial Carriers, Inc., did no testing on the cable.

Terzain depo P. 49.

47.    No other type or design of cable tried before put on all 861 trucks.

Terzain depo P. 51.

48.    The cables were made so that drivers could grab onto them and prevent a fall.

Terzain depo P. 56.

49.    Allied assumed the liabilities of all the trailers that had been built by Commercial

Carrier, Inc.

Terzain depo P. 67.

50.    Commercial Carriers, Inc., still exists as a subsidiary of Allied Systems, Inc.

Terzain depo Pp. 68, 69.

51.    Mr. Terzain testified that:

A.    They were a -- Commercial Carriers was a subsidiary of Ryder Automotive Carrier Services, which was a subsidiary of Ryder Automotive, which was a subsidiary of Ryder Service -- Ryder Systems, Inc.

Q.    You think I got it. From my -- from what you've told me, Commercial Carriers, Inc., was a subsidiary of?

A.    RACS, Ryder Automotive Carrier Services.

Q.    Okay.

A.    Which was --

Q.    Which was a subsidiary of Ryder Systems, Inc.?

A.    That's correct. Yes, sir.

Q.    Okay. I -- at the time, '94, '95 when --

A.    That's correct, yes.

Q.    -- we're involved with fitting these trucks with cables?

A.    Well, no, no, no. Let me -- let me be more specific.

Q.    Okay.

A.    Ryder Automotive Carrier Services never came into existence until 1996. CCI was a subsidiary of RAOI, which was a subsidiary of RACG. RACG changed its name in 1996 to RACS. I just wanted to be specific because you mentioned '94, '95 and there was no RACS in '94, '95.

Q.    Okay. So that's -- the name was changed?

A.    Yes, sir. In 1996.

Q.    Okay. But, Ryder Systems, Inc., they were all a subsidiary of Ryder Systems, Inc.?

A.    Well, Ryder Systems, RACG, Ryder Automotive Carrier Group was a subsidiary of Ryder System, Inc. Ryder Automotive Operations, Inc., was a subsidiary of Ryder Automotive Carrier Group. CCI was a subsidiary of Ryder

13

Automotive Operations Inc.

> Q.    And it goes up to the Ryder systems, Inc.?

> A.    Yes, sir.

> MR LARSON:    The ultimate parent through that period of time up until '97 was Ryder System, Inc.

Terzain depo Pp. 70-71.

52.    The tractor trailer in question was delivered to Commercial Carriers, Inc., on April 23, 1995 and the cables were put on a day or two before.

Terzain depo Pp. 76-77.

53.    Go over to Allied in Buffalo and see units with original cables on February 11, 2003.

Terzain depo P. 90.

54.    The option to have clear vinyl coating but Commercial Carriers, Inc., decided they wanted coating in yellow.  It could have been clear vinyl.

Terzain depo Pp. 93-94.

55.    Cables on Ferguson's trailer purchased from Defendant Hanes.

Terzain depo Pp. 100-101.

56.    Didn't buy cables from anyone but Hanes.

Terzain depo P. 101.

57.    No warning labels were on the trailer concerning cables.

Terzain depo P. 120.

58.    Terzain decided to switch from clear vinyl to yellow coated vinyl.

14

Terzain depo P. 124.

59.    As of March, 1999, replacing cables with eyebolt design.

Dziadaszek depo Pp. 15,16.

60.    Replacement still being ordered today, March 26, 2003.

Dziadaszek depo P. 17.

61.    Commercial Carriers, Inc., owned by Ryder Systems between 1994 and 1997

when this cable was produced and designed.

Bevilaqua depo at P. 5.

62.    From 1994 through 1997, cables were only bought from Hanes Supply Company.

Bevilaqua depo Pp. 8, 21.

63.    Commercial Carriers, Inc.'s decision to paint cables yellow.  They came clear.

Bevilaqua depo P. 16.

64.    No tests done other than equipment on all 861 trucks with cables and none asked

for including corrosion tests.

Bevilaqua depo P. 27.

65.    Clear coating is available for the cables.

Hanes depo P. 14.

66.    Able to see through the clear coating but not the yellow coating.

Hanes depo P. 15.

67.    Commercial Carrier, Inc., ordered all yellow coating on cables.

Hanes depo P. 21.

68.    Mr. Hanes met with Commercial Carrier, Inc., representatives and gave them the

option but made no recommendation as to which wire rope threaded stud and coating to use.

Hanes depo Pp. 24, 25.

69.    Mr. Hanes provided CCI with different types of materials and with a price list of $19.00; $28.00; $48.00 and $97.25.

Hanes depo Pp. 1-30.

70.    CCI requested galvanized but stainless steel was an option.

Hanes depo P. 31.

71.    Stainless steel is more corrosion resistant.

Hanes depo P. 32.

72.    Coating goes up to metal parts, threaded stud, as close as possible.

Hanes depo P. 34.

74.    In 1999, they changed the design of the cables.  Changed to eyebolt design from threaded stud design.

Hanes depo P. 40.

75.    Try and get coating up to metal stud.

Hanes depo P. 42.

76.    CCI chose the material specifications for material coating for material.  No one at Hanes Supply gave advice or recommendations on material or design of the safety cable.

Hanes depo Pp. 44-47.

77.    No one from Hanes Supply gave advice on how long material would last.

Hanes depo P. 47.

78.    No one from Hanes Supply knew how long cables are suppose to last.  CCI never

told that Hanes's cable were to last the life of the truck, approximately 10 years.

Hanes depo P. 47.

79.    Hanes Supply only gave standard warning, no instructions on longevity of cables,

no instruction on maintenance of cables and no written instructions were given.

Hanes depo P. 49.

80.    Straight line cables probably better without slack.

Hanes depo Pp. 50-51.

81.    No testing requested or performed on safety cable.

Hanes depo P. 59.

82.    No one asked him for suitable material or coating nor did he render opinion as to

same.

Hanes depo P. 61.

83.    Mr. Hanes states that if asked, he would not have recommended material

(galvanized steel) because of corrosion.

Hanes depo P. 70.

84.    Mr. Hanes stated that stainless steel is a better choice, more corrosion resistant.

Hanes depo P. 71.

85.    Mr. Hanes states that after five or six years if maintained properly and inspected,

should have been life of the cable.

Hanes depo Pp. 71, 72.

86.    Material galvanized aircraft cables used not suitable for 10 year life span.

Hanes depo P. 72.

17

87.    Stainless steel more appropriate material for the safety cables.

Hanes depo P. 73.

88.    Area susceptible to corrosion and threaded stud at vinyl coating.

Hanes depo P. 107.

89.    Yellow vinyl coating all the way up to threaded stud.

Hanes depo P. 108.

90.    No one at CCI ever told Hanes how long cable to last.

Hanes depo P. 109.

91.    Hanes never told CCI the proper maintenance.

Hanes depo P. 110.

92.    Never discussed by either party, CCI or Hanes, how long cables were to last.

Hanes depo P. 111.

93.    CCI picked the least expensive option for the cables.

Hanes depo Pp. 1-15.

94.    One Hundred manufacturers in the United States could have made the replacement cables.

Defendant Hanes's Answer to Plaintiff's Interrogatory No. 3

95.    Hanes Supply could have made 2,000 replacement cables in six days.

Defendant Hanes's Answer to Plaintiff's Interrogatory No. 3


CONCLUSIONS OF LAW

1.    Allied, Commercial Carriers, Inc., and Hanes's actions and omissions formed a

18

casual link, casual connection which together were the actual cause of Mr.. Ferguson's injuries.

2.    Allied, Commercial Carriers, Inc., and Hanes's actions and omission together were the proximate cause of Mr. Ferguson's injuries.

3.    Defendant Commercial Carriers, Inc., designed a defective product, manufactured a defective product and gave no warning of the defect.

4.    The Plaintiffs have met their burden of coming forward with evidence that the hand cable assembly was defective in its design.

5.    The Plaintiffs have met their burden of coming forward with evidence that the hand cable assembly was defective in its manufacture.

6.    The Plaintiffs have net their burden of coming forward with evidence that the hand cable assembly was defective with respect to any warning.

7.    The Plaintiffs have met their burden of coming forward with evidence that the hand cable assembly was defective with respect to any representation by Commercial Carriers, Inc.

8.    The material facts support a claim or cause of action against Commercial Carriers, Inc., on all theories alleged by Plaintiffs.

9.    Actions of Commercial Carriers, Inc., are the proximate cause of Plaintiff Ferguson's injuries.

10.    Defendant Commercial Carriers, Inc., has not met its burden for summary judgment of an intervening superseding cause.

11.    The material facts support a claim or cause of action against Commercial Carriers, Inc., on all theories alleged by Plaintiff.

12.    The material facts establish that the defect in the design or manufacturer of the product in question was the proximate cause of Mr. Ferguson's injuries.

13.    The material facts establish that Commercial Carriers, Inc., is not entitled to summary judgment in its favor on the strict liability and negligent failure to warn claims.

14.    The material facts establish that Commercial Carriers, Inc., is not entitled to summary judgment in its favor on the implied warranty claims.

15.    The material facts establish that Commercial Carriers, Inc., is not entitled to summary judgment in its favor on the strict liability and negligent design defects claims.

16.    Commercial Carriers, Inc.'s, Motion For Summary Judgment is denied.

Respectfully submitted,

_____
Thomas R. Koustmer   (0008410)
Attorney for Plaintiff
1800 Federated Building
7 West Seventh Street
Cincinnati, Ohio 45202
(513) 621-3616

_____
Michael J. Honerlaw, Esq.
Attorney for Plaintiff
Honerlaw & Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, Ohio  45231

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by electronic transmission or Ordinary U.S. Mail to the following this _____ day of September, 2003:

20

Kenneth Robert Schoeni
Kohnen & Patton
PNC Center, Suite 800
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 381-0656
Attorney for Defendants, Ryder System Inc;
and Commercial Carriers, Inc.

David E. Larson
Larson & Larson PC
11300 Tomahawk Creek Parkway, Suite 310
Leawood, KS 66211
Attorney for Defendants Ryder System Inc.,
And Commercial Carriers, Inc.

Robert Albert Winter, Jr.
Hemmer Spoor Pangburn DeFrank & Kasson PLLC
250 Grandview Dr., Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
Attorney for Defendants, Allied Systems and
Allied Automotive Group

Craig R. Paulus, Esq.
Taft, Stettinius & Hollister LLP
PNC Center
201 E. Fifth St., Suite 800
Cincinnati, Ohio 45202-3957
Attorney for Defendant Hanes Supply, Inc.


_____
Thomas R. Koustmer
Attorney for Plaintiff


a:\green\undisput.cci

21