SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID FERGUSON, et al.

               Plaintiff,

                                        C-1-02-039

      -v-

RYDER AUTOMOTIVE, et al.,                  Judge Weber

               Defendants.

### PLAINTIFF'S ANSWER TO DEFENDANT ALLIED SYSTEMS, LTD AND DEFENDANT ALLIED AUTOMOTIVE GROUP, INC.'S HEREINAFTER ALLIED'S MOTION FOR SUMMARY JUDGMENT

Testimony has shown that Commercial Carriers, Inc., still exists as a subsidiary of Allied Systems, Inc. <u>Terzain depo at 68 and 69.</u>  Supposedly, Defendant Allied assumed the liability of all the trailers that had been built by Commercial Carriers, Inc. <u>Terzain depo at 67.</u>  Commercial Carrier changed to Allied in 1997. <u>Palladino depo at 13.</u>  As of October, 2002, more than 30 cases have been filed concerning falls from trucks while loading cars. <u>Thomas R. Koustmer Affidavit filed 07/08/03., Exhibit 3, P.38.</u>  Many of these cases were filed prior to Plaintiff Ferguson's injuries on September 7, 2000. Cases from other United States District Courts filed in this case are all pre-Ferguson accident.

There is some evidence that Defendant Allied and Defendant Ryder have a joint defense agreement. <u>Affidavit Thomas R. Koustmer, filed 07/08/03, Exhibit 3, P.35.</u>

These safety cables were put out in to the stream of commerce without anyone testing the design of the cables and in fact, no one will take credit for the design of the cables, not Allied Automotive Group, Inc., not Allied Systems, Inc., not Commercial Carriers, Inc., not Ryder Systems, Inc., not Hanes Supply, Inc.  In fact, Hanes Supply, Inc., blames the design of the safety cable on Commercial Carrier, Inc., and Commercial Carrier, Inc., blames Hanes Supply,

Inc., for the design of the safety cable that caused Mr. Ferguson's injuries.

There have been numerous lawsuits involving the safety of loading and unloading cars from these tractor trailers. That is why the Defendants Allied refer to this as the most dangerous occupation. Defendants Allied, by these very statements, admit knowledge that injuries were occurring. Furthermore, in the instant case, 19 months after Allied was told to immediately replace all cables because they were breaking, Allied still had not done so. Depo. of Bill Weaver at 9, 10, 12, 13, 14, 15, 17, 19, 20, 22 and 47 and Mike Palladino depo. at 16, 18, 19, 20, 21, 22, 23, 24, 27 and 40.

Allied, 19 months prior to Mr. Ferguson's injury, was supposed to replace all the original hand cables and knew in the weeks leading up to Mr. Ferguson's accident that all the old cables were not replaced. Allied knew that the failure to replace cables was causing injuries. Palladino depo. at 19-22. In fact, the cables caused an injury one month prior to Mr. Ferguson's injury. The so-called "Allied Replacement Program" began in January or February of 1999 and was to be done immediately. Weaver depo. at 13-14. However, prior to the Plaintiff's September 7, 2000 injuries, another Allied driver, Thomas Fay, was injured by a breaking cable just one month before the Plaintiff Mr. Ferguson's accident. Palladino depo. at 19-22. Allied did nothing to take the cables out of service and fix the dangerous instrumentality. Thus, Allied knew of facts that would lead it to conclude that litigation was likely. Allied also had a motive to eliminate the evidence. Allied shares a parent corporation with manufacturer-defendant Commercial Carriers, Inc. Ex. D, Terzain depo. 68-69. Thus, a loss to Commercial Carriers, Inc.'s bottom line is the same as a loss to Allied's bottom line.

In fact, Allied assumed the liabilities of the very tractor-trailer designed and

2

manufactured by Defendant Commercial Carriers, Inc.  <u>Terzain depo. at 67</u>.  Defendant Allied

admits destroying the defective cables in question when it is Allied's company policy to retain

any product involved in an injury.  Defendant Allied should not benefit from its willful and

malicious conduct and attempt to deny Plaintiff Ferguson his rights under the Ohio Constitution

Article 1 § 5; Article 1 §16.

<u>INTENTIONAL TORT</u>
A.    <u>DEFENDANT ALLIED MISSTATEMENTS</u>

Defendant Allied moves for Summary Judgment under <u>Blankenship  v. Cincinnati

Milacron Chemicals, Inc.</u>, (1982), 69 Ohio St.3d 608 Cert. denied, 459 U.S. 857.  Not only does

Allied not construe the facts in the light most favorable to the non-moving party, (ie. Plaintiff

Ferguson,) Defendant Allied actually makes up facts not in the record.  There is nothing in this

record that the safety cable in question had not been replaced due to inadequate maintenance

supply and record keeping procedures as alleged by Defendant Allied, P. 3, Memorandum

Motion For Summary Judgment.  In fact, the real reason the safety cable was not replaced is

money and budgets.  (Shively depo. at P.11) Furthermore, Allied knew they were not replaced

prior to the Ferguson injury.  (Weaver depo. at P. 19).

Defendant Allied makes another false statement at P. 5 of their Memorandum, "Shortages

were apparently caused by supply and demand for new cables from the requisition placed by the

terminal manager."  In fact, all of the replacement cables could have been made and replaced

within one month of the January/February, 1999 decision to replace all cables because they were

breaking.  Defendant Allied chose not to replace immediately for budgetary reasons which

caused Plaintiff Ferguson's injury.  However, Defendant Allied does admit that Defendant Allied

3

was only replacing cables as trucks were shopped for other reasons and only replacing if

available.  If unavailable, then the tractor was returned to service to be used by the drivers.

Memorandum in Support of Defendant Allied's Motion For Summary Judgment, P. 5.

Therefore, the truck drivers were required to continue to perform dangerous duties.

### B.    ACTUAL FACTS

Mr. Weaver, a maintenance supervisor of Defendant Allied testified,"

> A.     In the conference call, we were to replace – and this is specific.  At
> that time in that conference call, we were told to replace them because there were
> rusted areas between the crimping area and the nylon, is where we will see that.
> We were not to question it.  We were not to check and see if they were broken or
> any strands were broken.  We were to strictly replace it.  Cut and dried.  That's
> what we were supposed to do, replace it.

> Q.     And you were supposed to do that right away?

> A.     Do it as soon as we could possibly do it within reason.

> Q.     Because they were corroding?

> A.     Yes.

Weaver depo at Pp. 49-51.

All cables were to be replaced not inspected but replaced January/February, 1999.

Weaver depo. at Pp. 15, 16.

Mr. Taggett, Regional Maintenance Manager for Allied, told all terminals in the midwest

in January/February, 1999, to replace all cables.  Weaver depo. at Pp. 12 and 13.  Cables were to

be replaced because they were breaking.  Weaver depo at Pp. 14 and 15; Palladino depo. at Pp.

21 and 22.  Between January, 1994 and 1997, 861 trailers were manufactured by Commercial

Carriers, Inc., with cables.  Terzain depo. Pp. 13 and 37.  That only 500 trucks were in the fleet

in January/February, 1999 that had cables.  <u>Robert Farrell, Vice-President, Allied, depo</u>.  That

the Marion facility had 61 trucks in 2000.  <u>Answers To Interrogatories filed herein with Affidavit</u>

<u>of Thomas R. Koustmer</u>.  That in January/February, 1999, there were over 100 manufacturers in

the United States would and could have made these replacement cables.  <u>Defendant Hanes's</u>

<u>Answers to Plaintiff's Interrogatory No. 3 filed</u>.  That Defendant Allied should have replaced the

safety cables within one month of January, 1999.  <u>Gabriel deposition Pp. 105 and 106</u>.

In Gabriel Alexander's deposition at Pages 105 and 106 he testified:

Q.    "How long should it have taken from the time the Allied defendants first discovered a head ramp cable failure problem until the cables were ordered?

And I mean replacement cables, sir.

A.    Should have been done right away.

Q.    Who are the available suppliers, sir?

A.    There's a multitude of suppliers.  I could not list them all.

Q.    More than a hundred?

A.    I would say so.

Q.    And all of them could have replaced – is cost to Allied a factor to be considered in replacement cables?

A.    Not when safety is at issue.

Q.    How long could it have taken for these hundreds of suppliers to provide safety cables that were safe from an engineering perspective?

A.    I think you're looking at less than a month."

Defendant Hanes has stated that they could have made 2,000 replacement cables in six

days.  <u>Defendant Hanes Answer to Plaintiff's Interrogatory No. 3 filed</u>.  In fact, Defendant Hanes

could have produced 10,000 cables in 1999.  Hanes Answer to Plaintiff's Interrogatory No. 2.

Defendant Hanes is one of 100 suppliers in the U.S. that can make 30 replacement design cables

an hour.  Hanes Answer to Plaintiff Interrogatory No. 3 filed.

Therefore, there was obviously no supply problem to get replacement cables in

January/February, 1999.

The injury to Plaintiff Ferguson occurred September 7, 2000, 19 months after ALL 500

cables were to be replaced immediately by Allied.  The reason for not replacing the safety cables

was budgetary.  Shively depo. at P. 11; Ferguson depo. Pp. 114-115.  That all replacement cables

had to come from Allied Parts Center.  Weaver depo. P. 22.  Maintenance was not allowed to

order cables from other suppliers other than Allied companies.  Weaver depo. P.47.

That prior to the injury to Plaintiff Ferguson on September 7, 2000, not all cables were

replaced.  Weaver depo. P. 19.  That Allied Parts Center did not provide enough cables.  Weaver

depo. Pp. 15, 16, 17.  There was no time table to replace cables per Mr. Palladino, Safety

Supervisor.  Palladino depo. Pp. 40-51.  That prior to Plaintiff Ferguson's injury, the

Maintenance Department was not inspecting cables for problems.  Palladino depo. P. 40; Wolf

depo. P.25.  Safety cables just prior to Plaintiff Ferguson's injury were only being replaced if a

truck came into the shop for other maintenance and if at that time replacement cables were on

hand.  Wolf depo. P.9; Shively depo. P. 22; Weaver depo. P. 35.  If replacement cables were not

on hand, the truck was given back to the driver to operate.  Wolf depo. Pp. 23, 24, 25, 45, and

46; Weaver depo. Pp. 19 and 20.  Mr. Palladino stated that the problem with the cables was that

the cables were breaking where the cable meets the steel crimp the same as the broken cable in

the Ferguson case.  Palladino depo. Pp. 24, 27, 71.  The safety cables were never lubricated by

Defendant Allied nor did they have routine maintenance performed on them.  Wolf depo. P. 40.
No instruction was ever given as to care, maintenance or inspection of the cables.  Weaver depo.
P. 27; Shively depo. P. 38; Wolf depo. P. 40.  No one told Allied employees, including Plaintiff
Ferguson, to inspect the cables for corrosion or how to inspect the cables for corrosion or
breakage.  Weaver depo. P. 30.  The replacement cables have a clear plastic coating to see the
metal.  On the old cables as in the Ferguson injury, the plastic was painted yellow and you could
not see the metal or corrosion.  Weaver depo. Pp. 31, 32.  Plaintiff Ferguson could not examine
the cables for corrosion because of the painted yellow vinyl coating over the area of failure.
Ferguson depo. Pp. 33 - 35 and 157.

The cables were originally put on the truck so drivers could grab onto them and prevent a
fall.  Ferguson depo Pp. 13, 37.  Plaintiff Ferguson prior to his injury, was never told not to use
the cables because they were corroding and breaking and needed to be replaced.  Ferguson depo.
P. 53.  Defendant Allied, prior to Ferguson's injury, did not provide enough replacement cables
to replace 30 trucks in employee Shively's yard.  Shively depo. P. 35.  There were not enough
replacement cables to replace needed ones.  Shively depo. P. 34.  If the maintenance department
did not have enough replacement cables to replace all four cables, they would send trucks back
out for the driver to use with only some cables replaced and with no recall or notification to
finish the job when new cables became available.  Wolf depo. Pp. 23, 24, 25, 45 and 46; Weaver
depo. Pp. 19 and 20.  That it would have been safer to take off all defective cables instead of
leaving them on until replaced.  Alexander's depo. Pp. 132 and 133.

Mike Palladino was Safety Director at Allied on the date of the accident who stated the
accident was caused by fatigued cables on the head rack and "There has been an on going

problem with these cables breaking." <u>Palladino depo. Pp. 8, 16, 18 and 19; Exhibit 4 depo</u>.

Palladino also knew of Thomas Fay's injury from the same type of cable breaking on August 8,

2000.  However, after Mr. Fay's injury from a broken cable on August 8, 2000, Mike Palladino

DID NOT give any order to not allow trucks out until the cables were replaced.  <u>Palladino depo.</u>

<u>P. 75</u>.

      Mr. Ferguson naturally assumed the cables on the replacement truck he was given by

Defendant Allied to be safe.  He testified:

> A.    Well, not necessarily due to the fact that you're getting out of this vehicle, you're being told by your employer that the cables are safe, they're replacing them, that they're good cables, don't worry about them, if they're on the truck they're good, they've been checked, they're good.  You trust – I basically say you would trust your employer that they would be telling you the truth that the cables would be good. . . .
>
>         . . .
>
> A.    I looked at the cable, sir, I looked – when I looked at the truck, when I did my walk around I seen it had four cables on it.  I had seen that some of the cables had been replaced.  I presumed that whoever replaced those first cables would have inspected the whole – the other – the rest of the one.  And if it had one of the old type on that I would presume that they would have checked to see if it was okay seeing how that's their job.
>
> Q.    Okay.  So you assumed that if there was what would be considered original equipment, came on there, that somebody had inspected it and made the decision that it would stay there?
>
> A.    Sir, there's – they replaced – Mr. Weaver and Allied has told us, there's two types of these two cables right here (indicating).  They're telling us one has a newer type of steel in it that is better than the old ones we've got.  I wouldn't know if this would be the new one or the old one.
>
> Q.    Okay.
>
> A.    They're telling us that this same exact cable has got a newer steel in it, it's made different, and it doesn't rust through like these do and they don't break.

<u>Ferguson depo Pp. 55 - 58.</u>

Plaintiff Ferguson further testified:

       Q.     And the fourth you reasonably anticipated that had been tested and tested satisfactorily?

       A.     Actually, I just presumed that it was replaced with the rest of them or it would have been good.

       Q.     No reason to believe –

       A.     – that it was defective, no, sir.

       Q.     Who would have done the testing or replacing in the ordinary course of Allied's business?

       A.     I would imagine the shop would have.

       Q.     And that's Bill Weaver's folks?

       A.     Yes, sir.

<u>Ferguson depo. P. 129.</u>

The old style cables were eventually being replaced by the same design only stainless steel instead of galvanized steel.  <u>Shively depo. P.17.</u>

In fact, expert Alexander testified that if a cable is present it is reasonable for a driver to believe the cable is satisfactory, that's why they grab it.  <u>Alexander depo. Pp. 132 and 133.</u>  Mr. Ferguson described the accident as follows:

       A.     I hooked the T hook into the elongated slot, took up the slack with my left hand in the chain.  They have a special hook that you can take up the slack in the chain.

       Q.     Grab hook?

       A.     Grab hook.  I took the slack in the chain up with the grab hook, put my right hand down on the trailer ramp, which is the slide part of the trailer, it

9

slides in and out.  It's like a pan actually.  I put my right hand down on that.  I
went to get up and I put my left – I had to stick my foot back a little ways because
I was down basically hunched into the wheel.  I started – my foot went back, my
foot slipped back a little bit and I just out of instinct grabbed the cable, and I lifted
up and when I did the cable snapped.  When the cable let loose I grabbed the top
cable, trying to stop from going, but I couldn't.  I was already over the edge of the
trailer and that's when I come on down.

Q.     Did you get hold of the top cable at all?

A.     Yes, I did.

Q.     With what hand?

A.     Right hand.

Q.     When you grabbed the lower cable you grabbed it with your left
hand?

A.     Yes, sir.

Q.     And did I understand you to say you grabbed it because you were
losing your balance?

A.     Not exactly losing my balance.  My foot – it's kind of hard to
explain it for someone who has never loaded a tractor-trailer with car carriers, but
I'll try to explain it to you.

There's a gap between the two ramps.  My foot rolled over the front
roller, or my tip of my toe went over the roller.  I just instinctively went – I mean,
I wasn't – I just out of instinct grabbed ahold of the – placed my hand on to the
lower safety cable right – I'd say just a little ways in front of the upright that holds
the cable on.

Q.     Were you doing that to help yourself stand up?  I mean, was that
the purpose for it?

A.     Do you mean to pull myself up?

Q.     Yes.

A.     No.  I just – I just put my – when my foot went down, when my
foot slipped down a little ways, I mean, I wasn't going to fall off the truck at that
time.  My foot slipped a little bit off of the front where the two decks connect

10

because I was down on my knees, I reached up just instinctively.  When I did, I just put my weight on the cable and the cable let go.  But I was getting up.

Ferguson depo. Pp. 99 - 101.

Gabriel G. Alexander's expert opinion is:

"Hanes design and manufacture of the incident Safety Cable was improper and caused Ferguson's fall.  Further, CCI and Allied's actions were improper in that they failed to correct the defective condition that Hanes created.  Further, Allied had prior knowledge of the defective condition, and was responsible for the vehicle's maintenance, and failed to act on the knowledge and correct the defective condition that Hanes created.

By not properly maintaining the incident vehicle Allied, reasonably and with substantial certainty, created an unsafe work condition that would and in fact did lead to Ferguson's injuries."

Gabriel G. Alexander's Report filed in Plaintiff's 26A Disclosure.

## LEGAL ARGUMENT

The safety cable in question is designed for drivers to grab onto to prevent a fall.  In Mr. Ferguson's injury, the cable broke.  Defendant Allied knew as early as January, 1999, that the cables were corroding and breaking.  That is why they issued an order to replace them immediately.  Even Mr. Palladino, Allied Safety Supervisor, knew of prior breaking safety cables.  In fact, one month prior to Mr. Ferguson's injury, a safety cable broke injuring Mr. Fay at Mr. Palladino's facility.  The maintenance workers knew of at least six cables breaking.  There would be no reason to discard a broken cable as it could not be used again.  No evidence exists that OSHA was ever notified by Allied of Mr. Ferguson's injuries.  Somehow, Defendant Allied relies on the fact of no OSHA citation for proof in their argument for summary judgment.  However, OSHA was never notified.  Defendant Allied is grasping at straws.

Defendant Allied states the law of intentional tort as follows from *Fyffe v. Peno, Inc.*

11

(1991), 59 Ohio St.3d, 115, 116 Paragraph 1 of the syllabus:

> (1) knowledge by the employer of the existence of a dangerous, process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentally or condition, then harm to the employee will be a substantial certainly; and (3) that the employer, under such circumstances, and with such, did act to require the employee to continue to perform the dangerous task.

At paragraph 2 of the *Fyffe* syllabus, the Court further held that:

> To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established.  Where the employer acts despite his knowledge of some risk, his conduct may be negligence.  As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness.  As a probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result."

Taken in a light most favorable to Plaintiff, all of these elements have been shown.

Certainly, as a matter of law, Defendant Allied is not entitled to summary judgment.

1.    Knowledge By Allied Of Dangerous Process.

Defendant Allied, in January/February, 1999, knew of the danger of the breaking safety cables and ordered replacement design safety cables to be installed immediately.  This should have been accomplished in one month.  However, due to budgeting concerns, 19 months later Mr. Ferguson was injured with one of these old cables.  Now if in January, 1999, safety cables were to be replaced immediately due to rust, breaking and corrosion, 19 months later there would be even more rust, breaking and corrosion.  In fact, one month prior to Mr. Ferguson's injury on September 7, 2000, a Mr. Fay was injured in the same manner, a broken cable, on August 8, 2000.  Additionally, Defendants Allied admits knowledge of the problem by the Safety

12

Committee meeting in April, 1999. Still, as of September 7, 2000, all cables were not replaced even though they were told to be replaced in January, 1999. The reason was budgetary. Replacement cables could be obtained through Defendant Allied only.

Maintenance workers had seen at least six other broken cables. Contrary to Defendant Allied's Memorandum, there is no evidence that Mr. Ferguson's cable was just overlooked by personnel. There is no testimony from the maintenance people to same. If so, did they just overlook Mr. Fay's broken cable on August 8, 2000, just one month prior. No, the evidence is that cables were not being replaced due to budgets. That as of September 7, 2000, they still were not all replaced. That Defendant Allied had no program or timetable to replace the cables. That only as trucks came into the shop were cables replaced if the cables were on hand. If not on hand, the trucks were given back to the drivers to drive with bad cables.

2.    Substantial Certainty Of Injury.

Defendant Allied in their Motion For Summary Judgment again misstate the facts in the Ferguson injury. What is involved in this case is the actual safety equipment (ie. the safety cable.) *Emphasis added*. Not a safety alternative. This is the actual safety equipment. This is a case where the employer gave an employee dangerous safety equipment knowing that an employee was injured by that very dangerous safety equipment a month earlier. Unlike the cases cited by Defendant Allied, *Faust v. Magnum Restaurants*, (10th Dist. 1994), 97 Ohio App.3d 451 or McOnville v. Jackson Carpet Systems, (9th Dist. 1994), 95 Ohio App.3d 297, the instant case does not involve a dangerous process where Plaintiff failed to use safety equipment but rather, in the instant case, the safety equipment itself (ie. the defective safety cable) which was used caused the injury. This is not about the dangerous instrumentality of automobile transport as

claimed by the Defendant but is about the dangerous defective safety cable given to the truck

drivers to elevate the known dangerous instrumentality of automobile transport.

Defendants Allieds' relies on the following statement in their brief :

"Simply because an employer "uses a dangerous instrumentality in its business operations
does not create the substantial certainty of injury necessary to meet the second element of
*Fyffe*." *Goodie v. Columbia Gas of Ohio, Inc*. (4th Dist. 2000), 141 Ohio App.3d
2076.224, *appeal dismissed as improvidently allowed by* (2001), 92 Ohio St.3d 1214,
2001 Ohio 143. "[Exposure to hazardous or unusually dangerous conditions or processes
is insufficient by itself to constitute a basis for bringing an intentional tort claim against an
employer." *Id*. Mr. Ferguson acknowledged that it is a fact in the automobile
transportation industry that operators may be exposed to hazardous and dangerous
conditions through their employment. To that end, the Ohio workers' compensation act
provides a remedy to him."

However, This is not about Ferguson's engagement in a dangerous occupation but is about the

safety devise (ie. safety cable) given to employees to alleviate the dangerous occupation being

defectively designed and known to break causing injury. Defendant Allied knows of a

dangerous occupation and knows that the safety cables designed to protect from the dangerous

occupation are breaking from rust and corrosion. Yet, Defendants Allied, for 19 months, does

not correct same. With this knowledge of substantial certainty of injury because of breaking

cables in January, 1999, Defendant Allied fails to immediately stop this dangerous condition

with replacement cables because of budgetary reasons. The replacement of Allied cables should

or could have been done in one month. However, knowing that corrosion and rust are only gets

worse over time, 19 months later, September 7, 2000, Mr. Ferguson is injured. Furthermore,

Defendant Allied knew with substantial certainty of a broken cable injury in August 8, 2000, to

Mr. Fay. Yet, Defendant Allied after Mr. Fay's injury did <u>not</u> give any order to not allow trucks

out until all old style cables were replaced with the new design. Further, no timetable existed to

replace the cables. Prior to the accident, the maintenance department did not inspect the cables

or do any maintenance, oiling or lubricate the cables. The employees including Mr. Ferguson

were never instructed on how to inspect or care for the cables. Mr. Palladino in his report on

Ferguson's injury stated, "There has been an on going problem with these cables breaking."

Defendant Allied states that 1,000 cables had been replaced in 19 months but if 500

trucks had cables to be replaced with four cables per truck, then only one half (½) of the cables

were replaced in 19 months. They all should and could have been replaced in one month.

Therefore, what Plaintiff relied upon to make an unsafe job safe was itself knowingly defective

and getting worse everyday with substantial certainty to cause injury. Yet for budget reasons,

Defendant Allied refused to replace the cables with new design cables. Certainly, this one cable

was not just one overlooked cable as Defendant Allied asserts without introducing any evidence

to that assertion because one half or 1,000 cables were overlooked. This truck had been in the

shop many times after three cables were replaced but Defendant Allied did not have the

replacement cable on hand to replace this cable but continued for 19 months to require drivers to

use this knowingly dangerous safety equipment.

Did Defendant Allied have actual subjective knowledge that a fall would be substantially

certain to occur? Of course they did. One had just occurred one month prior on August 8, 2000.

After Mr. Fay's cable broke on August 8, 2000, an order was NOT given to not allow trucks out

until cables were replaced. After 19 months, Defendants Allied continued to use old cables that

were breaking, rusting and corroding and injuring people. The only remedial measure was to

replace the cables with the new design cables. Furthermore, the truck drivers could not see the

rust because of the yellow coating put on the cable at the crimp by Defendant Commercial

Carriers, Inc.

Contrary to Defendant Allied's statement, "This is not a case in which the Allied Defendants utterly failed to institute and maintain safety procedures, despite knowing of a dangerous process. *See generally, Russell v. Interim Personnel, Inc*. (6th Dist. 1999), 135 Ohio App.3d 301, 308.": <u>This is worse</u>. Defendant Allied's safety devices (ie. safety cables) used to alleviate a dangerous processes were knowingly defective. The defective cables had previously caused injury. Yet Defendant Allied for 19 months did not correct the problem when the cables could easily have been replaced. There was no active replacement program. For 19 months if a truck came into the shop for something else and the new design cables were on hand, some cables were replaced. If there were not enough cables for all four cables to be replaced, the truck was given back to the drivers to operate. The record is void of testimony where the drivers were told to not use the truck if the old cables were on the truck. Exactly the opposite is true. Defendant Allied admits that if there were no replacement cables available, the trucks were returned to the driver to use. The Safety Meetings referred to in Defendant Allied's Memorandum was in May, 1999 and October, 1999. This accident occurred on September 7, 2000. Mr. Ferguson is totally correct and justified in his testimony:

Mr. Ferguson explains the accident as follows:

Q.     Why don't you try it again.

A.     Okay, sir. As I said in my previous statement to the question you asked previously, I looked up, by the time – yes, I looked up – they told us they were fixing cables. I looked up, I saw new cables on one side of the truck, I presumed the cables were good because I knew they had been up there.

If they didn't look at the whole thing and they left one on there that was bad then God help them. I mean, to me it seemed like if a person fixed three, wouldn't you fix the fourth one? If you go up there, you know you got three bad

16

ones and it's in the shop, you would presume that they would have looked at the other and said, Well, this one's okay for the time being or they just didn't have the cable to fix it or whatever.  I don't know what their problem was.

Q.    And the fourth you reasonably anticipated that had been tested and tested satisfactorily?

A.    <u>Actually, I just presumed that it was replaced with the rest of them or it would have been good</u>.

Q.    No reason to believe –

A.    – that it was defective, no, sir.

Q.    Who would have done the testing or replacing in the ordinary course of Allied's business?

A.    I would imagine the shop would have.

Q.    And that's Bill Weaver's folks?

A.    Yes, sir.

(Emphasis added).

Mr. Ferguson testified:

Q.    Okay.  So you assumed that if there was what would be considered original equipment, came on there, that somebody had inspected it and made the decision that it would stay there?

A.    Sir, there's -- they replaced -- Mr. Weaver and Allied has told us, there's two types of these two cables right here (indicating).  They're telling us one has a newer type of steel in it that is better than the old ones we've got.  I wouldn't know if this would be the new one or the old one.

<u>Ferguson depo. Pp. 55-58</u>.  (Emphasis added).

There was no alternative means of proceeding in the instant case for Mr. Ferguson.  This truck was given to Mr. Ferguson because his truck was in the shop.  He thought the cables were good and had no reason to believe otherwise.  The yellow coating prevented him from seeing the

rust and corrosion.  The newer design looked the same but the material was stainless steel

instead of galvanized steel.  However, the design looked the same.

3.    Employer Acted To Require Employee To Continue To Perform Dangerous Task.

The third prong of the *Fyffe* test state, "(3) that the employer, under such circumstances

and with such, did act to require the employee to continue to perform the dangerous task."  That

is the exact instant situation.  Mr. Ferguson put his usual truck in the shop and was given the

instant truck to operate.  Defendant Allied has admitted that they would replace what cables they

had replacements for and return the truck to be used by the driver even if the old cables were still

on the truck.  There were two types of replacement cables.  One was eyebolt and the other was

the same design as the original but stainless steel which appeared and was the same as the

original design.  Therefore, Mr. Ferguson has testified:

A.    Sir, there's – they replaced – Mr. Weaver and Allied has told us.
There's two types of these two cables right here (indicating).  They're telling us
one has a newer type of steel in it that is better than the old ones we've got.  I
wouldn't know if this would be the new one or the old me.

Q.    Okay.

A.    They're telling us that this same exact cable has got a newer steel
in it, it's made different, and it doesn't rust through like these do and they don't
break.

Q.    And the fourth you reasonably anticipated that had been tested and
tested satisfactorily?

A.    Actually, I just presumed that it was replaced with the rest of them
or it would have been good.

Q.    No reason to believe –

A.    – that it was defective, no, sir.

Q.    Who would have done the testing or replacing in the ordinary

18

course of Allied's business?

    A.    I would imagine the shop would have.

    Q.    And that's Bill Weaver's folks?

    A.    Yes, sir.

(Emphasis added).

Furthermore, the crimp where the rusting, corrosion and breaking took place was covered with a yellow plastic so no one could see if there was rusting. How Allied can now blame this injury on Mr. Ferguson himself is beyond belief. Allied was returning the trucks to the drivers to be used even if they had bad cables. Mr. Ferguson did not have the ability to determine if a cable was new stainless steel or if they were rusted galvanized steel because of the yellow coating. Further, no Allied employee was given instruction on how to inspect the cables. In fact, no evidence exists that Allied told its employees to shop any truck with old style cables immediately contrary to Allied's Memorandum. The evidence is that after Mr. Fay's injury on August 8, 2000, Allied did not give any order to not allow the trucks out until the cables were replaced. Therefore, contrary to *Sheb v. AMF Bowling Center, Inc*, (10th Dist. 1998), 1998 WL 212619, the instant case does not involve Defendant Allied telling Mr. Ferguson not to perform his tasks. Quite the contrary, Mr. Ferguson was given this truck for his shopped truck to perform his tasks. Mr. Ferguson didn't know if old cables or new style stainless steel cables were on the truck. Mr. Ferguson would have no way to know because of the yellow coating and no instructions by Allied on how to inspect if the cables were rusting, corroding or breaking. In *Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 696 NE 2d 1044, 1047 (1998), the court stated:

Additionally, sufficient evidence was presented to create an issue of fact whether DP & L required the decedent to perform the rescue.  DP & L contends that this requirement is not satisfied because DP & L never ordered the decedent to climb up the ladder to rescue the stranded men.  However, under the third element of *Fyffe*, DP & L did not have to expressly order the decedent to make the rescue.  Instead, to overcome a motion for summary judgment, an opposing party can satisfy this requirement by presenting evidence that raises an inference that the employer, through its actions and policies, required the decedent to engage in that dangerous task.

The court in *Hannah, id*, at 1046 further stated:

In deciding whether there exists a genuine issue of fact, the evidence must be viewed in the nonmovant's favor.  Civ.R. 56(C).  Even the inferences to be drown from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion.  *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123, 1127.

There is no evidence that Mr. Ferguson ignored safety warnings concerning the cables from Allied because they did not exist for this particular cable.  Defendant Allied could have but did not after Mr. Fay's accident on August 8, 2000 give an order to not allow trucks out until old style cables were replaced.  Palladino, Allied Safety Supervisor depo. P. 75.  Therefore, Allied required Plaintiff to continue to work with these old style cables.

## CONCLUSION

For the reasons set forth above, genuine issues of material fact exists and as a matter of law, Defendant Allied's Motion for Summary Judgment should be denied.

Respectfully submitted,

_____
Thomas R. Koustmer   (0008410)
Attorney for Plaintiff
1800 Federated Building
7 West Seventh Street

20

Cincinnati, Ohio 45202
(513) 621-3616


_____
Michael J. Honerlaw, Esq.
Attorney for Plaintiff
Honerlaw & Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, Ohio  45231

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a copy of the foregoing was served electronically or by Ordinary U.S. Mail to the following this _____ day of September, 2003:

Kenneth Robert Schoeni
Kohnen & Patton
201 E. Fifth Street
Cincinnati, Ohio 45202
(513) 381-0656
Attorney for Defendants, Ryder System Inc;
and Commercial Carriers, Inc.

David E. Larson
Larson & Larson PC
11300 Tomahawk Creek Parkway, Suite 310
Leawood, KS 66211
Attorney for Defendants Ryder System Inc.,
And Commercial Carriers, Inc.

Robert Albert Winter, Jr.
Hemmer Spoor Pangburn DeFrank & Kasson PLLC
250 Grandview Dr., Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
Attorney for Defendants, Allied Systems and
Allied Automotive Group

Craig R. Paulus, Esq.
Taft, Stettinius & Hollister LLP
PNC Center
201 E. Fifth St., Suite 800
Cincinnati, Ohio 45202-3957

Attorney for Defendant Hanes Supply, Inc.

_____

Thomas R. Koustmer
Attorney for Plaintiff