UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID FERGUSON, et al.

            Plaintiff,

  -v-

RYDER AUTOMOTIVE, et al.,

            Defendants.

Case No. C-1-02-039

Judge Herman J. Weber
PLAINTIFFS' RESPONSE TO THE ALLIED DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

I. **INTRODUCTION**.

Pursuant to numbered paragraph 2 of the Court's *Amended Scheduling Order*, entered May 15, 2003, defendants Allied System, Ltd. And Allied Automotive Group, Inc. (Together, the "Allied Defendant") provide the following proposed findings of fact and conclusions of law in support of their motion for summary judgment on all claims and causes of action asserted against them: (I) by plaintiffs David E. Ferguson and Martha Ferguson (together, the "plaintiffs") at Counts V (Intentional Tort) and VII (Loss of Consortium) of their *Second Amended Complaint*, and (ii) by defendant Hanes Supply, Inc. ("Hanes Supply") within its *Cross-Claim* (Spoilation of Evidence).

II. **PROPOSED FINDINGS OF FACT.**

1. Plaintiffs are natural individuals and citizens of the State of Ohio.

2. The Allied Defendants and defendants Ryder System, Inc. And Commercial Carriers, Inc., are citizens of states other than the State of Ohio, being incorporated or organized in and having their respective principal places of business located in states other than Ohio.

3. The amount in controversy here exceeds the sum of $75,000.00, exclusive of

interest and costs.

4. The Allied Defendants are in the business of transporting motor vehicles from the manufacturer's final assembly point to the designated shipping point. Tractors and trailers are used to haul the motor vehicles.

5. At all pertinent times, plaintiff David E. Ferguson ("Mr. Ferguson") was employed by the Allied Defendants as a tractor trailer operator, and plaintiff Martha Ferguson was his wife.

6. Mr. Ferguson related that his job as a tractor trailer operator "is considered one of the most dangerous transportation jobs in the industry."

7. Some of the tractors used by the Allied Defendants in their business have two safety cables attached to two posts located atop the head ramp on each side of the tractor. Thus there are two head ramp safety cable assemblies per truck and each truck has four safety cables.

8. In 1999 and 2000, the Allied Defendants operated two terminals in the greater Dayton, Ohio area. One was located at Marion and the other was at Moraine.

9. Mr. Ferguson operated out of the Moraine terminal at all pertinent times.

10. The Allied Defendants were in the process of merging the two terminals into Moraine by December, 2000.

11. At all pertinent times, the maintenance manager at Marion was Mr. Gordon Beal, and his counterpart at Moraine was Mr. William Weaver.

12. The superior of Messrs. Beal and Weaver was the Allied Defendants' regional maintenance manager, Mr. John Taggart.

13. In late January or early February 1999, Mr. Taggart initiated a telephonic

conference call with all the maintenance managers within his region, including Messrs. Beale and Weaver, Mr. Taggart reported that the head ramp safety cables were rusting and directed that they must be replaced right away or as soon as possible within reason. The removed cables were to be cut up and discarded so that there would be no chance of reuse.

14. Thereafter, the Allied Defendants began replacing head ramp safety cables on all tractor units on which they were installed.

15. During 1999-2000, more than 1,000 head ramp safety cables were ordered and/or installed.

16. Mr. Weaver requisitioned new cables for the approximately 29 trucks then stationed at Moraine from Gill Transportation Services, Inc., the Allied Defendants' source for ordering parts and supplies.

17. All of the all old cables on tractors stationed at the Moraine Terminal were replaced. Cables were replaced when maintenance personnel went out in the yard and inspected the trucks on hand for the presence of old type cables. Most cables were replaced when tractors were brought to the shop either for regular maintenance or to fix a driver's complaint or concern.

18. Drivers are the individuals in the best position to know about the condition of a tractor, since they work with their equipment every day.

19. The Allied Defendants' maintenance managers and personnel had not received any technical manuals, training or instruction on how to inspect or maintain the old style cables. Following Mr. Taggart's conference call, maintenance personnel were instructed not to inspect the cables, but rather to replace them.

20. Although Mr. Weaver had no problem obtaining enough new type cables to complete the initial replacement of the 29 trucks operating out of Moraine, he experienced shortages when tractors being transferred from Marion arrived at Moraine without having had all their cables replaced.

21. For whatever reason, not all of the tractors stationed at Marion had their old cables replaced.

22. Shortages of new cables were apparently caused by supply and demand principles - the manufacturer of the new cables simply could not keep up with the demand for new cable from the requisitions placed by the terminal maintenance managers.

23. When operators brought their tractors into the shop for maintenance and there were insufficient numbers of replacement cables on hand, the maintenance personnel would replace the cables they could, leave the old ones on until the tractor was "shopped" the next time, advise the driver of the forgoing, and the tractor would then be returned to service.

24. Prior to being the safety supervisor at Moraine, Mr. Palladino was the safety supervisor at the Marion terminal.

25. Mr. Palladino recalled some instances of safety cable failures at the Marion terminal.

26. Mr. Palladino stated that Marion's maintenance personnel had been replacing all old type cables with new ones. Those were the instructions given to the Marion terminal's maintenance department on the subject.

27. The maintenance manager at the Marion terminal, Gordon Beal, died before the commencement of this action.

28. Following the conference call with Mr. Taggart, Mr. Beal instructed the maintenance personnel under his supervision to replace all of the old style cables with new ones. Mr. Frederick Wolf, a maintenance mechanic stationed at Marion in 1999-2000, stated that he thought all of the old style cables had been replaced. In the event that there were not enough new cables to replace all of the old cables on tractors in the maintenance cycle, the mechanics would check the cables for integrity, replace the old with the limited number of new cables and leave the best looking ones remaining on the truck after visual inspection, pulling and twisting.

29. The tractor at issue had previously been stationed at the Marion terminal. It had just been transferred to Moraine and it arrived there around August 21, 2002.

30. Prior to arriving at Moraine, three of the four head ramp safety cables had been replace by Marion's maintenance department on or about May 8, 1999l.

31. The truck's maintenance records do not reflect that the fourth cable had been replaced.

32. There were approximately six instances where maintenance personnel saw broken old cables when replacing them with new ones.

33. There had been one accident prior to Mr. Ferguson's fall known to the Allied Defendants involving allegedly defective head ramp safety cables. On August 8, 2000, Mr. Thomas Fay was injured when a head ramp safety cable broke and he fell.

34. Following the accident involving Mr. Fay, Mr. Palladino taped a written notice to the dispatch counter at the Moraine terminal informing the drivers to have any old cables remaining on their tractors replaced and not to place any pressure on any old cables that might still be installed.

35. Drivers pass the dispatch counter every day.

36. Although one Roy Thornton might have fallen due to a defective cable, the Allied Defendants have no knowledge of that incident, as it had never been reported to them.

37. Issues surrounding the head ramp safety cables had been subjects of several drivers' safety meetings.

38. In late April 1999, Mr. Ferguson attended a safety meeting where the drivers were admonished to check their head ramp safety cables, have them replaced if they saw any problems (such as rust, the plastic cover pulling away or the like), and have Mr. Weaver or other maintenance personnel check the cables if the driver was not sure of their condition.

39. Another safety meeting was held on October 13, 1999, where the drivers were again told of the problems with the safety cables, check them and have them replaced.

40. Mr. Ferguson related attending a drivers' safety meeting about one year before Mr. Fay's fall where the attendees were warned about the head ramp safety cables being potentially dangerous due to breakage.

41. Another safety meeting was held some time before Mr. Fay's accident where the issue of the safety cables was again discussed. At that meeting, the Allied Defendants' safety supervisor indicated that the problem was being taken care of.

42. The truck that Mr. Ferguson was operating on the morning of September 9, 2000 was a spare unit and not the tractor that he normally operated.

43. On the morning of September 9, 2000, Mr. Ferguson performed a walk-around inspection of his tractor and trailer.

44. Had Mr. Ferguson found anything unsafe or defective about the truck, it was his practice to have had it "shopped" with Mr. Weaver's maintenance department.

45. Mr. Ferguson had "shopped" his truck on several occasions in the past when he found conditions thereon that were unsafe or defective.

46. Mr. Ferguson is not hesitant to have his truck sent to the maintenance department when he believes that it is unsafe or defective.

47. During his inspection on the morning of September 9, 2000, Mr. Ferguson looked up at the head ramp safety cables and notes that there were three new cables installed, two of which were on the passenger side.

48. Mr. Ferguson also knew that the Allied Defendants had not yet replaced all of the safety cables on every tractor, but he did not specifically check the two safety cables on the driver's side, even though his eyes were literally inches away from the old type cable installed on the lower driver's side just shortly before his accident.

49. Had Mr. Ferguson visually inspected the lower cable on the driver's side at issue, he would have seen that it was an old type cable that the Allied Defendants were trying to replace.

50. Mr. Ferguson presumed that the Moraine maintenance department had inspected the cable and determined it to be safe:

51. At approximately 10:35 a.m. on September 9, 2000, Mr. Ferguson lost his footing while chaining down a vehicle to the head ramp on the driver's side of the tractor, and grabbed onto the lower of two head ramp safety cables.

52. The cable broke, Mr. Ferguson was unable to regain his balance and he fell approximately ten feet to the asphalt pavement.

53. Mr. Ferguson claims to have sustained severe injuries to his low back as a result of the fall.

54. Mr. Ferguson has received and is receiving medical and income benefits under the Ohio workers' compensation act on behalf of the Allied Defendants.

55. It is the Allied Defendants' standard practice for a terminal safety supervisor to obtain custody over any items that are involved in an accident.

56. In this instance, the safety supervisor at the time, Mr. Palladino, never obtained custody of the broken cable on Mr. Ferguson's tractor that was involved in his accident.

57. The Allied Defendants do not know the whereabouts of the broken cable at issue. It was last seen by their assistant terminal manager, Tom Heller, the day after the accident.

58. An unidentified member of the Moraine Terminal's maintenance department undoubtedly retrieved the cable following the accident.

59. The broken cable was most likely discarded shortly after the accident, since the Moraine terminal's maintenance department personnel had been instructed to do so when they replaced the old cables.

60. Neither the state nor the federal OSHA administrative bodies issued the Allied Defendants any citations or notices of violations arising from Mr. Ferguson's accident.

III.   **PROPOSED CONCLUSIONS OF LAW.**

A.   This Court has subject matter jurisdiction over the claims and causes of action asserted herein by virtue of the diversity of citizenship statute, 28 U.S.C. §1332, and the doctrines of pendant or ancillary jurisdiction.

B.   This Court has personal jurisdiction over all parties to this action.

C.   To prove that an intentional tort was committed by an employer against an employee, the employee must show: (I) knowledge by the employer of the existence of a dangerous, process, procedure, instrumentality or condition within its business operation; (ii) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentally or condition, then harm to the employee will be a substantial certainly; and (iii) that the employer, under such circumstances, and with such, did act to require the employee to continue to perform the dangerous task.  To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established.  Where the employer acts despite his knowledge of some risk, his conduct may be negligence.  As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness.  As a probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.  However, the mere knowledge and appreciation of a risk - something short of substantial certainly - is not intent.

D. On motion for summary judgment, the employee must set forth specific facts which demonstrate a genuine issue of whether the employer had committed an intentional tort.

E. Evidence beyond that required to prove either negligence or recklessness is necessary to establish an intentional tort by an employer. It must be shown that the employer specifically desired to injure the employee, or knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded. It is not enough that the harm was likely to occur. Nor is it enough that there was a high risk of the harm occurring. Rather, it must have been substantially certain to occur.

F. There is no credible evidence that the Allied Defendants knew that the tractor assigned to Mr. Ferguson was dangerous. In late January or early February 1999, the Allied Defendants knew that there were problems with the head ramp safety cables. They implemented a program to replace the old, potentially defective cables with new ones. On several occasions during drivers' safety meetings, the drivers were warned of the problem, admonished to inspect their trucks and directed to have the maintenance department replace any old cables. The drivers were told that the problem was being addressed. During 1999 and 2000, more than 1,000 cables were either ordered or replaced on the Allied Defendants' tractors. Unfortunately, replacement cables could not be procured and installed fast enough. After Mr. Fay's accident in June 2000, a written notice was placed by Mr. Palladino at a conspicuous location – the Moraine terminal's dispatch office – of the possibility that old type cables still might remain on the tractors. Mr. Ferguson's accident is an instance where an old cable remaining on one tractor was simply overlooked by all personnel, including Mr. Ferguson.

G.  The second prong of an intentional tort claim requires a showing of knowledge by the Allied Defendants that injury to Mr. Ferguson will be a substantial certainty. To satisfy this prong, there must be admissible evidence that the Allied Defendants knew of the substantial certainty of injury to Mr. Ferguson as a result of the dangerous condition.

H.  The issue under the second prong is not whether injury is substantially certain to occur from such a fall, but rather whether the Allied Defendants knew or should have known that a fall by Mr. Ferguson would have been substantially certain to occur under those circumstances.

I.  There is no evidence tending to show that by subjecting Mr. Ferguson to operating his tractor under the aforementioned precautions, the Allied Defendants had actual or subjective knowledge a fall would be substantially certain to occur. This is not a case in which the Allied Defendants utterly failed to institute and maintain safety, inspection and maintenance procedures, despite knowing of a dangerous process. The Allied Defendants' replacement program was in effect. Their safety personnel had warned and admonished tractor operators on the safety, inspection and maintenance procedures that needed to be taken in response to the presence of defective cables. In the event that an issue existed in the mind of an operator as to whether an old style cable was still installed on his truck, he was directed to obtain assistance from maintenance department personnel and/or "shop" the truck. Unfortunately, (I) one old type cable remaining on the truck Mr. Ferguson was operating on the morning of September 9, 2000, and (ii) he did not vigorously inspect the safety cables located on the driver's side of that truck. He assumed that the truck had already been through the maintenance department when, in fact, it had just arrived at Moraine and had not been checked by Mr. Weaver's mechanics. Mr. Ferguson

11

acknowledges that had he done so, he would have known that the lower cable on the driver's side was an old one needing replacement.

      J.     Since Mr. Ferguson had available an alternate, safer means of proceeding with his work, the Allied Defendants could not have known to a substantial certainty that he would be subjected to a dangerous procedure and that harm resulting from that dangerous procedure would be a substantial certainty.  Specifically, Mr. Ferguson had been made aware from several sources that old safety cables were unreliable and required replacing.  He had been encouraged by the Allied Defendants to take the truck out of service and obtain a new one if there were any safety issues present.  As an experienced driver, Mr. Ferguson had "shopped" his truck in the past.  Thus, the Allied Defendants could not be expected to anticipate Mr. Ferguson's actions that lead to an injury where that employee has alternative means of proceeding available to him.

      K.     The Allied Defendants might have known that there might be trucks in their fleet that had not yet undergone cable replacement under their program, and that there might be some risk that an operator might not conduct a through pre-trip inspection despite prior warnings and training and suffer injury thereby.  Knowledge of some risk, however, falls far short of knowledge to a substantial certainty.

      L.     There is no evidence demonstrating that the Allied Defendants required Mr. Ferguson to proceed with operating the tractor with an old, potentially defective safety cable installed.  Instead, the Allied Defendants had previously warned and trained Moraine-based operators like Mr. Ferguson to: (I) place a truck in the maintenance shop if there were old style safety cables on the head ramp, and (ii) contact Bill Weaver or other maintenance personnel if there was any doubt whether any head ramp safety cable was of the old variety or defective.  Mr.

Ferguson was never instructed to disregard those instructions or to load and operate a truck that was unsafe.

  M  The Allied Defendants did not require Mr. Ferguson to perform his work in an unsafe manner.

  N.  The Allied Defendants are entitled to the grant of judgment on the intentional tort claims asserted against them by Mr. Ferguson within the *Second Amended Complaint*. Mr. Ferguson's remedies against the Allied Defendants are set forth within and limited by the Ohio workers' compensation act.

  O.  Since the Allied Defendants are entitled to summary judgment on Mr. Ferguson's intentional tort claims, it follows that plaintiff Martha Ferguson's derivative claim for loss of consortium within the *Second Amended Complaint* should likewise be disposed of summarily against her.

  P.  The elements of Hanes Supply's intentional spoliation of evidence *Cross-Claim* against the Allied Defendants are: (I) pending or probable litigation involving the plaintiff, (ii) knowledge on the part of the defendant that litigation exists or is probable, (iii) wilful destruction of evidence by defendant designed to disrupt the plaintiff's case, (iv) disruption of the plaintiff's case, and (v) damages proximately caused by the defendant's acts.

  Q.  The term "wilful" contemplates more than mere negligence or failure to conform to standards of practice, but instead anticipates an intentional, wrongful act. A showing of carelessness is insufficient to establish willfulness.

  R.  The Allied Defendants do not have custody of the broken cable at issue. The last person to have seen it was its assistant terminal manager, Tom Heller, on the day after the

accident. Its safety supervisor, Michael Palladino, is the person who investigated the accident and he never obtained possession over it. Since the Moraine terminal's maintenance personnel were instructed to cut up and discard all old style cables upon replacement so that they could not be reused, the only reasonable inference from the facts is the cable at issue was destroyed shortly after the accident in the ordinary course of the tractor maintenance process and for the aforementioned purpose. There is no evidence tending to indicate that the broken cable was destroyed with a purpose to hinder Hanes Supply's defense of this case. The Allied Defendants did not know the identity of the cable component manufacturer in September 2000.

  S. The Allied Defendants could not reasonably foresee in September 2000 that litigation would be occurring with Hanes Supply. If there would be any litigation, it would be between the Allied Defendants and Mr. Ferguson in the context of an Ohio workers' compensation act claim. In any such litigation, the Allied Defendants' fault or absence of fault for a defectively designed or manufactured cable causing a work-related injury would be irrelevant.

  T. The Allied Defendants are entitled to the grant of judgment against the intentional tort claims asserted against them by Hanes Supply within its *Cross-Claim*.

               Respectfully submitted,

               _____
               Thomas R. Koustmer   (0008410)
               Attorney for Plaintiff
               1800 Federated Building
               7 West Seventh Street
               Cincinnati, Ohio 45202
               (513) 621-3616

                                                                                                          _____
Michael J. Honerlaw, Esq.
Attorney for Plaintiff
Honerlaw & Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, Ohio 45231

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was sent electronically and by Ordinary U.S. Mail to the following this _____ day of September, 2003:

Kenneth Robert Schoeni
Kohnen & Patton
PNC Center, Suite 800
201 E. Fifth Street
Cincinnati, Ohio 45202
(513) 381-0656
Attorney for Defendants, Ryder System Inc;
and Commercial Carriers, Inc.

David E. Larson
Larson & Larson PC
11300 Tomahawk Creek Parkway, Suite 310
Leawood, KS 66211
Attorney for Defendants Ryder System Inc.,
And Commercial Carriers, Inc.

Robert Albert Winter, Jr.
Hemmer Spoor Pangburn DeFrank & Kasson PLLC
250 Grandview Dr., Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
Attorney for Defendants, Allied Systems and
Allied Automotive Group

Craig R. Paulus, Esq.
Taft, Stettinius & Hollister LLP
PNC Center
201 E. Fifth St., Suite 800
Cincinnati, Ohio 45202-3957
Attorney for Defendant Hanes Supply, Inc.

                                                      _____
Thomas R. Koustmer, Attorney for Plaintiff