# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| DAVID FERGUSON, ET AL. | : | |
| | : | Case No.  C-1-02-039 |
| Plaintiffs | : | |
| | : | Judge Herman J. Weber |
| v. | : | |
| | : | **MEMORANDUM OF** |
| RYDER AUTOMOTIVE CARRIER | : | **DEFENDANTS ALLIED** |
| SERVICES, INC., ET AL. | : | **SYSTEMS, LTD. AND ALLIED** |
| | : | **AUTOMOTIVE GROUP, INC.** |
| Defendants | : | **IN OPPOSITION TO THE** |
| | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT OF PLAINTIFFS** |
| | : | **DAVID FERGUSON AND** |
| | : | **MARTHA FERGUSON** |
| | : | |
| | : | **AFFIDAVITS OF WILLIAM C.** |
| | : | **WEAVER, RICHARD H.** |
| | : | **SHIVELY, BILL MCDANIEL,** |
| | : | **ROBERT A. WINTER, JR. AND** |
| | : | **SCOTT MACAULAY** |
| | : | **ATTACHED** |

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    The Allied Defendants, Their Car Hauling Business, Their
Relationship With CCI, Mr. Ferguson's Employment With
Them As An Operator, The Accident At Issue And The
Absence Of Any Pleading By Plaintiffs Setting Forth A
Spoliation Of Evidence Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    The Allied Defendants' Discovery Of The Defective Safety
Cables, Their Response To Those Defects, And Their
Maintenance, Inspection, Cable Replacement And Drivers'
Safety Meetings, Procedures And Activities In 1999-2000 . . . . . . . . . 5

C.    The Facts And Occurrences Immediately Prior to
Mr. Ferguson's Accident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.    The Allied Defendants' Post-Accident Handling Of The Cable . . . . 10

III.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A.    Plaintiffs' Motion Is Fatally Flawed Because They Never
Pled A Claim of Spoliation Of Evidence Against The
Allied Defendants Within Either Their Original, First Or
Second Amended Complaints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B.    *Smith v. Howard Johnson Co.'s* First And Second Elements
Of A Spoliation Of Evidence Tort Claim With Regard To
The Probability Of The Allied Defendants Litigating
Against Plaintiffs, And Their Supposed Knowledge That
Litigation Was Probable At The Time Of The Accident . . . . . . . . . 12

C.    *Smith v. Howard Johnson Co.'s* Third Element To A
Spoliation Claim Of *Willful* Destruction Of Evidence,
The Absence Of Any Evidence That The Allied Defendants
Willfully Discarded The Broken Cable, And The Allied
Defendants' Corporate Affiliation With CCI Create A Genuine
Issue of Material Fact Warranting The Denial Of The Motion . . . . 14

D.    Plaintiffs' Reliance Upon *Sheets v. Norfolk Southern* Is Badly
Misplaced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.    The Allied Defendants Have Attempted To Attenuate The
Absence Of The Broken Cable From Mr. Ferguson's Truck By
Voluntarily Providing Old Type Cables From Another Tractor
As Soon As They Became Available.  That Production Militates
Against The "Willfulness" And "Disruption" Elements of
*Smith v. Howard Johnson Co* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## EXHIBIT TABLE

A  Scott Macaulay affidavit

B  David E. Ferguson deposition excerpts

C  William C. Weaver deposition excerpts

D  Richard H. Shively deposition excerpts

E  Michael Palladino deposition excerpts

F  Frederick Wolf deposition excerpts

G  Gary O. Chinn deposition excerpts

H  Richard H. Shively affidavit

I  William C. Weaver affidavit

J  *Matyok v. Moore* (6th Dist.), 2000 WL 1232417

K  Bill McDowell affidavit

L  Peter Terzian, Jr. deposition excerpts

M  Answers and Objections of Defendants Allied Automotive Group, Inc. and Allied Systems, Ltd. to Defendant Hanes Supply, Inc.'s First Set of Interrogatories

N  Robert A. Winter, Jr. affidavit

s:\dma\allied\ferguson\pleadings\table contents.wpd

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| DAVID FERGUSON, ET AL. | : | |
| | : | Case No.  C-1-02-039 |
| Plaintiffs | : | |
| | : | Judge Herman J. Weber |
| v. | : | |
| | : | **MEMORANDUM OF** |
| RYDER AUTOMOTIVE CARRIER | : | **DEFENDANTS ALLIED** |
| SERVICES, INC., ET AL. | : | **SYSTEMS, LTD. AND ALLIED** |
| | : | **AUTOMOTIVE GROUP, INC.** |
| Defendants | : | **IN OPPOSITION TO THE** |
| | : | **MOTION FOR SUMMARY** |
| | : | **JUDGMENT OF PLAINTIFFS** |
| | : | **DAVID FERGUSON AND** |
| | : | **MARTHA FERGUSON** |
| | : | |
| | : | **AFFIDAVITS OF WILLIAM C.** |
| | : | **WEAVER, RICHARD H.** |
| | : | **SHIVELY, BILL MCDANIEL,** |
| | : | **ROBERT A. WINTER, JR. AND** |
| | : | **SCOTT MACAULAY** |
| | : | **ATTACHED** |

## I.    INTRODUCTION.

This memorandum is provided by defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. (together, the "Allied Defendants") in opposition to *Plaintiffs' Motion for Summary Judgment Against Allied Systems, Inc. [sic] and Allied Automotive Group [sic] for Spoliation of Evidence* (the "Motion") of plaintiffs David E. Ferguson and Martha Ferguson (together, the "plaintiffs").  The Motion should be denied, because: (i) plaintiffs failed to set forth a claim for the tort of spoliation of evidence against the Allied Defendants within their pleadings or, alternatively, (ii) there are no genuine issues of material fact with regard to the reason for the Allied Defendants' maintenance mechanic's disposition of the broken head ramp safety cable

that had been removed from the tractor operated by plaintiff David E. Ferguson ("Mr. Ferguson")

on or shortly after his accident on September 7, 2000, and the disposition was proper and lawful.[1]

## II.    FACTS.

### A.    The Allied Defendants, Their Car Hauling Business, Their Relationship With CCI, Mr. Ferguson's Employment With Them As An Operator, The Accident At Issue And The Absence Of Any Pleading By Plaintiffs Setting Forth A Spoliation Of Evidence Claim.

This action arises from a fall by Mr. Ferguson from a tractor at the Allied Defendants'

Moraine, Ohio terminal.  Mr. Ferguson claims that he fell and sustained personal injuries on

September 7, 2000, when one of the four head ramp safety cables installed on his truck broke

when he attempted to lean into it.

The Allied Defendants are in the business of transporting motor vehicles from the

manufacturer's final assembly point to the designated shipping point.  Tractors and trailers are

used to haul the motor vehicles.  The tractor at issue was manufactured by co-defendant

Commercial Carriers, Inc. ("CCI").  Plaintiffs allege that the manufacturer of the broken cable is

co-defendant Hanes Supply, Inc.

There is some conjecture within the Motion about the inter-corporate relationship

between the Allied Defendants and CCI.  At all pertinent times, the Allied Defendants and CCI

were affiliated companies in that each was owned by their ultimate parent company, Allied

---

[1]  In other words, the Allied Defendants would themselves be entitled to the grant of summary judgment on a spoliation of evidence claim had plaintiffs bothered asserting that claim within their pleadings.  Plaintiffs did not so plead.  Consequently, the Allied Defendants did not offer a cross-motion for summary judgment on the issue.  As an aside, the Allied Defendants report that they have moved for summary judgment on the spoliation of evidence claim asserted against them by co-defendant Hanes Supply, Inc. ("Hanes Supply").

Holdings, Inc. (Exh. A, Macaulay aff. ¶7)  Contrary to plaintiffs' argument, there is no evidence that the Allied Defendants had either purchased CCI or assumed its liabilities.

Some of the tractors used by the Allied Defendants have two safety cables attached to two posts located atop the head ramp on each side of the tractor.  Thus, there are two head ramp safety cable assemblies per truck and each truck has four safety cables.

At all pertinent times, Mr. Ferguson was employed by the Allied Defendants as a tractor trailer operator, and plaintiff Martha Ferguson was his wife.  Mr. Ferguson related that his job "is considered one of the most dangerous transportation jobs in the industry."  (Exh. B, Ferguson dep. 125)

At approximately 10:35 a.m. on September 9, 2000, Mr. Ferguson was at work at the Allied Defendants' Moraine, Ohio terminal securing a motor vehicle to the head ramp of a tractor on the driver's side.  The tractor was not the one he usually operated, since it was either in the shop for maintenance or engaged on a split shift and had not yet returned to the Moraine terminal. (Exh. B, *Id.* 123-124)  The tractor at issue had recently arrived at Moraine, having just been transferred from the Marion terminal.  (Exh. C, Weaver dep. 16)  While chaining down a vehicle to the head ramp, Mr. Ferguson lost his footing and grabbed onto the lower of two head ramp safety cables.  The cable broke, Mr. Ferguson was unable to regain his balance and he fell approximately ten feet to the asphalt pavement.  Mr. Ferguson claims to have sustained severe injuries to his low back as a result of the fall.  Mr. Ferguson is receiving medical and income benefits under the Ohio workers' compensation act.

Although Mr. Ferguson himself described the Allied Defendants' conduct here as mere "negligence" (Exh. B, Ferguson dep. 49), he nevertheless asserts an intentional tort claim against the Allied Defendants under *Blankenship v. Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St.3d 608, *cert. denied*, 459 U.S. 857, and its progeny.  Plaintiff Martha Ferguson asserts a claim for loss of consortium.  The Allied Defendants contend that plaintiffs' claims are barred by the exclusive remedy provision of the Ohio workers' compensation act, and that their alleged acts and omissions do not rise to the level of culpability to support a *Blankenship* intentional tort claim.

By the Motion, plaintiffs move for summary judgment on the tort of spoliation of evidence. **However, although plaintiffs twice amended their original complaint, they <u>never</u> asserted a claim against the Allied Defendants for the tort of spoliation of evidence within those pleadings!**  The deadline for plaintiffs to have amended their pleadings to add such a claim was August 5, 2002.[2]  (*Scheduling Order*, entered June 24, 2002, ¶1; *Preliminary Plan for Litigation*, ¶11(a))

---

[2]  Hanes Supply sought leave of Court to amend its pleadings to assert a spoliation of evidence cross-claim against the Allied Defendants.  Any opposition by the Allied Defendants to the filing of such a claim by Hanes Supply would have been problematic, since it was not an original party to this action, it did not subscribe to the *Preliminary Plan for Litigation*, it was brought into this case in August 2002, and it needed additional time to learn of the missing broken cable.  Conversely, plaintiffs have been in the case all along and have continuously known that the broken cable was missing.  That knowledge notwithstanding, plaintiffs <u>never</u> set forth a spoliation tort claim within their pleadings.

**B.**    **The Allied Defendants' Discovery Of The Defective Safety Cables, Their Response To Those Defects, And Their Maintenance, Inspection, Cable Replacement And Drivers' Safety Meetings, Procedures And Activities In 1999-2000.**

In 1999 and 2000, the Allied Defendants operated two terminals in the greater Dayton, Ohio area. One was at Marion and the other was at Moraine. Mr. Ferguson operated out of the Moraine terminal at all pertinent times. The Allied Defendants were in the process of merging the two terminals into Moraine by December 2000. (Exh. C, Weaver dep. 18, 42) During this period, the maintenance manager at Marian was Mr. Gordon Beal, and his counterpart at Moraine was Mr. William C. Weaver ("Mr. Weaver"). (Exh. C, *Id.* 4-5, 36) Their superior was the Allied Defendants' regional maintenance manager, Mr. John Taggart. (Exh. C, *Id.* 12)

In late January or early February 1999, Mr. Taggart initiated a telephonic conference call with all the maintenance managers within his region, including Messrs. Beal and Weaver. (Exh. C, *Id.* 13-14) Mr. Taggart announced that the head ramp safety cables installed on the Allied Defendants' tractors were rusting, and directed that they be replaced either right away or as soon as possible within reason. (Exh. C, *Id.* 13-15, 25, 37-38, 49-50) The removed cables were to be cut up and discarded so that there would be no chance of any reuse. (Exh. C, *Id.* 14; Exh. D, Shively dep. 8)

The head ramp safety cables then began being replaced. (Exh. C, Weaver dep. 12) The Allied Defendants' purchase invoices and maintenance history records reflect that during 1999-2000, more than 1,000 head ramp safety cables were ordered and/or installed.

Mr. Weaver requisitioned new cables for the approximately 29 trucks then stationed at Moraine from Gill Transportation Services, Inc., the Allied Defendants' source for ordering parts and supplies. (Exh. C, *Id.* 12, 14) Mr. Weaver stated that all the old cables on tractors stationed

- 5 -

at the Moraine terminal were replaced. (Exh. C, *Id.* 14, 19)  Some cables were replaced when maintenance personnel went out in the yard and inspected the trucks on hand for the presence of old type cables. (Exh. C, *Id.* 20-21; Exh. D, Shively dep. 28-29)  Most cables were replaced when tractors were brought to the shop either for regular maintenance or to fix a driver's complaint or concern about them. (Exh. C, Weaver dep.19, 29)  Mr. Weaver noted that drivers are the individuals in the best position to know about the condition of a tractor, since they work with their equipment every day. (Exh. C, *Id.* 41-42)

Although Mr. Weaver had no problem obtaining enough new type cables to complete the initial replacement of the 29 trucks operating out of Moraine, he experienced shortages when tractors being transferred from Marion arrived at Moraine without having had all their cables replaced. (Exh. C, *Id.* 17-18, 19)  For whatever reason, not all of the tractors stationed at Marion had their old style cables replaced. (Exh. C, *Id.* 18)  Shortages were apparently caused by supply and demand principles – the cable manufacturer simply could not keep up with the demand for new cables from the requisitions placed by the terminal maintenance managers. (Exh. C, *Id.* 19, 26)  Therefore, when operators brought their tractors into the shop for maintenance and there were insufficient numbers of replacement cables on hand, the maintenance personnel would replace the cables they could, leave the old ones on until the tractor was "shopped" the next time, advise the driver of the foregoing, and the tractor would then be returned to service. (Exh. C, *Id.* 19-20, 32-33)

Prior to being the safety supervisor at Moraine, Mr. Michael Palladino was the safety supervisor at the Marion terminal. (Exh. E, Palladino dep. 16, 44-45)  He recalled some instances of safety cable failures there. (Exh. E, *Id.* 46)  Mr. Palladino stated that Marion's

maintenance personnel had been replacing all old type cables with new ones.  (Exh. E, *Id.* 42, 47, 64, 69)  Those were the instructions given to the Marion terminal's maintenance department on the subject.  (Exh. E, *Id.* 45-46)

The maintenance manager at the Marion terminal, Mr. Beal, died before the commencement of this action.  One of the maintenance mechanics at Marion, Mr. Frederick L. Wolf, testified that Mr. Beal and the mechanics under his supervision worked to implement Mr. Taggart's directive during 1999-2000.  (Exh. F, Wolf dep. 6-7, 12-13, 16, 19, 22, 24 and 48-49)

The tractor at issue had previously been stationed at the Marion terminal.  (Exh. C, Weaver dep. 16-17)  It had just been transferred to the Moraine terminal in conjunction with the wind down of the Marion operation, and the tractor arrived at Moraine around August 21, 2002. (Exh. C, *Id.*; Exh. E, Palladino dep. 44)  The truck's maintenance records reflect that prior to arriving at Moraine, three of the four head ramp safety cables had been replaced at Marion on or about May 8, 1999.  (Exh. H, Shively aff., ¶2 and Exh. A thereto at p.13, line 3; Exh. I, Weaver aff., ¶3 and Exh. A thereto at p.13, line 3)[3]  Those records tend to indicate that the fourth cable had not been replaced prior to Mr. Ferguson's accident.

There were approximately six instances where maintenance personnel saw broken old cables upon replacing them with new ones.  (Exh. D, Shively dep. 8)  There had been one accident prior to Mr. Ferguson's fall known to the Allied Defendants involving an allegedly defective head ramp safety cable.  On August 8, 2000, one Thomas Fay was injured when a cable

---

[3]  The original *Affidavit of Richard H. Shively*, dated August 6, 2003, is attached at Exhibit D of the *Memorandum of Defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. in Opposition to Defendant Hanes Supply, Inc.'s Motion to Strike the Errata Sheet of William C. Weaver.*

The original *Affidavit of William C. Weaver*, dated August 6, 2003, is attached at Exhibit E of the *Memorandum of Defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. in Opposition to Defendant Hanes Supply, Inc.'s Motion to Strike the Errata Sheet of William C. Weaver.*

broke. (Exh. E, Palladino dep. 19-20) Following that accident, Mr. Palladino affixed a written notice to the dispatch counter at the Moraine terminal to remind the drivers to get any old style cables on their tractors replaced, and not to place any pressure on any such cables that still might be installed. (Exh. E, *Id.* 76) Drivers pass the dispatch counter every day. (Exh. B, Ferguson dep. 165)

The head ramp safety cables had been a subject of several drivers' safety meetings. (Exh. B, *Id.* 22) In late April 1999, Mr. Ferguson attended a safety meeting where the drivers were admonished to check their cables, have them replaced if they saw any problems (such as rust, the plastic cover pulling away or the like), and have Mr. Weaver or other maintenance personnel check the cables if the driver was not sure of their condition. (Exh. B, Ferguson dep. 121 and Exh. T thereto; Exh. G, Chinn dep. 16-18) Another safety meeting was held on October 13, 1999, where the drivers were again told of the problems with the safety cables, check them and have them replaced. (Exh. G, Chinn dep. 7-8 and 10)

Mr. Ferguson recalled attending another drivers' safety meeting about one year before Mr. Fay's fall where the attendees were warned about the cables being potentially dangerous due to breakage. (Exh. B, Ferguson dep. 109) Another safety meeting was held some time before Mr. Fay's accident where the issue of the safety cables was again discussed. (Exh. B, *Id.* 43-44) At that meeting, the Allied Defendants' safety supervisor indicated that the problem was being taken care of. (Exh, B, *Id.* 45) Mr. Ferguson generally recalled drivers' safety meetings on this topic as follows:

> Q.    Now then the situation began to develop with the cables breaking, right, where you all began to talk about it in safety minutes?
>
> A.    Right.

- 8 -

Q.      And that occurred how long prior to your accident, best judgment?

                *   *   *   *   *   *   *   *   *   *   *

A.      Several months.  (Exh. B, *Id.* 52-53)


C.      <u>**The Facts And Occurrences Immediately Prior to Mr. Ferguson's Accident**</u>.

On the morning of September 9, 2000, Mr. Ferguson performed a walk-around inspection of his tractor and trailer.  Had he found anything unsafe or defective, the truck would have been "shopped" at Mr. Weaver's maintenance department.  (Exh. B, *Id.* 134)  Mr. Ferguson did just that to his truck on several occasions in the past and he is not hesitant to do so.  (Exh. B, *Id.*)

During his inspection, Mr. Ferguson looked up at the head ramp safety cables and noted that there were three new cables installed, two of which were on the passenger side.  (Exh. B, *Id.* 33)  He also knew that the Allied Defendants had not yet replaced all of the safety cables on every tractor, but he did not specifically check the cables on the driver's side, even though his eyes were literally inches away from the old cable shortly before his accident.  (Exh. B, *Id.* 49-50, 56, 100, 161)

Mr. Ferguson acknowledges that had he inspected the lower cable on the driver's side -- the one at issue here -- he would have seen that it was an old type cable that the Allied Defendants were trying to replace.  (Exh. B, *Id.* 56, 58-59)  Mr. Ferguson presumed that the Moraine maintenance department had inspected the cable and determined it to be safe.  (Exh. B, *Id.* 55-56)

**D.    <u>The Allied Defendants' Post-Accident Handling Of The Cable</u>.**

It is standard safety practice for the Allied Defendants' safety supervisor to obtain

custody over any items that are involved in an accident.  (Exh. C, Weaver dep. 8; Exh. G, Chinn

dep. 6)  In this instance, the safety supervisor, Mr. Palladino, did not retrieve the broken cable.

(Exh. E, Palladino dep. 37)  The Allied Defendants' repair and maintenance records reflect that

the broken cable was replaced on September 8, 2000, the day after the accident, by maintenance

mechanic Richard H. Shively.  (Exh. H, Shively aff. ¶3 and Exh. A thereto at page 7)  The Allied

Defendants do not know the exact whereabouts of the broken cable.  (Exh. C, Weaver dep. 7;

Exh. G, Chinn dep. 6; Exh. E, Palladino dep. 37)  However, it was also the Allied Defendants'

standard maintenance practice under Mr. Taggart's directive to cut up and discard all old style

cables as they were replaced so that they would not be reused or refurbished.  (Exh. C, Weaver

dep. 13-14; Exh. I, Weaver aff. ¶6; Exh. D, Shively dep. 8; Exh. H, Shively aff. ¶4; Exh. F, Wolf

dep. 52)  Mr. Shively did not treat the broken cable in any manner other than that standard

maintenance practice and no one, including Mr. Palladino, ever asked him to turn over the cable.

(Exh. H, Shively aff. ¶¶4-5)

There is some testimony by Mr. Weaver to the effect that Mr. Palladino said to him that

he had retrieved the broken cable from the truck shortly after the accident.  Plaintiffs then

speculate that Mr. Palladino destroyed it when it became apparent that the Allied Defendants

were going to become embroiled in litigation with plaintiffs beyond Mr. Ferguson's workers'

compensation claim.

Mr. Weaver's deposition was taken in this action on February 20, 2003, along with those

of maintenance mechanics Richard H. Shively and Frederick Wolf.  Mr. Weaver has no personal

- 10 -

knowledge of what happened to the broken cable at issue, but he initially recalled hearing Mr.

Palladino say at some time after the accident that he, Mr. Palladino, had retrieved or obtained

possession of the cable. (Exh. C, *Id.* 9-10)

Upon a review of his deposition transcript, Mr. Weaver realized that his testimony was

incorrect with regard to Mr. Palladino's supposed retrieval of the cable. (Exh. I, Weaver aff. ¶8)

In fact, Mr. Palladino never told Mr. Weaver that he had retrieved or had possession of the

broken cable. (Exh. I, *Id.*) Accordingly, Mr. Weaver made one change to his deposition

testimony with regard to the question concerning whether anyone disclosed to Mr. Weaver the

whereabouts of the broken cable after the accident:

> The day I got back, I had a casual conversation with Tom Heller and, in turn, he
> spoke to me about Mr. Ferguson falling off a truck. I asked him how it happened
> and he told me that a cable broke and that he had fallen through that. So, in turn,
> we talked a little more about it. I asked how Ferguson was, etc. And I also asked
> him where the old cable was at. Mr. Heller said that he was not sure, but he
> thought Mike Palladino had it. I left it at that, because generally when something
> would happen like that, Mike Palladino being the safety man would impound that
> and hold it pending an investigation. Later on, it might have been 1-2 weeks later,
> Mike called and asked me some questions about cables and the policies on
> whether we were changing them and how often we were going to change them,
> etc. I then asked Mike if he had the cable to Ferguson's truck. He said, "Well,
> I've got a cable." That is all that was said. I did not ask anymore, since I figured
> it was in investigation and it wasn't any of my business. (Exh. C., Weaver dep.,
> errata sheets; Exh. I, Weaver aff., ¶8 and Exh. B thereto) [4]

---

[4] Thus, the earlier testimony of Mr. Weaver at pages 9-10 of his deposition is now of no value except for
possible impeachment. Plaintiffs may not be granted summary judgment here based upon Mr. Weaver's repudiated
testimony, since they cannot rely upon the hope that the trier of fact will disbelieve his corrected testimony, but must
present affirmative evidence of evidence spoliation. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.
1989), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). That they cannot do. Further, Mr.
Weaver's initial recollection of his conversation with Mr. Palladino is simply "implausible," *id.*, citing *Matsushita
Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), since his recollection makes no sense
when juxtaposed against the objective evidence -- the entries of September 8, 2000, within the maintenance/repair
records on Mr. Ferguson's truck that the cable had been replaced -- and the testimonies of Messrs. Shively and
Palladino that the broken cable was discarded in the ordinary course and not turned over to Mr. Palladino. Thus,
where the record taken as a whole cannot lead a rational trier of fact to find for plaintiffs, the Motion should be
denied. *Street v. J.C. Bradford*, 886 F.2d at 1489, citing *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio
Corp.*, 475 U.S. 574, 587 (1986).

- 11 -

### III.    DISCUSSION.

**A.    Plaintiffs' Motion Is Fatally Flawed Because They Never Pled A Claim of Spoliation Of Evidence Against The Allied Defendants Within Either Their Original, First Or Second Amended Complaints.**

Plaintiffs amended their original Complaint two times prior to the expiration of the deadline for amending pleadings on August 5, 2002, without any opposition from the Allied Defendants.  Plaintiffs never set forth a claim for spoliation of evidence within any of those pleadings. The subject of spoliation of evidence was first raised by plaintiffs within the Motion. The failure to include such a claim within their pleadings is fatal.  *Matyok v. Moore* (6th Dist.) 2000 WL 1232417 at *2 (Exhibit J hereto) (plaintiffs/appellants' tort claim of spoliation of evidence held fatally flawed when the claim was never set forth within the pleadings and was first raised in a memorandum in opposition to defendants/appellees' motion for summary judgment).

**B.    *Smith v. Howard Johnson Co.'s* First And Second Elements Of A Spoliation Of Evidence Tort Claim With Regard To The Probability Of The Allied Defendants Litigating Against Plaintiffs, And Their Supposed Knowledge That Litigation Was Probable At The Time Of The Accident.**

Assuming for the sake of argument, which we do not, that plaintiffs can somehow surmount their failure to plead a spoliation of evidence claim, the Motion should still be denied. The evidence of record does not support a claim of spoliation of evidence, let alone the grant of summary judgment as sought by the Motion.

In either late January or early February 1999, Mr. Taggart chaired a telephonic conference call with his terminal maintenance managers at which time he directed that: (i) all old style head ramp safety cables be removed from the Allied Defendants' tractors, and (ii) the carcasses be cut

up and discarded. (Exh. C, Weaver dep. at 12-14) Unfortunately, not all of the old style cables had been replaced by September 7, 2000, the date of Mr. Ferguson's accident. Prior to that date, there had been one work-related injury involving the accidental breakage of an old style head ramp safety cable involving one Thomas Fay. (Exh. E, Palladino dep. 19-20) Other than a workers' compensation claim, there have been no civil actions brought against the Allied Defendants as a result of allegedly defective prior to this case. (Exh. K, Affidavit of Bill McDaniel, ¶3)[5] The only litigation arising from an employee sustaining a work-related injury due to a cable breaking that could be reasonably characterized as "probable" would be workers' compensation claims arising under R.C. Chapter 4123. The parties' negligence is irrelevant in those proceedings and that is the employee's exclusive claim against the employer. R.C. §4123.74 (exclusive remedy provision).

There is no evidence that the Allied Defendants knew that civil litigation was probable over the issue of broken cables. Mr. Taggart's directive was being implemented and was soon to be concluded. Messrs. Ferguson and Fay were receiving workers' compensation benefits. There is no evidence that either plaintiffs or their representatives placed the Allied Defendants on notice of probable litigation other than workers' compensation where the employers' fault is not at issue. It would be a sad commentary upon our society for the law to be such that when an employee seeks workers' compensation benefits that civil litigation is deemed to be "probable" and that the employer should take notice.

---

[5] The original *Affidavit of Bill McDaniel,*, dated August 14, 2003, is attached at Exhibit C of the *Reply Memorandum of Defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. in Further Support of Their Motion for Summary Judgment Against Defendant Hanes Supply, Inc.'s Cross-Claim.*

The only "probable" litigation due to the broken cable would be a workers' compensation claim where the Allied Defendants' fault is not at issue. The Allied Defendants had no knowledge that civil litigation with plaintiff over the broken cable would be "probable" under the first two elements of *Smith v. Howard Johnson Co.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038 (to recover on a claim for destruction of evidence, a claimant must prove, among other things, "pending or probable litigation involving the plaintiff [and] knowledge on the part of defendant that litigation exists or is probable"). Consequently, the Motion should be denied.

C.     ***Smith v. Howard Johnson Co.'s* Third Element To A Spoliation Claim Of *Willful* Destruction Of Evidence, The Absence Of Any Evidence That The Allied Defendants Willfully Discarded The Broken Cable, And The Allied Defendants' Corporate Affiliation With CCI Create A Genuine Issue of Material Fact Warranting The Denial Of The Motion.**

Assuming that plaintiffs somehow survive the analysis of *Smith's* first two elements, they must also show conclusively that the Allied Defendants willfully destroyed, altered, or concealed the broken cable. *Smith*, 67 Ohio St.3d at 29, 615 N.E.2d at 1038. The concept of "willfulness" contemplates not only an intentional commission of the act, but also a *wrongful* commission of the act. *Drawl v. Cornicelli* (11th Dist. 1997), 124 Ohio App.3d 562, 567, 706 N.E.2d 849, 852. Black's Law Dictionary (6th ed. 1990) 1599, defines the term "willful" to include the following:

- premeditated; malicious; done with evil intent, or with a bad motive or purpose.

- an act is 'willfully' done, if done voluntarily and intentionally and with the specific intent to do something the law forbids; that is to say, with bad purpose. *Id.*, 124 Ohio App.3d at 567, 706 N.E.2d at 852.

To meet its burden, plaintiffs argue that the Allied Defendants had an evil motive to destroy the broken cable removed from Mr. Ferguson's tractor due to an alleged corporate affiliation with CCI, the tractor's manufacturer. (Motion at 9-12) They argue that there is "no

apparent reason" to discard the broken cable.  (*Id.* at 12)  There is no factual foundation for the argument.

The Allied Defendants acknowledge that there is a corporate affiliation between them and CCI.  They are each owned by the same ultimate corporate parent, Allied Holdings, Inc.  (Exh. A, Macaulay aff., ¶7)  Notwithstanding that affiliation, there is no evidence that CCI participated whatsoever in the directive promulgated by Mr. Taggart in January or February 1999 to: (i) replace the old style cables with new ones, and (ii) cut up the replaced cables.  (Exh. C, Weaver dep. 12-14)  Mr. Taggart's conference call was among the Allied Defendants' maintenance managers and did not involve anyone from CCI.  (Exh. C, *Id.* 13)  Thus any affiliation between Allied Defendants and CCI played <u>no</u> role in any maintenance mechanic's decision to destroy the old type cables as they were replaced in the maintenance process.  (Exh. H, Shively aff. ¶6; Exh. I, Weaver aff. ¶7)

Plaintiffs baldly argue that "Allied Systems is a parent company of Commercial Carriers, Inc. (Terzian depo. P. 68,69)" (Motion 9), and that "Defendant Allied" had "assumed the liabilities of Defendant CCI" (*Id.* 12) – and that supposedly gives rise to an inference of a motive to discard the broken cable.  (*Id.* 9-11)  However, the stretch made by plaintiffs to create such an inference, even if successful at this stage of the proceedings, does not warrant the grant of summary judgment on an unpled spoliation claim.

Additionally, the Allied Defendants acknowledge that Mr. Peter J. Terzian, Jr., a transportation consultant associated with CCI, testified during his deposition that during 1997, CCI's car hauling operation was sold to Allied Holdings, Inc. and CCI's tractor manufacturing operation was sold to an unrelated entity.  (Exh. L, Terzian dep. 6, 13-14, 67-69)  Mr. Terzian

talks several times about "Allied," but not in specifics with regard to either Allied Defendant. When asked specifically to discuss the corporate relationship between CCI, Allied Holdings and the Allied Defendants, Mr. Terzian stated that he would be merely engaging in speculation. (Exh. L, *Id.* 72-73)  However, there was colloquy among counsel to the effect that the Allied Defendants are subsidiaries of Allied Holdings, Inc.  (Exh. L, *Id.* 69)

In response to plaintiffs' question with regard to whether "Allied" had assumed CCI's liabilities, Mr. Terzian was very forthcoming and flatly stated that "CCI is still in existence" and that "CCI is still responsible for its trailers they built...."  (Exh, K, *Id.*)  Thus, Mr. Terzian provides no support for plaintiffs' argument that the Allied Defendants are either the owners, successors in interest or assignees of the liabilities of CCI.

In fact, the disposition of the broken cable at issue was done without any thought given to any corporate affiliation between the Allied Defendants and CCI.  The maintenance mechanic who replaced the broken cable on Mr. Ferguson's tractor on September 8, 2000, Mr. Shively, relates that: (i) though he has no present recollection of disposing of the broken cable, it would have been his standard maintenance practice to cut the cable up and discard it, (ii) he has no reason to believe that the cable he had removed from the tractor was treated in any manner other than his standard practice, and (iii) he would not have cut up and discarded the broken cable because of any relationship that CCI might have with the Allied Defendants.  (Exh. H, Shively aff. ¶¶4 and 6)

Frankly, it is preposterous for plaintiffs to argue that Messrs. Weaver and Shively knew of and appreciated the corporate relationship between the Allied Defendants and CCI, and that the relationship played any role in their behavior with regard to the disposition of the broken

- 16 -

cable. Plaintiffs say that the relationships of Allied Holdings, Inc. and others discussed within

*Gruber v. Ryder System, Inc.*, Case No. 99-310-DRH (S.D. Ill. *Order*, filed March 15, 2000)

(Koustmer aff., Exh. 2 thereto at page 4), are "deliberately confusing" -- even among educated

persons like attorneys. (Motion 10) Yet plaintiffs expect a maintenance mechanic stationed at a

terminal in Moraine, Ohio to know about, understood and appreciated those corporate

relationships in deciding how to handle the disposition of the broken cable from Mr. Ferguson's

truck! That is implausible. There is no evidence that Mr. Shively (or Mr. Weaver for that

matter) talked either directly or indirectly with anyone having any knowledge or appreciation of

the corporate affiliation between the Allied Defendants, Allied Holdings, Inc. and CCI.

The reason the cable was discarded was to comply with Mr. Taggart's directive. That is

the reason that plaintiffs seem continuously to miss when arguing that "a cable is discarded for

no apparent reason when it was the policy of the company to keep any part that was involved in

an injury." (Motion at 12)

Plaintiffs also argue that the Allied Defendants' safety manager, Mr. Palladino, was

motivated to destroy the cable to assist CCI in the defense of the product liability-related claims

asserted against it by plaintiffs. However, the argument falls apart upon review. Mr. Palladino

never received the broken cable. Even if he had, the converse of plaintiffs' argument is that the

destruction of the broken cable actually hinders CCI's ability to determine the cause of the cable

failure. The only way for the Allied Defendants to have known the identity of the cable

manufacturer was to obtain the information from CCI. However, the Allied Defendants did not

know the identity of the cable manufacturer or designer. (Exh. M, *Answers and Objections of*

*Defendants Allied Automotive Group, Inc. and Allied Systems, Ltd. to Defendant Hanes Supply,*
*Inc.'s First Set of Interrogatories*, served November 18, 2002, ¶7)

Plaintiffs apparently argue that the Allied Defendants had constructive knowledge of the true identity of the cable manufacturer in 2000 due to the fact that the information was somewhere on documents, dated circa 1994 or 1995, located deep in the files of their corporate affiliate, CCI. (Motion at 9-10) That type of constructive knowledge, or osmosis, between corporate affiliates is unknown under Ohio's spoliation of evidence law. If, however, plaintiffs can make their case in chief against CCI without the cable being present at trial, then CCI is the party who is actually prejudiced by the broken cable's destruction, because it would not have evidence to disprove that any defect was related to the broken cable's design, manufacturing or some other cause. At the risk of speaking on behalf of CCI, it would appear that CCI would much rather have the broken cable than not have it.

There is simply no credible testimony supporting or tending to support plaintiffs' argument that Mr. Palladino somewhere along the line obtained and retained possession of the broken cable only to discard it when it appeared litigation was imminent. Mr. Palladino himself denies ever receiving the broken cable. (Exh. E, Palladino dep. 37) Mr. Weaver does not know where the cable is located and states affirmatively that Mr. Palladino never indicated to him that he, Palladino, had possession of it. (Exh. C, Weaver dep., errata sheets; Exh. I, Weaver aff. ¶8 and Exh B. thereto) **Most compelling is the testimony of Mr. Shively, who states that Michael Palladino never requested that he be provided with the broken cable from Mr. Ferguson's truck upon its replacement on September 8, 2000.** (Exh. H, Shively aff. ¶5)

- 18 -

Although Mr. Palladino should have obtained and retained possession of the broken cable, he did not do so. It was not possible for Mr. Palladino to then discard the missing cable once plaintiffs commenced this action.

**D.    Plaintiffs' Reliance Upon *Sheets v. Norfolk Southern* Is Badly Misplaced.**

Plaintiffs rely upon *Sheets v. Norfolk Southern Corporation* (3d Dist. 1996), 109 Ohio App.3d 278, 671 N.E.2d 1364, for the proposition that summary judgment should be entered on their unpled spoliation claim because they supposedly made out a *prima facie* case. (Motion at 11-12) However, that decision is distinguishable from this case. First, the plaintiffs in *Sheets* actually set forth a claim for spoliation of evidence within their pleadings. Plaintiffs have not.

Second, as set forth above, plaintiffs have not shown the absence of disputed material fact on the first three elements of *Smith v. Howard Johnson Co.* (probable litigation involving plaintiff, knowledge by defendant that litigation is probable, and willful destruction of evidence by defendant designed to disrupt plaintiff's case). Further, unlike the defendants in *Sheets* who were denied summary judgment for failing to explain why the recordings were missing, the Allied Defendants provide an explanation why the missing cable was not preserved.

*Sheets* was a wrongful death action arising from a collision at a railroad crossing. One of plaintiffs' claims was that at some point following the collision, the railroad intentionally destroyed audio dispatch tapes containing communications between the train's operators and its dispatcher. *Id.* at 288, 671 N.E.2d at 1370. The tapes were the only record of communications between the train crew and the dispatcher. *Id.* at 288-289, 671 N.E.2d at 1370. Defendants' in-house counsel stated that normally the tapes are retained in a situation where litigation is anticipated, but in routine situations where no litigation is anticipated, the tapes are either reused

- 19 -

or destroyed. *Id.* at 288, 671 N.E.2d at 1370. The defendants contended they should have been granted summary judgment on the spoilation claim because there was no evidence that the tapes were willfully destroyed. *Id.* However, since **no explanation was "given as to why the tapes were not preserved for trial" by the defendants**, the trial court denied their motion. *Id.* at 289, 671 N.E.2d at 1370.

The Court of Appeals held that the circumstances presented a jury issue on whether the tapes were willfully destroyed. *Id.* **The jury actually found for the defendants on the spoliation claim.** *Id.* That ends alone ends any argument that the Motion should be granted.

Further, unlike the defendants in *Sheets*, the Allied Defendants provide an explanation why the broken cable was not preserved. At the risk of repetition, all of the old type cables on the Allied Defendants' tractors were ordered replaced by Mr. Taggart in January or February 1999. There were to be no exceptions. Mr. Shively, the maintenance mechanic who replaced countless numbers of the old type cables, replaced the cable on Mr. Ferguson's truck on September 8, 2000, and evidently disposed of it pursuant to Mr. Taggart's directive. Mr. Shively did so without regard to any relationships between the Allied Defendants and CCI, and without regard to the prospect of litigation. (Exh. H, Shively aff. ¶¶6-7) Neither Mr. Palladino nor anyone else asked Mr. Shively to save and retain the broken cable. (Exh. H, *Id.* ¶¶4-5) Thus, the *Sheets* case does not support plaintiffs' argument that they made out a *prima facie* case of spoliation of evidence, let alone the grant of summary judgement.

- 20 -

**E.    The Allied Defendants Have Attempted To Attenuate The Absence Of The Broken Cable From Mr. Ferguson's Truck By Voluntarily Providing Old Type Cables From Another Tractor As Soon As They Became Available. That Production Militates Against The "Willfulness" And "Disruption" Elements of *Smith v. Howard Johnson Co*.**

Shortly after the onset of this case, it became apparent to the Allied Defendants that the broken cable at issue could not be located. (Exh. N, Winter aff. ¶5)[6]  The Allied Defendants attempted to obtain another old type cable but were without success until the end of May 2003, at which time some old type cables may have been located. (Exh. N, *Id*.)  They were received by the Allied Defendants' trial attorney on June 6, 2003.  Even though the discovery cut-off date had lapsed, the Allied Defendants' trial attorney notified the other trial attorneys by e-mail of the old type cables' existence and arrival at his office. (Exh. N, *Id*. and Exh. B thereto)

Shortly thereafter, the trial attorneys for Hanes Supply and plaintiffs were granted access to view those cables at counsel's office. (Exh. N, *Id*. ¶6)  The cables have also been physically delivered to counsel for Hanes Supply for the purpose of its management's inspection and evaluation. (Exh. N, *Id*.)  The Allied Defendants voluntarily provided all parties with the copies of the maintenance/repair history of the tractor from where the cables were recently retrieved. (Exh. N, *Id*. ¶7)

The Allied Defendants acknowledge that their voluntary identification and production of old style cables came late in this case.  However, that delay can only be expected, since the Allied Defendants are at the end of completing Mr. Taggart's directive, and there are no old style cables remaining.  After all, Mr. Taggart ordered the old style cables discarded upon

_____

[6]  The original *Affidavit of Robert A. Winter, Jr.*, dated August 8, 2003, is attached at Exhibit H of the *Memorandum of Defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. in Opposition to Defendant Hanes Supply, Inc.'s Motion to Strike the Errata Sheet of William C. Weaver*.

- 21 -

replacement.  While plaintiffs' counsel pronounce that they find it "hard to believe that [the Allied Defendants] cannot produce an exemplar sample of the type of cables in question" (Motion at 8), the fact is that the Allied Defendants were fortunate that any of the old style cables could be found and produced at all.

The recent production of exemplar cables shows two points with regard to the third element of *Smith v. Howard Johnson Co.*  First, the production demonstrates that the destruction of the broken cable from Mr. Ferguson's tractor around September 8, 2000, was not "willful."  If the Allied Defendants were truly attempting to shield either Mr. Palladino or any of their other employees, themselves or CCI, the recently-discovered cables simply would not have been produced.

Second, the production and tender of the exemplar cables to plaintiffs attenuate any disruption to their case caused by the absence of the broken cable from Mr. Ferguson's truck.  Plaintiffs have not requested that the cables be sent to their trial expert, Gabriel Alexander, or anyone else for further investigation and analysis.  Mr. Alexander has given opinion testimony on liability issues here in the absence of the actual broken cable from Mr. Ferguson's truck that is based, among other things, upon the condition of exemplar cables provided early on in this case by the business manager of Mr. Ferguson's Teamster local.  Mr. Alexander might have found the exemplar cables recently produced by the Allied Defendants to be material to his opinions even though they too did not come off of Mr. Ferguson's truck.  Nevertheless, the Allied Defendants' tender of the exemplar cables eliminates any issue with regard to the "disruption of plaintiff's case" aspect of *Smith v. Howard Johnson.  Accord Matyok v. Moore*, 2000 WL 1232417 at *3 (6th Dist. 2000) (plaintiff failed to show genuine issue of material fact on the spoliation of

evidence "disruption of the case" element where plaintiff was injured from a fall from an allegedly defective staircase and defendants subsequently disposed of the staircase, since photographs were taken prior to the disposal that clearly portrayed the staircase and the section that cracked and failed) (Exh. J hereto).

## IV.    **CONCLUSION**.

For the reasons set forth above, the Court should deny plaintiffs' summary judgment motion.

Respectfully submitted,

Robert A. Winter, Jr. (0038673)
250 Grandview Drive, Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
(859) 578-3869 (fax)
Trial attorney for defendants
Allied Systems, Ltd. and
Allied Automotive Group, Inc.

OF COUNSEL:

Hemmer Spoor Pangburn DeFrank PLLC
250 Grandview Drive, Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
(859) 578-3869 (fax)

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served by depositing the same into the United States Mails, first class postage prepaid, on this 22 day of September 2003, to:

Thomas R. Koustmer, Esq.
1800 Federated Building
7 West Seventh Street
Cincinnati, OH 45202

Michael J. Honerlaw, Esq.
Honerlaw and Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, OH 45231

K. Roger Schoeni, Esq.
Kohnen & Patton LLP
PNC Center, Suite 800
201 East Fifth Street
Cincinnati, OH 45202

David E. Larson, Esq.
Larson & Larson PC
11300 Tomahawk Creek Parkway
Suite 310
Leawood, KS 66211

Craig R. Paulus, Esq.
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202

Robert A. Winter, Jr.

s:\dma\allied\ferguson\pleadings\memo contra ps' msj .wpd

- 24 -