## AFFIDAVIT

STATE OF GEORGIA        )
                                 )
COUNTY OF DEKALB     )

COMES NOW, Scott Macaulay, of sound mind and lawful age, and after being duly sworn deposes and says:

1.      I am the Vice President and Treasurer of Allied Holdings, Inc., a Georgia corporation located in Decatur, Georgia.

2.      I have personal knowledge of the matters set forth herein.

3.      Allied Systems, Ltd. is a Georgia limited partnership formed in 1988.

4.      Allied Automotive Group, Inc. is a Georgia corporation incorporated in 1995.

5.      Commercial Carriers, Inc. is a Michigan corporation incorporated in 1934.

6.      Allied Automotive Group, Inc. is the managing general partner of Allied Systems, Ltd.

7.      Allied Systems, Ltd., Allied Automotive Group, Inc., and Commercial Carriers, Inc. are affiliated, in that each company is owned by the same ultimate parent company, Allied Holdings, Inc., a Georgia corporation.

8.      Allied Systems, Ltd. is not and has never been a parent of Commercial Carriers, Inc. Allied Systems, Ltd. does not now and has never owned any stock of Commercial Carriers, Inc.

FURTHER AFFIANT SAYETH NOT.

_____
Scott Macaulay

Sworn to and subscribed before me this _19th_ day of September, 2003, by

_Scott Macaulay_, who is personally known to me or who has produced _____

_____ as identification.



(SEAL)

_____
**Notary Public (signature)**

Linda M. Weaver
_____
**Notary Public (print name)**

Ferguson, et al. vs. Ryder Systems, et al.          DAVID EDWARD FERGUSON
November 21, 2002
Case 1:02-cv-00039-HJW     Document 129-2     Filed 09/22/2003     Page 3 of 38

*Exh. B* 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
- - - - - - - - - - - - -
DAVID FERGUSON, et al.,     :
                            :
                            :
        Plaintiffs,         :
   vs.                      :   Case No. C-1-02 039
                            : (Judge Herman J. Weber)
RYDER SYSTEM, INC., et      :
al.,                        :
                            :
        Defendants.         :
- - - - - - - - - - - - -
```

Deposition of DAVID EDWARD FERGUSON,

plaintiff herein, called by the defendants for

cross-examination, pursuant to the Federal Rules of

Civil Procedure, taken before me, Wendy L. Welsh, a

Registered Diplomat Reporter and Notary Public in

and for the State of Ohio, at the offices of Kohnen

& Patton, 1400 Carew Tower, Cincinnati, Ohio, on

Thursday, November 21, 2002, at 1:18 a.m.

Ferguson, et al. vs. Ryder Systems, et al.
November 12, 2002    DAVID EDWARD FERGUSON
00039-HJW    Document 129-2    Filed 09/22/2003    Page 4 of 38

**Page 22**

1 grievance hearing.

2    Q. Okay. And who was the business agent

3 during this same time frame?

4    A. George Foster.

5    Q. And does he still hold that position?

6    A. Yes, sir, he does.

7    Q. Is that an elected position?

8    A. Yes, sir, it is.

9    Q. Mr. Foster, does he also drive?

10    A. No, sir.

11    Q. So his duties are, of the business agent,

12 full time?

13    A. Yes, sir.

14    Q. And what's that local number?

15    A. 957.

16    Q. Now, when the Marion terminal was in

17 operation was that part of the 957?

18    A. Yes, sir.

19    Q. Any other terminals that that included?

20    A. I'm sorry --

21    Q. The local 957, were there any other

22 terminals that that included?

23    A. As far as car hauling?

24    Q. Yes.

**Page 23**

1    A. No, they just had the two. They just had

2 the one at Marion and the one there in Moraine.

3    Q. Any other trades? Like does that

4 include --

5    A. In the union?

6    Q. Yes.

7    A. Yes, sir. We're one of the largest

8 locals. We probably have 60, 70,000 members

9 probably. I don't know the exact amount, but I

10 would say that's a pretty good guess.

11    Q. That would include the auto workers at the

12 GM plant?

13    A. No, sir.

14    Q. They're separate?

15    A. No, sir. They belong to the International

16 Brotherhood of the Electrical Workers.

17    Q. So from the Teamster's side it's more the

18 truck driving side?

19    A. No, sir. We have policemen, we have

20 county workers, we have airline pilots, we have a

21 variety -- airline mechanics.

22    Q. And Mr. Foster, he's the business agent

23 for all of those people?

24    A. No, sir. That's divided up -- that's

**Page 24**

1 divided up amongst the business agents. And each

2 agent is awarded X amount of what we call barns, in

3 other words, companies that he represents. And I

4 don't know all of them that Mr. Foster represents.

5    Q. But among those is the car haulers?

6    A. Yes, sir, it is.

7    Q. These cables that were produced here

8 today, Mr. Ferguson, to the best of your knowledge,

9 where did they come from?

10    A. I have not a clue, sir. They were given

11 to me. Where they came from prior to that I have

12 absolutely no knowledge.

13    Q. And just so the record is clear, we're

14 talking about what's been marked as Exhibit Q and

15 the remainder of that cable and apparently one cable

16 that's not damaged, correct? Or at least not

17 visibly damaged, right? Or maybe -- it's intact

18 anyway.

19    A. Right.

20    MR. WINTER: Let the record reflect that

21 Mr. Ferguson has examined the intact cable.

22    MR. LARSON: It may so reflect.

23    Q. Who gave them to you?

24    A. George Foster.

**Page 25**

1    Q. When did he give them to you?

2    A. Last Monday.

3    Q. What were the circumstances for that? I

4 mean, did he call you and say he's got these cables

5 or what?

6    A. No, not exactly. It didn't exactly work

7 that way.

8    Q. That's why I'm asking.

9    A. He said he had acquired a couple of the

10 cables. He didn't say where he got them or who he

11 got them from.

12    Q. And did he call you?

13    A. No, sir. I called him on some other

14 business and it came up in the conversation.

15    Q. And he just announced to you that he had

16 these in his custody and would you like them?

17    A. Not in those exact words, no.

18    Q. Tell me the exact words.

19    A. He just said that he had found some of the

20 old cables, and I asked him if I could have them.

21    Q. Okay. Do I understand you correctly that

22 he didn't tell you and you didn't ask as to how he

23 came into custody of them?

24    A. No. There was no reason why I would.

Ferguson, et al. vs. Ryder Systems, et al.        **DAVID EDWARD FERGUSON**

November 11, 2002    ...0039-HJW    Document 129-2    Filed 09/22/2003    Page 5 of 38

### Page 30

1 I believe that I signed for a spare and this was a
2 spare truck. I don't believe -- I would have to
3 look at my logbook to refresh my memory, but I do
4 believe that this was a spare truck that I had taken
5 because mine was in for repairs.
6      Q. Do you have your logs still?
7      A. I don't know if I do or not. I'd have to
8 look and see.
9      Q. Okay. We'll make a request for them, but
10 if you could locate them and give them to one of
11 your lawyers.
12      A. I can do that.
13      Q. If you can find them.
14      A. Allied should have them.
15      Q. How long are they supposed to keep their
16 logs?
17      A. I believe their -- here's their attorney,
18 but I believe their norm is what, six months, then
19 they get rid of them, destroy them.
20      Q. That's your best judgment?
21      A. That's what I believe they do with them,
22 isn't it? Six months, something like that.
23      Q. He's not being rude. He's just not here
24 to testify. At least I don't think he's being rude.

### Page 31

1      A. I apologize.
2      MR. WINTER: I'm never rude. They just
3 didn't swear me in yet.
4      A. But I believe in six months they destroy
5 them. It might even be less than that, I'm not real
6 sure.
7      Q. Okay. But if you had your logs or they
8 had your logs it would identify which tractor and
9 trailer you're operating?
10      A. Yes, sir. It sure would.
11      Q. On any given day?
12      A. Yes, sir. We have assigned bid trucks,
13 what they call bid trucks.
14      Q. Whether it was a spare or your regular bid
15 truck how long had you been working with a 2878
16 quick 12?
17      A. Since their existence. I believe they
18 started out in '80 -- or excuse me, not '80. I'm
19 sorry. I believe that their -- when we started
20 getting them, I believe, they was around '94, '95,
21 somewhere in around in that neighbor -- I'm not real
22 sure, but I believe that's when we started getting
23 them. And I was on that -- that's basically the
24 truck I've used, 2878.

### Page 32

1      Q. When the new ones started coming in to
2 your terminal there was a bid process and you were a
3 successful bidder for that piece of equipment, is
4 that the way it works?
5      A. I would get -- yeah, that's the way the
6 system works, yes, every man has to bid.
7      Q. All right. So you were familiar with, if
8 not necessarily the spare truck on the day in
9 question you were familiar with that model and the
10 way it operated?
11      A. Oh, yeah.
12      Q. As to your regular bid truck, had the
13 cables been traded out on it as of the time of your
14 injury?
15      A. No, sir, they weren't.
16      Q. Any of them?
17      A. Some of them had been, yes.
18      Q. Do you recall how many of the four?
19      A. I can't really -- I can't really say. But
20 I knew I had it once before -- I asked them to put
21 cables on it once before.
22      Q. Now on the day of your accident with the
23 spare truck did you at any time prior to your injury
24 examine the cables on that truck to see whether or

### Page 33

1 not the cables had been replaced?
2      A. Are you talking about the truck that I had
3 the injury on?
4      Q. Correct.
5      A. Well, there would have been no way that I
6 could have examined the ends of the cables because
7 there's -- as you can see there's plastic over them.
8 I mean, there would have been no way I would have
9 been able to tell if it was broke or not.
10      Q. Well, that wasn't quite my question, but I
11 appreciate you saying that. Did you examine them to
12 see whether or not a new or different type of cable
13 had been installed?
14      A. I had looked up and I had seen that there
15 was three new ones. Well, actually I seen there was
16 two new ones on the right hand -- on the passenger's
17 side.
18      Q. Two new ones on the passenger's side?
19      A. Yes, sir.
20      Q. And did you look at the driver's side?
21      A. When I was up loading the truck I noticed
22 it had the ring type on it.
23      Q. And the ring type meaning new or old?
24      A. It's just like an O-ring or an eyebolt

et al. vs. Ryder Systems, et al.
DAVID EDWARD FERGUSON

Case 1:02-cv-00039-HJW    Document 129-2    Filed 09/22/2003    Page 6 of 38

Page 42

1    Q. Who was that?

2    A. Tom Heller, and Tom Kelley was at one of

3 them.

4    Q. Okay.

5    A. Bob Donnelly, Tom Heller was at another

6 one.

7    Q. Are records made of those things, minutes

8 or any other document that would indicate that this

9 was the action that was taken?

10   A. There is. On occasions there is. But as

11 a rule, you're rushing through maybe 200 grievances

12 sometimes. And as a rule yeah, we do keep minutes,

13 but as a rule if a grievance is withdrawn there's no

14 record of it.

15        The only ones that we keep is the ones

16 that the company agrees to pay or the ones that

17 we've withdrawn -- or, I mean, not withdrawn, but

18 the ones that is deadlocked to a panel. Then there

19 is minutes made of those due to the fact that we can

20 see where the grievance went. But if the grievance

21 was withdrawn by the driver we will never see it due

22 to the fact it's given back to the driver and it

23 usually ends up in the garbage can.

24   Q. Were these grievances filed under the

Page 43

1 safety article?

2    A. Yes.

3    Q. Were there any grievances, to your

4 knowledge, filed about these cables prior to your

5 injury?

6    A. Joel Hand had filed one prior to mine.

7    Q. Prior to your injury?

8    A. Yes. No. Excuse me, sir, I'm sorry, it

9 was after my injury.

10   Q. Do you know of any that were filed before?

11   A. There wasn't a grievance filed, but it was

12 a safety meeting complaint.

13   Q. Who made that?

14   A. I'm not real sure. We were in a safety

15 meeting. It was probably 20, 25 guys at the

16 meeting. Gary Chinn held the meeting and the cable

17 issue was addressed by Joel Hand who was on the

18 safety committee at the time. And we were assured

19 that the problem was being taken care of. And that

20 was long before even Mike Fay got hurt because Roy

21 Thornton had told us in a meeting that he had fell

22 off a truck in Marion, Ohio, that a cable broke and

23 he fell off. He had some bumps and bruises, but he

24 wasn't seriously injured.

Page 44

1    Q. So if I understand correctly, you and

2 other drivers were in attendance at a meeting which

3 Joel Hand made an issue of the need to correct these

4 cables?

5    A. Yes, sir.

6    Q. And was it in that same meeting that this

7 information about Mr. Thornton came to light?

8    A. Yes, I believe it was.

9    Q. Now, was Mr. Thornton in attendance or did

10 somebody just mention Mr. Thornton?

11   A. I don't know. He was on a different

12 shift. We were on the second -- at that time the

13 two terminals were split, and we ran a shuttle to

14 Marion and they had a night shuttle and a day

15 shuttle. And Roy Thornton was on the day shuttle,

16 we were on the night shuttle.

17   Q. But Mr. Thornton was a Moraine driver?

18   A. Yes, he was.

19   Q. The information that you recall being

20 relayed at that time was that Mr. Thornton had had a

21 cable break on him and that he had a fall?

22   A. Right.

23   Q. Any discussion about the nature or extent

24 of his injuries?

Page 45

1    A. No, sir.

2    Q. If any?

3    A. No, sir. I know that he wasn't seriously

4 injured because he was still working. Or I assume

5 that he wasn't seriously injured because he was

6 still working.

7    Q. Now, I think you indicated that during

8 that safety meeting that the management

9 representative from Allied indicated that the

10 problem was being taken care of?

11   A. He said it was going to be addressed, that

12 he would take care of it. That was Gary Chinn.

13   Q. Now, in that regard was there any

14 instruction or warning given by Mr. Chinn or anybody

15 else to the drivers as to precautions they should

16 take with respect to working around these cables?

17   A. No, sir. The safety meeting was supposed

18 to have been held for an hour. It went on for about

19 15 minutes because he was complaining about having

20 to pay us for a half hour.

21   Q. Mr. Chinn?

22   A. Yes, sir. The meeting was supposed to go

23 on for an hour and Mr. Chinn was complaining because

24 he had only took 15 minutes and we was -- everybody

**Page 46**

1 was wanting a half-hour and he was complaining about
2 he had to pay -- complaining because he had to pay
3 for the half-hour.
4     Q. Well, are you guys paid for safety
5 meetings?
6     A. Yes, we are.
7     Q. Is there a minimum that you're paid for
8 those?
9     A. Well, the safety meetings -- when we have
10 the safety meetings they're actually -- we're
11 supposed to have two hours per month per union
12 contract. We don't have those. We might have a
13 safety meeting, there might be 5 guys -- there might
14 be 50 guys go to it one month and they might not
15 have another one for three or four months. There is
16 no set -- there's no pattern for safety meetings
17 there.
18     Q. But when you would go are you paid, by
19 contract, are you paid --
20     A. We're paid contractually, yes, sir.
21     Q. And are you paid that no matter how long
22 the meeting lasts? I mean, are you paid for two
23 hours or one hour?
24     A. They could only hold us two hours. That's

**Page 47**

1 contractual.
2     Q. If you go there for 15 minutes you get
3 paid for two hours?
4     A. No, sir.
5     Q. You don't?
6     A. No.
7     Q. Okay. What do you get paid?
8     A. Fifteen minutes. One quarter hour.
9     Q. Do you put in time for that then?
10     A. Yes. You have to file for your time.
11 Sometimes they just have you sign a blank down time
12 slip and they pay everybody's name, Social Security
13 numbers, employee numbers on this list.
14     Q. Did you attend any other safety meetings
15 in which the subject of breaking cables was taken
16 up?
17     A. I don't re-- no, I don't think I did. I'm
18 not real sure.
19     Q. What was your understanding of what was
20 being done to address the cable issue?
21     A. I can only repeat what was told to me by
22 Mr. Weaver, that they would do them as they got the
23 cables in from Atlanta, or Decatur, which is
24 Atlanta.

**Page 48**

1     Q. And this statement was made before or
2 after your accident?
3     A. After, and before.
4     Q. And before?
5     A. Yes, sir.
6     Q. Okay. So as of the time of your accident
7 you were aware that some effort was being undertaken
8 to replace cables, but that not all cables
9 necessarily had been replaced, right?
10     A. Well, my personal opinion was that Allied
11 wasn't doing --
12         MR. WINTER: Object to opinion.
13     A. Okay. All right.
14     Q. What I want to know is as of the day of
15 your injury you were aware that there were some
16 cables out there that hadn't been replaced, right?
17     A. I know that Allied was going to get people
18 hurt by not replacing them, that they had actually
19 refused to replace them.
20     Q. Wasn't quite my question. What I want to
21 know is what you knew as of the day of your
22 accident.
23     A. I knew they were going to get people hurt.
24 I don't know exactly how I can answer your question

**Page 49**

1 except for the fact that Allied caused my injury,
2 they specifically caused my injury due to negligence
3 because they would not go by the safety codes that
4 they themselves had established.
5     Q. Okay. Well, I understand that.
6     A. I'm sorry.
7     Q. I understand your feelings, believe me, I
8 do, but what I'm trying to do is get to some factual
9 information.
10     A. Okay. I apologize.
11     Q. No apology necessary. But irrespective of
12 your feelings about what Allied should or shouldn'
13 have done --
14     A. Readdress your question.
15     Q. My question is, is it fair to say that as
16 of the day of your accident that you were aware th
17 there were cables out there that had not been
18 replaced?
19     A. The day of my accident?
20     Q. Correct. In the fleet, that they hadn't
21 replaced all the cables yet.
22     A. Was I -- no, I wasn't absolutely aware of
23 it. I would have presumed if I would have had to
24 guess I would have said absolutely they were.

Page 46 - Page

Page 50

1  Q. They were replaced?

2  A. No, that they were out there, hadn't been
3  replaced. No, I knew that they hadn't been
4  replaced.

5  Q. Okay. That's what I was getting to.

6  A. Right. No, sir, they hadn't been
7  replaced.

8  Q. With this spare truck that you're working
9  on the day of your accident, you told me that you
10 had looked on the passenger's side and seen the
11 replacement cables up there?

12 A. Yes, sir.

13 Q. Or the O-ring type of a configuration --

14 A. Right.

15 Q. -- that led you to conclude that they were
16 new cables, right?

17 A. Right.

18 Q. You looked at the other side too?

19 A. And I seen the O-ring and I presumed they
20 both had them.

21 Q. So you saw one. Did you specifically look
22 at the lower cable?

23 A. No, I didn't. I didn't specifically look
24 at the cable.

Page 51

1  Q. Okay. Now, I'm going to approach this two
2  different ways, but the first way was just in your
3  general training without specific regard to this
4  cable issue, what training, if any, did you have
5  about whether or not these cables were there for use
6  as handholds?

7  A. We were told they were safety cables.

8  Q. And --

9  A. That when we were getting out of the
10 vehicles that we were to use those instead of
11 hanging on to the side of the vehicle and damaging
12 and scratching the vehicles. They were put there
13 for that purpose is what we were told.

14 Q. So the cables were there for you to grab
15 on to --

16 A. To use.

17 Q. -- as a means of keeping your balance --

18 A. Right.

19 Q. -- or achieving a three-point stance?

20 A. Well, you wouldn't be getting no
21 three-point stance on top of a head rack, but --

22 Q. Just to be clear, you were instructed that
23 that cable was there for you to use as a means to
24 hold on on the head rack as opposed to holding on to

Page 52

1  the vehicle?

2  A. When we got the vehicle, sir, when it came
3  down from Delavan when they were new, we were told
4  that was a modification because we'd had people
5  falling off of head ramps. That's the most
6  dangerous ramp of the truck. As most people -- as
7  car haulers will tell you, that's the one you have
8  trouble getting in and out of because there's no
9  other way of getting out of it except holding on to
10 the vehicle, in an ice storm, et cetera.

11     We were told that they put the cables on
12 there as a safety -- that's what they called them,
13 safety cables that we could use to hold on to to
14 keep our balance and so forth like that. That they
15 were there to keep us from falling off the truck is
16 what we were told.

17 Q. Do you have any recollection of who said
18 that?

19 A. Not for ten years back I don't, no.

20 Q. And did you use those cables for that
21 purpose?

22 A. On occasions.

23 Q. Now then the situation began to develop
24 with the cables breaking, right, where you all began

Page 53

1  to talk about it in safety meetings?

2  A. Right.

3  Q. And that occurred how long prior to your
4  accident, best judgment?

5  A. I can't say exactly right to the --

6  Q. Oh, I understand.

7  A. I would say probably --

8  Q. Are we talking about months?

9  A. Yeah, months maybe.

10 Q. And --

11 A. Several months.

12 Q. Was there any -- I may have asked you this
13 before, but did you get any type of -- you meaning
14 yourself or the drivers in general, get any kind of
15 caution that while they're in the process of
16 replacing these cables that the drivers should avoid
17 using the cables for keeping balance or for any
18 other reason?

19 A. I myself have never been -- had no
20 instructions not to use the cables. As far as I
21 know, personally, I've never heard nobody tell me
22 they ever got instructions not to use them.

23 Q. Well, whether or not you got that
24 instruction, based upon your awareness that some

Page 50 - Page 5

Page 54

1 these cables were breaking, did you yourself then
2 decide that until I'm satisfied that I've got a
3 replacement cable, I'm not going to rely upon a
4 cable for keeping my balance or holding on to it?
5    A. I'm not real sure. Are you asking me to
6 make a personal judgment what I would know about the
7 cable or --
8    Q. Yeah, because you're aware that some are
9 breaking, right?
10    A. I understand your question, but I'm not
11 sure how -- I'm not sure I know how to answer it due
12 to the fact that I don't know if the cable is good
13 or bad.
14    Q. And that's my exact point.
15    A. Because I wouldn't know if this cable
16 would break or not from looking at it. If I put my
17 hands on it, it breaks, then it was bad. If I put
18 my hands on it and it doesn't break, then I guess it
19 was all right. I don't have -- I don't have that
20 expertise to know if this cable is going to break or
21 not.
22    Q. And since you know that some are breaking,
23 doesn't it make sense then that you aren't going to
24 trust any of them?

Page 55

1    MR. KOUSTMER: Objection.
2    Go ahead.
3    A. Well, not necessarily due to the fact that
4 you're getting out of this vehicle, you're being
5 told by your employer that the cables are safe,
6 they're replacing them, that they're good cables,
7 don't worry about them, if they're on the truck
8 they're good, they've been checked, they're good.
9 You trust -- I basically say you would trust your
10 employer that they would be telling you the truth
11 that the cables would be good.
12    Q. Okay. When were you told that your cables
13 had been checked and that they're all good?
14    A. I believe that -- I believe Mr. Palladino
15 answered that question for me. He --
16    Q. Well, I'm asking you.
17    A. Well, as Mr. Palladino said, you know, he
18 said they had told everybody that they had replaced
19 all the cables.
20    Q. I don't think I heard that. But I'm
21 asking you, who told you that all the cables had
22 been checked and that they were all fine?
23    A. When the cable -- when you -- when you
24 send a cable in, you write it up to put it into

Page 56

1 have the cables replaced, they're supposed to check
2 every cable on that truck to see if any more needs
3 replaced. So if that truck comes out and it's got
4 three new cables that means that -- I would presume
5 that they checked the fourth one and it was good.
6    Q. But you're not the one that sent that
7 truck in to the shop, right?
8    A. Which truck -- the truck that the cable
9 broke on, no, I didn't.
10    Q. So you weren't aware of the circumstances
11 because that wasn't your regular truck, of what was
12 or wasn't done or why? True?
13    A. Well, that's true.
14    Q. And had you looked at that cable that
15 broke on that day it would have been evident to you
16 that this was one of the non-replaced cables, right?
17    A. If I would have got up and examined the
18 cable yes, it would have been.
19    Q. Well, you were right up next to it right
20 before you grabbed it, weren't you?
21    A. I looked at the cable, sir, I looked --
22 when I looked at the truck, when I did my walk
23 around I seen it had four cables on it. I had seen
24 that some of the cables had been replaced. I

Page 57

1 presumed that whoever replaced those first cables
2 would have inspected the whole -- the other -- the
3 rest of the ones. And if it had one of the old type
4 on that I would presume that they would have checked
5 to see if it was okay seeing how that's their job.
6    Q. Okay. So you assumed that if there was
7 what would be considered original equipment, cabl
8 on there, that somebody had inspected it and made
9 the decision that it should stay there?
10    A. Sir, there's -- they replaced --
11 Mr. Weaver and Allied has told us, there's two types
12 of these two cables right here (indicating).
13 They're telling us one has a newer type of steel in
14 it that is better than the old ones we've got. I
15 wouldn't know if this would be the new one or the
16 old one.
17    Q. Okay.
18    A. They're telling us that this same exact
19 cable has got a newer steel in it, it's made
20 different, and it doesn't rust through like these do
21 and they don't break.
22    MR. HONERLAW: Just listen to his
23    questions and just answer his questions.
24    MR. KOUSTMER: For the record, he was

Page 58

moving up the rolled-up cable when he was
talking.

3     MR. LARSON: Could you go back and read my
4 question back.
5     (Record read.)
6   A. Yes, I would.
7   Q. Okay. Now, from the answer before that
8 you gave, did I understand you to say that there
9 were two different styles of replacement cable that
10 they were using?
11   A. Yes, sir. There was actually three, sir.
12   Q. One that looked like the O-ring like you
13 mentioned. And did the other look like the original
14 equipment?
15   A. Yes, sir.
16   Q. So is it your testimony that the cable
17 that broke on the day of your accident could have
18 been a replacement cable?
19   A. No, sir, it was original.
20   Q. How do you know that?
21   A. Because of the replacements they've got a
22 new type of metal that when they're put together
23 down here they look like they're -- Mr. Weaver told
24 me that they're pressed a different way or something

Page 59

1 and that they're all shiny. You can tell they're
2 new because the bottom part are all shiny.
3   Q. Okay.
4   A. And they've never been painted over.
5   Q. So is it fair to say that it would have
6 been evident on inspection that this lower cable on
7 the day of your accident, that that lower cable was
8 original issue?
9   A. I would assume if I would -- it would have
10 been original, yes.
11   Q. You could have determined that by visual
12 inspection, right?
13   A. If it was the new type -- yes, I guess it
14 could have.
15   Q. If it was the original equipment?
16   A. Right.
17   Q. And likewise, you could have determined if
18 it was a replacement cable?
19   A. If it hadn't been painted over.
20   Q. Now, the vehicle that you were loading at
21 the time of your injury, you backed it on?
22   A. Yes, sir.
23   Q. What kind of a vehicle was that?
24   A. It was an S10 Blazer.

Page 60

1   Q. Was that the makeup of your load that day?
2   A. I believe so.
3   Q. When you loaded that Blazer did you extend
4 your ramps out forward?
5   A. Yes, sir, they stay in an extended
6 position.
7   Q. For the overhang?
8   A. Yes.
9   Q. And what is it, you're allowed three-feet
10 overhang?
11   A. In front.
12   Q. On the front. Is that what you used?
13   A. I wouldn't have measured it. I would have
14 presumed that it would have been three foot or
15 under.
16   Q. Okay. But it was your practice with those
17 Blazers to take the ramp extension out and use the
18 overhang?
19   A. Right. They stay in number three position
20 all the time unless you're loading different
21 vehicles.
22   Q. And the tie-down slot for that -- we're
23 talking about the rear of the Blazer -- where is
24 that situated in relationship to the tire?

Page 61

1   A. It would have been in the rear of the -- I
2 mean, it depends on what you call the rear. It
3 would have been actually behind the right front
4 tire, passenger's side, right behind the front tire.
5   Q. Toward the rear of the vehicle?
6   A. In the front, sir.
7   Q. Okay. If you've got it backed on, the
8 back of the Blazer is up here toward the front of
9 your head ramp, right?
10   A. Yes, sir.
11   Q. So as I'm looking at the vehicle from the,
12 say the ground on the driver's side, the rear tire
13 is to my left, right? Correct?
14   A. The rear tire --
15   Q. The rear tires are on the left and the
16 front tires are on the right as I'm looking at it?
17   A. Right.
18   Q. From the ground. For the rear tie-down
19 slot is it to the right or the left of that rear
20 tire as I'm looking at it?
21   A. It's in -- the rear tie-down slot?
22   Q. Yes.
23   A. It's in the front of the tire.
24   Q. Okay. Toward the front of the vehicle?

et al. vs. Ryder Systems, et al.
DAVID EDWARD FERGUSON
Case 1:02-cv-00039-HJW    Document 129-2    Filed 09/22/2003    Page 11 of 38

Page 98

1  issue as an individual. The issue was taken up as a
2  whole for both terminals that this problem wasn't
3  being rectified. But I don't think Mr. Fay had any
4  bearing on -- well, I'm sure it did to the fact that
5  the business agent brought it up that there was a
6  man injured, a couple people injured on it. I'm
7  sure he brought it up at the mid-level hearings in
8  probably Kansas City, Chicago, wherever it was
9  brought up at.
10    Q. Would it be fair to say that based upon
11  what you had learned about Mr. Fay's injury that
12  there were still some issues with respect to these
13  cables on vehicles at Marion and/or Moraine?
14    A. I'm not sure I understand --
15       MR. KOUSTMER: Objection.
16    A. I'm not sure I understand your question,
17  sir. It seems like I've answered the same question,
18  but just in a different way about three or four
19  times. I'm not real sure I know exactly what you're
20  asking.
21    Q. Okay. Well --
22    A. I believe that you're trying to ask me if
23  Mr. Fay had any bearing on me or my accident. No.
24  Mr. Fay is --

Page 99

1       MR. KOUSTMER: Just answer his question.
2    Q. Well, the point is that based upon your
3  awareness of Mr. Fay's accident you were aware that
4  there were ongoing problems with the cables, right?
5    A. Sir, after Mr. Fay had his accident I
6  never saw Mr. Fay again.
7    Q. I understand, but the manner in which he
8  was injured came to your attention, correct?
9    A. Yes, sir.
10    Q. And is it your testimony that that didn't
11  create any issues so far as you were concerned as to
12  whether the cables that were still on the vehicles
13  presented a hazard?
14       MR. KOUSTMER: Objection. I think it's
15       been asked and answered several times.
16    A. I believe I've answered that question,
17  sir.
18    Q. Why don't you try it again.
19    A. Okay, sir. As I said in my previous
20  statement to the question you asked previously, I
21  looked up, by the time -- yes, I looked up -- they
22  told us they were fixing cables. I looked up, I saw
23  new cables on one side of the truck, I presumed the
24  cables were good because I knew they had been up

Page 100

1  there.
2       If they didn't look at the whole thing and
3  they left one on there that was bad then God help
4  them. I mean, to me it seemed like if a person
5  fixed three, wouldn't you fix the fourth one? If
6  you go up there, you know you got three bad ones and
7  it's in the shop, you would presume that they would
8  have looked at the other and said, Well, this one's
9  okay for the time being or they just didn't have the
10  cable to fix it or whatever. I don't know what
11  their problem was.
12    Q. When you're up there securing that
13  vehicle, just prior to your injury, that lower cable
14  was only a couple feet from you, wasn't it?
15    A. It would be inches, sir, not feet. I
16  would say it would probably be inches from my face.
17  I would say probably less than a foot from my face
18  at times.
19    Q. I really don't mean to be repetitious, but
20  I just want to understand. Was your grabbing of
21  that lower cable on the occasion of your fall simply
22  a reflex to the fact that you were losing your
23  footing?
24    A. I would -- that's exactly what I was

Page 100

1  trying to explain to you. I grabbed the cable, just
2  out of reflex -- when I -- I didn't lose my footing.
3  I stepped back, there was a gap in between the two
4  trailers, my toe went in, and I was still getting up
5  and the tip of my toe came off of the deck. I just
6  went down that few inches and, out of reflex, I
7  grabbed the cable, put weight on it, and that's when
8  it snapped.
9    Q. So if your toe hadn't caught the way you
10  described it, it wasn't your plan to use the cable
11  to help yourself up?
12    A. I probably wouldn't have used it, no.
13    Q. And I'm curious as to why that information
14  does not appear in any of the injury reports. Can
15  you help me with that?
16    A. I would say it was probably because of the
17  injury.
18    Q. Why is that?
19    A. I would say -- I would imagine I was
20  probably trying to get out of there. That report
21  was taken before I left to go to the emergency room.
22  They don't let you move until you fill that out
23  unless you go out in an ambulance.
24    Q. Regardless of the circumstances of giving

Page 98 - Page 1

Q. we're having a visit next month?
2    A. Yes, sir.
3    Q. With Dr. Simons or one of his colleagues?
4    A. Yes, sir.
5    Q. Okay. Is there a next step that you're
6 aware of in your treatment regimen that you see
7 coming or that anyone's told you about, Mr.
8 Ferguson?
9    A. No, sir. They haven't told me. I've
10 requested to go back to work, but the company says
11 that they don't have no work that fits the format
12 that they've got me on.
13    Q. I meant from a medical side. I didn't
14 mean from an Allied side. But strictly from
15 Dr. Simons or any of the other healthcare givers
16 that you're seeing.
17    A. No, sir, they haven't -- they haven't -- I
18 believe what you're asking is if I know if I'm --
19 the treatment will be over with in Dec-- I couldn't
20 answer that, sir, I don't know. That would be
21 something that Mr. Simons -- or Dr. Simons would
22 have to answer on. I couldn't answer that.
23    Q. Right. Not only am I asking you about
24 your personal knowledge, but has anyone, within --

1 any doctor told you what will be next?
2    A. No, sir. Hopefully work.
3    Q. Okay.
4    A. And insurance for my family, I hope.
5    Q. If I can get back to the Thomas Foy
6 incident.
7    A. Fay you mean?
8    Q. Yes, Mr. Fay. If you could give me a
9 number of days or number of weeks of the period of
10 time from the time of Mr. Fay's accident until you
11 became aware that the reason allegedly for that
12 accident was because of a broken cable.
13    A. I really couldn't do that, sir, because I
14 wouldn't know how many days it was. I know I didn't
15 know right -- I didn't know -- actually, I didn't
16 even know who it was that the ambulance took out of
17 the -- off of the yard probably until about four
18 hours later because I was busy doing something else.
19 I did see the ambulance leave, but we have yard
20 workers getting hurt all the time. And there's
21 always somebody getting hurt. It was probably at --
22 the 6:00 crew was coming in on the shuttle when I
23 found out that Mike Fay had got hurt.
24    Q. Was it Mike --

1    A. Nobody said nothing about a cable, they
2 just said he fell off the truck and hit his head is
3 what they told me.
4    Q. I'm just trying to get a flavor or a feel
5 for the amount of time it was from the time you knew
6 that Mr. Fay had fallen off the truck until you had
7 become aware that the reason for his fall was
8 because of a snapped cable. And not a matter of
9 minutes or seconds, of course.
10    A. Two or three weeks maybe, I guess,
11 probably.
12    Q. Approximately --
13    A. Because I don't think there was that much
14 time span between mine and his.
15    Q. So approximately two to three weeks?
16    A. I would assume, yes.
17    Q. You're acquainted with a Ray Thornton?
18    A. Roy Thornton.
19    Q. Yes, Roy.
20    A. Yes, sir, I know him.
21    Q. Who is he, sir?
22    A. He's an employee at Allied, a driver.
23    Q. Is he a friend or colleague?
24    A. No, sir, I just know the guy.

1    Q. Has he had any injuries on the job as a
2 result of one of these cables failing?
3    A. I don't know if he had medical attention.
4 I know that he fell off -- the cable broke and I
5 know he fell off the truck in Marion, Ohio. I don't
6 know if he had any medical attention or not. I
7 couldn't answer that.
8    Q. How do you know that he fell off a truck
9 because of a cable snapping, sir?
10    A. We had a safety meeting. This was
11 probably a year prior to the Mike Fay incident. We
12 had a safety meeting. I'm not exactly sure how long
13 it was, but we had a safety meeting and I believe I
14 stated once before that that was a safety meeting
15 with Gary Chinn. And it was brought up by -- Joel
16 Hand and Roy Thornton -- he was -- the name of Joel
17 Hand brought up Roy Thornton's name in a safety
18 meeting that Roy Thornton was the guy who fell off
19 the truck in Marion, that the cable broke, and
20 that's what got the whole cable issue started.
21    Q. Okay.
22    A. I mean, as far as our local goes. I know
23 that they've had problems at other locations with
24 them because we had been told. Later on we found

Case 1:01-cv-00099-HJW    Document 129-2    Filed 09/22/2003    Page 13 of 38

Carson, et al. vs. Ryder Systems, et al.    DAVID EDWARD FERGUSON
December 11, 2002

**Page 118**

1  meeting that you discussed that occurred in
2  approximately the latter part of '99, did you have
3  any other chance to meet Messrs. Kelley and Heller
4  where the cable issue was addressed?
5      A.  We'd address the issue on several
6  occasions with the union and the company.  I don't
7  have the time frame.
8      Q.  Okay.  It just happens that the later part
9  of '99 was your best recollection the first time
10 that was addressed with these two fellows?
11     A.  No, sir, I think that was after the first
12 issue -- this has been an ongoing thing, sir.
13     Q.  Let me hand you what we marked as Exhibit
14 T.
15         (Discussion off the record.)
16             (Deposition Exhibit T
                was marked for identi-
17                  fication.)
18     Q.  Now, have you had a chance to review
19 Allied Exhibit T?
20     A.  Yes, sir.
21     Q.  Have you ever seen any of these documents
22 before, sir?
23     A.  The only one I've seen, sir, is the one
24 that I've got my name on.

**Page 119**

1      Q.  I count that as the fifth page in Exhibit
2  T; is that accurate?
3      A.  Well, it's the fourth one on mine.  No, it
4  would be the fifth page.  I'm sorry, yes.
5      Q.  I'm publicly educated.  If you went to
6  private school maybe it's the fourth.
7          We're all in agreement it's the fifth; is
8  that fair to say?
9      A.  Yes, sir.
10     Q.  All right.  I'm looking down at the second
11 block in the name section.  It says Dave Ferguson.
12 Is that you?
13     A.  Yes, sir.
14     Q.  There's a number, it says 63894?
15     A.  Yes, sir.
16     Q.  Under department.  What's that mean?
17     A.  Employee number, sir.
18     Q.  And that's you?
19     A.  Yes, sir.
20     Q.  AAG under company, it means Allied
21 Automotive Group?
22     A.  Yes, sir.
23     Q.  Okay.  And it talks about Course Title,
24 Safety Meeting-Backing Chain.  Do you see where I

**Page 120**

1  am?
2      A.  Yes, sir.
3      Q.  And there's a date that says April 12,
4  1999.  Do you see where I am?
5      A.  Yes, sir.
6      Q.  Do you recall this safety meeting
7  occurring as indicated with your name on there?
8      A.  Not specifically.  Not specifically the
9  date, sir, no.
10     Q.  Please turn with me to the first page.
11     A.  Yes, sir.
12     Q.  Do you see where I am on the first page?
13     A.  Yes, sir.
14     Q.  There's an item 3 approximately halfway
15 down the page where it says, "Next we discussed
16 problems/concerns expressed in our last meeting:"
17 "3.) Check your clothes lines.  If you see any
18 problems (plastic pulling away, rusting, etc.) have
19 them replaced.  If you are not sure, have Bill or
20 the shop check them."  Do you see where I'm at?
21     A.  Yes, sir.
22     Q.  To the best of your recollection, did that
23 discussion occur during this safety meeting?
24     A.  I can't say.

**Page 121**

1      Q.  Do you refer --
2      A.  I knew that it had came up, but I'm not
3  sure this is the date it was on.
4      Q.  Then let me ask the question.  I think you
5  already answered it, but bear with me.  Would this
6  type of topic have occurred at at least one or
7  another safety meetings?
8      A.  Yes, sir.
9      Q.  "Bill" being Bill Weaver?
10     A.  Yes, sir.  I presume.  I believe that's
11 who it would be.
12     Q.  No reason to be any other Bill?
13     A.  No, sir.
14     Q.  And Bill being the safety manager at the
15 Moraine terminal?
16     A.  No, sir.  He's a shop superintendent.
17 He's the maintenance supervisor.
18         MR. WINTER:  What did I say?
19         MR. KOUSTMER:  Safety.
20         MR. LARSON:  Safety.
21         MR. WINTER:  See, I'm getting tired too.
22 BY MR. WINTER:
23     Q.  Did you get any warning during these
24 safety meetings about use the cable sparingly if at

Page 122

1 all?

2    A. No, sir.

3    Q. You don't recall those words being

4 discussed?

5    A. No, sir.

6    Q. Okay. There's been some discussion during

7 Mr. Palladino's testimony about a new safety chain.

8 Do you remember that kind of discussion during his

9 testimony?

10    A. Yes, I do. I remember his statement.

11    Q. Did you ever hear personally about a new

12 type of safety chain being used to replace allegedly

13 defective cable?

14    A. A safety chain?

15    Q. Yes.

16    A. No, sir, I have not heard that. Today was

17 the first time I've heard of anything about a safety

18 chain.

19    Q. Did you hear anything about the Moraine

20 terminal being the test or prototype site for a new

21 type of cable?

22    A. No, sir. Today is the first time I've

23 ever heard anything about any of this. I mean, as

24 far as safety cable or chains or anything like that,

Page 123

1 about Moraine being the test site, I never heard

2 nothing about that.

3    Q. I understood you to say that the truck on

4 which you were injured was a spare truck?

5    A. I believe it was, sir. I'm not absolutely

6 certain, no, sir. I do believe I was on a spare.

7    Q. I understood you to have one specific

8 truck assigned to you; is that correct?

9    A. It's a bid truck, sir.

10    Q. And what does that mean?

11    A. It means that that truck, you use it

12 unless it's in the shop -- if it goes in the shop

13 then you can take a spare piece of equipment. If

14 it's in the shop more than 30 days you could bump

15 another piece of equipment. That's a union term.

16    Q. I don't want to be confusing because I've

17 never driven a truck before. My brother has, but I

18 haven't. So would there be a truck that you would

19 know to yourself as "my truck"?

20    A. Yes, sir. Absolutely.

21    Q. What are the other possibilities that

22 could be there? There's a spare truck.

23    A. Yes, sir.

24    Q. Is there any other kind of truck that's

Page 124

1 out there besides "my truck" and "spare truck"?

2    A. I guess that would cover it, sir.

3    Q. Okay. Why was your truck unavailable on

4 September 7, 2000?

5    A. I can't recall, sir. There could have

6 been two variations there.

7    Q. To the best of your recollection.

8    A. Best of my recollection, it would have

9 been in the shop for repairs for something, or we

10 were on split shift, the truck might not have been

11 back.

12    Q. Did you have any operator gripes with the

13 truck before September 7, 2000?

14    A. The truck that I fell off of or my truck?

15    Q. Your truck.

16    A. No, sir. My safety chains were replaced,

17 sir.

18    MR. LARSON: Cables.

19    A. Safety cables. You got me saying chains.

20    Q. We kind of forced it upon you I suppose.

21    Did you make use of the safety cables on

22 your truck prior to September 7th, 2000?

23    A. Yes, sir, on occasions I have.

24    Q. The ones that were replaced?

Page 12

1    A. Yes, sir.

2    Q. How did they work?

3    A. Okay.

4    Q. No gripes?

5    A. I didn't fall off.

6    Q. In general, is working around a terminal a

7 dangerous thing to do?

8    MR. KOUSTMER: Objection. Go ahead.

9    A. I do believe, sir, a car hauler is

10 considered one of the most dangerous transportation

11 jobs in the industry.

12    Q. Just due to its very nature?

13    A. Yes, sir.

14    Q. How do you as a driver make it safe?

15    A. Mostly it's common sense, I guess. Try to

16 just work with what you have.

17    Q. What have you got that you have to work

18 with?

19    A. Junk.

20    Q. Pray tell, what do you mean?

21    A. All of Allied's equipment is junk. It's

22 all outdated, it's all old. Half of it don't run,

23 it's broke down half the time. They take parts off

24 one truck to keep another truck running. Basically,

Page 122 - Page 1

Case 2:01-cv-00089-HJW    Document 129-2    Filed 09/22/2003    Page 15 of 38

DAVID EDWARD FERGUSON

... vs. Ryder Systems, et al
... er 11, 2002

Page 134

1 those portions that have non-skid?
2    A. I do a trailer inspection. I do a walk
3 around.
4    Q. Okay. What happens if you find something
5 that's inadequate as a result of your inspection,
6 what's your practice, in response to that?
7    A. Shop the truck.
8    Q. Sir?
9    A. Shop the truck.
10    Q. And that means give it to Bill Weaver's
11 folks?
12    A. Yes, sir.
13    Q. Have you ever done that?
14    A. Yes, sir.
15    Q. What type of deficiencies can you recall
16 as being remarkable enough to send it over to
17 Mr. Weaver's folks?
18    A. Welds, variation of different things.
19    Q. When you say welds --
20    A. Welds.
21    Q. W-E-L --
22    A. When the trailer needed welds.
23    Q. Welding?
24    A. Like a welding torch.

Page 135

1    Q. What type of things did you see that
2 weren't adequate in the way of welding?
3    A. I can't recall specifics. I'm just giving
4 a statement of things that I have previously -- if
5 it's not safety related they release it from the
6 shop and load the truck.
7    Q. Do I understand your testimony that you're
8 not acquainted with the term treadway?
9    A. Treadways, no, sir.
10    Q. During your inspection of the truck, do
11 you check to see if the decks are even and resting
12 on safety pins on both sides?
13    A. That's common practice, yes, sir.
14    Q. And that's your practice?
15    A. Yes, sir.
16    Q. Because it's a safe thing to do?
17    A. Yes, sir.
18    Q. Obviously, you report defects when you see
19 them to allow repair activities?
20    A. Yes, sir.
21    Q. Please review item number 3, please.
22    A. Yes, sir.
23       MR. KOUSTMER: Objection again. He's
24 never seen the document before.

Page 136

1       MR. WINTER: Let me finish my statement,
2 then you can object.
3       MR. KOUSTMER: I thought you had finished
4 your statement. You asked him to review it.
5       MR. WINTER: I was going to say then
6 entitled Maintain three points of contact.
7 Same objection I take it?
8       MR. KOUSTMER: Same objection.
9 BY MR. WINTER:
10    Q. Have you had a chance to review number 3?
11    A. Yes, sir.
12    Q. What are three points of contact?
13    A. Don't have a clue, sir.
14    Q. Do you make sure that you have a stable
15 place to plant your foot whenever you transfer your
16 weight?
17    A. Yes, sir. I try.
18    Q. And you use handholds whenever possible?
19    A. Wherever possible, sir, yes.
20    Q. What's a handhold?
21    A. It can be a variation of several things.
22 They can have a little steps welded on the side,
23 like on the head rack's got them. Variation of --
24    Q. I'm handing you what's been marked Exhibit

Page 137

1 A, sir. If you could kind of point to me --
2    A. I would imagine this would be a step and a
3 handhold right there. This one across there
4 (indicating).
5    Q. So if I marked --
6    A. That's what you have to do to put the
7 chains in that unit right there.
8    Q. So if I marked A with a circle and A with
9 a circle in blue ink that would be a handhold?
10    A. Yes, sir, or a foothold.
11    Q. Or a foothold?
12    A. Yes, sir.
13    Q. If you'll look at topic number 4 on
14 Exhibit U entitled Maintain stability.
15       MR. KOUSTMER: Same objection.
16    A. Yes, sir.
17    Q. Is it your practice as a driver to
18 maintain stability through the proper foot
19 placement?
20    A. Are you asking separate from what this
21 says or what do you want?
22    Q. No. I mean, is that a good rule, item
23 number 4?
24    A. If you could do it, yes.

Page 134 - Page 137

DAVID EDWARD FERGUSON

Case 1:02-cv-00039-HJW   Document 129-2   Filed 09/22/2003   Page 16 of 38

... et al. vs. Ryder Systems, et al.
... ber 11, 2002

Page 158

1 passenger's side wheel, right front wheel.
2   Q. So it was --
3   A. The unit's back on.
4   Q. Since you backed it on it was toward the
5 rear --
6   A. It was pretty much over the driver's door.
7   Q. -- of the number 1 posit.?
8   A. It was pretty much over the driver's door.
9   Q. And tell me whether or not this is a true
10 statement: Would it be correct that you wouldn't
11 have knowingly placed your hand on a cable that you
12 knew was the original cable?
13       MR. KOUSTMER: Objection.
14       Go ahead.
15   Q. For purposes of support.
16   A. I wouldn't say that, sir. I took -- like
17 I told you in my previous statement, that I saw
18 three new brand-new cables with, you know, the new
19 style hooks on them and I just took it for granted
20 everything was safe on it. I mean, I didn't even
21 notice that the fourth one didn't have it on.
22   Q. That was the nature of my question.
23   A. No sir, I didn't --
24   Q. You're saying you didn't know it was an

Page 159

1 old cable?
2   A. No, sir.
3   Q. And my question is if you had known you
4 wouldn't have knowingly or willingly used that cable
5 for support?
6       MR. KOUSTMER: Objection.
7   A. Well, no, sir. I wouldn't have -- I
8 wouldn't have put my hand on the cable if I knew it
9 was going to break, no.
10   Q. Knew or suspect it might break, right?
11       MR. KOUSTMER: Objection.
12   A. Sir, I wouldn't know if it would have
13 broke or not. Because if it would have been painted
14 over, there would have been no way I would have knew
15 it would have broke.
16   Q. I understand we've been through that. But
17 my question is if you knew that you're dealing with
18 cables that were original issue, okay, and you knew
19 that there were problems with original issue cables,
20 I'm simply trying to establish, with that foundation
21 of knowledge, you wouldn't have knowingly placed
22 your hand on one of those cables for support based
23 upon what you knew about them, right?
24       MR. KOUSTMER: Objection.

Page 160

1   A. Sir, I wouldn't have knew if it had been
2 original or not because these trucks have been
3 painted over so much I wouldn't have -- I mean, it
4 would have been impossible for me to even know if it
5 was the original one, the new one or -- because as
6 you can see, there's two styles there and they're
7 different type cables. I wouldn't have never knew
8 this.
9   Q. You were able to tell three of the four
10 had been replaced?
11   A. Sir, I seen the two on the passenger's
12 side of the truck.
13   Q. You knew those were new cables?
14   A. Yes, sir. Those two on the passenger's
15 side. Okay?
16   Q. Right.
17   A. After I had fell off the truck I looked up
18 and seen the third one was a new one.
19   Q. So you didn't check at all on the driver's
20 side?
21   A. Sir, like I said, there was three new
22 cables on it. I took for granted there was four.
23   Q. Okay. My question is did you check, at
24 all, the cables on the driver's side before you

Page 161

1 worked on the equipment?
2   A. I seen the cables --
3       MR. KOUSTMER: Objection. Asked and
4   answered.
5       MR. LARSON: Well, I thought it was, but
6   I'm confused now.
7       MR. WINTER: It was asked. I haven't
8   heard an answer yet.
9       MR. KOUSTMER: Well, I mean it's been
10   asked and answered before.
11       Go ahead. We don't need to debate it. Go
12   ahead.
13       THE WITNESS: Do you want me to answer it?
14       MR. KOUSTMER: Yeah, go ahead.
15   A. What again did you exact -- did you want
16 to know if I knew there was a third cable that was
17 on there that had been replaced?
18 BY MR. LARSON:
19   Q. Did you check the driver's side cables?
20   A. I looked at -- I visually checked the
21 cables, yes, sir. I didn't inspect them inch by
22 inch, no.
23   Q. The last question I have is you said that
24 for reasons you described you didn't want to have

Page 158 - Page 16

## Page 162

1  surgery performed by Dr. Roberts or anybody else.
2     A. No, sir.
3     Q. Do you understand or have any knowledge as
4  to what surgery that they would do if they were to
5  perform surgery?
6     A. I knew -- all the knowledge I have is what
7  Dr. Roberts told me and my wife. When he brought us
8  in for a consultation I know what he told us.
9     Q. What did he tell you?
10    A. He told me if I had the surgery I'd never
11 drive again. I need six years to get my pension.
12    Q. Okay. My question is what surgery would
13 he perform if he were to do it?
14    A. He said he would fuse my spine.
15       MR. LARSON: Thank you.
16       MR. WINTER: I have two.
17          CROSS-EXAMINATION
18 BY MR. WINTER:
19    Q. Who is the driver who started the design
20 of the cables?
21    A. David West.
22    Q. W-E-S-T?
23    A. W-E-S-T, right.
24    Q. Is he still with the company?

## Page 163

1     A. Oh, yeah.
2     Q. Okay. I thought I had heard you say that
3  Phil Kuchar had demanded that all the cables be
4  retrofitted?
5     A. No, sir, I didn't say that.
6     Q. Oh, I must have misunderstood.
7     A. I think he did (indicating). I didn't say
8  Phil Kuchar demanded that no, sir.
9     Q. It's Kuchar, right?
10    A. Yes, sir.
11       MR. KOUSTMER: I think I asked
12    Mr. Palladino a question about Phil, but he
13    hadn't said anything about Phil.
14    A. I didn't say that. No, sir I didn't say
15 that.
16    Q. I misunderstood then.
17       Was Mr. Kuchar on the safety committee?
18    A. At what time, sir? We've had so many
19 safety committees. We've had more safety
20 committees -- each month they've got new people on
21 it. I couldn't tell you.
22    Q. Was Mr. Kuchar on any safety committee?
23    A. I know he has been on safety committees,
24 yes. Safety committee usually consists of whoever's

## Page 164

1  standing there at the time they want to do the
2  safety meeting. That's usually the safety
3  committee. There's no set rule for this.
4     Q. What role does Mr. Kuchar play at the
5  company?
6     A. He's a driver. Just strictly a driver.
7     Q. Does he hold any office with the union?
8     A. No, sir.
9     Q. Do you know one way or the other whether
10 he was taking a stand with regard to the cables that
11 were allegedly failing?
12    A. I can't answer that. I don't know what
13 Mr. Kuchar thought. I never had no discussions with
14 him about it.
15    Q. So I think I heard you say I don't know.
16 Is that fair to say?
17    A. Yes, sir. I don't know.
18       MR. WINTER: Thank you. I have nothing
19    further.
20       MR. KOUSTMER: Okay. You're beyond your
21    two, but we're going to let you go.
22       MR. PAULUS: Famous last words. I just
23    have two more questions.
24          CROSS EXAMINATION

## Page 165

1 BY MR. PAULUS:
2     Q. In the course of your duties when you were
3  a driver, how frequently did you pass the dispatch
4  desk?
5     A. Every time you dispatch.
6     Q. Is that every day?
7     A. Yes, sir, at that time it was every day.
8     Q. And not to go too far back into this, but
9  at the time you made a visual inspection of the
10 truck that you fell off of, when you looked at the
11 passenger's side how did you know that those two
12 hand cables were new, newer models?
13    A. It's -- the ends are --
14       MR. KOUSTMER: Objection. Asked and
15    answered, but go ahead.
16    A. Okay. They're like an eyebolt and then
17 they're shiny, as you can see --
18    Q. An eyebolt rather than this design that we
19 have?
20    A. Yes, sir. Totally different. I mean,
21 visually you can see it from a mile away.
22       MR. PAULUS: Thanks. That's it.
23       MR. KOUSTMER: Okay, guys, is that it?
24       MR. WINTER: I think we need to say one

## SAFETY MEETINGS

4-12-99 - 9:00 AM
4-29-99 - 6:00 PM
4-30-99 - 5:00 PM

We opened the safety meeting with a discussion of accidents/injuries YTD and a comparison to our goals for 1999. We emphasized the need to "warm up" in relation to Steve Northup's recent injury.

Next we discussed problems/concerns expressed in our last meeting:

1.) Skids will be repaired/replaced as required. Please see Bill Weaver. Should you have problems, let Gary Chinn know.

2.) Marion has been contacted about tree limbs problems.

3.) Check your clothes lines. If you see any problems (plastic pulling away, rusting, etc.) have them replaced. If you are not sure, have Bill or the shop check them.

4.) We are in the process of reinforcing the "pins" that have broken recently.

We then covered Module 3 "Proper Chain Positioning" and Module 2 "Proper Use of the Tie Down Bar".

"T"

m orAinc

Page 1

```
 1                 UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF OHIO
 3                      WESTERN DIVISION
 4
 5     ----------------------------------------
                                              :
 6     DAVID FERGUSON, et al.,                :
                                              :
 7              Plaintiffs,                   :
                                              :
 8          vs.                               :      CASE NO.
                                              :      C-1-02-039
 9     RYDER AUTOMOTIVE, et al.,              :
                                              :
10              Defendants.                   :
                                              :
11     ----------------------------------------
12
13          DEPOSITION OF:     WILLIAM C. WEAVER
14          TAKEN:             By the Plaintiffs
                               Pursuant to Agreement
15
            DATE:              February 20, 2003
16
            TIME:              Commencing at 11:27 a.m.
17
            PLACE:             Kohnen & Patton
18                             441 Vine Street
                               Suite 1400
19                             Cincinnati, Ohio  45202
20          BEFORE:            Debra J. Henderson, RPR
                               Notary Public - State of Ohio
21
22
23
24
```

COPY

## Page 2

APPEARANCES:

On behalf of the plaintiffs:

    Thomas R. Koustmer, Esq.
      of
    Law Office of Thomas R. Koustmer
    7 West Seventh Street
    Suite 1800
    Cincinnati, Ohio 45202

On behalf of the defendant Allied Systems, Inc.:

    Robert A. Winter, Jr., Esq.
      of
    Hemmer Spoor Pangburn DeFrank, PLLC
    Suite 200
    250 Grandview Drive
    Ft. Mitchell, Kentucky 41017

On behalf of the defendant Ryder Systems & Commercial Carrier:

    David E. Larson, Esq.
      of
    Larson & Larson, P.C.
    11300 Tomahawk Creek Parkway
    Suite 310
    Leawood, Kansas 66211

On behalf of the defendant Hanes Supply:

    Craig R. Paulus, Esq.
      of
    Taft, Stettinus & Hollister, LLP
    425 Walnut Street
    Suite 1800
    Cincinnati, Ohio 45202-3957

Also present:

    Peter J. Terzian

## Page 3

### I N D E X

WILLIAM C. WEAVER       PAGE

Cross-Examination by Mr. Koustmer    4
Cross-Examination by Mr. Larson    37
Cross-Examination by Mr. Paulus    39
Further Cross-Examination by Mr. Koustmer  49
Further Cross-Examination by Mr. Larson   50

EXHIBITS       MARKED REFERENCED

Wolf Exhibit A       -  44
Plaintiffs' Exhibit A     -  7
Plaintiffs' Exhibit B     -  7
Plaintiffs' Exhibit C     -  7
Plaintiffs' Exhibit D     -  7
Plaintiffs' Exhibit E     -  7
Plaintiffs' Exhibit G     -  16
Plaintiffs' Exhibit I     -  16
Plaintiffs' Exhibit S     -  11
Plaintiffs' Exhibit V     -  37
Plaintiffs' Exhibit Y     -  22

- - -

## Page 4

WILLIAM C. WEAVER
of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

### CROSS-EXAMINATION

BY MR. KOUSTMER:

Q. Good morning, Mr. Weaver. My name is Tom Koustmer. I'm going to be asking you some questions this morning as well as some of the other gentlemen.

Can you just start by giving us your name and your address?

A. It's William C. Weaver. And the address is 1429 Golf Street.

Q. Like the golf ball?

A. Like the sport, yes. Riverside, Ohio. And the zip there is 45432.

Q. And how old are you, sir?

A. 54.

Q. And how long have you worked for the Allied companies or CCI or Complete Auto Transit?

A. I'm in my 15th year, sir.

Q. Okay. And what is your current position?

A. Maintenance manager.

Q. And what was your position back in 1999, 2000?

A. Same thing, maintenance manager, shop manager.

## Page 5

Q. At what facility?

A. At Moraine.

Q. And who worked under you?

A. Rick Shivley, Jeff Taylor, Greg Woodward, and Jim Putsch, P-u-t-s-c-h.

Q. And are they all still working for the company?

A. Yes, sir.

Q. And you have the same position now as then?

A. Yes, sir.

Q. And prior to working for the Allied Group, where did you work?

A. Dealerships.

Q. Truck dealerships or --

A. Yes, sir.

Q. -- or car dealerships?

A. Truck.

Q. What did you do for them?

A. I was shop foreman, service manager, parts manager, and sales.

Q. Directing your attention back to September 7th of 2000, do you remember an injury to a Mr. Ferguson?

A. No, sir. I wasn't there that day.

Q. When was the first you heard of that?

Page 6

1   A.  The next day.
2   Q.  And what did -- who did you hear from?
3   A.  Tom Heller.
4   Q.  Tom Heller?
5   A.  Yes.  H-e-l-l-e-r.  Yes.
6   Q.  Was Mr. Heller there that day that you know of?
7   A.  I'm not aware of -- I'm not sure.
8   Q.  Okay.  Now, do you know what happened to the
9   cable that broke on Mr. Ferguson's truck that day?
10  A.  Only from what I was told.
11  Q.  Okay.  Who told you?
12  A.  Tom Heller.
13  Q.  What did Tom tell you?
14  A.  He told me it broke at the end where the cable
15  connects to the crimper.
16  Q.  To the crimp?
17  A.  Yes, sir.
18  Q.  Here, we have one right here.  This is like an
19  exemplar.  Is that the type we're talking about?
20  A.  That's what I'm referring to.  It was broken in
21  this area right here.
22  Q.  Right where it meets?
23  A.  Yes, sir.
24  Q.  Where the vinyl and the steel meet the crimp,

Page 7

1   as you call it?
2   A.  Yes, sir.
3   Q.  Now, do you know what anyone did with that
4   cable?
5   A.  No, I don't.
6   Q.  Did you ever hear what happened to it?
7   A.  No.
8   Q.  Did you ever see it on the truck?
9   A.  No.
10  Q.  I will show you some pictures here, A
11  through -- B, C, D, E, which are photos of the actual truck
12  and cable.  Did you ever see that?
13  A.  No.
14  Q.  Okay.  How about a Thomas Fay, when he was
15  injured 8/8, 2000, do you remember that?
16  A.  I know -- I don't remember exactly what it was.
17  I heard it hearsay through drivers only that Fay had fallen.
18  That is all I know.
19  Q.  Was that a broken cable?
20  A.  I'm not sure.  I'm not aware of what it was.
21  Q.  You don't know what happened to the cable in
22  that case?
23  A.  No, sir.
24  Q.  Did you ever see the cable that was involved in

Page 8

1   Mr. Ferguson's accident?
2   A.  No.
3   Q.  Nobody in the shop showed it to you?
4   A.  No.
5   Q.  You don't know what happened to it, if it was
6   thrown away or kept or anything?
7   A.  No, I don't.
8   Q.  What would be the -- normally what happens if
9   a part on a truck had been involved or possibly involved in
10  someone's injury, what would be the procedure with the
11  company?
12  A.  Proper procedure would be to hold it.
13  Q.  Is that written down anywhere, or is it
14  verbally, are you instructed?
15  A.  Something we have just been doing for years.
16  Q.  Do you know whether this cable that was
17  possibly involved in Mr. Ferguson's accident was kept?
18  A.  I never saw the cable, sir.  I don't know.
19  Q.  You don't know one way or the other what
20  happened to it?
21  A.  No, sir, I don't.  I never saw the cable.
22  Q.  No one came up to you and said, Bill, I threw
23  it away or, Bill, I gave it to Joe, or, Bill, I had it but I
24  got rid of it?

Page 9

1   A.  No, sir.
2   Q.  The proper procedure would have been to keep
3   it?
4   A.  Yes, sir.  Proper procedure would have been to
5   keep it.
6   Q.  Did anyone ask you about what to do with it?
7   A.  No.
8   Q.  Did you ask anyone when you got back to work
9   the next day, where's the cable?
10  A.  Yes.
11  Q.  Who did you ask?
12  A.  I asked Mike Palladino.
13  Q.  And what did Mike Palladino say?
14  A.  He told me he had it.
15  Q.  So Mike said he had the cable?
16  A.  Yes, sir.
17  Q.  Did he say where or --
18  A.  No.
19  Q.  And that was on the 8th, correct, of --
20  September 8th, the day you got back?
21  A.  I talked with Tom Heller that day.  I did not
22  talk to Palladino that day.
23  Q.  Okay.  What day did you talk to Palladino --
24  I'm sorry  I just misunderstood you.  What day did you talk

3 (Pages 6 to 9)

Page 10

1  to Palladino about the cable?
2      A.  I'm not sure what date, but it was after that.
3      Q.  So it was more than a day after the accident?
4      A.  It could have been.  I'm not sure.
5      Q.  I just said that because you said you talked to
6  Heller on the 8th, and you said you didn't talk to Palladino
7  that day.
8      A.  Okay.  I was out of the office the day it
9  happened.
10     Q.  Right.
11     A.  I was at a vendor.  The next day I was briefed
12  by Tom Heller that it happened.  He said Mike Palladino was
13  involved with the investigation and also the report.  We
14  have a first report of injury we make, okay?  And that's
15  where it was left at, with safety.  This individual took
16  care of the safety.  And I'm not sure what they did the next
17  day on it because I was never consulted about it.
18     Q.  But you did ask Mr. Palladino at some point in
19  time, where's the cable?
20     A.  Yes.  I asked him if he had the cable.
21     Q.  And he said yes?
22     A.  He said yes.
23     Q.  Did you ever talk to him about that again?
24     A.  Not about the cable, no.

Page 11

1      Q.  Did you ever talk to anyone else in the company
2  or outside of the company about, where is the cable?
3      A.  No.
4      Q.  You never inquired to Mr. Palladino if he still
5  has the cable?
6      A.  No.
7      Q.  Have you inquired of anyone else if they still
8  have the cable?
9      A.  No.
10     Q.  Do you know where the cable is today?
11     A.  No, I don't.
12     Q.  And what was Mr. Palladino's position there at
13  the time?
14     A.  He was safety quality supervisor.
15     Q.  Now, were you involved with replacing the
16  broken cable on Mr. Ferguson — the truck he was using that
17  day?
18     A.  No.
19     Q.  Did you see the truck he was using that day?
20     A.  No.
21     Q.  After the fact?
22     A.  No.
23     Q.  I will show you what's been marked as
24  Plaintiffs' Exhibit Number S.  And it says, "9/7/00

Page 12

1  inspecting and replacing as needed per Gordon."  I
2  understand that is Gordon Beal, correct?
3      A.  Yes.
4      Q.  What was the — strike that.  Tell me the —
5  strike that.  The safety cables were being — in the process
6  of being replaced, correct?
7      A.  Yes, sir.
8      Q.  Okay.  Whose decision was it to replace them?
9      A.  It was corporate.  We were notified — I was
10  notified through a conference call, all us were that was
11  under John Taggart, the regional maintenance manager at the
12  time, that there was a cable problem.
13     We were told to requisition from our parts
14  warehouse or contact the parts manager there and give them
15  the quantities that we needed per truck.  At the time, I
16  ordered enough to cover 29 units or within the 29 units that
17  I had that had cable on them.  I also had other units that
18  did not have cable on them that was not manufactured with
19  them.
20     But the particular units that had cable on
21  them, we had enough for the two different models that we
22  had.  We had a quick loader 2727A, and we had four of the
23  2878s.  We were a shuttle operation in GM's parking lot.
24     Q.  And Mr. Ferguson's truck was a 2878, correct?

Page 13

1      A.  Yes.
2      Q.  So you were told in a conference — you said
3  we all were told on a conference call.  Who is "we all"?
4      A.  Under that man's jurisdiction was Moraine,
5  Marysville, Marian, Dearborn, Pontiac, Flint, Janesville,
6  and Fort Wayne.
7      Q.  So all of the maintenance managers were on a
8  conference call with Mr. Tagget (sic), correct?
9      A.  Yes.
10     Q.  And where was Mr. Tagget calling from?
11     A.  Regional office in Southfield, Michigan.
12     Q.  Regional office for who?
13     A.  For him.
14     Q.  Okay.  But, I mean, what company?
15     A.  Allied.
16     Q.  Okay.  Allied Holdings?
17     A.  Allied Automotive.
18     Q.  And so he said, we have a cable problem?
19     A.  Yes, sir.
20     Q.  Did he say what the problem was?
21     A.  Yes, sir.
22     Q.  What did he say?
23     A.  He said there was a rust problem on a cable
24  between the plastic and the joint and fixture, at the crimp,

4 (Pages 10 to 13)

Ace Reporting Services  (513) 241-3200
30 Garfield Place, Suite 620  Cincinnati, Ohio  45202

Page 14

1   and that we were to replace. And when we took the old ones
2   off, we were to cut them up, destroy them, put them in the
3   trash so they could not be reused.
4   Q.  So you were to replace them all?
5   A.  Yes, sir. There wasn't any question about it,
6   we replaced them.
7   Q.  And when did this conference call take place?
8   A.  Late January of '99 or early February of '99.
9   Q.  So as of that date, you were supposed to order
10  them and replace them?
11  A.  Yes.
12  Q.  Because they were breaking; is that right?
13  A.  Yes, sir.
14  Q.  And where were you supposed to get them from
15  again?
16  A.  We have a company that is requisitioned
17  through. That's called Allied Parts Center, which is Gill
18  Transportation.
19  Q.  Okay.
20  A.  And they were in Conyers, Georgia.
21  Q.  And so the parts were supposed to come through
22  Conyers, Georgia?
23  A.  Yes, sir.
24  Q.  Allied Parts Center?

Page 15

1   A.  Yes, sir.
2   Q.  Is that a company or is that part of Allied
3   Automotive?
4   A.  I'm not sure on that.
5   Q.  Okay. Anyway, that's where you got all of the
6   replacements from?
7   A.  Yes, that's where all of our parts are
8   requisitioned from through our automated computer system.
9   Q.  And this sample that we have here, the old
10  style we've been referring to, when he said they were
11  breaking, he's talking about the place where the nylon
12  meets –
13  A.  Yes.
14  Q.  – the metal, correct?
15  A.  Yes, that's correct.
16  Q.  There is a corrosion problem inside there?
17  A.  Yes.
18  Q.  Okay. Did he say inspect the cables or did he
19  just say replace them all?
20  A.  I remember him saying replace them all.
21  Q.  Okay. So did you try to do that?
22  A.  Yes, we did.
23  Q.  When was it – well, strike that. What were
24  you replacing them with, the same type cable or a different

Page 16

1   type?
2   A.  No. It was a different type cable.
3   Q.  Okay.
4   A.  There was an eyebolt loop design.
5   Q.  I will show you what's been marked as
6   Plaintiffs' Exhibit G. Is that the type of design it was?
7   A.  Yes.
8   Q.  Okay. It's also here on Plaintiffs' Exhibit I,
9   this type of design, the one next to the cars?
10  A.  Yes.
11  Q.  Okay. So that's what you were replacing them
12  with?
13  A.  Yes.
14  Q.  When was it that they were all replaced?
15  A.  I can't give you an exact date. I can tell you
16  it was within two to three weeks.
17  Q.  Now, Mr. Ferguson's, you saw the picture of his
18  on A. That was an old style cable, correct?
19  A.  Yes, sir.
20  Q.  Okay. How could it be that there was an old
21  style cable on a truck on September 7th of 2000?
22  A.  That truck wasn't assigned to me until just
23  before his accident.
24  Q.  Okay. How about the truck – Thomas Fay's

Page 17

1   truck on 8/8, 2000?
2   A.  I don't know what truck Tom was on.
3   Q.  Okay. What do you mean, it wasn't assigned to
4   you?
5   A.  It was assigned to Marian terminal.
6   Q.  Okay. Now, the Marian terminal, was that
7   person in the conference call?
8   A.  Yes.
9   Q.  Okay. So he heard the same conference call.
10  replace them all?
11  A.  Yes, sir.
12  Q.  Do you know why they hadn't replaced this one
13  for Mr. – the truck being used by Mr. Ferguson?
14  A.  It could have been a supply problem. Supply
15  and demand. It was overwhelming when we started doing it.
16  Q.  Okay. Did you have a supply problem?
17  A.  Later on I did, yes.
18  Q.  Okay. But the 29 units back in December,
19  January – let me get it right – January, February of '99,
20  you didn't have a supply problem there?
21  A.  No, I did not.
22  Q.  Okay. Now, you say you had a supply problem
23  later on. When did that come up?
24  A.  That was after the return of equipment back to

Ace Reporting Services  (513) 241-3200

Page 18

1 Moraine and the traffic pattern had changed. They didn't
2 all come back at the same time.
3    Q.   What do you mean by that?
4    A.   Well, it would be like 20 -- 10, 20, 30 trucks
5 come at a time, different intervals, as the traffic pattern
6 increased and changed with General Motors.
7    Q.   Okay. They were coming back from where?
8    A.   Marian. That was before. We were a shuttle
9 operation. We shuttle from Dayton to Marian 24 hours a day,
10 six days a week out of the plant. It was just the
11 distribution point was Marian for General Motors.
12         Once they changed that, once General Motors
13 started doing some construction work there, we moved to an
14 old plant and made a loading yard out of it, then our
15 equipment in Marian started coming back to Moraine.
16    Q.   Okay. And when it came back, all of the cables
17 had not just been replaced on the trucks?
18    A.   Not all of them had been, no.
19    Q.   How many had been replaced, if you know?
20    A.   I don't know.
21    Q.   Was it a significant number that had not been
22 replaced?
23    A.   No.
24    Q.   What did you do when they came back and they

Page 19

1 weren't replaced?
2    A.   Replaced them.
3    Q.   Now, you said you had a supply problem?
4    A.   Yes, sir.
5    Q.   What was that?
6    A.   When we requisitioned them, they had -- the
7 manufacturer could not supply them fast enough.
8    Q.   Okay. And so up until August and at least
9 September 2000, some of the trucks had still not had new
10 cables put on them, correct?
11    A.   I don't know about the other installations.
12 Mine was taken care of.
13    Q.   But Mr. Ferguson still had an old cable on it,
14 correct?
15    A.   I -- according to these pictures, yes.
16    Q.   Now, when you had supply problems, how is it
17 that you would determine which trucks would get the cable?
18    A.   The driver would bring the truck to us, we
19 would replace the cables.
20    Q.   Okay. Would the driver bring the truck to you
21 for cables or would the driver bring the truck for repair?
22    A.   Anything.
23    Q.   Okay. And if you didn't have the requisite
24 number of replacement cables, you would replace the ones

Page 20

1 that you could on the truck and leave the other ones, the
2 old one?
3    A.   At times we had to do that.
4    Q.   Then you would put the truck back in working,
5 correct?
6    A.   Yes.
7    Q.   How many times did you have to do that?
8    A.   I don't know.
9    Q.   Okay. In this memo it says, "Will speak to B.
10 Weaver. Rick said he only replaces what Bill tells him to.
11 He does not inspect for problems."
12    A.   That's not true.
13    Q.   That's not true?
14    A.   No, sir.
15    Q.   Okay. Who was inspecting for problems?
16    A.   We were not inspecting. The driver would tell
17 us. We did not just go, per se, and inspect and say, well,
18 that's a bad cable. We were instructed to replace. That's
19 what we did when we had the cables to replace them with.
20    Q.   Did you ever ask Mr. Shivley to go out in the
21 yard and take a look around and see what trucks had bad
22 cables on them to replace them?
23    A.   I had him look from time to time to do that,
24 yes.

Page 21

1    Q.   How many times did that happen?
2    A.   More than once. It was several times. If we
3 had the cables on hand and one of them had got through -- in
4 other words, had been -- we didn't have the supply at the
5 time and the truck went on and did its job, we would go back
6 and look and see if there was any that we had missed.
7    Q.   Okay. Just so I understand -- I think I
8 understand what you're saying. So if a truck came in for
9 some other repair and you were replacing cable but you
10 didn't have enough to replace all of the cables, the next
11 time that you got cables you would have Mr. Shivley go out
12 and look in the yard for the trucks that might need cable?
13    A.   Yes. I also had the other mechanics do the
14 same thing.
15    Q.   And they would change them there with their
16 ladders?
17    A.   Yes, sir.
18    Q.   And they were changing to the swivel style that
19 we have marked --
20    A.   The one that is in the pictures, the bolt,
21 eyebolt.
22    Q.   Eyebolt?
23    A.   Yes, sir.
24    Q.   Okay. Are they using a different style now?

6 (Pages 18 to 21)

**Page 22**

1    A.    Yes.

2    Q.    Okay.  What are they using now?

3    A.    It's 100 percent stainless steel on the same

4    manufacture style of this.

5    Q.    As the original?

6    A.    As the original, yes, sir.

7    Q.    But it's -- I will show you Plaintiffs'

8    Exhibit Y.  It's a nylon-coated stainless steel?

9    A.    Yes, sir.

10    Q.    Do you order these, Exhibit Y?

11    A.    Yes, sir.

12    Q.    Okay.

13    A.    I requisition them.  They come through the same

14    supplier, through Allied Parts Center.

15    Q.    You go to the same place, but they are shipped

16    from a different company?

17    A.    They are shipped in from that warehouse.

18    Q.    Okay.

19    A.    I'm assuming that the -- the manufacturer ships

20    it to them and they ship it to us.  We keep it on a stock

21    order.  We keep it in stock all of the time.

22    Q.    So all of them are coming through Allied Parts?

23    A.    Yes, sir.

24    Q.    The swivel ones and now the stainless steel

**Page 23**

1    ones?

2    A.    Yes.

3    Q.    With the nylon coating, correct?

4    A.    Yes.

5    Q.    And are you in the process now of replacing the

6    swivel ones or just as needed you're replacing them with the

7    stainless steel?

8    A.    No, we haven't had to replace the swivel ones.

9    Q.    Okay.  So there is no campaign to replace the

10    swivel ones right now?

11    A.    No.

12    Q.    The ones that you're replacing are the old --

13    still the old style?

14    A.    I'm not -- I'm not sure on your question

15    there.  The old styles shouldn't be around.  Are not around

16    that I've seen.

17    Q.    Okay.  So why would you be ordering stainless

18    steel cables?

19    A.    Well, there is equipment that has been

20    transferred in to me in the last six months that came from

21    out West, that they had ramp cables that had been totally

22    removed.  I install those.  There is other units that come

23    in from other terminals that had broken cable.  I've

24    replaced those.

**Page 24**

1    Q.    Okay.  So as of 11/15/00 here, you ordered 26,

2    it looks like, stainless steel cables; is that correct?

3        MR. WINTER:  Which exhibit is that, sir?

4        MR. KOUSTMER:  Y.

5        MR. WINTER:  Y.

6    A.    It was shipped -- it was shipped to me, yes.

7    Q.    And that is in the year 2000.  The order date

8    is 10/12, 2000; is that correct?

9    A.    Yes.

10    Q.    Do you know when the switchover was from the

11    eyebolt to the stainless steel?

12    A.    No.

13    Q.    Do you know why they stopped with the eyebolt?

14    A.    No, I don't.

15    Q.    But at some point in time -- strike that.  You

16    wouldn't replace an eyebolt with an eyebolt now, right, it

17    would be the stainless steel?

18    A.    It would be the newest ones we have, yes.

19    Q.    And that is the stainless steel with the nylon

20    coating?

21    A.    Yes.

22    Q.    Was Decatur, Georgia in that conference call?

23    A.    No.

24    Q.    Dearborn was, right?

**Page 25**

1    A.    Yes, sir.

2    Q.    How about Kansas City, were they in the

3    conference call?

4    A.    No.  They were a different region.

5    Q.    Massachusetts?

6    A.    That is the northeast region.

7    Q.    Henderson, Colorado?  That's a different

8    region?

9    A.    Yes, sir.

10    Q.    Chicago is a different region?

11    A.    Yes, sir.

12    Q.    Maybe you could just tell me what states were

13    in that conference call?

14    A.    Indiana, Michigan, and Ohio.

15    Q.    So as of late January, February of '99,

16    Indiana, Michigan, Ohio were ordered to replace all safety

17    cables on the trucks?

18    A.    Yes.

19    Q.    Because they were breaking?

20    A.    Yes.

21    Q.    Correct?

22    A.    Yes, sir.

23    Q.    And they were told to do that right away?

24    A.    Yes, sir.

7 (Pages 22 to 25)

Page 26

1    Q.    Was there a -- was there a memo from anybody
2  on that?
3    A.    No.
4    Q.    You've never seen a memo?
5    A.    There was never anything in writing, sir.  It
6  was verbal.
7    Q.    Did you put anything down in writing as to
8  that, to tell the mechanics?
9    A.    No.
10    Q.    Okay.  Other than supply, was there any problem
11  in replacing them?
12    A.    No.
13    Q.    And it would be, in those states, the
14  maintenance managers, equivalent position that you have, of
15  the different terminals to order the parts from Allied
16  Parts, right?
17    A.    Yes, that's correct.
18    Q.    So as they got them, they would ship them to
19  you?
20    A.    Yes.
21    Q.    When you were having a supply problem with
22  them, when they were shipped to you, would they come in
23  different size batches or one size batch or all different
24  kinds?

Page 27

1    A.    There's all different kinds of batches.
2    Q.    So you could get six?
3    A.    Sometimes I would get six, sometimes I would
4  get 30.
5    Q.    Was there any rhyme or reason to it?
6    A.    No.  The only thing we were told by the parts,
7  by Sycamore, which is the same as Gill Allied Parts Center,
8  was it was the manufacturer could not keep up.
9    Q.    You say "Sycamore."  Is that Allied Parts,
10  Sycamore?
11    A.    No.  Sycamore Parts, in logistics, and Gill
12  Transportation are the same company within the same address.
13    Q.    Are they related at all to Allied?
14    A.    I'm not aware of it.
15    Q.    Since the merger of the two facilities, when
16  was it that all the trucks had replacement cable of some
17  type on them?
18    A.    It had to be late 2000 or early 2001.
19    Q.    Now, were you ever given any information on how
20  to care for cables or maintenance of cables?
21    A.    No.
22    Q.    Did you receive any books or documents from the
23  manufacturers or the builder of the trailer what to do with
24  the cables, how to take care of them?

Page 28

1    A.    No.
2    Q.    Were you ever given any instruction on how to
3  inspect the cables for breakage?
4    A.    No.
5    Q.    Were you ever told, using this as an example,
6  to twist around this nylon to try to see between the nylon
7  and the metal part here?
8    A.    No.
9    Q.    You weren't told that in writing and you
10  weren't told verbally by anyone?
11    A.    No.
12    Q.    You weren't told to put any oil on them or to
13  wash them or to clean them or anything like that?
14    A.    No.  No.
15    Q.    Once you were informed at this conference call
16  that they are a problem, that they are breaking at this
17  point from corrosion, were you then told anything that you
18  should do other than replace them?
19    A.    No.
20    Q.    Were you told at that point how to inspect them
21  or what to do?
22    A.    No.
23    Q.    You were just told to replace them?
24    A.    Replace them.

Page 29

1    Q.    And get parts from Allied Parts?
2    A.    Yes, sir.
3    Q.    And then, when the parts came in from Allied
4  Parts, you realized the design has changed?
5    A.    Yes, sir.
6    Q.    So you went ahead and put on the new design?
7    A.    Yes, sir.
8    Q.    Other than you telling the mechanics to go out
9  in the yard when you had some extra cables and check trucks,
10  was there any other type of inspection program going on for
11  broken cables --
12    A.    Yes.
13    Q.    -- or frayed cables?
14    A.    It's part of the PM schedule.
15    Q.    What is "PM"?
16    A.    Preventive maintenance service.
17    Q.    And what was that, when the trucks were brought
18  in?
19    A.    Yes.  When you open a repair order for a PM
20  service, it does a federal inspection and it's also -- and
21  that's also included in this as one of the items that you
22  check.
23    Q.    And what was the inspection, just eye it?
24  Looking at it?

8 (Pages 26 to 29)

Page 30

1    A.   That's to inspect, replace if necessary.
2    Q.   And how were you supposed to inspect?
3    A.   You inspect it to see if there was a proper
4  cable on it or not.  If it had the old style cable on it,
5  you replace it.
6    Q.   You weren't inspecting to see —
7    A.   We weren't inspecting for corrosion.
8    Q.   Nobody told you to inspect for corrosion?
9    A.   No.
10   Q.   You were just inspecting it.  That's an old
11 cable, I'm putting a new one on there?
12   A.   We were told verbally on the conference call
13 about a quarter-inch or half-inch section where the nylon
14 coating did not cover the cable up to there, that if it was
15 rust colored in any shape or form, it was to be immediately
16 replaced.
17   Q.   And then the rest of them were to be replaced?
18   A.   Yes.
19   Q.   But they — on this one, you can't see, can
20 you, this exemplar?
21   A.   That's an unusual one there, sir.  Most of them
22 I have seen, they are a quarter-inch back.
23   Q.   Okay.
24   A.   Like this one here.

Page 31

1    Q.   This is a different one, though, correct?
2    A.   I don't know.  It's colored, so I couldn't tell
3  you.
4    Q.   Okay.  Well, when — the nylon colored, you
5  can't see through, correct?
6         MR. LARSON:  Object.
7    A.   The original one was yellow because the truck
8  was yellow.  The original cables were painted yellow
9  colored.  The ones we are getting now is clear.
10   Q.   And the stainless steel ones?
11   A.   This cable that you showed me the picture of
12 with the eyebolt was also yellow in color.
13   Q.   But that had a gap?
14   A.   It was a totally different design.
15   Q.   All right.  Okay.  That one that we're
16 referring to, that has a gap between the metal thing and the
17 nylon or vinyl?
18   A.   Right.
19   Q.   Do you know if this, the replacement, the
20 swivel you're talking about, if that was — the material was
21 vinyl or was that nylon?
22   A.   The coating?
23   Q.   Yes.
24   A.   I believe — I don't know what the texture

Page 32

1  was.  To me it looks like nylon or vinyl coating.
2    Q.   Okay.
3    A.   There was a plastic coating of some sort.
4    Q.   These that you're ordering now are nylon
5  coated, correct?
6    A.   They are a clear plastic, the best I can tell.
7    Q.   Okay.  And you can see through them?
8    A.   Yes, you can see the cable.
9    Q.   And the original ones, the yellow, you couldn't
10 see —
11   A.   Correct.
12   Q.   — the cable?  Did Mr. John Tagget tell you
13 where he was getting his information from?
14   A.   No.
15   Q.   Was there any — when you didn't — strike
16 that.  When you didn't have enough new cable to replace all
17 four on the truck, was there anything saying, we're going to
18 replace the top, the bottom, the sides, the right side, left
19 side, or was it just up to the mechanic?
20   A.   We replaced what we could.  If we had a truck
21 down for some other reason and there was a truck there with
22 a broken cable or missing cable, we would actually
23 physically take one of the eyebolt cables off of that truck
24 that was down for another component for a length of time and

Page 33

1  put it on that truck before it went back out.
2    Q.   That's if one was missing or broken?
3    A.   Yes.
4    Q.   And how many during this period of time did you
5  know to be broken?
6    A.   I don't understand.  The period of time of
7  what?
8    Q.   Well, 1999.  I think you said January,
9  February, 1999, you were told to replace them.  Prior to
10 that, had you known any to break?
11   A.   No, not to my knowledge.
12   Q.   After that, had you known any to break?
13   A.   Yes, sir.
14   Q.   How many?
15   A.   Physically, I've seen three.
16   Q.   But you didn't see Mr. Ferguson's?
17   A.   No, sir.
18   Q.   And you didn't see Mr. Fay's?
19   A.   No, sir.
20   Q.   Did those other three result in any injuries?
21   A.   I — not that I'm aware of, no.
22   Q.   So if a truck was in for service and you were
23 in the process also of replacing the cables, and all four
24 cables needed to be replaced but you only had two cables

9 (Pages 30 to 33)

Page 34

1  there, how would you determine which ones to replace?
2      A.   With the way the driver is on the headramp, we
3  would generally replace the bottom cable.
4      Q.   And why would that be?
5      A.   That's because they are in a cross-position
6  when they are working up there.
7      Q.   It just makes sense if they were going to start
8  to fall, they grab the lower one, right?
9      A.   Well, it could be.  A driver is trained when he
10  is on the headramp, and I have been through this training
11  myself, to hold onto mirrors, wiper arm, windshield molding
12  area.
13      Q.   When he's walking?
14      A.   Yes.  Fenders, underneath the fenders.  You
15  were taught a specific way to mount and dismount that truck.
16  You're trained that way before they ever let you take a
17  truck out by yourself.  And I started in 1988 with CCI and
18  Complete Auto Transit.  I went through that extensive
19  training in Romulus, Michigan.  All supervisors went through
20  that at that time.
21      Q.   So the top cable, they're already trained to
22  hold onto parts of the truck when they were actually walking
23  up there?
24      A.   Prior to 1994, there was never any cable up

Page 35

1  there.  So we were taught how to hold onto the unit itself
2  to dismount from the truck.
3      Q.   So did you give a directive to your mechanics
4  to, if you don't have enough to replace all four, replace
5  the lower ones first?
6      A.   No, I didn't give them that directive.
7      Q.   You would say that that's -- well, strike that.
8      A.   They would come to me and ask if they -- if I
9  would accept that, that they felt it was better to put it
10  there.  We made that decision at the time from what it
11  looked like.  If the upper cable looked worse, we would
12  replace those.
13      Q.   Do you remember a conversation with Mr. Shivley
14  about, we should do the lower ones first?
15      A.   No.  I did not have that conversation with him.
16      Q.   Okay.  So how many times would you say it was
17  that they came to you and said, we don't have enough to
18  replace all four, which ones should we replace?
19      A.   What do you mean by that?
20      Q.   Well, you said that you guys would have a
21  conversation or look at them to see which ones you thought
22  were worse, and if the upper ones were worse, you would
23  replace those.  How many times did that occur?
24      A.   No more than two or three times.

Page 36

1      Q.   Were you on the safety committee?
2      A.   No.
3      Q.   Who was on the safety committee then, if you
4  know?
5      A.   During that period, sir?
6      Q.   Yes.
7      A.   Craig Woodward.
8      Q.   Okay.  How about Mr. Chinn, was he at the other
9  facility?
10      A.   Yes, sir.
11      Q.   And who would be the person that was in your
12  position at the other facility?
13      A.   At Marian?
14      Q.   Yes.
15      A.   That was Gordon Beal.
16      Q.   What does "retrofitted" mean to you?  If you've
17  got, "clotheslines will not be retrofitted onto trucks.  We
18  will continue to replace them as required," what would that
19  mean to you?
20      A.   Retrofitted would mean, to me, that you would
21  go outside someplace and get some sort of a cable from a
22  hardware store and put on there.
23      Q.   Do you know if there's ever supposed to be
24  any -- to your knowledge, any chains used for that or any

Page 37

1  other design other than the three we've mentioned?
2      A.   Not on this particular model.
3      Q.   Okay.  On other models?
4      A.   I've seen stationary handrails on other
5  equipment.
6      Q.   Has there been any problem, to your knowledge,
7  with the swivel design, that we have marked here as V,
8  breaking?
9      A.   No.  I still have equipment with those on
10  there, and they are doing a very good job.
11          MR. KOUSTMER:  That's all I have.
12              CROSS-EXAMINATION
13  BY MR. LARSON:
14      Q.   Mr. Weaver, a few questions.  I need to clarify
15  some testimony about the conference call with Mr. Taggart.
16      A.   Okay.
17      Q.   Originally you had testified, as my notes
18  reflect, that Mr. Taggart informed you that the replacement
19  program was being initiated because of the discovery of
20  corrosion in a location that you described on the cable
21  itself?
22      A.   Rust.  Yes, rust.
23      Q.   Rust.  Then later on Mr. Koustmer asked you a
24  question that indicated or said that cables were to be

10 (Pages 34 to 37)

Page 38

1 replaced because they were breaking. Now, did Mr. Taggart
2 say in the conference call that the cables were breaking?
3    A.  No.
4    Q.  Or that the cables were rusting?
5    A.  They were rusting, and we were to replace them.
6    Q.  All right.  So he did not say that they were
7 breaking?
8    A.  Not in that conference call, sir.
9    Q.  As to the – did I hear you say that you
10 underwent the training that the drivers – at one time you
11 underwent the training that the drivers underwent for how to
12 be a car hauler?
13    A.  Yes.
14    Q.  With respect to the insertion and removal of
15 hooks on the vehicles in the number one position there --
16 are you with me?
17    A.  The number one position?
18    Q.  Above the headramp.
19    A.  On the headramp.
20    Q.  That is the only location where these cables
21 are, that number one position?
22    A.  Yes.
23    Q.  Those – doesn't the training call for
24 inserting the hooks in the vehicles on that number one

Page 39

1 position to either do it from the front bumper or from
2 inside the trailer, from the lower ramp?
3    MR. KOUSTMER:  Objection.
4    Q.  You can answer.
5    A.  The training I received was on older equipment
6 and it was not on this style of equipment.  This style
7 equipment can be hooked from the top or the bottom.
8    Q.  So if a driver chooses to, on the 2878, he can
9 insert hooks into the undercarriage of a vehicle on the
10 number one position from underneath?
11    A.  Yes, sir.
12    Q.  Without having to get up on that top ramp?
13    A.  On certain types of cargo units, it can be
14 done.  On others, it cannot be done.
15    Q.  And if it is a cargo unit that can be done
16 from underneath, that would be the preferred location?
17    MR. KOUSTMER:  Objection.
18    Q.  Correct?
19    A.  Yes.
20    MR. LARSON:  Thank you.  That's all.
21    CROSS-EXAMINATION
22 BY MR. PAULUS:
23    Q.  I have a few questions.  I'm Craig Paulus.  I
24 represent Hanes Supply, who manufacturers cables like this.

Page 40

1    One question that's a follow-up to a previous
2 deposition, when did the Miamisburg garage open?
3    A.  First of May, 2002.
4    Q.  Are you responsible for maintaining records of
5 the inventory of parts, like cables like this?  Whose
6 responsibility is that?
7    A.  It's automated on the computer.
8    Q.  Who inputs the information on the computer?
9    A.  We input what we need.  Yes, we set the
10 maximums.
11    Q.  And then, as it's received, does that reflect
12 on the computer?
13    A.  It's received through a piece of paper on a
14 documentation of what they call a shipper number.  We
15 receive the shipper number, it receives the items.
16    Q.  You mentioned that the last time you heard, the
17 cable that was actually involved in Mr. Ferguson's accident
18 was in Mr. Palladino's possession; is that correct?
19    A.  Yes.
20    Q.  So it's standard procedure, proper procedure to
21 hold the parts that were involved in an accident?
22    A.  Yes, sir.
23    Q.  Who would have normally held it under that
24 procedure?

Page 41

1    A.  Safety supervisor would.
2    Q.  It should have been with Mr. Palladino?
3    A.  Yes, sir.
4    Q.  Do you know where he kept parts?
5    A.  No, sir.
6    Q.  Was Mr. Palladino in the conference call with
7 Mr. Taggart –
8    A.  No, sir.
9    Q.  – that we discussed?
10    A.  No.
11    Q.  He wasn't?
12    A.  No.
13    Q.  Was he aware of the program to replace the
14 cable?
15    A.  He was aware at the time he was at Marian, and
16 he was aware through Gordon Beal, the shop manager in
17 Marian.
18    Q.  And this is at the time of Mr. Ferguson's
19 accident?
20    A.  No.
21    Q.  Okay.  When were you talking about?
22    A.  When we were told to replace these cables, the
23 safety people were also consulted with, as far as we had to
24 notify the drivers that there was a problem here, they

11 (Pages 38 to 41)

Page 42

1   needed to also be our eyes, too.  They work on this
2   equipment and drive it every day.  They know it better than
3   any mechanic or shop manager in the world.
4       Q.   Mr. Palladino is one of the safety people
5   you're talking about?
6       A.   Yes.
7       Q.   And he was at Marian at the time of this
8   conference call?
9       A.   Yes.  Gary Chinn was part of that at Moraine.
10  We were a small operation at Moraine, only a shuttle
11  operation.
12      Q.   At that time?
13      A.   At that time, yes, sir.
14      Q.   Okay.  What time did Mr. Palladino come to
15  Moraine?  Did he ever?
16      A.   I'm not sure.  I don't know.
17      Q.   When did the Marian facility close?
18      A.   December of 2000.  December 31st, 2001
19  officially.
20      Q.   That was downsized before that?
21      A.   Yes, sir.
22      Q.   When you do these federal inspections that you
23  mentioned -- do you remember those?
24      A.   Yes.

Page 43

1       Q.   Do you know what I'm talking about?  Is there a
2   checklist or any sort of written document that you're
3   supposed to follow?
4       A.   A checklist for the mechanic to follow, yes.
5       Q.   Is that in written form or electronic?
6       A.   It's in written form.  It's printed out when we
7   do our computerized repair work.  We do a print mode after
8   we put in -- we have a section for comments for drivers on
9   the vehicle condition report that we type in.
10      Q.   Okay.
11      A.   We type that in.  We also have a code that we
12  put in a job budget on the work order that makes a PM
13  service out of it.
14      Q.   Okay.
15      A.   It also includes a federal type inspection,
16  RP-1 PM, includes the federal inspection.  We do that every
17  time.
18      Q.   What is an RP-1?
19      A.   An RP-1 PM also includes the federal
20  inspection.
21      Q.   And PM stands for preventive --
22      A.   Preventive maintenance.  Change the oil,
23  fluids, check the lights, all of the frame, et cetera, like
24  that.

Page 44

1       Q.   I'm going to show you quickly what has been
2   marked earlier in another deposition as Wolf A.  Do you have
3   it right there?  It's this one.
4           Can you take a look at that document for me?
5   Do you recognize -- can you tell me what it is?
6       A.   It's a detailed history of a piece of
7   equipment --
8       Q.   Can you tell me what --
9       A.   -- for repairs and parts.
10      Q.   Can you tell me which piece of equipment?
11      A.   Yes.  It says under the unit number that it's
12  61304.
13      Q.   Okay.  Do you know when this unit -- or do you
14  have records of when this unit first arrived at Moraine from
15  Marian?
16      A.   Yes.  It was 8/21 of 2000.
17      Q.   Okay.  When you worked on the safety cables,
18  would that be reflected on here?
19      A.   It would be under code 55, which is for cargo.
20      Q.   If you look at page -- some of the page numbers
21  are semi-obscured -- I think it's page 13, about three lines
22  from the top.  I see a reference to a safety cable, "HO/RK
23  long."  Is that a reference to the replacement of the safety
24  cable?

Page 45

1       A.   Yes.  That item number is assigned -- is an
2   assigned inventory number.
3       Q.   Okay.
4       A.   Which, as you see, the first two digits are 55.
5   That's under the cargo.
6       Q.   Okay.
7       A.   That is our system code.  Then the
8   balance of it is a control number.
9       Q.   Is that like a part number?
10      A.   Yes.
11      Q.   If you compared that to inventory records,
12  could you determine the part?
13      A.   No -- yes.  You could.  I'm sorry.  You can.
14      Q.   You can?
15      A.   You can go back and tell on another screen.
16  You can -- it will give you a manufacturer's part number.
17      Q.   Okay.  Does this -- if you look at that same
18  entry, it reflects -- I believe it reflects three is the
19  quantity.  Three cables were replaced?
20      A.   Yes, sir.
21      Q.   Does it say -- is there any way of telling from
22  these records whether it was the upper, the lower, the
23  driver's side or the passenger's side?
24      A.   No, sir.

12 (Pages 42 to 45)

Page 46

1  Q.  Did you ever exchange parts with other garages
2  in the area?
3  A.  I don't understand.
4  Q.  When another facility, Allied facility, needed
5  parts for one of the trucks, did they ever call you up and
6  say, do you have one?
7  A.  Yes.
8  Q.  Did they ever do that with safety cables, to
9  your knowledge?
10  A.  Yes.
11  Q.  Can you tell me the circumstances of that?  Did
12  you ever give any away to another facility?
13  A.  We transferred.
14  Q.  Transferred them?
15  A.  Yes.
16  Q.  To which facility?
17  A.  From time to time.  It was Marian.
18  Q.  Okay.
19  A.  Sometimes -- twice at Marysville, and it had to
20  do with supply.
21  Q.  Okay.
22  A.  Let me highlight this.  We were in the process
23  of transferring equipment.  The product was coming back to
24  Dayton, which it had not been for four years.

Page 47

1  Q.  When you say "Dayton," you mean Moraine, right?
2  A.  Moraine, yes.  In that, there was equipment
3  that was transferred back to us.  We did not have enough
4  cables to cover all of this.  From time to time, there was
5  other terminals that would transfer in to help me.
6  Q.  Okay.
7  A.  Now, we could go out through the system,
8  contact that shop manager, and requisition it.  We still --
9  we are still tied to requisitioning that in the system.  So
10  we had to issue a purchase order through Sycamore Gill,
11  which is on the title there, on the invoice.
12  Q.  How do you spell "Gill"?
13  A.  G-i-l-l.
14  Q.  Okay.  I spelled it Guild, G-u-i-l-d.  I have
15  that wrong.
16  A.  We still have to requisition.  We're not
17  allowed to order parts.  We requisition parts.
18  Q.  You requisition parts from the warehouse?
19  A.  Yes.  That's under the ISO program.  We
20  requisition the parts from Allied Parts Center, okay?  That
21  is probably our company name for Gill Transportation,
22  Sycamore Logistics.  There might be another company under
23  that facility, I don't know.  They are a warehousing
24  logistics company that ships the parts to us.

Page 48

1  Q.  Do you know if they have other customers
2  besides Allied and the Allied --
3  A.  I don't know.  I don't know.
4  Q.  I have another couple of questions.  You saw
5  some broken cables?
6  A.  Yes.
7  Q.  And you said they were broken at the crimp
8  joint.  Do you know if the crimp joint, the metal bolt
9  itself, was broken or the wire rope?
10  A.  The wire rope.
11  Q.  Did you ever see one or hear of one where the
12  swage was broken?
13  A.  Can I take my pen and show you?
14  Q.  Yeah, sure.
15  A.  In this area here -- it was usually right in
16  this area here that it would be broken, and it would be
17  fingered out like this way, okay?
18  Q.  Okay.  You're indicating --
19  A.  Where the strands were breaking.
20  Q.  And it would be discolored from --
21  A.  Yes.
22  Q.  -- rust?
23  A.  It would be rust-colored.
24      MR. PAULUS:  I think that's all I have.

Page 49

1      THE WITNESS:  Okay.
2      FURTHER CROSS-EXAMINATION
3  BY MR. KOUSTMER:
4  Q.  Such as this example we have here where this
5  one is broken, correct?
6      MR. LARSON:  I object to the form.
7  A.  I can't tell what's there.
8  Q.  Okay.  You can't tell?
9  A.  No.
10  Q.  You said that at the time Mr. Tagget -- right?
11  A.  Taggart, T-a-g-g-a-r-t.
12  Q.  -- said they were rusting, correct?
13  A.  Look for the rust-colored, yes, sir.
14  Q.  And that's why they were being replaced,
15  because of corrosion?
16  A.  Yes.
17  Q.  Okay.  Now, did later he say because they were
18  breaking?
19  A.  No.
20  Q.  It seemed with your answer you were saying at
21  that time --
22  A.  In the conference call, we were to replace --
23  and this is specific.  At that time in that conference call,
24  we were told to replace them because there were rusted areas

13 (Pages 46 to 49)

Page 50

between the crimping area and the nylon, is where we will see that.

We were not to question it. We were not to check and see if they were broken or any strands were broken. We were to strictly replace it. Cut and dried. That's what we were supposed to do, replace it.

Q. And you were supposed to do that right away?

A. Do it as soon as we could possibly do it within reason.

Q. Because they were corroding?

A. Yes.

MR. KOUSTMER: That's all.

FURTHER CROSS-EXAMINATION

BY MR. LARSON:

Q. I need to ask you one more thing. This exemplar here, that is the old style that's broken on one end. You've seen a lot of original cables?

A. Yes, sir.

Q. How many of them have you seen that have the coating this close up to the metal part?

A. That's rare. This is rare. Most of them were at the gap, like you see on this one there.

Q. On the complete one?

A. Yes, sir.

Page 51

Q. Of what, a quarter-inch?

A. Quarter-inch.

Q. Such that you could actually visualize and observe this rust if it were there, this rust color on the outside of the cable?

A. You could stand on the ground and see rusted cable, yes. You didn't have to climb on the truck to find it.

Q. And the broken cables that you saw, I think you indicated that rather than a straight across break, that there were fingers extending in the inside cable?

A. Yes. It was all frazzled cable. A cable will frazzle. When it breaks, the strands will frazzle. It's like a rope that you would cut with a pocketknife, and it would unravel. That's what it looks like, to describe it to you. And I don't know what's happened with this, but that doesn't look broke.

Q. It's not the type of break you've observed?

A. Not the break that I'm familiar with.

MR. LARSON: Do you happen to have the originals of Exhibits A through G with you?

MR. KOUSTMER: No.

MR. LARSON: That's all I have. Thank you.

MR. PAULUS: Thank you.

Page 52

MR. WINTER: Anything from anybody else? Okay, we're done. We don't waive signature.

---

WILLIAM C. WEAVER

- - -

DEPOSITION CONCLUDED AT 12:34 P.M.

- - -

Page 53

C E R T I F I C A T E

STATE OF OHIO        :
                     : SS
COUNTY OF CLERMONT  :

I, Debra J. Henderson, RPR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, WILLIAM C. WEAVER was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by WILLIAM C. WEAVER; that said deposition was taken in all respects pursuant to stipulations of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this _____ day of _____, 2003.

My commission expires:        Debra J. Henderson, RPR
May 8, 2005.        Notary Public - State of Ohio

14 (Pages 50 to 53)

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _20_ day of _FEBRUARY_, 20 _03_, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

*Page 1*

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 9 | 12-24 | THE DAY I GOT BACK, I HAD A CASUAL |
| 10 | 1-22 | CONVERSATION WITH TOM HELLER AND, IN TURN |
| | | HE SPOKE TO ME ABOUT MR. FERGUSON FALLING |
| | | OFF A TRUCK. I ASKED HIM HOW IT HAPPENED |
| | | AND HE TOLD ME THAT A CABLE BROKE |
| | | AND THAT HE HAD FALLEN THROUGH THAT. |
| | | SO, IN TURN, WE TALKED A LITTLE MORE |
| | | ABOUT IT. I ASKED HOW FERGUSON WAS, ETC. |
| | | AND I ALSO ASKED HIM WHERE THE OLD |
| | | CABLE WAS AT. MR. HELLER SAID THAT HE |
| | | WAS NOT SURE, BUT HE THOUGHT MIKE |
| | | PALLADINO HAD IT. I LEFT IT AT THAT, |
| | | BECAUSE GENERALLY WHEN SOMETHING WOULD |
| | | HAPPEN LIKE THAT, MIKE PALLADINO, BEING THE SAFETY MAN |
| | | WOULD IMPOUND THAT AND HOLD IT PENDING |
| | | AN INVESTIGATION. LATER ON (IT MIGHT |
| | | HAVE BEEN 1-2 WEEKS LATER), MIKE CALLED |
| | | AND ASKED ME SOME QUESTIONS ABOUT |
| | | CABLES AND THE POLICIES ON WHETHER WE |
| | | WERE CHANGING THEM AND HOW OFTEN WE |
| | | WERE GETTING TO CHANGE THEM, ETC. |
| | | I THEN ASKED MIKE IF HE HAD THE CABLE |

_3-30-03_
Date

_William Coleman_
(Signature of Deponent)

TO THE REPORTER: I have read the entire transcript of my deposition taken on the _____ day of _____, 20____, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorized you to attach the following changes to the original transcript:

*Page 2*

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 9 | 12-24 | TO FERGUSONS TRUCK. HE SAID, |
| 10 | 1-22 | "WELL, I'VE GOT A CABLE," THAT IS |
| CONTINUED | | ALL THAT WAS SAID. I DID NOT ASK |
| | | ANY MORE, SINCE I FIGURED IT WAS |
| | | IN INVESTIGATION AND IT WASN'T ANY |
| | | OF MY BUSINESS. |

1    MR. WINTER:  Anything from anybody else?

2    Okay, we're done.  We don't waive signature.

3

4    _____
     WILLIAM C. WEAVER

5

6    - - -

7    DEPOSITION CONCLUDED AT 12:34 P.M.
     - - -

8

9    ORIGINAL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 1

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF OHIO
3                   WESTERN DIVISION
4
5    ----------------------------------------
                                          :
6    DAVID FERGUSON, et al.,
                                          :
                                          :
7              Plaintiffs,               :
                                          :
8         vs.                            :      CASE NO.
                                          :      C-1-02-039
9    RYDER AUTOMOTIVE, et al.,           :
                                          :
10             Defendants.               :
                                          :
11   ----------------------------------------
12
13   DEPOSITION OF:        RICHARD H. SHIVLEY
14   TAKEN:                By the Plaintiffs
                            Pursuant to Agreement
15
     DATE:                 February 20, 2003
16
     TIME:                 Commencing at 10:29 a.m.
17
     PLACE:                Kohnen & Patton
18                         441 Vine street
                            Suite 1400
19                         Cincinnati, Ohio  45202
20   BEFORE:               Debra J. Henderson, RPR
                            Notary Public - State of Ohio
21
22
23                         COPY
24

Page 6

1  A.  Absolutely.
2  Q.  What did you do after that?
3  A.  Then I went to work for -- Complete Auto
4  Transit was the name.
5  Q.  And what facility did you work for them at?
6  A.  That was in Flint.
7  Q.  So you have been with the affiliations of
8  Commercial Carrier, Inc., Allied, Ryder, Delavan all of that
9  time?
10  A.  For years, yes, sir.
11  Q.  And at one point in time you said you left or
12  was laid off or what?  There was a gap, you were talking
13  about?
14  A.  Right.  I hired in the first time in '72.  Back
15  in the gas crunch, business got rough.  I got laid off a few
16  times, hired back on 11/3/75.
17  Q.  And starting then, what were your job duties?
18  A.  Mechanic.
19  Q.  And are you still a mechanic?
20  A.  Yes, sir.
21  Q.  And were you a mechanic back in 1999, 2000?
22  A.  Yes.
23  Q.  And what place were you a mechanic at during
24  that period of time?

Page 7

1  A.  At Moraine.
2  Q.  Do you know a Dave Ferguson?
3  A.  Yes, I do.
4  Q.  How do you know him?
5  A.  He's a driver -- or was a driver.
6  Q.  Where was he a driver at?
7  A.  Moraine, Ohio.
8  Q.  Do you know anything about his accident where
9  the safety cable broke?
10  A.  Only hearsay, sir.  I heard that he had fallen.
11      MR. WINTER:  Objection to hearsay, but go
12  ahead and answer.
13  Q.  You can go ahead and answer.
14  A.  I understood he fell off a truck.
15  Q.  Okay.  And that occurred on September 7th of
16  2000.  Did you have anything to do with fixing the truck
17  after he fell off it?
18  A.  I couldn't recall that.  I did so many of them.
19  Q.  Would you recall around that period of time
20  replacing a cable that was broken?
21  A.  Like I said, sir, I replaced a lot of cables.
22  There was a campaign going on.  We did them all of the
23  time.  I don't remember truck numbers or dates.  I really
24  don't.

Page 8

1  Q.  Do you remember broken cables?
2  A.  Yes, I do, sir.
3  Q.  Okay.  And so how many broken cables did you
4  replace?
5  A.  I would say about six, personally, that I saw
6  broken.
7  Q.  And what did you do with them once you replaced
8  them?
9  A.  We discarded the old cables so they could not
10  be reused.
11  Q.  And that included the broken cables?
12  A.  Yes, sir.
13  Q.  Well, you wouldn't reuse a broken cable, right?
14  A.  Yeah, no.  There is no use for them.
15  Q.  Do you know what happened to the broken cable
16  that was involved in Mr. Ferguson's injury?
17  A.  No, sir.
18  Q.  We have kind of an exemplar here of a cable.
19  You say you replaced six of them that were broken.  Where
20  would they break?
21  A.  This one pretty much looks intact.  See this
22  area right here?
23  Q.  Right.  And describe that so the court reporter
24  can understand it.  What is this metal piece here?  What do

Page 9

1  you call that?
2  A.  Where the braiding goes into the swedging.
3  Q.  That's where they would break?
4  A.  Yes, sir.
5  Q.  Okay.  And what period of time did you replace
6  these six that were broken?
7  A.  I was on a voluntary layoff for a while.  I
8  came back to work to the Moraine facility in May '99.
9  Q.  Okay.
10  A.  And they were replacing them at that time,
11  during that summer, I remember.
12  Q.  And how long were they being replaced?  How
13  long did that campaign last?
14  A.  Pretty much that whole summer on into the fall,
15  that I recall, as they were available.
16  Q.  And were they being replaced in 2000, also?
17  A.  I couldn't swear to that.
18  Q.  Are you saying -- as they became available,
19  what do you mean by that?
20  A.  Yes, sir.  There was some supply problems.
21  Q.  What were those problems?
22  A.  We couldn't get all that were necessary to
23  replace the entire fleet.  They came in in batches.
24  Q.  Okay.  And what type of batches would they come

3 (Pages 6 to 9)

Page 26

1 coated stainless steel cables with studs on each end. Would
2 those be the new ones?
3     A.   That sounds like them.
4         MR. KOUSTMER:  Give me a minute here, maybe I'm
5 done.
6     Q.   Who is Phil Kuchar?
7     A.   Mr. Kuchar is a driver, one of the higher
8 seniority drivers at Moraine.
9     Q.   Did you ever talk to him about the
10 clotheslines, the cables?
11    A.   I couldn't tell you that, sir.
12    Q.   Have you been at your new job — not in the
13 building — what do you call it?
14    A.   I'm a yard mechanic.  I work out of a van.
15    Q.   How long have you been doing that?
16    A.   Over a year now.
17    Q.   Okay.  We had another receipt in there that
18 someone has just produced to me for today for 11/15 of
19 cables coming to Moraine, these new stainless steel cables.
20 Do you remember getting that many?  There was like 25 of
21 them.
22    A.   Those would have been delivered to the shop in
23 Miamisburg.  I wouldn't know when.
24    Q.   Okay.  I have it marked, this whole thing, as

Page 27

1 EE.  I didn't give you guys one of these.  They just came in
2 my office, but there's a shipment in Moraine for —
3         MR. LARSON:  I don't know what the question is,
4     but I will object to lack of foundation.
5     Q.   Do you remember getting cables back during that
6 period of time, stainless steel cables?
7         MR. WINTER:  "That period of time" being
8     approximately mid-November of 2000?
9         MR. KOUSTMER:  Yeah.
10    A.   No, sir.
11    Q.   Is that what they are using now, stainless
12 steel?
13    A.   There are some in the parts room.  That's all I
14 can tell you about that.
15    Q.   Are there some on the trucks?
16    A.   There are stainless steel designs on trucks
17 today, yes.
18    Q.   Okay.
19        MR. KOUSTMER:  I don't have anything else.
20    Thanks.
21        CROSS-EXAMINATION
22 BY MR. LARSON:
23    Q.   Mr. Shively, I just have a couple of questions.
24        In your earlier testimony you made reference to

Page 28

1 budget problems that you perceived while working with Allied
2 Systems, correct?
3     A.   Yes, sir.
4     Q.   Would it be correct that you have no personal
5 knowledge as to whether or not budgetary constraints played
6 any factor at all in the program to replace cables?
7         MR. KOUSTMER:  Objection.
8     Q.   You can answer.
9     A.   I have no direct knowledge of budget problems.
10 That statement was made based on how regular parts came in.
11 My gut feeling what that was, my opinion.
12    Q.   All right, sir.
13        MR. LARSON:  I think that's all.  Thank you.
14        CROSS-EXAMINATION
15 BY MR. PAULUS:
16    Q.   I have a couple of questions.  I'm Craig
17 Paulus.  I represent Hanes Supply, who manufactured the
18 cables.  And I think I just have a couple of questions, and
19 it relates to your inspections out in the yard.
20        When you were instructed by your supervisor to
21 go inspect out in the yard for cables, did you immediately
22 recognize cables that needed to be replaced from just
23 walking by them on the ground and looking up at them?
24    A.   Well, we were told they were all to be

Page 29

1 replaced, that they all had a potential to break.  But if I
2 only had four that day, go get the ones that look the worse.
3     Q.   Okay.  So if you saw something — you went out
4 in the yard and saw some that needed to be replaced, would
5 you go get your tools and ladder and come back and fix them
6 right then and there?
7     A.   If I had the cables, yes, sir.
8     Q.   But you didn't always have the cables?
9     A.   No.
10    Q.   How often — can you tell me how many times —
11 strike that.  How many cables do you think you saw, to the
12 best of your recollection, that needed to be replaced but
13 you didn't have the parts to replace them?
14    A.   I would be guessing.  I mean, there were some.
15    Q.   More than ten?
16        MR. LARSON:  Object to the form.
17    A.   I couldn't say.
18    Q.   And I have a question about Miamisburg.  Did
19 you ever share parts between — well, tell me what's in
20 Miamisburg.  Is there a yard there?  Is there a garage
21 there?
22    A.   The company rented a four-bay facility in
23 Miamisburg.
24    Q.   A four-bay garage?

8 (Pages 26 to 29)