FILED
KENNETH J. MURPHY
CLERK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**    **03 OCT -3  AM 8: 34**
**WESTERN DIVISION**

COURT
EAST OHIO
WEST DIV CINCINNATI

| | | |
|---|---|---|
| **DAVID FERGUSON, ET AL.** | : | |
| | : | **Case No.  C-1-02-039** |
| **Plaintiffs** | : | |
| | : | **Judge Herman Weber** |
| **v.** | : | |
| | : | **DEFENDANTS ALLIED** |
| **RYDER AUTOMOTIVE CARRIER** | : | **SYSTEMS, LTD.'S AND ALLIED** |
| **SERVICES, INC., ET AL.** | : | **AUTOMOTIVE GROUP, INC.'S** |
| | : | **RESPONSE TO PLAINTIFFS** |
| **Defendants** | : | **DAVID FERGUSON'S AND** |
| | : | **MARTHA FERGUSON'S** |
| | : | **PROPOSED FINDINGS OF** |
| | : | **FACT AND CONCLUSIONS OF** |
| | : | **LAW** |

In accordance with the Court's *Scheduling Order*, entered June 24, 2003, and other

applicable law, defendants Allied Systems, Ltd. and Allied Automotive Group, Inc. tender the

attached response to *Plaintiffs' Undisputed* [sic] *Facts and Conclusions of Law as to Defendants

Allied Systems, Ltd. and Allied Automotive Group, Inc.*, marked in accordance with the Court's

Order.

Respectfully submitted,

_____

Robert A. Winter, Jr. (0038673)
250 Grandview Drive, Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
(859) 578-3869 (fax)
Trial attorney for defendants
Allied Systems, Ltd. and
Allied Automotive Group, Inc.

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served by depositing the same into the United States Mails, first class postage prepaid, on this 2 day of October 2003, to:

Thomas R. Koustmer, Esq.
1800 Federated Building
7 West Seventh Street
Cincinnati, OH 45202

Michael J. Honerlaw, Esq.
Honerlaw and Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, OH 45231

K. Roger Schoeni, Esq.
Kohnen & Patton LLP
PNC Center, Suite 800
201 East Fifth Street
Cincinnati, OH 45202

David E. Larson, Esq.
Larson & Larson PC
11300 Tomahawk Creek Parkway
Suite 310
Leawood, KS 66211

Craig R. Paulus, Esq.
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202

Robert A. Winter, Jr.

s:\d:ma\allied\ferguson\pleadings\response2 plaintiffs findings conclusions.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID FERGUSON, et al.

           Plaintiff,

                                  C-1-02-039

    -v-

RYDER AUTOMOTIVE, et al.,                Judge Weber

           Defendants.

## PLAINTIFF'S UNDISPUTED FACTS AND CONCLUSIONS OF LAW AS TO DEFENDANTS ALLIED SYSTEMS LTD. AND ALLIED AUTOMOTIVE GROUP, INC.

1.     That only 500 trucks were in the fleet in January and February, 1999 that would need replacement cables.

Robert Farrell, V.P., Allied deposition.

2.    Q.    "If you had received an order for safety cables either eye bolt design or stainless steel from Allied, Allied Holding Commercial Carriers or Allied, put in on February, 1999 for 10,000 cables, could you have produced same?"

           A.    Hanes Supply objects to these Interrogatories on the grounds that it is not relevant to the subject matter involved in the pending action.  Without waiving objection, yes.

INTERROGATORY NO. 3

If the answer to No. 2 is yes, in what period of time would have been provided?

ANSWER:    Hanes Supply objects to this Interrogatory on the grounds that it is not relevant to the subject matter of the pending action.  Without waiving this objection, Hanes Supply can make 30 cables of the eye bolt design per hour, or 45 cables of the threaded stud design per hour.  These figures are based on a 3 man team, which is Hanes Supply's typical work configuration, though additional teams could be added if production needs required it.  Hanes

Supply can fabricate cable assembling in galvanized or stainless steel at the same pace.

INTERROGATORY NO. 4

"Approximately how many competitors were there in the United States with Hanes Supply Company to make the type of safety cables used by Commercial Carriers, Inc., Allied Holding, Inc., Allied Systems, Inc., and Allied parts during the years 1999 - 2000?"

ANSWER:    Hanes Supply objects to this Interrogatory on the grounds that it is not relevant to the issues of the present action, and on the grounds that the Interrogatory is vague and ambiguous.  Without waiving this objection, Hanes Supply believes there are well over 100 manufacturers in the United States alone.

Hanes Supply, Inc.'s, Answer and Objections to Plaintiff's Third Set of Interrogatories and Requests For Production of Documents, Nos. 2, 3 and 4 filed herein.

3.      At 45 an hour production of stainless steel cables, 2,000 cables would be produced in less than six days.

Mathematics.

4.      A.      "I'd have to see the issues that you're proposing and then take a look at it that way.

It was my understanding based on the testimony that this particular wire rope, the exemplar, if you will, the failed exemplar was consistent with what was being supplied by Hanes. There has been no evidence to suggest otherwise.

According to Allied individuals that testified and saw it, it was -- the failure was consistent with what we were experiencing, or what they were experiencing.  I'm not sure what you want to look at."

2

<u>Alexander depo P.22</u>.

5.    This design would not be fit for a 10 year/million mile life.

<u>Alexander depo P. 57</u>.

6.    That the cables used in this application being made of galvanized steel would only

last three to five years.

<u>Alexander depo P. 95</u>.

7.    That the yellow coating over the cable obstructed an inspection for rust.

<u>Alexander depo. Pp. 68, 69, 70</u>.

8.    That Allied should have replaced the safety cables within one month of January,

1999.

Q.    How long should it have taken from the time the Allied defendants first

discovered a head ramp cable failure problem until the cables were ordered?

And I mean replacement cables, sir.

A.    Should have been done right away.

Q.    Who are the available suppliers, sir?

A.    There's a multitude of suppliers.  I could not list them all.

Q.    More than a hundred?

A.    I would say so.

Q.    And all of them could have replaced -- is cost to Allied a factor to be

considered in replacement cables?

A.    Not when safety is at issue.

Q.    How long could it have taken for these hundreds of suppliers to provide

3

safety cables that were safe from an engineering perspective?

      A.     I think you're looking at less than a month.

Alexander depo Pp. 105, 106.

9.     The instruction given to the drivers concerning the cables in April of 1999 were inadequate.

Alexander depo Pp. 109, 110.

10.    Q.     It stays: By not properly maintaining the incident vehicle, Allied reasonably and with substantial certainty created an unsafe work condition that would,    and in fact did, lead to Ferguson's injuries.

        Did I properly state your finding number 10?

      A.     Yes.

Alexander depo P. 123.

11.     Defendant Allied did not properly maintain their vehicle by not properly lubricating and remarking.

Alexander depo P. 127.

12.     That it would have been safer to take off all defective cables instead of leaving on until replaced.

Alexander depo Pp. 132, 133.

13.    Q.     That's what I was asking you, that if an untrained driver who is not able to recognize the deterioration of a cable sees a cable, is it your opinion that it's reasonable for him to expect it to be satisfactory in going to hold it?

      A.     I think yes.  That's why he would grab for it.

<u>Alexander depo Pp. 132, 133</u>.

14.    The findings of Gabriel G. Alexander are that:

Within a reasonable degree of engineering certainty, and subject to change if additional

information becomes available, it is my professional opinion that:

1.    The Ferguson vehicle was defective.

2.    Ferguson's actions were proper and were not a cause of this incident.

3.    The Safety Cable failed during normal reasonable operation and caused his crash.

4.    The incident vehicle was defective in that the Safety Cable failed during normal reasonable operation.

5.    The Safety Cable was defective in that it was not corrosion resistant and failed in an area of reduced cross section in the presence geometric stress concentrations.

6.    The incident vehicle was defectively manufactured without a proper Safety Cable, known available technology that should have been utilized in its design.

7.    The incident Vehicle was dangerous and defective in a manner that caused Ferguson's fall.

8.    Furthermore, in the absence of a proper design, which would prevent falls, warnings and instructions should have been provided with regard to required inspection and maintenance procedures.

9.    Hanes' design and manufacture of the incident Safety Cable was improper and caused Ferguson's fall. Further, CCI and Allied's actions were improper in that they failed to correct the defective condition that Hanes created. Further, Allied had prior knowledge of the defective condition, and was responsible for the vehicle's maintenance, and failed to act on the knowledge and correct the defective condition that Hanes created.

10.    By not properly maintaining the incident vehicle Allied, reasonably and with substantial certainty, created an unsafe work condition that would and in fact did lead to Ferguson's injuries.

11.    CCI's responsibility for the configuration of the incident vehicle was as great as that of Hanes as they completed the vehicle and was responsible for it's

5

configuration.

Alexander report previously filed with 26A Disclosures

15. That as of July 16, 2003, Defendant Allied sent over maintenance records for a truck which cables. No replacement cables are noted and therefore they were never done.

Thomas R. Koustmer Affidavit filed.

16. Commercial Carriers, Inc., changed to Allied sometime in 1997.

Palladino depo P. 13.

17. Mike Palladino was Safety Director at Allied on the date of the accident, September 7, 2000, who took responsibility to investigate the accident of David Ferguson.

Palladino depo Pp. 16, 18, 19.

18. Mike Palladino knew of a previous accident with Mr. Fay from a broken cable on August 8, 2000.

Palladino depo Pp. 19, 20.

19. The cables in question were all to be replaced on all trucks because they were breaking.

Palladino depo Pp. 21, 22.

20. Mr. Palladino knew of other breaks other than Mr. Fay's and Mr. Ferguson's broken cables.

Palladino depo Pp. 22, 23.

21. Mr. Palladino says the problem with the cables was that the cables were breaking where the cable meets the steel crimp as in Ferguson's case.

Palladino depo Pp. 24, 27, 71.

6

Wolf depo P. 9.

29.    If Maintenance Department, when replacing cables, did not have enough they would replace what they had and send the truck out to be used with no recall or notification to finish the job when new cables became available.

Wolf depo Pp. 23, 24, 25.

30.    There was no campaign to inspect cables, Allied just replaced when a truck was in the shop for something else.

Wolf depo P. 25.

31.    Wolf saw three cables broken at the same place before Plaintiff Ferguson's injury.

Wolf depo P. 29.

32.    The cables were never lubricated by Allied or had routine maintenance done.

Wolf depo P. 40.

33.    Allied employees were never instructed how to care for the cables.

Wolf depo Pp. 44-46.

34.    If a driver had requested replacement cables but the Maintenance Department did not have enough cables, the truck would be given back to the driver to use without all the cables replaced.

Wolf depo Pp. 45, 46.

35.    The Safety Director would make the decision to throw away broken cables that were the cause of an accident.  The Maintenance Department wouldn't make that decision.

Wolf depo P. 53.

36.    Mr. Shively, maintenance employee, saw six broken cables personally, usually

lower cables on 30 trucks in his yard.

Shively depo. Pp. 8-22.

37.    Budget problems effected the replacement of the cables.

Shively depo P. 11.

38.    There were not enough cables to replace needed ones.

Shively depo P. 14.

39.    Eventually the design of the cables went to using stainless steel to eliminate

corrosion.

Shively depo P. 17.

40.    Never given instruction for care, maintenance or how to inspect cables.

Shively depo P. 18.

41.    Cables were replaced on availability of new cables.

Shively depo P. 22.

42.    Allied did not provide enough replacement cables to replace the 30 trucks in their

yard.

Shively depo P. 35.

43.    Proper procedures at Allied is to hold a part on a truck that is involved in an

accident.

Weaver depo Pp. 8, 9, 40.

44.    Allied maintenance personnel admit there is no danger in reusing a broken cable.

Weaver depo Pp. 8, 9, 40.

45.    Mike Palladino, Safety Supervisor, told Bill Weaver he, Mike Palladino, had the

cable that injured Plaintiff after the accident.

Weaver depo Pp. 9, 10.

46.    Corporate decided to replace all cables in a conference call with John Taggart, Regional Maintenance Manager in January, February, 1999.

Weaver depo Pp. 12, 13.

47.    Mr. Taggart said that corporate said in a conference call late in January, February, 1999, "There was a rust problem on a cable between the plastic and the joint and fixture, at the crimp, and that we were to replace."

Weaver depo Pp. 13, 14.

48.    Cables were to be replaced because of breaking.

Weaver depo Pp. 14, 15.

49.    There was a problem, corrosion where the vinyl meets metal and all were to be replaced not inspected but replaced January, February, 1999.

Weaver depo Pp. 15, 16.

50.    There was a supply problem getting cables.

Weaver depo P. 17.

51.    From January, February, 1999 to September 7, 2000, not all cables replaced.

Weaver depo P. 19.

52.    If not enough cables, put truck back in service with old cables like the one that injured Mr. Ferguson. **???**

Weaver depo Pp. 19, 20.

53.    All replacement cables came through Allied Parts Center.

10

Weaver depo P. 22.

54.    As of late January, February, 1999, all cables were to be replaced because they were breaking.

Weaver depo P. 25.

55.    No instructions of any kind were given for care, maintenance, and inspection of cables.

Weaver depo P. 27.

56.    No one told Allied employees to inspect cables for corrosion or how to inspect for corrosion.

Weaver depo P. 30.

57.    The new cables have clear plastic coating to see the metal through.  On the old cables as in the Ferguson case, the plastic was painted yellow and you could not see the metal or corrosion.

Weaver depo Pp. 31, 32.

58.    If there were not enough cables on hand to replace all four, replace lower one because drivers used lower ones.

Weaver depo P. 35 and Shively depo

59.    Maintenance at Allied requisition parts from Allied Parts Center.  They are not allowed to order parts from other suppliers.

Weaver depo P. 47.

60.    Mr. Weaver testified:

A.    In the conference call, we were to replace -- and this is specific.  At

11

that time in that conference call, we were told to replace them because there were

rusted areas between the crimping area and the nylon, is where we will see that.

We were not to question it. We were not to check and see if they

were broken or any strands were broken. We were to strictly replace it. Cut and

dried. That's what we were supposed to do, replace it.

Q.    And you were supposed to do that right away?

A.    Do it as soon as we could possibly do it within reason.

Q.    Because they were corroding?

A.    Yes.

Weaver depo Pp. 49-51.

61.    Mr. Ferguson could not examine the cables on this truck because of plastic over

the cables painted yellow by Commercial Carriers, Inc.

Ferguson depo Pp. 33-35.

62.    Mr. Weaver, Head of Maintenance, said he could not buy cables locally but had to

buy through Decatur the company and that is why not all cables were replaced, maintenance

could not get the cables.

Ferguson depo Pp. 35, 36.

63.    Allied was aware of the problem but did not replace the cables even after two

injuries.

Ferguson depo Pp. 48, 49.

64.    The safety cables were put on the trucks to stop people from falling off at the most

dangerous part of the truck to hold on to management told Ferguson.

12

Ferguson depo Pp. 51, 52.

65.    Ferguson, prior to his injury, was never told not to use cables because they were

failing.

Ferguson depo P. 53.

66.    Ferguson stated:

A.    Well, not necessarily due to the fact that you're getting out of this

vehicle, you're being told by your employer that the cables are safe, they're

replacing them, that they're good cables, don't worry about them, if they're on the

truck they're good, they've been checked, they're good. You trust -- I basically say

you would trust your employer that they would be telling you the truth that the

cables would be good. . . .

. . .

A.    I looked at the cable, sir, I looked -- when I looked at the truck,

when I did my walk around I seen it had four cables on it. I had seen that some of

the cables had been replaced. I presumed that whoever replaced those first cables

would have inspected the whole -- the other -- the rest of the one. And if it had

one of the old type on that I would presume that they would have checked to see if

it was okay seeing how that's their job.

Q.    Okay. So you assumed that if there was what would be considered

original equipment, cable on there, that somebody had inspected it and made the

decision that it should stay there?

A.    Sir, there's -- they replaced -- Mr. Weaver and Allied has told us,

13

there's two types of these two cables right here (indicating). They're telling us one has a newer type of steel in it that is better than the old ones we've got. I wouldn't know if this would be the new one or the old one.

Q.    Okay.

A.    They're telling us that this same exact cable has got a newer steel in it, it's made different, and it doesn't rust through like these do and they don't break.

Ferguson depo Pp. 55-58.

67.    Not sure new cables depended on painted.

Ferguson depo P. 59.

68.    Ferguson described the accident as follows:

A.    I hooked the T hook into the elongated slot, took up the slack with my left hand in the chain. They have a special hook that you can take up the slack in the chain.

Q.    Grab hook?

A.    Grab hook. I took the slack in the chain up with the grab hook, put my right hand down on the trailer ramp, which is the slide part of the trailer, it slides in and out. It's like a pan actually. I put my right hand down on that. I went to get up and I put my left -- I had to stick my foot back a little ways because I was down basically hunched into the wheel. I started -- my foot went back, my foot slipped back a little bit and I just out of instinct grabbed the cable, and I lifted up and when I did the cable snapped. When the cable let loose I grabbed the top cable, trying to stop from going, but I couldn't. I was already over the edge of the

14

trailer and that's when I come on down.

Q.    Did you get hold of the top cable at all?

A.    Yes, I did.

Q.    With what hand?

A.    Right hand.

Q.    When you grabbed the lower cable you grabbed it with your left hand?

A.    Yes, sir.

Q.    And did I understand you to say you grabbed it because you were losing your balance?

A.    Not exactly losing my balance.  My foot -- it's kind of hard to explain it for someone who has never loaded a tractor-trailer with car carriers, but I'll try to explain it to you.

There's a gap between the two ramps.  My foot rolled over the front roller, or my tip of my toe went over the roller.  I just instinctively went -- I mean, I wasn't -- I just out of instinct grabbed ahold of the -- placed my hand on to the lower safety cable right -- I'd say just a little ways in front of the upright that holds the cable on.

Q.    Were you doing that to help yourself stand up?  I mean, was that the purpose for it?

A.    Do you mean to pull myself up?

Q.    Yes.

15

A.    No.  I just -- I just put my -- when my foot went down, when my foot slipped down a little ways, I mean, I wasn't going to fall of the truck at that time.  My foot slipped a little bit off of the front where the two decks connect because I was down on my knees, I reached up just instinctively.  When I did, I just put my weight on the cable and the cable let go.  But I was getting up.

Ferguson depo Pp. 63, 64.

69.    Mr. Ferguson explains the accident as follows:

Q.    Why don't you try it again.

A.    Okay, sir.  As I said in my previous statement to the question you asked previously, I looked up, by the time -- yes, I looked up -- they told us they were fixing cables.  I looked up, I saw new cables on one side of the truck, I presumed the cables were good because I knew they had been up there.

If they didn't look at the whole thing and they left one on there that was bad then God help them.  I mean, to me it seemed like if a person fixed three, wouldn't you fix the fourth one?  If you go up there, you know you got three bad ones and it's in the shop, you would presume that they would have looked at the other and said, Well, this one's okay for the time being or they just didn't have the cable to fix it or whatever.  I don't know what their problem was.

Q.    When you're up there securing that vehicle, just prior to your injury, that lower cable was only a couple feet from you, wasn't it?

A.    It would be inches, sir, not feet.  I would say it would probably be inches from my face.  I would say probably less than a foot from my face at times.

16

Q.    I really don't mean to be repetitious, but I just want to understand.

Was your grabbing of that lower cable on the occasion of your fall simply a reflex

to the fact that you were losing your footing?

A.    I would -- that's exactly what I was trying to explain to you.  I

grabbed the cable, just out of reflex -- when I -- I didn't lose my footing.  I stepped

back, there was a gap in between the two trailers, my toe went in, and I was still

getting up and the tip of my toe came off of the deck.  I just went down that few

inches and, out of reflex, I grabbed the cable, put weight on it, and that's when it

snapped.

Ferguson depo Pp. 99-101.

70.    Mr. Ferguson understood from Allied management that the reason for the delay in

the cables was due to ordering the cables from Allied and the cost.

Ferguson depo Pp. 114, 115.

71.    The cost was the reason for the delay in the cables per Mr. Weaver.

Ferguson depo Pp. 114, 115.

72.    Mr. Ferguson stated:

Q.    And the fourth you reasonably anticipated that had been tested and

tested satisfactorily?

A.    Actually, I just presumed that it was replaced with the rest of them

or it would have been good.

Q.    No reason to believe --

A.    -- that it was defective, no, sir.

17

Q.     Who would have done the testing or replacing in the ordinary

course of Allied's business?

A.     I would imagine the shop would have.

Q.     And that's Bill Weaver's folks?

A.     Yes, sir.

Ferguson depo P. 129.

73.    Mr. Ferguson's testimony was that where the cables had been painted, the paint

obscures the metal cable underneath and impairs your ability to see if there has been any

deterioration of the metal.

Ferguson depo P. 157.

74.    Pete Terzain, General Manager of Manufacturing, Commercial Carriers, Inc., until

sold to Allied in 1997.

Terzain depo P. 6.

75.    Between January 1, 1994 and 1997, 861 trailers were manufactured by

Commercial Carriers, Inc., all with cables designed that injured Plaintiff.

Terzain depo Pp. 13, 37.

76.    The cables were made so that drivers could grab onto them and prevent a fall.

Terzain depo P. 56.

77.    Allied assumed the liabilities of all the trailers that had been built by Commercial

Carrier, Inc.

Terzain depo P. 67.

78.    Go over to Allied in Buffalo and see units with original cables on February 11,

2003.

Terzain depo P. 90.

79.    One Hundred manufacturers in the United States could have made the replacement cables.

Defendant Hanes's Answer to Plaintiff's Interrogatory No. 3

80.    Hanes Supply could have made 2,000 replacement cables in six days.

Defendant Hanes's Answer to Plaintiff's Interrogatory No. 3

81.    Allied never notified OSHA of Plaintiff Ferguson's injuries.

PROPOSED CONCLUSIONS OF LAW

1.    This Court has subject matter jurisdiction over the claims and causes of action asserted herein by virtue of the diversity of citizenship statute, 28 U.S. C. § 1332, and the doctrine of pendant or ancillary jurisdiction.

2.    This Court has personal jurisdiction over all parties to this action.

3.    To prove that an intentional tort was committed by an employer against an employee, the employee must show: (I) knowledge by the employer of the existence of a dangerous, process, procedure, instrumentality or condition within its business operation; (ii) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumently or condition, then harm to the employee will be a substantial certainly; and (iii) that the employer, under such circumstances, and with such, did act to require the employee to continue to perform the dangerous task.

4.    In deciding whether there exists a genuine issue of fact, the evidence must be viewed in the nonmovant's favor.

19

5.    Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and deposition, must be construed in a light most favorable to the party opposing the motion.  *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123, 1127.

6.    A genuine issue of material facts exists as to Defendant Allied's knowledge of the existence of a dangerous, process, procedure, instrumentality or condition within its business operations.

7.    A genuine issue of material fact exists that Defendant Allied knew that if an employee was subjected to such dangerous process, procedure, instrumentality or condition then harm to the employee will be a substantial certainty to occur.

8.    That a genuine fact exists that Defendant Allied did act to require employees to continue to perform the dangerous task.

9.    That summary judgment on behalf of Defendant Allied is inappropriate and denied due to genuine issues of fact.

Respectfully submitted,

_____
Thomas R. Koustmer   (0008410)
Attorney for Plaintiff
1800 Federated Building
7 West Seventh Street
Cincinnati, Ohio 45202
(513) 621-3616

_____
Michael J. Honerlaw, Esq.

20

Attorney for Plaintiff
Honerlaw & Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, Ohio 45231

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by electronic transmission to the following this _____ day of September, 2003:

Kenneth Robert Schoeni
Kohnen & Patton
201 E. Fifth Street
Cincinnati, Ohio 45202
(513) 381-0656
Attorney for Defendants, Ryder System Inc;
and Commercial Carriers, Inc.

David E. Larson
Larson & Larson PC
11300 Tomahawk Creek Parkway, Suite 310
Leawood, KS 66211
Attorney for Defendants Ryder System Inc.,
And Commercial Carriers, Inc.

Robert Albert Winter, Jr.
Hemmer Spoor Pangburn DeFrank & Kasson PLLC
250 Grandview Dr., Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
Attorney for Defendants, Allied Systems and
Allied Automotive Group

Craig R. Paulus, Esq.
Taft, Stettinius & Hollister LLP
PNC Center
201 E. Fifth St., Suite 800
Cincinnati, Ohio 45202-3957
Attorney for Defendant Hanes Supply, Inc.

_____
Thomas R. Koustmer
Attorney for Plaintiff

green

21