UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO    03 OCT -3 AM 8:33
WESTERN DIVISION

DAVID FERGUSON, ET AL.            :
                                  :    Case No.  C-1-02-039
        Plaintiffs                :
                                  :    Judge Herman Weber
v.                                :
                                  :    **REPLY MEMORANDUM OF**
RYDER AUTOMOTIVE CARRIER          :    **DEFENDANTS ALLIED**
SERVICES, INC., ET AL.            :    **SYSTEMS, LTD. AND ALLIED**
                                  :    **AUTOMOTIVE GROUP, INC.**
        Defendants                :    **IN FURTHER SUPPORT OF**
                                  :    **THEIR MOTION FOR**
                                  :    **SUMMARY JUDGMENT**
                                  :    **AGAINST PLAINTIFFS'**
                                  :    **COMPLAINT**
                                  :
                                  :    **AFFIDAVITS OF LYNN**
                                  :    **BUCKHALT, RICHARD H.**
                                  :    **SHIVELY AND BILL**
                                  :    **MCDANIEL ATTACHED**

## I.    INTRODUCTION.

This memorandum is provided by defendants Allied Systems, Ltd. and Allied Automotive

Group, Inc. (together, the "Allied Defendants"): (i) in reply to *Plaintiff's* [sic] *Answer To*

*Defendant Allied Systems, Ltd. and Defendant Allied Automotive Group, Inc.'s Hereinafter*

*Allied's Motion for Summary Judgment* (the "Memo Contra") of plaintiffs David Ferguson and

Martha Ferguson (together, the "plaintiffs"), and (ii) in further support of the Allied Defendants'

motion for summary judgment against Counts V (Mr. Ferguson's *Blankenship* intentional tort

claim) and Count VII (Ms. Ferguson's claim for loss of consortium) of plaintiffs' *Second*

*Amended Complaint*.

The gist of plaintiffs' argument in opposition to the motion is that the Allied Defendants should have completed the implemented John Taggart's directive to replace the old style cables well before the date of Mr. Ferguson's accident on September 7, 2000. (Memo Contra, *passim*) However, the most that can be drawn from that "fact" is that the Allied Defendants were merely negligent in implementing his directive. Since the undisputed facts presented by plaintiffs and the inferences therefrom do not rise to the threshold level needed to avoid summary judgment on the *Blankenship* claim, the Allied Defendants' summary judgment motion should be granted and Counts V and VII of the Second Amended Complaint should be dismissed with prejudice.

## II.    DISCUSSION.

### A.    Principles Governing *Blankenship* Intentional Tort Claims.

At the risk of repetition, the Allied Defendants set forth the threshold that plaintiffs must surmount to avoid the grant of summary judgment against them. To show that an intentional tort was committed by an employer against an employee, the employee must show:

> (1) knowledge by the employer of the existence of a dangerous, process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentally or condition, then harm to the employee will be a substantial certainly; and (3) that the employer, under such circumstances, and with such, did act to require the employee to continue to perform the dangerous task. *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, 1109, paragraph 1 of the syllabus.

At paragraph 2 of the *Fyffe* syllabus, the Court further held that:

> To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his

- 2 -

knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk – something short of substantial certainly – is not intent.

To avoid summary judgment, the employee must set forth specific facts which demonstrate a genuine issue of whether the employer had committed an intentional tort. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 102, 522 N.E.2d 489, 492, ¶7 of the syllabus.

These factors mean that evidence beyond that required to prove either negligence or recklessness is necessary to establish an intentional tort by an employer. In fact, it must be shown that the employer specifically desired to injure the employee, or knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded. *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 193, 532 N.E.2d 753, 756. It is not enough that the harm was likely to occur. *Jones v. VIP Development Co.* (1984), 15 Ohio St. 3d 90, 95, 472 N.E.2d 1046, 1051. Nor is it enough that there was a high risk of the harm occurring. *Van Fossen*, 36 Ohio St.3d at 117, 522 N.E.2d at 504. Rather, it must have been substantially certain to occur. *Id.*

**B.    Knowledge of Dangerous Condition.**

To prevail on this motion, Mr. Ferguson must present evidence that the Allied Defendants knew of a dangerous condition, process, procedure, or instrumentality within its business

operation.  The condition complained of must be one which falls outside the inherent dangers of one's job.

Plaintiffs argue *ad nauseam* within the Memo Contra that "in January/February, 1999, [the Allied Defendants] knew of the breaking safety cables and ordered replacement design safety cables to be installed immediately.  However due to budgeting concerns, 19 months later, Mr. Ferguson was injured with one of these old cables."  (Memo Contra 12, for example) Plaintiffs are simply wrong on almost all of those representations.

What Mr. John Taggart, the Allied Defendants' regional maintenance manager, knew and communicated to his terminal maintenance managers, including William C. Weaver of Moraine, Ohio, in late January or early February 1999 during a conference call was that the old style head ramp safety cables were "**corroding**," not breaking, and that they required replacement.  (Weaver dep. 49-50)  Although plaintiffs' counsel attempted to get Mr. Weaver to say during his deposition that Mr. Taggart knew of cables breaking at that time, Mr. Weaver continuously rejected his overtures:

Q.    You said that at the time Mr. [Taggart] . . . said they were rusting, correct?

A.    Look for the rust-colored, yes, sir.

Q.    And that's why they were being replaced, because of corrosion?

A.    Yes.

Q.    Okay.  **Now, did later he say because they were breaking?**

A.    **No.**

Q.    It seemed with your answer you were saying at that time --

A.    In the conference call, we were to replace -- and this is specific.  At that time in that conference call, we were told to replace them because there were rusted areas between the crimping area and the nylon, is where we will see that.  We were not to question it.  We were not to check and see if they were broken or any strands were broken.  We were to strictly replace it.  Cut and dried.  That's what we were supposed to do, replace it.

Q.    **And you were supposed to do that right away?**

A.    **Do it as soon as we could possibly do it within reason.**

Q.    **Because they were corroding?**

A.    **Yes.**  (*Id.* 49-50) (emphasis added)[1]

Mr. Ferguson cannot now change Mr. Weaver's testimony to his own liking when he failed to do so during the deposition.

As discussed at pages 8-9 of the Allied Defendants' Opening Brief, the topic of corroding and rusting cables were the subject of drivers' safety meetings.  At the risk of repetition, drivers like Mr. Ferguson were told on several occasions to "Check your clothes lines.  If you see any problems (plastic pulling away, rusting, etc.) have them replaced.  If you are not sure, have Bill or the shop check them."  (Palladino dep. Exh. O)

The incidents of observing broken cables in the tractor maintenance cycle mentioned by mechanics Richard H. Shively and Frederick Wolf and safety supervisor Mike Palladino did not occur until later on.  Thomas Fay had his fall due to a cable breaking on August 8, 2000.  There has been only one known lawsuit involving a fall from a head ramp of a tractor due as a result of a safety cable, and that is this case. (Affidavit of Bill McDaniel, ¶3)

---

[1] Mr. Palladino, the Moraine terminal's safety manager, did not participate in the conference call and cannot be used by plaintiff at page 4 of the Memo Contra to support what was discussed by the maintenance managers.  He had no first-hand knowledge that any cable had broken prior to the accident.  (Palladino dep. 21)  None of the drivers had complained to him of old style cables breaking.  (*Id.*)  He had only heard on a hearsay basis that cables had broken.  (*Id.*)

Further, it is incorrect for plaintiffs to represent that Mr. Taggart directed the old style cables had to be replaced "immediately." That was merely Mr. Ferguson's timetable. That is the gravamen of his argument in opposition to the Allied Defendants' summary judgment motion. However, the fact that the Allied Defendants did not "immediately" implement Mr. Taggart's directive or was not otherwise to Mr. Ferguson's liking is, at most, negligence for which Mr. Ferguson's exclusive remedy is the Ohio workers' compensation statute. Mr. Ferguson himself acknowledges that the Allied Defendants' activities in implementing the replacement program were merely **"negligent."** (Ferguson dep. 49) In any event, as set forth above and as Mr. Ferguson himself acknowledges at page 4 of the Memo Contra, Mr. Taggart instructed Mr. Weaver and others that the replacement cables were to be installed "as soon as we could possibly do it within reason." (Weaver dep. 50) That does not mean "immediately."

There are valid reasons for Mr. Taggart's instruction. In large companies, new programs do not become implemented overnight. Between 500 and 600 tractors needed replacement cables.[2] (Farrell dep. 41) The Allied Defendants made a business decision to use a single source of supply for repair parts and material as a part of their computerized method of inventory control, purchasing and management.[3] (Ferrell dep. 65; Weaver dep. 14-15, 47) To implement the directive, the maintenance managers ordered replacement cables from that company, and

---

[2]  Plaintiffs represent that Mr. Farrell said that "only 500" trucks required cable replacements. (Memo Contra 5) The truth is that Mr. Farrell actually said that between 500 and 600 tractors required new cables. (Farrell dep. 41)

[3]  The parts company has been known over the years as either Allied Parts Connection, Gill Transportation or Sycamore Parts.

were not authorized to issue purchase orders on their own.[4]  (*Id.*)  Mr. Weaver's department

completed the cable replacements for the tractors stationed in Moraine in fairly short order,

including Mr. Ferguson's regular truck.  (Weaver dep.17, 19, 23)  Thereafter, Mr. Weaver

experienced shortages of replacement cables, as the Marion terminal was being closed, and its

and other terminals' units were being transferred to Moraine.  The manufacturer of the

replacement cable could not keep up with the supply company's purchase orders for new cables

and, notwithstanding plaintiffs' incorrect disparagement to the contrary at page 3 of the Memo

Contra, shortages were experienced by Mr. Weaver based upon supply and demand.[5]  (*Id.* 17)

Mr. Ferguson argues that budgetary reasons were the reason that the Allied Defendants

chose not to replace the old style cables, and relies upon his own testimony and that of a

maintenance mechanic.  (Memo Contra at 3 and 6)  A reading of Mr. Ferguson's testimony

reveals that he has no personal knowledge of the Allied Defendants' budgetary, financial or

business policies or practices with regard to repair parts procurement.  Mr. Shively initially

testified that there were "budget problems."  (Shively dep. 11) However, like Mr. Ferguson, he

has no personal knowledge on the subject:

> Q.    In your earlier testimony you made reference to budget problems that you
>        perceived while working with Allied Systems, correct?
>
> A.   Yes, sir.

---

[4]  Plaintiffs argue at length in the Memo Contra that other suppliers like Hanes Supply could have quickly
manufactured and provided the Allied Defendants with replacement cables upon receipt of a purchase order.
However, that was not the manner in which the Allied Defendants transacted business.  Plaintiff's second guessing
of the Allied Defendants' use of its sole source of supply to obtain repair parts instead of directly negotiating price,
quantity, quality, performance standards and other contract terms is, at worse, mere negligence.

[5]  Plaintiffs represent that

Q.   Would it be correct that you have no personal knowledge as to whether or not budgetary constraints played any factor at all in the program to replace cables?

MR. KOUSTMER:  Objection.

Q.   You can answer.

A    I have no direct knowledge of budget problems. That statement was made based on how regular parts came in.  My gut feeling what that was, my opinion. (*Id.* 27-28)

The aforementioned testimony on budgeting constitutes inadmissible lay opinion and cannot be used as a basis for denying the Allied Defendants' motion for summary judgment. Fed. R. Evid. 701.  Only evidence that can be presented in admissible form at trial may be used to oppose a motion for summary judgment.  *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994).

**C.    Substantial Certainty of Harm.**

The second prong of *Fyffe* requires a showing of knowledge by the Allied Defendants that injury to Mr. Ferguson will be a substantial certainty.  To satisfy this prong, there must be admissible evidence that the Allied Defendants knew of the substantial certainty of injury to Mr. Ferguson as a result of the dangerous condition.

The Allied Defendants were implementing Mr. Taggart's directive to alleviate the rusting and corroding old style cables.  Undaunted by that fact, plaintiffs argue that there was no program in place to remediate the defective cables.  The Allied Defendants' implementation of the Taggart directive and their instructions and warnings provided to their drivers are discussed in detail at pages 4 - 9 of the Opening Brief.  To summarize, the old style cables were being replaced during the normal maintenance cycle and when a driver requested assistance or had a

- 8 -

question. They were also replaced when the maintenance managers sent their mechanics out into the yard to inspect tractors and replace cables that visibly required replacement. The implementation of the Taggart directive, while short of Mr. Ferguson's standards, did not create an environment where an injury to a driver was a substantial certainty. That may have been the case had the Allied Defendants sat back and done nothing in the face of the difficulties experienced with the old style cables.

The tractor in question came to the Moraine terminal from Marion during the closure of the latter and a shifting of units. Unfortunately, it did not receive cable maintenance prior to Mr. Ferguson's accident. This is merely an instance where a tractor proverbially "slipped through the cracks" in implementing the Taggart directive. Indeed, that is the conclusion reached by plaintiffs' trial expert witness on the issue, Gabriel Alexander, P.E.:

Q.   Would you agree with the procedure that if the employer didn't have, for whatever reason, enough cables to replace all of the cables at one time, that the maintenance department was to attempt to identify those cables that did demonstrate the visible signs of corrosion and change those with what stock they did have available?

A.   I would agree with that, but I would also agree that they should come back and finish the job.

Q.   Okay. **So what you're saying, I think, is that this particular cable slipped through the cracks?**

A.   **I would say yes, with regard to being replaced, yes. It appears that way.**

Q.   **On an otherwise system-wide effort to replace them all, right?**

A.   **Yes.** (Alexander dep. 126) (emphasis added)

**D.** __Required Performance Of Dangerous Duties.__

The third prong of *Fyffe* requires a showing of the employer, with knowledge of a dangerous condition and of a substantial certainty of harm, requiring the employee to perform a dangerous task. *Hannah v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 486, 1998 Ohio 408. Under this prong, the employees must show that employer either: (1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and despite this knowledge, still proceeded. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d at 193, 532 N.E.2d at 756 (complaint will be dismissed under Rule 12 where employer located in a high-crime area in Montgomery County failed to equip its stores with security devices or provide its employees with training in handling violent situations, because it did not follow that employer knew that injury to its employees was certain, or substantially certain, to result).

Plaintiffs completely fail on their proof here. There is absolutely no evidence that the Allied Defendants required Mr. Ferguson to load the truck knowing that it had an old style cable installed.

Mr. Ferguson claims that he performed a visual pre-trip inspection of his truck, glanced upward, saw that there were three new replacement cables installed with one older type cable positioned on the driver's side, lower level. (Ferguson dep. 33) He knew that the Allied Defendants had not yet replaced all of the safety cables on every tractor, but he did not bother specifically to check the cables on the driver's side, even though his eyes were literally inches away from the old cable shortly before his accident. (*Id.* 49-50) Notwithstanding being in

- 10 -

extremely close proximity to the allegedly defective part of the cable, Mr. Ferguson could not or did not observe any rust, corrosion, gaps or frazzling and kept on loading the head ramp.

Plaintiff claims that he was not warned about the dangers of the corroding cables, that he was not trained to observe problem cables and that he was not instructed to "shop" his truck if old style cables were found on this tractor. (Memo Contra at 19)  The argument is silly.  At pages 7-8 of the Opening Brief, the Allied Defendants document several drivers' safety committee meetings that Mr. Ferguson attended whereat the rust, corrosion, separation and other problems with the cables were described and discussed.  Although it was not possible for any employee to look through the yellow plastic coating to ascertain if rust and corrosion were beginning to be present (Weaver dep. 32), **Mr. Weaver stated that one could easily see from ground level any significant: (i) cable separation, (ii) rust, and (iii) frazzling.**  (*Id.* 50-51) Mr. Shively was able to see the same characteristics when he inspected tractors in the yard to determine which trucks should be shopped and how many replacement cables would be needed. (Shively dep. 11)  Those kinds of cable defects are precisely what the Allied Defendants told its operators to be on the lookout for and to report to the maintenance department.  It is simply wrong to argue that Mr. Ferguson could not inspect a tractor that he was admittedly unfamiliar with for cable rust, corrosion, separation and frazzling.

Assuming, *arguendo*, which we do not, that it was not possible for Mr. Ferguson to see the defects in the cable at issue on September 7, 2000, due to the yellow paint on the plastic coating, that condition is a two-edged sword.  If Mr. Ferguson could not, neither could the maintenance mechanics.  That is precisely why Mr. Taggart issued the directive that he did.  To again paraphrase his words and their effect upon Mr. Weaver:

- 11 -

[W]e were told to replace them because there were rusted areas between the crimping area and the nylon, is where we will see that. We were not to question it. We were not to check and see if they were broken or any strands were broken. We were to strictly replace it. Cut and dried. That's what we were supposed to do, replace it. (*Id.* 49-50)

Plaintiffs further argue that the Allied Defendants required him to perform a known dangerous task since "[t]here were two types of replacement cables. One was eyebolt and the other was the same design as the original but stainless steel which appeared and was the same as the original design.... I wouldn't know if this would be the new one or the old one." (Memo Contra at 18) It seems that prudence and his training received from the Allied Defendants would have compelled Mr. Ferguson to obtain assistance from the maintenance department, since he admits having a question about whether the cable at issue was an old style cable that needed to be replaced. **The other difficulty with Mr. Ferguson's argument is that the Allied Defendants' sole source parts supplier never received the look-alike, stainless steel replacement cables from their manufacturer for ultimate reshipment to the Allied Defendants until October 9, 2000 -- one month after Mr. Ferguson's accident.** (Affidavit of Lynn Buckhalt, ¶¶3-7) Any replacement cables supplied to the Allied Defendants prior to Mr. Ferguson's accident could only have been of the eyebolt variety, which bore no resemblance to the old style cable. (*Id.* ¶7)

Simply stated, the Allied Defendants never required Mr. Ferguson to operate a tractor with an old style cable. On the contrary, they encouraged operators to "shop" their trucks if they had old style cables and to ask questions when in doubt about the status of their cables. Mr. Ferguson was never bashful in the past to "shop" his tractor if he found a deficiency and he was not reprimanded for doing so. Assuming that Mr. Ferguson is correct in stating that he saw no defect, then it was not possible for the Allied Defendants' mechanics to see the defect. Had Mr. Ferguson brought the cable issue to the forefront on September 7, 2000, prior to the accident, the

- 12 -

cable would have been immediately replaced pursuant to the Taggart directive. After all, there is

no question that replacement cables were on hand at Moraine on that date because the broken

cable was replaced by Mr. Shively on the next day. (Affidavit of Richard H. Shively, ¶2 and

Exh. A at page 7) Plaintiffs fail on the third prong of the *Fyffe* test.

### E.    **Miscellaneous Matters.**

The Memos Contra does not merely deal with the issues arising under *Blankenship*

intentional torts. Plaintiffs also discuss matters that are germane to their ill-fated spoliation of

evidence claim. The Allied Defendants dealt with generally that issue within their *Memorandum*

*. . . in Opposition to the Motion for Summary Judgment of Plaintiffs . . .* , filed September 22,

2003. The Allied Defendants discuss only those matters raised within the Memo Contra.

Plaintiffs represent that "Commercial Carriers, Inc. still exists as a subsidiary of Allied

Systems, Inc. . . , Allied assumed the liability of all the trailers that had been built by Commercial

Carriers, Inc.," and rely in support upon the deposition testimony of Mr. Peter J. Terzian, Jr., a

CCI technical consultant. (Memo Contra at 1 and 3) Half of that representation is correct – CCI

continuously exists as a stand alone corporation. The remainder is not. Plaintiffs provide no

documents to satisfy the statute of frauds provision that all contracts to answer for the debt of

another must be in writing signed by the party to be charged. *See generally* R.C. §1335.05. In

any event, in response to plaintiffs' question with regard to whether "Allied" had assumed CCI's

liabilities, Mr. Terzian flatly stated that "CCI is still responsible for its trailers they built...."

(Terzian dep. 72) There is no legal or factual support for plaintiffs' representation that the Allied

Defendants assumed any liabilities of CCI.

Plaintiffs rely upon an exhibit attached to the affidavit of their attorney for the representation that more than 30 cases have been filed concerning falls from truck while loading them, and that is why the Allied Defendants can "refer to this as the most dangerous occupation." (Memo Contra 1 and 2) This alleged fact has nothing to do with this case other than to confirm that being a tractor operator is a very dangerous job. It was Mr. Ferguson himself who stated that his job is one of the most inherently dangerous jobs in the transportation industry and having nothing to do with litigation. (Ferguson dep. 125)

Furthermore, the reference by counsel is to oral argument made by David Larson, Esq., counsel for the Ryder Defendants, at which time he estimated that the number of personal injury cases was less than thirty in number. However, the actual number of cases involving falls from trucks involving head ramp safety cables is but one – and this case is it. (Affidavit of Bill McDaniel, ¶3) In any event, the "evidence" proffered by counsel cannot be used as a basis for denying the Allied Defendants' motion for summary judgment, since it is not in admissible form, since counsel is not and cannot be a witness at trial in this case and his document, a hearing transcript, has not been properly authenticated. As previously noted, only evidence that can be presented in admissible form at trial may be used to oppose a motion for summary judgment. *Wiley v. United States*, 20 F.3d at 226.

The same fate pertains to plaintiffs' argument that defendants have a joint defense agreement for the same reasons. (Memo Contra at 1) Further, a reading of Exhibit 3, page 35 of the Koustmer Affidavit does not support the proposition asserted.

Plaintiffs bemoan the fact that the Allied Defendants "will not take credit for the design of the cables...." (Memo Contra at 1) They did not design the cables. Even if they did, it would

do no good for plaintiffs, as their product liability claim for the design of the cables would be subsumed by the exclusive remedy provision of the Ohio workers' compensation act. R.C. 4123.74; *Schump v. Firestone Tire and Rubber Co.* (1989), 44 Ohio St.3d 148, 151, 541 N.E.2d 1040, 1044 ("It is universally held that where an employer designs and manufactures a product for use by its employees and not for sale to the general public, an employee injured while using that product within the scope of his employment may not maintain a products liability action against his employer under the dual-capacity doctrine on the theory that the employer assumed an independent role as manufacturer.").

Finally, plaintiffs argue that the Allied Defendants had a motive to eliminate the broken cable by representing that they share a parent corporation with CCI and that "a loss to CCI's bottom line is the same as a loss to Allied's bottom line." (Memo Contra at 2) The Allied Defendants acknowledge that they and CCI were affiliated companies in that each was owned by their ultimate parent company, Allied Holdings, Inc. (Affidavit of Scott Macaulay, ¶7) However, the disposition of the broken cable was done without any thought given to any corporate affiliation between the Allied Defendants and CCI. The maintenance mechanic who replaced the broken cable on Mr. Ferguson's tractor on September 8, 2000, Richard H. Shively, relates that: (i) though he has no present recollection of disposing of the broken cable, it would have been his standard maintenance practice to cut the cable up and discard it, (ii) he has no reason to believe that the cable he had removed from the tractor was treated in any manner other than his standard practice, and (iii) he would not have cut up and discarded the broken cable because of any relationship that CCI might have with the Allied Defendants. (Affidavit of Richard H. Shively aff. ¶¶4 and 6)

- 15 -

Frankly, it is preposterous for plaintiffs to argue that Messrs. Weaver and Shively knew of and appreciated the corporate relationship between the Allied Defendants and CCI, and that the relationship played any role in their behavior with regard to the disposition of the broken cable. Plaintiffs have argued in prior memoranda in this case that the relationships of Allied Holdings, Inc. and others discussed within *Gruber v. Ryder System, Inc.*, Case No. 99-310-DRH (S.D. Ill. *Order*, filed March 15, 2000) (Koustmer aff., Exh. 2 thereto at page 4), are deliberately confusing -- even among educated persons like attorneys. **Yet plaintiffs expect a maintenance mechanic stationed at a terminal in Moraine, Ohio to know about, understand and appreciate those corporate relationships in deciding how to handle the disposition of the broken cable from Mr. Ferguson's truck! That is implausible.** There is no evidence that Mr. Shively (or Mr. Weaver for that matter) talked either directly or indirectly with anyone having any knowledge or appreciation of the corporate affiliation between the Allied Defendants, Allied Holdings, Inc. and CCI.

The reason the broken cable off Mr. Ferguson's tractor was discarded was Mr. Shively's compliance with the Taggart directive. That is the reason that plaintiffs seem continuously to miss when arguing that a cable is discarded for no apparent reason when it was the policy of the company to keep any part that was involved in an injury. (Memo Contra at 3)

## IV.    CONCLUSION.

For the reasons set forth above, the Memo Contra provides no genuine issue of material fact to preclude the grant of summary judgment in favor of the Allied Defendants on Counts V and VII of plaintiffs' *Second Amended Complaint*. Consequently, the Court should grant their summary judgment motion and dismiss those counts with prejudice.

Robert A. Winter, Jr. (0038673)
250 Grandview Drive, Suite 200
Ft. Mitchell, KY 41017
(859) 344-1188
(859) 578-3869 (fax)
Trial attorney for defendants
Allied Systems, Ltd. and
Allied Automotive Group, Inc.

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing were served by depositing the same into the United States Mails, first class postage prepaid, on this 2nd day of October 2003, to:

Thomas R. Koustmer, Esq.
1800 Federated Building
7 West Seventh Street
Cincinnati, OH 45202

Michael J. Honerlaw, Esq.
Honerlaw and Honerlaw Co., L.P.A.
9227 Winton Road
Cincinnati, OH 45231

K. Roger Schoeni, Esq.
Kohnen & Patton LLP
PNC Center, Suite 800
201 East Fifth Street
Cincinnati, OH 45202

David E. Larson, Esq.
Larson & Larson PC
11300 Tomahawk Creek Parkway
Suite 310
Leawood, KS 66211

Craig R. Paulus, Esq.
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202

Robert A. Winter, Jr.

s:\dma\allied\ferguson\pleadings\reply memorandum2.wpd