1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4    - - - - - - - - - - - - - -
     DAVID FERGUSON, et al.,      :

5                                 :
                                  :
6          Plaintiffs,            :
        vs.                       :   Case No. C-1-02 039
7                                 :   (Judge Herman J. Weber)
     RYDER SYSTEM, INC., et       :
8    al.,                         :
                                  :
9          Defendants.            :
     - - - - - - - - - - - - - -

10

11

12          Deposition of MIKE PALLADINO, witness

13   herein, called by the plaintiffs for

14   cross-examination, pursuant to the Federal Rules of

15   Civil Procedure, taken before me, Wendy L. Welsh, a

16   Registered Diplomate Reporter and Notary Public in

17   and for the State of Ohio, at the offices of Kohnen

18   & Patton, 1400 Carew Tower, Cincinnati, Ohio, on

19   Thursday, November 21, 2002, at 9:46 a.m.

20

21

22

23              **ORIGINAL**

24

2

```
 1  APPEARANCES:

 2       On behalf of the Plaintiffs:

 3           Thomas R. Koustmer, Esq.
             The Federated Building
 4           7 West Seventh Street, Suite 1800
             Cincinnati, Ohio  45202
 5           Phone:  (513) 621-3616

 6           Michael J. Honerlaw, Esq.
             9227 Winton Road
 7           Cincinnati, Ohio  45231
             Phone (513) 931-2200

 8

 9       On behalf of the Defendant Hanes Supply:

10           Craig R. Paulus, Esq.
             Taft, Stettinius & Hollister LLP
11           425 Walnut Street
             Suite 1800
12           Cincinnati, Ohio  45202
             Phone:  (513)381-2838

13

         On behalf of the Defendants Allied Systems,
14       Inc. and Allied Automotive Group:

15           Robert A. Winter, Jr., Esq.
             Hemmer Spoor Pangburn DeFrank PLLC
16           Suite 200 250 Grandview Drive
             Ft. Mitchell, Kentucky  41017
17           Phone:  (859) 344-1188

18       On behalf of the Defendant Commercial Carriers,
         Inc.
19
             David E. Larson, Esq.
20           Larson & Larson
             11300 Tomahawk Creek Parkway, Suite 310
21           Leawood, Kansas  66211
             Phone:  (913) 253-3100

22
         Also present:
23       Mr. David Ferguson, Plaintiff
         Pete Terzian, Jr.
24                          - - -
```

3

# S T I P U L A T I O N S

1
2
3     It is stipulated by and among counsel for the

4  respective parties that the deposition of MIKE

5  PALLADINO, witness herein, called by the plaintiffs

6  for cross-examination pursuant to the Federal Rules

7  of Civil Procedure, may be taken at this time by the

8  notary; that said deposition may be reduced to

9  writing in stenotype by the notary, whose notes may

10  then be transcribed out of the presence of the

11  witness; and that proof of the official character

12  and qualifications of the notary is expressly

13  waived.

14
                             - - -
15
16
17
18
19
20
21
22
23
24

4

**I N D E X**

Examination                              Page

Mr. Koustmer . . . . . . . .   7, 86

Mr. Paulus . . . . . . . .        80

Mr. Larson . . . . . . . .        85

Mr. Winter . . . . . . . .        88

                - - -


**E X H I B I T S**

                                         Page


Plaintiffs' Exhibit A ..................   24
Plaintiffs' Exhibit B ..................   25
Plaintiffs' Exhibit C ..................   26
Plaintiffs' Exhibit D ..................   26
Plaintiffs' Exhibit E ..................   27
Plaintiffs' Exhibit F ..................   27
Plaintiffs' Exhibit G ..................   28
Plaintiffs' Exhibit H 1  - H 5..........   28
Plaintiffs' Exhibit I ..................   38
Plaintiffs' Exhibit J ..................   54
Plaintiffs' Exhibit K ..................   68
Plaintiffs' Exhibit L ..................   68
Plaintiffs' Exhibit M ..................   68
Plaintiffs' Exhibit N ..................   68
Plaintiffs' Exhibit O ..................   68
Plaintiffs' Exhibit P ..................   68
Plaintiffs' Exhibit Q ..................   27
Plaintiffs' Exhibit Palladino R  .......   82
Plaintiffs' Exhibit Palladino S ........   84

                - - -

5

1          MR. KOUSTMER:  Just for the record, let me

2     put this on the record.  Sitting in front of us

3     are a couple of cables to supplement discovery.

4     These were given to our client by a George

5     Foster on Monday and our client gave them to

6     Mike Honerlaw who then gave them to me, and

7     instead of calling everyone on Wednesday I just

8     decided that I'd bring them here and everybody

9     could look at them.  It's not the cable in

10    question, but it's cables.

11         So if anyone wants to look at them, or we

12    can decide how we want to keep them.  If

13    anybody wants to get them tested, or whatever,

14    we can go through that process too, but there's

15    two cables.  One's broken and one's not.

16         What the significance of them are to this

17    case, I don't know, but I'm supplementing

18    discovery saying that I think there were some

19    discovery requests:  Did anybody have a cable?

20    We asked Allied if they had any cables that

21    were broken to take a look at, they said they

22    didn't have any.  Somehow George Foster got

23    these.  I don't know how that happened, but it

24    happened and they're here.  If anybody wants to

6

1       look at them, take a look at them.

2            MR. LARSON:  Who is George Foster?

3            MR. KOUSTMER:  I think he's a union rep.

4            MR. HONERLAW:  Business agent.

5            MR. KOUSTMER:  Business agent of the

6       teamsters.  I don't know him personally.  He

7       gave them to our client and he gave them to us.

8            MR. PAULUS:  Are you going to hang on to

9       those after today?

10           MR. KOUSTMER:  We can discuss how we want

11      to do it.  They've been in my possession since

12      yesterday when Mike brought them down.  I can

13      keep them in a safe place.

14           MR. PAULUS:  I think that would be great.

15           MR. KOUSTMER:  Allied can keep them in a

16      safe place or we can designate who wants to

17      keep them.  If anybody wants to get them tested

18      for metal or whatever, they can.

19           MR. PAULUS:  I'll get back to you about

20      that.

21           MR. KOUSTMER:  Okay.  In the meantime,

22      I'll keep them unless after the depos you guys

23      want to talk about somebody else taking them.

24      I can keep them in a safe place in a locked

1    file cabinet.  I don't know how much relevancy

2    there is to them, but they're here.  Somebody

3    might have asked for them in discovery so we're

4    getting out all the truth.

5        MR. WINTER:  We'll talk about it after

6    Mr. Palladino's deposition.

7        MR. KOUSTMER:  That's good.  So we're

8    ready.  Let me give you guys things that I

9    might use as exhibits, I might not, but I want

10    to give copies to everybody.

11                    MIKE PALLADINO

12  being by me first duly cautioned and sworn, deposes

13  and says as follows:

14                    CROSS-EXAMINATION

15  BY MR. KOUSTMER:

16        Q.    State your name and spell your last name.

17        A.    Mike Palladino, P-A-L-L-A-D-I-N-O.

18        Q.    And what's your date of birth, Mike?

19        A.    12/1/62.

20        Q.    And your Social Security number?

21        A.    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.

22        Q.    And what is your home address?

23        A.    4120 Locus Bend Drive, Dayton, Ohio,

24  45440.

8

```
1        Q.    And what's your work address?

2        A.    It's 3200 Springboro Pike, Moraine, Ohio.

3        Q.    Have you ever been deposed before?

4        A.    No.

5        Q.    I'm sure you've talked to counsel for the

6   company, but just to let you know that you have to

7   answer "yes" or "no" or audibly.  Shaking of the

8   head is not going to be able to be recorded by the

9   court reporter and she's taking down whatever we

10  say.  So if you can do that.  Also yeah, nah, uh-huh

11  really doesn't come off very well, so "yes" and "no"

12  would be better.

13            If for any reason you don't understand a

14  question I ask, ask me to rephrase it or have the

15  court reporter read it back to you and she'll do

16  that or I'll rephrase the question.  If you answer

17  it, I'm going to assume that you understood the

18  question.  Is that fair?

19       A.    Yes.

20       Q.    Also, if you want to take a break at any

21  time to talk to your counsel, feel free to do so.

22  This is not an endurance test.  If you need to go to

23  the bathroom or get a cup of coffee or water or

24  anything, just let me know and we'll take a break.
```

9

1   Okay?

2       A.   Yes.

3       Q.   Can you just start with giving me a brief

4   description of your education.  Where did you go to

5   high school?

6       A.   Connellsville High School in Pennsylvania.

7       Q.   Did you graduate from there?

8       A.   Yes.

9       Q.   Did you go to college or have any college

10  training or technical training beyond high school?

11      A.   No.

12      Q.   Did you serve any time in the military?

13      A.   No.

14      Q.   After you got out of high school, what was

15  your first job?

16      A.   Worked in a grocery store.

17      Q.   How long did you do that?

18      A.   About five months.

19      Q.   Where did you go from there, your next

20  job?

21      A.   M&G Convoy.

22      Q.   And what was that job?

23      A.   That was a car hauling business.

24      Q.   Were you an actual car hauler or did you

1    work in administration or what was your job?

2        A.    I was in supervision.

3        Q.    Did you get any training for that?

4        A.    Before taking the job or during the course

5    of the job?

6        Q.    Before taking the job.

7        A.    No.

8        Q.    Okay.  After taking the job?

9        A.    Yes.

10        Q.    What was that?

11        A.    It just depended on -- the first job I had

12    there was an inspector and they have to teach you

13    how to inspect the vehicle.

14        Q.    So you were inspecting vehicles?

15        A.    Initially, yes.

16        Q.    How long did you do that?

17        A.    To the best of my recollection, two years.

18        Q.    And where was that job located?

19        A.    That was New Stanton, Pennsylvania.

20        Q.    Did you graduate to another job with that

21    company or did you move?

22        A.    I went to rail supervisor.

23        Q.    What does a rail supervisor do?

24        A.    Supervise the loading of the outbound

11

1  railcars.

2          MR. LARSON:  Can you speak up just a

3      little bit, Mike?

4          THE WITNESS:  Yes.

5          MR. LARSON:  Thank you.

6  BY MR. KOUSTMER:

7      Q.    How long did you do that job?

8      A.    I believe until probably about February of

9  1998.

10      Q.    When did you start as a rail supervisor?

11      A.    Well, I was hired on November 3rd of 1980,

12  and to the best of my recollection, I was an

13  inspector for two years, and then I became a rail

14  supervisor.

15      Q.    So you did that until February of '98, and

16  where did you go from there?

17      A.    No, of '88, 1988.

18      Q.    Oh, I'm sorry.  Where did you go from

19  there?

20      A.    I went to Lordstown, Ohio.

21      Q.    And who was that with?

22      A.    M&G Convoy.

23      Q.    What did you do at Lordstown?

24      A.    I was a supervisor.

1    Q.    Supervisor of what or just --

2    A.    Truck away, outbound truck away and also

3 outbound rail.

4    Q.    What does a supervisor of outbound truck

5 away do?

6    A.    We had -- it was a storage facility and it

7 was a short term.  It was a temporary site.  I

8 believe I was there 10 months, and it was just

9 making sure that the units were parked where they

10 were supposed to be parked, and they were put on --

11 you know, dispatched the loads to the drivers.

12    Q.    Did you inspect for anything to do with

13 safety?

14    A.    No.

15    Q.    How long were you at Lordstown in that

16 capacity?

17    A.    To the best of my recollection, about 10

18 months.

19    Q.    Then where did you go?

20    A.    Georgetown, Kentucky.

21    Q.    Is that for the same company?

22    A.    It was Commercial Carriers, which was a

23 division.

24    Q.    What did you do in Georgetown?

13

1    A.    Mostly dispatcher, payroll.

2    Q.    How long were you at Georgetown?

3    A.    Six years.

4    Q.    In the same capacity?

5    A.    Well, in Georgetown I was a dispatcher in

6  payroll.

7    Q.    That was the title you had?

8    A.    Well, the title was just operations

9  supervisor, but that's the job function I had.

10    Q.    So you were there six years.  Where did

11  you go from there?

12    A.    Moraine, Ohio.

13    Q.    And who did you work for at Moraine?

14    A.    My immediate supervisor?

15    Q.    Well, what company?

16    A.    Oh, it was with Commercial Carriers.

17    Q.    Are you still with them?

18    A.    It's Allied Systems.

19    Q.    When did it change from Commercial

20  Carriers to Allied Systems?

21    A.    I believe it was in the fall of 1997.

22    Q.    And what were your job duties there at

23  Moraine when you first got there?

24    A.    I was check-in, check-in department.

1  Q. What does the check-in department do?

2  A. When the drivers come back from a trip

3 they turn in their delivery receipts and their logs

4 and their tolls.

5  Q. So you were doing the paperwork for the

6 drivers as they came back?

7  A. Correct.

8  Q. Did you have anything to do with safety

9 there?

10  A. No.

11  Q. How long did you do that job?

12  A. Less than a year.

13  Q. Then what did you do?

14  A. Became the quality supervisor.

15  Q. So that would be sometime in 1998 you

16 became the quality supervisor?

17  A. No, that would have been the end of 1995

18 or 1996.  I don't know the exact time.

19  Q. What does a quality supervisor do?

20  A. We handle damages on the cargo vehicles,

21 any type of damage to a new cargo unit, I would be

22 involved in it.

23  Q. So if a driver damaged a new car at

24 delivery point or in the yard, you would fill out

15

1 reports or --

2       A.    Yeah, I would fill out a report if

3 necessary, talk to the driver, interview the driver

4 as to how the damage occurred, how it could be

5 prevented.

6       Q.    How long were you the quality supervisor

7 there at Moraine?

8       A.    That hasn't been taken away from me since.

9       Q.    So you still do that job?

10       A.    Correct.

11       Q.    Were you given other responsibilities

12 other than quality supervisor?

13       A.    At Moraine?

14       Q.    Yes.

15       A.    Nothing -- unless somebody was off for a

16 day or to fill in, but nothing long term.

17       Q.    By "fill in," you would drive the trucks?

18       A.    Oh, no.

19       Q.    Fill in in the office, is that what you

20 mean?

21       A.    Correct.

22       Q.    When this accident happened on 9/7 of

23 2000, what were your duties?

24       A.    I was the quality and the safety

1  supervisor.

2        Q.    When did you become the safety supervisor?

3        A.    I first got involved in safety in Marion,

4  Ohio in the spring of 1998.

5        Q.    And what does the safety supervisor do?

6        A.    Safety supervisor does any paperwork

7  involved in accidents, injuries, and conducts

8  meetings to prevent accidents and injuries.

9        Q.    So you started that job in the spring of

10  '98?

11        A.    Correct.

12        Q.    Did you have that job on 9/7/2000?

13        A.    Yes.

14        Q.    What are you currently doing?

15        A.    Quality and yard.

16        Q.    You're not the safety supervisor anymore?

17        A.    No.

18        Q.    When did you stop being the safety

19  supervisor?

20        A.    Within the last two months.

21        Q.    As the safety supervisor, you were

22  involved in this accident on 9/7/2000?

23        A.    Correct.

24        Q.    Tell us briefly what you did.

17

1    A.    I don't totally understand that.

2    Q.    Well, an accident occurred on

3  9/7/2000 involving Mr. Ferguson, correct?

4    A.    Yes.

5    Q.    What steps did you do after the accident?

6  How was it reported to you and then what did you do?

7    A.    The first knowledge I had of it was Dave

8  told me about it.

9    Q.    Where did it occur?

10   A.    It occurred on our south lot on Springboro

11  Pike in Moraine, Ohio.

12   Q.    What did Dave tell you?

13   A.    Dave initially told me that he fell off

14  his truck.

15   Q.    Did you ask him how?

16   A.    I'm sure I would have.

17   Q.    Do you remember the conversation you had

18  with Mr. Ferguson?

19   A.    Yes.

20   Q.    What was the conversation?

21   A.    I can't remember word for word, but it was

22  to the effect that Dave said he fell off his truck,

23  and obviously I would have asked him, how are you

24  and are you okay and that type of thing, but I can't

1  remember word for word.

2      Q.    Do you remember basically what he said?

3      A.    He said he had fell off the head rack.  He

4  said he had hurt -- he had hit his back.  And he

5  said he felt like he was okay and that he could

6  continue working.

7      Q.    Did he continue the work?

8      A.    Yes.  Me and Dave both went over to his

9  rig, because I was in another part of the yard, and

10 we looked at his rig.

11     Q.    And what did you see?

12     A.    I seen a unit on the head rack, backed on,

13 and I saw one of the cables broken.

14     Q.    Do you remember what cable it was that you

15 saw broken?

16     A.    To the best of my recollection, it was the

17 driver's side of the rig, the bottom cable.

18     Q.    What did Mr. Ferguson say about the cable?

19     A.    Nothing that I can remember.

20     Q.    What did you do with the truck?  Was

21 anything done with the truck?

22     A.    At that point?

23     Q.    Yes.

24     A.    No.

1     Q.    At some other point was something done?

2     A.    I don't know what would have been done

3  after that.   I have no knowledge of what was done.

4     Q.    Do you know if the cable was replaced?

5     A.    I don't know that.

6     Q.    Are these cables called clothes lines?

7     A.    They've been referred to as clothes lines.

8     Q.    The one that broke, correct?

9     A.    Yes, it could -- they have been referred

10  to as clothes lines.

11     Q.    Did you see where it was broken?

12     A.    I can't recall.

13     Q.    Had there been previous accidents

14  involving the cables?

15     A.    Yes, but I don't know the specific --

16     Q.    Do you know if anyone else was injured by

17  a cable breaking?

18     A.    Yes, I do.

19     Q.    Can you tell us who that was?

20     A.    Thomas Fay.

21     Q.    Fay?

22     A.    Correct.

23     Q.    F-A-Y-E?

24     A.    No, just F-A-Y.

20

1     Q.   Do you know when that was?

2     A.   That was on August 8th of 2000.

3     Q.   And what happened with Mr. Fay?

4     A.   One of the cables broke.  I believe -- one

5 of the cables broke.  Which cable, I'm not totally

6 sure.

7     Q.   Was Mr. Fay injured?

8     A.   Yes.

9     Q.   Do you know how he was injured?

10    A.   No.

11    Q.   Do you know what his injuries were?

12    A.   No.

13    Q.   You just know that a cable broke and he

14 was injured?

15    A.   Correct.

16    Q.   Do you know any other specifics concerning

17 that?

18    A.   I know it occurred -- where it occurred.

19    Q.   Where did it occur?

20    A.   It occurred in the north yard in Moraine,

21 Ohio.

22    Q.   Anything else you know about that

23 accident?

24    A.   Nothing that I can recollect.

1     Q.    Do you know of anyone else that was

2  injured by a cable that broke?

3     A.    No.

4     Q.    Do you know of other cables breaking?

5     A.    No.  I mean, maybe you can let me back up

6  on that one.

7     Q.    Okay.

8     A.    Specific cases of cables breaking?

9     Q.    Yes.

10    A.    No, I don't.

11    Q.    Generally, do you know of cables breaking?

12    A.    Yes.

13    Q.    Had that been a complaint of the drivers?

14    A.    No.

15    Q.    Were the cables in the process of being

16  replaced?

17    A.    Yes.

18    Q.    On all the trucks or just some of the

19  trucks?

20    A.    They were supposed to be replaced on all

21  the trucks.

22    Q.    Do you know why?

23    A.    Because we were having some problems with

24  them failing.

22

1   Q.   What problems were you having with them

2 failing?

3   A.   Breaking.

4   Q.   How long had this been going on?

5   A.   I don't know.

6   Q.   Do you know how long prior to 9/7/2000?

7   A.   No.

8   Q.   It had been the subject of safety

9 meetings?

10   A.   Yes.

11   Q.   Did you fill out a report as it relates to

12 the accident with Mr. Ferguson?

13   A.   Yes.

14   Q.   Did you fill out a report as it relates to

15 the accident with Mr. Fay?

16   A.   Yes.

17   Q.   Do you remember filling out any other

18 reports as it related to accidents involving the

19 cables other than Mr. Fay and Mr. Ferguson?

20   A.   No.

21   Q.   Were there any other accidents after

22 Mr. Ferguson's, involving the cables?

23   A.   Not that I can recollect.

24   Q.   Now, you said they were in the process of

23

1   being replaced.  Was there a written procedure

2   involved in the replacement of them?

3        A.   I don't know.

4        Q.   Who told you about the replacement?

5        A.   I don't understand the question.

6        Q.   Well, you said you knew there was a

7   problem with them and they were in the process of

8   being replaced, but there wasn't a written

9   procedure.  So did someone verbally tell you about

10  replacing them?

11       A.   I was in Marion for two and a half years

12  and I know our shop along with the Moraine shop were

13  replacing the cables.

14       Q.   Do you know, was it just that they were

15  replacing them all or they were replacing just ones

16  with problems, or did they have a written or verbal

17  procedure of how they were being replaced?

18       A.   They were replacing all the cables, and

19  whether there was a written procedure or not, I

20  don't know.

21       Q.   Do you know where they were getting the

22  cables from to replace?

23       A.   No.

24       Q.   Was there a new design for the cables?

1      A.    I don't know.

2      Q.    Do you know where the cables were having

3  the problems?

4      A.    To the best of my knowledge, they were

5  having the problems where they meet the end here

6  (indicating).

7      Q.    Okay.  That's one of our problems in doing

8  a deposition.  When you point to something and we

9  don't have it marked as an exhibit, we can't really

10  refer back to that when the judge asks us something.

11  Okay?

12      A.    All right.

13      Q.    Let me show you some of these exhibits and

14  see if we can pin it down.  This is Exhibit A.  Let

15  me give you the original.  Plaintiffs' Exhibit A.

16                          (Plaintiffs' Exhibit A
                            was marked for identi-
17                          fication.)

18      Q.    Do you recognize that as the truck that

19  Mr. Ferguson was injured on?

20      A.    No, I can't say that's the truck he was

21  on.

22      Q.    Did you take any photographs of the truck

23  that he was injured on?

24      A.    No.

1      Q.    Do you know of anybody that took any

2  photographs?

3      A.    No.

4      Q.    Exhibit A shows a cable that's broken, a

5  lower cable that's broken.  And you're saying they

6  broke -- they were breaking, they were having

7  problems where it meets here (indicating), meets

8  here, the cable meets here with the steel part; is

9  that correct?

10      A.    Yes.

11           MR. WINTER:  Just for identification, let

12      the record reflect the part that Mr. Koustmer

13      just referred to has been annotated in red ink.

14      Q.    That's where they were having the

15  problems, where it's in red ink?

16      A.    Correct.

17      Q.    Also Exhibit B, I think even, shows it

18  better if we can mark it.

19                         (Plaintiffs' Exhibit B
                           was marked for identi-
20                         fication.)

21      Q.    It was right here where they were having

22  the problems (indicating)?

23      A.    Yes.

24           MR. WINTER:  Let the record reflect that

26

1    that point that Mr. Palladino just spoke of has

2    been annotated in red ink.

3                              (Plaintiffs' Exhibit C
                              was marked for identi-
4                              fication.)

5    Q.    We'll circle it again.    Exhibit C, it's

6    right here where we're going to circle with the red

7    ink so Mr. Winter doesn't have to tell us.    Right

8    there is where they were having the problems

9    (indicating)?

10    A.    Yes.

11                              (Plaintiffs' Exhibit D
                              was marked for identi-
12                              fication.)

13    Q.    While we're looking at these, Exhibit D

14    shows one that's broken, and you would say that

15    that's where the problems were happening?

16    A.    Yeah.    If that piece right there is this

17    piece (indicating), yes.

18    Q.    What you're referring to is here

19    (indicating)?

20    A.    Yes.

21    Q.    And this is where they were breaking?    Why

22    don't we mark this.    We'll mark it and get a

23    photograph of it.

24

1                              (Plaintiffs' Exhibit Q
                               was marked for identi-
2                              fication.)

3     Q.    I'll show you Plaintiffs' Exhibit Q, which

4  is an actual cable.  And you're saying where this

5  one broke is where they were having problems with

6  them?

7     A.    Yes.

8          MR. PAULUS:  Just so the record is clear,

9      Exhibit Q is a cable, but not the cable that

10     broke in Mr. Ferguson's case.

11          MR. KOUSTMER:  That's correct.

12                             (Plaintiffs' Exhibit E
                               was marked for identi-
13                             fication.)

14     Q.    Same as, then, Plaintiffs' Exhibit E,

15  since we have it marked, it shows it broken there

16  and that's the place where they were having

17  problems?  Again, it shows the broken cable?

18     A.    If it's the same as what we just talked

19  about, yes.

20                             (Plaintiffs' Exhibit F
                               was marked for identi-
21                             fication.)

22     Q.    And Plaintiffs' Exhibit F shows they were

23  breaking right where that one broke, correct?

24     A.    To the best of my knowledge, correct.

1    Q.    Do you know how many broke or --

2    A.    No.

3    Q.    Now, when they were replacing them, what

4   were they replacing them with?

5    A.    New cables.

6    Q.    The same design or a different design?

7    A.    I don't know.

8                            (Plaintiffs' Exhibit G
                            was marked for identi-
9                            fication.)

10    Q.    You don't know.  I'll show you Plaintiffs'

11   Exhibit G.  Were they replacing them with this type

12   of design on the cable?

13    A.    I don't know.

14    Q.    You don't know that?

15    A.    (Shaking head.)                        .

16                            (Plaintiffs' Exhibits H
                            1 - H 5 were marked for
17                            identification.)

18    Q.    Let me show you Plaintiffs' Exhibit H and

19   ask you if this is the report you filled out?

20    A.    Yes.

21    Q.    That's your signature on the report?

22    A.    Yes.

23    Q.    Do I have all the pages that would be on

24   the report or am I missing something?

1          MR. WINTER:  Let me take a peek at this

2     document.

3          Take a look at it.  He's asking you if

4     that's yours.

5     A.    This is my report, this is Dave Ferguson's

6 report, this is my report, this is my report, and

7 this is Dave Ferguson's report.

8     Q.    Let's mark those because there's several

9 of them together, okay?  So the first page, we'll

10 just call it H 1, is your report, correct?

11     A.    Yes.

12     Q.    The second page, we'll call it H 2, that's

13 Mr. Ferguson's report?

14     A.    Correct.

15     Q.    H 3 is your report?

16     A.    Yes.

17     Q.    Okay.  H 4 is your report?

18     A.    Yes.

19     Q.    And H 5 would be Mr. Ferguson's report?

20     A.    Yes.

21     Q.    Now, is there anything else to the report

22 that you would fill out as a safety supervisor than

23 what we have here?

24     A.    Yes.  There's one form that's a release of

30

1  medical information that I don't see in there.

2      Q.    What does that do?

3      A.    The employee signs it and it gives us the

4  right to look at the medical information.

5      Q.    Where does this report go?

6      A.    It would go to our haul risk management in

7  Decatur, Georgia.

8      Q.    When did you fill this out?

9      A.    The same day that the injury occurred.

10     Q.    And the time of injury was 10:15 it looks

11 like?

12     A.    Correct.

13     Q.    And you have here that he received medical

14 attention?

15     A.    Yes.

16     Q.    Do you remember that?

17     A.    Yes.

18     Q.    When did he go to get medical attention?

19     A.    He went, to the best that I can remember,

20 he went that day, but I don't believe he went to

21 Kettering Workers Care.  I believe he went to the

22 hospital, I believe.

23     Q.    But you said earlier that when he first

24 reported the accident to you he said he fell from

1    the truck, that he thought he could keep working,

2    and I thought you said he kept working?

3        A.    Yes, he did.

4        Q.    For how long?

5        A.    Approximately, to the best that I can

6    remember, half-hour, 20 minutes.

7        Q.    Then he came back to your --

8        A.    -- office.

9        Q.    And what did he say then?

10       A.    That his back was hurting.

11       Q.    So you told him to go to Kettering or to

12   the hospital?

13       A.    Kettering Workers Care is where we

14   normally send our employees that are injured on the

15   job unless it's something serious, then obviously

16   they go to the emergency room.

17       Q.    You don't know if he went to Kettering or

18   the emergency room?

19       A.    I don't know that.

20       Q.    Did an ambulance come get him or was he

21   driven there or how did he get there, if you know?

22       A.    An ambulance -- I didn't see an ambulance.

23       Q.    But he did leave work and go to some

24   medical facility?

1      A.   Yes.

2      Q.   Within about half an hour to an hour after

3  the accident?

4      A.   I don't know that.

5      Q.   Well, you said he came and reported to you

6  that his back hurt about 20 to 30 minutes after your

7  first conversation with him?

8      A.   Correct.

9      Q.   Once he said his back hurt, did he then go

10  from there to the medical facility, whichever one it

11  was?

12      A.   He went, but I don't know if he went

13  immediately.

14      Q.   Now, in your report you have written, How

15  did injury occur?  Do you want to look at that.  You

16  say "Kneeling on both knees on headrack.  Inserting

17  hook in rear tiedown.  Left hand was on lower

18  headrack cable.  Cable broke.  Driver fell to

19  ground.  Landed on feet, but back struck," rack?  Is

20  that what that says?

21      A.   Rail.

22      Q.   -- "rail on the way to the ground.  Pain

23  in middle of lower back."  Was that what was

24  referred to you by Mr. Ferguson?

1      A.    Yes.

2      Q.    Going to H 3.  That's more part of your

3  report?

4      A.    Yes.

5      Q.    Again, that's a report on 9/7/00, correct?

6      A.    Yes.

7      Q.    Again, that relates what he said happened

8  during the accident?

9      A.    Yes.

10     Q.    Why do you write it twice on your report?

11     A.    We're given forms to fill out and I just

12  answer the questions that are on the form.

13     Q.    And you said number 4 was also part of

14  your report?

15     A.    Yes.

16     Q.    The very top of that is Front, Middle,

17  Front, Middle, Back of the trailer.  I didn't see on

18  the Xerox copy.  Did you circle anything of where it

19  occurred?

20     A.    From where I can see, I didn't circle up

21  top where the drawing is, but I circled down below.

22     Q.    Okay.  Injured on tractor.  Okay.  And

23  here your comments, you say "There has been an

24  ongoing problem with these cables breaking.  The

1    Maintenance Dept. is inspecting and replacing as

2    needed.  Three cables appear new.  The cable that

3    failed was not new."  What do you mean when you say

4    "three cables appear new"?

5         A.   Visually there was three cables that

6    looked newer than one of the four.

7         Q.   Would they have a different design?

8         A.   I don't know.

9         Q.   You don't remember?

10        A.   No.

11        Q.   Could they have been of the design of

12   what's shown as Plaintiffs' Exhibit G?

13        A.   I don't know.

14        Q.   But you inspected the tractor, correct?

15        A.   I looked at it.  I didn't inspect the

16   cable.

17        Q.   You did put the "three cables appear new"?

18        A.   Yeah.  I mean, just -- yes.

19        Q.   What would make them appear new is what

20   I'm trying to get at.

21        A.   Shiny.

22        Q.   Now you say "The Maintenance Dept. is

23   inspecting and replacing as needed."  Who would the

24   maintenance department be?

1      A.    The Moraine and Marion shops.

2      Q.    And who are the people in those at that

3  time?

4      A.    Gordon Beal was the shop manager in

5  Marion.  Bill Weaver was the shop manager in

6  Moraine.

7      Q.    Do you know who worked under Bill Weaver?

8      A.    No.  Other than his mechanics, obviously.

9      Q.    Do you know who the mechanics were?

10      A.    I don't know all of them.

11      Q.    Do you know some of them?

12      A.    Yes.

13      Q.    Can you give me the names that you do

14  know?

15      A.    On that particular day?

16      Q.    Yes.

17      A.    No, I can't.

18      Q.    Do you know who works there now?

19      A.    Not everyone.

20      Q.    Well, can you give me some of the names of

21  the people that do work there, that you know?

22      A.    Bob Carls, Frank Boettcher.

23          MR. HONERLAW:  Can you spell his last

24      name?

1    A.    I'm guessing here, B-O-E-T-T-C-H-E-R.

2  Craig Woodward, Rick Shively, Homer Ryman.

3    Q.    Is that with a "Y"?

4    A.    Correct.  Jeff Taylor, Jim Putsch.

5    Q.    Do you know how to spell his last name?

6    A.    I believe P-U-T-S-C-H.  Rick Wolf.  That's

7  all I can remember.

8    Q.    Do you know what they were doing to

9  inspect the cables?

10    A.    No.

11    Q.    Do you know how many were being replaced a

12  week or a month or anything?

13    A.    No.

14    Q.    Do you know how long they had been

15  replacing them?

16    A.    No.

17    Q.    Do you know when the problem first came to

18  their attention or the company's attention?

19    A.    No.

20    Q.    Are they still replacing them?

21    A.    I don't know.

22    Q.    Have they all been replaced?

23    A.    I don't know.

24    Q.    Do you know what design they're using now

1  for the cables?

2      A.   No.

3      Q.   Showing you again Plaintiffs' Q.  The

4  cable that broke in Mr. Ferguson's accident, do you

5  know what happened to that cable?

6      A.   No.

7      Q.   Did you look at the broken piece?

8      A.   No.

9      Q.   Did you look at the cable that was still

10 attached to the truck?

11     A.   When you say "look at it," do you mean

12 closely look at it or from a --

13     Q.   Well, just tell me what you did.

14     A.   I seen that the cable was broken, but I

15 did not get up closely and examine the cable.

16     Q.   So you didn't climb up on the tractor and

17 look at it?

18     A.   No.

19     Q.   But you could see that it was broken?

20     A.   Yes.

21     Q.   And did it have this coating on it?

22     A.   I don't know.

23                         (Plaintiffs' Exhibit I
                        was marked for identi-

24                         fication.)

1    Q.    Plaintiffs' Exhibit I was produced by your

2    counsel.  Do you know what this is or is that your

3    handwriting?

4           MR. LARSON:  What's the question, Tom,

5        whose handwriting that is?

6           MR. KOUSTMER:  Yes.

7    A.    That's my handwriting.

8    Q.    It doesn't say who it's to or from, but it

9    is your handwriting?

10   A.    Yes.

11   Q.    Do you know what happened to this

12   document, if it went to someone?

13   A.    This looks like something I would just --

14   my notes.

15   Q.    Where would you keep these notes?

16   A.    In the file.

17   Q.    What file?

18   A.    On the injury.

19   Q.    So these are part of the injury file?

20   A.    They were my personal notes and that's

21   where I would normally put them.

22   Q.    But you wouldn't give it to anyone?

23   A.    No.

24          MR. WINTER:  Objection.  We gave them to

1    you.

2    Q.    "9-7," it says at the top, "9-7-00,

3    Inspecting and replacing as needed per Gordon."

4    What does that refer to?

5    A.    That, to the best of my knowledge, that

6    would mean that I talked to Gordon on 9/7, and that

7    would be the reply Gordon gave them.

8    Q.    Who's Gordon?

9    A.    Gordon Beal was the shop manager in

10   Marion.

11   Q.    And then the next paragraph you say "Will

12   speak to B. Weaver.  Rick said he only replaces what

13   Bill tells him to.  They (He) does not inspect for

14   problems."  What does that refer to?

15   A.    Bill Weaver is the shop manager in

16   Moraine.  Rick would be one of the mechanics.

17   Q.    Would that be Rick Shively?

18   A.    I don't know which Rick that would be.

19   Q.    So does that mean you talked to Rick that

20   day?

21   A.    Yes.

22   Q.    And he told you you were asking him about

23   the cables; is that correct?

24   A.    Reading from this, yeah.

1    Q.    And he says that he only replaces the ones

2  that Bill tells him to.  They, then you put "(he)"

3  does not inspect for problems.  When you say that,

4  that means they were not inspecting for problems,

5  they were just replacing the ones Bill Weaver told

6  him to replace?

7    A.    Yes.

8    Q.    Then it's got "2:37," question, "Ferguson

9  not at KWC."  Is that what you're referring to as

10  Kettering?

11    A.    Kettering Workers Care.

12    Q.    So you checked to see if Ferguson was

13  there?

14    A.    Correct.

15    Q.    And that's why you think that he went to

16  the emergency room instead?

17    A.    Yes.

18    Q.    Then at the bottom there's something about

19  9/7, "Must go to a doctor in the network 'BWC

20  certified' for all care or bills could be denied.

21  Per Russell."  So you checked to see if the hospital

22  was going to be covered?

23    A.    Normally when an employee has an injury we

24  send them to Kettering Workers Care unless,

41

1  obviously, it's a serious injury.

2      Q.   So this one went to the hospital instead?

3      A.   It went somewhere other than Kettering

4  Workers Care.

5      Q.   Which would be considered a serious

6  injury?

7           MR. LARSON:  Object to the form.

8      Q.   Yes or no?  So this would be considered a

9  serious injury?

10     A.   No.

11     Q.   Do you know if there's any inspections

12  going on of the cables --

13     A.   No.

14     Q.   -- by the people under Bill Weaver?

15     A.   No.  I don't know if there's any

16  inspections.

17     Q.   As head of the safety -- again, you were

18  in the safety -- what was your job title?

19     A.   Safety and quality.

20     Q.   Safety and quality supervisor?

21     A.   Correct.

22     Q.   Wouldn't that be part of your duties to

23  see if an inspection system was going on as it

24  related to the trucks?

42

1     A.   Are you talking about today or --

2     Q.   Back then.

3     A.   I was in contact with the shop.

4     Q.   What contact did you have with the shop

5 before 9/7 of 2000 as it related to these cables?

6     A.   When I worked in Marion we were replacing

7 the cables, all cables.

8     Q.   How about in Moraine?

9     A.   Moraine was supposed to be replacing all

10 the cables.

11     Q.   Were they doing that?

12     A.   I don't know.

13     Q.   Wasn't that part of your job duties to

14 find that out?

15     A.   No.

16     Q.   Why not?

17     A.   The maintenance department, that was their

18 job.

19     Q.   So you don't know one way or the other if

20 they were replacing all the cables?

21     A.   They were supposed to replace all the

22 cables.

23     Q.   Do you know if there was a time limit for

24 them to do that?

43

1    A.    No.

2    Q.    Do you know if they were doing it?

3    A.    They were doing it.

4    Q.    Do you know how long it was taking them?

5    A.    No.

6    Q.    Did they try to replace them all at one

7    time?

8    A.    What do you mean, "all at one time"?

9    Q.    Well, did they retrofit them, the trucks?

10    A.    Retrofit meaning replace the cables?

11    Q.    Yes.

12    A.    They were supposed to replace all the

13    cables.

14    Q.    When was it that they were supposed to

15    replace all the cables?

16    A.    I don't know the exact date.

17    Q.    Was it before 9/7 of 2000?

18    A.    I don't know.

19    Q.    Did you attend the safety committee

20    meetings?

21    A.    In Marion.  I mean, I had just come back

22    from Marion in July of 2000.

23    Q.    So you were at Moraine from July of

24    2000 until the accident?

44

1    A.    Correct.

2    Q.    Exclusively?

3    A.    No.

4    Q.    You were back and forth between jobs?

5    A.    Yes.

6    Q.    When did you get exclusively down to

7    Moraine?

8    A.    As an estimate, about September of 2001.

9    Q.    Who had your job there prior to

10   September 2001?

11   A.    I did.

12   Q.    So you were the safety supervisor for both

13   places?

14   A.    Yes.

15   Q.    From what dates to what dates?

16   A.    I was the safety supervisor in Marion from

17   February of '98 through approximately September of

18   2001.

19   Q.    Okay.

20   A.    And I took over safety in Moraine

21   approximately August of 2000.

22   Q.    And you're currently still in that

23   position, or when did you stop doing that?  About

24   two months ago, is that it?

45

1        A.    Yes.

2        Q.    So it would be, let's see, September of

3   2002?

4        A.    Yes.    That's an estimate.

5        Q.    So at Marion were all the cables replaced

6   by September of 2000?

7        A.    I don't know.

8        Q.    And Moraine, do you know if they were?

9        A.    I don't know.

10        Q.    Who would have been the safety person

11   prior to August of 2000 at Moraine?

12        A.    Gary Chinn.

13        Q.    Is Gary Chinn still with the company?

14        A.    Yes.

15        Q.    At Moraine do you remember anyone

16   complaining about the safety cables when you were

17   there?

18        A.    No.

19        Q.    At Marion do you remember anyone?

20        A.    Complaining?

21        Q.    Yes.

22        A.    No.

23        Q.    At either place do you know of any

24   procedure that was being followed as far as

46

1   inspecting them to see if they should be replaced?

2        A.   To the best of my knowledge, they were

3   supposed to replace all the cables.

4        Q.   You don't know of any inspections that the

5   people were doing?

6        A.   No.

7        Q.   Do you know if the maintenance people were

8   supposed to do any inspections?

9        A.   To the best of my recollection, they were

10   supposed to replace all the cables.

11        Q.   But you don't know a date that that was

12   supposed to occur?

13        A.   No.

14        Q.   Where would your recollection of that come

15   from?  Was there someone from Georgia that said that

16   should happen or how do you know they were supposed

17   to all be replaced?

18        A.   When I was in Marion we were having some

19   cables failing.  And I had talked to the maintenance

20   department, and we came to the agreement that we

21   were going to replace all the cables.

22        Q.   Do you know when that was?

23        A.   No.

24        Q.   Do you know what year it was?

47

1     A.    No.

2     Q.    Do you know if it was prior to

3   Mr. Ferguson's accident?

4     A.    Yes.

5     Q.    Do you know if it was prior to Mr. Fay's

6   accident?

7     A.    Yes.

8     Q.    Do you know how much prior it was?

9     A.    No.

10    Q.    When you talked to the maintenance people

11  at Marion, was anyone else involved in the company,

12  such as the headquarters or anything, about

13  replacing them?

14    A.    I don't know.

15    Q.    What occurred at this meeting?  Who was at

16  the meeting?  What occurred?

17    A.    I can't recollect the exact meeting.

18    Q.    What do you recollect about it?

19    A.    We were having problems and that I had

20  talked to the shop, the maintenance department, and

21  we had agreed that we were going to replace the

22  cables.

23    Q.    Did you set up any type of timetable to do

24  that?

48

1     A.   No.

2     Q.   Do you know where the new cables were

3  coming from?

4     A.   No.

5     Q.   Do you know if there was a problem getting

6  new cables?

7     A.   No.  I mean, I don't know that there was a

8  problem.

9     Q.   When you got to Moraine, was it your

10  understanding that they were replacing the cables,

11  too?

12     A.   That was my understanding.

13     Q.   And that they were all supposed to be

14  replaced?

15     A.   Ask the question again.

16     Q.   When you got to Moraine, was it your

17  understanding that all the cables were supposed to

18  be replaced?

19         MR. WINTER:  At Moraine?

20         MR. KOUSTMER:  At Moraine.

21     A.   That's my understanding.

22     Q.   Other than you and maintenance, did anyone

23  else in the company know this was happening?

24     A.   I don't know.

49

1      Q.    And who was it in maintenance that you had

2  this understanding with that they were all supposed

3  to be replaced?

4      A.    Gordon Beal and --

5      Q.    Bill Weaver?

6      A.    Bill Weaver.

7      Q.    He would be at Moraine and then Gordon

8  would be at Marion?

9      A.    Correct.

10     Q.    Do you know if they talked to anyone else

11 in the company?

12     A.    I don't know.

13     Q.    Did you talk to anyone else in the company

14 about it?

15     A.    On replacing cables, no.

16     Q.    Do you have any idea what it costs to

17 replace the cables?

18     A.    No.

19     Q.    There's four of them on each truck,

20 correct?

21     A.    The trucks that have cables have four, to

22 the best of my knowledge.

23     Q.    How many trucks would you say there were

24 at Marion and Moraine that had cables?

1    A.    I don't know.

2    Q.    More than 100?

3    A.    I don't know.

4    Q.    How many trucks are at the two facilities?

5    A.    Well, Marion no longer exists.

6    Q.    At the time, back in 9/7/2000.

7    A.    It would be a total guess.

8          MR. WINTER:  Object to the guessing.

9    A.    Okay.  I don't know.

10   Q.    Do you know how many are at Moraine?

11   A.    Today?

12   Q.    Yes.

13   A.    I don't know.

14   Q.    Is it more than 100?

15   A.    I don't know.

16   Q.    Why do they call them clothes lines?

17         MR. LARSON:  Object to the form.

18   A.    I don't know.

19   Q.    That's just one of the words for them?

20   A.    Yes.

21   Q.    The drivers just came up with that?

22   A.    I don't know.

23   Q.    Did you attend any of the safety meetings

24   at Moraine?