51

1       A.      During what time period?

2       Q.      Prior to 9/7 of 2000.

3       A.      No.

4       Q.      That would be Mr. Chinn?

5       A.      Mr. Chinn, yes.

6       Q.      But you attended the safety meetings at

7   Marion?

8       A.      Yes.

9       Q.      Marion, you said they're no longer in

10  business.  Did they consolidate with Moraine?

11      A.      Yes.

12      Q.      When was that?

13      A.      It was phased in and I don't know the

14  exact date of when it was totally phased in.

15      Q.      Do you know the year?

16      A.      2001.

17      Q.      As the safety person, were you in charge

18  of Mr. Ferguson's, keeping track of his treatment

19  and his injury after the fact?

20      A.      To a degree.

21      Q.      What degree was that?

22      A.      To a small degree.

23      Q.      What did you do?

24      A.      As far as?

52

1     Q.   As far as Mr. Ferguson and his injury.

2     A.   Most of it would be handled through our

3 haul risk department in Decatur.

4     Q.   Did you fill out forms?

5     A.   The initial injury forms, yes.

6     Q.   Any other forms that you might have filled

7 out as related to his injury?

8     A.   Nothing other than modified duty forms for

9 pay.

10    Q.   Do you know if he came back to work?

11    A.   Yes, he did.

12    Q.   When did he come back to work?

13    A.   I don't know.

14    Q.   Do you know how long he came back to work?

15    A.   No.

16    Q.   Is he working there now?

17    A.   No.

18    Q.   Do you know why he left work again?

19    A.   Yes.

20    Q.   And why was that?

21    A.   The modified duty program is set up for

22 basically a 90-day period.

23    Q.   So he did a 90-day period?

24    A.   He did more than 90 days.

53

1      Q.    Is that called light duty?

2      A.    Yes.

3      Q.    What does that consist of?

4      A.    It consists of anything that does not

5  violate the doctor's restrictions.

6      Q.    And the reason he was stopped on that is

7  because it only goes for so many days?

8      A.    In general, 90 days.

9      Q.    And then why is there this 90-day

10  restriction?

11      A.    It's set up for employees who the doctor

12  expects to return to work within 90 days.

13      Q.    So if the 90 days go by and the doctor

14  doesn't give permission to go back to full duty then

15  they're terminated from that light duty?

16          MR. WINTER:  Object to the form of the

17      question, specifically the word "terminated."

18      Q.    What happens to them?  Why don't you just

19  answer what happens to them.  After the 90 days,

20  what happens if the doctor doesn't get them back to

21  full duty?

22      A.    If the doctor gives them a slip saying

23  they're going to be back within two weeks or three

24  weeks, the 90 days is just a guideline.

54

1    Q.    What happened in Mr. Ferguson's case?

2    A.    I believe Dave was on modified duty, then

3 he went off, then he went on several different

4 times.  How many different times, I don't know.

5    Q.    And that's guided by his doctor, is what

6 you're saying?

7    A.    It's guided by his doctor, yes.  The

8 doctor has to okay that he can work modified duty.

9    Q.    And then the doctor has to okay modified

10 up to full duty?

11    A.    Correct.

12                              (Plaintiffs' Exhibit J
                                was marked for identi-
13                              fication.)

14    Q.    Plaintiffs' Exhibit J is for the purpose

15 of when you were at Marion, you had similar safety

16 committee minutes?

17    A.    We were supposed to, yeah.

18    Q.    Did you keep those minutes?

19    A.    I don't know.

20    Q.    Well, let me ask you this:  How often were

21 the safety committee meetings?

22    A.    They were supposed to be once a month.

23    Q.    And at that once a month meeting was a

24 written statement made of what occurred at the

55

1   meeting?

2       A.    I don't know.

3       Q.    Would you have kept those records?

4       A.    I don't have the records.

5       Q.    Would you have been the one that wrote

6   down what occurred at the meeting?

7       A.    Not in every case, no.

8       Q.    Would someone write down what occurred?

9       A.    Supposed to.

10      Q.    Was there a secretary to the meetings?

11   You were the safety committee person.  Was there a

12   secretary, or were you the secretary?

13      A.    Sometimes we'd have more than one person

14   who would keep track of the minutes.

15      Q.    Are they kept somewhere?

16      A.    I don't know.

17      Q.    Would you file them somewhere?  Is that

18   your responsibility or someone else's?

19      A.    They would be filed.  We had to file them

20   with Decatur.  We have to fax them or mail them off

21   to Decatur.

22      Q.    So every safety committee meeting where

23   there's minutes taken they get sent to Decatur?

24      A.    Supposed to.

56

1      Q.    Did that happen when you were at Moraine?

2      A.    Best that I can recollect, yeah.

3      Q.    I just showed you what's marked as

4  Plaintiffs' Exhibit J.  It looks like a safety

5  committee meeting that was at Moraine, it has the

6  people that were in attendance, and then discusses

7  what was discussed.  Is that what you were doing

8  also at your facility?

9      A.    In Marion we were.  I don't know that it

10  happened every month.

11      Q.    But you were supposed to do it every

12  month?

13      A.    Correct.

14      Q.    And they were supposed to be sent to

15  Decatur?

16      A.    Correct.

17      Q.    And would those, prior to 9/7/2000,

18  contain anything about the clothes lines or the

19  cables in question in this lawsuit?

20      A.    The question again?

21      Q.    Would those minutes of those meetings in

22  Marion where you were on the safety committee, would

23  those contain comments about the clothes lines or

24  the cables?

57

1    A.   I don't know for sure.  I don't know.

2    Q.   Would those minutes contain the decision

3 to replace them all, all the cables?

4    A.   I don't know.

5    Q.   You'd have to go back and get the actual

6 minutes, correct?

7    A.   Yes.

8    Q.   Other than what we've identified here,

9 which would be H 1, H 3, H 4, and Plaintiffs'

10 Exhibit I, did you make any other writings as it

11 related to this accident with Mr. Ferguson and how

12 it occurred?

13   A.   I don't know.

14   Q.   You don't remember anything else that you

15 had to file with anyone?

16   A.   Like I said, the only other form that I

17 don't see here is --

18   Q.   -- the one you discussed, authorization?

19   A.   That's correct.

20   Q.   After the accident, was there any change

21 about replacing the cables?

22   A.   I don't know.

23   Q.   And who else would know?  I mean, you were

24 the safety person.  Is there someone else who was

58

1    involved?

2        A.    Maintenance department.

3        Q.    Other than the maintenance department.

4        A.    I don't know.

5        Q.    Do you remember talking to anyone from

6    Decatur about the cables?

7        A.    The cables breaking?

8        Q.    Yes.

9        A.    No.

10            MR. KOUSTMER:  Can I have one moment to

11       talk to Mike a minute?

12            MR. WINTER:  Absolutely.

13        (Recess taken: 10:56 a.m.  -  11:10 a.m.)

14            MR. WINTER:  We've had a chance to

15       reconsider some of Mr. Koustmer's questions.

16       There's one thing we want to add just because

17       we've had a chance to think about it.

18            Go ahead, Michael.

19            THE WITNESS:  In Marion, sometime in '99

20       they had hired another safety supervisor that

21       pretty much took over the safety.  Me and him

22       worked hand in hand.  What time in '99, I don't

23       know.

24        Q.    What's his name or her name?

59

```
 1      A.    It was Ken -- I believe it was Ken, I want
 2  to say Smalls, but I'm not totally certain on that.
 3  S-M-A-L-L-S, I believe.
 4      Q.    So you two were co-safety --
 5      A.    I was both, and then when they hired him
 6  he pretty much took the safety side of it and I kept
 7  the quality side, but we worked hand in hand.
 8      Q.    That was in '99 and --
 9      A.    In Marion.
10      Q.    But when you came to Moraine you took back
11  safety?
12      A.    From Gary Chinn, yes.
13      Q.    And this other function, too?
14      A.    And quality also.
15            MR. WINTER:  Wait.  I don't think he
16        answered his question, what happened up at
17        Marion safety when you came down to Moraine.
18        That's what he was asking.
19      A.    Ken had quit and they hired Chris Sanders
20  who took over safety.  And exactly when that
21  happened, I don't know.  And it was the same thing,
22  me and Chris worked hand in hand.  And then
23  eventually they laid Chris off.  And I'm not sure
24  when they laid Chris off.
```

60

1    Q.    And neither Chris nor Ken are with the

2    company now?

3    A.    No, they're not with the company.

4    Q.    Do you know where they're at?

5    A.    No.

6    Q.    Do you have any idea where they live or

7    anything?

8    A.    Chris lives in Marion.

9    Q.    That's Chris Sanders?

10    A.    Yes.

11    Q.    Do you know where Ken Smalls lives?

12    A.    No.

13    Q.    Were you supposed to give them training in

14    safety when they came on?

15    A.    No, not formal training.

16    Q.    Do you get any formal training to be the

17    safety person?

18    A.    No.

19    Q.    You didn't get any formal training?

20    A.    Formal training meaning?

21    Q.    The person that you took over for, did

22    they give you any training on what to do?

23    A.    Yes.

24    Q.    What training did you get?

1    A.    How to do accident and injury reports, how

2    to key them into the computer system, which forms

3    needed to be filled out, where they needed to be

4    sent, where to send the employees when they're

5    injured.

6    Q.    So it was paperwork training that you were

7    trained in?

8    A.    Not entirely.  There was training at the

9    loading dock.

10    Q.    Were you trained at all in inspecting the

11    vehicles?

12    A.    Inspecting the vehicles?

13    Q.    Yes, the trucks.

14    A.    The trucks?  To a degree.

15    Q.    What were you trained to do?

16    A.    Basic as far as looking for cracks, maybe

17    cracks in the equipment, if there's something

18    visual, something bent, something broken, something

19    cracked.

20    Q.    Were you trained at all as to the cables

21    in question?

22    A.    No.

23    Q.    Who took over for you at Moraine?

24    A.    Robin Smith.

62

1    Q.    Where did she come from?

2    A.    I don't know.

3    Q.    Do you know what her background is?

4    A.    No.

5    Q.    Is she there now?

6    A.    Yes.

7    Q.    Did you train her?

8    A.    No.

9    Q.    Do you know anybody that trained her?

10    A.    They sent her to Louisville or

11 Shelbyville, Kentucky for, I believe, a two-week

12 period.

13    Q.    Who's "they"?

14    A.    The company.

15    Q.    The company is out of Decatur, Georgia?

16    A.    Allied Systems.

17    Q.    Do you know what training she got there?

18    A.    No.

19    Q.    Did you ever go there for training?

20    A.    No.

21    Q.    Did you ever go anyplace for the company

22 for training?

23    A.    Yes.

24    Q.    Where was that?

63

1      A.    Romulus, Michigan.

2      Q.    What training did you get in Romulus?

3      A.    It was how to load a truck, preparing

4  logs, driver logs.  That's been about 18 years ago,

5  so I don't recollect everything they taught us.

6      Q.    Did you get any training there to be a

7  safety supervisor?

8      A.    No.

9      Q.    Did you ever get any training with the

10 company to go somewhere to be trained to be a safety

11 supervisor?

12     A.    No.

13     Q.    Do you know what the purpose of the cable

14 is in question here?

15     A.    Going back to that last question, I

16 remember we were sent to Marysville to a day's

17 training on safety.

18     Q.    Marysville, Ohio?

19     A.    Marysville, Ohio.

20     Q.    And who was that through?

21     A.    Allied Systems.

22     Q.    And what did they teach you there?

23     A.    It was mostly paperwork.

24     Q.    Paperwork?  How to fill out the forms, who

64

1  to send them to, correct?

2      A.    Yes.

3      Q.    Back to the other question.  Do you know

4  what the purpose of the cable is in question here?

5      A.    No.

6      Q.    You've said that you and maintenance in

7  Marion decided to replace the cables; is that

8  correct?

9      A.    Yes.

10      Q.    That was your decision?

11      A.    Not my decision entirely, no.

12      Q.    Whose decision was it?

13      A.    I don't know.

14      Q.    Was there a memorandum that came down from

15  Delavan saying to replace all the cables?

16      A.    I don't know.

17      Q.    Have you ever heard of such a memorandum?

18      A.    No.

19      Q.    Have you ever seen such a memorandum?

20      A.    Not that I can remember.

21      Q.    Has maintenance ever told you about such a

22  memorandum?

23      A.    Not that I can remember.

24      Q.    I'm having a hard time understanding, so

1   let me ask you a couple more questions.  If I repeat

2   myself, I'm sorry.  You met with maintenance, and

3   you and maintenance decided to replace all the

4   cables at Marion and Moraine?

5       A.    The only thing I relayed to the

6   maintenance department is that we were having

7   problems with the cables, but I do not have the

8   authority --

9       Q.    That's what I'm getting at.  I didn't

10  think you would have the authority to expend that

11  kind of money to replace cables.

12      A.    No, that is not my decision.

13      Q.    So whose decision was that in the company?

14      A.    I don't know.

15      Q.    So somebody else had to make that

16  decision?

17      A.    Yes.

18      Q.    Did maintenance have the authority to make

19  that decision?

20      A.    When you say "maintenance," you mean who?

21      Q.    The people you talked to there at

22  maintenance.  You said you talked to Gordon at

23  Marion and Bill Weaver at Moraine.  Did they have

24  the authority to make that decision?

66

1      A.    I wouldn't think so.

2      Q.    There was about 100 trucks, wasn't there,

3  at Marion, and there's about 100 trucks now at

4  Moraine?

5           MR. WINTER:  What time are we talking

6      about?

7           MR. KOUSTMER:  Back in 2000.

8      A.    Back in 2000 I would say there was less

9  than 100 trucks in Marion when this injury occurred.

10     Q.    And Moraine?

11     A.    I don't know exactly how many trucks would

12 be there.

13     Q.    But you would agree with me there would be

14 expense to replacing all the cables on the trucks at

15 these two facilities?

16     A.    Yes.

17     Q.    Do you know if they were being replaced

18 systemwide?

19     A.    No.  I don't know that.

20     Q.    Do you have any idea how many terminals

21 such as Moraine and Marion that Allied operated back

22 in 2000?

23     A.    2000, I don't know.

24     Q.    Do you know now?

1      A.    I believe total, United States and Canada,

2  I believe it would be about 80 to 85 terminals.

3      Q.    Do you know how many trucks or an estimate

4  of how many trucks are involved in those 80 to 85

5  terminals?

6      A.    As a total estimate, probably about 4500

7  to 5000.   That's just a guess.

8      Q.    You said something before about some of

9  them don't have cables?

10      A.    Correct.

11      Q.    And some of them do have cables?

12      A.    Correct.

13      Q.    Do you know how many there are that have

14  cables versus how many that don't have cables?

15      A.    I don't know.

16      Q.    The ones that don't have cables, they just

17  don't have any of the clothes lines or the four

18  cables?

19      A.    Correct.

20      Q.    The ones that have cables should have all

21  four?

22      A.    To the best of my knowledge.

23                          (Plaintiffs' Exhibits
                            K, L, M, N, O, P were
24                          marked for identi-
                            fication.)

68

1    Q.    These safety committee meetings, we had

2  some marked here J, K, L, M, N, O, P, from Marion

3  back in '99.  It's your testimony that safety

4  committee meetings are supposed to be faxed, or was

5  it mailed to company headquarters in Decatur?

6    A.    They could be faxed or mailed.

7    Q.    Or mailed.  So the ones that Mr. Chinn was

8  doing in Moraine should have been faxed or mailed to

9  Decatur?

10    A.    I don't know what Mr. Chinn did.

11    Q.    Do you know if there was a decision not to

12  retrofit the clothes lines, but to replace them as

13  required?

14    A.    I don't know that.

15    Q.    That never came down to you when you were

16  the safety committee person?

17    A.    The question again.

18    Q.    Was there ever a decision made not to

19  retrofit the clothes lines, but just to replace them

20  as they broke?

21    A.    Not that I know of.

22    Q.    Was there ever a decision made not to

23  retrofit the clothes lines on all the trucks, but

24  just to replace them as required?

1       A.    Not that I recall.

2       Q.    You don't remember being told that?

3       A.    No.  My understanding was they were going

4  to replace them all.

5       Q.    But you don't know where that decision

6  came from?

7       A.    No.

8       Q.    But you certainly didn't have the power to

9  do that?

10      A.    Correct.

11      Q.    You don't think maintenance had the power

12  to do that either, Mr. Weaver?

13      A.    Local maintenance, I would say no.

14      Q.    That would be Mr. Weaver or Mr. Gordon,

15  the two gentlemen you were talking with?

16      A.    Correct.

17      Q.    And they were the two heads of the

18  maintenance department at Marion and Moraine?

19      A.    Yes.

20      Q.    Do you know of something called a new

21  chain clothes line?

22      A.    I was made aware of that, yeah.

23      Q.    What is that?

24      A.    From what I understand, there was talk

70

1   that they would use a chain instead of a cable.

2       Q.   Where was this talk?

3       A.   Can I talk to Bob for a second?

4       Q.   Well, not really because there's a

5   question on.  You have to answer the question.  As

6   soon as you answer the question then you can talk

7   with Bob all you want.

8           MR. WINTER:  Do you understand the

9       question?

10          THE WITNESS:  He's asking when did I hear

11      about chains being used versus the cable.

12      Q.   Right.  Where.  I think it was where.

13          Do you want to read back his prior answer

14  then read back the question?

15          (Record read.)

16      A.   It was in Moraine.

17          MR. WINTER:  Do you want to talk?  You

18      answered the question.  Do you want to talk?

19          THE WITNESS:  Yeah.

20          MR. WINTER:  Why don't we take a minute.

21          (Recess taken:  11:24 a.m. - 11:27 a.m.)

22          MR. WINTER:  Before proceeding further, I

23      just want to let you know that Mr. Palladino's

24      knowledge about the chain occurred yesterday

71

1    when he reviewed minutes in a meeting with me.

2    The remainder of the conversation is

3    privileged.

4         MR. KOUSTMER:  Well, I'm going to ask him

5    some questions about it.  You can object as you

6    wish.

7         MR. WINTER:  Okay.

8  BY MR. KOUSTMER:

9    Q.   Was Moraine supposed to be the test site

10 for the new chain clothes lines?

11   A.   I don't know.

12   Q.   Do you know what a new chain clothes line

13 was?

14        MR. WINTER:  If you know.

15   A.   It would be something that would replace a

16 cable, but it would be a chain.

17   Q.   Do you know why they were thinking about

18 going with the new chain clothes line?

19   A.   To replace the cables.

20   Q.   Why?

21   A.   Because some of them were failing.

22   Q.   And they were failing in the place that we

23 identified earlier?

24   A.   To the best of my knowledge, yeah.

72

1    Q.    Do you know if that was ever done?

2    A.    I don't know.

3    Q.    Do you know of any trucks that have the

4    new chain clothes line on them?

5    A.    No.

6    Q.    You haven't seen any at Moraine like that?

7    A.    No, I have not.

8    Q.    They have cables and they're either --

9          MR. WINTER:  Who's "they"?

10   Q.    The trucks at Moraine.  They either have

11   cables like the ones that we've seen or like the

12   ones in Plaintiffs' Exhibit G?

13   A.    I've seen both versions.

14   Q.    Are there still both versions?

15   A.    Yes.

16   Q.    When they're replaced, are they replaced

17   with the ones in Plaintiffs' Exhibit G or are they

18   replaced with ones similar to the ones that were on

19   Mr. Ferguson's truck at the time of the accident,

20   which would be Plaintiffs' Exhibit A?

21   A.    I don't know.

22   Q.    You don't know what they're replacing them

23   with?

24   A.    No.

1    Q.    Who would you ask to find that out?

2    A.    Who would I ask?

3    Q.    Who would I ask?

4    A.    I'd ask the maintenance department.

5    Q.    Mr. Weaver?

6    A.    Correct.

7    Q.    Or anybody who works under him?

8    A.    Correct.

9    Q.    Do you know if these new chain clothes

10   lines were going to be adjustable?

11   A.    I don't know that.

12   Q.    Are they called clothes lines because they

13   swivel like this when they're going down the road,

14   back and forth, back and forth (indicating)?

15   A.    I don't know.

16   Q.    Have you ever seen them do that, going

17   down the road?

18   A.    I personally haven't, no.

19   Q.    Do you know a Phil Kuchar, K-U-C-H-A-R?

20   A.    Yes.

21   Q.    Who is he?

22   A.    He's a driver at Moraine.

23   Q.    Do you know back in '99 that he wanted all

24   the trucks refitted?

74

1      A.    I don't know that.

2      Q.    Were there any drivers back then that

3 wanted all the trucks refitted with the cables at

4 Marion?

5      A.    I don't know.

6      Q.    Were you doing refitting back in 1999?

7      A.    I'm not sure of the time frame we were

8 doing refitting.

9      Q.    I take it you would have to ask

10 maintenance that, they would have records of that?

11     A.    Maintenance was the ones doing the

12 refitting, yes.

13     Q.    Do you know if they kept records of when

14 cables were changed?

15     A.    I don't know.

16     Q.    But you didn't keep any as the safety

17 supervisor?

18     A.    No.

19     Q.    Did you ever check up as safety supervisor

20 to say how far along are we on getting all these

21 cables replaced?

22     A.    I remember having conversations with

23 Gordon.   I remember seeing boxes of them in the shop

24 at Marion.

75

1    Q.    What were the conversations you had with

2    Gordon?

3    A.    I can't recall, exactly.

4    Q.    Were you asking him how far along are we

5    in getting all of them replaced?

6    A.    I can't recall, exactly, conversations.  I

7    just know I seen boxes of new cables and they were

8    replacing cables.

9    Q.    Do you know what time frame that was?

10    A.    No.

11    Q.    Was that before or after Mr. Ferguson's

12    accident?

13    A.    That would have been before.

14    Q.    Do you know what period of time before?

15    A.    No.

16    Q.    Mr. Fay got hurt in August of 2000,

17    correct?

18    A.    Yes.

19    Q.    Was anything done different after he got

20    hurt as far as replacing cables?

21    A.    I don't know.

22    Q.    As safety person, did you say:  No trucks

23    out unless the cables are replaced on those trucks?

24    A.    I didn't say no trucks out, no.

1     Q.   What did you do?

2     A.   I know one thing I did is I immediately

3 put a notice, taped it right to the dispatch

4 counter.

5     Q.   What was the note?

6     A.   Notifying the drivers, don't lean on the

7 cables, don't put any pressure on the cables, get

8 the cables replaced.

9     Q.   Now, in Mr. Ferguson's truck three of the

10 cables had been replaced?

11    A.   I don't know.  I just know three of the

12 cables looked different than the one cable.

13    Q.   Do you know why they would replace only

14 three?

15    A.   No.

16    Q.   Mr. Fay was a Marion driver, right?

17    A.   At the time of his injury, I believe so.

18    Q.   And he's never come back to work?

19    A.   I don't believe he has.

20    Q.   He had severe injuries?

21    A.   I don't know.

22    Q.   Did you do anything to speed up the

23 process, after Mr. Fay's injury, of replacing the

24 cables?

77

1            MR. LARSON:  Object to the form.

2       A.   I can't recall an instance.  I would think

3  that I maybe made phone calls to the shop.

4       Q.   Do you recall making phone calls to the

5  shop?

6       A.   I can't recall specifically, no.

7       Q.   You don't recall talking to Gordon or

8  Bill?

9       A.   I can't recall it, but I would -- I know I

10  put the notice up and I would -- I know I talked to

11  Chris.  Chris would have been in Marion at the time

12  doing safety.

13      Q.   Chris?

14      A.   Chris Sanders.

15      Q.   You put the notice up in Marion?

16      A.   No, I put the notice up in Moraine.

17      Q.   On Exhibit I, isn't the 2:37 notice there

18  because you had set up an appointment for Mr.

19  Ferguson at 2:37?

20      A.   No.  Dave was told to go to the Kettering

21  Workers Care because the injury happened, I believe,

22  what, 10:15 in the morning, and it was 2:37 in the

23  afternoon and Kettering Workers Care had not seen

24  him yet.

78

1      Q.    You didn't set up an appointment prior to

2   that for him to go there around 2:00 or 2:30?

3      A.    To Kettering Workers Care?

4      Q.    Yes.

5      A.    No.   To the best I can recollect, he was

6   told to go to Kettering Workers Care.

7      Q.    Who's Audra Britt?

8      A.    She was a supervisor that worked in

9   Moraine.

10      Q.    What did she supervise?

11      A.    She was a dispatcher.

12      Q.    Did she have the authority to send him to

13   the emergency room?

14      A.    She could have if she felt that was

15   necessary.

16      Q.    Do you know if that happened?

17      A.    I don't know.

18      Q.    You don't know one way or the other?

19      A.    No.

20      Q.    Roy Thornton, did he fall off a truck

21   prior to Mr. Ferguson's injury?

22      A.    Not that I know of.

23      Q.    You don't know anything about a cable

24   breaking on a Roy Thornton?

79

1    A.    No, I don't.

2    Q.    At Marion.

3    A.    At Marion, no, I don't.

4    Q.    Do you know who suggested to use chain

5    clothes lines instead of the cables?

6    A.    No, I don't.

7    Q.    Do you know where that came from in the

8    chain of command?

9    A.    I believe it was brought up at a committee

10   meeting in Moraine.

11   Q.    In Moraine?

12   A.    (Nodding head.)

13   Q.    You don't know anyone in the company that

14   said they would be using that as a test site?

15   A.    No, I don't.

16   Q.    Do you know if it has ever been done?

17   A.    No, I don't know.

18   Q.    Have you ever seen a truck with one of

19   them?

20   A.    No.

21        MR. KOUSTMER:  Nothing else.  Thanks.

22        MR. LARSON:  I don't have any questions.

23        MR. PAULUS:  I've just got a couple.

24

1                    CROSS-EXAMINATION

2    BY MR. PAULUS:

3        Q.    Mr. Palladino, I'm Craig Paulus.  I'm an

4    attorney for Hanes Supply.  Other than the notice on

5    the dispatch counter, did you make any other efforts

6    to make the drivers aware of the problems you were

7    having with the hand cables?

8        A.    The only one I know that I did was the one

9    that you just mentioned, but I'm sure in Marion we

10   had posted notices there, because when I was in

11   Marion, Gordon was the shop manager and that's where

12   I worked every day.  So I'm sure there were notices

13   posted in Marion.

14       Q.    Did you have periodic meetings with the

15   drivers to inform them of safety concerns?

16       A.    The drivers were supposed to attend one

17   safety meeting a month.

18       Q.    Who ran the safety meetings?

19       A.    In Marion, as I said, Ken and Chris

20   Sanders, and then prior to that, I had them.

21       Q.    At the time Mr. Ferguson was injured, who

22   would have been doing it then?

23       A.    It had just gone from Gary to me, because

24   I came back in July of 2000 and it had just changed

1  hands.

2      Q.    Did the drivers have any other safety

3  training besides attending the safety meetings

4  periodically?

5      A.    Yes, they would go through some training.

6      Q.    Could you briefly describe the nature of

7  it?

8      A.    If an employee had a problem with cargo

9  damage, they could be put through training up to

10 three days, formal training.  If they had problems

11 with accidents or injuries, same thing, they'd go

12 through formal training.

13     Q.    Was there a program for everyone

14 regardless of whether they damaged the cargo or had

15 been involved in accidents?

16     A.    Once a month they're supposed to attend a

17 safety meeting.

18     Q.    Other than the safety meeting, anything

19 else?

20     A.    Nothing that would be for every employee.

21     Q.    The cable that was broken on the truck

22 that Mr. Ferguson was injured on, did you ever see

23 it with your own eyes?

24     A.    That cable?

82

1      Q.    Yes.

2      A.    Yes, I saw it.

3      Q.    Was it still on the truck when you saw it?

4      A.    Yes.

5      Q.    Did you ever see it off the truck?

6      A.    No.

7      Q.    I think earlier you said you didn't

8   closely examine it, the cable, when it was still on

9   the truck?

10     A.    Correct.

11     Q.    So can you tell me whether it was broken

12  in the area that we've generally described as the

13  troublesome area, for lack of a better term, for

14  this type of cable?

15     A.    Yes.

16     Q.    It was broken in that area?

17     A.    It wasn't broken anywhere in the middle.

18     Q.    Okay.  I'm going to show you a document.

19  This is one that Allied has produced.

20          MR. PAULUS:  Could you mark this as

21      Exhibit, I think we're on R.

22          (Discussion off the record.)

23                      (Plaintiffs' Exhibit
                        Palladino R was marked
24                      for identification.)

83

1      Q.   Do you recognize this document?  Can you

2  tell me what it is?

3           MR. WINTER:  Take your time.

4      A.   This is an office vision document.

5      Q.   What is the purpose of this document?

6      A.   It's a way we electronically transmit an

7  injury to haul risk management in Decatur, Georgia.

8      Q.   Did you produce this document, fill it in?

9           MR. WINTER:  I'll state for the record,

10      Allied produced the document.

11      Q.   Did you type in the information that's

12  contained on this document?

13      A.   Yeah, this is me.  On the third page it

14  has "REPORT COMPLETED BY."

15      Q.   Okay.  On the first page there's an entry,

16  it looks like it's on line 13B.  It says "Based on

17  your investigation, what was the root cause of this

18  injury?"  It says "Fatigued cable on headrack."  Did

19  you fill that part of the report in too?

20      A.   Yes.

21      Q.   What made you conclude that it was

22  fatigued cable on the head rack?

23      A.   The cable broke.

24      Q.   Other than that?

84

1       A.    Other than that, nothing.

2       Q.    Was there any other part of your

3   investigation other than seeing it was broken?

4       A.    No.

5       Q.    I've got one more document I'd like you to

6   take a look at for me.

7           MR. PAULUS:  Would you please mark this as

8       Exhibit S.

9                           (Plaintiffs' Exhibit
                            Palladino S was marked
10                          for identification.)

11      Q.    That's marked Exhibit S.  Do you recognize

12  this document and can you tell me what it is?

13          (Witness and counsel conferred.)

14          MR. PAULUS:  What's that?

15      A.    Pardon me?  I don't recognize the

16  document, no.

17      Q.    Do you think you could tell me what the

18  columns are labeled as, unit number, group, item

19  number, description?  Do you know what those columns

20  represent?

21      A.    Unit number -- like I said, I've never

22  seen this document before -- but unit number would

23  be the truck number.

24          MR. PAULUS:  Okay.  If you don't recognize

1       it, I don't have any other questions for you.

2              MR. LARSON:  I do have a quick question.

3                        CROSS-EXAMINATION

4    BY MR. LARSON:

5       Q.    After you were notified by Mr. Ferguson of

6    his injury and you went and looked at his truck,

7    right?

8       A.    Yes.

9       Q.    You saw the broken cable from standing on

10   the ground?

11      A.    Yes.

12      Q.    What was the appearance of the, what would

13   be the longer part of the cable that had come apart

14   from the -- toward the end of the other side?  Do

15   you follow me?

16      A.    What was the appearance?

17      Q.    Yeah.  My question is:  How was it hanging

18   or configured on the truck after it was severed

19   there?

20      A.    Best I can recall, it was just hanging

21   straight down, just hanging down.

22             MR. LARSON:  Thank you.

23             MR. KOUSTMER:  Just have one other

24      question.

86

1

2                        CROSS-EXAMINATION

3   BY MR. KOUSTMER:

4        Q.    What they marked as Exhibit R, there

5   should be one of these then for Mike Fay, correct?

6        A.    Yes.

7             MR. WINTER:   I believe it's Thomas Fay.

8        Q.    Thomas Fay, I'm sorry.   Tom Fay?

9        A.    Yes.

10       Q.    And also, if Roy Thornton was injured,

11  there should be one of these, too, correct?

12       A.    Should be.

13       Q.    On the last page it has "Corrective

14  actions taken," correct?

15       A.    Yes.

16       Q.    That's number 26.   Okay?

17       A.    Yes.

18       Q.    So you're telling them that this is the

19  corrective actions you took?

20       A.    Yes.

21       Q.    And the corrective actions you took was

22  "Maintenance Dept. to inspect and replace as

23  needed," correct?

24       A.    That's what I typed, yes.

87

1     Q.   Not replace all of them, but as needed?

2     A.   That's what I typed.

3     Q.   And this is on the date of Mr. Ferguson's

4 accident?

5     A.   Yes.

6     Q.   And on that date it says you posted a

7 notice in dispatch to alert drivers to inspect,

8 correct?

9     A.   Yes.

10     Q.   Could I ask you why you would need to do

11 that if you already had a notice up?

12     A.   When you post a notice on the dispatch

13 window it doesn't always -- I mean, after 30 days it

14 could be tore off or -- everybody that comes through

15 dispatch -- it may not have even been up there -- if

16 it wasn't there on September 7th then I would have

17 made sure another one was posted.

18     Q.   Aren't you telling them that you posted

19 one?

20     A.   Yes, I did.

21     Q.   So was it there or wasn't it there from

22 Mr. Fay's accident?

23     A.   I posted one on September 7th.

24     Q.   So we can assume that the one from

88

1  Mr. Fay's accident was not there because why would

2  you need to post one if there was already one there?

3      A.    If there was one there I certainly

4  wouldn't have posted a second one.

5      Q.    So there wasn't one there?

6          MR. LARSON:  Object to the form.

7      Q.    There wasn't one there?

8      A.    If I posted one I certainly wouldn't have

9  posted two of them.

10      Q.    And you're not saying for the maintenance

11  department to retrofit all the trucks, you're just

12  saying what you did on the day of the accident to

13  Mr. Ferguson was to tell the maintenance department

14  to inspect and replace the cables as needed?

15      A.    That's what I typed.

16      Q.    You probably don't know this, but let me

17  ask you.  What we've got marked here is Plaintiffs'

18  Q, with this rubber coating over the cable, how

19  would someone know that that's rusted through?

20      A.    I don't know.

21          MR. KOUSTMER:  Nothing further.

22          MR. PAULUS:  Nothing.

23              DIRECT-EXAMINATION

24  BY MR. WINTER

90

1                    C E R T I F I C A T E

2  STATE    OF    OHIO    :
                              SS:
3  COUNTY OF HAMILTON    :

4       I, Wendy L. Welsh, a duly qualified and

5  commissioned notary public in and for the State of

6  Ohio, do hereby certify that prior to the giving of

7  his deposition, the within named MIKE PALLADINO was

8  by me first duly sworn to testify the truth; that

9  the foregoing pages constitute a true and correct

10 transcript of testimony given at said time and place

11 by said deponent; that said deposition was taken by

12 me in stenotypy and transcribed under my

13 supervision; that I am neither a relative of nor

14 attorney for any of the parties to this litigation,

15 nor relative of nor employee of any of their

16 counsel, and have no interest whatsoever in the

17 result of this litigation.  I further certify that I

18 am not, nor is the court reporting firm with which I

19 am affiliated, under a contract as defined in Civil

20 Rule 28 (D).

21      IN WITNESS WHEREOF, I hereunto set my hand and
   official seal of office, at Cincinnati, Ohio, this
22 19TH day of March, 2003.

23

24 MY COMMISSION EXPIRES:  WENDY L. WELSH, RDR-CRR
   NOVEMBER 20, 2005.       NOTARY PUBLIC, STATE OF OHIO

89

1        Q.    When you marked on Deposition R,

2   Mr. Palladino, to inspect as needed, was that

3   restricted to any specific type of cable, or was

4   that for the cables that had been replaced as well?

5        A.    That would have been to inspect the

6   cables, your head rack cables.

7              MR. KOUSTMER:  Objection.

8              MR. WINTER:  Nothing further.

9              MR. KOUSTMER:  Nothing further.  We'll

10       want signature.

11

12   _____
                   MIKE PALLADINO

13

14                    -  -  -

15         (Deposition concluded at 11:52 a.m.)

16

17                    -  -  -

18

19

20

21

22

23

24