# EXHIBIT A

Case 1:02-cv-00039-HJW    Document 151-2    Filed 12/16/2003    Page 2 of 15

Ferguson vs. Ryder                                John M. Roberts, M.D., 2/4/03

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4                        - - -
 5   DAVID FERGUSON, et al.,:
 6      Plaintiffs,        :
 7      vs.                : CASE NO. C-1-02-039
 8   RYDER SYSTEMS, INC.,  :
 9   Et al.,               :
10      Defendants.        :
11                        - - -
12        Deposition of JOHN M. ROBERTS, M.D., a
13   witness herein, taken by the defendants as upon
14   cross-examination, pursuant to the Federal
15   Rules of Civil Procedure and pursuant to Notice
16   To Take Deposition and agreement by counsel as
17   to the time and place and stipulations
18   hereinafter set forth, at the offices of 9250
19   Blue Ash Road, Cincinnati, Ohio, at 5:40 p.m.
20   on Tuesday, February 4, 2003, before M. Sue
21   Lopreato, a Registered Merit Reporter and
22   Notary Public within and for the State of Ohio.
23                        - - -
24
25
```

## Page 2

```
 1   APPEARANCES:
 2       On behalf of the plaintiff:
 3           MICHAEL J. HONERLAW, ESQ.
                of
 4           Honerlaw & Honerlaw
             9227 Winton Road
 5           Cincinnati, Ohio 45231
 6       On behalf of the defendant,
         Allied System & Allied Automotive
 7       Group:
 8           ROBERT A. WINTER, JR., ESQ.
                of
 9           Hemmer, Spoor, Pangburn &
             DeFrank, PLLC
10           250 Grandview Drive, Suite 200
             Ft. Mitchell, Kentucky 41017
11
         On behalf of the defendant,
12       Commercial Carriers, Inc., and
         Ryder Systems, Inc.:
13
             K. ROGER SCHOENI, ESQ.
14              of
             Kohnen & Patton
15           1400 Carew Tower
             441 Vine Street
16           Cincinnati, Ohio 45202
17       On behalf of the defendant,
         Hanes Supply:
18
             CRAIG R. PAULUS, ESQ.
19              of
             Taft, Stettinius & Hollister
20           1800 Firstar Tower
             425 Walnut Street
21           Cincinnati, Ohio 45202
22
23                      - - -
24
25
```

## Page 3

```
 1              S T I P U L A T I O N S
 2       It is stipulated by counsel for the
 3   respective parties that the deposition of JOHN
 4   M. ROBERTS, M.D., a witness herein, may be
 5   taken at this time by the defendants as upon
 6   cross-examination and pursuant to the Federal
 7   Rules of Civil Procedure and Notice To Take
 8   Deposition, all other legal formalities being
 9   waived by agreement; that the deposition may be
10   taken in stenotypy by the Notary Public-Court
11   Reporter and transcribed by her out of the
12   presence of the witness; that submission of the
13   deposition to the witness for examination and
14   signature is expressly waived.
15                        - - -
```

## Page 4

```
 1                      I N D E X
 2
 3   BY MR. SCHOENI:                      PAGE
 4       Cross                             6
 5       Recross                          35
 6   BY MR. WINTER:
 7       Cross                            31
 8
 9
10                      EXHIBITS
11
12   Exhibit     Description          Marked
13   Defendant's 1  History and Physical    5
                of David E. Ferguson,
14              1/2/01, by John M.
                Roberts, M.D.
15
     Defendant's 2  Letter to M. Honerlaw    5
16              from J. Roberts, M.D.,
                1/22/03.
17
     Defendant's 3  Medical Report, 6/9/95.  5
18
     Defendant's 5  Kettering Memorial Hospital 5
19              Emergency Room Visit, 5/7/97.
20
     Defendant's 6  Kettering Medical Center  5
21              Medical Imaging Report,
                L Spine Complete, 5/7/97.
22
23
24   Defendant's 7  Kettering Medical Center  5
                Medical Imaging Report,
25              T Spine Complete, 5/7/97.
```

Case 1:02-cv-00039-HJW   Document 151-2   Filed 12/16/2003   Page 3 of 15

Ferguson vs. Ryder                                John M. Roberts, M.D., 2/4/03

Page 5:

| Exhibit | Description | Marked |
|---|---|---|
| Defendant's 10 | Reconstructive Orthopaedics, Inc. Treatment Report. | 5 |
| Defendant's 12 | The Franciscan Workplace Rehabilitation Center Functional Capacity Evaluation, 7/8/97. | 5 |
| Defendant's 17 | Letter to M. Honerlaw from B. Siegel, D.O., 5/10/99. | 5 |
| Defendant's 18 | Kettering Medical Center Medical Imaging Report, L Spine Complete, 9/7/00. | 5 |
| Defendant's 20 | Curriculum Vitae of John M. Roberts, M.D. | 5 |
| Defendant's 21 | Letter to M. McTighe, M.D. from J. Roberts, M.D., 1/2/01. | 5 |
| Defendant's 22 | Part II, Complete on Initial or Subsequent Visits, 1/2/01. | 5 |

- - -

Page 6:

JOHN M. ROBERTS, M.D.
a witness herein, being first duly sworn, as hereinafter certified, was examined and deposed as follows:
            (Defendant's Exhibit Nos. 1-22 were marked for identification.)
            CROSS-EXAMINATION
BY MR. SCHOENI:
    Q. Please state your name, sir.
    A. John Mark Roberts.
    Q. Dr. Roberts, my name is Roger Schoeni. I'm a lawyer at the law firm of Kohnen & Patton here in Cincinnati.
    A. Okay.
    Q. And I am representing and defending one of the defendants in the lawsuit that one of your patients, David Ferguson, has filed in federal district court. Let me show you what we've marked as Defendant's Exhibit 20, and I'll ask you to identify it.
    A. That's my resume.
    Q. And is that current as of February 4th, 2003?
    A. Relatively so, yes.
    Q. And it's in an abbreviated

Page 7:

fashion?
    A. Yes.
    Q. Okay. You have a more complete CV, I take it?
    A. Yes.
    Q. You provided each of the defense counsel today an opportunity to review your file, and I appreciate you agreeing to do that. I have premarked as Defendant's Exhibit 1 what I believe to be most of that file. I think there may be two or three or a handful of documents that are missing.
            MR. HONERLAW: Roger, are these copies for me to look at?
            MR. SCHOENI: Those are your copies. I made copies for everyone.
    A. Yes, I think this constitutes the bulk of the chart. I can't say with certainty it's every page, but it looks to be pretty close.
    Q. I'll show you what's been marked as Defendant's Exhibit 21 and 22.
    A. Yes, these are from my chart.
    Q. And Exhibit 2, which I think if we take 1, 22 and 2 all together, it should be

Page 8:

pretty close to just about everything that's in your file?
    A. It pretty much is.
    Q. I'm not going to walk through your entire file here today, but I would like to go through some of it with you, Dr. Roberts. Now, you first saw Mr. Ferguson on January 2nd of 2001; is that right?
    A. Yes.
    Q. And he was a referral patient; is that correct?
    A. Yeah.
    Q. And who referred him to you?
    A. Dr. Marty McTighe.
    Q. And when you saw him on January 2nd of 2001, did you take a history?
    A. Yes.
    Q. And did you perform a physical examination?
    A. Yes, I did.
    Q. And then a few days ago, January 23rd of 2003, you authored an opinion letter at the request of Mr. Honerlaw; is that correct?
    A. Yes.

Case 1:02-cv-00039-HJW    Document 151-2    Filed 12/16/2003    Page 4 of 15

Ferguson vs. Ryder                                    John M. Roberts, M.D., 2/4/03

**Page 9**

1  Q. And your opinions are indicated in
2  that letter, and I believe in the last
3  paragraph or two you indicate your opinions are
4  to a reasonable degree of medical certainty; is
5  that correct?
6  A. Yes.
7  Q. And when you use the term
8  reasonable degree of medical certainty, you
9  mean that's based upon your training, your
10  experience, your education, the history that
11  you would have taken, the physical that you
12  would have conducted, and any other medical
13  records that would have been available for you
14  to review; is that correct?
15  A. Yes.
16  Q. And if any of those elements is
17  lacking or in error in any way, it could
18  perhaps cause you to change your opinions; is
19  that correct?
20  A. Yes.
21  Q. Now, when you took the history
22  from Mr. Ferguson on January 2nd of 2001, what
23  did he tell you?
24  A. His chief complaint was that of
25  low back pain and occasional left leg pain. I

**Page 10**

1  understand that he was a driver for a company
2  called Allied Systems. He was working on top
3  of a car carrier, truck of some type, and the
4  security cable broke and he fell to the ground.
5  I don't know what his initial care
6  was. I do know that Dr. McTighe ultimately was
7  the orthopaedic surgeon who was taking care of
8  him for his back and leg pain. He informed me
9  that the pain in the left leg was produced by
10  any physical endeavor, and it was a typical
11  description of radicular pain with radiation of
12  the lateral calf. He rated it on a scale from
13  zero to ten as a six to eight over ten. He
14  said his back pain was constant at a level of
15  five over ten, and he said that he had no
16  similar symptoms in the past.
17  Q. Okay. Now, when he told you he
18  had no similar symptoms in the past, what did
19  you understand that to mean?
20  A. No major back or leg symptoms, I
21  would suppose. I really don't define it in any
22  more detail than that.
23  Q. Now, a few lines down on the first
24  page of your history and physical, there's a
25  line called medical history. Do you see that?

**Page 11**

1  A. Yes.
2  Q. And it says non-contributory?
3  A. Yes.
4  Q. What did you mean when you
5  dictated non-contributory?
6  A. It means that there was nothing
7  discussed or provided that related to the back.
8  Q. And did you ask him if he had had
9  previous problems with back complaints? By
10  previous, I mean prior to his September 4,
11  2000 --
12  A. Yes, we do.
13  Q. And is that a significant part of
14  your treatment?
15  A. It's important in, as we all know,
16  establishing causation. It's important in
17  establishing duration of symptoms and type of
18  treatment approaches you might take.
19  Q. And did you ask Mr. Ferguson if he
20  had any prior back problems before his accident
21  of September 4, 2000?
22  A. Yes, I'm sure we did. I do on
23  every exam of a new patient.
24  Q. And if he would have indicated
25  that he had prior back problems, you would have

**Page 12**

1  expected him to disclose those to you, wouldn't
2  you?
3  A. Normally so, but I guess it's a
4  matter of magnitude as to what they perceive as
5  being important and relevant. I wish patients
6  would allow me to make that decision, but
7  sometimes they do that on their own, where they
8  might only have a few visits to a chiropractor,
9  and they already decided it's not pertinent.
10  So normally, I would prefer that they give me
11  all the information in that regard.
12  Q. But I suppose it's not all that
13  uncommon if a person has had only minor
14  complaints or symptoms over a number of years
15  and sought only occasional treatment, to
16  neglect to mention that?
17  A. That's correct.
18  Q. But on the other hand, if someone
19  had been off work for a number of weeks, had
20  filed workers' comp. claims, and had been
21  diagnosed as having a low back condition that
22  was chronic in nature, you certainly would have
23  expected that to have been disclosed?
24  A. Typically, yes.
25  Q. And it's important, in your

Case 1:02-cv-00039-HJW    Document 151-2    Filed 12/16/2003    Page 5 of 15

Ferguson vs. Ryder                              John M. Roberts, M.D., 2/4/03

**13**

1  treatment of your patients, that they be
2  forthright with you, isn't it?
3       A.  To the best of their knowledge,
4  yes.
5       Q.  Now, after you completed the
6  history portion of your initial visit with
7  Mr. Ferguson, you performed an actual physical
8  examination, didn't you?
9       A.  Yes, I did.
10      Q.  And what did your physical
11 examination consist of, Dr. Roberts?
12      A.  When you perform an examination
13 such as this, you look at all the different
14 neurologic functions, that being motor,
15 strength, sensation, reflexes, one's gait.  And
16 the only abnormality I found was that he had
17 questionable decreased sensation in the left L4
18 and L5 dermatomal pattern; that is, the exact
19 distribution of each of those nerves, L4 and
20 L5, decreased sensation of pinprick.
21          He had no reproduction of the pain
22 when the lower legs were elevated, so there was
23 no major evidence of neurologic compression
24 throughout the exam, so basically, the only
25 thing I found was the decreased sensation in

**14**

1  that particular area.
2       Q.  Okay.  What does it mean by
3  decrease sensation in the left L4-L5 dermatoma?
4       A.  That there is some involvement of
5  those nerve.
6       Q.  And L4-L5 is a low back area?
7       A.  Yes, those are the lumbar 4 and
8  lumbar 5 nerve roots.
9       Q.  And did you actually place your
10 hands on Mr. Ferguson to make that assessment?
11      A.  Yes.
12      Q.  Okay.  Now, did you have any
13 diagnostic studies available for you to review
14 on January 2nd of 2001?
15      A.  Yes.  We had radiographs of the
16 lumbar spine.  My note indicates he had a
17 moderate degree of lumbar spondylosis, which is
18 another word for early degenerative arthritis
19 involving the lumbar spine.  We also had an MRI
20 scan, the date of which I did not record.  I
21 suppose that had been obtained by Dr. McTighe,
22 and that showed that he had a small
23 non-compressive disc herniation at L5-S1,
24 non-compressive referring to no evidence of
25 neural compression.

**15**

1          My note indicates he had a small
2  degree of apophyseal joint arthropathy, which I
3  stated was consistent with his age and activity
4  level.  Apophyseal joint arthropathy is just
5  another word for arthritic change of the facet
6  joints, or small linkages in the back.
7       Q.  Now, the apophyseal joint
8  arthropathy you say is essentially an arthritic
9  change?
10      A.  Yes.
11      Q.  And would not have been
12 traumatically induced?
13      A.  No.  That's a long-standing
14 change.  It's just due to one's level of
15 physical activity.
16      Q.  And same question with regard to
17 the moderate lumbar spondylosis?
18      A.  Yes.
19      Q.  All right.  Then what was the
20 assessment that you made on January 2, 2001?
21      A.  Three different things.  The first
22 was the lumbar sprain/strain, which I
23 attributed to the accident of 9/4/2000.  Second
24 thing was bilateral hamstring contractures,
25 which I didn't comment to you earlier.  When

**16**

1  hamstrings are tight, they can contribute to
2  chronic back pain.  I think they played some
3  role here.  And then the third topic was -- or
4  third assessment was that of minor facet
5  arthropathy, which I said is non-contributory
6  to his work-related condition.
7       Q.  So your initial assessment, in any
8  event, was that the lumbar sprain or strain was
9  causally related to his fall in September 2000;
10 is that right?
11      A.  Yes.
12      Q.  And the bilateral hamstring
13 contractures may or may not have been related?
14      A.  I do not think they were
15 particularly related.  I think it was probably
16 just his nature of being one who drives trucks
17 and sits at a desk through the long hours of
18 the day tend to develop hamstring contractures.
19      Q.  Then you switched his medication,
20 didn't you?
21      A.  Yes.
22      Q.  Why did you switch him from
23 Vicodin to Indocin?
24      A.  Well, Vicodin is a narcotic and
25 simply covers up the symptoms, whereas Indocin

Case 1:02-cv-00039-HJW   Document 151-2   Filed 12/16/2003   Page 6 of 15

Ferguson vs. Ryder                                          John M. Roberts, M.D., 2/4/03

**Page 17**

1  is an anti-inflammatory and will more directly
2  treat the underlying problem.
3      Q.  What was your prognosis, then,
4  that day?
5      A.  It was good.  I thought that there
6  would be a gradual resolution of his symptoms
7  as time went on.
8      Q.  Did you then dictate a letter to
9  Dr. McTighe later that day?
10     A.  Yes, I did.
11     Q.  I've marked that as Exhibit 21.
12 And, in essence, what did you tell Dr. McTighe?
13     A.  That firstly, he was not a
14 surgical candidate.  There was nothing that
15 required surgical intervention.  I felt the
16 majority of his symptoms were soft tissue
17 related, and that would refer to the muscles in
18 the back.  I told him that I shifted him from
19 the Vicodin to the Indocin.  I recommended
20 light duties, and I'd recommended a possible
21 consultation with a physiatrist, physical
22 therapy specialist if the symptoms persisted.
23     Q.  Now, have your impressions changed
24 since January 2nd of 2001?
25     A.  They have, in that when you first

**Page 18**

1  see a patient, you establish a working
2  diagnosis, so your first opinions or
3  assessments are not absolutely carved in stone.
4  I saw him next six months later.
5      Q.  That was July 17th?
6      A.  Yes.  And I don't remember the
7  circumstances, but he was angry about the care
8  he was receiving elsewhere.  I'm not sure what
9  the basis of that was, but we reviewed his MRI
10 scan again, and we had recommended ultimately
11 that he undergo a CAT scan.
12         An MRI scan is somewhat incomplete
13 in evaluating the lumbar spine from a bony
14 standpoint.  It's not a superior way of imaging
15 the bony anatomy.  It is certainly superior for
16 looking at discs and nerves, but you can't
17 always appreciate the proximity of a nerve to a
18 bone spur or the bony anatomy on it.
19         He did undergo EMG performed by
20 Dr. Mitchell Simons that showed acute and
21 chronic radiculopathy, which actually harbors
22 back to what we found in his initial
23 examination that there was a decreased
24 sensation in that L4-L5 pattern.
25         With that, then I decided it was

**Page 19**

1  wise to get the CAT scan.  And I reported on
2  that on 8/30/01, and it showed discs bulging at
3  L4-L5 L5-S1.  That's an insignificant age
4  related process, but it did show facet
5  hypertrophy; that is, enlargement of the joints
6  at L5-S1, which was precariously close to the
7  nerve roots.
8          The working diagnosis that I had
9  initially did change, in that his symptoms, the
10 left leg pain -- at least based on the
11 information available to me, the left leg pain
12 was consistent with my finding on examination,
13 decreased sensation in that L4-L5 distribution.
14         His CAT scan goes on to show that
15 there is some very suspicious compression or
16 irritation of his nerve roots.  So it all
17 seemed to fit together that he had sustained an
18 injury to the nerve, and based upon that, when
19 Mr. Honerlaw asked me for an updated report,
20 and that one dated January 22nd of '03, I had
21 said to him that I thought the pieces fit
22 together; that the left leg symptoms were
23 reflected by the positive EMG, and were shown
24 in the CAT scan to be due to irritation at that
25 L5-S1 level.  And based upon his information is

**Page 20**

1  why I offered the opinion that I thought there
2  was a causation here.
3      Q.  So was the facet hypertrophy
4  traumatically induced?
5      A.  No, over a long-standing period of
6  time.  So it's an accumulative sort of process,
7  over years and years.
8      Q.  So it would not have been caused
9  by the September 4, 2000 fall?
10     A.  No, that's correct.
11     Q.  Can you say, to a reasonable
12 degree of medical certainty, when Mr. Ferguson
13 sustained his injury to the nerve?
14     A.  I learned just before we started
15 today that he did have a prior back-related
16 condition and where there was an absence from
17 work.  I don't think that anyone with a
18 significant degree of nerve irritation as
19 Mr. Ferguson has shown would be able to work
20 productively for very long, particularly in the
21 capacity as a long-distance hauler or an
22 automotive hauler.  Unless there is other
23 information to say that his left leg pain
24 was -- that he'd been treated for it prior to
25 the accident of 9/4/2000, I do think that there

Case 1:02-cv-00039-HJW    Document 151-2    Filed 12/16/2003    Page 7 of 15

Ferguson vs. Ryder                                      John M. Roberts, M.D., 2/4/03

**21**

1  is a basis to say that there is a connection
2  here, within reasonable medical probability.
3      Q.  Well, let me show you Dr. Siegel's
4  May 10, 1999 report.
5      A.  Okay.
6      Q.  Which I've marked as Defendant's
7  Exhibit 17.  It's in everyone's stack.  And I'd
8  ask you to take a moment or two to review
9  Dr. Siegel's report to Attorney Honerlaw, and
10 then I'd like you to answer that question
11 again.
12     A.  (After reviewing document) Okay.
13 Could you restate your question?
14     Q.  Based upon this additional
15 information, which is Dr. Siegel's report of
16 May 10, 1999, can you say, to a reasonable
17 degree of medical certainty, that the injury
18 suffered or that Mr. Ferguson complains of to
19 his nerve was proximately caused by the
20 September 4, 2000 fall?
21     A.  Looking at Dr. Siegel's evaluation
22 really does not give me any reason to think
23 that he had nerve involvement at that time,
24 unless I'm missing something in this.  So
25 there's nothing in this that makes me think

**22**

1  otherwise or to change my opinion.
2          The patient had decreased motion
3  in the back, and had a known injury to his
4  sacroiliac joint on the right side, I believe.
5  And Dr. Siegel notes that neurologically, the
6  patient was intact.
7          Now, he doesn't mention anything
8  about a sensory examination, but I find nothing
9  in here to believe that he had a neurologic
10 injury present at that time.
11     Q.  He certainly had significant
12 complaints of low back pain as of May 10, 1999,
13 didn't he?
14     A.  Yes, he did.
15     Q.  And were you aware that he had
16 similar complaints of low back pain two years
17 previously, in May of 1997?
18     A.  No, I'm not aware of that.
19     Q.  Let me show you what has been
20 marked as Defendant's Exhibit 5, which is the
21 Kettering Memorial Hospital emergency room
22 report from May 7th of 1997.  Ask you to take a
23 minute to look at this.
24     A.  It's curious that this is the same
25 mode of injury as the other two events.

**23**

1          MR. HONERLAW:  Just so we're
2  clear, the report from Dr. Siegel is -- he
3  examined him for a, what was it, May of 1997
4  injury, which I think is the Kettering records
5  that you're looking at right now.
6      A.  Okay.  I follow.
7      Q.  And would you agree that it
8  appears as though this May 7th, 1997 emergency
9  room report is related to or relates to the
10 fall which Dr. Siegel is talking about in his
11 May 10, 1999 report?
12     A.  Yes.
13     Q.  And you weren't aware of the
14 existence of this injury?
15     A.  No.
16     Q.  Prior to today, were you?
17     A.  No, I was not.
18     Q.  And were you aware that his lumbar
19 spine was x-rayed on May 7th of 1997?
20     A.  No, I wasn't aware of that.
21     Q.  Let me show you what I've marked
22 as Defendant's Exhibit 6, and what do you
23 recognize that document to be?
24     A.  It's an x-ray report from
25 Kettering Memorial Hospital, dated 5/7/97, for

**24**

1  an injury sustained at work.  It's a complete
2  set of films of the lumbar spine, showing no
3  abnormalities.
4      Q.  And then on that same date, a
5  thoracic spine examination was done, and let me
6  show you what's been marked as Exhibit 7.
7      A.  That's correct.  And it again
8  shows no abnormality.
9      Q.  And let me show you what I've
10 marked as Exhibit 18, ask you if you can
11 identify that?
12     A.  Complete x-ray of the lumbar spine
13 on 9/7/2000, basically a normal study.
14     Q.  And it even references the May 7,
15 '97 study, doesn't it?
16     A.  No change compared to 5/7/97, yes.
17     Q.  And all three of those reports
18 were taken by the radiologist at Kettering
19 Medical Center?
20     A.  Yes.
21     Q.  All right.  So at least as far as
22 x-ray examination is concerned, his condition
23 between the fall on May 7th of '97 and
24 September 4th of 2000 was unchanged?
25     A.  That's correct.

Case 1:02-cv-00039-HJW   Document 151-2   Filed 12/16/2003   Page 8 of 15

Ferguson vs. Ryder                                    John M. Roberts, M.D., 2/4/03

**25**

1  Q. Well, since Mr. Ferguson didn't
2  tell you about his 1997 fall, am I safe in
3  assuming he didn't tell you about his 1988 fall
4  either?
5  A. That's correct. I'm not aware of
6  that.
7  Q. Let me show you what I've marked
8  as Defendant's Exhibit 3, which is a report of
9  Dr. Marc Whitsett, based on examination he
10 conducted of Mr. Ferguson on June 9th of 1995,
11 and ask you if you've reviewed this before
12 today?
13 A. No, I have not seen this before.
14 Q. Okay.
15 A. (After reviewing document) Okay.
16 Q. Now, this report includes a
17 history that was provided by Mr. Ferguson to
18 Dr. Whitsett, doesn't it?
19 A. Yes.
20 Q. And it looks like he had another
21 similar fall, doesn't it?
22 A. Yes, it sure does.
23 Q. At least according to the history,
24 it says he fell back while tightening some
25 chains and injured his lower back?

**26**

1  A. Yes.
2  Q. And those x-rays didn't reveal any
3  acute fracture or dislocation; is that right?
4  A. Yes, that's correct.
5  Q. And at that time, as of June 9th
6  of 1995, Dr. Whitsett records Mr. Ferguson
7  complained of no significant back pain, but
8  that it comes and goes, and occasionally it
9  goes out to the point that he's in bed for up
10 to periods of one week. Do you see that?
11 A. Yes, I do.
12 Q. And it goes on to say, He does use
13 a low back brace with work, doesn't it?
14 A. Yes.
15 Q. Certainly, you would have expected
16 Mr. Ferguson, if he was being forthright, to
17 convey to you the fact that he had a low back
18 injury in 1988 as a result of a fall, another
19 low back injury in May of 1997 as a result of a
20 fall, both of which preceded his accident in
21 September of 2000?
22 A. Well, it's certainly more than a
23 trivial history, so yes, I would have expected
24 some report of this.
25 Q. Now, Dr. Whitsett gives him a

**27**

1  whole person impairment for this November 10,
2  '88 fall, doesn't he?
3  A. Yes.
4  Q. And it looks like he's using the
5  AMA Guidelines in giving him a two percent
6  whole person impairment?
7  A. Yes, I see that.
8  Q. Now, did you know that Dr. Siegel
9  also gave him a whole person impairment rating
10 for injury to his low back?
11 A. Yes, I did see that.
12 Q. And he gave him an additional
13 eight percent, didn't he?
14 A. Yes.
15 Q. And both these impairment ratings
16 were for injuries to the low back, weren't
17 they?
18 A. Yes.
19 Q. And both of them predated
20 September 4th of 2000, didn't they?
21 A. Yes.
22 Q. And you weren't aware of either of
23 those when you examined him at any time, were
24 you?
25 A. No.

**28**

1  Q. Yet you specifically asked him if
2  he had a back history, didn't you?
3  A. We did.
4  Q. Now, did you send Mr. Ferguson to
5  Dearborn County Hospital for an EMG?
6  A. I don't think I was the one to
7  send him for that.
8  Q. I believe you have a copy of the
9  Dearborn County Hospital EMG in your file,
10 though?
11 A. Yes, there is a copy here.
12 Q. Okay.
13 A. Actually, I did send him for that
14 on 7/20/01.
15 Q. And the EMG was performed on
16 August 7th, is that correct, of 2001?
17 A. If that's what it indicates, yes.
18 Q. I'll let you find it.
19 A. Yes, here it is.
20 Q. Now, page 2 of 2 of the EMG has a
21 space for comments and impression. Do you see
22 that?
23 A. Yes.
24 Q. And Dr. Swartzel writes, There are
25 findings compatible with an old or chronic --

Case 1:02-cv-00039-HJW    Document 151-2    Filed 12/16/2003    Page 9 of 15

Ferguson vs. Ryder                                    John M. Roberts, M.D., 2/4/03

Page 29

1  what's that, left L5 radiculopathy appearing
2  mild to moderate. Did I read that correctly?
3  A. Yes, you did.
4  Q. Now, when he refers to findings
5  compatible with old or chronic L5 radiculopathy
6  on August 7th of 2001, would you interpret that
7  to mean relating back to the fall that he had
8  in 1988, or the fall that he had in 1997, or
9  the fall that he had in 2000, or can you not
10 say which of those falls would be compatible
11 with an old or chronic L5 radiculopathy?
12 A. Based on the study alone, you
13 cannot make any temporal relationship or
14 temporal determination.
15 Q. Because the EMG doesn't
16 distinguish between time periods that extend
17 that far back?
18 A. That's right.
19 Q. So would you have to rely
20 essentially on your history --
21 A. Yes.
22 Q. -- to make that determination?
23 A. I would.
24 Q. And, of course, you know
25 Mr. Ferguson didn't share with you a complete

Page 30

1  history, did he?
2  A. He did not, but the one element in
3  this that I haven't yet seen in the evidence
4  you're showing me is the description of the
5  left leg pain. I think at this point, clearly
6  I -- when I had said in my letter of 1/22/03
7  that he sustained lumbar strain/sprain, I
8  suspect he did, although it's clear that he's
9  had that before. And I said he had an
10 aggravation of his facetal arthropathy. I
11 would say at this stage I would rate that of a
12 mild aggravation of his facet arthropathy.
13       But the one thing I haven't seen
14 that was present before this injury of 2000 was
15 the L5 radiculopathy, unless you're about to
16 show me that.
17       MR. SCHOENI: Well, I'll be frank
18 with you, Dr. Roberts, there are a half dozen
19 or so doctors that have treated Mr. Ferguson
20 whose records I don't have, and we're going to
21 get those, and then maybe we'll have to come
22 back, but for today, I'm done.
23       THE WITNESS: Okay.
24       MR. SCHOENI: I'm going to turn it
25 over to Mr. Paulus and Mr. Winter, see if they

Page 31

1  have any additional questions.
2        CROSS-EXAMINATION
3  BY MR. WINTER:
4  Q. Dr. Roberts, I'm Bob Winter. I
5  represent Allied System and Allied Automotive
6  Group who, by coincidence, happen to be
7  Mr. Ferguson's employer.
8  A. Okay.
9  Q. Just so we can clear up a
10 housekeeping matter, my partner is Michael
11 DeFrank.
12 A. Okay. We've talked before on
13 other matters.
14 Q. Yes. And I wanted to make it
15 understood and that if you can, please,
16 describe what role, if any, that Michael
17 DeFrank's role as your attorney played in the
18 testimony you've given here today?
19 A. Zero.
20 Q. That's what I thought, but we
21 might as well clean it up. Your discussion of
22 facetal hypertrophy, I'm going to mispronounce
23 that, forgive me, is found from the C-scan that
24 appears in your records?
25 A. On the CAT scan, yes.

Page 32

1  Q. Did you actually see the film?
2  A. I don't recall. I think I did see
3  the original films, because then I also make a
4  comment about Dr. Botsford's report.
5  Q. Do you know for a fact whether you
6  saw the film, as you sit here today?
7  A. No.
8  Q. Could have, maybe you did, maybe
9  you didn't?
10 A. Yeah. Based on my dictation, I'm
11 fairly certain I saw it, but I can't guarantee
12 that.
13 Q. Sure. If you could turn to the
14 report for me, and I believe it's dated
15 August 13, '01?
16 A. Yes, I have it right here.
17 Q. If I can turn you all's attention
18 to here. If I can read the language from the
19 report, There's localized -- how do you
20 pronounce that?
21 A. Hypertrophic.
22 Q. -- hypertrophic change along the
23 facet joints at this interspace that is S1, I
24 believe the right greater than left. This
25 results in a slight lateral stenosis right

Case 1:02-cv-00039-HJW   Document 151-2   Filed 12/16/2003   Page 10 of 15

Ferguson vs. Ryder                          John M. Roberts, M.D., 2/4/03

**33**

1  greater than left?
2      A.  Yes, I did say that.
3      Q.  Is that the language in the
4  report, sir, that you rely upon in stating your
5  opinion in Exhibit 2 that the facetal
6  hypertrophy was noted, which was most likely
7  responsible for his neurologic symptoms
8  secondary to minor neural entrapment? And take
9  a minute to review the CT scan report.
10     A.  Well, it was certainly part of
11 what went into my forming my opinion.
12     Q.  Or were there other language or
13 evidence that you had with regard to the
14 facetal hypertrophy within the CT lumbar spine?
15     A.  No, there's no other language
16 there that would come in to that, making that
17 diagnosis.
18     Q.  How about anywhere else in the
19 records, Dr. Roberts?
20     A.  No. The EMG study does relate to
21 this, and potentially not on the right side,
22 but on the left. The left L4-L5 radiculopathy
23 and L5 radiculopathy would come from this sort
24 of hypertrophy at the L5-S1 level.
25     Q.  Okay. Again, the radiculopathy,

**34**

1  though, is -- as far as we're sitting here
2  today, is unknown as to when that -- it's an
3  old chronic radiculopathy as set forth in the
4  EMG?
5      A.  That's right. The EMG, as I said,
6  doesn't tell me. It's the history of what's
7  been in the records here that really -- or what
8  the patient tells me which comes into making
9  that diagnosis.
10     Q.  You had indicated in Exhibit 2,
11 your report, that the facetal hypertrophy was
12 noted, which was most likely responsible for
13 his neurologic symptoms?
14     A.  I did say that, yes.
15     Q.  Are there -- based on the history
16 that my distinguished colleague, Roger Schoeni,
17 has discussed with you, could this undisclosed
18 history be another matter that would be maybe
19 not likely responsible, but somewhat
20 responsible for the neurologic symptoms that
21 were reported to you by Mr. Ferguson?
22         MR. HONERLAW: Objection.
23     A.  Yes, it could potentially be, but
24 yet I have not seen anywhere in the record that
25 he was complaining of radicular-type pain in

**35**

1  his leg; but certainly, these other injuries
2  could have contributed to it.
3          MR. WINTER: I don't have anything
4  further, Doctor. Thank you for your time, sir.
5          MR. PAULUS: And I will just
6  thank you for your time. I don't have
7  anything.
8          MR. SCHOENI: I've got a couple
9  more.
10         RECROSS-EXAMINATION
11 BY MR. SCHOENI:
12     Q.  Just so I'm clear, if I can find
13 references in the record to complaints that
14 predate September 4th of 2000 to left leg
15 radiculopathy, that may bear on your opinions
16 in this case?
17     A.  It definitely will, yes.
18     Q.  Let me show you what's been marked
19 as Defendant's Exhibit 12, which is a
20 functional capacity evaluation that was
21 performed on July 8, 1997, by a physical
22 therapist, Barb Michalowski.
23     A.  (Reviewing document.)
24     Q.  I'm going to certainly invite you
25 to read the entire report if you would like.

**36**

1  I'm going to direct your attention primarily to
2  the past medical history section at the bottom
3  of page 1 that carries over into the top of
4  page 2.
5      A.  Okay.
6      Q.  And when the physical therapist
7  took Mr. Ferguson's history, he apparently
8  related to her pain in his right shoulder, left
9  lumbar area, with occasional ache in left hip
10 and left knee.
11     A.  I do see that.
12     Q.  Which would suggest that as of
13 July 8, 1997, he was suffering pain that
14 extended down to his left hip and on to his
15 left knee?
16         MR. HONERLAW: Objection.
17     A.  It's really not stated that way.
18 It's suspicious, but again, it's -- I wish that
19 she had detailed the description a little more
20 carefully. An occasional ache in the hip and
21 left knee, that could be anything. I just
22 don't know. That's not a typical description
23 of a radicular sort of thing, where you do a
24 continuity. So -- although it's concerning,
25 it's a poor description of something going on

Case 1:02-cv-00039-HJW   Document 151-2   Filed 12/16/2003   Page 11 of 15

Ferguson vs. Ryder    John M. Roberts, M.D., 2/4/03

Page 37

1 there.
2 Q. We'll get her file and see if she
3 describes it more accurately.
4 A. That would be very helpful.
5 Q. Let me show you what I've marked
6 as Defendant's Exhibit 10, which is one of
7 Dr. Autry's Reconstructive Orthopaedics, Inc.
8 documents. And it's entitled "Treatment
9 Report," and it appears to be signed by your
10 patient, Mr. Ferguson, on May 12th of 1997. Do
11 you see that?
12 A. Yes, I do.
13 Q. And above that, above his
14 signature, there is a line for date of injury.
15 Do you see that?
16 A. Yes.
17 Q. And what's the date of injury
18 indicated on this report?
19 A. 10/6/94.
20 Q. And what's the impression that's
21 identified on Exhibit 10?
22 A. Lumbar, acute lumbar strain.
23 Q. So it could be that there's
24 another back injury that occurred on
25 October 6th of 1994 that we don't even know

Page 38

1 about?
2 A. Yes.
3 MR. SCHOENI: That's all I have.
4
        (Signature waived.)
5        JOHN M. ROBERTS, M.D.

6 (DEPOSITION CONCLUDED AT 6:25 P.M.)
         - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 39

           C E R T I F I C A T E
1
  STATE OF OHIO    :
2                  : SS.
  COUNTY OF HAMILTON :
3     I, M. Sue Lopreato, the undersigned,
4 a duly qualified notary public within and for
5 the State of Ohio, do hereby certify that JOHN
6 M. ROBERTS, M.D. was by me first duly sworn to
7 depose the truth and nothing but the truth;
8 foregoing is the deposition given at said time
9 and place by said witness; deposition was taken
10 pursuant to stipulations hereinbefore set
11 forth; deposition was taken by me in stenotypy
12 and transcribed by me by means of computer;
13 submission of the deposition to the witness for
14 examination and signature is expressly waived;
15 I am neither a relative of any of the parties
16 or any of their counsel; I am not, nor is the
17 court reporting firm with which I am
18 affiliated, under a contract as defined in
19 Civil Rule 28(D) and have no financial interest
20 in the result of this action.
      IN WITNESS WHEREOF, I have hereunto set
21 my hand and official seal of office at
   Cincinnati, Ohio, this 4th day of March, 2003.
22
23        M. Sue Lopreato
          Notary Public - State of Ohio
24 My Commission expires:
   April 14, 2005.
25

November 11, 2001


Mitchell Simons, M.D.
4242 Hunt Road
Cincinnati, Ohio  45242

Re:  David Ferguson

Dear Mitch:

I have asked Mr. David Ferguson to come in for your evaluation. Mr. Ferguson is a commercial car hauler who presents with an acute and chronic left L5 radiculopathy.  It is my opinion this is the result of facetal hypertrophy with neural entrapment at L5-S1.  Because this is degenerative in nature, I have discouraged any type of surgical intervention.  In my experience many of these patients end up requiring multiple surgeries and ultimately show no benefit from surgical intervention.

Instead, I have recommended he come in to see you in regard to chronic pain management.  He should have his diagnostic studies in his possession for your review.  I do currently have him on a 20 lb. lifting restriction.

If you require any additional information, please do contact me.

Cordially,


John M. Roberts, V, M.D.

JMR/bjh

**DEARBORN COUNTY HOSPITAL**

8-7-01
PATIENT NAME: Ferguson, David E.
ROOM NO. (ADDRESS IF OUT-PATIENT):
HOSPITAL NO.: 147283  10754141
DOCTOR: John Roberts
AGE: 7-27-49   SEX: M

**NERVE STIMULATION STUDIES:**

Distal Motor Latency   Motor Conduction   Distal Sensory Latency

① Peroneal  3.9 bn (<5.5)   BFH – 41 m/s (>37)
            (5.8 m/s)         AFH – 53 m/s (>41)
                                                3.82
                                                (←→)

① Peroneal F wave – 49.8 m

Ⓡ  "       "      – 48.2 m

**COMMENTS AND IMPRESSION:**

There are findings compatible with an old or chronic ① L-5 radiculopathy (mild to moderate).

ROBERT SWARTZEL JR. M.D.

20-0795 5/84                           EMG – (PAGE 2 OF 2)

# EXHIBIT B

FERGUSON, DAVID                                                    FOLLOW-UP DR. SIMONS
7/17/03

Mr. Ferguson is here for follow-up. He continues to have trouble with pain in his back and leg and actually it has gotten worse lately. The MRI shows actually a tear in his disc and that is something we need to address because obviously it is due to the sciatica problem and the sprain/strain situation that is all work related. This trouble with the radicular symptoms and work related condition needs to be treated with 2 more epidural steroid injections, which we will of course guide fluoroscopically and also there are some facet nerves involved again that need to be addressed and this will help control his pain. In the meantime we need to get him in to see a spine surgeon as soon as we can. We are going to increase his Kadian to 50 mgs. a day and change his Norco over to Actiq sticks, which will be at 400 micgs. We will get a kidney and liver profile to check his blood chemistry to make sure everything is going okay there and make sure there are no adverse effects from the work related medications. We will see him back for follow-up in a month and hopefully by then we have the epidural authorized and done. He understands the risks of steroid use and the epidurals as well.
Mitchell E. Simons, M.D./ns