1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                    WESTERN DIVISION

4    - - - - - - - - - - - - - -
     DAVID FERGUSON, et al.,    :
5                               :
                                :
6          Plaintiffs,          :
       vs.                      :   Case No. C-1-02 039
7                               : (Judge Herman J. Weber)
     RYDER SYSTEM, INC., et     :
8    al.,                       :
                                :
9          Defendants.          :
     - - - - - - - - - - - - - -
10

11

12          Deposition of DAVID EDWARD FERGUSON,

13   plaintiff herein, called by the defendants for

14   cross-examination, pursuant to the Federal Rules of

15   Civil Procedure, taken before me, Wendy L. Welsh, a

16   Registered Diplomat Reporter and Notary Public in

17   and for the State of Ohio, at the offices of Kohnen

18   & Patton, 1400 Carew Tower, Cincinnati, Ohio, on

19   Thursday, November 21, 2002, at 1:18 a.m.

20

21

22

23

24

                                                                2

1   APPEARANCES:

2       On behalf of the Plaintiffs:

3           Thomas R. Koustmer, Esq.
            The Federated Building
4           7 West Seventh Street, Suite 1800
            Cincinnati, Ohio  45202
5           Phone:  (513) 621-3616

6           Michael J. Honerlaw, Esq.
            Honerlaw & Honerlaw
7           9227 Winton Road
            Cincinnati, Ohio  45231
8           Phone (513) 931-2200

9       On behalf of the Defendant Hanes Supply:

10          Craig R. Paulus, Esq.
            Taft, Stettinius & Hollister LLP
11          425 Walnut Street
            Suite 1800
12          Cincinnati, Ohio  45202
            Phone:  (513)381-2838
13
        On behalf of the Defendants Allied Systems,
14      Inc. and Allied Automotive Group:

15          Robert A. Winter, Jr., Esq.
            Hemmer Spoor Pangburn DeFrank PLLC
16          Suite 200, 250 Grandview Drive
            Ft. Mitchell, Kentucky  41017
17          Phone:  (859) 344-1188

18      On behalf of the Defendant Commercial Carriers,
        Inc.
19
            David E. Larson, Esq.
20          Larson & Larson
            11300 Tomahawk Creek Parkway, Suite 310
21          Leawood, Kansas  66211
            Phone:  (913) 253-3100
22
    Also present:
23  Pete Terzian, Jr.

24                          - - -


                            Merit
            602 Main Street, Suite 703, Cincinnati, OH  45202
            (513) 381-8228 * (800) 578-1542 * www.merit-ls.com

3

1                    S T I P U L A T I O N S
2
3        It is stipulated by and among counsel for the
4    respective parties that the deposition of DAVID
5    EDWARD FERGUSON, plaintiff herein, called by the
6    defendants for cross-examination pursuant to the
7    Federal Rules of Civil Procedure, may be taken at
8    this time by the notary; that said deposition may be
9    reduced to writing in stenotype by the notary, whose
10   notes may then be transcribed out of the presence of
11   the witness; and that proof of the official
12   character and qualifications of the notary is
13   expressly waived.

14                            - - -
15
16                      I N D E X
17           Examination                    Page
18           Mr. Larson . . . . . . . .     5, 157
19           Mr. Winter . . . . . . . .   102, 162
20           Mr. Paulus . . . . . . . .   150, 164
21                            - - -
22
23
24

4

1

2

3                    E X H I B I T S

4
                                           Page
5
   Deposition Exhibit T ...................  118
6  Deposition Exhibit U ...................  128

7

8                         - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                  DAVID EDWARD FERGUSON

2  being by me first duly cautioned and sworn, deposes

3  and says as follows:

4                  CROSS-EXAMINATION

5  BY MR. LARSON:

6        Q.    Tell us your full name, please.

7        A.    David Edward Ferguson.

8        Q.    Where do you live, Mr. Ferguson?

9        A.    5885 Lawrenceburg Road, Harrison, Ohio,

10  45030.

11        Q.    Mr. Ferguson, we're here to take your

12  deposition today in a lawsuit that is currently

13  pending here in the federal court in Cincinnati.  Do

14  you understand that?

15        A.    Yes, sir.

16        Q.    Have you ever had your deposition taken

17  before?

18        A.    Yes, sir.

19        Q.    And when was that?

20        A.    The best I recall it was probably four or

21  five years ago.

22        Q.    What were the circumstances of that

23  deposition?

24        A.    It was in a lawsuit that one of our

6

1  drivers had with Allied and I was going to be used

2  as a witness.  And I gave a deposition, but I was

3  never called as a witness.

4       Q.   All right.  Was that an injury that that

5  driver had sustained?

6       A.   I believe it was.

7       Q.   I don't want to go into any detail on that

8  other than what was the type of injury that was

9  involved in that case, as to how it happened?

10      A.   Industrial injury.

11      Q.   Okay.  Working on his truck?

12      A.   Hydraulic line exploded and put chemicals

13 in his eyes.

14      Q.   I'm going to ask, and as are some of these

15 other lawyers here today, several questions, and you

16 heard Mr. Koustmer give some direction to the prior

17 witness about keeping your answers audible and I'd

18 ask for you to do that.  Let us finish our questions

19 and we'll let you finish your answers so we're not

20 talking on top of each other.

21      A.   Yes, sir.

22      Q.   Is that agreeable with you?

23      A.   Yes, sir.

24      Q.   All right.  You, we understand, at least

7

1    up until September 2000, were a car hauler, correct?

2        A.    Yes, sir.

3        Q.    Have you hauled any cars since the date of

4    the injury that we're here about today?

5        A.    No, sir.

6        Q.    And other than the reduced duty, whatever

7    you want to call it, that you were back on a basis

8    with Allied doing limited duties, have you had any

9    other type of employment at all since the day of

10   your accident until today?

11       A.    No, sir.

12       Q.    Have you applied for work anywhere else?

13       A.    No, sir.

14       Q.    Okay.

15       A.    Excuse me, sir.  I didn't apply for work,

16   I did give a resume to the International Brotherhood

17   of Teamsters as a representative -- field

18   representative, but that was -- would be an elected

19   position.  It would have -- even I could still be an

20   employee of Allied and still hold the position.

21       Q.    Is that a paid position?

22       A.    Yes, sir, it is.  It would be a paid

23   position.

24       Q.    Have you stood for election in that

8

1  regard?

2      A.   No, sir.  It's -- it's never came about

3  yet.

4      Q.   Something that's still in the works maybe?

5      A.   Possible.

6      Q.   What are the current restrictions that

7  you're under as far as your doctor's told you,

8  either lifting or anything like that?

9      A.   No prolonged standing, if I sit too long,

10  if I'm uncomfortable, get up, sit down, back and

11  forth, so forth.  Light work as far as like I think

12  the limit was 55 pounds I believe it was.  I believe

13  to my knowledge it was 55 pounds.

14      Q.   And are you currently under the care of a

15  physician?

16      A.   Yes, sir.

17      Q.   And which doctor is that?

18      A.   It's pain management.  It's an alternative

19  to surgery.

20      Q.   Is there a specific physician that

21  oversees your care in that regard?

22      A.   Yes, sir, a Dr. Simons.

23      Q.   And does the pain management program that

24  you're under, does that include medication?

9

1          A.    Yes, sir, it does.

2          Q.    Tell us what your current prescription

3    calls for.

4          A.    I take -- in the mornings I take three

5    pills.  I take -- I might mispronounce some of these

6    medications because some of them's got extensive

7    names to them.

8          Q.    Do your best.

9          A.    I take one pain medication, Kadian, which

10   is a morphine.  I take Celebrex with that and then I

11   take another drug for anti-seizure.  At noon I take

12   Celebrex -- or later on in the afternoon about 3:00

13   I take Celebrex, another pain medication, which is

14   called Norco, and another one of those anti-seizure

15   pills.  And at night before I go to bed, two hours

16   before I go to bed I take a muscle relaxer,

17   antidepressant and another pill for the

18   anti-seizure.

19         Q.    Have you ever had a seizure?

20         A.    No, sir.

21         Q.    Is the anti-seizure medication, is it

22   given to prevent seizures or is it given because

23   there's some benefits from that drug that relate to

24   your pain control?

10

1     A.    It's related to the pain control.

2     Q.    How effective is the regimen that you're

3  under now as far as pain management is concerned?

4     A.    The new regimen I'm under, it is better.

5  It's considerably better than what it was before I

6  went on it, but I still have a lot of pain.

7     Q.    I take it that your pain levels ebb and

8  flow a little bit based upon the level of activity

9  that you do, would that be correct?  Get worse and

10  get better depending on how much you're moving

11  around?

12     A.    Well, no, sir.  Usually the level of pain

13  is more consistent with the medication, what time I

14  take what medication.  If I take the morphine,

15  naturally I'm going to have a better morning than I

16  have a night.

17     Q.    So as the medicine starts to wear off is

18  when you start to feel a little bit more sensitivity

19  to the pain?

20     A.    Sure.

21     Q.    Just as we're sitting here today during

22  the previous deposition and this one, on a scale of

23  one to ten how would you rate your pain?

24     A.    Five to six.

11

1      Q.    And where is the pain located?

2      A.    Lower lumbar region.

3      Q.    Are you having any problems into either

4  leg?

5      A.    My left leg, it goes numb on me.

6      Q.    Is there any pain there or is it just the

7  numbness?

8      A.    Just the numbness.

9      Q.    I think I saw in your records a few

10  occasions where you had actually fallen because of

11  some numbness in your leg.

12      A.    My leg, I -- on several occasions I've

13  lost the use of my leg.  I fell and broke my right

14  toe on my right foot, my big toe on my right foot.

15  And I put a gash in my left leg on the second

16  occasion it happened.

17      Q.    Due to falls?

18      A.    Yes, sir.

19      Q.    Have any of your treating doctors

20  indicated that you would benefit from surgery?

21      A.    Dr. Roberts told me that I wasn't a

22  candidate at the time, that he would like to try the

23  pain management because he told me that the type of

24  surgery he would do I would be back within a year to

1  repeat the surgery.  And I told him that surgery was

2  not an option for me, that I'd like to try the pain

3  management so I could go back to work.  And that's

4  what me and him agreed on and that's when I started

5  the pain management.

6      Q.  Have you been back to Dr. Roberts since

7  you started on the pain management protocol?

8      A.  No, sir, I haven't.  No, sir.

9      Q.  But I understand correctly that although

10 the pain management regime you're under now is an

11 improvement over what you had you're still not to

12 the level where you think you can go back to work as

13 a car hauler?

14     A.  I couldn't do the heavy car hauling,

15 lifting, no, sir, I couldn't, I don't believe, I

16 couldn't --

17     Q.  How about driving a truck, but not being

18 involved with the cargo, is that something that you

19 would be suited for at this point?

20     A.  That part, sir, I don't know.  I would

21 have -- I can't sit for no four or five hours

22 without having to get up, nothing like that.

23     Q.  Have you discussed that possibility with

24 Dr. Simons or any of the other doctors about other

13

1 types of work that you might be able to do provided

2 you could stand up and stretch and that sort of

3 thing?

4        A.   The only thing I've discussed with them,

5 sir, is the fact that I want to go back to work at

6 my job at Allied hauling cars to get my time in with

7 the Teamsters.

8        Q.   By getting your time in, to get to your

9 retirement level?

10       A.   Yes, sir.

11       Q.   How much more do you need to do that?

12       A.   I need six years.

13       Q.   Do you currently have a Workers'

14 Compensation claim pending, or has that been

15 resolved?

16       A.   I'm -- they give me a check each -- well,

17 they haven't gave me a check in a while, but they

18 were giving me a check.

19       Q.   Okay.

20       A.   But I haven't received anything in a

21 while.

22       Q.   Has there been any final disposition

23 insofar as a permanent rating on your back or

24 anything like that?

14

1    A.   No, sir.

2    Q.   Are you receiving any benefits from the

3  Teamsters at all?

4    A.   No, sir.

5    Q.   Are you receiving any benefits from Social

6  Security administration?

7    A.   No, sir.

8    Q.   What sources of revenue do you have

9  currently, if any?  Revenue meaning any type,

10  supplemental payments or benefits.

11    A.   Other than what Allied was giving me?

12    Q.   Yes.

13    A.   The only thing I had, sir, was what little

14  money we had in the bank and the money we could

15  borrow is what we've been living on.

16    Q.   Have you applied for any benefits from the

17  Social Security administration?

18    A.   No, sir.

19    Q.   You originally became a car hauler in

20  1985?

21    A.   Yes, sir.

22    Q.   What did you do before that?

23    A.   I was a truck driver.

24    Q.   Over the road?

15

1    A.    Yes, sir.

2    Q.    Who did you drive for?

3    A.    TF Dunlap Trucking in Fairfield, Ohio.

4    Q.    How long did you work for that company?

5    A.    12 years.

6    Q.    What kind of freight did you haul?

7    A.    General freight.  We hauled Pease

8  Ever-Strait Doors, I'm sure you wouldn't be familiar

9  with that.  They're a door manufacturing company and

10 we hauled their doors to the west coast and hauled

11 their unfinished product back to the plant.

12    Q.    And prior to working for Dunlap who did

13 you work for, if anybody?

14    A.    U.S. Plywood-Champion International.

15    Q.    What were your duties with that company?

16    A.    I was a truck driver.

17    Q.    For how long?

18    A.    Two years.

19    Q.    How about prior to that?

20    A.    I was -- I was in the U.S. Service.  I was

21 in the Army.

22    Q.    How long did you serve in the military?

23    A.    From 1966 and I got out in '69.

24    Q.    When you went to work as a car hauler in

16

1   '85, which company did you start on with?

2        A.   Complete Auto Transit.

3        Q.   At which terminal?

4        A.   Moraine.

5        Q.   And did you remain at that terminal

6   throughout your tenure as a car hauler?

7        A.   Yes, sir.

8        Q.   What number were you on the seniority

9   board when you got hurt?

10       A.   At that time I was 54 on the board at that

11  time because they had merged the two boards back.

12  But now I'm in a lot better position because there's

13  a lot of the young guys that's under me that came

14  from the area.  I'm up on the seniority roster.

15       Q.   And that spot is held for you in the event

16  you're able to return?

17       A.   Yes, sir.  Absolutely.

18       Q.   When you hired on did you undergo some

19  training?

20       A.   Yes, sir.

21       Q.   Through Complete Auto Transit?

22       A.   Yes, sir.

23       Q.   Did they send you somewhere for that or

24  was that local at the terminal?

17

1       A.   It was local.

2       Q.   What did that training generally consist

3  of?

4       A.   How to load and unload cars.

5       Q.   Did they have some hands-on demonstration

6  and also some book teaching or manual teaching?

7       A.   No manual teaching.  It was just all

8  hands-on in the yard.

9       Q.   How long did that training last?

10      A.   Two weeks.  And then we were on the road

11  for a week with another driver.

12      Q.   Do you remember the names of any of the

13  people that trained you?

14      A.   Yes, sir, I remember every one.

15      Q.   Tell me who they were.

16      A.   Dennis Griggs, Phillip Kuchar and Don

17  Anderson -- or Andrews, excuse me.

18      Q.   Andrews?

19      A.   Andrews, yes, sir.

20      Q.   Now, were these all driver trainers?

21      A.   Yes, sir.

22      Q.   Were any of them Complete Auto Transit

23  management people?

24      A.   No, sir.

1    Q.   Did you get any training from anybody from

2  management insofar as how to haul cars?

3    A.   Not as I recall.

4    Q.   Did you, from '85 up until 2000, receive

5  any type of interim training?

6    A.   I'm sure I did because occasionally they

7  have this -- they'll come up with this three-day --

8  they'll take everybody in the entire company and

9  make them go for two hours.  And this happens, and

10  one time I think it was even for three days, but

11  it's usually not on nothing to do with driving.

12  It's all don't tear up a car.

13    Q.   And from time to time would there be like

14  safety videos or other types of videos that are

15  shown to the drivers in the safety meetings?

16    A.   Yes, sir.

17    Q.   Did you attend safety meetings?

18    A.   On occasions, yes.

19    Q.   What was the policy about the attendance

20  of safety meetings?  Were drivers expected to

21  attend?

22    A.   Well, sir, the road drivers, they got them

23  as they came in.  If there was -- some guys got to

24  go, some guys never even went through it.  The

19

1  safety meetings were basically just if a guy was in

2  they'd put him in the safety class for a couple

3  hours, paid him for two hours being in the safety

4  class and that was basically it.  Some guys went for

5  30 minutes and some didn't even go at all.

6      Q.    Were those classes always held on-site or

7  did they take them off site on occasion?

8      A.    They were both.

9      Q.    And would the same be true with Allied

10 Systems, would they hold training safety meetings on

11 a regular basis?

12     A.    I'm sorry, sir, I thought you meant --

13 with the question you asked me prior to this I

14 thought you were talking about Allied.  Were you

15 referring to Allied or --

16     Q.    We started originally talking about

17 Complete Auto Transit.

18     A.    They're all the same company.  They were

19 just bought out by Allied.  They're all still the

20 same people we're all the same that work for

21 Complete, Commercial, right into Allied, we're all

22 the same people still.

23     Q.    Same drivers?

24     A.    Yes, sir.

20

1      Q.    And a lot of the same managers?

2      A.    Well, not management.  They fired most of

3   the them.

4      Q.    Allied did?

5      A.    Yes, sir.  I believe they've got a couple

6   left.  I think they fired two last week.

7      Q.    Now, I take it that from what you just

8   said you keep up on what's going on at that terminal

9   through your acquaintances that are driving there?

10      A.    When I was at the terminals, sir, I was

11   union representative.  So naturally I did -- drivers

12   call me asking me questions, advice and so forth and

13   so on.

14      Q.    Was there a title to the union position?

15      A.    Yes, sir, alternate steward.

16      Q.    How long did you hold that position?

17      A.    I believe it was either three and a half,

18   four years I believe, sir.

19      Q.    What types of things would you usually get

20   involved in in that position?

21      A.    A union steward's job, the alternate's job

22   is when the steward's not there he is the steward.

23   And the steward, we shared the responsibilities of

24   the job.  And the steward's job basically is to

21

1   address the grievances from the drivers to the

2   company.  You're basically a middle man.  You listen

3   to the grievances and instruct a driver.  If you

4   think he has got a grievance then you instruct him

5   what his best action is to take.  And then if he

6   wants to file a grievance then you address it with

7   the company.

8        Q.   Would the steward actually draw up the

9   grievance?

10       A.   No, sir.

11       Q.   The driver would do that?

12       A.   Yes, the driver has to do that himself.

13  The steward can't, that's -- the steward can't do

14  that.

15       Q.   But the driver, should he decide to pursue

16  a grievance, one of the steward's jobs is to help

17  him through that process?

18       A.   Yes, sir.

19       Q.   And if there's a hearing on the grievance

20  would the steward appear at that also with the

21  driver?

22       A.   Well, most likely, sir, you and the

23  business agent will be the person who does the whole

24  thing.  Very seldom does the driver attend the

22

1   grievance hearing.

2       Q.   Okay.  And who was the business agent

3   during this same time frame?

4       A.   George Foster.

5       Q.   And does he still hold that position?

6       A.   Yes, sir, he does.

7       Q.   Is that an elected position?

8       A.   Yes, sir, it is.

9       Q.   Mr. Foster, does he also drive?

10      A.   No, sir.

11      Q.   So his duties are, of the business agent,

12  full time?

13      A.   Yes, sir.

14      Q.   And what's that local number?

15      A.   957.

16      Q.   Now, when the Marion terminal was in

17  operation was that part of the 957?

18      A.   Yes, sir.

19      Q.   Any other terminals that that included?

20      A.   I'm sorry --

21      Q.   The local 957, were there any other

22  terminals that that included?

23      A.   As far as car hauling?

24      Q.   Yes.

23

1     A.   No, they just had the two.  They just had

2  the one at Marion and the one there in Moraine.

3     Q.   Any other trades?  Like does that

4  include --

5     A.   In the union?

6     Q.   Yes.

7     A.   Yes, sir.  We're one of the largest

8  locals.  We probably have 60, 70,000 members

9  probably.  I don't know the exact amount, but I

10  would say that's a pretty good guess.

11     Q.   That would include the auto workers at the

12  GM plant?

13     A.   No, sir.

14     Q.   They're separate?

15     A.   No, sir.  They belong to the International

16  Brotherhood of the Electrical Workers.

17     Q.   So from the Teamster's side it's more the

18  truck driving side?

19     A.   No, sir.  We have policemen, we have

20  county workers, we have airline pilots, we have a

21  variety -- airline mechanics.

22     Q.   And Mr. Foster, he's the business agent

23  for all of those people?

24     A.   No, sir.  That's divided up -- that's

24

1  divided up amongst the business agents.  And each

2  agent is awarded X amount of what we call barns, in

3  other words, companies that he represents.  And I

4  don't know all of them that Mr. Foster represents.

5      Q.   But among those is the car haulers?

6      A.   Yes, sir, it is.

7      Q.   These cables that were produced here

8  today, Mr. Ferguson, to the best of your knowledge,

9  where did they come from?

10     A.   I have not a clue, sir.  They were given

11 to me.  Where they came from prior to that I have

12 absolutely no knowledge.

13     Q.   And just so the record is clear, we're

14 talking about what's been marked as Exhibit Q and

15 the remainder of that cable and apparently one cable

16 that's not damaged, correct?  Or at least not

17 visibly damaged, right?  Or maybe -- it's intact

18 anyway.

19     A.   Right.

20         MR. WINTER:  Let the record reflect that

21     Mr. Ferguson has examined the intact cable.

22         MR. LARSON:  It may so reflect.

23     Q.   Who gave them to you?

24     A.   George Foster.

25

1     Q.   When did he give them to you?

2     A.   Last Monday.

3     Q.   What were the circumstances for that?  I

4 mean, did he call you and say he's got these cables

5 or what?

6     A.   No, not exactly.  It didn't exactly work

7 that way.

8     Q.   That's why I'm asking.

9     A.   He said he had acquired a couple of the

10 cables.  He didn't say where he got them or who he

11 got them from.

12    Q.   And did he call you?

13    A.   No, sir.  I called him on some other

14 business and it came up in the conversation.

15    Q.   And he just announced to you that he had

16 these in his custody and would you like them?

17    A.   Not in those exact words, no.

18    Q.   Tell me the exact words.

19    A.   He just said that he had found some of the

20 old cables, and I asked him if I could have them.

21    Q.   Okay.  Do I understand you correctly that

22 he didn't tell you and you didn't ask as to how he

23 came into custody of them?

24    A.   No.  There was no reason why I would.

26

1      Q.    Whether there was a reason or not, that

2  didn't come up?

3      A.    No, sir, I didn't ask him.  No.

4      Q.    Do you know whose truck these came from?

5      A.    No, sir, I don't.

6      Q.    Do you know what terminal it came from?

7      A.    Like I stated, sir, I don't have no clue

8  where these came from.  They could have came from

9  Georgetown, they could have came from Ft. Wayne.  We

10  have drivers come that knows Mr. Foster for 30 years

11  and comes from all over.  I mean, I'm not even

12  sure -- he could have found them in the garbage

13  because they throw these in the garbage.

14      Q.    The cables that are here before us, have

15  you seen cables like that before?

16      A.    Yes, sir.

17      Q.    Did you have cables like this at any time

18  on a rig that you were using or driving?

19      A.    Like the yellow one here, yes.

20      Q.    And when you say "the yellow one," you

21  mean the one that's broken?

22      A.    Yes, sir.

23      Q.    Now, the truck that you were operating at

24  the time of your injury, 61304 tractor, 71304

1  trailer?

2       A.   I believe that was the numbers.

3       Q.   How long had you been operating that rig

4  prior to the day of your accident?

5       A.   I'm not real sure, but I believe that was

6  a spare truck.

7            MR. WINTER:  A what truck?

8       A.   A spare truck.  I believe mine was in for

9  repairs, for service.  I'm not real sure, but I

10 believe that I was using that as a spare.  I don't

11 believe that was my regular truck.

12      Q.   Do you know what model it was?

13      A.   It's called a 2878 Quick 12.

14      Q.   So it's your best recollection that your

15 regular rig was in for maintenance?

16      A.   As I recall, sir, yeah.  I believe that's

17 true.

18      Q.   And your regular rig was what kind of a --

19      A.   Same thing.

20      Q.   2878?

21      A.   Yes, sir.

22      Q.   Now, are Exhibits A, B, C, D and E, and

23 perhaps even F photographs of the tractor that you

24 were driving on the day of your accident, or that

28

1    you were working on on the day of your accident?

2         A.   I can't rightly say, sir, because I can't

3    see the numbers on it.

4         Q.   Do you know who took those photographs?

5         A.   I know who took the photographs of the

6    pic-- the photographs of the truck that I fell off

7    of.

8         Q.   Okay.

9         A.   Lee Jordan.

10        Q.   Lee Jordan?

11        A.   Yes, sir.

12        Q.   Is he a driver?

13        A.   Yes, sir.

14        Q.   Do you know when Mr. Jordan took those

15   photographs?

16        A.   The day it happened.  I believe he was

17   with another driver, Bobby Slack.  I think they took

18   them together.

19        Q.   Do you know why they took them?

20        A.   Please?

21        Q.   Do you know why they took the photographs?

22        A.   Why they took the photographs?

23        Q.   Yes.

24        A.   Due to the fact that we had had so many of

29

1    them break and we just had a guy to get his neck

2    broke -- I guess Bobby Slack is the union steward so

3    I guess he wanted to -- he was not -- that's

4    something you would really have to ask him.

5         Q.   Okay.  Did you find out about the taking

6    of these photographs sometime later?

7         A.   Yes, sir.  It was a while later.

8         Q.   Mr. Slack was the union steward?

9         A.   Yes, sir.

10        Q.   Now, based upon your testimony was the day

11   of your accident the first occasion you had to

12   utilize the spare truck that you were injured on?

13   Was that the first day you used that?

14        A.   Oh, I'm sure I've used the truck prior to

15   that.  I may not -- it might have been six months

16   prior to that, but I'm sure I've drove the truck

17   before, yes.

18        Q.   Okay.  But as of that occasion at least

19   that was the first --

20        A.   I believe it was.

21        Q.   Your truck had just been shopped?

22        A.   Right.

23        Q.   And you picked this alternate truck --

24        A.   I believe -- to the best of my knowledge,

30

1  I believe that I signed for a spare and this was a

2  spare truck.  I don't believe -- I would have to

3  look at my logbook to refresh my memory, but I do

4  believe that this was a spare truck that I had taken

5  because mine was in for repairs.

6       Q.   Do you have your logs still?

7       A.   I don't know if I do or not.  I'd have to

8  look and see.

9       Q.   Okay.  We'll make a request for them, but

10  if you could locate them and give them to one of

11  your lawyers.

12      A.   I can do that.

13      Q.   If you can find them.

14      A.   Allied should have them.

15      Q.   How long are they supposed to keep their

16  logs?

17      A.   I believe their -- here's their attorney,

18  but I believe their norm is what, six months, then

19  they get rid of them, destroy them.

20      Q.   That's your best judgment?

21      A.   That's what I believe they do with them,

22  isn't it?  Six months, something like that.

23      Q.   He's not being rude.  He's just not here

24  to testify.  At least I don't think he's being rude.

31

1      A.   I apologize.

2          MR. WINTER:  I'm never rude.  They just

3      didn't swear me in yet.

4      A.   But I believe in six months they destroy

5      them.  It might even be less than that, I'm not real

6      sure.

7      Q.   Okay.  But if you had your logs or they

8      had your logs it would identify which tractor and

9      trailer you're operating?

10     A.   Yes, sir.  It sure would.

11     Q.   On any given day?

12     A.   Yes, sir.  We have assigned bid trucks,

13     what they call bid trucks.

14     Q.   Whether it was a spare or your regular bid

15     truck how long had you been working with a 2878

16     quick 12?

17     A.   Since their existence.  I believe they

18     started out in '80 -- or excuse me, not '80.  I'm

19     sorry.  I believe that their -- when we started

20     getting them, I believe, they was around '94, '95,

21     somewhere in around in that neighbor -- I'm not real

22     sure, but I believe that's when we started getting

23     them.  And I was on that -- that's basically the

24     truck I've used, 2878.

32

1    Q.   When the new ones started coming in to

2   your terminal there was a bid process and you were a

3   successful bidder for that piece of equipment, is

4   that the way it works?

5    A.   I would get -- yeah, that's the way the

6   system works, yes, every man has to bid.

7    Q.   All right.  So you were familiar with, if

8   not necessarily the spare truck on the day in

9   question you were familiar with that model and the

10  way it operated?

11   A.   Oh, yeah.

12   Q.   As to your regular bid truck, had the

13  cables been traded out on it as of the time of your

14  injury?

15   A.   No, sir, they weren't.

16   Q.   Any of them?

17   A.   Some of them had been, yes.

18   Q.   Do you recall how many of the four?

19   A.   I can't really -- I can't really say.  But

20  I knew I had it once before -- I asked them to put

21  cables on it once before.

22   Q.   Now on the day of your accident with the

23  spare truck did you at any time prior to your injury

24  examine the cables on that truck to see whether or

33

1   not the cables had been replaced?

2       A.   Are you talking about the truck that I had

3   the injury on?

4       Q.   Correct.

5       A.   Well, there would have been no way that I

6   could have examined the ends of the cables because

7   there's -- as you can see there's plastic over them.

8   I mean, there would have been no way I would have

9   been able to tell if it was broke or not.

10      Q.   Well, that wasn't quite my question, but I

11  appreciate you saying that.  Did you examine them to

12  see whether or not a new or different type of cable

13  had been installed?

14      A.   I had looked up and I had seen that there

15  was three new ones.  Well, actually I seen there was

16  two new ones on the right hand -- on the passenger's

17  side.

18      Q.   Two new ones on the passenger's side?

19      A.   Yes, sir.

20      Q.   And did you look at the driver's side?

21      A.   When I was up loading the truck I noticed

22  it had the ring type on it.

23      Q.   And the ring type meaning new or old?

24      A.   It's just like an O-ring or an eyebolt

34

1  like type thing, where the cable goes through it

2  when it takes the -- when it's flopping in the wind.

3  I take it for granted that keeps the wire from

4  working or whatever -- I don't know what the

5  purpose -- I just -- that's my assumption.

6      Q.   Okay.  And the O type was the new type,

7  the replacement type cable?

8      A.   Yes, sir, the best type.

9      Q.   And the --

10     A.   They have two types of replacements.

11     Q.   What was the other type?

12     A.   (Indicating).

13     Q.   Like the existing one?

14     A.   That one right there (indicating).

15     Q.   And you've demonstrated to us the cables

16 that were brought today that's wrapped in a coil?

17     A.   We were told when we had to sit down with

18 the company after Mr. Fay had broke his neck or

19 whatever injury he did to his neck -- as far as I

20 know the man's not working now.  He had to retire

21 over the injury.

22     Q.   Okay.

23     A.   But we were told that they would replace

24 them as they got them.  And Mr. Weaver, the head

35

1   honcho in the maintenance department told us that he

2   was only allowed -- that he was only allowed X

3   amount of cables at a time.  And I assume that

4   seeing how the truck I had had only had three, I

5   assumed that they had run out of cables because he

6   had to get them from Decatur he told us.

7          MR. PAULUS:  What was that last part?

8       A.   Mr. Weaver had told me and Robert Slack

9   and the terminal manager which was Tom Heller at the

10  time, and Bob Donnelly who was one of the district

11  managers and a Mr. Young who was the district

12  manager from Decatur, that Decatur would --

13          The maintenance -- the guy was the head of

14  maintenance down in Decatur.  I think his name was

15  White, Joe White I believe it is.

16          -- would only give them so many cables at

17  a time because evidently they were -- they wouldn't

18  let him buy them locally and they made them --

19  Weaver said -- Mr. Weaver said they wouldn't let him

20  buy them local that they had to get them from

21  Decatur.  Right.  That they wouldn't let them buy

22  them local to put on the trucks.  And that's the

23  reason we didn't have the cables.

24      Q.   Now were you on a conference call with

36

1    anybody from Decatur at any time to discuss this?

2        A.    No, sir.

3        Q.    That information that was conveyed to you

4    that you just told us, how was that conveyed to you?

5        A.    We were all in a meeting.

6        Q.    And the participants in the meeting were

7    who again?

8        A.    Bill Weaver.

9        Q.    Who's the maintenance --

10       A.    The Maintenance supervisor.

11   Superintendent supervisor.

12       Q.    Sure.

13       A.    Bob Donnelly, who was I guess he would be

14   the general terminal manager, Tom Heller, terminal

15   manager; and I'm trying to think of the fellow's

16   name -- oh, Russ Adams, he's the district manager.

17       Q.    Donnelly and Adams were --

18       A.    Big wigs.  They were higher up in the

19   company.

20       Q.    They were higher up than just the Moraine

21   terminal?

22       A.    Yes, sir.  Yeah, they're --

23       Q.    And this was a meeting that was held after

24   Mr. Fay's injury?

37

1    A.   No, sir.

2    Q.   Oh, when was this meeting held then?

3    A.   Me and Robert Slack had went in the yard.

4 This was after I had been off a year.  And the

5 cables -- they were still breaking.  We went -- we

6 figured the best time to get these cables taken care

7 of was to go in while Mr. Russ Adams was there

8 because he was the district manager.  We took a list

9 of 12 trucks, the numbers of 12 trucks and gave them

10 personally to Mr. Adams and Mr. Donnelly and the

11 other union steward.  And that's when they said they

12 were going to fix them.  Two months later five of

13 them were still unfixed.

14    Q.   So you had a list prepared of trucks that

15 had one or more cables on them that had not been

16 replaced?

17    A.   Yes, sir.

18    Q.   Who developed that list?

19    A.   Robert Slack.  Both of us together.

20    Q.   You went out and actually looked at the

21 trucks --

22    A.   We just happened to be out in the yard.

23 We just happened to be in the yard and I looked up,

24 and I told him that the cable -- that they still

38

1  hadn't replaced the cables on a lot of trucks.  And

2  Mr. Slack, he is the union steward, and he says,

3  Well, I'll take care of this.  And he got a pencil

4  and paper and we marked them down and ran them in to

5  Mr. Adams, and he said it would be taken care of.

6       Q.   And when, approximately, did this take

7  place?

8       A.   I can't give you the exact date.

9       Q.   The best you can recall.

10      A.   It was probably two months before I went

11 off of light duty.

12      Q.   But after your accident?

13      A.   Oh, absolutely.  It was about a year and a

14 half, if not longer after my accident.  I don't

15 recall the exact dates.

16      Q.   Now, do you know if you or Mr. Slack,

17 either one of you happened to keep a copy of that

18 list of the 12 that you gave Adams?

19      A.   No, sir, we gave the list to -- Mr. Slack

20 might have it, but we gave the list -- we showed

21 Mr. Donnelly, his name is Bob Donnelly, we showed

22 him the list.  Bill Weaver chimed in and said he had

23 this taken care of, that the cables were being sent

24 from Decatur, that he wasn't allowed to buy them

1    locally.  And Mr. Slack, I doubt very seriously if

2    he has the numbers of the truck, but -- if I looked

3    through my memos at home I might even have them

4    because it came up later on in a discussion with the

5    company through the union.

6        Q.   Now, based upon what Mr. Weaver said at

7    that time did you conclude that Mr. Weaver was aware

8    that there were some cables that had not been

9    replaced, but they were in the process of doing that

10   when they would become available from Decatur?

11       A.   So I answer this right, just repeat the

12   question so I make sure I answer this the right way.

13       Q.   Did you get the impression from Mr. Weaver

14   at that time that he was aware that not all of the

15   cables had been changed out?

16       A.   I know darn well he was aware that they

17   hadn't been changed out.

18       Q.   Okay.

19       A.   I don't believe it, I know it.

20       Q.   Okay.  And what do you base that on?

21       A.   Because he had been told.  I mean, not

22   only by me, but other drivers, the union.  We had

23   had safety meetings over it.

24       Q.   And this is after your fall?

40

1      A.   Why, yes, it was over a year after my

2  fall, probably a year and a half, if not longer.

3      Q.   Were there any grievances filed?

4      A.   Yes, there was.

5      Q.   Do you know who filed it?

6      A.   Guy by the name of Joel Hand filed one.

7      Q.   H-A-N?

8      A.   H-A-N-D.   Joel, J-O-E-L.

9      Q.   All right.

10      A.   Now, let me explain what happens when a

11  grievance is rescinded.   The reason I'm explaining

12  is so you'll know what happened to the grievance.

13  Okay?

14      Q.   Sure.

15      A.   If the company agrees in a grievance

16  hearing that they'll rectify the problem that the

17  grievant has, in order to keep it from going up the

18  ladder to a hearing in Chicago or Kansas City,

19  wherever it may be, the driver can withdraw the

20  grievance.   Okay.   That's what happened to these

21  grievances, they were withdrawn.   Okay?

22      Q.   Based upon the representation --

23      A.   Based upon the representation that was

24  there at the time, but the company said they would

41

1  take care of this problem.

2      Q.   Okay.

3      A.   And this was the second time that these

4  grievances had been filed and the company gave us

5  the same promise two times in a row.

6      Q.   Was Mr. Hand the guy that filed both

7  grievances or did somebody else do one of the two on

8  this particular issue?

9      A.   I had filed one -- this was after I was

10  injured.

11      Q.   Sure.

12      A.   I had filed one, Joel Hand had filed one.

13  We had heard the same -- we had heard the same

14  scenario in a grievance procedure probably three

15  times.  Two that I'm absolutely positive of, and one

16  I think Mr. Foster heard at a panel hearing, that he

17  had brought it up to one of the Allied

18  representatives and they said they would take care

19  of it.

20      Q.   And I was just going to ask you, as to any

21  of those grievances do you recall who on behalf of

22  Allied was making the representations that it would

23  get corrected?

24      A.   Yes, sir, I do.

42

1     Q.   Who was that?

2     A.   Tom Heller, and Tom Kelley was at one of

3 them.

4     Q.   Okay.

5     A.   Bob Donnelly, Tom Heller was at another

6 one.

7     Q.   Are records made of those things, minutes

8 or any other document that would indicate that this

9 was the action that was taken?

10    A.   There is.  On occasions there is.  But as

11 a rule, you're rushing through maybe 200 grievances

12 sometimes.  And as a rule yeah, we do keep minutes,

13 but as a rule if a grievance is withdrawn there's no

14 record of it.

15       The only ones that we keep is the ones

16 that the company agrees to pay or the ones that

17 we've withdrawn -- or, I mean, not withdrawn, but

18 the ones that is deadlocked to a panel.  Then there

19 is minutes made of those due to the fact that we can

20 see where the grievance went.  But if the grievance

21 was withdrawn by the driver we will never see it due

22 to the fact it's given back to the driver and it

23 usually ends up in the garbage can.

24     Q.   Were these grievances filed under the

43

1   safety article?

2       A.   Yes.

3       Q.   Were there any grievances, to your

4   knowledge, filed about these cables prior to your

5   injury?

6       A.   Joel Hand had filed one prior to mine.

7       Q.   Prior to your injury?

8       A.   Yes.  No.  Excuse me, sir, I'm sorry, it

9   was after my injury.

10      Q.   Do you know of any that were filed before?

11      A.   There wasn't a grievance filed, but it was

12  a safety meeting complaint.

13      Q.   Who made that?

14      A.   I'm not real sure.  We were in a safety

15  meeting.  It was probably 20, 25 guys at the

16  meeting.  Gary Chinn held the meeting and the cable

17  issue was addressed by Joel Hand who was on the

18  safety committee at the time.  And we were assured

19  that the problem was being taken care of.  And that

20  was long before even Mike Fay got hurt because Roy

21  Thornton had told us in a meeting that he had fell

22  off a truck in Marion, Ohio, that a cable broke and

23  he fell off.  He had some bumps and bruises, but he

24  wasn't seriously injured.

44

1    Q.   So if I understand correctly, you and

2  other drivers were in attendance at a meeting which

3  Joel Hand made an issue of the need to correct these

4  cables?

5    A.   Yes, sir.

6    Q.   And was it in that same meeting that this

7  information about Mr. Thornton came to light?

8    A.   Yes, I believe it was.

9    Q.   Now, was Mr. Thornton in attendance or did

10 somebody just mention Mr. Thornton?

11   A.   I don't know.  He was on a different

12 shift.  We were on the second -- at that time the

13 two terminals were split, and we ran a shuttle to

14 Marion and they had a night shuttle and a day

15 shuttle.  And Roy Thornton was on the day shuttle,

16 we were on the night shuttle.

17   Q.   But Mr. Thornton was a Moraine driver?

18   A.   Yes, he was.

19   Q.   The information that you recall being

20 relayed at that time was that Mr. Thornton had had a

21 cable break on him and that he had a fall?

22   A.   Right.

23   Q.   Any discussion about the nature or extent

24 of his injuries?

45

1     A.   No, sir.

2     Q.   If any?

3     A.   No, sir.  I know that he wasn't seriously

4  injured because he was still working.  Or I assume

5  that he wasn't seriously injured because he was

6  still working.

7     Q.   Now, I think you indicated that during

8  that safety meeting that the management

9  representative from Allied indicated that the

10 problem was being taken care of?

11    A.   He said it was going to be addressed, that

12 he would take care of it.  That was Gary Chinn.

13    Q.   Now, in that regard was there any

14 instruction or warning given by Mr. Chinn or anybody

15 else to the drivers as to precautions they should

16 take with respect to working around these cables?

17    A.   No, sir.  The safety meeting was supposed

18 to have been held for an hour.  It went on for about

19 15 minutes because he was complaining about having

20 to pay us for a half hour.

21    Q.   Mr. Chinn?

22    A.   Yes, sir.  The meeting was supposed to go

23 on for an hour and Mr. Chinn was complaining because

24 he had only took 15 minutes and we was -- everybody

46

1   was wanting a half-hour and he was complaining about

2   he had to pay -- complaining because he had to pay

3   for the half-hour.

4        Q.   Well, are you guys paid for safety

5   meetings?

6        A.   Yes, we are.

7        Q.   Is there a minimum that you're paid for

8   those?

9        A.   Well, the safety meetings -- when we have

10  the safety meetings they're actually -- we're

11  supposed to have two hours per month per union

12  contract.  We don't have those.  We might have a

13  safety meeting, there might be 5 guys -- there might

14  be 50 guys go to it one month and they might not

15  have another one for three or four months.  There is

16  no set -- there's no pattern for safety meetings

17  there.

18       Q.   But when you would go are you paid, by

19  contract, are you paid --

20       A.   We're paid contractually, yes, sir.

21       Q.   And are you paid that no matter how long

22  the meeting lasts?  I mean, are you paid for two

23  hours or one hour?

24       A.   They could only hold us two hours.  That's

47

1    contractual.

2        Q.   If you go there for 15 minutes you get

3    paid for two hours?

4        A.   No, sir.

5        Q.   You don't?

6        A.   No.

7        Q.   Okay.  What do you get paid?

8        A.   Fifteen minutes.  One quarter hour.

9        Q.   Do you put in time for that then?

10       A.   Yes.  You have to file for your time.

11   Sometimes they just have you sign a blank down time

12   slip and they pay everybody's name, Social Security

13   numbers, employee numbers on this list.

14       Q.   Did you attend any other safety meetings

15   in which the subject of breaking cables was taken

16   up?

17       A.   I don't re-- no, I don't think I did.  I'm

18   not real sure.

19       Q.   What was your understanding of what was

20   being done to address the cable issue?

21       A.   I can only repeat what was told to me by

22   Mr. Weaver, that they would do them as they got the

23   cables in from Atlanta, or Decatur, which is

24   Atlanta.

48

1       Q.   And this statement was made before or

2   after your accident?

3       A.   After, and before.

4       Q.   And before?

5       A.   Yes, sir.

6       Q.   Okay.  So as of the time of your accident

7   you were aware that some effort was being undertaken

8   to replace cables, but that not all cables

9   necessarily had been replaced, right?

10      A.   Well, my personal opinion was that Allied

11  wasn't doing --

12           MR. WINTER:  Object to opinion.

13      A.   Okay.  All right.

14      Q.   What I want to know is as of the day of

15  your injury you were aware that there were some

16  cables out there that hadn't been replaced, right?

17      A.   I know that Allied was going to get people

18  hurt by not replacing them, that they had actually

19  refused to replace them.

20      Q.   Wasn't quite my question.  What I want to

21  know is what you knew as of the day of your

22  accident.

23      A.   I knew they were going to get people hurt.

24  I don't know exactly how I can answer your question

1  except for the fact that Allied caused my injury,

2  they specifically caused my injury due to negligence

3  because they would not go by the safety codes that

4  they themselves had established.

5       Q.   Okay.  Well, I understand that.

6       A.   I'm sorry.

7       Q.   I understand your feelings, believe me, I

8  do, but what I'm trying to do is get to some factual

9  information.

10       A.   Okay.  I apologize.

11       Q.   No apology necessary.  But irrespective of

12  your feelings about what Allied should or shouldn't

13  have done --

14       A.   Readdress your question.

15       Q.   My question is, is it fair to say that as

16  of the day of your accident that you were aware that

17  there were cables out there that had not been

18  replaced?

19       A.   The day of my accident?

20       Q.   Correct.  In the fleet, that they hadn't

21  replaced all the cables yet.

22       A.   Was I -- no, I wasn't absolutely aware of

23  it.  I would have presumed if I would have had to

24  guess I would have said absolutely they were.

50

1       Q.   They were replaced?

2       A.   No, that they were out there, hadn't been

3    replaced.  No, I knew that they hadn't been

4    replaced.

5       Q.   Okay.  That's what I was getting to.

6       A.   Right.  No, sir, they hadn't been

7    replaced.

8       Q.   With this spare truck that you're working

9    on the day of your accident, you told me that you

10   had looked on the passenger's side and seen the

11   replacement cables up there?

12      A.   Yes, sir.

13      Q.   Or the O-ring type of a configuration --

14      A.   Right.

15      Q.   -- that led you to conclude that they were

16   new cables, right?

17      A.   Right.

18      Q.   You looked at the other side too?

19      A.   And I seen the O-ring and I presumed they

20   both had them.

21      Q.   So you saw one.  Did you specifically look

22   at the lower cable?

23      A.   No, I didn't.  I didn't specifically look

24   at the cable.

51

1     Q.   Okay.  Now, I'm going to approach this two

2  different ways, but the first way was just in your

3  general training without specific regard to this

4  cable issue, what training, if any, did you have

5  about whether or not these cables were there for use

6  as handholds?

7     A.   We were told they were safety cables.

8     Q.   And --

9     A.   That when we were getting out of the

10  vehicles that we were to use those instead of

11  hanging on to the side of the vehicle and damaging

12  and scratching the vehicles.  They were put there

13  for that purpose is what we were told.

14     Q.   So the cables were there for you to grab

15  on to --

16     A.   To use.

17     Q.   -- as a means of keeping your balance --

18     A.   Right.

19     Q.   -- or achieving a three-point stance?

20     A.   Well, you wouldn't be getting no

21  three-point stance on top of a head rack, but --

22     Q.   Just to be clear, you were instructed that

23  that cable was there for you to use as a means to

24  hold on on the head rack as opposed to holding on to

52

1  the vehicle?

2      A.   When we got the vehicle, sir, when it came

3  down from Delavan when they were new, we were told

4  that was a modification because we'd had people

5  falling off of head ramps.  That's the most

6  dangerous ramp of the truck.  As most people -- as

7  car haulers will tell you, that's the one you have

8  trouble getting in and out of because there's no

9  other way of getting out of it except holding on to

10  the vehicle, in an ice storm, et cetera.

11          We were told that they put the cables on

12  there as a safety -- that's what they called them,

13  safety cables that we could use to hold on to to

14  keep our balance and so forth like that.  That they

15  were there to keep us from falling off the truck is

16  what we were told.

17      Q.   Do you have any recollection of who said

18  that?

19      A.   Not for ten years back I don't, no.

20      Q.   And did you use those cables for that

21  purpose?

22      A.   On occasions.

23      Q.   Now then the situation began to develop

24  with the cables breaking, right, where you all began

53

1  to talk about it in safety meetings?

2      A.   Right.

3      Q.   And that occurred how long prior to your

4  accident, best judgment?

5      A.   I can't say exactly right to the --

6      Q.   Oh, I understand.

7      A.   I would say probably --

8      Q.   Are we talking about months?

9      A.   Yeah, months maybe.

10     Q.   And --

11     A.   Several months.

12     Q.   Was there any -- I may have asked you this

13  before, but did you get any type of -- you meaning

14  yourself or the drivers in general, get any kind of

15  caution that while they're in the process of

16  replacing these cables that the drivers should avoid

17  using the cables for keeping balance or for any

18  other reason?

19     A.   I myself have never been -- had no

20  instructions not to use the cables.  As far as I

21  know, personally, I've never heard nobody tell me

22  they ever got instructions not to use them.

23     Q.   Well, whether or not you got that

24  instruction, based upon your awareness that some of

54

1  these cables were breaking, did you yourself then

2  decide that until I'm satisfied that I've got a

3  replacement cable, I'm not going to rely upon a

4  cable for keeping my balance or holding on to it?

5      A.   I'm not real sure.  Are you asking me to

6  make a personal judgment what I would know about the

7  cable or --

8      Q.   Yeah, because you're aware that some are

9  breaking, right?

10     A.   I understand your question, but I'm not

11 sure how -- I'm not sure I know how to answer it due

12 to the fact that I don't know if the cable is good

13 or bad.

14     Q.   And that's my exact point.

15     A.   Because I wouldn't know if this cable

16 would break or not from looking at it.  If I put my

17 hands on it, it breaks, then it was bad.  If I put

18 my hands on it and it doesn't break, then I guess it

19 was all right.  I don't have -- I don't have that

20 expertise to know if this cable is going to break or

21 not.

22     Q.   And since you know that some are breaking,

23 doesn't it make sense then that you aren't going to

24 trust any of them?

55

1          MR. KOUSTMER:  Objection.

2          Go ahead.

3     A.   Well, not necessarily due to the fact that

4  you're getting out of this vehicle, you're being

5  told by your employer that the cables are safe,

6  they're replacing them, that they're good cables,

7  don't worry about them, if they're on the truck

8  they're good, they've been checked, they're good.

9  You trust -- I basically say you would trust your

10  employer that they would be telling you the truth

11  that the cables would be good.

12     Q.   Okay.  When were you told that your cables

13  had been checked and that they're all good?

14     A.   I believe that -- I believe Mr. Palladino

15  answered that question for me.  He --

16     Q.   Well, I'm asking you.

17     A.   Well, as Mr. Palladino said, you know, he

18  said they had told everybody that they had replaced

19  all the cables.

20     Q.   I don't think I heard that.  But I'm

21  asking you, who told you that all the cables had

22  been checked and that they were all fine?

23     A.   When the cable -- when you -- when you

24  send a cable in, you write it up to put it in to

56

1  have the cables replaced, they're supposed to check

2  every cable on that truck to see if any more needs

3  replaced.  So if that truck comes out and it's got

4  three new cables that means that -- I would presume

5  that they checked the fourth one and it was good.

6       Q.   But you're not the one that sent that

7  truck in to the shop, right?

8       A.   Which truck -- the truck that the cable

9  broke on, no, I didn't.

10       Q.   So you weren't aware of the circumstances

11  because that wasn't your regular truck, of what was

12  or wasn't done or why?  True?

13       A.   Well, that's true.

14       Q.   And had you looked at that cable that

15  broke on that day it would have been evident to you

16  that this was one of the non-replaced cables, right?

17       A.   If I would have got up and examined the

18  cable yes, it would have been.

19       Q.   Well, you were right up next to it right

20  before you grabbed it, weren't you?

21       A.   I looked at the cable, sir, I looked --

22  when I looked at the truck, when I did my walk

23  around I seen it had four cables on it.  I had seen

24  that some of the cables had been replaced.  I

57

1  presumed that whoever replaced those first cables

2  would have inspected the whole -- the other -- the

3  rest of the ones.  And if it had one of the old type

4  on that I would presume that they would have checked

5  to see if it was okay seeing how that's their job.

6       Q.   Okay.  So you assumed that if there was

7  what would be considered original equipment, cable

8  on there, that somebody had inspected it and made

9  the decision that it should stay there?

10       A.   Sir, there's -- they replaced --

11  Mr. Weaver and Allied has told us, there's two types

12  of these two cables right here (indicating).

13  They're telling us one has a newer type of steel in

14  it that is better than the old ones we've got.  I

15  wouldn't know if this would be the new one or the

16  old one.

17       Q.   Okay.

18       A.   They're telling us that this same exact

19  cable has got a newer steel in it, it's made

20  different, and it doesn't rust through like these do

21  and they don't break.

22            MR. HONERLAW:  Just listen to his

23       questions and just answer his questions.

24            MR. KOUSTMER:  For the record, he was

1    picking up the rolled-up cable when he was

2    talking.

3         MR. LARSON:  Could you go back and read my

4    question back.

5         (Record read.)

6    A.   Yes, I would.

7    Q.   Okay.  Now, from the answer before that

8    you gave, did I understand you to say that there

9    were two different styles of replacement cable that

10   they were using?

11   A.   Yes, sir.  There was actually three, sir.

12   Q.   One that looked like the O-ring like you

13   mentioned.  And did the other look like the original

14   equipment?

15   A.   Yes, sir.

16   Q.   So is it your testimony that the cable

17   that broke on the day of your accident could have

18   been a replacement cable?

19   A.   No, sir, it was original.

20   Q.   How do you know that?

21   A.   Because of the replacements they've got a

22   new type of metal that when they're put together

23   down here they look like they're -- Mr. Weaver told

24   me that they're pressed a different way or something

59

1    and that they're all shiny.  You can tell they're

2    new because the bottom part are all shiny.

3         Q.   Okay.

4         A.   And they've never been painted over.

5         Q.   So is it fair to say that it would have

6    been evident on inspection that this lower cable on

7    the day of your accident, that that lower cable was

8    original issue?

9         A.   I would assume if I would -- it would have

10   been original, yes.

11        Q.   You could have determined that by visual

12   inspection, right?

13        A.   If it was the new type -- yes, I guess it

14   could have.

15        Q.   If it was the original equipment?

16        A.   Right.

17        Q.   And likewise, you could have determined if

18   it was a replacement cable?

19        A.   If it hadn't been painted over.

20        Q.   Now, the vehicle that you were loading at

21   the time of your injury, you backed it on?

22        A.   Yes, sir.

23        Q.   What kind of a vehicle was that?

24        A.   It was an S10 Blazer.

1      Q.    Was that the makeup of your load that day?

2      A.    I believe so.

3      Q.    When you loaded that Blazer did you extend

4   your ramps out forward?

5      A.    Yes, sir, they stay in an extended

6   position.

7      Q.    For the overhang?

8      A.    Yes.

9      Q.    And what is it, you're allowed three-feet

10  overhang?

11     A.    In front.

12     Q.    On the front.  Is that what you used?

13     A.    I wouldn't have measured it.  I would have

14  presumed that it would have been three foot or

15  under.

16     Q.    Okay.  But it was your practice with those

17  Blazers to take the ramp extension out and use the

18  overhang?

19     A.    Right.  They stay in number three position

20  all the time unless you're loading different

21  vehicles.

22     Q.    And the tie-down slot for that -- we're

23  talking about the rear of the Blazer -- where is

24  that situated in relationship to the tire?

61

1    A.    It would have been in the rear of the -- I

2    mean, it depends on what you call the rear.   It

3    would have been actually behind the right front

4    tire, passenger's side, right behind the front tire.

5        Q.    Toward the rear of the vehicle?

6        A.    In the front, sir.

7        Q.    Okay.  If you've got it backed on, the

8    back of the Blazer is up here toward the front of

9    your head ramp, right?

10       A.    Yes, sir.

11       Q.    So as I'm looking at the vehicle from the,

12   say the ground on the driver's side, the rear tire

13   is to my left, right?  Correct?

14       A.    The rear tire --

15       Q.    The rear tires are on the left and the

16   front tires are on the right as I'm looking at it?

17       A.    Right.

18       Q.    From the ground.  For the rear tie-down

19   slot is it to the right or the left of that rear

20   tire as I'm looking at it?

21       A.    It's in -- the rear tie-down slot?

22       Q.    Yes.

23       A.    It's in the front of the tire.

24       Q.    Okay.  Toward the front of the vehicle?

62

1    A.    It's behind the -- it's behind the front

2  wheels and in front of the rear wheels.

3    Q.    Thank you.  All right.  Is it pretty close

4  to that rear tire?

5    A.    Yes, sir.

6    Q.    Now, as of the time of your fall had you

7  already set the hook in that location?

8    A.    Yes, sir.

9    Q.    And then tell me what you did then and

10  explain to me how the fall happened.

11    A.    I hooked the T hook into the elongated

12  slot, took up the slack with my left hand in the

13  chain.  They have a special hook that you can take

14  up the slack in the chain.

15    Q.    Grab hook?

16    A.    Grab hook.  I took the slack in the chain

17  up with the grab hook, put my right hand down on the

18  trailer ramp, which is the slide part of the

19  trailer, it slides in and out.  It's like a pan

20  actually.  I put my right hand down on that.  I went

21  to get up and I put my left -- I had to stick my

22  foot back a little ways because I was down basically

23  hunched into the wheel.  I started -- my foot went

24  back, my foot slipped back a little bit and I just

63

1  out of instinct grabbed the cable, and I lifted up

2  and when I did the cable snapped.  When the cable

3  let loose I grabbed the top cable, trying to stop

4  from going, but I couldn't.  I was already over the

5  edge of the trailer and that's when I come on down.

6      Q.   Did you get ahold of the top cable at all?

7      A.   Yes, I did.

8      Q.   With what hand?

9      A.   Right hand.

10     Q.   When you grabbed the lower cable you

11  grabbed it with your left hand?

12     A.   Yes, sir.

13     Q.   And did I understand you to say you

14  grabbed it because you were losing your balance?

15     A.   Not exactly losing my balance.  My foot --

16  it's kind of hard to explain it for someone who has

17  never loaded a tractor-trailer with car carriers,

18  but I'll try to explain it to you.

19          There's a gap between the two ramps.  My

20  foot rolled over the front roller, or my tip of my

21  toe went over the roller.  I just instinctively

22  went -- I mean, I wasn't -- I just out of instinct

23  grabbed ahold of the -- placed my hand on to the

24  lower safety cable right -- I'd say just a little

64

1  ways in front of the upright that holds the cable

2  on.

3      Q.   Were you doing that to help yourself stand

4  up?  I mean, was that the purpose for it?

5      A.   Do you mean to pull myself up?

6      Q.   Yes.

7      A.   No.  I just -- I just put my -- when my

8  foot went down, when my foot slipped down a little

9  ways, I mean, I wasn't going to fall off the truck

10 at that time.  My foot slipped a little bit off of

11 the front where the two decks connect because I was

12 down on my knees, I reached up just instinctively.

13 When I did, I just put my weight on the cable and

14 the cable let go.  But I was getting up.

15     Q.   Okay.  Your work at that position was over

16 as far as setting the hook?

17     A.   I had set the hook, yes, sir.

18     Q.   And you were going to be moving back to

19 the rear of that side for the next hook?

20     A.   No, sir.  I had the right -- facing the

21 vehicle from the back of the trailer, I had the

22 right-hand side hooked, I was on the left-hand side

23 hooking it up.  I was -- after that -- at that point

24 I would have tightened them down with a tie-down

65

1  bar.

2      Q.  Oh, I see.  I'm not sure you'll be able to

3  do this with Exhibit A because it shows the broken

4  cable, but when you reached your left hand out to

5  grab the lower cable, where did you grab in relation

6  to the, say where this red circle is?

7      A.  I didn't grab it there at all, sir.

8      Q.  Okay.  That's what I'm trying to figure

9  out is where you did grab it.

10     A.  It was back here somewhere (indicating).

11     Q.  Oh, toward the back?

12     A.  Yes, sir.

13     Q.  So if we just assume that, just for

14 demonstrative purposes --

15     A.  Yes, sir.

16     Q.  -- if the upper rail looks the same as the

17 lower rail, or cable, right, they both kind of have

18 that little sag look to them?

19     A.  Yes.

20     Q.  Since this one's intact I'll just use it,

21 you would have grabbed it back here to where it's

22 attached?

23     A.  Pretty much, yes.

24     Q.  To the post?

66

1      A.   Yes, sir.

2             (Discussion off the record.)

3  BY MR. LARSON:

4      Q.   You've seen the injury reports that were

5  filled out that day?

6      A.   Yes, sir.

7      Q.   And you signed at least a couple of places

8  once you filled out and signed Exhibit H-2, correct?

9      A.   Yes.

10     Q.   And for the information that's contained

11 at least on the ones that Mr. Palladino filled out

12 he was getting information from you and writing that

13 down, is that the way it worked?

14     A.   No, sir.  I think Mr. Palladino filled his

15 out after I left.  I'm not real sure.  I don't

16 recall -- I don't recall being there when he filled

17 his out.  But that one there I do recall that one,

18 yes, sir.

19     Q.   The information that he writes in his

20 reports about the accident is information he would

21 have received from you?

22     A.   He would have took it off of mine, yes,

23 sir.

24     Q.   And you talked to him about how it

67

1  happened?

2       A.   Shortly, yes.

3       Q.   Did you sit down with him and go through

4  the questions on this injury reconstruction form

5  which starts on Exhibit H-3?

6       A.   I'll be truthful with you, sir, I can't

7  remember.  I'm not being facetious.  I just really

8  don't really remember it.

9       Q.   You've looked at these before, but feel

10  free to look at them again.  Is there anything in

11  the reports that Mr. Palladino prepared that you

12  think is incorrect?  Why don't we go off the record

13  and let you do that, and we'll take a short break

14  because we've been at it for almost an hour.  Well,

15  longer than an hour.

16            (Recess taken:  2:35 a.m.  -  2:48 p.m.)

17  BY MR. LARSON:

18       Q.   Let's go back on the record.  Mr.

19  Ferguson, I think when we took a recess I asked you

20  to look at those injury reports that Mr. Palladino

21  prepared to see if you saw anything that was

22  incorrect.  And have you had a chance to look at

23  those now?

24       A.   Yes, sir.

68

```
 1      Q.   Tell me what, if anything, you see there

 2  that is not in accordance with your understanding?

 3      A.   It's misleading, sir.

 4      Q.   In what way?

 5      A.   The way it says, you know, the way my left

 6  hand was on the lower head rack cable and the other

 7  hand was on the T hook, that would have been pretty

 8  much impossible to do, sir.

 9      Q.   Okay.  You couldn't have had your hand on

10  one and the other at the same time is what you're

11  saying?

12      A.   It would have been pretty much, I won't

13  say impossible, but it would have been hard to do.

14      Q.   Okay.  Anything else that you saw there

15  that you have a quarrel with?

16      A.   No.  Other than that this is misleading

17  the way he's got it written down, it's misleading as

18  to what I was -- to the position I was actually in.

19      Q.   Now, the report that you filled out and

20  bears your signatures, does that contain your

21  handwriting, Mr. Ferguson?

22      A.   Yes, sir.

23      Q.   I'm looking at H-2 for the record.

24      A.   It appears so, sir.
```

69

1    Q.    You described what happened as follows:

2  "Putting unit on head ramp put T hook in unit.  Had

3  left hand on safet line."  Is that right?

4    A.    Yes, sir.

5    Q.    "Right on tire started to get up from

6  kneeling position safety line broke causing me to

7  fall side ways.  Hit my back on rial" --

8    A.    Yes, sir.

9    Q.    -- "of head ramp wile I was falling.

10  Safet line was rusted into."  Did I read that

11  correctly?

12    A.    Yes, sir, you read it correctly.

13    Q.    All right.  Now, there's no indication on

14  this form that you filled out about any type of

15  losing your footing or having your toe catch or

16  anything on the ramp, true?

17    A.    No, sir, it's not.

18    Q.    Or it doesn't appear there?

19    A.    No, it doesn't appear, sir.

20    Q.    Would you agree that if someone were

21  looking at this for the first time as to your

22  description of what happened, that they would

23  believe that you were in the process of getting up

24  from a kneeling position and had your hand on the

70

1  cable in that process?

2         MR. KOUSTMER:  Objection.

3         Go ahead.

4     A.   I suppose that's possible, sir.

5     Q.   Well, what other --

6     A.   There's more --

7     Q.   -- conclusion --

8     A.    -- well, yes, there is a conclusion.

9  There is a leading conclusion there, but there's

10  more to it than what is stated in this.

11     Q.   Okay.  Well, you're the guy that fills

12  this out, right?

13     A.   Yes, sir.

14     Q.   Now, it does indicate that the safety line

15  broke causing you to fall sideways.  Now, you would

16  have had your left hand, I think you indicated, on

17  the cable.  So we're talking of falling sideways

18  from the position you were in on the trailer.  Were

19  you facing forward?

20     A.   I was facing -- I was facing the rear of

21  the vehicle.  I mean, the rear of the unit that I

22  just -- the front of the vehicle, the truck.  The

23  rear of the unit that I was putting on but the front

24  of the head ramp.  I was facing the front of the

71

1  head ramp, I guess would be more easier to tell you.

2      Q.   Okay.  That's -- so that the cable and the

3  side of the truck of the head ramp would have been

4  on your left?

5      A.   Yes, sir.

6      Q.   So when you say causing you to fall

7  sideways, you're falling to the left as that cable

8  gives way and your left hand no longer has any

9  support?

10     A.   Yes, sir.

11     Q.   At that point in time when the cable gave

12 way were you somewhere between a kneeling position

13 and standing up?  I'm trying to get a feel for how

14 your feet and legs were arranged at the time that

15 the cable gave way.

16     A.   I really don't recall --

17     Q.   Okay.

18     A.   -- how far off the trailer I was when the

19 cable broke.  I can just recall some of the -- we're

20 talking a matter of seconds here, and like I said, I

21 can't recall exactly how far up off the trailer I

22 was at the time.

23     Q.   Now, fair to say that you had to be low

24 enough down that you went under the top cable?

72

1      A.   Yes, sir.

2      Q.   And what is it that, after you went over

3   the side, what is it that -- what part of your body

4   first came in contact with something else?  Was it

5   your back?  Before you hit the ground did your back

6   hit something?

7      A.   Yes, my back hit the head ramp, but I'm

8   not quite sure which part of my body hit what first.

9   I do recall my back hitting the rail, but I'm not

10  sure if it was my feet hit the side of the truck

11  first or --

12     Q.   Okay.

13     A.   What if nothing -- I mean, this is --

14  we're talking seconds.  There's no way I could --

15     Q.   I understand.

16     A.   I don't believe I could recall something

17  like that, sir.

18     Q.   I understand what you're saying, but can

19  you point out on Exhibit A what it is that your back

20  came in contact with?

21     A.   Yes, sir.

22     Q.   You can put an X on it or --

23     A.   When it broke, when this broke I was about

24  in this position, more than likely was probably in

73

1   this position (indicating).  I reached up with my

2   right hand, grabbed this.  When I did it threw me

3   side -- I was falling.  I grabbed with my right hand

4   to try to stop.

5       Q.   On the top cable?

6       A.   Top.  I was already going over the side

7   and I mean I just got it with the upper part of my

8   fingers and there was no way I was holding on.  My

9   back hit this rail right here (indicating).

10      Q.   And you've drawn a diagonal line through

11  the rail.

12      A.   Right.  I'm sorry.

13      Q.   That's all right.

14      A.   But I -- and also hit this and when I hit

15  the mirror I grabbed on to the mirror and my butt

16  hit the -- the fender comes over -- pretty far over

17  this way and I hit the bottom part of the fender.

18  But I was on my feet, but I didn't stay that way

19  long.

20          MR. LARSON:  Could you read the answer

21      back.

22          (Record read.)

23      Q.   Okay.  You hit your feet first once you

24  got to the ground?

74

```
 1      A.   Yes, sir.  I was grabbing on to everything

 2   that I could grab on to.

 3      Q.   And what is it that came in contact with

 4   the mirror?

 5      A.   I'm not real sure.  All I know is the

 6   mirror was bent, when I got down the mirror was

 7   bent.  The mirror was bent because when I fell off

 8   the truck I was twisting and I was grabbing ahold of

 9   everything that was on the truck to grab ahold of

10   like wet paint.

11      Q.   Is the mirror that you're talking about

12   this right here (indicating)?

13      A.   Right.

14      Q.   I'm going to put an X just to signify the

15   mirror.  Is that okay?

16      A.   Yes, sir.

17      Q.   What I'm having a hard time understanding,

18   you can probably help me with this.  You're holding

19   on with your left hand and the lower cable gives way

20   and you're starting to --

21      A.   Fall to the left.

22      Q.   -- fall left sideways over the side,

23   right?

24      A.   Yes, sir.
```

1    Q.    How is it that you were able to get your

2  feet back under you so that your feet hit the ground

3  first?

4    A.    Well, sir, when I grabbed on to the cable

5  behind me I started turning around, okay.  That's

6  how I grabbed my -- that's what caused my back to

7  hit the rail to begin with.

8    Q.    Turning around --

9    A.    I was going -- I was doing a complete

10  turnaround.  When I reached back this way, when I

11  was going to the left I reached back like this and

12  grabbed the top cable.  I couldn't hold on to it.

13  And when I -- and that's what turned me around to

14  begin with.

15    Q.    So it could have turned you in a

16  counterclockwise fashion?

17    A.    The way you're sitting there, go back the

18  opposite direction.  That's the way I come off the

19  truck.  That's right.

20    Q.    Did you spin --

21    A.    I spun to my right.

22    Q.    Clockwise or counterclockwise?

23    A.    When I was falling, like this

24  (indicating), I started going down.  Okay?  I

76

1  grabbed the cable.  I was already going off the

2  truck.

3      Q.  All right.

4      A.  I grabbed the top cable.  And when I did,

5  by holding on to the cable and my feet coming off

6  the trailer it spun me around, and that's what got

7  my back on the rail.

8      Q.  And what I'm trying to figure out is which

9  way it spun you when you --

10      A.  It would have had to have spun me to the

11  right.

12      Q.  Can you do it counterclockwise versus

13  clockwise?  That's the easiest way for me to

14  understand it.

15      A.  Okay.  I guess that would be clockwise.

16      Q.  Clockwise.

17      A.  To the right.

18      Q.  All right.  Just a poor Kansas boy.

19          MR. KOUSTMER:  Yeah, right.

20          MR. WINTER:  Everybody's reaching for

21      their billfolds right now.

22          MR. KOUSTMER:  Let me put my shoes up.  I

23      didn't wear my boots today.

24  BY MR. LARSON:

77

```
 1      Q.   Okay.  When you hit the ground did you

 2  then tumble on down or did you stay on your feet

 3  when you hit the ground?

 4      A.   No, sir.  I went to the ground, but I

 5  wouldn't say tumbled.

 6      Q.   Okay.

 7      A.   I didn't do no end over end or nothing

 8  like that, no.

 9      Q.   Okay.  And then after that did you go back

10  up and try to continue securing that car?

11      A.   No, sir.  I sat right where I was for a

12  while.

13      Q.   Okay.

14      A.   I can't recall exactly how long.  It could

15  have been five minutes, couple minutes, could have

16  been ten minutes.  But I explained that to

17  Mr. Palladino when I got up there that I had to sit

18  there for a while.

19      Q.   Okay.

20      A.   Trying to get my wits about me.

21      Q.   Trying to get yourself assessed there and

22  sit there for a minute?

23      A.   Uh-huh.

24      Q.   Did you do anything else with respect to
```

78

1  your load after that or did you go see Palladino?

2      A.    No, sir.  I went straight to see

3  Mr. Palladino.  That's procedure.

4      Q.    Okay.  And did you tell him at that time

5  that you thought you might be okay, you wanted to

6  wait and see or --

7      A.    No, sir.

8      Q.    Wanted to get medical attention right

9  then?

10      A.    That's not what happened, sir.

11      Q.    Tell me what happened.

12      A.    I went to see Mr. Palladino, told him what

13  happened, I told him that the cable had broke -- the

14  safety cable had broke and I fell off the truck and

15  I was in pretty severe pain.  He says, Well, can you

16  finish loading?  And I says, I don't think so.  I

17  says, But I gotta -- I says, I left the pony motor

18  running and all this.  I said, I'm going to try to

19  walk back to the truck.  So I -- me and him went

20  back to the truck.  He took me back in his little

21  Toyota pickup.  He left.

22          I walked back up to the trailer by myself.

23  And I told him that -- I said, exact quote, I said,

24  Mike, I don't think I can do this.  I said, I'm

79

1  hurting real bad.

2          He told me that he had called the clinic

3  and he had me an appointment for 2, something.  I

4  think he said 2:30 or something like that in the

5  afternoon.  This is at 10:00 in the morning.

6      Q.  Okay.

7      A.  And so he gave me a ride up to the north

8  yard, Mike Palladino did, dropped me off.  I went to

9  dispatch, and the rest of it, I went to the

10  emergency room from there.

11     Q.  Did you tell somebody inside the dispatch

12  office that you wanted to go right to the hospital?

13     A.  No, I didn't tell them, sir, they told me.

14     Q.  Somebody at dispatch told you you were

15  going to the hospital?

16     A.  Yes, sir.

17     Q.  Based on what you told them?

18     A.  No, I guess because I was -- she said I

19  was -- the guys who were standing there said I was

20  passing out.  I don't know.

21     Q.  Oh.

22     A.  And Ms. Britt came out, Audra Britt came

23  out and sent me to the emergency room.

24     Q.  And how did you get there?

80

1       A.    Driver took me.

2       Q.    Do you recall who?

3       A.    Ed Bush.

4       Q.    Insofar as injuries that you relate to

5  this incident, are we primarily talking about your

6  low back and then the leg numbness?

7       A.    That's pretty much it, sir.

8       Q.    Any other parts of your body that were

9  injured that you still think are injured as a

10 result?

11      A.    Well, I'm having problems -- I'm having

12 problems with the upper part of my back, but, you

13 know, I didn't -- you know, I guess that's my -- I

14 didn't put it down as a claim for this accident or

15 anything.

16      Q.    So you do have -- is it just below your

17 neck that you're having some other problems or in

18 your neck itself?

19      A.    It's below my neck.  It's below -- yes, it

20 is, it's below my neck.

21      Q.    And do I understand you to say that you

22 are unable to correlate those complaints to the fall

23 or do you think they are a result of the fall?

24      A.    No, that's not what I said, sir.  What I

1   said is basically is -- well, I can't say it, the

2   lady's here.

3           What I'm trying to say is I did complain

4   about the problem, but when it was put down it was

5   put down as a -- everything that happens at our

6   place is a sprain/strain unless you've got blood

7   running out of you.  And I told them about the neck,

8   the whole nine yards, but the only thing they put

9   down was a sprain/strain.  Once they put that down

10  at the emergency room, the rest of it, I mean,

11  there's no going back on nothing.  You're just

12  pretty much stuck with whatever part of the body

13  they got down.

14          Q.   Well, the emergency room is separate --

15          A.   Yes, sir.

16          Q.   -- from Allied --

17          A.   I understand that, sir.

18          Q.   -- as far as what they write down, right?

19          A.   I understand that, sir.

20          Q.   And did you tell the emergency room

21  anything about a neck or upper back problem?

22          A.   Yes, sir, I did.  And I seen a kid that

23  had been on staff for about three weeks right out of

24  med school.

82

1      Q.    Young doctor?

2      A.    Yes, sir.

3      Q.    And have you seen your reports from the

4   emergency room?

5      A.    No, sir, I haven't.

6      Q.    Do you know what he wrote down?

7      A.    No, sir, I'm not -- I don't have a clue

8   what he wrote down.

9      Q.    I'm just trying to understand your answer

10  then about it being the young doctor.  Is it your

11  suggestion that he got something wrong or didn't --

12     A.    No, sir.  What I'm saying is he didn't put

13  down all the complaints that I had.

14     Q.    Okay.  What did he put down?

15     A.    I don't know what -- when I got -- when I

16  got down to the doctor that they sent me to, right?

17     Q.    Sure.

18     A.    In Cincinnati, he had got the report from

19  the emergency room, right, and he said -- I'm just

20  going by what the doctor had told me that they had

21  it down as a sprain/strain in the lower lumbar

22  region.

23     Q.    Okay.  And you're telling us that you told

24  that doctor at the emergency room more than problems

1  that you were feeling with the lower back, is that

2  what you're saying?

3      A.   I told the -- I told the emergency room

4  physician that -- he says, Where is your most pain?

5  I told him in the lower part of my back.  He said,

6  Do you have any other pain?  I told him about the

7  neck region.

8      Q.   What did you tell him?

9      A.   I said, It's hurting up here and my arm is

10  sore.

11      Q.   "It's hurting up here," where, in your

12  neck?

13      A.   Yeah, I said between my shoulder blades.

14  I said, It's hurting up here also.  And I just took

15  it for granted when I reached up and grabbed the

16  cable that that's what was causing -- that I had

17  pulled a muscle or something.

18      Q.   Now, have your complaints between the

19  shoulders continued up until today?

20      A.   Sir?

21      Q.   Do you still have complaints to the area

22  of your upper back even today?

23      A.   My arms go to sleep, but the doctor says

24  that they can't -- they can't do nothing about it

84

1  because it's not on the -- it's not on the, what

2  they're treating me for.  And they won't even treat

3  me for it and I don't have insurance because my -- I

4  don't have no insurance and I can't go to any other

5  doctor, so I'm pretty much stuck.

6      Q.  What doctor did you see after you did the

7  emergency room?  I mean did they keep you overnight

8  when they did that?

9      A.  No, sir.

10     Q.  What did he do, check you over and then

11 send you home?

12     A.  He put me -- well, what he did, he checked

13 me over and told me to go my -- he told me to go see

14 a specialist is what he told me to do.

15     Q.  Okay.

16     A.  He said make an appointment to see --

17     Q.  Who did you see then?

18     A.  I saw Dr. McTighe. McTighe.

19     Q.  M-C-T-I-G-H-E?

20     A.  T-I-G-U-E, I believe is the way he spells

21 it.

22     Q.  Okay.  Was he your primary treating

23 physician then?

24     A.  For a while, yes.

85

1      Q.   For a while?

2      A.   Yes, sir.

3      Q.   As you understand it what was Dr.

4   McTighe's diagnosis of your back?

5      A.   Until we did the MRIs he was treating me

6   for a sprain/strain.  He had MRIs done and -- now

7   this Mr. McTighe, he's the one that Allied sent me

8   to.

9      Q.   Okay.

10      A.   Down in Cincinnati.  And he was treating

11   me for a strain/sprain.  He sent me to have an

12   MRI -- do you want me to tell this whole --

13      Q.   Well, just what's your understanding,

14   after they had the MRI --

15      A.   He was treating me for --

16      Q.   Did you get a different diagnosis?

17      A.   Yes.  Yes, I did.

18      Q.   Okay.  And what did that tell you?

19      A.   I had a protruding disc, and the sciatic

20   nerve, bone spur.

21      Q.   Okay.  Did that change at all the way in

22   which you were being treated?

23      A.   Pretty much.  He said it -- he sent me to

24   Cincinnati Spine Institute.

86

1     Q.   Who did you see there?

2     A.   Dr. Roberts.

3     Q.   Okay.  Now, prior to September of

4 2000 when you had this accident we've been talking

5 about what, if any, injuries to your back had you

6 ever sustained?

7     A.   I had been off -- I had been off a couple

8 times with a back injury.  I believe it was in '84

9 and '87.  I was off a couple weeks in '84, I

10 believe, and a couple months in '87.  I'm not real

11 sure.  Just pulled muscles I believe is what it was.

12     Q.   '84 or '94?

13     A.   I'm just -- jeez, it would have been '94.

14     Q.   '94?

15     A.   I'm sorry.

16     Q.   And then '97?

17     A.   I believe so, yes.

18     Q.   Tell me about the first incident in '94,

19 what happened?

20     A.   Just pulled a muscle.  Black and blue it

21 was.  I think I was off for two weeks.  I don't even

22 think I received any benefits or anything.

23     Q.   What were you doing when you did that?

24     A.   Chain broke, I believe it was, the best I

87

1  can recall.  It's been a while.

2      Q.   What part of your back was hurting at that

3  time?

4      A.   The middle of my back, lower middle back,

5  but it was up higher.

6      Q.   And what about the second incident in '97?

7      A.   I'm trying to remember.  I do believe that

8  that's the time that the vehicle slid backwards and

9  pulled a tie-down bar out of my hand.  I fell off

10  the truck, I believe.

11      Q.   Fell off the truck?

12      A.   Yes, I believe it was.

13      Q.   From where, what location?

14      A.   On the first -- the trailer on the 12 car.

15      Q.   Were you on the first level or the second,

16  on the top deck?

17      A.   I was up on -- climbed up on the trailer.

18  There's no ladders or anything.

19      Q.   On the side of the trailer?

20      A.   Yes, sir.

21      Q.   And you fell on your back?

22      A.   Yeah, I believe that's what it was.  Yes.

23      Q.   What part of your back was hurting after

24  that?

88

1      A.   Just lower part of the back.

2      Q.   Did you receive any medical attention?

3      A.   Yes, I did.

4      Q.   From whom, do you recall?

5      A.   Dr. Autrey.

6      Q.   Autrey?

7      A.   Autrey, yes.

8      Q.   Where is he located?

9      A.   Cincinnati.

10     Q.   Was he somebody the company sent you to?

11     A.   No, sir.  I got to Dr. Autrey's address

12 out of the team care book, which is our medical book

13 that comes with our benefit package.  And I

14 called -- at that time I believe it was Commercial

15 Carriers, and they okayed it to go see him.

16     Q.   Okay.  He was one of the available doctors

17 under your program?

18     A.   Yes, sir.

19     Q.   Did you miss some time from work for that?

20     A.   I believe it was May to August or

21 something like that.  I'm not real sure.  It's been

22 a while.

23     Q.   The '94 incident in which the chain broke,

24 did you get any medical attention from them, from

89

1  that time?

2        A.   The first day it happened I believe I did.

3  I'm not real sure.  It's been awhile.

4        Q.   Would that have been in a clinic or

5  emergency room type thing?

6        A.   I believe it was their -- which I can't

7  remember.

8        Q.   I'm sorry?

9        A.   I'm sorry, I can't remember.

10       Q.   Okay.  What did Dr. Autrey tell you about

11 what the situation was with your back in '97?

12       A.   I had a -- pretty much I was off a couple

13 months and went back to work, if I recall.  I'm not

14 real sure.

15       Q.   Did he tell you what, if any, diagnosis he

16 had?

17       A.   I'm not trying to evade these questions,

18 sir.  I just -- It's been a while and I just really

19 can't remember.  I really don't.

20       Q.   All right.

21       A.   I mean, if I had some medical records to

22 look at or, you know, some records, I could probably

23 recall.  You know, being that long amount of time I

24 really don't remember.

90

1     Q.   Did you continue to treat with Dr. Autrey

2  after you went back to work?

3     A.   Yes, sir.

4     Q.   For how long?

5     A.   Dr. Autrey, I just went back to see him

6  just here not too long ago for a checkup.

7     Q.   And what kind of a doctor is he?

8     A.   He's an orthopedic specialist.

9     Q.   When you saw him here recently was that at

10  your expense or somebody else's?

11     A.   I would assume it would be at Allied's

12  expense.

13     Q.   Okay.  What did Dr. Autrey tell you when

14  you saw him here recently?

15     A.   He said that -- I was having a little

16  problem with my numbness in my arm and stuff and he

17  pretty much just told me if I got any worse to come

18  back and see him.

19     Q.   Okay.  When was the last time you had seen

20  him prior to this most recent visit?

21     A.   I really can't recall.  It's --

22     Q.   Let me ask it this way --

23     A.   It's been probably a couple years.

24     Q.   After you saw -- you went to him in '97,

Merit
602 Main Street, Suite 703, Cincinnati, OH  45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com

91

1  immediately after this incident where you fell off

2  the side of the trailer.  Did you then go to him off

3  and on for a period of time?

4      A.   Yes, sir.  Off and on, yes.  But I don't

5  recall the dates.

6      Q.   Did he have any involvement in your

7  treatment after the September of 2000 injury?

8      A.   No, sir.

9      Q.   Did Dr. McTighe, to your knowledge, obtain

10 your records from Dr. Autrey?

11     A.   I don't know if he did or not.

12     Q.   On the day of the accident was

13 Mr. Palladino ever back at your rig with you at the

14 same time?  Did you guys ever go back over there

15 together?

16         MR. KOUSTMER:  After the first time?

17     Q.   After your injury.  The day of your

18 injury?

19     A.   No, sir, not as I can recall.

20     Q.   Now you heard him testify that you went

21 over there and looked at it and saw your tractor.

22 But if he did that you weren't there?

23     A.   No, sir.  You misunderstood what I said.

24 I believe you did.

92

1     Q.   Okay.

2     A.   Well you asked me if -- at the time of the

3  injury when I went up to the trailer.  And if I

4  recall I told you that Mr. Palladino took me back

5  over to my truck --

6     Q.   Okay.

7     A.   -- in his Toyota pickup.

8     Q.   Okay.

9     A.   Now, what Mr. Palladino observed while he

10  was there I have no -- you know, I was -- I can't

11  state what he observed or what he didn't observe.  I

12  don't have a clue what he looked at.

13     Q.   He took you back up to where you were

14  loading?

15     A.   Yes, sir.

16     Q.   And what was the purpose for that?

17     A.   He just took me over to see what -- you

18  know, look at the truck -- I mean, he took me back

19  over there because the truck was still running, the

20  ramps were up, the unit wasn't tied down.

21     Q.   Okay.

22     A.   35, $40,000 unit sitting up there with no

23  chains on it, truck running.

24     Q.   Okay.  How did you get down to where he

93

 1   was?  Did you walk?

 2        A.   I walked, sir.

 3        Q.   How far is that?

 4        A.   Jeez.  I guess probably been a couple

 5   hundred yards.

 6        Q.   Okay.

 7        A.   I'm not real sure.  It's across the

 8   parking lot.

 9        Q.   Did you have any bruising to your lower

10   back, any discoloration or bruising?

11        A.   I had some discoloration for a few weeks

12   after that.

13        Q.   Did anybody take any pictures of that?

14        A.   No, sir.

15        Q.   I'm sorry?

16        A.   No, sir.

17        Q.   Now, there's been some talk about

18   Mr. Fay's incident.  Did you know Mr. Fay?

19        A.   I know him just as a co-worker is all.

20   Don't know him personally, no.

21        Q.   Was he a Moraine driver?

22        A.   He was -- no, he was a Marion driver.

23        Q.   Was his home terminal ever the Moraine

24   terminal while you were there at Moraine?

94

1    A.    I'm not real sure.  I don't know if he had

2  been transferred down at the time of his injury, but

3  I believe he was a Marion driver still.

4    Q.    Okay.  And I should ask you this, if you

5  know, the spare truck that you were using on the day

6  of your injury, was that truck domiciled to Marion

7  or Moraine or some other terminal?

8    A.    I couldn't answer that.  I don't have a

9  clue where that truck was domiciled at.  I would

10  assume it would either be Moraine or Marion.

11    Q.    Now, did the word get around pretty

12  quickly that Mr. Fay had fallen as a result of a

13  cable break?

14    A.    I couldn't answer that.  I assume that

15  people talked to one another.

16    Q.    Did you become aware of it?

17    A.    I was there the day it happened, sir.

18    Q.    Did you do any type of investigation

19  yourself?

20    A.    No, sir, I didn't.

21    Q.    How did you become aware of Mr. Fay's fall

22  on that day?

23    A.    Seeing the ambulance leaving.

24    Q.    Okay.  Did you make any inspection of his

95

1   tractor-trailer?

2       A.   No, sir.

3       Q.   Did you make any inquiry as to what

4   happened?

5       A.   I did see the tractor, yes, sir.

6       Q.   You did?

7       A.   Yes, sir.

8       Q.   Were you able to tell if there were any

9   broken cables?

10      A.   I didn't look at it, sir.  They just said

11  he had fell off the truck.  Nobody even told me

12  where he fell from.  It was much later that I found

13  out that the cable had broke on him.

14      Q.   Was it prior to your injury that you found

15  that out?

16      A.   Yes, sir.

17      Q.   Was there any discussion about that at any

18  type of a safety meeting format?

19      A.   I don't recall any, sir.

20      Q.   Any type of discussion insofar as your

21  position as an assistant union steward?

22      A.   Do you mean in regards to Mr. Fay, sir?

23      Q.   Yes.

24      A.   I don't recall no discussion, no, sir.

96

1    Q.   Now, was --

2    A.   Excuse me, sir.  When you say discussion

3  do you mean did we have a meeting over Mr. Fay or

4  did we just have a casual talk?  I'm not real sure I

5  know what you're asking.

6    Q.   Let me ask you, I took it from what you

7  said before that you in your position as a union

8  representative had concerns about the fact that

9  Allied wasn't addressing this cable issue in a

10  satisfactory way.  Is that true?

11       MR. KOUSTMER:  Objection.

12       Go ahead.

13    A.   No, sir.  I don't think they was

14  addressing the issue at all.

15    Q.   And once it came to your attention that

16  the driver had fallen and the indication was that it

17  was because of a cable breaking, did that generate

18  any activity on your part insofar as your union

19  responsibilities were concerned?

20    A.   I wasn't Mr. Fay's steward.  Mr. Fay had

21  another steward, totally different steward.  His

22  name was Ken Barrett.

23    Q.   Did you discuss that with that gentleman?

24    A.   No, sir.  Mr. Barrett had his own people.

97

1  We handled ours, they handled theirs.

2      Q.   Did it create any concerns on your part

3  either just because you're a driver or in your

4  capacity as a union official or representative that

5  there was still a problem with these cables?

6      A.   We turned that over to the local, sir, and

7  they handle that.  After we go so far with it it's

8  turned over to the local and they take care of the

9  rest of it.  If the company doesn't address the

10  issues then it's a matter of the local to take up.

11      Q.   And that's what I'm wanting to know is

12  what, if anything, was done by anybody on behalf of

13  the union?

14      A.   Of Mr. Fay?

15      Q.   As it relates to the union as to the fact

16  that he had an accident that appeared to involve a

17  breaking cable.  Do you know of anything that was

18  done at the union level after that was done, after

19  that happened?

20      A.   Do you mean did the union take up an issue

21  with Mr. Fay specifically or did they take it up as

22  a whole that the cable was --

23      Q.   Either one.

24      A.   I don't think Mr. Fay was taken up as an

98

1    issue as an individual.  The issue was taken up as a

2    whole for both terminals that this problem wasn't

3    being rectified.  But I don't think Mr. Fay had any

4    bearing -- well, I'm sure it did to the fact that

5    the business agent brought it up that there was a

6    man injured, a couple people injured on it.  I'm

7    sure he brought it up at the mid-level hearings in

8    probably Kansas City, Chicago, wherever it was

9    brought up at.

10        Q.   Would it be fair to say that based upon

11   what you had learned about Mr. Fay's injury that

12   there were still some issues with respect to these

13   cables on vehicles at Marion and/or Moraine?

14        A.   I'm not sure I understand --

15             MR. KOUSTMER:  Objection.

16        A.   I'm not sure I understand your question,

17   sir.  It seems like I've answered the same question,

18   but just in a different way about three or four

19   times.  I'm not real sure I know exactly what you're

20   asking.

21        Q.   Okay.  Well --

22        A.   I believe that you're trying to ask me if

23   Mr. Fay had any bearing on me or my accident.  No.

24   Mr. Fay is --

99

1          MR. KOUSTMER:  Just answer his question.

2     Q.   Well, the point is that based upon your

3 awareness of Mr. Fay's accident you were aware that

4 there were ongoing problems with the cables, right?

5     A.   Sir, after Mr. Fay had his accident I

6 never saw Mr. Fay again.

7     Q.   I understand, but the manner in which he

8 was injured came to your attention, correct?

9     A.   Yes, sir.

10    Q.   And is it your testimony that that didn't

11 create any issues so far as you were concerned as to

12 whether the cables that were still on the vehicles

13 presented a hazard?

14         MR. KOUSTMER:  Objection.  I think it's

15     been asked and answered several times.

16    A.   I believe I've answered that question,

17 sir.

18    Q.   Why don't you try it again.

19    A.   Okay, sir.  As I said in my previous

20 statement to the question you asked previously, I

21 looked up, by the time -- yes, I looked up -- they

22 told us they were fixing cables.  I looked up, I saw

23 new cables on one side of the truck, I presumed the

24 cables were good because I knew they had been up

1  there.

2          If they didn't look at the whole thing and

3  they left one on there that was bad then God help

4  them.  I mean, to me it seemed like if a person

5  fixed three, wouldn't you fix the fourth one?  If

6  you go up there, you know you got three bad ones and

7  it's in the shop, you would presume that they would

8  have looked at the other and said, Well, this one's

9  okay for the time being or they just didn't have the

10  cable to fix it or whatever.  I don't know what

11  their problem was.

12      Q.   When you're up there securing that

13  vehicle, just prior to your injury, that lower cable

14  was only a couple feet from you, wasn't it?

15      A.   It would be inches, sir, not feet.  I

16  would say it would probably be inches from my face.

17  I would say probably less than a foot from my face

18  at times.

19      Q.   I really don't mean to be repetitious, but

20  I just want to understand.  Was your grabbing of

21  that lower cable on the occasion of your fall simply

22  a reflex to the fact that you were losing your

23  footing?

24      A.   I would -- that's exactly what I was

101

1  trying to explain to you.  I grabbed the cable, just

2  out of reflex -- when I -- I didn't lose my footing.

3  I stepped back, there was a gap in between the two

4  trailers, my toe went in, and I was still getting up

5  and the tip of my toe came off of the deck.  I just

6  went down that few inches and, out of reflex, I

7  grabbed the cable, put weight on it, and that's when

8  it snapped.

9       Q.   So if your toe hadn't caught the way you

10 described it, it wasn't your plan to use the cable

11 to help yourself up?

12      A.   I probably wouldn't have used it, no.

13      Q.   And I'm curious as to why that information

14 does not appear in any of the injury reports.  Can

15 you help me with that?

16      A.   I would say it was probably because of the

17 injury.

18      Q.   Why is that?

19      A.   I would say -- I would imagine I was

20 probably trying to get out of there.  That report

21 was taken before I left to go to the emergency room.

22 They don't let you move until you fill that out

23 unless you go out in an ambulance.

24      Q.   Regardless of the circumstances of giving

102

1  the accident report you would agree that it's

2  important to report correctly and accurately what

3  happened, true?

4        MR. KOUSTMER:  Objection.

5     A.   Do I believe that that's important?

6     Q.   Sure.

7     A.   How it is filled out?  I would imagine so,

8  yes.

9     Q.   If you want it to be true and accurate as

10  to what happened, don't you?

11     A.   Yes, sir, I would imagine you would.

12        MR. LARSON:  Tell you what I'm going to

13        do.  I'm going to pass you on to one of these

14        other lawyers here, Mr. Ferguson.  Thanks for

15        your attention and your time.

16        THE WITNESS:  Thank you, sir.

17        (Discussion off the record.)

18              CROSS-EXAMINATION

19  BY MR. WINTER:

20     Q.   Mr. Ferguson, please tell me what

21  medications you've taken today.

22     A.   I took the medications I described to the

23  other attorney here.  I take them on a daily basis.

24     Q.   Do those medications in your viewpoint

1   sitting here today impair your ability to testify

2   truthfully during your deposition?

3       A.   No, sir.  I don't think they would impair

4   my ability to testify truthfully, no.

5       Q.   So you've done your best to testify

6   truthfully and completely today?

7       A.   I believe I have, sir, yes.

8       Q.   When's your next appointment to treat with

9   any physician or healthcare giver regarding the

10  injuries that you've talked about today?

11      A.   December the 20th, sir, I believe is the

12  next appointment.

13      Q.   Who will you see?

14      A.   I will either see a lady by the name of

15  Lisa or a gentleman by the name of Michael Simons.

16      Q.   Oh, Mitch Simons?

17      A.   Yes, Mitch Simons.

18      Q.   The pain management guy?

19      A.   Yes.

20      Q.   And Lisa's with Dr. Simons' office?

21      A.   Yes, sir.  She is.

22      Q.   That's up on Hunt Road, isn't it?

23      A.   Yes, sir.

24      Q.   Please describe for me why you will be

104

1    seeing either Dr. Simons or Lisa.

2         A.    It's a monthly checkup.

3         Q.    Okay.  We're not doing a procedure or

4    test --

5         A.    I had shots yesterday, sir.

6         Q.    Please describe for me what you received

7    yesterday.

8         A.    I believe they were steroids.  I received

9    two in the back.

10         Q.    Have you received any cure or relief as a

11    result of the injections you received yesterday?

12         A.    I'm sore due to the fact you'll be sore

13    after you get them.  You'll be sore for a couple

14    days.  It's --

15         Q.    Do they help get rid of pain?

16         A.    Yes, sir, they do.

17         Q.    How long does the positive effects of pain

18    relief last after an injection?

19         A.    It depends, sir.  Sometimes they last

20    months, sometimes six weeks.

21         Q.    How long have you --

22         A.    I've had five epidural steroid injections,

23    which is the spinal injections, plus I've had ten of

24    the steroid injections.

105

1    Q.   Will this injection that you have

2  yesterday be the last in the series of pain

3  management techniques?

4    A.   I couldn't answer that, sir.  I believe it

5  would be, yes.  I hope it would be, but I can't

6  answer that.  I really don't know, honestly, I

7  don't.  I just do what they tell me to do pretty

8  much.  You know, I do walking and do whatever they

9  tell me to do, you know.

10    Q.   At the risk of repetition, does the fact

11  that you received an injection yesterday impair your

12  ability to testify truthfully today?

13    A.   No, sir, I don't believe it does.  No.

14    Q.   After the December visit that you say is

15  upcoming, where do you see your treatment going?

16    A.   Well, I eventually see my treatment going

17  back to work.  That's why I'm in pain management.

18  That's the reason I elected to take pain management

19  instead of having surgery.  Because Dr. Roberts told

20  me and my wife that if I had the surgery that I was

21  done.  But I could fight the pain, go to pain

22  management, and then I could probably eventually get

23  back to where I could get the rest of the time in

24  for my retirement.

106

1    Q.   We're having a visit next month?

2    A.   Yes, sir.

3    Q.   With Dr. Simons or one of his colleagues?

4    A.   Yes, sir.

5    Q.   Okay.  Is there a next step that you're

6  aware of in your treatment regimen that you see

7  coming or that anyone's told you about, Mr.

8  Ferguson?

9    A.   No, sir.  They haven't told me.  I've

10  requested to go back to work, but the company says

11  that they don't have no work that fits the format

12  that they've got me on.

13    Q.   I meant from a medical side.  I didn't

14  mean from an Allied side.  But strictly from

15  Dr. Simons or any of the other healthcare givers

16  that you're seeing.

17    A.   No, sir, they haven't -- they haven't -- I

18  believe what you're asking is if I know if I'm --

19  the treatment will be over with in Dec-- I couldn't

20  answer that, sir, I don't know.  That would be

21  something that Mr. Simons -- or Dr. Simons would

22  have to answer on.  I couldn't answer that.

23    Q.   Right.  Not only am I asking you about

24  your personal knowledge, but has anyone, within --

1  any doctor told you what will be next?

2       A.   No, sir.  Hopefully work.

3       Q.   Okay.

4       A.   And insurance for my family, I hope.

5       Q.   If I can get back to the Thomas Foy

6  incident.

7       A.   Fay you mean?

8       Q.   Yes, Mr. Fay.  If you could give me a

9  number of days or number of weeks of the period of

10  time from the time of Mr. Fay's accident until you

11  became aware that the reason allegedly for that

12  accident was because of a broken cable.

13       A.   I really couldn't do that, sir, because I

14  wouldn't know how many days it was.  I know I didn't

15  know right -- I didn't know -- actually, I didn't

16  even know who it was that the ambulance took out of

17  the -- off of the yard probably until about four

18  hours later because I was busy doing something else.

19  I did see the ambulance leave, but we have yard

20  workers getting hurt all the time.  And there's

21  always somebody getting hurt.  It was probably at --

22  the 6:00 crew was coming in on the shuttle when I

23  found out that Mike Fay had got hurt.

24       Q.   Was it Mike --

1     A.    Nobody said nothing about a cable, they

2   just said he fell off the truck and hit his head is

3   what they told me.

4     Q.    I'm just trying to get a flavor or a feel

5   for the amount of time it was from the time you knew

6   that Mr. Fay had fallen off the truck until you had

7   become aware that the reason for his fall was

8   because of a snapped cable.  And not a matter of

9   minutes or seconds, of course.

10    A.    Two or three weeks maybe, I guess,

11  probably.

12    Q.    Approximately --

13    A.    Because I don't think there was that much

14  time span between mine and his.

15    Q.    So approximately two to three weeks?

16    A.    I would assume, yes.

17    Q.    You're acquainted with a Ray Thornton?

18    A.    Roy Thornton.

19    Q.    Yes, Roy.

20    A.    Yes, sir, I know him.

21    Q.    Who is he, sir?

22    A.    He's an employee at Allied, a driver.

23    Q.    Is he a friend or colleague?

24    A.    No, sir, I just know the guy.

109

1     Q.   Has he had any injuries on the job as a

2  result of one of these cables failing?

3     A.   I don't know if he had medical attention.

4  I know that he fell off -- the cable broke and I

5  know he fell off the truck in Marion, Ohio.  I don't

6  know if he had any medical attention or not.  I

7  couldn't answer that.

8     Q.   How do you know that he fell off a truck

9  because of a cable snapping, sir?

10     A.   We had a safety meeting.  This was

11  probably a year prior to the Mike Fay incident.  We

12  had a safety meeting.  I'm not exactly sure how long

13  it was, but we had a safety meeting and I believe I

14  stated once before that that was a safety meeting

15  with Gary Chinn.  And it was brought up by -- Joel

16  Hand and Roy Thornton -- he was -- the name of Joel

17  Hand brought up Roy Thornton's name in a safety

18  meeting that Roy Thornton was the guy who fell off

19  the truck in Marion, that the cable broke, and

20  that's what got the whole cable issue started.

21     Q.   Okay.

22     A.   I mean, as far as our local goes.  I know

23  that they've had problems at other locations with

24  them because we had been told.  Later on we found

110

1  out that they had had problems in other locations

2  and they had replaced cables throughout the system.

3      Q.   Who told you that there was a system-wide

4  problem with cables?

5      A.   Management.

6      Q.   Who specifically?  I'm looking for names.

7      A.   Tom Kelley and Tom Heller.  We were in a

8  meeting and they had said that they had had problems

9  with the cables.  Actually, it was Bill Weaver was

10  the guy that actually we were meeting -- Bill Weaver

11  is actually the guy who said there had been problems

12  with the cables breaking.

13     Q.   Is this the same meeting that you had

14  testified to earlier about Messrs. Kelley, Heller

15  and Weaver being at?

16     A.   No, sir, it wasn't.

17     Q.   Oh, a separate meeting?

18     A.   Yes, sir.  Yes, it was.

19     Q.   Any idea when this meeting occurred when

20  this system-wide problem was brought to your

21  attention?  And I'll even take a quarter in a year,

22  like first quarter of ninety--

23     A.   I'd say probably it was latter part of '91

24  maybe.

1      Q.   '91?

2      A.   Or 2000, the year 2000, excuse me -- or

3  excuse me.  It was probably in '99, excuse me.

4      Q.   Certainly before your --

5      A.   Yes, way before.  It was maybe a year

6  before or something like that.  I'm not good at

7  dates, but it was probably -- it was quite a while

8  because Mr. Weaver -- they were having -- they were

9  working -- they don't have a shop at this time they

10 don't have a garage at this time.

11     Q.   So these guys were up in Marion?

12     A.   Up in Moraine.  In Moraine.  When all this

13 was going on, Moraine don't have no shop or garage

14 or nothing else.  They work on trucks rain, snow or

15 sleet out in the middle of a parking lot.  They

16 don't have no facility to work on anything at that

17 time.  And I mean, they can't weld or do anything in

18 the wintertime so they basically don't do a heck of

19 a lot of nothing.  You know, most of the stuff was

20 just, what we call it, outsourcing, scabbing the

21 work out.

22     Q.   The meeting with Messrs. Kelley, Heller

23 and Weaver around the 1999 time frame where the

24 system-wide problem was discussed, and that's what

1    I'm referring to.

2         A.   Yes, sir.

3         Q.   Please tell me where that meeting

4    occurred.

5         A.   It would have been in Moraine, Ohio.

6         Q.   At the trailers?

7         A.   No, not at the shop trailers.  Shop's got

8    a little trailer.  But we also have an office

9    building there.  Most likely it would have -- I'm

10   not real sure if it was in Tom Heller's office or

11   Tom Kelley's office.  It was just a casual meeting.

12   Union and company meet every day about something.

13        Q.   As they should.

14        A.   Something's going on, somebody's punched

15   somebody or something's going on all the time.  So,

16   I mean, you can't recall all these meetings because

17   you're having two or three a day.  I really don't

18   know exactly what the time frame was, but --

19        Q.   Happens all the time though, doesn't it?

20        A.   Every day.  Every day.  Two to three times

21   a day.

22        Q.   As it should, right?

23        A.   I wouldn't say that.

24             MR. LARSON:  Not the punching part.

113

1      Q.    The meeting part's okay.  The punching

2 part's not okay.

3      A.    The company just needs to get along.

4      Q.    It works that way in the legal profession,

5 too.  We'll put that aside for a minute.

6            Besides Messrs. Kelley, Heller, Weaver,

7 and Ferguson, who else was there?

8      A.    On several occasions --

9      Q.    Let me withdraw the question.  On this

10 particular meeting where we're talking about a

11 system-wide problem with cables, I just want to

12 know, to the best of your recollection, tell me the

13 warm bodies that were at that meeting.

14     A.    Okay.  To the best of my recollection, it

15 was Bobby Slack was with us at this.

16     Q.    Okay.  One of these three guys says, we've

17 got a system-wide problem with cables snapping.  Is

18 that a rough paraphrase?

19     A.    No, sir, it's not.  It was more like

20 everybody's having problems with them.  When I say

21 everybody, I take it we're talking system, we're

22 talking our company.

23     Q.    "System" being Allied?

24     A.    Allied, yes, sir.

114

1     Q.   And did they say anything else about

2  cables at that meeting?

3     A.   Said he couldn't get them.

4     Q.   Did they indicate to you who they were

5  trying to get them from, Mr. Ferguson?

6     A.   Yes, sir.

7     Q.   Who would --

8     A.   Decatur.

9     Q.   Now, "Decatur" meaning Allied

10  headquarters?

11     A.   Yes, sir.

12     Q.   As opposed to some cable manufacturing

13  firm located in Decatur?

14     A.   No, sir.  The way I understood it, I mean,

15  this is my understanding of what goes on, Mr. Weaver

16  told us that everything he gets, every part he gets

17  for one of our trucks at that time had to come from

18  Decatur, Georgia.  I believe the guy's name was Joe

19  White or something like that that's the main honcho

20  down there.  And Mr. White has to okay everything

21  that goes on as far as like getting cables.  I've

22  seen trucks in the shop for two weeks for a fan belt

23  coming from Atlanta.  I mean, we can go to Autozone

24  and buy one, but they got it in the shop for two

1   weeks.

2       Q.   Is there a reason for that?

3       A.   Yes, sir.  They say it's cost.

4       Q.   And who's "they" on that one?

5       A.   Allied.

6       Q.   No.  I mean, I need a --

7       A.   Mr. Weaver says that it's Allied, that's

8   the way they keep the costs down at the garages and

9   stuff.  They can keep track of what goes in which

10  trucks, so forth and so on.

11      Q.   The need to go to Decatur for new cables

12  was expressed to you by Mr. Weaver?

13      A.   Yes, sir.

14      Q.   Was it also expressed to you by Messrs.

15  Kelley or Heller at this meeting?

16      A.   No, sir, they wouldn't -- they wouldn't --

17  all they would do, with them being management, all

18  they would do is tell Mr. Weaver to replace them.

19  They wouldn't -- they're not mechanics.

20      Q.   Well, I'm just saying --

21      A.   I mean, they would just tell them what

22  needs to be done.

23      Q.   I'm just going back to the meeting at the

24  shop.

116

1     A.    Okay.  Right.

2     Q.    That's all I'm sort of narrowed in on.

3  Did Messrs. Kelley or Heller tell you at that

4  meeting what was going to be done with respect to

5  the cable issue?

6     A.    Mr. Kelley just said it would be taken

7  care of.

8     Q.    No specifics?

9     A.    No, sir.

10    Q.    Did Mr. Heller say anything?

11    A.    No, sir.

12    Q.    At that time did Mr. Weaver say anything?

13    A.    Yes, sir.

14    Q.    And in front of the assembled multitude of

15  five?

16    A.    I believe so.  I believe that that --

17    Q.    And he said?

18    A.    He said that he asked for 20 and got 8.

19    Q.    And he said that he had asked for 20?

20    A.    He said he had asked for 20 cables and got

21  8 cables.  And they were already gone.

22    Q.    And "gone" in the sense they were

23  installed on trucks?

24    A.    Right.

1       Q.   And was there any reaction by Mr. Slack or

2   yourself with respect to that news?

3       A.   Yes, sir.  We thanked him.

4       Q.   Why did you thank you him?

5       A.   Anything we can get done to our equipment

6   we thank him for it because it's hard to get

7   anything done.

8       Q.   Was there any reaction from Messrs. Kelley

9   or Heller as to that news of 20 requisitions sent,

10  but only 8 fulfilled?

11      A.   No, sir.  You've got to understand, sir,

12  at this time --

13          MR. KOUSTMER:  We'll be here all day.

14          I think he's getting tired, he's talking a

15      lot.

16          MR. WINTER:  Do you need to take a break?

17          THE WITNESS:  No, let's go on, answer

18      questions.

19  BY MR. WINTER:

20      Q.   Did you ever meet with Mr. Joe White?

21      A.   No, sir.

22      Q.   Never met the man?

23      A.   No, sir.

24      Q.   Other than the Kelley, Heller, Weaver

118

1  meeting that you discussed that occurred in

2  approximately the latter part of '99, did you have

3  any other chance to meet Messrs. Kelley and Heller

4  where the cable issue was addressed?

5      A.  We'd address the issue on several

6  occasions with the union and the company.  I don't

7  have the time frame.

8      Q.  Okay.  It just happens that the later part

9  of '99 was your best recollection the first time

10  that was addressed with these two fellows?

11     A.  No, sir, I think that was after the first

12  issue -- this has been an ongoing thing, sir.

13     Q.  Let me hand you what we marked as Exhibit

14  T.

15          (Discussion off the record.)

16                          (Deposition Exhibit T
                            was marked for identi-
17                          fication.)

18     Q.  Now, have you had a chance to review

19  Allied Exhibit T?

20     A.  Yes, sir.

21     Q.  Have you ever seen any of these documents

22  before, sir?

23     A.  The only one I've seen, sir, is the one

24  that I've got my name on.

1     Q.    I count that as the fifth page in Exhibit

2  T; is that accurate?

3     A.    Well, it's the fourth one on mine.  No, it

4  would be the fifth page.  I'm sorry, yes.

5     Q.    I'm publicly educated.  If you went to

6  private school maybe it's the fourth.

7          We're all in agreement it's the fifth; is

8  that fair to say?

9     A.    Yes, sir.

10     Q.    All right.  I'm looking down at the second

11  block in the name section.  It says Dave Ferguson.

12  Is that you?

13     A.    Yes, sir.

14     Q.    There's a number, it says 63894?

15     A.    Yes, sir.

16     Q.    Under department.  What's that mean?

17     A.    Employee number, sir.

18     Q.    And that's you?

19     A.    Yes, sir.

20     Q.    AAG under company, it means Allied

21  Automotive Group?

22     A.    Yes, sir.

23     Q.    Okay.  And it talks about Course Title,

24  Safety Meeting-Backing Chain.  Do you see where I

120

1  am?

2       A.   Yes, sir.

3       Q.   And there's a date that says April 12,

4  1999.  Do you see where I am?

5       A.   Yes, sir.

6       Q.   Do you recall this safety meeting

7  occurring as indicated with your name on there?

8       A.   Not specifically.  Not specifically the

9  date, sir, no.

10      Q.   Please turn with me to the first page.

11      A.   Yes, sir.

12      Q.   Do you see where I am on the first page?

13      A.   Yes, sir.

14      Q.   There's an item 3 approximately halfway

15  down the page where it says, "Next we discussed

16  problems/concerns expressed in our last meeting:"

17  "3.) Check your clothes lines.  If you see any

18  problems (plastic pulling away, rusting, etc.) have

19  them replaced.  If you are not sure, have Bill or

20  the shop check them."  Do you see where I'm at?

21      A.   Yes, sir.

22      Q.   To the best of your recollection, did that

23  discussion occur during this safety meeting?

24      A.   I can't say.

121

1      Q.   Do you refer --

2      A.   I knew that it had came up, but I'm not

3   sure this is the date it was on.

4      Q.   Then let me ask the question.  I think you

5   already answered it, but bear with me.  Would this

6   type of topic have occurred at at least one or

7   another safety meetings?

8      A.   Yes, sir.

9      Q.   "Bill" being Bill Weaver?

10     A.   Yes, sir.  I presume.  I believe that's

11  who it would be.

12     Q.   No reason to be any other Bill?

13     A.   No, sir.

14     Q.   And Bill being the safety manager at the

15  Moraine terminal?

16     A.   No, sir.  He's a shop superintendent.

17  He's the maintenance supervisor.

18          MR. WINTER:  What did I say?

19          MR. KOUSTMER:  Safety.

20          MR. LARSON:  Safety.

21          MR. WINTER:  See, I'm getting tired too.

22  BY MR. WINTER:

23     Q.   Did you get any warning during these

24  safety meetings about use the cable sparingly if at

122

1  all?

2      A.   No, sir.

3      Q.   You don't recall those words being

4  discussed?

5      A.   No, sir.

6      Q.   Okay.  There's been some discussion during

7  Mr. Palladino's testimony about a new safety chain.

8  Do you remember that kind of discussion during his

9  testimony?

10      A.   Yes, I do.  I remember his statement.

11      Q.   Did you ever hear personally about a new

12  type of safety chain being used to replace allegedly

13  defective cable?

14      A.   A safety chain?

15      Q.   Yes.

16      A.   No, sir, I have not heard that.  Today was

17  the first time I've heard of anything about a safety

18  chain.

19      Q.   Did you hear anything about the Moraine

20  terminal being the test or prototype site for a new

21  type of cable?

22      A.   No, sir.  Today is the first time I've

23  ever heard anything about any of this.  I mean, as

24  far as safety cable or chains or anything like that,

123

1  about Moraine being the test site, I never heard

2  nothing about that.

3      Q.   I understood you to say that the truck on

4  which you were injured was a spare truck?

5      A.   I believe it was, sir.  I'm not absolutely

6  certain, no, sir.  I do believe I was on a spare.

7      Q.   I understood you to have one specific

8  truck assigned to you; is that correct?

9      A.   It's a bid truck, sir.

10     Q.   And what does that mean?

11     A.   It means that that truck, you use it

12  unless it's in the shop -- if it goes in the shop

13  then you can take a spare piece of equipment.  If

14  it's in the shop more than 30 days you could bump

15  another piece of equipment.  That's a union term.

16     Q.   I don't want to be confusing because I've

17  never driven a truck before.  My brother has, but I

18  haven't.  So would there be a truck that you would

19  know to yourself as "my truck"?

20     A.   Yes, sir.  Absolutely.

21     Q.   What are the other possibilities that

22  could be there?  There's a spare truck.

23     A.   Yes, sir.

24     Q.   Is there any other kind of truck that's

124

1   out there besides "my truck" and "spare truck"?

2       A.   I guess that would cover it, sir.

3       Q.   Okay.  Why was your truck unavailable on

4   September 7, 2000?

5       A.   I can't recall, sir.  There could have

6   been two variations there.

7       Q.   To the best of your recollection.

8       A.   Best of my recollection, it would have

9   been in the shop for repairs for something, or we

10  were on split shift, the truck might not have been

11  back.

12      Q.   Did you have any operator gripes with the

13  truck before September 7, 2000?

14      A.   The truck that I fell off of or my truck?

15      Q.   Your truck.

16      A.   No, sir.  My safety chains were replaced,

17  sir.

18           MR. LARSON:  Cables.

19      A.   Safety cables.  You got me saying chains.

20      Q.   We kind of forced it upon you I suppose.

21           Did you make use of the safety cables on

22  your truck prior to September 7th, 2000?

23      A.   Yes, sir, on occasions I have.

24      Q.   The ones that were replaced?

125

1     A.   Yes, sir.

2     Q.   How did they work?

3     A.   Okay.

4     Q.   No gripes?

5     A.   I didn't fall off.

6     Q.   In general, is working around a terminal a

7   dangerous thing to do?

8          MR. KOUSTMER:  Objection.  Go ahead.

9     A.   I do believe, sir, a car hauler is

10   considered one of the most dangerous transportation

11   jobs in the industry.

12    Q.   Just due to its very nature?

13    A.   Yes, sir.

14    Q.   How do you as a driver make it safe?

15    A.   Mostly it's common sense, I guess.  Try to

16   just work with what you have.

17    Q.   What have you got that you have to work

18   with?

19    A.   Junk.

20    Q.   Pray tell, what do you mean?

21    A.   All of Allied's equipment is junk.  It's

22   all outdated, it's all old.  Half of it don't run,

23   it's broke down half the time.  They take parts off

24   one truck to keep another truck running.  Basically,

1  you know, that's what I mean by do the best with

2  what you got.

3      Q.   And that was the condition of the

4  equipment before September 7, 2000?

5      A.   I believe it probably still is to this

6  day, sir.

7      Q.   No, but that wasn't my question.

8      A.   Yes, sir, it was.

9      Q.   And you were working for the company as of

10  8:00 a.m., September 7, 2000?

11      A.   Yes, sir.

12      Q.   I understood your testimony to be that you

13  had driven trucks without the cables installed on

14  them for at least ten years?

15      A.   I don't know that it was ten years or not,

16  sir.

17      Q.   Or approximately ten years?

18      A.   It could have been, yes.

19      Q.   Could be 8, could be 12?

20      A.   Yes, sir.

21      Q.   Did you ever fall off the number 1 posit.

22  before?

23      A.   I personally, no, sir, I haven't

24  personally fell off.  But that was a common problem.

127

1        Q.    But that wasn't my question.

2        A.    No, sir, I have not fell off, no.

3        Q.    How do you attribute that exemplary safety

4    record?

5        A.    Of not falling off a truck?

6        Q.    Off number 1 posit.

7        A.    Well, sir, I guess just a lot of the

8    trucks had wider -- the old ones didn't have the

9    cables, they had a special plate up there that was

10   wider than what we got on the ones now.  I know we

11   had some that had like a foot -- plates welded up on

12   the head ramps.  There's walkways.  We had some

13   trucks that had them all the way down each side.

14   Each terminal modifies their own equipment to meet

15   their needs.

16       Q.    Was there any modifications to this

17   truck -- let me withdraw the question.  Bad

18   question.  We occasionally ask bad questions so

19   we'll have to clear them up whenever we can.

20            On the truck that you were loading on

21   September 7, 2000, had there been any modifications

22   to posit. 1 that you're aware of?

23       A.    Not that I was aware of, no.

24       Q.    I believe you testified that at least

128

1 three of the cables had been replaced?

2      A.    That I could see, yes, sir.

3      Q.    That you could see.

4      A.    Yes, sir.

5      Q.    And the fourth you reasonably anticipated

6 that had been tested and tested satisfactorily?

7      A.    Actually, I just presumed that it was

8 replaced with the rest of them or it would have been

9 good.

10      Q.    No reason to believe --

11      A.    -- that it was defective, no, sir.

12      Q.    Who would have done the testing or

13 replacing in the ordinary course of Allied's

14 business?

15      A.    I would imagine the shop would have.

16      Q.    And that's Bill Weaver's folks?

17      A.    Yes, sir.

18                      (Deposition Exhibit U
                           was marked for identi-

19                      fication.)

20      Q.    I'll hand you what's going to be marked

21 Exhibit U. For the purpose of identification, this

22 purports to be a document called Work Module 6:

23 Preventing Slips and Falls on Equipment.

24 Regrettably I only have one, but I did produce

129

1  copies of this document to my colleagues earlier

2  prior to Mr. Palladino's deposition.  Mr. Ferguson,

3  if you could, please, take a look at that document,

4  let me know when you're done.

5       A.   I've looked at it prior.

6       Q.   Have you ever seen this before, sir?

7       A.   No, sir, I haven't.

8       Q.   Have you ever seen documents that are

9  called modules that discuss or describe safety rules

10  or procedures --

11       A.   No, sir.

12       Q.   -- that ought to be used at Allied?

13       A.   No, sir.  Never seen one before.

14       Q.   Have you seen others before?

15       A.   No, sir.

16       Q.   Let me give you an example.  Like, at

17  Exhibit T, the second page is "Module 2:  Proper

18  Backing Procedures."

19       A.   No, sir, I've never seen nothing with

20  module nothing written on it.

21       Q.   Okay.

22       A.   This is a new procedure they just started,

23  I believe.  I believe they just started this not too

24  long ago.

1      Q.   These modules would not have been in

2  existence on September 7th, 2000?

3      A.   I've never seen it, sir.

4      Q.   Okay.  That's fine.

5      A.   I couldn't answer that because I've never

6  seen it.

7      Q.   Notwithstanding that fact, if you'll bear

8  with me.

9      A.   Yes, sir.

10     Q.   If you'll please read numbered paragraph 1

11  entitled Prepare for work.

12     A.   "Prepare for work.  Decide in advance

13  which footwear is appropriate for the weather

14  conditions.

15          "Are the soles in good condition and made

16  of non-skid material?  Leather-soled shoes are never

17  appropriate."

18     Q.   Are those true statements?

19     A.   They don't enforce it, sir.

20     Q.   No, I'm saying are they true statements?

21     A.   Is this what you should do?

22     Q.   Yes.

23          MR. KOUSTMER:  I'm going to object.  He's

24          never seen this before.  What are you referring

1      to?

2           MR. WINTER:  I'm asking are the statements

3      in module 6 on numbered paragraph 1, Prepare

4      For Work, good safety rules.

5      A.   You're asking my opinion I presume?

6      Q.   Yes.

7           MR. KOUSTMER:  So he's an expert?

8      A.   I'm not an expert, but I would say yes,

9  number 1 would be --

10          MR. KOUSTMER:  We'd like him to be an

11     expert for trial if I can get stipulations.

12     A.   I would say number 1 would be a good thing

13  to do, yes.

14     Q.   But no one at --

15     A.   Did they enforce this at Allied?

16  Absolutely not.

17     Q.   No.  We have to go -- you just can't at

18  point blank -- there may be one in there that we do

19  enforce.

20     A.   Yes, okay.

21     Q.   And then Mr. Koustmer won't be happy with

22  you --

23     A.   Okay.  All right, sir.

24     Q.   -- when I hammer you on cross-examination

132

1   at trial.

2        A.   Okay.

3        Q.   So bear with me.

4             Okay.  It is accurate that a driver ought

5   to select appropriate footwear based on the weather?

6        A.   I would say yes.

7        Q.   Do you do that?

8        A.   Yes, sir, I do.

9        Q.   Do you check the soles of your shoes to

10  see if they're in good condition and made of

11  non-skid material?

12       A.   I wore work boots, sir.

13       Q.   Are the soles in good condition?

14       A.   Yes, sir, they are.

15       Q.   I'll tell you what, I'll ask a full

16  question and I'll give you all the time to answer.

17  Deal?

18       A.   Okay.

19       Q.   And then we'll get out of here real quick.

20  Okay, now the question is are the shoes that you

21  wear as a driver, the soles in good condition and

22  made of non-skid material?

23       A.   Yes, sir.

24       Q.   That's just part of being a safe driver?

133

1      A.    Right.

2      Q.    Please review item number 2.

3      A.    Inspect your trailer.

4      Q.    Well, I mean, you don't have to read it,

5  just look it over.

6      A.    Okay.

7            MR. KOUSTMER:  Objection.  He's never seen

8      the document before until it's been presented

9      to him.

10     Q.    Have you had a chance to review item

11 number 2?

12     A.    Yes.

13     Q.    That's of course entitled Inspect your

14 trailer.  Okay?

15     A.    Yes.

16     Q.    Mr. Ferguson, prior to starting loading

17 operations do you inspect the treadways of your

18 trailer or the one that's been assigned to you to

19 ensure that the treadways are in good condition?

20     A.    I don't know what a treadway is.

21     Q.    Assume for the sake of argument that it's

22 a part of a trailer that ought to have non-skid

23 material on it.  Do you inspect your trailer to see

24 if there's adequate amount of non-skid material on

134

1 those portions that have non-skid?

2    A.   I do a trailer inspection.  I do a walk

3 around.

4    Q.   Okay.  What happens if you find something

5 that's inadequate as a result of your inspection,

6 what's your practice, in response to that?

7    A.   Shop the truck.

8    Q.   Sir?

9    A.   Shop the truck.

10    Q.   And that means give it to Bill Weaver's

11 folks?

12    A.   Yes, sir.

13    Q.   Have you ever done that?

14    A.   Yes, sir.

15    Q.   What type of deficiencies can you recall

16 as being remarkable enough to send it over to

17 Mr. Weaver's folks?

18    A.   Welds, variation of different things.

19    Q.   When you say welds --

20    A.   Welds.

21    Q.   W-E-L --

22    A.   When the trailer needed welds.

23    Q.   Welding?

24    A.   Like a welding torch.

135

1       Q.    What type of things did you see that

2   weren't adequate in the way of welding?

3       A.    I can't recall specifics.  I'm just giving

4   a statement of things that I have previously -- if

5   it's not safety related they release it from the

6   shop and load the truck.

7       Q.    Do I understand your testimony that you're

8   not acquainted with the term treadway?

9       A.    Treadways, no, sir.

10       Q.    During your inspection of the truck, do

11   you check to see if the decks are even and resting

12   on safety pins on both sides?

13       A.    That's common practice, yes, sir.

14       Q.    And that's your practice?

15       A.    Yes, sir.

16       Q.    Because it's a safe thing to do?

17       A.    Yes, sir.

18       Q.    Obviously, you report defects when you see

19   them to allow repair activities?

20       A.    Yes, sir.

21       Q.    Please review item number 3, please.

22       A.    Yes, sir.

23       MR. KOUSTMER:  Objection again.  He's

24       never seen the document before.

1        MR. WINTER:  Let me finish my statement,

2    then you can object.

3        MR. KOUSTMER:  I thought you had finished

4    your statement.  You asked him to review it.

5        MR. WINTER:  I was going to say then

6    entitled Maintain three points of contact.

7    Same objection I take it?

8        MR. KOUSTMER:  Same objection.

9    BY MR. WINTER:

10    Q.    Have you had a chance to review number 3?

11    A.    Yes, sir.

12    Q.    What are three points of contact?

13    A.    Don't have a clue, sir.

14    Q.    Do you make sure that you have a stable

15    place to plant your foot whenever you transfer your

16    weight?

17    A.    Yes, sir.  I try.

18    Q.    And you use handholds whenever possible?

19    A.    Wherever possible, sir, yes.

20    Q.    What's a handhold?

21    A.    It can be a variation of several things.

22    They can have a little steps welded on the side,

23    like on the head rack's got them.  Variation of --

24    Q.    I'm handing you what's been marked Exhibit

137

1  A, sir.  If you could kind of point to me --

2       A.   I would imagine this would be a step and a

3  handhold right there.  This one across there

4  (indicating).

5       Q.   So if I marked --

6       A.   That's what you have to do to put the

7  chains in that unit right there.

8       Q.   So if I marked A with a circle and A with

9  a circle in blue ink that would be a handhold?

10      A.   Yes, sir, or a foothold.

11      Q.   Or a foothold?

12      A.   Yes, sir.

13      Q.   If you'll look at topic number 4 on

14  Exhibit U entitled Maintain stability.

15           MR. KOUSTMER:  Same objection.

16      A.   Yes, sir.

17      Q.   Is it your practice as a driver to

18  maintain stability through the proper foot

19  placement?

20      A.   Are you asking separate from what this

21  says or what do you want?

22      Q.   No.  I mean, is that a good rule, item

23  number 4?

24      A.   If you could do it, yes.

1    Q.    Do you do it?

2    A.    Whenever possible.

3    Q.    There are times when it's not possible?

4    A.    Primarily about 50 to 60 percent of the

5    time.  There's no way you could.

6    Q.    In dealing with the facts and

7    circumstances that gave rise to your accident, you

8    couldn't properly place your foot, feet, knees and

9    other body parts to maintain stability?

10    A.    Well, I guess that would be up to the

11    individual, sir, what he would consider.  Because

12    there's no guidelines that says you stand here at

13    point A to do the job at point B.  It's left up to

14    the driver where he puts his feet.  There's no -- I

15    mean, there's no Xs marked on a trailer saying put

16    foot here before you put a chain in.  That's up to

17    an individual where he puts his foot.  Yes, you try

18    to maintain stability at all times, naturally.

19    Q.    And I think I heard you say that's a

20    matter of common sense for the driver?

21    A.    Yes, sir, it is.

22    Q.    Sir, are there ladder rollers for the

23    handholds that we've discussed on 3?

24    A.    Ladder rollers, sir?

1      Q.   Yes.

2      A.   I'm not sure I know what a ladder roller

3  is.  I've never heard the term ladder roller at our

4  place.

5      Q.   If you could take a look at number 5

6  dealing with Look to see where you are going.  There

7  are three grammatical subparts for that if you could

8  review that for me, sir.

9           MR. KOUSTMER:  Objection.

10          MR. WINTER:  Same one?

11          MR. KOUSTMER:  Same objection.

12     A.   It's common sense, for of all these.

13     Q.   All number 4 --

14          MR. KOUSTMER:  5.

15     Q.   5.

16     A.   All number 5 would be at the discretion of

17 the driver and common sense.

18     Q.   Please examine then item number 6

19 entitled, "Use the ladders for climbing."

20          MR. KOUSTMER:  Objection.  Same objection.

21     A.   What's the question, sir?

22     Q.   After having read the first sentence in

23 item number 6 does that help you understand what a

24 treadway may or may not be?

140

1    A.   I believe you're talking about what we

2  call a catwalk.

3    Q.   Catwalk.  Okay.  Let's just assume that a

4  treadway means a catwalk.  Okay?

5    A.   That's what we call it, yes, sir.

6    Q.   I'm, again, not a truck driver.

7    A.   Okay.

8    Q.   What's a catwalk?

9    A.   It's a narrow space.

10    Q.   On a truck?

11    A.   On a truck.

12    Q.   Is it a good practice to avoid walking

13  down a catwalk?

14    A.   Some of the catwalks are not as narrow.

15  And the center of the trailer is -- the second

16  paragraph -- well, sir, a lot of our ladders have

17  been taken off.  I mean cut off.

18    Q.   Were there any ladders that were cut off

19  at the front part of the spare truck that you were

20  using on September 7, 2000?

21    A.   I can't recall, sir.

22    Q.   If you could hand over Plaintiff's --

23  excuse me, Exhibit A.  I understand that that is a

24  true and accurate photograph of the truck at issue?

1    A.   Yes, sir, I believe there is a ladder

2 missing off this one.

3    Q.   Okay.  Is there one near the cab part of

4 the truck?

5    A.   A ladder?

6    Q.   Yes, sir.

7    A.   It would be behind number 2 post there.

8 It wouldn't be called a ladder.  It's footholds.

9 Foot steps.  It would be back here.  Right back in

10 there, behind this post right here (indicating).

11    Q.   If you could put your finger on the area

12 where --

13    A.   They've got -- that's a different truck.

14 There's different type trucks, there's different

15 models.  Some of them have footholds going up here;

16 some of them don't.  Some of them's been cut off.

17 We've got ladder racks on the trailer and just about

18 all of those have been cut off.  They came from the

19 manufacturer with ladders on them and a lot of them

20 have been cut off.

21    Q.   Are there any ladders that have been cut

22 off from the door to the cab forward?

23    A.   I can't answer that, sir, because I don't

24 know what model -- I don't know if the original had

142

1  ladders on them.  Some of them did, some of them

2  didn't.  Depends on when the trailer was made, so

3  forth, so on.  I don't know the specific model

4  numbers that had the ladders and the ones that

5  didn't.

6       Q.   You don't know one way or the other as to

7  this truck?

8       A.   No, sir.

9       Q.   Do you know, sir, then as to the truck in

10 Exhibit A if there had been ladders or holds cut aft

11 of the X?

12      A.   I can't tell with this, sir.  There's

13 usually foot steps going right up through, right

14 through here (indicating).

15      Q.   Okay.  But you don't know if that was a

16 situation where they were cut off or they weren't

17 installed in the first place on this particular

18 model?

19      A.   I didn't -- I can't remember if it had it

20 on or it didn't have it on.  I can't answer that.

21 It could or it couldn't.  You know, I don't know.

22      Q.   Based on our discussions that you and I

23 have had does any of those refresh your recollection

24 as to what the three points of contact concept is?

143

1       A.   I think you're misinterpreting this with

2   what we were taught is a three-point stance.  Is

3   that what you're referring to?

4       Q.   All I have is the document in front me.

5       A.   I don't know what three-point contact is.

6            MR. KOUSTMER:  Objection to the document.

7       A.   I don't have a clue what this is.

8       Q.   What's a three-point stance?  I mean, I

9   used to play a little football, I know what it is

10  there, but what does that mean --

11      A.   That's exactly what it means.  You put a

12  three-point stance, you got one foot in front of the

13  other.  They call it golfer's stance.

14      Q.   Like G-O-L-F?

15      A.   Yes, sir.  That's what they call it.

16  That's why it's called the three-point stance.  Put

17  one foot in front of the other when you're getting

18  ready to do the big drive, you know.

19      Q.   Okay.

20      A.   That's when you're pulling down on the tie

21  down, it's called a three-point stance.  I believe

22  that's what you're referring to.  Other than that, I

23  don't know what you're talking about.

24      Q.   What's significance about the three-point

144

1  stance to a driver?

2      A.   If at all possible when you can do it it's

3  common sense you do it.  But you can't always do it.

4      Q.   What kind of benefits do you get from it,

5  Mr. Ferguson?

6      A.   You can tie the unit down tighter.  You

7  can put more pressure on the tie down bar.

8      Q.   And that makes sure that the truck stays

9  on the truck?

10     A.   Well not on that, sir.  Divides the

11 pressure on your arms, your legs evenly.

12     Q.   Okay.  So you use that to ratchet the

13 chains to keep the unit tied to the truck?

14     A.   Yes, sir.  It's called a three-point

15 stance.

16     Q.   Does a three-point stance in addition to

17 providing you with the ability to torque down the

18 wrench also give you as a driver greater stability

19 so you don't fall off?

20     A.   You can only do that, sir, on the ground.

21 You can't do it up high.

22     Q.   What do you do up high to maintain

23 stability?

24     A.   When you're tying down a head ramp you've

1  got to stand both feet side by side because you're

2  standing in front -- you're standing beside your

3  vehicle.  And you and the vehicle is on the same

4  ramp.

5      Q.  On the third item of item number 6,

6  notwithstanding, again, the fact that you haven't

7  seen this, is it your practice not to use the

8  ladders or steps for storing loose items such as

9  chains or hooks?

10     A.  Do you want my opinion if it's good or

11 bad?

12     Q.  No, I'm asking for your practice as a

13 driver.

14     A.  Every car hauler that hauls cars does it.

15     Q.  Uses ladders and chains for --

16     A.  Yes, sir.

17     Q.  Is that safe?

18     A.  To hang your -- tie tarp stirrups and

19 stuff on there?

20     Q.  Yes, sir.

21     A.  I wouldn't know if it would be safe or

22 not.  What would be dangerous about tarp straps?

23     Q.  You had said every driver.  Does that

24 include Mr. Ferguson?

146

1    A.   Every driver that's ever hauled cars has

2  hooked chains on a ladder.  I mean, it's a common

3  practice and every car hauler who does it does it.

4    Q.   Including yourself?

5    A.   Every car hauler.

6    Q.   Including yourself?

7    A.   Yes, sir.

8    Q.   Okay.  Is it your practice not to use

9  ladders with objects in your hand?

10    A.   It helps you climb when you don't have

11  your tie-down bar in your hand.

12    Q.   Do you have tie down bars or other objects

13  in your hand as you climb ladders?

14    A.   Not normally, no, sir.

15    Q.   Sir, if you would, read the items in

16  numbered paragraph 7 entitled, Always face cargo

17  units.

18        MR. KOUSTMER:  Same objection.

19    Q.   Is it your practice to always face the

20  cargo units when you enter or leave them?

21    A.   It is my practice?

22    Q.   Yes.

23    A.   When possible, yes.

24    Q.   Under what circumstances would you enter a

1  cargo unit?

2      A.   Would you enter a cargo unit?

3      Q.   Yes.

4      A.   When you're taking it off the truck you

5  would have -- when you would, like I said, case --

6  take them all off the head ramp, you would climb up

7  the ladder facing the unit, we'd walk sideways, open

8  the door, get in the unit and drive it off.

9      Q.   My understanding is on the date of the

10  accident you drove a unit up to posit number 1?

11      A.   I backed the unit.

12      Q.   Backed the unit.  Did you face the unit as

13  you were leaving or exiting that unit?

14      A.   You have to face it, sir, in order to get

15  the chains on it.

16      Q.   The second item, if you could review that,

17  sir.

18      A.   Yes.

19      Q.   Is it your practice to face the units when

20  you move past them?

21      A.   That's always common practice, sir.

22      Q.   If you would read the third grammatical

23  numbered paragraph 7 of Exhibit U.

24      A.   "Never face the outside of the trailer

1  when moving past cargo units."

2      Q.   Is that your practice as a driver?

3      A.   When possible, yes.  It's not always

4  possible.

5      Q.   When is it not possible?

6      A.   When you're in -- sometimes when you're in

7  the belly you can't face it.  I mean, taking them

8  out of the belly, behind the trailer -- I mean,

9  behind the cab, you can't.

10     Q.   Would it be accurate to say, Mr. Ferguson,

11 that the belly or behind the cab portion that you

12 just testified to would be located to the right of

13 the X on Plaintiff's Exhibit A?

14     A.   It would be right here, sir (indicating).

15     Q.   Yes, that's the blue X?

16     A.   Right behind the blue X, yes.

17     Q.   Yes, sir.

18     A.   On the bottom.

19     Q.   That's the area you referred to?

20     A.   Yes, sir.

21     Q.   Are there any other areas of the cab where

22 it would not be feasible to not face the outside of

23 the trailer when removing units?

24     A.   Like I said, sir, it's usually at the

149

1  discretion of the driver.  The safest way he thinks

2  it's safest for him to -- it appears to me that this

3  is a training slip for new drivers.  I'm sure --

4  they hire new drivers, I'm sure this is a new thing

5  they came out with.  We were never taught none of

6  this except a few items on here.  As a matter of

7  fact, we were never taught this, period.

8      Q.  Have you received formal training on the

9  items you just talked about or the -- or what

10  appears in Exhibit U, is it your practice except for

11  dealing with the belly units that you've identified

12  on Plaintiff's Exhibit A, except for those, not to

13  face the outside of the trailer when moving past

14  cargo units?

15      A.  Well, sir, it's common practice to face

16  the cargo unit in case you start falling you can

17  grab the antenna, the windshield wiper or tire or

18  something.  Car haulers do that.  It's just common

19  practice.  You try to face the unit at any time you

20  can.

21          MR. WINTER:  I think that's all I have,

22      Mr. Ferguson.  Thank you for your time.

23          MR. KOUSTMER:  You've got another one to

24      go.

1          MR. PAULUS:  I'll try to be short.

2                    CROSS-EXAMINATION

3  BY MR. PAULUS:

4      Q.   As you probably remember I'm Craig Paulus.

5          MR. KOUSTMER:  We forgot.

6          MR. PAULUS:  Well, you tried to maybe.

7      Q.   I believe you testified that Dr. Autrey

8  saw you for some injuries you received to your back

9  from another fall; is that correct?

10     A.   Yes, sir.

11     Q.   And what year was that fall again?

12     A.   I don't really recall, sir.  It was either

13  '84 or -- '94 or '97, one of the two.

14     Q.   Okay.  Did he ever order an MRI, do you

15  remember?

16     A.   I can't recall.

17     Q.   Any other tests that you remember besides

18  an examination, a physical examination of you?

19     A.   Maybe a physical.  I can't remember the

20  dates.

21     Q.   The day you fell you were loading an S10

22  Blazer, correct, or tying it down?

23     A.   I can't swear that it was an S10 Blazer.

24  It could have been a Jimmy it could have been an

1  Oldsmobile Bravada, they're all the same unit.  They

2  just got a different name on them.

3      Q.   Do you load any other types of cars

4  besides that body style of car?

5      A.   Yes, sir.

6      Q.   Like what?

7      A.   Everything.

8      Q.   Everything.  Malibus, and --

9      A.   Yes, sir.

10     Q.   Impalas?

11     A.   Yes, sir.

12     Q.   Okay.  I think you testified that you're

13 taking antidepressants at night before you go to

14 bed; is that right?

15     A.   Yes, sir.

16     Q.   Who prescribed those?

17     A.   Dr. Simons.

18     Q.   Simons?

19     A.   Yes, sir.

20     Q.   Is he seeing you in regards to any

21 emotional, mental health issues?

22     A.   No, sir.

23     Q.   Have you ever seen with your own eyes

24 design specifications for cables like this?

152

1      A.    If I saw design specifications?

2      Q.    Yes.

3      A.    No, sir, I don't believe so.

4      Q.    Have you ever seen the design

5  specifications for a head rack in general?

6      A.    No, sir.

7      Q.    Who designed the hand cable, to your

8  knowledge, the one that broke?

9      A.    My honest opinion?

10     Q.    Well, do you know facts --

11     A.    I don't know who designed it, but I know

12  why they designed it.  I mean, I know who put the

13  idea in their head.  It was one of our drivers was

14  sent to Buffalo to tell them what he wanted on the

15  trucks.

16     Q.    Okay.

17     A.    That's what I understand.

18     Q.    I ask because in your interrogatory

19  responses you identified in response to

20  Interrogatory Number 10 that Defendant Hanes

21  designed the hand cable.  Do you have any firsthand

22  knowledge of who designed the hand cable?

23     A.    No, sir, I have not a clue who made that

24  hand cable.  I've never heard of your --

1         MR. KOUSTMER:  For the record, that was

2     answered by the attorney.

3         THE WITNESS:  Yes, I didn't even know who

4     designed, made, manufactured, nothing else that

5     cable.

6         MR. KOUSTMER:  For the record that was

7     answered by the attorney, by us.

8         MR. PAULUS:  Do you have any fact

9     witnesses who can tell us that?

10        MR. KOUSTMER:  Well, you can ask more

11     interrogatories.  I'm like him, I'm not under

12     oath yet.

13        MR. WINTER:  But I can hardly wait for

14     that to happen, Mr. Koustmer.

15        MR. PAULUS:  I asked in Interrogatory

16     Number 3:  Identify all persons answering,

17     assisting in answering or providing information

18     or documents used in answering these

19     interrogatories and the answer is David

20     Ferguson.

21  BY MR. PAULUS:

22     Q.   Has anybody ever told you that Hanes

23  Supply designed these hand cables?

24     A.   No, sir, I was under the impression that

154

1  Delavan did.

2       Q.   Okay.

3       A.   I don't know who designed them.  I know

4  who I was told designed them.  We've always been

5  told that the manufacturer was Delavan, as far as I

6  knew.  I don't know.

7            (Discussion off the record.)

8  BY MR. PAULUS:

9       Q.   The truck that you referred to as your

10  regular truck, I think you called it your bid truck?

11      A.   Yes, sir.

12      Q.   Was that your truck from the day it

13  arrived at Allied or at your employer?

14      A.   No, sir.

15      Q.   Somebody else used it before you?

16      A.   Yes, sir.

17      Q.   When did you start working with it?

18      A.   It would have been at the truck bid.  I'm

19  not -- annual truck bid.  I'm not sure when that

20  was.

21      Q.   You don't know which year you got it?

22      A.   No, sir.

23      Q.   Do you know how old the truck was?

24      A.   I believe it was '95, '96.  Around in

155

1   there.  I think it was one of the older 2878s.

2        Q.   Earlier you used the word "junk" to refer

3   to some of the equipment you worked with at Allied.

4   Was the truck at the time you started using it

5   showing some wear and tear?  Was it worn out?

6        A.   Yes, sir.

7        Q.   My next question is about some of these

8   cables we have in front of us.  I'm going to show

9   you this coiled up cable.  Can you see in the middle

10  section here, I know it's coiled, but can you see

11  the metal cable inside the plastic?

12       A.   Yes.

13       Q.   It's not opaque.  You can see through it?

14       A.   Yes, sir.  I can see the steel, yes.

15       Q.   On the ends it appears to be painted?

16       A.   Yes, sir.

17       Q.   Is that one way you can tell the

18  difference between a cable that's been replaced and

19  a cable that hasn't been replaced, whether they're

20  painted?

21       A.   Sometimes, sir, they send them out to be

22  refitted.  They call them refits.  They paint them,

23  put new valves on them, hydraulics.  It's hard to

24  say.  You don't know why the paint is on there or

156

1  how long it's been on there.

2      Q.   Have you ever seen a new truck come from

3  the factory?

4      A.   Yes, sir.

5      Q.   Are they painted then?

6      A.   Y, sir.  Sure are.  To the best of my

7  knowledge, they're painted.

8      Q.   They're not painted in the center, but

9  they're painted on the outsides; is that right?

10     A.   As far as I know, sir, they look just like

11  this.

12          MR. WINTER:  This being of course --

13     A.   The yellow one, sir.

14     Q.   The yellow one?

15     A.   Yes, sir.  When the trucks come from

16  Delavan everything's painted yellow except the seat.

17     Q.   Now, these here are all painted with some

18  green.  Do you know when they were painted green,

19  who painted them green?

20     A.   No, sir, I don't.

21     Q.   Are the Allied trucks now green?

22     A.   Some of them -- Allied's original colors

23  are green and white.  See, Ryder's was red and

24  black.  So when Allied took over Ryder or Commercial

157

1  Carriers, the truck that was originally yellow, they

2  just left them yellow.

3      Q.   Is it your testimony that where it's been

4  painted that can obscure the metal cable underneath

5  and impair your ability to see if there's been any

6  deterioration of the metal?

7      A.   Yes, sir.

8      Q.   Okay.  And you don't know who painted the

9  cables?

10     A.   No, sir.

11         MR. PAULUS:  If you can give me one more

12     minute.  I think that's going to be all I have.

13         MR. LARSON:  I've just got a couple.

14         MR. PAULUS:  Go ahead.

15                 CROSS-EXAMINATION

16  BY MR. LARSON:

17     Q.   Just to clarify something, Mr. Ferguson,

18  the hook that you had just installed right before

19  you went over the edge, which hook, which location

20  on that cargo unit was it that you had just

21  installed the hook into?

22     A.   Do you mean where I put the T hook?

23     Q.   Correct.

24     A.   It was behind -- it was behind the front

158

1  passenger's side wheel, right front wheel.

2       Q.   So it was --

3       A.   The unit's back on.

4       Q.   Since you backed it on it was toward the

5  rear --

6       A.   It was pretty much over the driver's door.

7       Q.   -- of the number 1 posit.?

8       A.   It was pretty much over the driver's door.

9       Q.   And tell me whether or not this is a true

10 statement:  Would it be correct that you wouldn't

11 have knowingly placed your hand on a cable that you

12 knew was the original cable?

13          MR. KOUSTMER:  Objection.

14          Go ahead.

15      Q.   For purposes of support.

16      A.   I wouldn't say that, sir.  I took -- like

17 I told you in my previous statement, that I saw

18 three new brand-new cables with, you know, the new

19 style hooks on them and I just took it for granted

20 everything was safe on it.  I mean, I didn't even

21 notice that the fourth one didn't have it on.

22      Q.   That was the nature of my question.

23      A.   No sir, I didn't --

24      Q.   You're saying you didn't know it was an

159

1  old cable?

2      A.   No, sir.

3      Q.   And my question is if you had known you

4  wouldn't have knowingly or willingly used that cable

5  for support?

6           MR. KOUSTMER:  Objection.

7      A.   Well, no, sir.  I wouldn't have -- I

8  wouldn't have put my hand on the cable if I knew it

9  was going to break, no.

10      Q.   Knew or suspect it might break, right?

11           MR. KOUSTMER:  Objection.

12      A.   Sir, I wouldn't know if it would have

13  broke or not.  Because if it would have been painted

14  over, there would have been no way I would have knew

15  it would have broke.

16      Q.   I understand we've been through that.  But

17  my question is if you knew that you're dealing with

18  cables that were original issue, okay, and you knew

19  that there were problems with original issue cables,

20  I'm simply trying to establish, with that foundation

21  of knowledge, you wouldn't have knowingly placed

22  your hand on one of those cables for support based

23  upon what you knew about them, right?

24           MR. KOUSTMER:  Objection.

 1      A.   Sir, I wouldn't have knew if it had been

 2  original or not because these trucks have been

 3  painted over so much I wouldn't have -- I mean, it

 4  would have been impossible for me to even know if it

 5  was the original one, the new one or -- because as

 6  you can see, there's two styles there and they're

 7  different type cables.  I wouldn't have never knew

 8  this.

 9      Q.   You were able to tell three of the four

10  had been replaced?

11      A.   Sir, I seen the two on the passenger's

12  side of the truck.

13      Q.   You knew those were new cables?

14      A.   Yes, sir.  Those two on the passenger's

15  side.  Okay?

16      Q.   Right.

17      A.   After I had fell off the truck I looked up

18  and seen the third one was a new one.

19      Q.   So you didn't check at all on the driver's

20  side?

21      A.   Sir, like I said, there was three new

22  cables on it.  I took for granted there was four.

23      Q.   Okay.  My question is did you check, at

24  all, the cables on the driver's side before you

161

1  worked on the equipment?

2      A.   I seen the cables --

3          MR. KOUSTMER:  Objection.  Asked and

4      answered.

5          MR. LARSON:  Well, I thought it was, but

6      I'm confused now.

7          MR. WINTER:  It was asked.  I haven't

8      heard an answer yet.

9          MR. KOUSTMER:  Well, I mean it's been

10     asked and answered before.

11         Go ahead.  We don't need to debate it.  Go

12     ahead.

13         THE WITNESS:  Do you want me to answer it?

14         MR. KOUSTMER:  Yeah, go ahead.

15     A.   What again did you exact -- did you want

16 to know if I knew there was a third cable that was

17 on there that had been replaced?

18 BY MR. LARSON:

19     Q.   Did you check the driver's side cables?

20     A.   I looked at -- I visually checked the

21 cables, yes, sir.  I didn't inspect them inch by

22 inch, no.

23     Q.   The last question I have is you said that

24 for reasons you described you didn't want to have

1  surgery performed by Dr. Roberts or anybody else.

2       A.   No, sir.

3       Q.   Do you understand or have any knowledge as

4  to what surgery that they would do if they were to

5  perform surgery?

6       A.   I knew -- all the knowledge I have is what

7  Dr. Roberts told me and my wife.  When he brought us

8  in for a consultation I know what he told us.

9       Q.   What did he tell you?

10      A.   He told me if I had the surgery I'd never

11  drive again.  I need six years to get my pension.

12      Q.   Okay.  My question is what surgery would

13  he perform if he were to do it?

14      A.   He said he would fuse my spine.

15           MR. LARSON:  Thank you.

16           MR. WINTER:  I have two.          .

17                     CROSS-EXAMINATION

18  BY MR. WINTER:

19      Q.   Who is the driver who started the design

20  of the cables?

21      A.   David West.

22      Q.   W-E-S-T?

23      A.   W-E-S-T, right.

24      Q.   Is he still with the company?

163

1      A.    Oh, yeah.

2      Q.    Okay.  I thought I had heard you say that

3  Phil Kuchar had demanded that all the cables be

4  retrofitted?

5      A.    No, sir, I didn't say that.

6      Q.    Oh, I must have misunderstood.

7      A.    I think he did (indicating).  I didn't say

8  Phil Kuchar demanded that no, sir.

9      Q.    It's Kuchar, right?

10      A.    Yes, sir.

11          MR. KOUSTMER:  I think I asked

12      Mr. Palladino a question about Phil, but he

13      hadn't said anything about Phil.

14      A.    I didn't say that.  No, sir I didn't say

15  that.

16      Q.    I misunderstood then.

17          Was Mr. Kuchar on the safety committee?

18      A.    At what time, sir?  We've had so many

19  safety committees.  We've had more safety

20  committees -- each month they've got new people on

21  it.  I couldn't tell you.

22      Q.    Was Mr. Kuchar on any safety committee?

23      A.    I know he has been on safety committees,

24  yes.  Safety committee usually consists of whoever's

164

1  standing there at the time they want to do the

2  safety meeting.  That's usually the safety

3  committee.  There's no set rule for this.

4      Q.   What role does Mr. Kuchar play at the

5  company?

6      A.   He's a driver.  Just strictly a driver.

7      Q.   Does he hold any office with the union?

8      A.   No, sir.

9      Q.   Do you know one way or the other whether

10 he was taking a stand with regard to the cables that

11 were allegedly failing?

12     A.   I can't answer that.  I don't know what

13 Mr. Kuchar thought.  I never had no discussions with

14 him about it.

15     Q.   So I think I heard you say I don't know.

16 Is that fair to say?

17     A.   Yes, sir.  I don't know.

18          MR. WINTER:  Thank you.  I have nothing

19      further.

20          MR. KOUSTMER:  Okay.  You're beyond your

21      two, but we're going to let you go.

22          MR. PAULUS:  Famous last words.  I just

23      have two more questions.

24                    CROSS EXAMINATION

165

1  BY MR. PAULUS:

2      Q.   In the course of your duties when you were

3  a driver, how frequently did you pass the dispatch

4  desk?

5      A.   Every time you dispatch.

6      Q.   Is that every day?

7      A.   Yes, sir, at that time it was every day.

8      Q.   And not to go too far back into this, but

9  at the time you made a visual inspection of the

10 truck that you fell off of, when you looked at the

11 passenger's side how did you know that those two

12 hand cables were new, newer models?

13     A.   It's -- the ends are --

14         MR. KOUSTMER:  Objection.  Asked and

15     answered, but go ahead.

16     A.   Okay.  They're like an eyebolt and then

17 they're shiny, as you can see --

18     Q.   An eyebolt rather than this design that we

19 have?

20     A.   Yes, sir.  Totally different.  I mean,

21 visually you can see it from a mile away.

22         MR. PAULUS:  Thanks.  That's it.

23         MR. KOUSTMER:  Okay, guys, is that it?

24         MR. WINTER:  I think we need to say one

166

1    thing on the record and that is I'll go ahead

2    and take custody of these cables, except for

3    Plaintiff's Exhibit Q.

4        MR. KOUSTMER:  The court reporter is

5    keeping Q.

6        MR. WINTER:  I'll take the rest if anybody

7    needs them.

8        MR. KOUSTMER:  But you'll make them

9    available.

10        MR. WINTER:  On reasonable notice.

11        MR. KOUSTMER:  On reasonable notice for

12    testing, if anybody wants to get them tested.

13        MR. WINTER:  For any other purpose.  Just

14    as long as everybody gets notice of the test

15    and what is anticipated during the test.

16        MR. KOUSTMER:  We're in federal court.  I

17    mean, you're going to have to hand over any

18    test you do on this cable.

19        MR. PAULUS:  My client might just want to

20    look at these things.  I don't know if they

21    will or not.

22        MR. LARSON:  Why don't we just all agree

23    if anybody wants access to them that everybody

24    notifies everybody else so that everybody knows

Merit
602 Main Street, Suite 703, Cincinnati, OH  45202
(513) 381-8228 * (800) 578-1542 * www.merit-ls.com

167

1       what's going on.

2              MR. KOUSTMER:  Sounds good.

3

4                        DAVID EDWARD FERGUSON

5                             - - -

6

7       (Deposition concluded at 4:52 PM.)

8                             - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

168

1              C E R T I F I C A T E

2 STATE   OF   OHIO  :
                         SS:
3 COUNTY OF HAMILTON  :

4      I, Wendy L. Welsh, a duly  qualified and

5 commissioned notary public in and for the State of

6 Ohio, do  hereby certify that prior to the giving of

7 his deposition, the within named DAVID EDWARD

8 FERGUSON was by me first duly sworn to testify the

9 truth; that the foregoing pages constitute a true

10 and correct transcript of testimony given at said

11 time and place by said deponent; that said

12 deposition was taken by me in stenotypy and

13 transcribed under my supervision; that I am neither

14 a relative of nor attorney for any of the parties to

15 this litigation, nor relative of nor employee of any

16 of their counsel, and have no interest whatsoever in

17 the result of this litigation.  I further certify

18 that I am not, nor is the court reporting firm with

19 which I am affiliated, under a contract as defined

20 in Civil Rule 28 (D).

21      IN WITNESS WHEREOF, I  hereunto set my hand and
   official  seal of office, at  Cincinnati, Ohio, this
22 15th day of December, 2002.

23

24 MY COMMISSION EXPIRES:  WENDY L. WELSH, RDR-CRR
   NOVEMBER 20, 2005.      NOTARY PUBLIC, STATE OF OHIO

                    Merit
        602 Main Street, Suite 703, Cincinnati, OH  45202
        (513) 381-8228 * (800) 578-1542 * www.merit-ls.com

169

```
 1                            December 15, 2002
     Mr. David Edward Ferguson
 2   c/o Thomas R. Koustmer
     1800 Federated Building
 3   7 West Seventh Street
     Cincinnati, Ohio 45202
 4
             In re:  Case No. C-1-02 039, Ferguson, et
 5                   al. vs. Ryder System, Inc., et al.

 6
     Dear Mr. David Ferguson,
 7
     Your deposition has been completely transcribed and
 8   is hereby submitted to you for your review pursuant
     to the applicable Federal Rules of Civil Procedure.
 9
     The original transcript is available for reading,
10   signing and correcting at this office during busi-
     ness hours of business days, and shall remain so for
11   a period of thirty (30) days.  The above-mentioned
     rule allows you to make any changes in form or
12   substance which you desire to make, which will then
     be attached to the record with the reason(s), if
13   any, for making them.

14   If your deposition is not signed within the time
     period allowed, I am required to sign it and state
15   the fact of your failure to do so, and your depo-
     sition may then be used as though signed by you.
16
     Your time limitation requires that your signature
17   page and any corrections you wish to make be
     returned to me at my office on or before --
18                   , 2002.  Please call the phone
     number below if you have any questions regarding
19   this procedure.

20                            Sincerely,


21
                              Wendy L. Welsh, RMR-CRR
22
     cc  David E. Larson, Esq.
23       Craig R. Paulus, Esq.
         Robert A. Winter, Jr., Esq.
24       Michael J. Honerlaw, Esq.
         Thomas R. Koustmer, Esq.

                         Merit
      602 Main Street, Suite 703, Cincinnati, OH  45202
      (513) 381-8228 * (800) 578-1542 * www.merit-ls.com
```