```
 1   UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                 WESTERN DIVISION
 4
 5   --------------------------------------
                                         :
 6   DAVID FERGUSON, et al.,             :
                                         :
 7            Plaintiffs,                :
                                         :
 8        vs.                            :        CASE NO.
                                         :      C-1-02-039
 9   RYDER AUTOMOTIVE, et al.,           :
                                         :
10            Defendants.                :
                                         :
11   --------------------------------------
12
13              Deposition of:   THOMAS HELLER
14              Taken:           By the Plaintiffs
                                 Pursuant to Agreement
15
                Date:            March 13, 2003
16
                Time:            Commencing at 2:26 p.m.
17
                Place:           Kohen & Patton LLP
18                               1400 Carew Tower
                                 441 Vine Street
19                               Cincinnati, Ohio  45202
20              Before:          Debra J. Henderson, RPR
                                 Notary Public -
21                               State of Ohio
22
23
24
25
```

2

```
 1    APPEARANCES:
 2
           On behalf of the plaintiffs:
 3
                  Thomas R. Koustmer, Esq.
 4                1800 Federated Building
                  7 West Seventh Street
 5                Cincinnati, Ohio  45202
 6
           On behalf of the defendant Allied
 7           Systems, Inc.:
 8                Robert A. Winter, Jr., Esq.
                       of
 9                Hemmer Spoor Pangbum DeFrank PLLC
                  250 Grandview Drive
10                Suite 200
                  Fort Mitchell, Kentucky  41017
11
12         On behalf of the defendant Ryder Systems
             & Commercial Carrier:
13
                  K. Roger Schoeni, Esq.
14                     of
                  Kohnen & Patton LLP
15                PNC Center, Suite 800
                  201 East Fifth Street
16                Cincinnati, Ohio  45202
17
           On behalf of the defendant Hanes Supply:
18
                  Craig R. Paulus, Esq.
19                     of
                  Taft Stettinius & Hollister LLP
20                425 Walnut Street
                  Suite 1800
21                Cincinnati, Ohio  45202
22
23                     - - -
24
25
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

```
1                      I N D E X

2

  THOMAS HELLER                              PAGE
3

4      Cross-Examination by Mr. Koustmer        4
       Cross-Examination by Mr. Paulus         17
5      Cross-Examination by Mr. Schoeni        17
       Examination by Mr. Winter               23
6      Further Cross-Examination by Mr. Paulus 24

7

  EXHIBITS                        MARKED   REFERENCED
8

9      Plaintiffs' Exhibit  A        -         7
       Plaintiffs' Exhibit  B        -         7
       Plaintiffs' Exhibit  C        -         8
10     Plaintiffs' Exhibit  D        -         8
       Plaintiffs' Exhibit  E        -         8
11     Plaintiffs' Exhibit  F        -         8

12
                        - - -
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    THOMAS HELLER

2   of lawful age, a witness herein, being first duly

3   sworn as hereinafter certified, was examined and

4   deposed as follows:

5                    CROSS-EXAMINATION

6   BY MR. KOUSTMER:

7     Q.    Sir, my name is Tom Koustmer.  I represent

8   Dave Ferguson and his wife, and I'm going to be

9   asking you some questions, and then these other

10  gentlemen might have some questions.

11        A.    Okay.

12        Q.    If, for any reason, you don't understand

13  one of my questions, just ask me to rephrase it, and

14  I will be glad to do that.

15              Why don't you give us your full name,

16  spelling your last name?

17        A.    Thomas J. Heller, H-e-l-l-e-r.

18        Q.    And what is your date of birth?

19        A.    12/20/51.

20        Q.    And what is your address?

21        A.    6017 Noble, N-o-b-l-e, Avenue.  That's

22  Cincinnati, Ohio, 45239.

23        Q.    Where are you currently employed?

24        A.    I'm not employed right now.

25        Q.    Okay.  Where were you employed back in
```

5

1    August and September of 2000?

2         A.    Allied Automotive, Moraine, Ohio.

3         Q.    Do you know a Dave Ferguson?

4         A.    Yes.

5         Q.    Okay.  How do you know him?

6         A.    He was a driver.

7         Q.    And were you a driver or what was your

8    position back then?

9         A.    I was assistant terminal manager.

10        Q.    And how long have you had that position?

11        A.    Well, from '98 till 2002.

12        Q.    And what's an assistant terminal manager

13   do?

14        A.    Just, basically, overseeing the whole

15   operation, from the yard crews to the drivers.

16        Q.    Okay.  And who was the terminal manager?

17        A.    That was Tom Kelly.

18        Q.    Is Tom Kelly still with the company?

19        A.    No.

20        Q.    Where is Tom Kelly at?

21        A.    I have no idea what he's doing right

22   now.  He got activated in the military.  He was in

23   the Air Force Reserves.

24        Q.    So he's over in Qandahar?

25        A.    He was, but I think he's back now.

6

```
 1          Q.      So were you there on the day of the
 2     accident with Mr. Ferguson, September 7th of 2000?
 3          A.      No, I was not there.
 4          Q.      Okay.  Do you know what happened to the
 5     cable that was involved in this accident?
 6          A.      As far as I know, the cable broke.
 7          Q.      Okay.  Did you make any reports or take
 8     any reports or talk to Mr. Ferguson or anyone else --
 9          A.      No.
10          Q.      -- that relates to the accident?
11          A.      No.
12          Q.      Do you know if Mr. Kelly did?
13          A.      No.  I don't believe he did.
14          Q.      Now, the actual cable that broke, did
15     you ever see it?
16          A.      Yes.
17          Q.      Okay.  Where did you see it at?
18          A.      It was down in the south yard, where the
19     accident occurred the next day.
20          Q.      Okay.  So when you say "it was down in
21     the south yard," was it in a building or where was
22     it?
23          A.      No.  It was just sitting out in the yard
24     where it happened, where it fell off the truck.
25          Q.      So you saw it the next day sitting in
```

1    the yard?

2        A.      Yeah.

3        Q.      And did it -- was it coiled up or how

4    was it being kept?

5        A.      No.  Well, it was just hanging there.

6        Q.      Hanging on the truck?

7        A.      Hanging on the truck.

8        Q.      Oh, okay.  Did you see it after that,

9    the actual cable that broke?

10        A.      No.

11        Q.      Do you know what happened to it?

12        A.      No.  I have no idea.

13        Q.      Did you ever hear scuttlebutt of what

14    happened to it?

15        A.      No.

16        Q.      No one said anything that so-and-so had

17    it or so-and-so was using it?

18        A.      No.

19        Q.      Okay.  You just saw it wrapped up on the

20    truck?

21        A.      Right.

22        Q.      Correct?

23        A.      Correct.

24        Q.      Let me show you what has previously been

25    marked as some exhibits.  Plaintiffs' Exhibits A, B,

1    C, D, E, F.  I think we can just start with A,

2    maybe.

3              Exhibit A, is that what you saw wrapped

4    up on the truck?  Is that what you're talking about?

5         A.    Yeah.  Uh-huh, yeah.

6         Q.    And Exhibit B is the same?

7         A.    Uh-huh.

8              MR. WINTER:  You have to say yes or no.

9         A.    Yes.

10        Q.    Okay.  Did you take those pictures?  Do

11   you know who took the pictures?

12        A.    No.  I don't know who took them, either.

13        Q.    Did you ever talk with Mike Palladino

14   about the accident?

15        A.    The only time I talked to Mike was -- in

16   relation to the cable is when these trucks had just

17   come down out of Marian, and it was as to when these

18   cables were going to be replaced in these trucks.

19        Q.    Okay.  We will get to that, but did you

20   ever talk to Mike Palladino about the actual cable

21   after it was broken?

22        A.    No.

23        Q.    You had a conversation with him

24   beforehand when the trucks came down from Marian?

25        A.    Yes.

9

```
 1          Q.      Okay.  Do you know when that was?
 2          A.      No.  No, I couldn't recall no date, no.
 3          Q.      Do you know how far it was before
 4    Mr. Ferguson's accident?
 5          A.      I really couldn't say offhand.
 6          Q.      What was your conversation with
 7    Mr. Palladino?
 8          A.      Well, it was just in relation to these
 9    trucks.  We had probably ten trucks that had just
10    been transferred down to Moraine from Marian, and it
11    was in relation to the cables that had not been
12    replaced on the trucks.
13          Q.      And what did you say?
14          A.      Well, about as far as contacting the
15    shop to find out when these cables were going to be
16    replaced.
17          Q.      And what did Mr. Palladino say?
18          A.      Well, we both had a discussion with the
19    shop foreman.
20          Q.      Who was that?
21          A.      Bill Weaver.
22          Q.      And what was that discussion about?
23          A.      About the cables on these trucks that
24    were coming down, being replaced, and he stated to us
25    that the cables were on back order at that time.  He
```

1    was waiting on them to come in.

2         Q.    Did he say why that he didn't have

3    cables?

4         A.    They were on back order.

5         Q.    Did he say there was any problem with

6    getting cables or --

7         A.    No.  The only thing he stated to us is

8    they were on back order, and he was waiting on them

9    to come in.

10        Q.    You don't know when this conversation

11   took place?

12        A.    No.  I really can't recall.  I don't

13   remember when we started getting these trucks.  I

14   don't remember the exact date that we started getting

15   the trucks transferred down from Marian.

16        Q.    But it was during the transfer of trucks

17   from Marian to Moraine; is that right?

18        A.    Yeah.

19        Q.    Now, had there been a problem with the

20   cables breaking?

21        A.    Yes.  I imagine that's why they had been

22   recalled.  I guess some other terminal, and I can't

23   state where, had been having problems with them, and

24   that's why there was a nationwide recall on them.

25        Q.    Why do you say there was a "nationwide

1  recall"?

2       A.    Well, it's my understanding there was

3  posted that there was a recall on this certain type

4  of cable.

5       Q.    And where were the bulletins posted?

6       A.    In the shop office and in the dispatch

7  office, drivers' room.

8       Q.    And what did they say, the bulletins?

9       A.    I couldn't say verbatim, but all I do

10 know is these cables were being recalled and replaced

11 on the trucks.

12      Q.    And how long had the bulletins been up

13 before Mr. Ferguson's accident?

14      A.    A few months.

15      Q.    Now, do you know a Mr. Fay?

16      A.    Yes.

17      Q.    Did he have an accident, too?

18      A.    Yes.

19      Q.    When was that?

20      A.    I couldn't recall the date.

21      Q.    Was that before or after Mr. Ferguson's

22 accident?

23      A.    It was before, I believe.

24      Q.    Do you know what happened on this

25 accident?

1     A.     He was loading the unit on the head rack

2   of his truck, and I guess he was leaning on the cable

3   and it snapped and he fell off.  And that was also a

4   Marian truck.  He was a Marian driver, not a Moraine

5   driver.

6     Q.     Do you remember that Mr. Ferguson's

7   truck had three swivel cables and one of the old

8   style cables on it?

9     A.     Yes.

10     Q.     Do you know why that would be, only

11   three had been replaced and one hadn't?

12     A.     I -- I couldn't tell you.  There was --

13   like I said, them was Marian trucks.  They were being

14   serviced in Marian, and I don't know why they would

15   replace three and not the other one.

16     Q.     Did you have anything to do, as part of

17   your job, with ordering the replacement cables?

18     A.     No.

19     Q.     It's your understanding that they were

20   all being replaced, all of the cables on the trucks?

21     A.     Yes.

22     Q.     So every truck was getting a new eyebolt

23   style cable?

24     A.     Yes.

25     Q.     Or was supposed to get one, correct?

```
 1          A.      Correct.

 2          Q.      Do you know when that started?

 3          A.      No, I couldn't recall the exact date.

 4          Q.      Who told you that, was it Mr. Weaver?

 5          A.      Yes.

 6          Q.      So Mr. Weaver was the person in charge

 7   of replacing the cables at your facility; is that

 8   correct?

 9          A.      Yes.

10          Q.      Were you involved with any inspection

11   program as it related to the cables?

12          A.      No.

13          Q.      Do you know of any inspection program as

14   it related to the cables?

15          A.      Only by the shop foreman.

16          Q.      The shop foreman, again, is Mr. Weaver?

17          A.      Uh-huh.

18          Q.      And he was the shop foreman in '99 and

19   2000, correct?

20          A.      Yes.

21          Q.      Do you know anything about the -- your

22   facility or the other facility there -- the two

23   facilities, Marian and Moraine were supposed to be a

24   test site for new chains that were going to be used

25   on these cables?
```

1          A.      No.

2          Q.      Had you seen cables break before, other

3    than Mr. Fay's and Mr. Ferguson's?

4          A.      No.

5          Q.      And you were't there the day of the

6    accident; is that correct?

7          A.      No.  Well, it happened in the evening.

8    I had done gone home.

9          Q.      Okay.  So the next day is the day that

10   you see the truck and hear about the accident,

11   correct?

12         A.      Yes.

13         Q.      And you saw the cables as they are there

14   in A and B?

15         A.      Yes.

16         Q.      I think that's A and B.  Yeah.  Exhibit

17   A and B, wrapped around.  So the next day when it was

18   daylight, you could see that there, correct?

19         A.      Yes.

20         Q.      Okay.  And did you have any conversation

21   then with Michael Palladino about Mr. Ferguson or the

22   truck?

23         A.      Not that I recall.  Well, yes, I did.

24   On -- I talked to him, contacted Mike about Dave.

25   You know, what they had done, if he was injured, and

1    if they had sent him to the hospital.

2        Q.    Okay.  So you talked to Mike about that,

3    and he told you the situation as related to

4    Mr. Ferguson's injury?

5        A.    Yes.

6        Q.    But did you talk to him about the truck

7    itself or the trailer and the broken cable?

8        A.    No.

9        Q.    Okay.  You said that was back on the

10   south lot.  My understanding, the place didn't have a

11   repair building there, right?

12       A.    No.  Our shop was outside.

13       Q.    Right.  Okay.  So who would have fixed

14   the truck the next day, put another cable on it?

15            MR. WINTER:  Object to the form of the

16       question.

17            THE WITNESS:  Please?

18            MR. WINTER:  I objected to the form of

19       the question.  Answer if you can.

20       A.    The only one that repaired our trucks

21   was the shop, our shop.

22       Q.    Okay.  Mr. Weaver?

23       A.    Well, one of his mechanics.

24       Q.    Okay.  Do you know if there was a --

25   strike -- that there's a record that shows that the

1    cable was replaced the next day on the 8th?  This

2    occurred on the 7th, you said, at night.

3                Do you know if -- on the 7th, if there

4    were cables in the shop to replace --

5        A.    I -- no.

6        Q.    You don't know one way or the other?

7        A.    No.

8        Q.    When it's back on the south lot, what

9    does that mean?

10       A.    Well, we had two lots.  We had our north

11   lot, which is actually where the maintenance office

12   and the shop was.  And then our other -- the other

13   lot, the south lot, is where a lot of the trucks

14   load, and that's where he was loading his truck at

15   the time.

16       Q.    And I take it when you saw the truck,

17   the truck hadn't moved from where the accident

18   occurred?

19       A.    No, I don't believe so.

20       Q.    So it was still sitting where he had

21   fallen off the truck?

22       A.    Uh-huh.

23       Q.    And what time on the 8th did you see it?

24       A.    It was around -- probably 7:30,

25   8:00 a.m.

```
 1          Q.     Was Mr. Palladino there that day, on the
 2    8th?
 3          A.     Yes.
 4                 MR. KOUSTMER:  I don't have any other
 5          questions.
 6                        CROSS-EXAMINATION
 7    BY MR. PAULUS:
 8          Q.     Do you know who Mr. Slag is?
 9          A.     Yes.
10          Q.     Who is that?
11          A.     He's the union steward of the drivers.
12          Q.     Did he ever give you a list of trucks
13    that he needed replacement cables for?
14          A.     I couldn't say.  I couldn't say.
15                 MR. PAULUS:  That's all I have.
16                        CROSS-EXAMINATION
17    BY MR. SCHOENI:
18          Q.     Mr. Heller, my name is Roger Schoeni.
19    Did you ever have physical possession of the cable
20    that broke?
21          A.     No.
22          Q.     Who took physical possession of that
23    cable?
24          A.     I really couldn't say.
25          Q.     Has anyone ever told you what became of
```

```
 1    that cable?
 2         A.     No.
 3         Q.     Who was the union rep or union steward
 4    or business agent, whatever the appropriate term is,
 5    in the year 2002 at that facility?
 6         A.     The union steward would have been
 7    Bob Slag.
 8         Q.     Did he ever have possession of the
 9    cable?
10         A.     I couldn't say.
11         Q.     When did you leave your position as
12    assistant terminal manager?
13         A.     It was October of 2002.
14         Q.     Have you been employed since?
15         A.     No.
16         Q.     And why did you leave Allied Automotive
17    Group in October of 2002?
18         A.     It was a mutual agreement.  They offered
19    me a severance package.
20         Q.     Were there other similarly situated
21    employees that received severance packages about that
22    same time?
23         A.     Yes.
24         Q.     How long -- do you have any plans to
25    return to the work force?
```

1       A.      Yes.

2       Q.      Are you currently looking for

3   employment?

4       A.      Yes.

5       Q.      What did you do before you became

6   assistant terminal manager at the Allied Automotive

7   Group?

8       A.      I was a terminal manager with Builders

9   Transport in Cincinnati.

10      Q.      From when to when?

11      A.      From March of '94 until March of '97.

12      Q.      Then were you off work between March of

13  '97 and when you accepted the assistant terminal

14  manager position with Allied in 1998?

15      A.      Yes.  March of '98?  No, I was working

16  then.

17      Q.      What did you do between the Builders

18  Transport employment and the Allied Automotive Group?

19      A.      I was working for Turner Enterprises.

20      Q.      What were you doing for Turner

21  Enterprises?

22      A.      Warehouse work.  Loading the machinery

23  on the trucks.

24      Q.      When did you meet Mr. Ferguson?

25      A.      It would have been probably October

20

```
 1    of '98.
 2         Q.      Is that when you started to work for
 3    Allied?
 4         A.      I started to work for Allied in March of
 5    '98, but I had an office at the Greater Cincinnati
 6    Airport that I was working out of, and they closed
 7    that.  That's when I transferred to Moraine, which
 8    would have been October.
 9         Q.      Did you know Mr. Ferguson any better or
10    any worse than any of the other drivers at the
11    Moraine facility?
12         A.      No.
13         Q.      Did you do anything socially with
14    Mr. Ferguson?
15         A.      No.
16         Q.      When is the last time you talked to
17    Mr. Ferguson?
18         A.      I believe maybe three weeks or a month
19    ago.
20         Q.      What did you discuss with Mr. Ferguson
21    three or four weeks ago?
22         A.      Just talk.  Just social.
23         Q.      And when was the last time prior to
24    three or four weeks ago that you had a conversation
25    with Mr. Ferguson?
```

1      A.      No, it would have been a few months.
2  Three or four months.
3      Q.      Now, when you and Mr. Ferguson had this
4  conversation three or four weeks ago, who initiated
5  that?
6      A.      David called me.
7      Q.      And why did he call you?
8      A.      Just checking to see how I was doing and
9  see what was going on.
10     Q.      Did you discuss his case?
11     A.      No.
12     Q.      At that time, did you know that you were
13  going to be called to testify?
14     A.      No.
15     Q.      Did Mr. Ferguson suggest to you that you
16  might be called to testify?
17     A.      No.
18     Q.      Have you had any discussions with
19  Mr. Koustmer before your deposition today?  You know
20  Mr. Koustmer, the fellow that asked you questions
21  first today.
22     A.      No.
23     Q.      Have you had any discussions with any
24  representatives of his office?
25     A.      No.

1        Q.     Now, you had a conversation with
2   Mr. Ferguson three or four months before your most
3   recent conversation.  Who initiated that
4   conversation?
5        A.     Dave.
6        Q.     Was that a telephone conversation?
7        A.     Yes.
8        Q.     And he called you?
9        A.     Yes.
10       Q.     Why did he call you, what, I guess,
11   would now be four or five months ago?
12              MR. KOUSTMER:  Objection.
13       A.     Just, basically, the same thing.  Just
14   checking to see what was going on.  He heard that I
15   was laid off.
16       Q.     You had gotten laid off four or five
17   months ago?
18       A.     No.  When he heard I got laid off, he
19   just called to see what was going on.
20       Q.     Did he want to know why you got laid
21   off?
22       A.     Yeah.  You know, just asking questions,
23   see what's going on.
24       Q.     Would it be fair to say Mr. Ferguson has
25   hard feelings with regard to Allied Automotive Group?

1          MR. KOUSTMER:  Objection.

2     A.     I couldn't say.

3     Q.     The general tenor of the conversation

4  that you had with Mr. Ferguson for the last four or

5  five months, did you get the feeling that there are

6  some hard feelings there between Mr. Ferguson and

7  Allied?

8          MR. KOUSTMER:  Objection.

9     A.     No.  Basically, our conversations are

10 just personal, about what's going on, you know, with

11 him, what's going on with me.

12    Q.     Do you have any personal animosity with

13 regards to the manner in which you left your

14 employment with Allied?

15    A.     No.

16          MR. SCHOENI:  I don't have anything

17    further.

18                    EXAMINATION

19 BY MR. WINTER:

20    Q.     Mr. Heller, the drivers for Moraine are

21 governed by the -- is that the Teamsters Union?

22    A.     Yes.

23    Q.     Are you involved, as the terminal

24 manager, in the grievance process?

25    A.     Yes.

```
 1        Q.      How so?
 2        A.      The majority of the grievances would
 3   come to me.  The union stewards, they would bring the
 4   grievance to me, and I would have to sign them.
 5        Q.      Almost all of the grievances came to
 6   you?
 7        A.      Yes.
 8        Q.      How many grievances did you see that
 9   address, referred, or related to head ramp cables and
10   unsafe --
11        A.      As far as the cables, I don't remember.
12   I don't recall ever seeing the reasons on the cable.
13   I don't recall.
14              MR. WINTER:  I don't have anything else
15         further.
16              FURTHER CROSS-EXAMINATION
17   BY MR. PAULUS:
18        Q.      Did you ever see the cable at any time
19   when it wasn't still attached to the truck?
20        A.      No.
21              MR. WINTER:  I think you're done.  You
22         have the right to review your deposition
23         transcript, if you want to, or you can trust
24         the court reporter to get it down correctly.
25              THE WITNESS:  Yeah.
```

```
 1                    MR. WINTER:  It's your call.

 2                    THE WITNESS:  No, I trust her.

 3                    MR. WINTER:  In other words, you want to

 4        waive your signature?

 5                    THE WITNESS:  Yeah.

 6

 7                          (Signature waived.)
                      ----------------------------
 8                          THOMAS HELLER

 9                    -  -  -

10        DEPOSITION CONCLUDED AT 2:55 P.M.

11                    -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

26

```
 1              C E R T I F I C A T E

 2   STATE OF OHIO        :
                          :        SS
 3   COUNTY OF CLERMONT   :

 4          I, Debra J. Henderson, RPR, the undersigned, a

 5   duly qualified and commissioned notary public within

 6   and for the State of Ohio, do hereby certify that

 7   before the giving of his aforesaid deposition,

 8   THOMAS HELLER was by me first duly sworn to depose

 9   the truth, the whole truth and nothing but the truth;

10   that the foregoing is the deposition given at said

11   time and place by THOMAS HELLER; that said deposition

12   was taken in all respects pursuant to stipulations of

13   counsel; that I am neither a relative of nor employee

14   of any of the parties or their counsel, and have no

15   interest whatever in the result of the action; that I

16   am not, nor is the court reporting firm with which I

17   am affiliated, under a contract as defined in Civil

18   Rule 28(D).

19          IN WITNESS WHEREOF, I hereunto set my hand and

20   official seal of office at Batavia, Ohio, this ____

21   day of _____, 2004.

22

23                            _____

     My commission expires:   Debra J. Henderson, RPR
24   May 8, 2005.             Notary Public - State of Ohio

25
```

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**