**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DAVID FERGUSON, et al.** | ) | |
| | ) | **JUDGE HERMAN J. WEBER** |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. C-1-02-39** |
| | ) | |
| **RYDER AUTOMOTIVE, et al.** | ) | |
| | ) | **JOINT FINAL PRETRIAL ORDER** |
| **Defendants** | ) | |

This matter is before the Court pursuant to Rule 16 of the Federal Rules of Civil

Procedure and other applicable law.

**I.    APPEARANCES:**

For plaintiffs David E. Ferguson and Martha Ferguson:

|  |  |
|---|---|
| Thomas R. Koustmer  (0008410) | Michael J. Honerlaw (0034469) |
| 1800 Federated Building | Honerlaw & Honerlaw Co., L.P.A. |
| 7 West Seventh Street | 9227 Winton Road |
| Cincinnati, OH  45202 | Cincinnati, OH  45231 |
| (513) 621-3616 | (513) 931-2200 |
| Email:  plpaige@aol.com | Email:  mike@honerlaw.com |

For defendant Commercial Carriers, Inc.:

|  |  |
|---|---|
| K. Roger Schoeni (0004812) | David E. Larson |
| Kohnen & Patton LLP | Larson & Larson PC |
| PNC Center, Suite 800 | 11300 Tomahawk Creek Pkwy, Suite 310 |
| 201 E. Fifth Street | Leawood, KS  66211 |
| Cincinnati, OH  45202 | (913) 253-3100 |
| (513) 381-0656 | E-mail:  dlarson@larsonlaw.biz |
| E-mail:  rschoeni@kohnenpatton.com | |

For defendants Allied Systems, Ltd. and Allied Automotive Group, Inc.:

> Robert Albert Winter, Jr. (0038673)
> Hemmer Spoor Pangburn DeFrank PLLC
> 250 Grandview Dr., Suite 200
> Ft. Mitchell, KY  41017
> (859) 344-1188
> E-mail:  bwinter@hemmerlaw.com

For defendant Hanes Supply, Inc.:

> Craig R Paulus (074352)
> Taft, Stettinius & Hollister LLP
> 425 Walnut Street, Suite 1800
> Cincinnati, OH  45202-3957
> (513) 381-2838
> E-mail: paulus@taftlaw.com

## II.    NATURE OF ACTION AND JURISDICTION:

A.  This is an action for personal injuries and loss of consortium.

B.  The jurisdiction of the Court is invoked under the diversity of citizenship statute, 28

U.S.C. §1332(a), since the parties are citizens of different states and the amount in controversy

exceeds the sum or value of $75,000.00, exclusive interest and costs.

C.  The jurisdiction of the Court is undisputed.

## III.   TRIAL INFORMATION:

A.  The estimated length of trial is 5-7 days.

B.  A jury trial will begin on May ___, 2004.

2

IV.    **STATEMENT OF THE CASE.**

    A.    **Plaintiffs' Statement of the Case.**

This is a product liability claim.  On or about September 7, 2000, Plaintiff David Ferguson was performing his normal work duties as a driver of a car hauling tractor trailer for Defendant Allied Automotive in Ohio.  Plaintiff fell when he grabbed a safety cable which broke on the headrack of the trailer manufactured by CCI.  At the time, the trailer and cable were defective in various respects.  The alleged defects include lack of warnings with regard to defects and hand cables which should have lasted 10 years but were in fact only lasting five years.  The hand cable which Mr. Ferguson grabbed hold of, is intended for safety.  Mr. Ferguson, using the cable in a safety manner, grabbed hold of it and it broke due to corrosion.  The safety cable was made of the wrong design and made out of the wrong material.  The safety cable was made by Defendant Hanes.  Defendant Hanes asserts that Defendant CCI designed the cable and picked the material to be used in the cable.  Defendant CCI maintains that Defendant Hanes designed the cable and picked the material to be used in the cable.  Defendant CCI admits that they put rubber coating on the end near the swivel which was yellow and not transparent so one cannot see whether or not the cable was rusting.

Defendants' failed to warn and misrepresented to Plaintiff concerning the length of use of the cable.  CCI contends that they instructed Hanes to design a cable that would last the life of a truck and/or 10 years.  Defendant Hanes denies the same.  The trailers were equipped with the wrong type cable.  The cable should have been stainless steel.  Instead it was galvanized steel which had the life span of four to five years as used in the swivel design.

That the cable was defective and upon Plaintiff grabbing hold of same it broke causing Plaintiff to fall to the ground and sustain serious injuries to his back.

3

Defendants have breached their duties that the product in question was defective under the Product Liability Statutes of the State of Ohio and common law in a negligent design, failure to warn, breach of warranty and misrepresentation, all of which proximately caused the Plaintiff's injuries. The cable in question was discarded by Defendant Allied. Plaintiff has a spoliation claim against Defendant Allied because the following apply:

1.    Pending or probable litigation involving the Plaintiff;

2.    Knowledge on the part of Defendant that litigation exists or is probable;

3.    Willful destruction of evidence by Defendant designed to disrupt the Plaintiff's case;

4.    Disruption of the Plaintiff's case; and

5.    Damages proximately caused by the Defendant's acts.

As a result of the defective design, failure to warn, breach of warranty and misrepresentation by Defendant CCI and Defendant Hanes and the spoliation of evidence by Defendant Allied, Plaintiff David Ferguson incurred injury to his back which resulted in his inability to work and lost wage damages in the amount of $713,844.00, plus other compensatory damages altogether totaling $1,000,000.00.

### B.    Defendant Commercial Carrier, Inc.'s Statement of the Case.

In this product liability action the plaintiff contends that he sustained an injury when a safety cable broke along the top deck of the automobile transport trailer where he was working. The plaintiff has alleged various theories against Commercial Carrier's Inc., ("CCI") including design and warnings theories pursuant to Ohio statutory and common law. CCI denies these allegations, and asserts that the plaintiff is chargeable with implied assumption of the risk which

would defeat his cause of action. CCI also contends that the plaintiffs are unable to establish that the plaintiff's injuries were proximately caused by any defect, design or otherwise, in the cable because the accident cable is no longer available for inspection. CCI also contends that the conduct of the plaintiff's employer served as an efficient intervening cause of the plaintiff's accident.

**C.    The Allied Defendants' Statement of the Case.**

The remaining claim against the Allied Defendants is asserted by defendant Hanes Supply, Inc. for spoliation of evidence; to wit, the destruction of the cable on Mr. Ferguson's truck that allegedly broke when he fell on September 7, 2000. Plaintiffs seek leave to file their *Third Amended Complaint* to add a spoliation of evidence claim. It remains to be seen whether plaintiffs will be permitted to do so.

The Allied Defendants are in the business of transporting motor vehicles from the manufacturer's final assembly point to the designated shipping point. Tractors and trailers are used to haul the motor vehicles. At all pertinent times, Mr. Ferguson was employed by the Allied Defendants at a tractor trailer operator, and plaintiff Martha Ferguson was his wife.

In 1999 and 2000, the Allied Defendants operated two terminals in the greater Dayton, Ohio area. One was at Marion and the other was at Moraine. Mr. Ferguson operated out of the Moraine terminal at all pertinent times. The Allied Defendants were in the process of merging the two terminals into Moraine by December 2000. During this period, the maintenance manager at Marian was Mr. Gordon Beal, and his counterpart at Moraine was Mr. William C. Weaver. Their superior was the Allied Defendants' regional maintenance manager, Mr. John Taggart.

In late January or early February 1999, Mr. Taggart initiated a telephonic conference call with all the maintenance managers within his region, including Messrs. Beal and Weaver. Mr. Taggart announced that the head ramp safety cables installed on the Allied Defendants' tractors were rusting, and directed that they be replaced either right away or as soon as possible within reason. The removed cables were to be cut up and discarded so that there would be no chance of any reuse. No one from defendant Commercial Carriers, Inc. participated in the call and there is no evidence that CCI had any say in the promulgation of Mr. Taggart's directive.

The head ramp safety cables then began being replaced. During 1999-2000, more than 1,000 head ramp safety cables were ordered and/or installed. Unfortunately, not all of the old style cables had been replaced by September 7, 2000, the date of Mr. Ferguson's accident. Prior to that date, there had been one work-related injury as a result of an old style head ramp safety cable breaking. Other than a workers' compensation claim, there have been no civil actions brought against the Allied Defendants as a result of allegedly defective head ramp safety cables prior to this case.

The tractor at issue had previously been stationed at the Marion terminal. It had just been transferred to the Moraine terminal in conjunction with the wind down of the Marion operation, and the tractor arrived at Moraine around August 21, 2002. The truck's maintenance records reflect that prior to arriving at Moraine, three of the four head ramp safety cables had been replaced at Marion on or about May 8, 1999. Those records indicate that the fourth cable had not been replaced prior to Mr. Ferguson's accident.

On the morning of September 7, 2000, the tractor that Mr. Ferguson usually drove was in the Moraine terminal's maintenance department.  He was given a temporary tractor, Unit No. 61304.  Mr. Ferguson performed a walk-around inspection of his tractor and trailer.  During his inspection, Mr. Ferguson looked up at the head ramp safety cables and noted that there were three new cables installed, two of which were on the passenger side.  He also knew that the Allied Defendants had not yet replaced all of the safety cables on every tractor, but he did not specifically check the cables on the driver's side, even though his eyes were literally inches away from the old cable shortly before his accident.

Mr. Ferguson acknowledges that had he inspected the lower cable on the driver's side -- the one at issue here -- he would have seen that it was an old type cable that the Allied Defendants were trying to replace.  Mr. Ferguson presumed that the Moraine maintenance department had inspected the cable and determined it to be safe.

While chaining down a vehicle to the head ramp, Mr. Ferguson lost his footing and grabbed onto the lower of two head ramp safety cables.  The cable broke, Mr. Ferguson was unable to regain his balance and he fell approximately ten feet to the asphalt pavement.  Mr. Ferguson claims to have sustained severe injuries to his low back as a result of the fall.

Mr. Ferguson is receiving medical and income benefits from the Allied Defendants as a self-insurer under the Ohio workers' compensation act.  Mr. Ferguson is receiving $589.00 per week for temporary total disability.  Totals medical benefits paid to date are approximately $40,613.58 and total income benefits are approximately $109,130.00.

It is standard safety practice for the Allied Defendants' safety supervisor to obtain custody over any items that are involved in an accident.  In this instance, the safety supervisor, Mr. Michael Palladino, did not retrieve the broken cable.  However, all of Mr. Palladino's written reports of the accident call for the tractors to be inspected and the old style cables

replaced.  Notwithstanding Mr. Palladino not retrieving the broken cable from the truck, it was observed still attached to the truck on the day after the accident by the assistant manager of the Moraine terminal, Mr. Tom Heller.

The Allied Defendants' repair and maintenance records reflect that the broken cable was replaced on September 8, 2000, the day after the accident, by maintenance mechanic Richard H. Shively.  The Allied Defendants do not know the exact whereabouts of the broken cable. However, it was also the Allied Defendants' standard maintenance practice under Mr. Taggart's directive to cut up and discard all old style cables as they were replaced so that they would not be reused or refurbished.  Mr. Shively did not treat the broken cable in any manner other than that standard maintenance practice and no one, including Mr. Palladino, ever asked him to turn over the cable.  Mr. Shively had never been told or influenced by anyone to dispose of any of the old style cables that he had replaced because of the possibility of litigation.  He would have destroyed the broken cable because it was standard practice under the Taggart directive to cut up and discard them.

There is some testimony by Mr. Weaver proffered by Hanes Supply and by plaintiffs to the effect that Mr. Palladino said to him that he had retrieved the broken cable from the truck shortly after the accident.  They then speculate that Mr. Palladino destroyed it when it became apparent that the Allied Defendants were going to become embroiled in litigation with plaintiffs beyond Mr. Ferguson's workers' compensation claim.

Mr. Weaver has no personal knowledge of what happened to the broken cable, but initially recalled hearing Mr. Palladino say at some time after the accident that he, Mr. Palladino, had retrieved or obtained possession of the cable.  Upon a review of his deposition transcript, Mr. Weaver realized that his testimony was incorrect with regard to Mr. Palladino's supposed retrieval of the cable, since Mr. Palladino never told Mr. Weaver that he had retrieved or had

possession of the broken cable. Accordingly, Mr. Weaver made one change to his deposition testimony with regard to the question concerning whether anyone disclosed to Mr. Weaver the whereabouts of the broken cable after the accident.

### D.        Defendant Hanes Supply, Inc.'s Statement of the Case.

The Plaintiffs cannot show why the cable in question failed because the cable was lost or destroyed by defendant Allied.  Likewise, the Plaintiffs cannot show that the cable that allegedly injured the Plaintiff was even made by Hanes Supply.  Hanes Supply disputes that the cables it made were defective in any way or that it had a duty to make any warning to the Plaintiff when both the Plaintiff and his employer were fully aware that the cables did not last forever.  Hanes was never informed that the cable should be designed to last ten years and the Plaintiffs have never identified any warranty or representation made by Hanes Supply.

Moreover, the cause of the Plaintiff's accident is not the cable, but the intervening act of Plaintiff's employer, Defendant Allied.  Like many components of a vehicle, the cables on these trucks needed to be periodically replaced.  Allied recognized this and instituted a program to replace all cables in the fleet.  But, between the start of the replacement program and the accident, eighteen months of opportunity to replace the cable passed and the truck was shopped in the maintenance department 99 times.  Nevertheless, Allied failed to replace the cable.

Concerning its cross-claim for spoliation of evidence, the Allied Defendants' personnel admit that the company had a policy of retaining parts and that the policy was not followed for this cable.  Because other workers were injured shortly before the Plaintiff's alleged injury, Allied was aware of the probability of litigation.  Moreover, Allied and co-defendant CCI are affiliates.

The loss or destruction of the cable by Allied has not only impaired Hanes Supply's ability to defend itself in this case, but if liability is imposed on Hanes Supply, Hanes Supply has

also lost its claim for indemnification against the manufacturer who supplied the wire rope component of this cable. All wire rope used by Hanes Supply has internal thread identifiers that can be used to identify the wire rope manufacturer. Because the cable is lost and Hanes Supply used 5-6 suppliers at the time, the proper party for an indemnification claim is impossible to determine. In other words, when Allied destroyed the cable, it also destroyed a potential cause of action by Hanes Supply thereby making itself liable for any damages assessed against Hanes Supply.

V.    **TRIAL DETERMINATIONS.**

   A.  **FACTS.**

     1.  **Stipulated Facts:**  The parties stipulate the following facts:

      a.    At all relevant times, plaintiff David E. Ferguson was employed by the Allied Defendants as a tractor trailer operator, and plaintiff Martha Ferguson was his wife.

      b.    That tractors used by Allied Defendants in their business have two safety cables attached to the two posts attached at the top of the head ramp on each side of the tractor.

      c.    Mr. Gordon Beal was the maintenance manager of the Allied Defendants' former Marion terminal. Mr. William C. Weaver was the maintenance manager at their Moraine terminal. Their regional maintenance manager was Mr. John Taggart.

      d.    Three of the four head ramp safety cables on the truck at issue had been replaced by Marion's maintenance department on or about May 8, 1999.

      e.    At the time of Plaintiff's accident Mr. Palladino was the Safety Supervisor at the Moraine terminal. He recalled some incidents of safety cable failures at Moraine.

f.     There had been one accident prior to Mr. Ferguson's fall known to the Allied Defendants involving allegedly defective head ramp safety cables. On August 8, 2000, Mr. Thomas Fay was injured when a head ramp safety cable broke and he fell.

g.     Mr. Ferguson presumed that the Moraine maintenance department had inspected the cable and determined it to be safe.

h.     At approximately 10:35 a.m., on September 7, 2000 while performing his normal duties on the truck, Plaintiff claims to have grabbed onto the lower of the two head ramp safety cable. The cable broke allegedly and Plaintiff allegedly fell approximately 10 feet to the asphalt pavement.

i.     It is the Allied Defendants' standard practice for a terminal safety supervisor to obtain custody over any items that are involved in an accident.

j.     CCI manufactured the truck in 1995, VIN-4RCAB7048SH019823.

k.     In 1994 CCI management decided to add safety cables to the head ramp of the truck for purposes of reducing the likelihood of a fall from that location. Two rails were installed in each side of the headrack, one above the other.

2.     **Disputed Facts:**

The parties dispute the following facts.

a.     What were the events of September 7, 2000, leading up to Mr. Ferguson's alleged accident?

b.     Nature and extent of Mr. Ferguson's and Ms. Ferguson's injuries.

c.     Who designed the cable that allegedly broke on September 7, 2000?

d.     Who supplied the cable that broke?

e.     Who selected the material for the cable that broke?

f.    What was the cause of the cable failure?

g.    Mr. Ferguson's knowledge of the alleged defective condition?

h.    Whether the Allied Defendants ever assumed the liabilities of Commercial Carriers, Inc., including any liability for products liability claims.

i.    Whether the Allied Defendants knew in September 2000 at the time the cable disappeared that litigation exists or is probable.

j.    Whether the Allied Defendants willfully destroyed the broken cable at issue here with a design to disrupt the litigation?

k.    Whether any litigation has been disrupted by the absence of the broken cable?

l.    Whether anyone sustained any damages caused by the Allied Defendant's acts.

m.    Whether the Allied Defendants have given an explanation as to why the broken cable was not preserved for trial.


B.  **APPLICABLE PROPOSITIONS OF LAW.**

1.  **Agreed Applicable Propositions of Law:**  The following applicable propositions of law are agreed to by the parties:

a.  The following statutes and Ohio common law, where applicable, govern plaintiffs' product liability claims against defendants Commercial Carriers, Inc. and Hanes Supply, Inc.:

*R.C. §2307.71*, entitled **Definitions**, provides as follows:

As used in sections 2307.71 to 2307.80 of the Revised Code:

(A) "Claimant" means either of the following:

(1)    A person who asserts a product liability claim or on whose behalf such a claim is asserted;

(2)    If a product liability claim is asserted on behalf of the surviving spouse, children, parents, or other next of kin of a decedent or on behalf of the estate of a decedent, whether as a claim in a wrongful death action under Chapter 2125. of the Revised Code or as a survivorship claim, whichever of the following is appropriate:

(a)    The decedent, if the reference is to the person who allegedly sustained harm or economic loss for which, or in connection with

which, compensatory damages or punitive or exemplary damages are sought to be recovered;

      (b)    The personal representative of the decedent or the estate of the decedent, if the reference is to the person who is asserting or has asserted the product liability claim.

(B)    "Economic loss" means direct, incidental, or consequential pecuniary loss, including, but not limited to, damage to the product in question, and nonphysical damage to property other than that product. Harm is not "economic loss."

(C)    "Environment" means navigable waters, surface water, ground water, drinking water supplies, land surface, subsurface strata, and air.

(D)    "Ethical drug" means a prescription drug that is prescribed or dispensed by a physician or any other person who is legally authorized to prescribe or dispense a prescription drug.

(E)    "Ethical medical device" means a medical device that is prescribed, dispensed, or implanted by a physician or any other person who is legally authorized to prescribe, dispense, or implant a medical device and that is regulated under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. 301-392, as amended.

(F)    "Foreseeable risk" means a risk of harm that satisfies both of the following:

      (1)    It is associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question;

      (2)    It is a risk that the manufacturer in question should recognize while exercising both of the following:

            (a)    The attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess;

            (b)    Any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question possesses.

(G)    "Harm" means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not "harm."

(H)    "Hazardous or toxic substances" include, but are not limited to, hazardous waste as defined in section 3734.01 of the Revised Code, hazardous waste as specified in the rules of the director of environmental protection pursuant to division (A) of section 3734.12 of the Revised Code, hazardous substances as defined in section 3716.01 of the Revised Code, and hazardous substances, pollutants, and contaminants as defined in or by regulations adopted pursuant to the

"Comprehensive Environmental Response, Compensation, and Liability Act of 1980," 94 Stat. 2767, 42 U.S.C. 9601, as amended.

(I)    "Manufacturer" means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product.

(J)    "Person" has the same meaning as in division (C) of section 1.59 of the Revised Code and also includes governmental entities.

(K)    "Physician" means a person who is licensed to practice medicine and surgery or osteopathic medicine and surgery by the state medical board.

(L)(1)    "Product" means, subject to division (L)(2) of this section, any object, substance, mixture, or raw material that constitutes tangible personal property and that satisfies all of the following:

(a)    It is capable of delivery itself, or as an assembled whole in a mixed or combined state, or as a component or ingredient;

(b)    It is produced, manufactured, or supplied for introduction into trade or commerce;

(c)    It is intended for sale or lease to persons for commercial or personal use.

(2)    "Product" does not include human tissue, blood, or organs.

(M)    "Product liability claim" means a claim that is asserted in a civil action and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(1)    The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
(2)    Any warning or instruction, or lack of warning or instruction, associated with that product;

(3)    Any failure of that product to conform to any relevant representation or warranty.

(N)    "Representation" means an express representation of a material fact concerning the character, quality, or safety of a product.

(O)(1)    "Supplier" means, subject to division (O)(2) of this section, either of the following:

(a)    A person that, in the course of a business conducted for the purpose, sells, distributes, leases, prepares, blends, packages, labels, or otherwise participates in the placing of a product in the stream of commerce;

(b)    A person that, in the course of a business conducted for the purpose, installs, repairs, or maintains any aspect of a product that allegedly causes harm.

(2) "Supplier" does not include any of the following:

(a) A manufacturer;

(b) A seller of real property;

(c) A provider of professional services who, incidental to a professional transaction the essence of which is the furnishing of judgment, skill, or services, sells or uses a product;

(d) Any person who acts only in a financial capacity with respect to the sale of a product, or who leases a product under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor.

(P)    "Unavoidably unsafe" means that, in the state of technical, scientific, and medical knowledge at the time a product in question left the control of its manufacturer, an aspect of that product was incapable of being made safe.

_R.C. §2307.72_, entitled **Damage claims; contamination or pollution claims; multiple**

**claims asserted in one civil action**, provides as follows:

(A)    Any recovery of compensatory damages based on a product liability claim is subject to sections 2307.71 to 2307.79 of the Revised Code.

(B)    Any recovery of punitive or exemplary damages in connection with a product liability claim is subject to sections 2307.71 to 2307.80 of the Revised Code.

(C)    Any recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, other than a product liability claim, is not subject to sections 2307.71 to 2307.79 of the Revised Code, but may occur under the common law of this state or other applicable sections of the Revised Code.

(D)(1) Sections 2307.71 to 2307.80 of the Revised Code do not supersede, modify, or otherwise affect any statute, regulation, or rule of this state or of the United States, or the common law of this state or of the United States, that relates to liability in compensatory damages or punitive or exemplary damages for injury, death, or loss to person or property, or to relief in the form of the abatement of a

nuisance, civil penalties, cleanup costs, cost recovery, an injunction or temporary restraining order, or restitution, that arises, in whole or in part, from contamination or pollution of the environment or a threat of contamination or pollution of the environment, including contamination or pollution or a threat of contamination or pollution from hazardous or toxic substances.

(2)    Consistent with the Rules of Civil Procedure, in the same civil action against the same defendant or different defendants, a claimant may assert both of the following:

        (a)    A product liability claim, including a claim for the recovery of punitive or exemplary damages in connection with a product liability claim;

        (b)    A claim for the recovery of compensatory damages or punitive or exemplary damages for injury, death, or loss to person or property, or for relief in the form of the abatement of a nuisance, civil penalties, cleanup costs, cost recovery, an injunction or temporary restraining order, or restitution, that arises, in whole or in part, from contamination or pollution of the environment or a threat of contamination or pollution of the environment, including contamination or pollution or a threat of contamination or pollution from hazardous or toxic substances.

_R.C. §2307.73_, entitled **Standard of proof for manufacturer's liability for compensatory damages; evidence of subsequent remedial measures**, provides as follows:

(A)    A manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, both of the following:

    (1)    Subject to division (B) of this section, the product in question was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code;

    (2)    A defective aspect of the product in question as described in division (A)(1) of this section was a proximate cause of harm for which the claimant seeks to recover compensatory damages.

(B)    If a claimant is unable because a product in question was destroyed to establish by direct evidence that the product in question was defective or if a claimant otherwise is unable to establish by direct evidence that a product in question was defective, then, consistent with the Rules of Evidence, it shall be sufficient for the claimant to present circumstantial or other competent evidence that establishes, by

a preponderance of the evidence, that the product in question was defective in any one of the four respects specified in division (A)(1) of this section.

_R.C. §2307.74_, entitled **Products defective in manufacture or construction**, provides as follows:

A product is defective in manufacture or construction if, when it left the control of its manufacturer, it deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards. A product may be defective in manufacture or construction as described in this section even though its manufacturer exercised all possible care in its manufacture or construction.

_R.C. §2307.75_, entitled **Products defective in design or formulation; foreseeable risks; benefits; drug or medical device**, provides as follows:

(A)     Subject to divisions (D), (E), and (F) of this section, a product is defective in design or formulation if either of the following applies:

(1)     When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;

(2)     It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

(B)     The foreseeable risks associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1)     The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(2)     The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;

(3)     The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(3)     The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer.

(C)     The benefits associated with the design or formulation of a product shall be determined by considering factors including, but not limited to, the following:

(1)     The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;

(2)     The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(4)     The nature and magnitude of any foreseeable risks associated with such an alternative design or formulation.

(D)     An ethical drug or ethical medical device is not defective in design or formulation because some aspect of it is unavoidably unsafe, if the manufacturer of the ethical drug or ethical medical device provides adequate warning and instruction under section 2307.76 of the Revised Code concerning that unavoidably unsafe aspect.

(E)     A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

(F)     A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

_R.C. §2307.76_, entitled **Products defective due to inadequate warning or instruction**, provides as follows:

(A)     Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:

(1)     It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:

      (a)     The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

      (b)     The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

   (2)     It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:

      (a)     The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

      (c)     The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

(B)     A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.

(C)     An ethical drug is not defective due to inadequate warning or instruction if its manufacturer provides otherwise adequate warning and instruction to the physician or other legally authorized person who prescribes or dispenses that ethical drug for a claimant in question and if the federal food and drug administration has not provided that warning or instruction relative to that ethical drug is to be given directly to the ultimate user of it.

     *R.C. §2307.77*, entitled **Products defective due to nonconformance with**

**manufacturers' representations**, provides as follows:

     A product is defective if it did not conform, when it left the control of its manufacturer, to a representation made by that manufacturer. A product may be defective because it did not conform to a representation even though its manufacturer did not act fraudulently, recklessly, or negligently in making the representation.

_R.C. §2307.78_, entitled **Liability of supplier**, states as follows:

(A)     Subject to division (B) of this section, a supplier is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, that either of the following applies:

       (1)     The supplier in question was negligent and that, negligence was a proximate cause of harm for which the claimant seeks to recover compensatory damages;

       (2)     The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages. A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation.

(B)     A supplier of a product is subject to liability for compensatory damages based on a product liability claim under sections 2307.71 to 2307.77 of the Revised Code, as if it were the manufacturer of that product, if the manufacturer of that product is or would be subject to liability for compensatory damages based on a product liability claim under sections 2307.71 to 2307.77 of the Revised Code and any of the following applies:

       (1)     The manufacturer of that product is not subject to judicial process in this state;

       (2)     The claimant will be unable to enforce a judgment against the manufacturer of that product due to actual or asserted insolvency of the manufacturer;

       (3)     The supplier in question owns or, when it supplied that product, owned, in whole or in part, the manufacturer of that product;

       (4)     The supplier in question is owned or, when it supplied that product, was owned, in whole or in part, by the manufacturer of that product;

       (5)     The supplier in question created or furnished a manufacturer with the design or formulation that was used to produce, create, make, construct, assemble, or rebuild that product or a component of that product;

       (6)     The supplier in question altered, modified, or failed to maintain that product after it came into the possession of, and before it left the

possession of, the supplier in question, and the alteration, modification, or failure to maintain that product rendered it defective;

(7)    The supplier in question marketed that product under its own label or trade name;

(8)    The supplier in question failed to respond timely and reasonably to a written request by or on behalf of the claimant to disclose to the claimant the name and address of the manufacturer of that product.

*R.C. §2307.79*, entitled **Compensatory damages**, provides as follows:

(A)    If a claimant is entitled to recover compensatory damages for harm from a manufacturer in accordance with section 2307.73 of the Revised Code or from a supplier in accordance with division (B) of section 2307.78 of the Revised Code, the claimant may recover from the manufacturer or supplier in question, in that action, compensatory damages for any economic loss that proximately resulted from the defective aspect of the product in question.

(B)    If a claimant is entitled to recover compensatory damages for harm from a supplier in accordance with division (A) of section 2307.78 of the Revised Code, the claimant may recover from the supplier in question, in that action, compensatory damages for any economic loss that proximately resulted from the negligence of that supplier or from the representation made by that supplier and the failure of the product in question to conform to that representation.

**b.**    The following principles govern spoliation of evidence claims against the Allied

Defendants:

To recover on a claim for interference with or destruction of evidence (also referred to as spoliation of evidence), a plaintiff must prove all of the following elements: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts. *Smith v. Howard Johnson Co., Inc.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037.

## 2.    Disputed Applicable Propositions of Law:

The following applicable propositions of law are disputed by the parties:

**a.**    Plaintiffs state that comparative/contributory negligence is not defense to a product liability claim and that assumption of the risk is not a defense to a product liability claim or this case.  Furthermore, express assumption of the risk is not a

defense for a design defect.  Defendants contend that implied assumption of the risk is available as a defense and is applicable in this case.

**b.**    Whether the Ohio workers' compensation act precludes the assertion of any spoliation of evidence claim against the Allied Defendants here.  R.C. §*4123.74*, entitled **Employer's liability in damages**, provides as follows:

> Employers who comply with section 4123.35 of the Revised Code shall not be liable to respond in damages at common law or by statute for any injury, or occupational disease, or bodily condition, received or contracted by any employee in the course of or arising out of his employment, or for any death resulting from such injury, occupational disease, or bodily condition occurring during the period covered by such premium so paid into the state insurance fund, or during the interval the employer is a self-insuring employer, whether or not such injury, occupational disease, bodily condition, or death is compensable under this chapter.

**c.**    Whether plaintiffs' claim for spoliation of evidence is barred by the applicable statute of limitations.  R.C. § *2305.10*, entitled **Bodily injury or injury to personal property; when certain causes of action arise**, provides as follows:

> An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose.

**d.**    Whether evidence of the Allied Defendants alleged assumption of Commercial Carriers, Inc.'s liabilities, including liability for products liability, can be received in any form other than in a manner consistent with the applicable statute of frauds. *R.C. §1335.05*, entitled **Certain agreements to be in writing**, provides that:

> No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person; nor to charge an executor or administrator upon a special promise to answer damages out of his own estate; nor to charge a person upon an agreement made upon consideration of marriage, or upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them, or upon an agreement that is not to be performed within one year from the making thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

> No action shall be brought to charge a person licensed by Chapter 4731. of the Revised Code to practice medicine or surgery, osteopathic medicine or surgery, or podiatric medicine and surgery in this state, upon any promise or agreement relating to a medical prognosis unless the promise or agreement is in writing and signed by the party to be charged therewith.

e.    Whether the principle of transferred intent is available to assist in establishing the Allied Defendants liability for alleged spoliation of evidence in the face of *Drawl v. Cornicelli* (11th Dist. 1997), 124 Ohio App.3d 849, 853-854, 706 N.E.2d 849, 569-570.

f.    Whether the Allied Defendants are entitled to a set off against any judgment entered against them for spoliation of evidence of all amounts paid to plaintiff under the Ohio workers' compensation act.

g.    Whether the conduct of the employer constitutes an efficient, intervening cause of plaintiffs accident.

h.    Whether the plaintiff can make a submissible case absent the accident cable.

C.    **Witnesses.**

The parties have listed on Appendices A through D those persons who will be called or who will be available to testify.

The parties reserve the right to call without prior notice to opposing counsel rebuttal witnesses whose testimony could not reasonably be anticipated.

D.    **Expert Witnesses.**

Except as objected to below, the parties propose to call the following number of expert witnesses, all of whom have been disclosed to the opposing side:

Plaintiffs:  Mitchell E. Simons, M.D., John M. Roberts V, M.D., Gabriel Alexander, P.E., Rod W. Durgin, Ph.D., and James E. Pawlukiewicz, Ph.D.   A summary of their testimonies and their CVs are provided at Appendix E hereto.

Defendant Commercial Carriers, Inc.:  John Sauer.  A summary of his testimony and his CV is provided at Appendix F hereto.

All defendants:  Ron M. Koppenhoefer, M.D.  A summary of his testimony and his CV is provided at Appendix G hereto.

Defendants object to the calling of Mr. Alexander.  Those objections have been fully briefed.  A *Daubert* hearing thereon is presently scheduled on April 19, 2004.

The parties certify we have complied with Rule 26 of the Federal Rules of Civil Procedure pertaining to expert testimony.

### E.  Exhibits:

The parties will offer as exhibits those items listed on appendices hereof prepared in accordance with Section C of the Order Instructing Certain Pretrial and Trial Procedures as follows, subject to objection at trial:

(1)    Joint Exhibits:  Appendix H hereto
(Roman Numerals)

(2)    Plaintiffs' Exhibits:  Appendix I hereto
(Arabic Numerals)

(3)    Defendant Commercial Carriers, Inc.'s Exhibits:  Appendix J hereto
(Numbered 500-999)

(4)    Defendants Allied Systems, Ltd.'s  and Allied Automotive Group, Inc.'s Exhibits:
Appendix K hereto (Numbered 2501-2999)

(5)    Defendant Hanes Supply, Inc.'s Exhibits:  Appendix L hereto (Numbered 1500-1999)

(6)    Defendants' Joint Medical Exhibits:  Appendix M hereto (Numbered 3500-3515)

### F.  Depositions, Interrogatories and Admissions:

The parties may offer the following depositions and interrogatories into evidence at trial, subject to objection by any party:

**1.**  Evidence from John Roberts, M.D., Mitchell E. Simons, M.D. and Ron M. Koppenhoefer, M.D. will be presented by videotape deposition.

**2.**  All parties may read into evidence the text of the Affidavits of Scott Macaulay, Lynn Buckhalt and Bill McDaniel.

**3.**  Plaintiffs may present evidence from the following fact witnesses by deposition:

**a.**    Peter Terzian - deposition at Page 6, Page 13, Page 37, Page 24 that between

January 1, 1994 and 1997, 861 trailers were manufactured by CCI all with cables designed similar to the one that injured Plaintiff.  That they started putting the cables on the trucks in the spring of 1994 that the cables were designed by Hanes Supply.  All 861 trucks were fitted with cables that were bought from Hanes Supply Corporation.  CCI requested the vinyl coating be colored yellow.  Hanes Supply decided that material specification design of the cables in question.  CCI did no testing on the cable.  No other type or design of cable was tried on all 861 trucks.  CCI told Hanes they wanted something to last the life of the truck, 10 years.  The cables were made so that the drivers could grab on to them and prevent a fall.  Allied assumed the liabilities of all the trailers that had been built by CCI.  CCI still exists as a subsidiary of Allied Systems, Inc.  The tractor trailer in question was delivered to CCI on April 23, 1995, and the cables were put on a day or two before.  None of the cables were supposed to fail in six years.  According to Hanes, the cables were to last the life of the truck.  There was the option to have clear vinyl coating put on but CCI decided they wanted the coating in yellow.  It could have been clear vinyl.  No warning or instructions were given from Hanes.

Terzian depo at 6

Between January 1, 1994 and 1997, 861 trailers were manufactured by Commercial Carriers, Inc., all with cables designed that injured Plaintiff.

Terzian depo at 13 and 37

Terzian says started putting cables on truck in the spring of 1994.

Terzian depo at 24

The cable was designed by Hanes Supply, Inc.

Terzian depo at 35

All 861 cables were bought from Hanes Corp.

Terzian depo at 39

Commercial Carriers, Inc., requested vinyl coating be colored yellow.

Terzian depo at 37

Hanes Supply decided the material specifications and design of the cable in question.

Terzian depo at 47, 65 and 66

Commercial Carriers, Inc., did no testing on the cable.

Terzian depo at 49

No other type or design of cable tried before put on all 861 trucks.

Terzian depo at 51

Allied told Hanes they wanted something to last the life of the truck (10 years.)

Terzian depo at 52, 53 and 54

The cables were made so that drivers could grab onto them and prevent a fall.

Terzian depo at 56

Allied assumed the liabilities of all the trailers that had been built by Commercial

Carriers, Inc.

Terzian depo at 67

Commercial Carriers, Inc., still exists as a subsidiary of Allied Systems, Inc.

Terzian depo at 70 and 71

The tractor trailer in question was delivered to Commercial Carriers, Inc., on April 23,

1995 and the cables were put on a day or two before.

Terzian depo at 90

None of the cables were supposed to fail in six years.

Terzian depo at 91

According to Hanes, the cables were to last the life of the truck

Terzian depo at 91

The option to have clear vinyl coating but Commercial Carriers, Inc., decided they wanted coating in yellow.  It could have been clear vinyl.

Terzian depo at 93 and 94

No warning or instruction were given from Hanes to Commercial Carriers, Inc., on care of the cables.

Terzian depo at 95

Cables on Ferguson's trailer purchased from Defendant Hanes.

Terzian depo at 100-101

Didn't buy cables from anyone but Hanes.

Terzian depo at 101

No warning labels were on the trailer concerning cables.

Terzian depo at 120

Terzian decided to switch from clear vinyl to yellow coated vinyl.


**b.**    Taken from Bevilaqua deposition:

Bevilaqua depo at 5

From 1994 through 1997, cables were only bought from Hanes Supply Company.

Bevilaqua depo at 8 and 21

Originally, Commercial Carriers, Inc., thought of using eyebolts but Hanes said use swedge on end with galvanized cables.

Bevilaqua depo at 14

Allied went to Hanes Supply for expertise on cables.

Bevilaqua depo at 14

Hanes decided on cable and decided on coating on cables.

Bevilaqua depo at 14 through 16

Commercial Carriers, Inc.'s decision to paint cables yellow.  They came clear.

Bevilaqua depo at 16

Hanes didn't give any maintenance instructions.

Bevilaqua depo at 22

Mr. Hanes picked out the metal, coating and swedge design.

Bevilaqua depo at 26

No tests done other than equipment on all 861 trucks with cables and none asked for including corrosion tests.

Bevilaqua depo at 27

Hanes gave no instruction concerning care or inspection of cables.

Bevilaqua depo at 30

Clear coating is available for the cables.


**4.**    Plaintiffs may present the following answers to interrogatories at trial:

**ANSWERS AND OBJECTION OF DEFENDANT, COMMERCIAL CARRIERS, INC. TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

1.    Please state the manufacturer of the tractor trailer in question in the instant lawsuit being the one contained in this certificate of title.

**ANSWER: The head ramp and trailer were manufactured by CCI.  The tractor was manufactured by Volvo.**

2.    If this certificate of title does not cover the tractor trailer in question in the instant lawsuit, please provide the manufacturer of the actual tractor trailer involved in the instant lawsuit.

**ANSWER: No response required.**

3.     Please state what entity provided the safety cable that is the subject of the instant lawsuit and installed same.

**ANSWER: The safety cable assembly was supplied to CCI by Hanes Supply, Inc., 55 James E. Casey Drive, Buffalo, NY 14206.  The safety cable assembly was installed by CCI.**

4.     Please state who designed the safety cables that are the subject of the instant lawsuit.

**ANSWER: The safety cables are a product of Hanes Supply, Inc.  The overall length of the assembly was determined by CCI.**

## ANSWERS AND OBJECTIONS OF DEFEDANT COMMERCIAL CARRIERS, INC., TO DEFENDANT HANES SUPPLY, INC., FIRST SET OF INTERROGATORIES, NO. 7 FILED HEREIN

**ANSWER: The safety cable at the time of manufacture of the unit in question is a product of Defendant Hanes Supply, Inc.  The overall length of the assembly was determined by Commercial Carriers, Inc.**

## DEFENDANT HANES SUPPLY, INC., ANSWERS AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, NO. 4 FILED HEREIN

**ANSWER: Hanes Supply did not design the hand cable.  Hanes Supply merely manufactured the cable in accordance with the specifications provided to it by Defendant Commercial Carriers, Inc.**

## ANSWER AND OBJECTIONS OF DEFEDANT COMMERCIAL CARRIERS, INC. AND PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PROCUCTION OF DOCUMENTS NO. 2 FILED HEREIN

**ANSWER: "Commercial Carriers, Inc., did not design the hand cable in question, Hanes Supply, Inc., did.  This Defendant does not know the exact person at Hanes Supply, Inc., who designed the hand cable."**

## ANSWERS AND OBJECTIONS OF DEFENDANTS, ALLIED SYSTEMS, LTD. AND DEFEDNANT ALLIED AUTOMOTIVE GROUP, INC. TO PLAINTIFFS' MOST RECENT SET OF INTERROGATORTIES AND REQUEST FOR PRODUCTION OF DOCUMENTS NOS. 3 AND 4 FILED HEREIN

**Q.     Please state what type of material was used in the cable that was broken that is the subject of this lawsuit.**

    **A.**     **Galvanized Steel.**

    **Q.**     **Please state what material is currently being used in the**

**replacement cables on the trucks.**

    **A.**     **Stainless steel.**

**5.** The Allied Defendants may present the following answers to interrogatories at trial:

**ANSWERS AND OBJECTIONS OF DEFENDANTS DEFENDANT ALLIED AUTOMOTIVE GROUP, INC. AND ALLIED SYSTEMS, LTD. TO DEFENDANT HANES SUPPLY, INC.'S FIRST SET OF INTERROGATORIES FILED HEREIN AND SERVED NOVEMBER 18, 2002**

    **4.**     **Identify each and every person who has had possession of the Hand Cable from the time of the Accident to the present, including who has the Hand Cable now, and the times when each such person or entity had possession of the Hand Cable.**

        <u>ANSWER</u>:  Subject to General Objection No. 4 above, upon information and belief, an unidentified member of the Moraine terminal's shop personnel retrieved the cable following the accident.  Allied does not presently know of the ultimate disposition of the cable.  More likely than not it was discarded shortly after the accident.

    **6.**     Defendant Commercial Carriers, Inc. may present the following testimony at trial

by deposition:

David Learn    (2-12-03)

| Page | Line |
|------|------|
| 4 | 5-9 |
| 5 | 4-22 |
| 6 | 3-16 |
| 9 | 3-23 |
| 10 | 1 |
| 13 | 15-23 |
| 14 | 1 |
| 15 | 21 |
| 16 | 1-19 |
| 17 | 3-23 |
| 18 | 1-6 |
| 21 | 14-23 |
| 22 | 1-15 |

G.    **Discovery.**

Discovery will be completed by April 21, 2004.  Trial depositions of the medical expert witnesses will be taken: (i) on April 20, 2004, of John Roberts, M.D., (ii) on April 27, 2004, of Mitchell E. Simons, M.D., and (iii) on April 28, 2004, of Ron M. Koppenhoefer, M.D.

H.    **Pending Motions.**

The following motions either are or will be pending:

1.  Defendants' various *Daubert* motions to exclude Gabriel Alexander, P.E.

2.  The parties' various motions in limine.

3.  Plaintiffs' motion for leave to file their *Third Amended Complaint* to add spoliation of evidence cause of action against the Allied Defendants.

VI.    **SETTLEMENT EFFORTS.**

Plaintiffs have offered to settle their aggregate claims for $675,000.00, including Mr. Ferguson's workers' compensation claims.  Defendants have not responded to the offer and wish to proceed to trial.

**IT IS SO ORDERED.**

_____
Herman J. Weber, Judge
Senior Judge, United States District Court

Thomas R. Koustmer and Michael J. Hoenerlaw
Trial attorney for plaintiffs

/s/ David E. Larson and K. Roger Schoeni
Trial attorney for defendant Commercial Carriers, Inc.

/s/ Robert A. Winter, Jr.
Trial attorney for defendants Allied Systems, Ltd. and Allied Automotive Group, Inc.

/s/ Craig R. Paulus
Trial attorney for defendant Hanes Supply, Inc.

{W0149306.1}    31

## APPENDIX A – PLAINTIFFS' LAY WITNESS LIST

1.      Plaintiff David Ferguson - David Ferguson will testify concerning how the accident occurred and also his injuries and employment status.

2.      Plaintiff Martha Ferguson - Martha Ferguson will testify concerning the loss of consortium and her husband's injuries.

3.      Peter Terzian - Peter Terzian's testimony has already been summarized.

4.      Scott Macaulay - Scott Macaulay will testify that Allied Systems, LTD, Allied Automotive Group and Commercial Carriers, Inc., are affiliated and that each company is owned by the same ultimate parent company, Allied Holdings, Inc., a Georgia Corporation.

5.      William Hanes - William Hanes, owner of Hanes Supply, Inc., will testify concerning manufacturing of the cables and the specifications required by Defendant Commercial Carriers, Inc.  He will also testify that the cables cannot last the 10-year life of the truck but should only last between four and six years by the material that was used in the design of the cable.  He will also testify as to who ordered the design and who ordered the material to be used in construction of the cables.  He will also testify as to who ordered what color of the coating of the cable.  Mr. Hanes will testify as to the meetings he had with Defendant CCI and the design request for the cables.  Mr. Hanes will testify that if asked, he would not have recommended the material used in the cable (i.e. galvanized steel).  That Mr. Hanes will testify he would have recommended, if asked, and it is his opinion that the proper material for this type of cable would be the stainless steel.  That Mr. Hanes will testify that the life of the cable is only four to six years if properly maintained.  That the area that is susceptible to corrosion is the threaded stud and vinyl coating.  That the yellow coating goes all the way up to the threaded stud.  That Mr. Hanes never told CCI the proper maintenance for the cables and never discussed

with CCI how long the cables would last.  That CCI picked the least expensive option for the materials in the cables.

6.    William Weaver - William Weaver will testify as to replacement of the cable in question and that the broken cable was given to Mike Pallandino.  Mr. Weaver will also testify as to his errata sheet and discrepancy in same.  That Mike Palladino told him that he had "a cable" or he told him that he had "the cable."  Mr. Weaver will testify that the proper procedure at Defendant Allied is to hold the part on a truck that is involved in an accident.  That the cables, as in the Ferguson case, were painted with a yellow coating.  That the new cables have clear plastic coating.  That the cable that injured David Ferguson broke at the end of the cable and crimped the same as the exemplar that is being used by the expert Gabriel Alexander.  Mr. Weaver will testify that in a conference call with Jim Taggart, Regional Maintenance Manager, in January or February, 1999, the corporation decided to replace all cables because they were rusting.

7.    Mike Palladino - Mike Palladino will testify concerning the cable, what happened to the cable in question.  Mr. Palladino will also testify as to the accident in question and taking the report of the accident and will verify the reports given of the accident.  Mike Palladino will state that the cause of the accident was the cable on the head rack.  Mike Palladino will testify that he was the Safety Supervisor.  Mr. Palladino will testify that the problem with the cable was that the cables were breaking where the cable meets the steel crimp as in the Ferguson case and the exemplar.  Mr. Palladino knew of the break in Mr. Fay's cable and Mr. Ferguson's cable.

8.    Mike Bevilacqua - Mike Bevilacqua will testify that between 1994 and 1997 the cables were only bought from Hanes Supply, Inc.  That it was CCI's decision to paint the cables yellow and that they came clear.  Mr. Bevilacqua will testify that there were no tests done on the cables for corrosion.  That clear coating was available for the cables.  That you are able to see

through the clear coating but not the yellow coating.  That Hanes Supply, Inc., supplied the cable in question that broke in the instant case.  That Hanes Supply, Inc., picked out the material and the specifications and the design of the cables in question.  That CCI originally thought of using eyebolts but Hanes Supply, Inc., said to use the swedge on the end with the galvanized steel for the cables.  That CCI went to Hanes Supply, Inc., for their expertise in the cables.

9.    Thomas Fay - Thomas Fay will testify about his accident approximately one month prior to Mr. Ferguson's accident when he also fell from a truck because a cable broke in the same place as Mr. Ferguson's cable.

10.    Richard Shively - Richard Shively will testify that eventually the design of the cables went to using stainless steel to eliminate corrosion.  That the proper procedure at Allied is to hold a part on a truck that is involved in an accident.  He will testify as to the condition of the cables and the replacement of same and the procedure used in retaining parts that are involved in accidents.

11.    Frederick Wolf - Frederic Wolf will testify that he saw three cables broken at the same place where Plaintiff David Ferguson's break in the cable was.  That if a driver requested replacement cables but the Maintenance Department did not have enough cables, the truck would be given back to the driver to use without all the cable replaced.  That the Safety Director would make the decision whether or not to throw away broken cables that were the cause of an accident.  The Maintenance Department would not make that decision.  That Mr. Shively, maintenance employee, saw six broken cables personally, usually the lower cables, on 30 trucks in the yard.

12.    George Foster - George Foster will testify concerning finding the exemplar cable and as a former truck driver will testify as to the procedure in chaining down trucks and using the cables as safety devices for which they were put on the trucks to be used.

13.    Jay Knepp - Jay Knepp will testify concerning driving a truck and the use of the cables as a safety procedure and how to chain down the trucks and the general safety procedure of the trucks.

14.    Lee Jordon - Lee Jordon will testify as to the fact that he took pictures of the truck and broken cable.

15.    Ed Bush - Ed Bush will testify as to the fact that he took pictures of the truck and broken cable.

Evidence from the following fact witnesses may be presented by deposition:

1.    Peter Terzian - live or by deposition

2.    Scott Macaulay - by deposition

3.    Mike Bevilacqua - live or by deposition

Plaintiffs reserve the right to call any witnesses designated by the other parties.

## APPENDIX B – DEFFENDANT COMMERCIAL CARRIERS' LAY WITNESS LIST

1.    Robert Silber

Mr. Silber is expected to testify concerning his review and analysis of the injury records of the Ryder Automotive Carrier Division of car hauling companies.  He will testify that there were no reported injuries involving the failure of a cable mounted in the number 1 position on the headrack.

2.    Peter Terzian, Jr.

Mr. Terzian will be the corporate representative for Commercial Carriers, Inc.  He was in charge of all manufacturing operations of Commercial Carriers, Inc. and has knowledge concerning the installation of cable at the number 1 position on the headrack.  He will testify concerning the manufacturing operation as well as his knowledge of the addition of cables and the experience with cables in the field.  Mr. Terzian may also testify concerning the corporate genealogy of CCI prior to its acquisition by Allied Holdings, Inc.  Mr. Terzian will also testify concerning CCI's relationship with Hanes Supply Company.  He may be asked to lay the foundation of CCI records.

3.    William Weaver

Mr. Weaver is expected to testify concerning his employment with Allied Systems, Ltd. along with his duties and responsibilities.  He is also expected to testify concerning the program implemented by his employer to replace cables on trucks in the fleet at Mr. Weaver's terminal.  Mr. Weaver may also testify concerning the level of awareness of the potential for faulty cables.

4.    Mike Palladino

Mr. Palladino will testify concerning his duties and responsibilities for his employer, Allied Systems, Ltd.  He will testify concerning his interaction with Mr. Ferguson following Mr. Ferguson's incident which gives rise to this lawsuit.  He will testify concerning the safety committee and the program implemented by his employer to replace safety cables.

5.    Frederick Wolf

Mr. Wolf is expected to testify concerning the program implemented by his employer, Allied Systems, Ltd. to replace safety cables.  He may also testify concerning the maintenance history of the tractor trailer rig in questions.

6.    Richard Shively

Mr. Shively is expected to testify concerning the program implemented by his employer, Allied Systems, Ltd. to replace safety cables.  He may also testify concerning the maintenance history of the tractor trailer rig in questions.

7.    Michael Bevilacqua

Mr. Bevilacqua is employed by Delavan Industries, Inc., a Texas Corporation.  He was previously employed by Commercial Carriers, Inc., and he was involved in the procurement of safety cables from Hanes Supply Co. that were to be installed on CCI trucks.  Mr. Bevilacqua is expected to testify that he met with William Hanes and laid out for Mr. Hanes the anticipated use of the cables and requested Hanes assistance in selecting the cable that would be suited for this application.  He will testify that Hanes suggested the type of cable and type of fitting that would be appropriate for this intended use.  CCI followed Hanes recommendation and purchased the suggested type and design of cable from Hanes.

8.    Scott Macaulay

Mr. Macaulay is expected to testify concerning the corporate relationships between CCI and Allied Systems, Inc.  Mr. Macaulay will also testify that Allied Systems, Ltd. has not assumed any liabilities of CCI.

9.    David Learn

Mr. Learn is an employee of Hanes Supply.  He is expected to testify live or via deposition, concerning Hanes' procedures for procuring and manufacturing cable products.


Commercial Carriers reserves the right to call any witnesses designated by the other parties.

## APPENDIX C – THE ALLIED DEFENDANTS' LAY WITNESS LIST

William C. Weaver will testify concerning a telephonic conference call whereat he received a directive from his supervisor, John Taggart, to replace all cables on trucks that had them installed, the absence of any representative of CCI from participating in the call, the planning and execution of Mr. Taggart's directive, the replacement of new cables on the trucks at the Moraine terminal, his receipt of the truck in question from the Marion terminal, the maintenance records, reports and history of the truck at issue, that those records indicate that Richard H. Shively replaced cables on the truck at issue on September 8, 2000, the uniform procedure for destroying and discarding the old style head ramp safety cables upon replacement by maintenance personnel, and the motive for that uniform procedure. He will also testify about concerning Allied's policy of retaining parts involved in accidents and that he does not know where the broken cable is located. He will also testify that Mike Palladino, the Moraine terminal's safety supervisor, did not tell him that he, Palladino, had recovered and was in possession of the broken cable at issue.

Mike Palladino will testify about the execution of Mr. Taggart's directive to replace cables, the actions he took as the Moraine terminal's supervisor following Mr. Ferguson's fall on September 7, 2000, the check list he followed, the accident and other reports he wrote, the corrective measures that he recommended for the terminal's maintenance department to undertake, and that he never recovered or had possession of the cable that broke.

Frederick Wolf will testify about the execution of Mr. Taggart's directive at the Allied Defendants' Marion terminal, and that he does not know of the broken cable's whereabouts.

Richard H. Shively will testify about the execution of Mr. Taggart's directive at the Allied Defendants' Moraine terminal. He will also testify that the truck's maintenance records indicate that it has he who replaced the broken cable on September 8, 2000, that his standard practice was to cut up removed cables into pieces and discard them, that Mike Palladino had never asked him for the broken cable pieces, and that the cables he removed from the truck on September 8, 2004, were not treated in any manner different from his standard practice. He has no knowledge of any type of ownership or business relationship between the Allied Defendants and Commercial Carriers when he made the repairs on September 8, 2000, and that no one told him the reason for the Taggart directive was due to any such ownership or business relationship and that relationship played no role in his practice of disposing replaced cables after removal. Mr. Shively was never told or influenced by anyone to dispose of the old style cables because of the possibility of litigation against his employer due to the cables breaking.

Tom Heller will testify that the Moraine terminal's trucks had their cables replaced, that some of the trucks being transferred from the Marion terminal had not had all of their cables replaced, that he inspected the truck at issue on September 8, 2000, and noted that the broken cable was still on the truck at the time of inspection and that three of the cables had previously been replaced. He does not know where the broken cable is located. He had post-accident conversations with Mike Palladino and at no time did he, Palladino, indicate to Heller that he had possession of the cable.

<u>Scott Macaulay</u> will testify either live or by affidavit that the Allied Defendants are affiliated with defendant Commercial Carriers, Inc.

<u>Bill McDaniel or Libby Margherio</u> will testify that the Allied Defendants have never been sued in a civil action as a result of the failure of old style cables, that this case is the first such case, and that the only type of foreseeable litigation stemming from a broken cable is a workers' compensation claim where the fault of the Allied Defendants is never at issue.  He will also testify about the amount of temporary total disability and medical benefits have been paid to Mr. Ferguson as a self-insured employer under the Ohio workers' compensation act.

   The Allied Defendants reserve the right to call any witnesses designated by the other parties.

## APPENDIX D – DEFENDANT HANES SUPPLY'S LAY WITNESS LIST

LIVE WITNESSES:

<u>William C. Hanes</u> is expected to testify concerning the circumstances surrounding the development of the cable in question, the properties of that cable and its materials.  He is also expected to testify concerning Hanes Supply's quality control procedures, and identifying characteristics of its products.  He is expected to testify concerning internal thread identifiers and Hanes Supply's component suppliers.  Mr. Hanes will also authenticate and identify exhibits disclosed by Hanes Supply pursuant to the Court's Scheduling Order and provide additional background as needed concerning the relationship between itself and Defendant, CCI.

<u>William Weaver</u> is expected to testify concerning Defendant Allied's program to replace all cables on the trucks and how the truck in question did not have its cables replaced.  He will also testify concerning Allied's policy of retaining parts involved in accidents and how the incident cable was not retained.  He will also testify that Mike Palladino, Allied's Safety Supervisor, told him that he was in possession of the cable from Mr. Ferguson's accident.

<u>Mike Palladino</u> will testify that he was aware of the probability of litigation stemming from Mr. Ferguson's fall from the truck and that Allied has been unable to produce the cable from the accident.

<u>Frederick Wolf</u> will testify about Allied's program to replace the cables and the maintenance history of the incident truck.

<u>Richard Shively</u>. will testify about Allied's program to replace the cables and the maintenance history of the incident truck.

OTHER WITNESSES:

<u>Mike McCauley</u> will testify live or by affidavit that Defendant Allied is affiliated with Defendant CCI.

<u>Michael Bevilacqua</u> will testify live or by deposition about the development of the cable and identify invoices stemming from the development of the cables and their predecessors.

Hanes Supply reserves the right to call any witnesses designated by the other parties to the case.

<u>**APPENDIX E -- SUMMARY OF PLAINTIFFS' EXPERTS' TESTIMONIES AND CVS**</u>

1.     Mitchell Simons, M.D. - Dr. Simons will testify concerning the history, examination, treatment, diagnosis and prognosis of Plaintiff, David Ferguson.  Dr. Simons will testify that Plaintiff injured his lower back when he fell from the upper deck of a car hauling unit after the safety cable broke.  Dr. Simons will testify that Plaintiff sustained injuries that included a lumbosacral sprain/strain, sciatica, L5 radiculopathy, aggravation of pre-existing facet arthropathy and lumbar disc disease at L4-5 and L5-S1.  Dr. Simons will testify to the medical necessity and reasonableness of the treatment that has been provided to Plaintiff as well as the fact that all charges for the medical treatment were reasonable and customary for similar services in this community.  Dr. Simons will testify concerning Plaintiff's inability to perform the work of a car hauler.  Dr. Simons will testify concerning his opinion as to whether Plaintiff sustained a permanent injury as a result of the fall from the truck as noted above.

2.     John M. Roberts, V, M.D. - Dr. Roberts shall testify concerning the treatment that he has provided to Plaintiff.  He shall testify concerning the history, examination, diagnostic testing, diagnosis and prognosis of Plaintiff.   Dr. Roberts will testify that Plaintiff sustained an acute lumbar sprain/strain and aggravation of his pre-existing facetal arthropathy and L5 radiculopathy.  Dr. Roberts will testify concerning his treatment of Plaintiff, the recommendations made and the rationale for said recommendations.  Dr. Roberts shall testify concerning the significance of the diagnostic testing that has been performed on Mr. Ferguson as well as his opinions concerning the future medical treatment that may be required of Mr. Ferguson, including surgical intervention.  Dr. Roberts shall testify as to necessity and reasonableness of all medical treatment rendered to Plaintiff to date.  Dr. Roberts may testify to the permanent disability that Plaintiff has sustained as a result of this injury.  Dr. Roberts shall

testify concerning his opinion as to the ability of Plaintiff to return to his former position of employment as well as his inability to work as a car hauler while he was under his care.

3.     Gabriel Alexander, P.E. - Mr. Alexander will testify as a professional engineer. Mr. Alexander will testify that the vehicle involved in this lawsuit was defective and that the actions of Plaintiff were proper and were not the cause of this incident. Mr. Alexander will testify that the safety cable failed during normal and reasonable operation and was the cause of Plaintiff's fall. Mr. Alexander will testify that the vehicle in question was defective for the reason that the safety cable failed during normal, reasonable operation. The safety cable was defective in that it was not corrosion resistant and failed in an area of reduced cross section in the presence of geometric stress concentrations. The incident vehicle was defectively manufactured without a proper safety cable. Known available technology that should have been utilized in its design was not. Mr. Alexander will further testify that the incident vehicle was dangerous and defective in a manner that caused Plaintiff's fall. Mr. Alexander will also testify that in the absence of a proper design, which will prevent falls, warnings and instructions should have been provided with regard to the required inspection and maintenance procedures. Mr. Alexander will testify that Defendant, Hanes' design and manufacture of the incident safety cable was improper and the cause of Plaintiff's fall. Further, Defendant, CCI's actions were improper in that they failed to correct the defective condition that Defendant Hanes created. Finally, Mr. Alexander will testify that Defendant, CCI's responsibility for the configuration of the incident vehicle was as great as that of Defendant, Hanes' as they completed the vehicle and were responsible for its configuration.

4.     Rod W. Durgin, Ph.D. - Dr. Durgin shall testify as a vocational expert. Dr. Durgin will testify concerning his opinion that the Plaintiff's pre-injury capacity to earn money was best represented by the actual earnings that he earned as a tractor/trailer operator for

Defendant, Allied Systems, Ltd.  Dr. Durgin will testify concerning his lifetime loss of power to

earn money is the difference between his present expected earnings based upon his capacity to

perform work and the earnings that would have accrued to him as a tractor/trailer operator.  Dr.

Durgin will testify that Plaintiff's present vocational profile is now one of a variety of semi-

skilled work that his sedentary in terms of physical demand and requires no more than an above

average degree of intelligence.  Additionally, Dr. Durgin will testify that Plaintiff should seek

occupations that would allow for frequent alterations in sitting/standing while working in a

sedentary position.  Dr. Durgin will testify that a computerized occupational analysis reveals that

such work constitutes 4.03% of the jobs existing in his local labor market.  The jobs which

Plaintiff retains the capacity to perform do not exist in significant numbers in his local, state or

national economies.  Ultimately, Dr. Durgin will testify that based upon Plaintiff's age,

physical/exertional restrictions, and lack of access to the jobs in his local labor market, Plaintiff

is competitively unemployable.

    5.    James E. Pawlukiewicz, Ph.D. - Dr. Pawlukiewicz will testify as an economist

concerning the damages sustained by Plaintiff.  Dr. Pawlukiewicz will testify due to the work

related injury on September 7, 2000, Plaintiff has experienced a loss of income.  Based upon the

opinion of Dr. Durgin, Dr. Pawlukiewicz will calculate Plaintiff's damages as a result of being

competitively unemployable.  His testimony will indicate that as of March 24, 2003, the present

value of his lost wages totaled $159,976.00.  Dr. Pawlukiewicz will testify that the present value

of future losses if Mr. Ferguson had been able to work to a retirement age of 60.2 years equals

$326,846.00.  Therefore, his total present value of lost earnings (past and future) total

$486,822.00.  In the event that Mr. Ferguson would have been able to work to the normal

retirement age of 65, the present value loss of future wages would total $553,868.00.  Therefore,

the total present value of total lost earnings should Mr. Ferguson work to age 65 would total

$713,844.00.  It is anticipated that these figures may be adjusted to reflect the fact that Mr.

Ferguson has remained unemployable from March 1, 2003 through the trial date.

## APPENDIX F  -- SUMMARY OF COMMERCIAL CARRIER'S EXPERT'S TESTIMONY AND CV

John Sauer

Mr. Sauer is a metallurgist.  He is expected to testify pursuant to his report.  His report indicates that the design of the cable in question was not negligent or defective.  He is also expected to testify that, absent the opportunity to examine, inspect and test the cable which the plaintiff claims to have failed, no one can determine what the cause of the failure was or if the cable failed as a result of the deficiencies in design alleged by the plaintiff and his expert.

## <u>APPENDIX G -- SUMMARY OF DEFENDANTS' EXPERT'S TESTIMONY AND CV</u>

Dr. Ron Koppenhoefer, M.D. will testify concerning his examination of Mr. Ferguson and the results of that examination as described in his report of December 8, 2003.  He concludes that Mr. Ferguson's present level of discomfort is the result of the natural aging process and is not causally connected to the fall of September 2000.

## APPENDIX H -- JOINT MEDICAL EXHIBIT LIST

I                    Kettering Medical Center

II                   John Botsford, M.D.

III                  Riverhills Healthcare

IV                   Nova Care Rehabilitation

V                    Dearborn County Hospital

VI                   Dr. Autry

VII                  Bethesda North/Good Samaritan

VIII                 James R. Leonard, M.D.

IX                   Gerald Al Palermo, M.D.

X                    Martin McTighe, M.D.

XI                   John Roberts, M.D.

XII                  Mitchell E. Simons, M.D.

## APPENDIX I – PLAINTIFFS' EXHIBIT LIST

1.    Photograph of truck in question

2.    Photograph of truck in question

3.    Photograph of truck in question

4.    Photograph of truck in question

5.    Photograph of truck in question

6.    Photograph of truck in question

7.    Photograph of truck in question

8.    Photograph of truck in question

9.    Photograph of truck in question

10.   Photograph of truck in question

11.   Photograph of truck in question

12.   Photograph of truck in question

13.   Photograph of truck in question

14.   Photograph of truck in question

15.   Photograph of truck in question

16.   Photograph of truck in question

17.   Gabriel Alexander's curriculum vitae, his report with exhibits

18.   Gabriel Alexander's Affidavit with exhibits

19.   Drawing of the cable in question

20.   CCI manufacturing order for the truck

21.   Invoice for truck sold to CCI

22.   Invoices for cables CCI invoices and Hanes invoices

23.    SU2 Form

24.    EM2+SU Form

25.    SU3 Form

26.    Patient chart

27.    SU2 Form

28.    EM2-SU

29.    SU3 Form

30.    EM3+SU Form

31.    Report of Mike Pallandino

32.    Thomas Fay Exhibit

33.    Printout of Exhibit of injury

34.    Hanes Supply, Inc. CCISCO

35.    License and Joint Defense Cooperation Agreement

36.    Medical bills incurred by David Ferguson and summary

37.    Report of Mitchell Simons, M.D. dated 08-22-02 and curriculum vitae

38.    Report of Martin McTighe, M.D. dated 01-09-03 and curriculum vitae

39.    Report of John Roberts, V, M.D. dated 01/22/03 and curriculum vitae

40.    Report of Mitchell Simons, M.D. dated 01/28/03 and curriculum vitae

41.    Report of Rod W. Durgin, Ph.D. dated 02/26/03 and curriculum vitae

42.    Report of Mitchell Simons, M.D. dated 03/24/03

43.    Report of James E. Pawlukiewicz, Ph.D. dated 03/24/03 and curriculum vitae

44.    Insurance document

45.    Terzian deposition

46.    McCauley Affidavit

47.    All exhibits of Defendants

48.    Exemplar cable

Joint Medical Records

Plaintiffs reserve the right to use any exhibits identified by any party, including, but not limited to, the joint medical records.  Plaintiffs further reserve the right to modify, amend or supplement this list as necessary.

## APPENDIX J – DEFENDANT COMMERCIAL CARRIER'S EXHIBIT LIST

500    Code of Federal Regulations Title 49, Volume 4, Part 396, Section 396.13

501    Selected pages from Hanes Supply, Inc.'s website

502    Photograph

503    Photograph

504    Photograph

505    Photograph

506    Photograph

507    Automotive Carriers Division Instructor Training Manual, Title Page, Table of Contents and pages 30 through 42

508    National Master Automobile Transporters Agreement and the Central and Southern Area Truckaway, Local and Garage Operations Supplemental Agreement, Article 30

509    1996 Ryder Automotive Operations Driver Training Manual, pages 25-30

510    Videotape

511    Videotape

512    Deposition Exhibit A - Photo

513    Deposition Exhibit Q - Drawing

514    Deposition Exhibit D - Drawing

515    Deposition Exhibit U - Excerpt from Hanes Catalog

516    Deposition Exhibit S - Hanes Purchase Orders

517    Deposition Exhibit B - Photo

518    Deposition Exhibit C - Photo

519    Deposition Exhibit D - Photo

520    Deposition Exhibit E - Photo

521    Deposition Exhibit F - Photo

522    Deposition Exhibit H - Photos

523    Deposition Exhibit I - Photos

524    Deposition Exhibit G - Photos

525    Bevilacqua Exhibit A - Purchase Records

526    Bevilacqua Exhibit B - Purchase Records

527    Bevilacqua Exhibit C - Purchase Records

528    Bevilacqua Exhibit D - Purchase Records

529    Bevilacqua Exhibit E - Purchase Records

530    Bevilacqua Exhibit F - Purchase Records

531    Bevilacqua Exhibit G - Purchase Records

532    Hanes Supply Catalog

533    Hanes Supply Catalog

534    Hanes Catalog Riggers Handbooks

535    Page from Hanes Supply Catalog

536    Wolf Exhibit A-Maintenance Record

537    Plaintiff's Deposition Exhibit H1 - Reports of Injury

538    Plaintiff's Deposition Exhibit R - Allied Systems Injury Record

539    Deposition Exhibit U-Allied Work Module 6

540    Plaintiff's Exhibit I - Allied Systems Memo

541    Plaintiff's Exhibit J - Allied Systems Safety Committee Meeting Minutes

542    Plaintiff's Exhibit K - Allied Systems Safety Committee Meeting Minutes

543    Plaintiff's Exhibit L - Allied Systems Safety Committee Meeting Minutes

544    Plaintiff's Exhibit M - Allied Systems Safety Committee Meeting Minutes

545    Plaintiff's Exhibit N - Allied Systems Safety Committee Meeting Minutes

546    Plaintiff's Exhibit O - Allied Systems Safety Committee Meeting Minutes

547    Plaintiff's Exhibit P - Allied Systems Safety Committee Meeting Minutes

548    Plaintiff's Exhibit T - Allied Systems Safety Committee Meeting Minutes

549    Curriculum Vitae of John Sauer

550    Affidavit of Scott Macaulay dated 9/19/03

551    Affidavit of Bill McDaniel dated 8/14/03

       Joint Defense Medical Records

       Joint Medical Records

       Any exhibits identified by any other party

Commercial Carriers, Inc. reserves the right to use any exhibits identified by any party, including, but not limited to, the joint medical records and defense joint medical records. Commercial Carriers, Inc. further reserves the right to modify, amend or supplement this list as necessary.

## APPENDIX K – THE ALLIED DEFENDANTS EXHIBIT LIST

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 2501 | Workers' Compensation Injury Operations Supervisor Checklist (SU1) |
| 2502 | Workers' Compensation Injury Employee Checklist (EM1) |
| 2503 | Supervisor's First Report of Injury (SU2) |
| 2504 | Employee Statement of Accident/Injury (EM2 + SU) |
| 2505 | Injury Reconstruction Form (SU3) |
| 2506 | Diagram (EM3 + SU) |
| 2507 | Michael Palladino note dated 9-7-00 |
| 2508 | Initial Report of Accident |
| 2509 | Follow up Report of Accident |
| 2510 | Unit Detail History List (Unit No. 61304) |
| 2511 | Sample Repair Order |
| 2512 | OSHA Log for 2000 at the Moraine Terminal |
| 2513 | David Ferguson's 1994 W-2 Form |
| 2514 | David Ferguson's 1995 W-2 Form |
| 2515 | David Ferguson's 1996 W-2 Form |
| 2516 | David Ferguson's 1997 W-2 Form |
| 2517 | David Ferguson's 1998 W-2 Form |
| 2518 | David Ferguson's 1999 W-2 Form |
| 2519 | David Ferguson's 2000 W-2 Form |
| 2520 | David Ferguson's 2001 W-2 Form |

| 2521 | Photograph |
|------|-----------|
| 2522 | Photograph |
| 2523 | Photograph |
| 2524 | Photograph |
| 2525 | Photograph |
| 2526 | Photograph |
| 2527 | Report of Ron M. Koppenhoefer, M.D. (including attachments) |

Joint Defense Medical Records

Joint Medical Records

Any exhibits identified by any other party

The Allied Defendants reserve the right to use any exhibits identified by any party, including, but not limited to, the joint medical records and defense joint medical records. The Allied Defendants further reserve the right to modify, amend or supplement this list as necessary.

## APPENDIX L – DEFENDANT HANES SUPPLY, INC.' S EXHIBIT LIST

1500.        Plaintiff's Exhibit A

1501.        Plaintiff's Exhibit B

1502.        Plaintiff's Exhibit C

1503.        Plaintiff's Exhibit D

1504.        Plaintiff's Exhibit E

1505.        Plaintiff's Exhibit F

1506.        Plaintiff's Exhibit G

1507.        Plaintiff's Exhibit H

1508.        Plaintiff's Exhibit I

1509.        Plaintiff's Exhibit J

1510.        Plaintiff's Exhibit K

1511.        Plaintiff's Exhibit L

1512.        Plaintiff's Exhibit M

1513.        Plaintiff's Exhibit N

1514.        Plaintiff's Exhibit O

1515.        Plaintiff's Exhibit P

1516.        Plaintiff's Exhibit S

1517.        Allied T "Safety Meetings"

1518.        Allied U "Work Module 6: Preventing Slips and Falls on Equipment

1519.        Palladino R

1520.        Palladino S "Truck Maintenance Log"

1521.        Wolf A "Truck Maintenance Log"

1522.        Hanes Supply Invoice Compilation

1523.    Hanes Supply, Inc. Riggers Handbook

1524.    Hanes Supply, Inc. Riggers Handbook

1525.    Hanes Supply, Inc. Riggers Handbook

1526.    SLINGMAX Rigging Handbook #0103

1527.    Hanes Supply, Inc. "Contractors and Industrial Supplies" Catalog 11

1528.    Hanes Supply, Inc. "Contractors and Industrial Supplies" Catalog 12

1529.    Bevilacqua Exhibit A

1530.    Bevilacqua Exhibit B

1531.    Bevilacqua Exhibit C

1532.    Bevilacqua Exhibit D

1533.    Bevilacqua Exhibit E

1534.    Bevilacqua Exhibit F

1535.    Bevilacqua Exhibit G

1536.    Bevilacqua Exhibit H

1537.    CCI Manufacturing Shipping Goals – Model 2878 Month of April 1995

1538.    Cable Schematic

1539.    Affidavit of Gabriel Alexander

1540.    Affidavit of Lynn Buckhalt taken 10/02/03

1541.    Affidavit of Scott Macaulay taken 09/19/03

1542.    Affidavit of Bill McDaniel taken 08/14/03

1543.    Affidavit of Richard Shively taken 08/03

1544.    Affidavit of William Weaver taken 07/30/03

1545.    Allied Expert Witness Testimony – Larry Bland

1546.    Commercial Carriers Expert Witness Testimony – John Sauer

1547.    Expert Report of Gabriel Alexander

1548.    Expert Report of Dr. Mitchell Simons

1549.    Expert Report of Dr. Martin McTighe

1550.    Expert Report of Dr. Robert Durgin

1551.    Expert Report of Dr. John Roberts

1552.    Expert Report of Dr. James Pawlukiewicz

1553.    Expert Report and Disclosure of Dr. Ron Koppenhoefer

1554.    Unit detail history list for unit 61078

1555.    Mill test certificate

1556.    First Report of Injury, Occupational Disease or Death - BWC

1557.    Photographs of truck and cables received from Michael Honerlaw

1558.    Photographs of truck and cables received from Robert A. Winter, Jr.

1559.    Photographs of truck and cables received from Thomas Koustmer

**Hanes Invoices (not enclosed; too voluminous)**

Hanes Supply, Inc. reserves the right to use any exhibits identified by any party, including, but not limited to, the joint medical records and defense joint medical records.  Hanes Supply, Inc. further reserve the right to modify, amend or supplement this list as necessary.

## <u>APPENDIX M – DEFENSE JOINT MEDICAL EXHIBIT LIST</u>

| | |
|---|---|
| 3500. | Dr. James Anthony/Riverhills Healthcare |
| 3501. | Dr. Stephen Autry |
| 3502. | Dr. Thomas Bender |
| 3503. | Bethesda North/Good Samaritan |
| 3504. | Dr. John Botsford |
| 3505. | Patty Hall, R.N. |
| 3506. | Dr. C.T. Lee |
| 3507. | Dr. James Leonard/Ohio Valley Orthopaedics |
| 3508. | Mercy Franciscan |
| 3509. | Dr. Gerald Palermo |
| 3510. | Dr. David Randolph |
| 3511. | Dr. Bruce Siegel |
| 3512. | Dr. Robert Whitten |
| 3513. | Mercy Franciscan Hospital |
| 3514. | Patty Hall, RN, GENEX |
| 3515. | Nydic |